**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**BENNY FITZWATER, CLARENCE BRIGHT,
and TERRY PRATER, on behalf of themselves
and others similarly situated,**

        **Plaintiffs,**

        **v.**                                   **No. 2:16-cv-9849**

**CONSOL ENERGY, INC., CONSOLIDATION**        **(Hon. John T. Copenhaver)**
**COAL CO., FOLA COAL CO., LLC, CONSOL
OF KENTUCKY, INC. and KURT SALVATORI,**

        **Defendants.**

**EMMETT CASEY, JR.,
CONNIE Z. GILBERT,
ALLAN H. JACK SR., and
ROBERT H. LONG,
on behalf of themselves and others similarly situated,**

        **Plaintiffs,**

**v.**                                     **No. 1:17-cv-3861**

**CONSOL ENERGY, INC.,**                **(Hon. John T. Copenhaver)**
**CONSOLIDATION COAL CO.,
CONSOL PENNSYLVANIA COAL CO., LLC,
and KURT SALVATORI,**

        **Defendants.**

## AMENDED COMPLAINT OF EMMETT CASEY, JR., ET AL. (No. 1:17-cv-3861)

1.     This case arises out of the Defendants' breach of their fiduciary duties, material

misrepresentations, and termination of critical welfare benefits for a class of retired non-union coal

miners, in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. Sec. 1001, et seq.  Plaintiffs Emmett Casey Jr., Connie Z. Gilbert, Allan H. Jack Sr., and

Robert H. Long, plan participants, bring this action pursuant to ERISA against CONSOL Energy,

Inc., Consolidation Coal Co., Consol Pennsylvania Coal Co., LLC (collectively, "Consol") and Kurt Salvatori, to recover premiums wrongfully charged by Defendants, to remedy Defendants' withholding of retiree welfare benefits (which the Defendants offered, and their employees accepted and paid for), to remedy the Defendants' breach of their fiduciary duties, and to prevent Defendants from discriminating against retired miners based on their health status or claims experience.

Plaintiffs, Messrs. Casey, Jack, and Long, and Ms. Gilbert, as well as other similarly-situated plan participants and beneficiaries, are entitled to continue receiving retiree welfare benefits (i.e. medical, prescription drug, dental, vision, and life insurance) under the applicable benefits plans because the Defendants offered lifetime retiree welfare benefits if the Plaintiffs worked for at least ten years of credited service and reached the age of fifty-five.  The Plaintiffs accepted that offer by working the requisite years and reaching age fifty-five, and they paid premiums to the Defendants in order to secure those benefits.

Plaintiffs seek declaratory, injunctive, and equitable relief, as appropriate, reinstating their benefits and remedying the breach of fiduciary duties, including surcharge for the return of the premiums that Plaintiffs paid with the intent of purchasing lifetime coverage that they did not receive, and restitution to provide Plaintiffs with the same lump sum transition payment that the Defendants provided to active (non-retired) employees when they terminated the retiree benefits, but which the Defendants withheld from those miners who had been on the plans longer (i.e. had a lengthier "claims experience") and had already retired.

2.      The Defendants established a group welfare benefits plan, referred to as the "Lifetime Plan," which covered both active and retired workers at the subsidiaries and entities controlled by Defendant CONSOL Energy. The Defendants contractually entered into that group

2

welfare benefits plan with the workforce, including with the Plaintiffs, based on the written and oral representations that the Defendants made to the Plaintiffs prior to their retirement.

3.     The Lifetime Plan, which is the first welfare plan at issue in this matter, was also periodically referred to by Defendants as being either part of or related to the CONSOL Energy Inc. Retiree Health and Welfare Plan, the Consolidation Coal Company Comprehensive Medical Expense Benefits Plan For Production And Maintenance Employees of Buchanan Mine and/or the CONSOL Energy Inc. Health and Welfare Plan.  The Lifetime Plan included medical, prescription drug, dental, vision, and life insurance for participants and certain beneficiaries.

4.     The second welfare plan at issue in this matter, which is referred to herein as the Retiree Plan, was also referred to on certain plan documents as the CONSOL Energy Inc. Retiree Health and Welfare Plan. This plan also included medical, prescription drug, dental, vision, and life insurance for participants and certain beneficiaries.

5.     In 2014, the Defendants substantially modified the Lifetime and the Retiree Plans, causing a curtailment of coverage for plan participants, including the Plaintiffs.

6.     On or about December 31, 2015, the Defendants terminated coverage of all retirees under the Lifetime and the Retiree Plans. In curtailing and terminating the plans, Defendants allocated the plans' assets for the benefit of persons other than the plan participants and beneficiaries – and the Defendants provided transition payments only to the plan participants who were still actively working, thus depriving the retired plan participants from receiving a transition benefit comparable to that received by the active workers.  Each of those actions separately violate ERISA, as set forth in more detail below.

## JURISDICTION AND VENUE

7.     Jurisdiction over Plaintiffs' ERISA claims is founded on the existence of a federal question.  This action arises under ERISA, 29 U.S.C. § 1001, *et seq*., and jurisdiction is conferred pursuant to 29 U.S.C. § 1132.

8.     Venue is proper in this District pursuant to ERISA, 29 U.S.C. § 1132(e)(2), because this District is where the actions that form the basis for this Complaint took place.

## PARTIES

9.     Plaintiff Emmett Casey is a resident of Bluefield, West Virginia.

10.     Plaintiff Connie Gilbert is a resident of Richlands, Virginia.

11.     Plaintiff Allan Jack Sr. is a resident of Washington, Pennsylvania.

12.     Plaintiff Robert Long is a resident of McMurray, Pennsylvania.

13.     Upon information and belief, over 12,000 similarly-situated, non-union retirees of the Defendants had their retiree welfare benefits terminated by the Defendants in a similar fashion as the named Plaintiffs---including both hourly workers and salaried workers who were directly engaged in coal production (the Defendants referred to these production-oriented salaried workers as "essential" salaried workers, as distinct from corporate staff who were not personally involved in the physical labor of producing coal).

14.     The CONSOL retirees affected by the termination of benefits includes three principal subgroups by geographic region: over 900 similarly-situated, non-union retirees of CONSOL Energy, Inc.'s operations in and around the Buchanan Mine and nearby facilities in southwestern Virginia and southern West Virginia; at least 10,000 similarly-situated non-union hourly and salaried retirees of CONSOL Energy, Inc.'s operations in northern West Virginia, western Pennsylvania, and affiliated locations; and at least 400 similarly-situated non-union hourly

and salaried retirees of CONSOL Energy, Inc.'s operations known as the Amvest and Consol of Kentucky operations (represented in the consolidated matter, *Fitzwater*, No. 2:16-cv-9849).

15.     Each of the regional subgroups is comprised of two subgroups by employment classification: hourly and salaried.

16.     Each of the aforementioned subgroups had their healthcare benefits terminated by the Defendants in a similar fashion as did the named Plaintiffs.

## STATEMENT OF FACTS

17.     Beginning in or around 2001 and thereafter at all relevant times, Defendant CONSOL Energy, Inc. was a Delaware corporation with its principal place of business located at 1000 CONSOL Energy Drive Canonsburg, Pennsylvania 15317.

18.     At all relevant times, Defendant Consolidation Coal Company ("Consolidation Coal") was a Delaware corporation with its principal place of business located at 1000 CONSOL Energy Drive Canonsburg, Pennsylvania 15317.  During the years 2014 and 2015, Consolidation Coal did business as Consol Buchanan Mining Company, LLC in reference to the Buchanan Mine.

19.     Beginning in or around 2008, Defendant Consol Pennsylvania Coal Company, LLC ("Consol Pennsylvania"), which is the successor to Consol Pennsylvania Coal Company, was a Delaware corporation and was (as its predecessor had been at all relevant times) a wholly-owned subsidiary of CONSOL Energy. The principal place of business of Consol Pennsylvania is located at 1000 CONSOL Energy Drive Canonsburg, Pennsylvania 15317.

20.     Defendant Kurt Salvatori was at all relevant times designated as the administrator of all of the employee welfare benefit plans at issue in this matter, exercised final judgment on behalf of those plans as their administrator, and conducted business at 1000 CONSOL Energy Drive Canonsburg, Pennsylvania 15317.

5

21.     At all relevant times, Consolidation Coal Co., Consol Pennsylvania Coal Company, LLC, and Consol Buchanan Mining Co. LLC were wholly-owned subsidiaries of CONSOL Energy.

22.     At all relevant times, Defendants on their own, or in concert, operated underground mines and surface plants and facilities for the extraction, preparation, and transportation of coal, at which the Plaintiffs were employed.

23.     At all relevant times, Defendants controlled and/or operated the Buchanan Mine in Buchanan County, Virginia, at which the Plaintiffs were employed, and Defendants also jointly controlled certain other known and unknown non-union employees at operations in Virginia and West Virginia.

24.     During their employment for the Defendants, Emmett Casey and Bob Long were part of a class of employees referred to by Defendants as the "essential" salaried employees.  These employees consisted of salaried employees who were involved in the production of coal---including section foreman, construction foreman, belt foreman, superintendent, assistant superintendents, and mine foremen, among others.

25.     "Non-essential" salaried employees included corporate safety and office staffers.

26.     During their employment by the Defendants, Connie Gilbert and Allan Jack worked as hourly coal miners at the Buchanan and Enlow Fork Mines, respectively.

   ***Connie Gilbert accepted the offer of lifetime welfare benefits that Consol extended to its non-union hourly workers (known as Production and Maintenance employees).***

27.     Ms. Gilbert began working for Island Creek Coal Company at the VP3 Mine in Vansant, Virginia in 1978, which was a union operation, and she was laid off from that site in 1982.

28.    In 1994, Ms. Gilbert exercised her "panel rights" through the union to go to work for Consolidation Coal Company at the VP3 Mine in Vansant, Virginia.  She worked there until 1997, and then went on the union seniority panel in non-working status.

29.    In 2005, CONSOL Energy called Ms. Gilbert off the panel to go to work at the non-union Buchanan Mine, where the Defendants nonetheless recognized the union seniority panel for purposes of recalling workers from VP3, despite Buchanan being a non-union operation.

30.    The non-union, non-management employees of the Defendants are known as "Production & Maintenance" or "P&M" employees.

31.    When Ms. Gilbert went to work at the Buchanan Mine, Consol's representative Terry Mason gave an orientation to Ms. Gilbert, along with about ten other new miners, in the upstairs office at the Buchanan Mine.  At that orientation, Mr. Mason handed out materials regarding the insurance benefits for the P&M workers at Buchanan.  Mr. Mason stated that if the miners worked for ten years and reached age fifty-five, they would receive retirement benefits for their lives and the lives of their spouses.

32.    At that orientation, Mr. Mason gave the new hires Consol's customary "union speech," saying that the miners should not join the union because they could represent themselves without a union and their retirement benefits would be better than union retirements benefits, which most notably included a Congressionally-backed guarantee of lifetime duration.

33.    When miners were approaching the age of fifty-five (55) years of age, Consol customarily sent them a letter in the mail notifying them about their right at that time, as participants in the insurance plan providing retirement insurance benefits (the Lifetime Plan), to attend a seminar free of charge to provide comprehensive information about the retirement benefits.

34.     On or about September 26-27, 2006, having received such a letter, Connie and her husband Dana went to a retirement seminar in or around Pittsburgh, Pennsylvania to learn about their rights as participants in the retirement plan.  Consol did not distribute to Connie any additional binders or other thick documents regarding retirement benefits, such as a summary plan description, either at that seminar or afterwards.

35.     Thereafter, Consol's representative Nancy M. Johnson informed Ms. Gilbert that she could claims her lifetime retirement benefits upon attaining the age of fifty-five and the years ten years of service.

36.     Consol made pre-tax deductions from each of Ms. Gilbert's paychecks throughout her working life, which upon information and belief Consol used to pay for retiree benefits or for the funds, securities, and/or bonds that secured the retiree benefits.

37.     On September 30, 2014, Ms. Gilbert retired from Consol and claimed her retirement benefits.

38.     On June 16, 2015, Consol sent Ms. Gilbert a letter stating that her retirement benefits would terminate at the end of 2015.  In Sept. 2015, Consol sent Ms. Gilbert a letter purporting to offer her a payment to compensate her fully for the loss of her retirement benefits.

***Emmett Casey accepted Consol's offer of lifetime retirement benefits for essential salaried employees.***

39.     On or about January 22, 1973, Mr. Emmett Casey began employment for Consolidation Coal Company through the Bishop Coal Company at Bishop, West Virginia. Mr. Casey worked as a general laborer and a union member for three years, running production equipment at the face of the mine. After three years, Mr. Casey was offered a job as section foreman – a salaried position involved in the production of coal underground.

40.     On or about February 1, 1976, Consol called all the prospective foreman trainees, including Mr. Casey, to a class at a restaurant in Bluewell.  A personnel official from Consol, named Ray Phillips, conducted an orientation about the guidelines and benefits of becoming a salaried employee.

41.     At the time that Mr. Casey considered becoming salaried, the union was engaging in strikes frequently.  Mr. Casey had saved up a substantial sum of money, and then had to spend everything he had saved to cover his bills during the strike.  Consol told him that he would have a lower wage but would have benefits by working for the company.

42.     On or about February 1, 1976, Consol called Mr. Casey to attend a foreman's class. The class took place at the old Crane Creek School in Crystal, West Virginia. The instructors were Consol employees Jim Jones, Archie Maynard, and Gerald Nicholson, who worked out of Consol's Pocahontas, Virginia main office.  The training was six weeks in length.  Consol paid Mr. Casey to attend the training for eight hours per day.  Consol executives spoke to Mr. Casey and the other trainees about coming to work as foremen, including a detailed description of retirement benefits.

43.     During that training, Consol officials represented that, once you retired as a non-union foreman, you would have lifetime welfare benefits, a pension check, and various other benefits.

44.     During the training, Consol offered supervisors that they could always return to serving as hourly employees in union operations if they were unsatisfied with their benefits as supervisors.

45.     Mr. Casey repeatedly viewed written materials presented by Consol that offered Mr. Casey and the other non-union foreman a lifelong retirement healthcare and related benefit package including medical, prescription drug, vision, dental, and life insurance.

46.     Archie Maynard, who was the head of the safety and industrial relations departments during the time that Mr. Casey worked for Pocahontas Fuel Division of Consol, presented a slide show to Mr. Casey and other foreman regarding that offer of lifetime welfare benefits.  Anne Sharpenberger, along with other Consol officials, also presented a benefit class for the salaried employees at the Bishop Mine that Mr. Casey attended, in which the non-union foremen were invited to designate beneficiaries for their lifetime welfare benefit plans.

47.     From 1976 through 1991, Mr. Casey worked as a non-union foreman for various Consol operations including: Pocahontas Fuel, Bishop Mine, Rowland No. 9, Jekinjones, Itmann No. 2, Matthews No. 2 Mine, and Amonate.

48.     After Consol closed down the section of the Amonate Mine where Mr. Caser worked in late 1991, Consol transferred Mr. Casey to the Buchanan Mine where he worked for the following twenty years.

49.     On or about April 19, 1992 Mr. Casey began working as an hourly employee underground producing coal.  He held that job until November 1, 1992 when he began to serve as a salaried production foreman at the Buchanan Mine.

50.      Throughout Mr. Casey's working life, Consol made annual presentations stating that he was entitled to the retirement benefits for him and his family until he passed away, including slide shows and presentations by senior Consol officials such as chief executive officers Brett Harvey or Bobby Brown. Gerald Kowzan, Nancy Johnson, and Gene Bailey would assist in making presentations, reading the written slides shows and printed materials out loud to Mr. Casey and his fellow workers, and answering questions from those workers under the apparent authority of Consol.

10

51.     Consol uniformly explained to Mr. Casey and other non-union workers that, as a non-union foreman or a non-union hourly worker, a miner's spouse would have retirement benefits until the spouse passed away or remarried. Children who were at home or in college would have healthcare up to age 26 or employed by a company that offered them insurance.  In all explanations provided Mr. Casey and other non-union workers, Consol never represented that benefits were subject to being eliminated.

52.     During the annual trainings, Consol stated that it cared an immense amount for its workers and that any changes to the policy would be made in the best interest of the beneficiaries.

53.      Consol made several changes to their benefits plans over the years, but never once did Consol indicate that the lifetime benefits eligibility could be rescinded after a worker had accepted the offer and the eligibility had vested.

54.     On February 1, 2013, Mr. Casey retired from Consol.  By that time, he had attained the necessary age to retire under the Lifetime Plan.

*Allan Jack and Bob Long accepted Consol's offers of lifetime retirement benefits for hourly and essential salaried employees.*

55.     <u>Robert "Bob" Long.</u>      In 1967, Mr. Bob Long began working for Consolidation Coal Co. as a union miner.  However, in 1969, he was promoted to serve as an "essential" salaried employee—that is, a mine foreman directly engaged in the production of coal underground.

56.     Mr. Long worked for Consol for more than ten years.

57.     In 2003, having reached the age of fifty-five, Mr. Long exercised his retirement through the Defendants.

58.      <u>Allan Jack</u>.   In July 1991, Allan Jack Sr. began working for Consol Pennsylvania as a non-union hourly miner at the Enlow Fork Mine in Washington County, Pennsylvania.

59.     Mr. Jack worked for Consol for more than ten years.

11

60.     In 2009, having reached the age of fifty-five, Mr. Jack exercised his retirement through the Defendants.

### *Common experience of Plaintiffs as plan participants*

61.     At the times that Plaintiffs began their jobs as non-union employees of Consol, the Defendants presented each of them with written materials, as part of a formal orientation for all new non-union miners, regarding the retiree welfare benefits for which the new hires became eligible.

62.     The Plaintiffs observed that the Defendants routinely made this presentation for their newly-hired, non-union miners.

63.     The Defendants' orientations materials and presentations for new non-union miners stated that, if a Consol employee garnered ten years of service and reached the age of fifty-five, he or she would receive retiree welfare benefits (medical, prescription drug, dental, vision, and life insurance) for that employee, and his or her dependents, for the remainder of their lives.

64.     In addition to reaching those thresholds for age and years of service, the employee had to pay premiums to the Defendants while they worked and also after they retired, in order to secure eligibility for the lifetime retiree welfare benefits.

65.     Consol's retiree benefits provided primary coverage through age 65 and then reverted to secondary coverage after the retiree became eligible for Medicare.

66.     Each year, during an annual "refresher" training, the Defendants and their agents, including Mr. Luke Gianato and Gerald Kowzan, reviewed the retiree benefits with the Plaintiffs and all of their co-workers together in groups, and specifically stated that the miners would not lose their retiree benefits once they had vested based on their age, years of service, and payment of premiums.

67.     Routinely throughout the entire working lives of the Plaintiffs and their co-workers, the Defendants and their agents created, supervised, and/or delivered annual written presentations stating that their employees would receive the retiree welfare benefits for them and their dependent family members as promised, so long as the miner satisfied the eligibility criteria of age and tenure, and paid the specified premiums.

68.      During their retirement, the Plaintiffs were receiving retiree welfare insurance coverage from the Defendants---medical, prescription drug, dental, vision, and life insurance.

69.     The Defendants never told the Plaintiffs that the retiree welfare benefits were subject to being eliminated for those retirees who had already paid in and exercised their right to retire.

70.     The Defendants stated that any changes to the retiree welfare benefits would be made in the best interest of the participants and beneficiaries.

*The Defendants' representations about the retiree welfare benefits were significant for the Plaintiffs and substantially inflated the value that the Plaintiffs were willing to pay for premiums during their active working lives and during their retirement, in order to secure the promised access to the retiree welfare benefits.*

71.     The retiree welfare benefits induced the employees of the Defendants, including the Plaintiffs, to rely on those Defendants' promises by continuing to work for the Defendants despite their inability to form a union.

72.     Defendants also used the lifetime benefits to induce their employees to accept lower-wage and lower-salary positions in exchange for the promise of lifetime benefits.

73.     Plaintiffs relied on the Defendants' promises by paying premiums and working for Defendants for at least ten years---that is, foregoing wage increases within the company, retiring earlier than they otherwise might have, and/or rejecting other more lucrative job opportunities.

74.     These promises of lifetime benefits induced the employees of the Defendants, and of their affiliated employers, to work for Defendants until they became eligible for retirement--a

13

process that the Defendants told the workers required at least ten years of service to the Defendants and the attainment of age fifty-five.

75.   The Defendants' promises regarding lifetime benefits constituted a welfare benefits plan enforceable under ERISA (the "Lifetime Plan").

76.   The Defendants' employees, including the Plaintiffs, were not provided with a copy of a so-called "Retirement SPD"---that informed the employees that there were any differences in the welfare benefits of retirees vis-a-vis those of active employees---at any time before those employees reached the age and tenure necessary for retirement.

77.   At no point before they became eligible for retirement were employees provided with the information or resources necessary to access the Retirement SPD.  Defendants did not inform their employees about the Retirement SPD or the Retirement Plan until after they reached fifty-five and had worked at least ten years with Defendants.

78.   The Retirement SPD, which the Defendants withheld during the course of Plaintiffs' employment and first provided to employees---if at all---only after the employees had become eligible for retirement, included language purporting to reserve the right for the Defendants to terminate the CONSOL Energy, Inc. Retiree Medical and Prescription Drug Expense Benefits Plan (the "Retiree Plan") at any time.

79.   The Retirement SPD described the Retiree Plan, which constituted a separate and distinct plan, unaffiliated with the Lifetime Plan.  To the extent that the Retiree Plan contained reservations of rights to terminate, those reservations of rights applied to the Retiree Plan and not to the Lifetime Plan.

80.   The first time that Plaintiffs were able to see the terms of the Retirement SPD, they had already worked for Defendants for over ten years, and paid premiums throughout that time, in

14

order to secure eligibility for lifetime retiree welfare benefits, in reliance on the Defendants' representations concerning lifetime benefits made repeatedly over the course of decades.

81.    The Defendants, through their misrepresentation of the terms of the retiree benefits and their regular, repeated, and material misrepresentations about the lifetime nature of benefits, have induced employees to accept lower wages, discontinue labor organizing efforts, continue working for Defendants for many years, and finally to retire and relinquish their earning power as active Consol employees earlier than they otherwise might have retired.

82.    On or about the time in 2014 that the Defendants sought to curtail and to commence a termination process for the retiree welfare benefits, the Plaintiffs learned for the first time that the Defendants were then asserting that they had two distinct plans---an Active Employee Plan and a Retiree Plan---which the Defendants then asserted to contain reservations of rights to alter or terminate benefits even after a person had retired.

83.    This newly-asserted right to terminate the receipt of benefits, after a worker had already exercised his or her retirement option, comprised a new term that Defendants had not previously presented to the Plaintiffs.

***The Defendants' SPDs misled participants by promoting the perception that there was a single Lifetime Plan***

84.    When identifying plans under ERISA, the Department of Labor has established that each distinct plan is required to have its own unique plan number.

85.    Despite Defendants' representations to employees that the Active Employee Plan and Retiree Plan were distinct, the SPDs for those plans shared a common plan number, 581.

86.    The Defendants persistently represented the welfare benefits to the workforce---including to the Plaintiffs---as being a single, unified employee welfare benefits plan (the "Lifetime Plan").

15

87.     The Defendants contractually entered into those benefits as a plan between the Defendants and the Plaintiffs, in a mutual understanding that was comprised of the written and oral representations that the Defendants made to the Plaintiffs prior to their retirement.

88.     The Defendants understood that distinct employee welfare benefit plans should be uniquely and separately identified by distinct Plan Numbers.

89.     Yet, the SPD and the Retirement SPD--the plan documents that were actually shared with the beneficiaries---all shared the same Plan Number (581), the same Plan Administrator, the same effective start date of January 1, 2006, and the same underlying welfare benefits.

90.     The Defendants' use of the same Plan Number, Plan Administrator, and effective start date in both the Employee SPD and the Retirement SPD further indicated that the Defendants were not truly presenting their workers with those two distinct plans, but rather a single Lifetime Plan---promising lifetime welfare benefits, which could not be terminated after retirement.

91.     If the Defendants intended that the Employee and Retiree Plans were to operate as distinct plans, they misrepresented that intention by the aforementioned conduct.

92.     In misrepresenting the relationship between the Active Employee Plan, the Lifetime Plan, and the Retiree Plan, Defendants fraudulently misrepresented the terms, eligibility requirements, and rights and obligations included within the Lifetime Plan that had already been offered to and accepted by employees and retirees, including the Plaintiffs, prior to the presentation of the Retirement SPD.

93.     Upon information and belief, the above misrepresentations offered significant potential for financial gain to Defendants. By offering incomplete, inaccurate, and misleading disclosures, Defendants were able to induce employees to reject unionization, accept lower wages,

continue working for Defendants, and pay higher premiums to secure their welfare benefits as both active workers and retirees---all of which redounded to the Defendants' financial advantage by decreasing the amount of Defendants' assets that had to be devoted to financing the welfare benefits of the Plaintiffs and the other retired and active workers.

94.     In the fall of 2014, the Defendants informed retirees--that is, the elderly subset of the individuals who were covered under the single Lifetime Plan--that their welfare benefits would be terminated no later than December 31, 2019. This change eliminated all or substantially all of the benefits available to those retirees under the Plan in outlying years after 2019, and upon information and belief it decreased the contribution rate required of the Defendants to maintain the residual benefits plans.

95.     Indeed, the annual reports on retiree benefits maintained by the Department of Labor indicate that as many as 16,000 plan participants lost the welfare benefits that they were receiving from the Defendants under the Lifetime Plan and related plans during 2014 alone.

96.     In or around June of 2015, the Defendants contacted retirees, including the Plaintiffs, to inform them that their welfare benefits would be terminated by December 31, 2015.

97.     The Defendants did not simply terminate the benefits of all active non-union employees in this same manner. Instead, the Defendants allowed those active employees to choose between two options.  First, they could retire and continue receiving the same benefits for five years.  Second, they could continue working and receive a lump sum payout from Defendants in lieu of further benefits.

98.     For workers with between ten and twenty years of service to the Defendants, the lump sum payout made available to each worker was $25,000.  For workers with twenty or more years of such service, the lump sum payout was $50,000.

17

99.     Defendants did not offer retired employees the opportunity to accept such lump sum payouts when the Defendants cancelled their benefits.

100.     Over 12,000 non-union, retired employees---and perhaps as many as 16,000---were affected by Defendants' unlawful conduct.

101.     The class seeking relief consists of all of the non-union, retired employees of Defendants whose benefits were terminated as described herein.  The class is comprised of three regional subclasses, each containing two subgroups by employment status---i.e. the hourly non-union retirees, and the "essential" salaried non-union retirees.

102.     The assets of the relevant plan or plans include the participant contributions, the plan investments, and any security or bonds that are or were put in place to balance the Defendants' financial condition based upon an analysis of audited financial statements and the full accrued value of current liability for future claim payments based upon generally accepted actuarial and accounting principles of the Defendants' existing and expected liability.

103.     At all relevant times, CONSOL Energy Inc. has been the Plan Sponsor of the Lifetime Plan, within the meaning of ERISA, 29 U.S.C. § 1002(16)(b) because it has been so designated in the governing plan instruments.

104.     At all relevant times, the Vice President of Human Resources at CONSOL has been the Plan Administrator of the Lifetime Plan within the meaning of ERISA, 29 U.S.C. § 1002(16)(a), because he has been so designated in the governing plan instruments.

105.     Plaintiffs are entitled to bring this civil action to restore their welfare benefits, to enjoin any act or practice which violates any provision of ERISA or the terms of the Plan, to disgorge the financial benefits of the Defendants' breach of their fiduciary duty, to disgorge the

profits therefrom, and/or to obtain other appropriate equitable relief. *See* 29 U.S.C. § 1132(a)(1), (2), (3).

## CLASS ALLEGATIONS

106.     Plaintiffs bring this action on their own behalf and on behalf of all other similarly situated individuals, pursuant to Rule 23 of the *Federal Rules of Civil Procedure*. The class consists of all non-union retirees from CONSOL Energy, and its subsidiaries and affiliated entities, whose retiree welfare benefits were curtailed or terminated in 2014 or 2015.

107.     The requirements of Rule 23 are satisfied as follows:

(a)     The class is numerous, with over 12,000 members, and joinder is impracticable due to the high number of plaintiffs that would frustrate the coordination of multi-plaintiff litigation involving so many affected individuals;

(b)     There are questions of law and fact common to all members of the class, which predominate over any questions affecting only individual members, regarding the ERISA plans and the facts surrounding the entry of those plans and the conditions of their curtailment or termination; and

(c)     The named Plaintiffs' claims are typical of those of the class as a whole because the named Plaintiffs were subject to the same curtailments and terminations, and were injured as a result, in the same manner as were the rest of the putative class members.

108.     The Plaintiffs have displayed an interest in vindicating the rights of the class members, will fairly and adequately protect and represent the interests of the class, and are represented by skillful and knowledgeable counsel. The relief sought by the named Plaintiffs will inure to the benefit of the class generally.

## FIRST CAUSE OF ACTION
**Breach of Fiduciary Duty**

## 29 U.S.C. § 1104(a)(1)(A)(i)

109.    Plaintiffs incorporate the preceding paragraphs by reference.

110.    At all relevant times, Defendants were fiduciaries as to the Lifetime Plan, as defined in 29 U.S.C. § 1002(21).

111.    The Defendants are fiduciaries with respect to the terms of enrollment and the scope of benefits in the applicable plans, including the Lifetime Plan, because they exerted control or authority over the management, administration, and/or disposition of the terms or assets of the plan or plans, and because they appointed other fiduciaries, including Luke Gianato, Terry Mason, Nancy M. Johnson, and Gerald Kowzan, among others, to exert control with respect to those same terms.

112.    29 U.S.C. § 1104(a)(1) requires that a fiduciary must discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration.

113.    Defendants breached their fiduciary duty and induced participants to make choices that were financially valuable for Defendants and detrimental to the participants by overstating and misrepresenting the value of the welfare benefits that the Plaintiffs earned by their labor and purchased by paying premiums, by releasing inaccurate SPDs to employees and retirees, by providing active workers with greater benefits than retired workers, and by not adhering to the terms of the Lifetime Plan.

114.    When the Defendants represented to the Plaintiffs that the Lifetime Plan would provide welfare benefits for the lifetimes of the Plaintiffs and their dependents, the Defendants misrepresented the Lifetime Plan.

115.    When the Defendants accepted the Plaintiffs' continued employment in exchange for the promise to provide the Lifetime Plan, the Defendants fraudulently induced the Plaintiffs into accepting the Lifetime Plan.

116.    When the Defendants accepted premiums from the Plaintiffs as consideration for enrollment in the plan on the basis of the promise of lifetime welfare benefits, the Defendants became bound by their promise to provide lifetime welfare benefits.

117.    Defendants thus violated ERISA, 29 U.S.C. § 1104(a)(1) by breaching their fiduciary duties when they took actions to increase revenue for the corporate sponsor of the plan by misrepresenting the benefits to the plan beneficiaries – thus acting not exclusively for the purpose of providing benefits to participants and their beneficiaries.

## SECOND CAUSE OF ACTION
### Enforcement of the ERISA Plan Entered into by Defendants' Representations
### 29 U.S.C. 1132(a)(1), (2), and (3)

118.    Plaintiffs incorporate the preceding paragraphs by reference.

119.    At all times relevant, the Plaintiffs were participants in an enforceable ERISA plan arising from the written representations, and consistent oral representations, made by the Defendants regarding the lifetime availability of the medical, prescription drug, vision, dental, and life insurance benefits as set forth above.

120.    The Plaintiffs were participants in the Lifetime Plan (separate from any plan that reserved the right to terminate benefits after a participant earned their retirement) at the time that Defendants, by their agents, including Luke Gianato, Terry Mason, and Gerald Kowzan, among others, made representations to the Plaintiffs concerning the lifetime nature of their welfare benefits, and at the time that the Plaintiffs detrimentally relied on those representations by paying

premiums and working for Defendants at least ten years---thus foregoing other job opportunities, retiring earlier than they otherwise might have, and/or foregoing union representations.

121.    The Active Employee Plan expressly excluded and disclaimed any authority over the benefits provided to inactive (that is, retired) or non-full time employees, so any reservations of rights asserted in the Active Employee Plan, or by the SPD, could not have applied to the Lifetime Plan.

122.    Since the time that they retired, the Plaintiffs have not been active, full-time employees as defined by the Active Employee Plan.

123.    Oral representations to Plaintiffs concerning the lifetime nature of their welfare benefits as participants in the Lifetime Plan did not conflict with any terms of the Active Employee Plan (or of the Lifetime Plan), and such oral representations fell entirely outside of the scope of the Active Employee Plan.

124.    The Plaintiffs were not participants in any contradictory ERISA plan at the time that they relied on the Defendants' representations. Accordingly, the Defendants' representations of lifetime welfare benefits were not an amendment to any other ERISA plan to which Plaintiffs were participants, and the promise of lifetime welfare benefits created the Lifetime Plan based on the oral representations made by Defendants.  If the representations were amendments to another plan, they were not inconsistent with the terms of such other plan.  The Lifetime Plan was and remains an enforceable plan under ERISA.

125.    The terms of the Lifetime Plan entered into by Defendants are plain on their face and should be interpreted to entitle Plaintiffs to the lifetime welfare benefits which the Defendants regularly and repeatedly described and promised to the Plaintiffs.

### THIRD CAUSE OF ACTION
**Discrimination Against Individual Participants and Beneficiaries in the Retiree Plan**

**Based on Health Status-Related Factors**
**29 U.S.C. § 1182**

126.     Plaintiffs incorporate the preceding paragraphs by reference.

127.     29 U.S.C. § 1182(a)(1) prohibits a group health plan from establishing rules for eligibility (including continued eligibility) based on health status-related factors.

128.     29 U.S.C. § 1182(b) prohibits a group health plan from requiring an individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor.

129.     Included among the prohibited health status-related factors are health status, medical condition, claims experience, receipt of healthcare, medical history, and disability.

130.     Individuals who had already retired as of September 30, 2014 necessarily had a lengthier history of filing claims under the applicable Plan, and receiving healthcare under that Plan (i.e., they had a lengthier claims experience), and also tended to be less healthy due to their advanced age relative to the active workers.

131.     In deciding to terminate benefits without a cash transition payment for the individuals who had already retired as of September 30, 2014, the Defendants unlawfully established and enforced rules for eligibility for the cash transition payment under the Lifetime Plan and/or the Retiree Plan based on the health status-related factors of health status, medical condition, claims experience, receipt of healthcare, medical history, and/or disability.

132.     Defendants' establishment of rules limiting and then terminating welfare benefits only for those retired employees over the age of fifty-five – while offering no offsetting payout to those employees, as they had offered to those younger, active employees with superior health status – was based on health status. The rules were based on health status because they

23

distinguished between those who were entitled to receive the payout and those who were not based on the retirement status of those individuals, and because those individuals who were retired were known to have a health status that was inferior to that of the other younger workers whose benefits were not terminated in the same fashion.

133.     Insofar as the Defendants provided a cash transition payment to the non-retired participants in the Lifetime Plan, but required the retired participants to continue paying larger premiums or contributions after the curtailment in 2014, the Defendants violated 29 U.S.C. § 1182(b).

134.     In establishing and enforcing rules that limited the Plaintiffs' eligibility or continued eligibility for benefits, Defendants did not comply with the requirements established in 29 U.S.C. § 1182(a)(1) and thus acted unlawfully under ERISA.

**FOURTH CAUSE OF ACTION**
**Failure to Meet Duty of Disclosure with Respect to Summary Plan Descriptions**
**29 U.S.C § 1021(a)(1)**

135.     Plaintiffs incorporate the preceding paragraphs by reference.

136.     ERISA, 29 U.S.C. § 1021, requires that plan administrators provide all plan participants and beneficiaries with accurate SPDs, conforming to the requirements of 29 U.S.C. § 1022(a).

137.     29 U.S.C. § 1022(a)(1) requires that SPDs be sufficiently accurate and comprehensive to reasonably apprise participants of their rights and obligations under the plan.

138.     Defendants provided Plaintiffs with no SPDs or with incomplete SPDs for many years. Those SPDs did not mention important benefits and obligations under the Lifetime Plan.

139.    The Plaintiffs did not receive the Retirement SPD, with the additional inconsistent terms, until those Lifetime Plan participants had reached at least age fifty-five and had worked for Defendants for a minimum of ten years.

140.    By excluding information about benefits that the plan confers upon retirement, Defendants provided inaccurate and incomplete SPDs to plan participants and beneficiaries, making it impossible for them to adequately be aware of their rights and obligations under the Lifetime Plan.

141.    By failing to provide accurate or comprehensive SPDs, Defendants violated their duty of disclosure under 29 U.S.C. § 1021.

142.    Plaintiffs are entitled to bring this civil action to enjoin any act or practice which violates any provision of ERISA or the terms of the Plan, and/or to obtain other appropriate equitable relief.  *See* 29 U.S.C. § 1132(a)(3).

## FIFTH CAUSE OF ACTION
### Failure to Provide Accurate and Comprehensive Summary Plan Description
### 29 U.S.C § 1022(a)

143.    Plaintiffs incorporate the preceding paragraphs by reference.

144.    Defendants' knowing and willful distribution of inaccurate and non-comprehensive Plan descriptions violates 29 U.S.C. § 1022(a) and the SPD requirements contained therein.

145.    SPDs provided by Defendants were neither accurate nor comprehensive, as set forth in preceding paragraphs, based on the inaccurate Plan Number, and the exclusion of information about benefits that the plan confers upon retirement.

## SIXTH CAUSE OF ACTION
### Failure to Accurately State the Plan's Requirements with Respect to Eligibility
### 29 U.S.C § 1022(b)

146.    Plaintiffs incorporate the preceding paragraphs by reference.

147.    To the extent that the Defendants did make available an SPD to certain of the Plaintiffs and the class, the Defendants only gave the Plaintiffs a single SPD, which the Defendants represented to apply to all benefits, including for both active and retired workers.

148.    Because the text of that SPD did not address any potential limitations on the promise of lifetime benefits under the Lifetime Plan, the only terms that the Plaintiffs could rely on as to the terms, scope, or duration of the Lifetime Plan were the oral representations made by the Defendants and their agents.

149.    Accordingly, insofar as the Defendants assert that they had a right to refuse eligibility for the Lifetime Plan, the SPDs that the Defendants offered to the Plaintiffs did not accurately state those terms, in violation of 29 U.S.C § 1022(b).

150.    The text of the SPD provided to the Plaintiffs and the other putative class members stated that only active, full-time employees were eligible to receive benefits.

151.    In reality, even though the SPD did not address retirees, the Defendants' oral representations indicated that the Plaintiffs were also enrolling in the Lifetime Plan at the time that they enrolled in the medical benefits plan as active workers, and consequently the SPD that the Plaintiffs received did not accurately state all of the plan's requirements with respect to eligibility for lifetime benefits.

152.    This misrepresentation was a violation of ERISA which prejudiced the Plaintiffs by depriving them of adequate notice of their benefits.

## SEVENTH CAUSE OF ACTION
### Failure to Provide an Adequate Summary Plan Description in a Timely Manner
### 29 U.S.C. § 1024(b)(1)

153.    Plaintiffs incorporate the preceding paragraphs by reference.

154.   ERISA at 29 U.S.C. § 1024(b)(1) requires that plan administrators and sponsors produce an accurate copy of the Summary Plan Description to plan participants and beneficiaries in a timely manner.

155.   Defendants failed to provide an accurate Summary Plan Description to plan participants and beneficiaries for many years after they were covered by the Lifetime Plan – or after they were covered by the Active Employee Plan and by the Retiree Plan, if those were separate plans.

156.   Because Defendants failed to provide an accurate Summary Plan Description within the required 90-day or 120-day period, they violated § 1024(b)(1) of ERISA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court would:

I.      Enjoin Defendants from any further violation of their ERISA fiduciary responsibilities, duties and obligations;

II.     Compel the Defendants to honor the terms of the Lifetime Plan entered into by Defendants, requiring Defendants to provide Plaintiffs and their beneficiaries with the specified lifetime welfare benefits;

III.    Compel the Defendants to treat the retirees the same as they treated the active employees by allowing the retirees either to maintain their terminated benefits or to receive the same lump sum payouts that the Defendants' active workers could elect to receive in lieu of ongoing benefits;

IV.     Issue an order of surcharge, accounting for profits, and restitution, compelling Defendants to return the value of the premiums paid by the Plaintiffs during their working lives and their retirement;

V.      Direct the Department of Labor to assess all appropriate civil penalties pursuant to 29 U.S.C. 1132, et seq., 29 C.F.R. § 2560.502c-7.

VI.      Award such other equitable or remedial relief as may be appropriate, including disgorgement of the financial benefit obtained by the Defendants through their breach of their fiduciary duties;

VII.      Award to the Plaintiffs their reasonable costs and attorney fees, pursuant to 29 U.S.C. § 1132(g); and

VIII.   Grant any such other and further relief as this Court may deem just and proper.


**Emmett Casey Jr., Connie Z. Gilbert,
Allan H. Jack Sr., and Robert H. Long,
on behalf of themselves and all others similarly situated,
PLAINTIFFS,
BY COUNSEL,**


   /s/ Samuel B. Petsonk
Samuel B. Petsonk (W. Va. Bar ID No. 12418)
Bren J. Pomponio (W. Va. Bar ID No. 7774)
Mountain State Justice, Inc.
1031 Quarrier Street, Suite 200
Charleston, West Virginia 25301
(304) 344-3144
(304) 344-3145 (fax)
sam@msjlaw.org
*Counsel Plaintiffs*