UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

BENNY FITZWATER, CLARENCE
BRIGHT, TERRY PRATER,
EMMET CASEY, JR., CONNIE Z.
GILBERT, ALLAN H. JACK, SR.,
and ROBERT H. LONG, on behalf of
themselves and others similarly
situated,

        Plaintiffs,

v.                           Civil Action No. 2:16-cv-09849

CONSOL ENERGY, INC.,         Consolidated with:
CONSOLIDATION COAL CO.,      Civil Action No. 1:17-cv-03861
FOLA COAL CO., LLC,
CONSOL OF KENTUCKY, INC.,
CONSOL PENNSYLVANIA COAL CO.,
LLC, and KURT SALVATORI,

        Defendants.

MEMORANDUM OPINION AND ORDER

Pending is defendants' motion for summary judgment,

filed May 29, 2020.  ECF No. 231.

I.    Background

As this case has progressed, plaintiffs' claims have

distilled down to two key issues: (1) whether plaintiffs were

misled by fiduciaries of an ERISA plan regarding the nature and

duration of their welfare benefits; and (2) whether defendants

discriminated against plaintiffs based on health status-related factors in violation of ERISA.

The seven named plaintiffs include Benny Fitzwater, Clarence Bright and Terry Prater ("Fitzwater Plaintiffs"), and Emmett Casey, Jr., Connie Z. Gilbert, Allan Jack Sr. and Robert H. Long  ("Casey Plaintiffs").[1]  Plaintiffs worked at four current or former subsidiaries of CONSOL Energy, Inc.: (a) Fola Coal Company, L.L.C. ("Fola"); (b) CONSOL of Kentucky Inc. ("CKI"); (c) CONSOL Pennsylvania Coal Co., LLC ("CONSOL Pennsylvania"), and (d) Consolidation Coal Company ("Consolidation") (collectively, "CONSOL").  In addition to these corporate defendants, plaintiffs also bring the same claims against Kurt Salvatori, CONSOL Energy, Inc.'s Vice President of Human Resources from 2011-2016.

To briefly summarize the work history of the Fitzwater Plaintiffs, Fitzwater worked at a Fola site in West Virginia since 1995, shifting to CONSOL when it acquired Fola in 2007. He was laid off in February 2013 and had his retiree benefits terminated in September 2014.[2]  Bright was also a Fola employee

---

[1] On December 22, 2017, Civil Action No. 2:16-cv-09849 was consolidated with Casey v. CONSOL Energy, Inc., No. 1:17-cv-03861 (S.D.W. Va. filed Aug. 23, 2017).

[2] Defs.' Ex. 6 ("Fitzwater Dep.") 13:7-14:6, 40:1-13, 145:10-148:12; Answer to Am. Fitzwater Compl. ("ECF No. 44") ¶¶ 29-30,

since 1995 and joined CONSOL after its acquisition.  He was laid off in June 2013 and retired in May 2014.[3]  Prater started working for CONSOL in November 2000 and retired on September 30, 2014.[4]  As to the <u>Casey</u> Plaintiffs, Casey started working for Consolidation in the 1970s, began working as a salaried employee at the Buchanan Mine in November 1992, and retired on February 1, 2013.[5]  Although Gilbert worked at Consolidation in a union hourly position from 1994 to 1997, she only started working at CONSOL's Buchanan Mine located in Virginia in 2005, where she held a non-union hourly position until she retired on September 30, 2014.[6]  In 1991, Jack started working at the Enlow Fork Mine located in Pennsylvania as a non-union hourly miner for CONSOL Pennsylvania, retiring in 2009.[7]  Long started working for Consolidation as a union miner in 1967, moved to a salaried position at the Enlow Fork Mine in 1991, and continued to work

---

32.  All of defendants' exhibits in support of their motion for summary judgment are referred to as "Defs.' Ex."

[3] Defs.' Ex. 5 ("Bright Dep.") 11:7-19, 65:15—66:5, 67:1-12; ECF No. 44 ¶ 31.

[4] Defs.' Ex. 8 ("Prater Dep.") 11:18-20, 14:11-15:12.

[5] Defs.' Ex. 10 ("Casey Dep.") 13:15-17, Answer to Am. <u>Casey</u> Compl. ("ECF No. 108") ¶¶ 49, 54.

[6] Defs.' Ex. 11 ("Gilbert Dep.") 14:18—15:11; ECF No. 108 ¶¶ 28-29, 37.

[7] Defs.' Ex. 7 ("Jack Dep.") 21:22-23, ECF No. 108 ¶ 60.

for Consolidation until retiring in 2003.[8]  Defendants offer the
following graph summarizing these events:



Plaintiffs maintain that during their employment at
CONSOL, defendants made oral and written promises of lifetime
medical benefits coverage to non-union miners and their
beneficiaries, all of which comprised a "Lifetime Plan,"
consisting of lifetime medical, prescription drug, dental,
vision, and life insurance coverage.  Defendants dispute that
any such Lifetime Plan existed.  In opposition to summary
judgment, plaintiffs largely rely on the same written materials
evaluated by the court's October 2019 decision denying
plaintiffs' supplemental motion for class certification.  See
ECF No. 203.

First, plaintiffs furnish new-hire orientation scripts
used at CONSOL's Enlow Fork and Bailey Mines in Pennsylvania
around 1990, which state that "[t]his wage and benefit package
is clearly superior to any . . . wage and benefit package

---

[8] Defs.' Ex. 12 ("Long Dep.") 27:18–28:8, 34:1-19; ECF No. 108
¶ 55.

negotiated by the UMWA [(United Mine Workers of America)] for anybody anywhere." ECF No. 66-1 at 7-9. ECF No. 67-2 ("Salvatori Decl.") ¶¶ 4-6, 13. Second, plaintiffs cite a "Know the Facts" handbill distributed by CONSOL and its subsidiaries to miners at the Fola operations around 2010. ECF No. 66-5. It states that "[y]ou are eligible for Retiree Health Care . . . once you have 10 years of service and reach age 55." It further concludes, "This is a better deal than the UMWA negotiated in the national contract. AND REMEMBER, IT DIDN'T COST YOU A PENNY IN DUES OR ASSESSMENTS." See ECF No. 66-5. It does not state that such benefits were "vested" for life.

Plaintiffs also support their claims with testimony that CONSOL representatives made oral representations of guaranteed lifetime benefits. Jack testifies that the orientation attendees interpreted the reference to UMWA in the CONSOL scripts to mean that they "were promised to have exactly the same benefits" as UMWA, with the knowledge that "UMWA represented coal miners -- would never ever go without health care in retirement." Jack Dep. 96:15-97:11 (testifying that CONSOL's Human Resources representative, Luke Gianato, told him during new hire employer orientation "that some day, when you retire, you and your wife will be covered for life.").

Prater testifies that during his orientation when he joined CONSOL in 2000, the films shown to new employees stated that once employees obtained ten years of service and reached age 55 and retired, "we get medical[,] insurance and prescription the rest of our life until we turned 65 years of age.  Then CONSOL's insurance would drop down to a supplement to our Medicare."  Prater Dep. 28:23-29:23; see also ECF No. 66-2 (Prater Dep.) 37:10-38:4.  Prater explains that he received the same message in documents and oral statements given during the orientation, all of which gave employees the impression that they would have these benefits guaranteed for life "because it was told to us all the time" during presentations.  ECF No. 66-2 (Prater Dep.) 37:10-38:20.  ("[It] would be safe to say every employee that CONSOL had up to January the 30th, 2014, that meeting, I[t]'d be safe to say every employee in their heart thought they would have medical insurance and prescription insurance the rest of their life.").

Although not directly referenced in opposition to the motion for summary judgment, testimony of Fitzwater, Bright, Casey, Gilbert, and Long in the record also assert that CONSOL representatives told employees that their benefits would vest for life after obtaining ten years of service and age 55.  For instance, Fitzwater describes how CONSOL's Manager of Human

Resources, Gerald Kowzan, offered him and other employees "that they could have medical coverage and retirement, if they met the requirements, for life." See Fitzwater Dep. 42:11-43:23, 89:24-90:18. Bright testifies, "I remember when they explained that we was going to have insurance and retirement after 10 years of service at age 55," though he acknowledges that such representations were only made orally. Bright Dep. 15:15-17; id. at 105:2-19. Casey states that he was told that once you met the minimum threshold, "you was vested into the retirement health benefit plan" as well as other benefits including vision, life, and dental insurance. ECF No. 155-10 (Casey Dep.) 344-345.

Long describes how Luke Gianato told him at his Enlow Fork orientation, and numerous other times, that benefits were "vested" "for life" if you met the age and service requirements, and that he believes such statements were included in presentation materials. Long Dep. 49:9-53:17; ECF No. 155-12 (Long Dep.) 40-42. Gilbert also remembers that the documents she received at orientation said that retiree health benefits would "vest" and that CONSOL's benefits would be the same, if not better, than union benefits. ECF No. 155-9 (Gilbert Dep.) 30, 33-35. As a former union employee, she "knew our union benefits were for our lifetime." Id. at 34:20-35:5.

Plaintiffs also cite testimony that CONSOL used an "equated date" for calculating employees' eligibility to retire and told employees that their benefits would vest after an "equated service date." Plaintiffs assert that the equated service date represents the company's policy that once attaining ten years of service and reaching the age of fifty-five, their medical benefits would vest for life.[9] By contrast, Salvatori testifies that an employee's "equated date" simply refers to his or her years of service with CONSOL, taking into account any service breaks. ECF No. 155-5 (Salvatori Dep.) 54:5-11. According to Salvatori, the company used the equated date to calculate the transition payment owed to employees as of September 30, 2014. Id. at 53:12-54:14.

Finally, plaintiffs again rely on Dean Michael Hymes, a former Regional Manager of Human Resources for CONSOL who oversaw employee orientations, workers' compensation, union relations, and employee development and training. ECF No. 155-4

---

[9] See Gilbert Dep. 29; Casey Dep. 343-44; Jack Dep. 56:129-57:4, 60:16-61:3; Long Dep. 176-177, 219-220; Prater Dep. 28:23-29:23, 37:10-38:4. Plaintiffs also furnish an affidavit of non-party Green Samons Jr., a former CONSOL miner who began working for CKI in 1993. Samons attests that CONSOL HR's representatives, including Craig Campbell, told him during his orientation session that his "retirement coverage would vest once [he] reached ten years of service with CONSOL and reached the age of fifty-five" and that these benefits included "lifetime retirement medical and prescription drug benefit coverage." ECF No. 63-4 (Sammons Aff.) ¶¶ 4-5.

8

("Hymes Decl.") ¶ 5.  Hymes described orientations at Buchanan, CKI, and Jones Fork mines until his departure from CONSOL in January 1993.  He testified that the objective of the orientation scripts "was to make everyone understand that they would not lose their benefits" and that non-union, CONSOL retiree benefits "were equal to, or better than the mine workers."  ECF No. 175-1 ("Hymes Dep.") 137:24-139:11.  Although he was "intimately involved in preparing the union-free orientation materials" during his tenure, his testimony provides no evidence as to CONSOL's "state of affairs" after his 1993 departure.  Id. at 117:8-13; Hymes Decl. ¶ 6.  This led the court to conclude in its October 2019 decision denying class certification that Hymes could not testify as to what was shown to any of the seven named plaintiffs, other than potentially Casey, inasmuch as Fitzwater, Bright, and Prater all started at CONSOL after 1993, Gilbert attended her orientation in 2005, and Jack and Long attended their new-hire orientations at Enlow Fork in 1991.  See Fitzwater v. CONSOL Energy, Inc., No. 1:17-CV-03861, 2019 WL 5191245, at *11 (S.D. W. Va. Oct. 15, 2019).

Plaintiffs assert that these oral and written representations evidence the existence of a unified Lifetime Plan.  Indeed, prior to 2011, both active and retired CONSOL employees were covered under a single health-benefit plan,

though CONSOL issued separate Summary Plan Descriptions ("SPDs")
for each operating entity.  ECF No. 67-5 ("First Lackovic
Decl.") ¶ 10.  Dating back to 1992, the SPDs for the various
benefit plans each contained a reservation of rights clause that
stated that CONSOL reserves the right to amend or terminate the
plans at any time for active employees and current or future
retirees. One such clause from a 1992 SPD reads as follows:

> The Company reserves the right to terminate, suspend,
> withdraw, amend or modify the Plan at any time.  Any
> such change or termination in benefits (a) will be
> based solely on the decision of the Company and
> (b) may apply to active Employees, future retirees and
> current retirees or other covered persons as either
> separate groups or as one group."

ECF No. 160 ("Second Lackovic Decl."), Ex. K, at 67,
CONSOL019250.  Plaintiffs concede that the reservation of rights
was also noted in written documents that they received or saw,
including SPDs, enrollment guides, summaries of material
modifications, employee handbooks, healthcare "highlights"
documents, and the benefits information sheets provided to
individuals before retirement.[10]

---

[10] <u>See</u> Defs.' Mem. Supp. Mot. Summ. J. 7 (citing Fitzwater Dep.
84:14–109:9, 130:17–131:13, 141:10–142:1; Prater Dep. 18:15–
31:10, 59:12–61:18, 96:24–102:11, 108:1–114:5; Casey Dep.
171:20–172:13, 208:24–213:13, 231:7–23; Gilbert Dep. 89:10-19,
125:23–129:12, 135:2–136:13; 153:2–158:19, 163:7–169:19,
175:12–179:24; Jack Dep. 78:11-18, 94:22–95:12, 190:14–193:22,
277:11–278:3; Long Dep. 46:4-13; 54:10–56:2, 137:2-24, 188:3–
196:1).  <u>See</u> <u>also</u> Defs.' Ex. 5, Bright Dep Ex. 3. and Defs.' Ex.

In January 2011, CONSOL issued a separate benefit plan for retired employees called the CONSOL Energy Inc. Retiree Health and Welfare Plan ("Retiree Benefits Plan").  See Second Lackovic Decl., Ex. A, ECF No. 160-19.  The reservation of rights clause in the Retiree Benefits Plan was provided in clause 6.3 titled, "Amendment and Termination," stating:

> This Plan has been established with the intent of being maintained for an indefinite period of time. Nonetheless, the Company may amend or terminate all or any part of this Plan at any time for any reason by action of its board of directors. The Company, by action of its board of directors, may delegate the authority to amend or terminate the Plan to a committee or individuals.

Defs' Ex. 15A, at 14.[11]

_____

6, Fitzwater Dep. Ex. 14 (Benefits Information Sheets of Bright and Fitzwater).

[11] Plaintiffs refer to the "primary reservation of rights" by quoting "Ex. 9," but the court is unable to locate which exhibit this refers to or where the quoted provision is located. Regardless, the language quoted by plaintiffs conveys the same message:

> The Board of Directors of CONSOL can amend, modify, suspend, or terminate all or part of the Plan at any time, By way of example, CONSOL may change the level of benefits provided under the Plan at any time or discontinue the Plan at any time.  If a change is made, benefits for claims incurred after the date the change takes effect will be paid according to the revised plan provisions.  In other words, once a change is made, there are no rights to benefits based on earlier plan provisions. Certain officers of CONSOL

In ruling on the plaintiffs' renewed motion for class certification, the court recently explained the ensuing events that instigated the present suit:

> [O]n September 30, 2014 [CONSOL] announced that it was terminating retiree health and welfare benefits for all active employees on October 1, 2014.  Under the announcement, retirement-eligible employees could continue to receive health and welfare benefits under the benefit plan for retired employees (the "Retiree Benefits Plan") if they retired as of September 30, 2014, although the Retiree Benefits Plan would terminate entirely on January 1, 2020.  Alternatively, active employees could continue working and receive a one-time, lump sum transition payment, based on their years of service, to support their healthcare coverage upon retirement.  Unlike active employees at the time, individuals who retired prior to the September 2014 announcement did not receive the option to receive a one-time transition payment as compensation for the termination of their retiree health and welfare benefits.  In any event, CONSOL informed retired employees a year later by letter that their retiree benefits under the Retiree Benefits Plan would terminate instead on December 31, 2015.

Fitzwater v. CONSOL Energy, Inc., No. 1:17-CV-03861, 2020 WL 3620078, at *1 (S.D.W. Va. July 2, 2020).  For retirees who had previously elected to retire after the Fall 2014 announcement, such as Prater and Gilbert, "CONSOL provided a pro-rated portion of the previously rejected transition payment to reflect the receipt of an additional year of benefits under the Retiree

---

are authorized to amend, modify, suspend, or terminate the Plan as well.

See Pls.' Opp. 11.

Benefits Plan." <u>Fitzwater</u>, 2019 WL 5191245, at \*4.  This pro-
rated benefit was offered only to approximately 50 new retirees
(plus nine surviving spouses) and paid out from December 2015
through January 2016.  <u>Fitzwater</u>, 2020 WL 3620078, at \*2.

     Both the <u>Fitzwater</u> plaintiffs and the <u>Casey</u> plaintiffs
now allege the same seven causes of action. The <u>Fitzwater</u>
plaintiffs had also raised a claim of coercive interference in
Count IV of their complaint, which the <u>Casey</u> plaintiffs did not.
<u>See</u> ECF Nos. 36, 103.  After defendants asserted that this claim
fails because 29 U.S.C. § 1141 does not provide a private right
of action, plaintiffs state that they no longer seek to pursue
this claim and voluntarily dismiss it.[12]  Pls.' Opp. 2.  Thus,
while Counts I, II, and III are the same in both complaints,
Counts V, VI, VII, and VIII in <u>Fitzwater</u> correspond to Counts
IV, V, VI, and VII in <u>Casey</u>, respectively.  For the purposes of
this order, the court utilizes the <u>Casey</u> numbering when
referring to the last four counts of both complaints, unless
otherwise noted.

     Defendants move for summary judgment on all seven
causes of action raised by plaintiffs: Count I, Breach of
fiduciary duties as to promises of lifetime benefits under 29

---

[12] Accordingly, defendants are entitled to summary judgment on
the coercive interference claim.

U.S.C. § 1104(a)(1)(a)(i); Count II, Enforcement of the Lifetime
Plan as an ERISA plan under 29 U.S.C. § 1132(a)(1)-(3); Count
III, Discrimination against individual participants based on
health-status related factors under 29 U.S.C. § 1182; Count IV,
Failure to meet the duty of disclosure by providing the
plaintiffs with incomplete SPDs that did not mention the
Lifetime Plan's benefits and obligations or with no SPDs at all
under 29 U.S.C. § 1021(a)(1); Count V, Failure to provide
accurate and comprehensive SPDs regarding the Lifetime Plan
under 29 U.S.C. § 1022(a); Count VI, Failure to accurately state
the Lifetime Plan's requirements with respect to eligibility
under 29 U.S.C. § 1022(b); and Count VII, Failure to provide an
adequate SPD regarding the Lifetime Plan in a timely manner
under 29 U.S.C. § 1024(b)(1).

## II.  Legal Standard

Summary judgment is appropriate only "if the movant
shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to
establish the elements of a party's cause of action.  Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News
& Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d
570, 576 (4th Cir. 2010).  A "genuine" dispute of material fact

exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party.  <u>Anderson</u>, 477 U.S. at 248.

Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).  A party is entitled to summary judgment if the record, as a whole, could not lead a rational trier of fact to find for the non-moving party.  <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).  Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at 248.

### III. Discussion

First, defendants argue that Counts I and II cannot survive summary judgment because the unambiguous terms of CONSOL's Retiree Benefits Plan contains a reservation of rights clause and no independent Lifetime Plan ever existed.

A. <u>Count II: Enforcement of the "Lifetime Plan"</u>

Under Count II, plaintiffs seek equitable enforcement of the Lifetime Plan under ERISA.  Section 502(a)(1)(b) provides that an ERISA plan participant or beneficiary may bring suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  Defendants argue that the oral representations comprising the Lifetime Plan cannot override the written plans, which expressly reserved the right to terminate plaintiffs' welfare benefits at any time.

ERISA requires that welfare benefit plans "shall be established and maintained pursuant to a written instrument."  29 U.S.C. § 1102(a)(1).  This provision, along with ERISA's formal procedures for amending or modifying an employee benefit plan, <u>see id.</u> § 1102(b)(3), are "designed to give both the plan's participants and administrators a clear understanding of their rights and obligations, and they do not authorize oral or implied modifications to a written plan."  <u>Singer v. Black & Decker Corp.</u>, 964 F.2d 1449, 1453–54 (4th Cir. 1992) (Wilkinson, J., concurring) (citations omitted) (internal quotation marks omitted); <u>Coleman v. Nationwide Life Ins. Co.</u>, 969 F.2d 54, 58–59 (4th Cir. 1992) ("[A]ny modification to a plan must be

implemented in conformity with the formal amendment procedures and must be in writing.").

This statutory scheme also means that "[o]ral or informal written modifications to a plan . . . are of no effect." Coleman, 969 F.2d at 59; see also 29 U.S.C. § 1102(b)(3); Gable v. Sweetheart Cup Co., 35 F.3d 851, 857 (4th Cir. 1994); Biggers v. Wittek Indus., Inc., 4 F.3d 291, 295 (4th Cir. 1993) ("Oral or informal written amendments are inadequate to alter the written terms of a plan, as this practice would undermine certainty."). An informal writing that merely suggests or implies a change to an ERISA plan does not suffice; the evidence must show "a clear intent to amend or modify the plan." Bilheimer v. Fed. Exp. Corp. Long Term Disability Plan, 605 F. App'x 172, 180 (4th Cir. 2015) ("Specific language regarding amendment or modification and specific references to amended or modified sections of a plan, for example, evidence a clear intent to amend or modify a plan.").

Unlike ERISA's vesting requirements for pension plans, see 29 U.S.C. § 1053, ERISA does not require that welfare plans offer vested benefits for life. See Wise v. El Paso Nat. Gas Co., 986 F.2d 929, 937 (5th Cir. 1993); Boyer v. Douglas Components Corp., 986 F.2d 999, 1004-05 (6th Cir. 1993). It follows that "[e]mployers or other plan sponsors are generally

free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." <u>Curtiss-Wright Corp. v. Schoonejongen</u>, 514 U.S. 73, 78 (1995).

      The preference for enforcing clear, written ERISA plans means that "any participant's right to a fixed level of lifetime benefits must be 'found in the plan documents and must be stated in clear and express language.'" <u>Gable</u>, 35 F.3d at 855 (4th Cir. 1994) (quoting <u>Wise</u>, 986 F.2d at 937)). Plaintiffs bear the burden of proving that the ERISA plan contains a promise of lifetime benefit. <u>Gable</u>, 35 F.3d at 855 (citing <u>Howe v. Varity Corp.</u>, 896 F.2d 1107, 1109 (8th Cir. 1990)).

      The enforcement of ERISA plans as written is the "linchpin" of the ERISA system, and the United States Supreme Court has emphasized "the particular importance of enforcing plan terms as written in § 502(a)(1)(B) claims." <u>Heimeshoff v. Hartford Life & Acc. Ins. Co.</u>, 571 U.S. 99, 108 (2013); <u>see also</u> <u>M & G Polymers USA, LLC v. Tackett</u>, 574 U.S. 427, 435 (2015). Insofar as plaintiffs argue that the cited written materials and oral representations regarding lifetime benefits amended the Retiree Benefits plan, "references to lifetime benefits contained in nonplan documents cannot override an explicit reservation of the right to modify contained in the plan

documents themselves." Gable, 35 F.3d at 854, 857 (finding that unambiguous reservation of rights clause prevailed even though a separate, informal document informed retirees that the company would "continue this Coverage for you during the remainder of your lifetime at company expense"). Courts have generally "recogniz[ed] that an employer can qualify the provision of 'lifetime' benefits by reserving the right to terminate the plan under which those benefits are provided." In re Unisys Corp. Retiree Med. Ben. ERISA Litig., 58 F.3d 896, 904 (3d Cir. 1995) (collecting cases).

Plaintiffs' response makes no attempt to claim that the Retiree Benefits Plan or the pre-2011 unified CONSOL Plan contained a lifetime guarantee of benefits. Instead, plaintiffs portray the Lifetime Plan as an independent, "informal" ERISA welfare plan.

ERISA defines an "employee welfare benefit plan" and "welfare plan" to "mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or

benefits . . . ."  29 U.S.C. § 1002(1).  Section 1002(1) means
that "for ERISA to apply, there must be (1) a plan, fund or
program, (2) established or maintained (3) by an employer,
employee organization, or both, (4) for the purpose of providing
a benefit, (5) to employees or their beneficiaries."  <u>Custer v.
Pan Am. Life Ins. Co.</u>, 12 F.3d 410, 417 (4th Cir. 1993).

  An ERISA "plan" refers to the scheme decided in
advance "compris[ing] a set of rules that define the rights of a
beneficiary and provide for their enforcement."  <u>Pegram v.
Herdrich</u>, 530 U.S. 211, 223 (2000) ("Rules governing collection
of premiums, definition of benefits, submission of claims, and
resolution of disagreements over entitlement to services are the
sorts of provisions that constitute a plan.").  The plan need
not be written.

  The Fourth Circuit allows that "[a]n informal plan may
exist independent of, and in addition to, a formal plan as long
as the informal plan meets all of the elements outlined in
<u>Donovan</u>."  <u>Elmore v. Cone Mills Corp</u>, 23 F.3d 855, 861 (4th Cir.
1994).  In <u>Donovan v. Dillingham</u>, the Eleventh Circuit held that
an ERISA plan "is established if from the surrounding
circumstances, a reasonable person can ascertain the intended
benefits, a class of beneficiaries, the source of financing, and
procedures for receiving benefits."  688 F.2d 1367, 1372 (11th

Cir. 1982).  Applying Donovan, plaintiffs maintain that they have proffered evidence from which a reasonable person could ascertain (1) the intended lifetime retirement benefits; (2) the plaintiffs as among a class of beneficiaries of the informal Lifetime Plan; (3) premiums and employer contributions as a source of funding; and (4) the equated service formula as the procedure for receiving the benefits.

Plaintiffs support their assertion that an informal ERISA plan guaranteed lifetime benefits by citing Gable v. Sweetheart Cup Co., where the Fourth Circuit stated that "[a]n employer may "waive[] its statutory right to modify or terminate benefits,'" if it "voluntarily undertak[es] an obligation to provide vested, unalterable benefits.  35 F.3d 851, 855 (4th Cir. 1994) (first and third alterations added); Pls.' Opp. 9.

As the court found in October 2019, none of the written materials contain a promise of lifetime benefits.  The scripts comparing the UMWA Plan do not "mention lifetime retiree medical benefits or retiree medical benefits." 2019 WL 5191245, at *11.  Neither does the 'KNOW THE FACTS" handbill.  Id. Plaintiffs do not offer any additional written evidence supporting the existence of the Lifetime Plan.  The court must reiterate its October 2019 conclusion that "[v]iewed in total, the written evidence presented by the plaintiffs does not

contain a promise of lifetime benefits." <u>Fitzwater</u>, 2019 WL
5191245, at *11.

Plaintiffs maintain that this does not defeat their
claims because a reasonable factfinder could infer that the
promise to provide benefits more generous than the UMWA Plan
necessarily means defendants were offering vested lifetime
benefits.  Pls.' Opp. 9.  Based on these scripts, plaintiffs
contend that a reasonable person would understand these
representations to mean that the UMWA Plan included lifetime
benefits.  <u>Id.</u>  In addition to the written materials, plaintiffs
rely on their own testimony as to the oral representations they
received as well as statements from Congress and federal courts
regarding UMWA's guarantee of lifetime benefits. <u>Id.</u> at 9-10;
<u>see</u> <u>Dist. 17, United Mine Workers of Am. v. Brunty Trucking Co.</u>,
269 F. Supp. 2d 702, 709 (S.D.W. Va. 2003) (noting that UMWA's
National Bituminous Coal Wage Agreement of 1993 "is clear that
the employers' obligation to provide health benefits continued
for the life of the employer, not simply for the life of the
collective bargaining agreement").  Additionally, plaintiffs
assert that CONSOL's conduct suggests that the parties
understood that the benefits had vested.  <u>Id.</u> at 10-11.  In
plaintiffs' view, CONSOL offered transition benefits after

terminating the retiree welfare benefit plan, even though they were not contractually obligated to do so.  Id.

Insofar as any ambiguity exists as to what the references to the UMWA Plan were intended to convey, "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." M & G Polymers USA, LLC v. Tackett, 574 U.S. 427, 442 (2015).  Moreover, offering transition payments to certain retirees as a one-time, lump sum payment does not establish a separate ERISA plan.  See Howe, 896 F.2d at 1110 ("[T]he mere fact that employee welfare benefits continue in retirement does not indicate that the benefits become vested for life at the moment of retirement."); Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 12 (1987) ("To do little more than write a check hardly constitutes the operation of a benefit plan.").

Nor does the oral testimony itself show the existence of a separate Lifetime Plan. As Donovan explained:

> A decision to extend benefits is not the establishment
> of a plan or program.  Acts or events that record,
> exemplify or implement the decision will be direct or
> circumstantial evidence that the decision has become
> reality-e.g., financing or arranging to finance or
> fund the intended benefits, establishing a procedure
> for disbursing benefits, assuring employees that the
> plan or program exists-but it is the reality of a
> plan, fund or program and not the decision to extend
> certain benefits that is determinative.

688 F.2d at 1373; see also Smith v. Hartford Ins. Grp., 6 F.3d 131, 135-36 (3d Cir. 1993) (finding that hospital's oral representations that plaintiff would receive exactly the same benefits under new self-funded insurance plan coupled with document summarizing effects of plan changes did not "establish" an informal plan when the document referred to another pre-existing plan).

Elmore v. Cone Mills Corp, 23 F.3d 855 (4th Cir. 1994) offers an illustrative example.  The Fourth Circuit addressed whether an informal plan arose from letters sent by the company's Chairman and CEO to employees guaranteeing that benefits under the existing pension plan would remain unchanged. Id. at 862.  Despite these assurances, the company did not incorporate them into the formal plan documents when it ultimately adopted the pension plan, leading the employees to bring suit to enforce the benefits promised in the letter.  Id. The court found that "[a]lthough the first three Donovan elements (the intended class of beneficiaries, the intended benefits, and the source of the funding) arguably may be ascertainable from the . . . letters, these letters do not satisfy the fourth element (the procedure for receiving benefits)."  Id. at 861-62.

Regarding the fourth element, Elmore reasoned that
"[t]he only way an employee could ascertain the procedures for
obtaining benefits would be to refer to the [later adopted]
formal plan document," indicating that the letters did not
constitute a separate, de facto plan.  Id. at 862.  Rather, the
letters were intended to keep "employees apprised of the
proposed developments in their pension plans" and "specifically
informed their employees that these plans were subject to
change," and therefor were "merely preliminary statements of its
intentions regarding the plan and do not constitute an
enforceable plan."  Id.; see also Siemon v. AT&T Corp., 117 F.3d
1173, 1179 (10th Cir. 1997) (finding that "the potential
benefits" of purported informal plan were "too ephemeral and
contingent for [the court] to ascertain what, if anything, AT&T
intends an employee to receive"); Stiltner v. Beretta U.S.A.
Corp., 74 F.3d 1473, 1480 n.7 (4th Cir. 1996) (finding that
employment offer letter fails to meet requirements of informal
ERISA plan because "it does not show the source of the funding
for the benefits described, and it does not indicate the
procedure by which an employee can apply for and receive
benefits"); see also Carver v. Westinghouse Hanford Co., 951
F.2d 1083 (9th Cir. 1991).

Plaintiffs rely on the equated service formula as the procedure for receiving benefits.  The court previously addressed in its October 2019 order the references to an "Equated Date Policy" in three PowerPoint slides that were each part of new-hire orientation presentations — created in 2003, 2008, and 2010, respectively — given at Buchanan Mine. Fitzwater, 2019 WL 5191245, at *10.  The court concluded that insofar as one of the slides referenced "Vesting only in retirement plan," it referred to CONSOL's separate pension plan, not its welfare benefits plan.  Id.  Based on these slides and Salvatori's testimony, the court found that "equated date" "simply refers to [an employee's] years of service with CONSOL, taking into account any service breaks."  Id.[13]

Plaintiffs no longer rely on the PowerPoint slides to support their equated date argument, instead pointing only to their own testimony and Salvatori's testimony that CONSOL's equated date referred to date of employment, taking into account service breaks.  Salvatori Dep. 53:10-54:11.  This testimony does not show the existence of a separate plan, particularly when the equated date was used in documents describing CONSOL's

---

[13] Indeed, CONSOL's decision to specifically use the term "vesting" in the context of pension benefits, but not in materials related to welfare benefits, strengthens the inference that the latter was not guaranteed for life.  See Skinner Engine Co., 188 F.3d 130, 144 (3d Cir. 1999)

formal welfare benefits plan.  The Lifetime Plan cannot
constitute a separate, informal plan when the procedures for
receiving benefits under the Lifetime Plan rely on the same
formal plan documents as the Retiree Benefits Plans and the
single, unified plan that preceded it.  See Elmore, 23 F.3d at
861-62.

     Plaintiffs have not shown that a reasonable person
could ascertain the procedures for a Lifetime Plan separate and
distinct from the formal CONSOL welfare plan.  Both the
Fitzwater and Casey amended complaints allege that the Lifetime
Plan was a separate plan, but at the same time was "either part
of or related to" CONSOL's written plans, including the Retiree
Benefits Plan.  ECF No. 103 ¶ 3; ECF No. 36 ¶ 5.  The Fitzwater
complaint alleges that the Lifetime Plan provided that
"Plaintiffs would continue to receive the same or similar
benefits that they received, and paid in to support, as active
workers," i.e., under CONSOL's written plans.  ECF No. 36 ¶ 22.
According to plaintiffs, "CONSOL Energy Inc. has been the Plan
Sponsor of the Lifetime Plan . . . because it has been so
designated in the governing plan instruments."  Id. ¶¶ 94.
Likewise, they assert that Salvatori was the Plan Administrator
of the Lifetime Plan "because he has been so designated in the
governing plan instruments."  Id. ¶ 95.  The Casey complaint

explains that CONSOL's "use of the same Plan Number, Plan Administrator, and effective start date in both the Employee SPD and the Retirement SPD further indicated that the Defendants were not truly presenting their workers with those two distinct plans, but rather a single Lifetime Plan."  ECF No. 103 ¶ 90.

Viewed in total, no reasonable factfinder could conclude that CONSOL "established or maintained" a separate, independent Lifetime Plan.  In the absence of a separate, informal Lifetime Plan, the reservation of rights clause must govern.

Plaintiffs nonetheless contend that the reservation of rights clause was ambiguous as to what "Plan" CONSOL may terminate.  Plus, plaintiffs believe that because the SPDs stated that "the plan controls" if there is any conflict between the SPDs and the "Plan document," the Lifetime Plan prevails over the reservation of rights clause.  Pls.' Opp. 11-12.

A reservation of rights clause "is effective only against contractual obligations explicitly covered by the reservation." Alday v. Raytheon Co., 693 F.3d 772, 791 (9th Cir. 2012).  Yet, plaintiffs' argument presupposes the existence of a separate Lifetime Plan.  Inasmuch as any promise of lifetime benefits was part and parcel with CONSOL's formal welfare benefits for retirees, the reservation of rights clause still

applies.  Accordingly, defendants are entitled to summary judgment as to Count II.

B. Count I: Breach of Fiduciary Duties

Under Count I, plaintiffs bring a claim for breach of fiduciary duty pursuant 29 U.S.C. § 1104(a)(1)(A)(i) based on defendants' misrepresentations that plaintiffs' retiree benefits would vest for life once they reached the equated service date. Plaintiffs allege that defendants fraudulently induced plaintiffs into continuing their employment to their detriment by misrepresenting the nature of their retiree benefits.

Section 404(a)(1)(A)(i) provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and— (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries."  29 U.S.C. § 1104(a)(1)(A)(i).  This section falls within ERISA's fiduciary responsibility provisions.  See Faircloth v. Lundy Packing Co., 91 F.3d 648, 656 (4th Cir. 1996) (citing 29 U.S.C. §§ 1101–14); Varity Corp. v. Howe, 516 U.S. 489, 506 (1996) ("To participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act 'solely in the interest of the participants and beneficiaries.'"); DiFelice v. U.S. Airways, Inc., 497 F.3d 410,

418 (4th Cir. 2007).  ERISA obligates fiduciaries not only to avoid making any material misrepresentations to beneficiaries, but also "incomplete, inconsistent, or contradictory disclosures that misinform beneficiaries."  George v. Duke Energy Ret. Cash Balance Plan, 560 F. Supp. 2d 444, 474 (D.S.C. 2008) (citing Griggs v. E.I. DuPont de Nemours & Co., 237 F.3d 371, 380 (4th Cir. 2001)).

In order to establish a claim for breach of fiduciary duty based on alleged misrepresentations regarding coverage under an employee welfare plan, a plaintiff must prove "(1) the defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the part of the defendant; (3) the materiality of that misrepresentation; and (4) detrimental reliance by the plaintiff on the misrepresentation."  Burstein v. Ret. Account Plan For Employees of Allegheny Health Educ. & Research Found., 334 F.3d 365, 384 (3d Cir. 2003) (quoting Daniels v. Thomas & Betts Corp., 263 F.3d 66, 73 (3d Cir.2001)); see also Adams v. Freedom Forge Corp., 204 F.3d 475, 492 (3d Cir. 2000) ("An employee may recover for a breach of fiduciary duty if he or she proves that an employer, acting as a fiduciary, made a material misrepresentation that would confuse a reasonable beneficiary about his or her benefits, and the beneficiary acted thereupon to his or her detriment."); James v.

Pirelli Armstrong Tire Corp., 305 F.3d 439, 449 (6th Cir. 2002);

Wiseman v. First Citizens Bank & Tr. Co., 215 F.R.D. 507, 510

(W.D.N.C. 2003); Tootle v. ARINC, Inc., 222 F.R.D. 88, 94 (D.

Md. 2004).  The four element outlined above will each be

considered in turn.

### i. ERISA Fiduciaries

As a threshold issue, plaintiffs must demonstrate that

the party charged meets the statutory definition of "fiduciary."

See Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 60–61 (4th

Cir. 1992); accord Moon v. BWX Techs., Inc., 577 F. App'x 224,

229 (4th Cir. 2014).  "ERISA contemplates two general types of

fiduciaries."  Dawson-Murdock v. Nat'l Counseling Grp., Inc.,

931 F.3d 269, 275 (4th Cir. 2019).  First, ERISA requires that

every plan instrument list a "named fiduciary" who has

"authority to control and manage the operation and

administration of the plan."  29 U.S.C.§ 1102(a).  ERISA also

allows for a "functional fiduciary," based on a person or

entity's de facto control and authority over a plan.  See

Dawson-Murdock, 931 F.3d at 276; see also In re Unisys Corp.

Retiree Med. Benefits ERISA Litig., 579 F.3d 220, 228 (3d Cir.

2009) (citing Mertens v. Hewitt Associates, 508 U.S. 248, 262

(1993)).  The latter types of fiduciaries are defined, insofar

as pertinent here, as "a fiduciary with respect to a plan to the

extent (i) he exercises any discretionary authority or
discretionary control respecting management of such plan or
exercises any authority or control respecting management or
disposition of its assets . . . or (iii) he has any
discretionary authority or discretionary responsibility in the
administration of such plan."  29 U.S.C. § 1002(21)(A).

The phrase "to the extent" has been interpreted to
mean that "a court must ask whether a person is a fiduciary with
respect to the particular activity at issue."  <u>Coleman</u>, 969 F.2d
at 61.  The court must "examine the relevant documents to
determine whether the conduct at issue was within the formal
allocation of responsibilities under the plan documents and, if
not, ascertain whether, in fact, a party voluntarily assumed
such responsibility for the conduct at issue."  <u>Phelps v. C.T.</u>
<u>Enterprises, Inc.</u>, 394 F.3d 213, 219 (4th Cir. 2005) (citing
<u>Coleman</u>, 969 F.2d at 61); <u>accord</u> <u>Adams v. Brink's Co.</u>, 261 F.
App'x 583, 590 (4th Cir. 2008).

A person who holds the position of plan
administrator,[14] "must, [by] the very nature of his position,
have discretionary authority or discretionary responsibility in

---

[14] ERISA defines "administrator" to include "the person
specifically so designated by the terms of the instrument under
which the plan is operated."  29 U.S.C. § 1002(16)(A)(i).

the administration of the plan." Dawson-Murdock, 931 F.3d at
276 ((quoting 29 C.F.R. § 2509.75-8 (D-3)). "[A} person or
entity that is not a plan administrator and performs only
ministerial functions in relation to a plan is not a functional
fiduciary." Id. "[P]ersons who have no power to make any
decisions as to plan policy, interpretations, practices or
procedures, but who perform" administrative functions — such as
"Application of rules determining eligibility for participation
or benefits," "Preparation of employee communications material,"
and "Orientation of new participants and advising participants
of their rights and options under the plan" — all "within a
framework of policies, interpretations, rules, practices and
procedures" do not act as fiduciaries with respect to the plan.
29 C.F.R. § 2509.75-8 (D—2).

ERISA also distinguishes between plan sponsors and
plan administrators for purposes of determining breaches of
fiduciary duty.  A plan sponsor is not generally subject to
ERISA's fiduciary duty provisions.  SeeuTaylor, 49 F.3d at 984
n.1 (citing Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 133
(3d Cir. 1993)).  An employer may serve "dual roles as plan
sponsor and plan administrator," though its "fiduciary duties
under ERISA are implicated only when it acts in the latter
capacity."  Beck v. PACE Int'l Union, 551 U.S. 96, 101 (2007);

see also Moon v. BWX Techs., Inc., 577 F. App'x 224, 229 (4th Cir. 2014) ("Simply because an employer is an ERISA plan sponsor does not automatically convert the employer into a plan fiduciary.").

Defendants argue that none of the individuals identified by plaintiff as having made representations regarding lifetime benefits meet the definition of a fiduciary.  In addition, they assert that plaintiffs offer no evidence that the employees who allegedly promised them lifetime benefits were ever fiduciaries or exercised discretionary authority over CONSOL plans.  Defendants further contend that there is no claim breach under the Lifetime Plan because no reasonable factfinder could conclude that CONSOL served as a fiduciary to the Lifetime Plan when it was not an ERISA plan.  Nor could CONSOL serve as a fiduciary to a nonexistent plan.  Moreover, "adherence to an ERISA controlled plan is not a breach of fiduciary duty." Sedlack v. Braswell Servs. Grp., Inc., 134 F.3d 219, 225 (4th Cir. 1998).  The defendants in turn claim that the decision to terminate retiree benefits cannot constitute a breach of fiduciary duty when it was consistent with the Retiree Benefits Plan.

Turning to formal allocation of responsibility under the plan documents, the Retiree Benefits Plan promulgated in

2011 states that the plan "Administrator" is the "Company,"
defined as CONSOL Energy Inc., "or such committee or individuals
to whom the Company has delegated its authority and
responsibility."  Second Lackovic Decl., Ex. A, ECF No. 160-19
at 2, 5-6.  The record indicates that plan administration
functions were delegated to the Vice President—Human Resources,
Kurt Salvatori.  See Defs.' Mem. Supp. Mot. Summ. J. 3;
Salvatori Dep. 8:12-11:13 (testifying that he was plan
administrator of CONSOL's benefit plans as Vice President—Human
Resources); ECF Nos. 155-1 to 155-3 (2014, 2015, 2016 Form 5500
Report of Employee Benefit Plan submitted to Department of
Labor, listing Plan Administrator as VP HR); ECF No. 108 ¶ 20.
By contrast, the SPDs for CONSOL's welfare benefit plans prior
to 2014 state that CONSOL Energy Inc. is only the plan sponsor
and that the "Plan Administrator" — and "named fiduciary of
the Plan within the meaning of ERISA section 402(a)" — is the
Vice President-Human Resources of CONSOL Energy Inc.  See,
e.g., Second Lackovic Decl. ¶¶ 7-8; id. Ex. B, ECF No. 160-19 at
66; id. at 111, 131.[15]  They also state that the "[t]he Plan
Administrator can allocate fiduciary responsibilities among

---

[15] The other SPDs in the record also show that the Vice
President—Human Resources was the plan administrator.  ECF No.
160-20 at 45, 90; ECF No. 160-21 at 5; Second Lackovic Decl.,
Ex. J, ECF No. 160-22 at 28; id. Ex. K, ECF No. 160-23 at 28.

fiduciaries, and can designate persons to carry out fiduciary responsibilities under the Plan."

Even though both CONSOL and Salvatori were listed as plan administrators at various times, plaintiffs do not rely on who specifically was a named fiduciary in the plan instruments. Citing <u>James v. Pirelli Armstrong Tire Corp.</u>, 305 F.3d 439 (6th Cir. 2002) and <u>In re Unisys Corp. Retiree Med. Benefits ERISA Litig.</u>, 579 F.3d 220 (3d Cir. 2009), plaintiffs assert that "[t]he representatives of CONSOL who spoke to or counseled Plaintiffs about their benefits were fiduciaries." Pls.' Opp. 13.[16] They add that these unnamed representatives acted as fiduciaries by representing that CONSOL's plan was more valuable than the UMWA Plan. Plaintiffs also assert that CONSOL acted as a fiduciary, particularly when it developed the new-hire orientation scripts used at CONSOL's Enlow Fork and Bailey Mines, which labeled the reservation of rights as "lawyer talk." Pls.' Opp. 13 (citing ECF No. 66-1).

In <u>James</u>, the plaintiffs identified specific representatives of the defendant employer who "provided inaccurate and misleading information to Plaintiffs about their

---

[16] Plaintiffs also cite <u>Poore v. Simpson Paper Co.</u>, 566 F.3d 922 9th Cir. 2009) and <u>Estate of Becker v. Eastman Kodak Co.</u>, 120 F.3d 5 (2d Cir. 1997), but neither case addresses whether the defendants were acting as fiduciaries.

retirement benefits during group meetings and exit interviews
conducted in connection with [the defendants'] effort to reduce
its salaried workforce." 305 F.3d at 455. The court concluded
that an employer breached its fiduciary duties when it "on its
own initiative provided, through its representatives . . .,
misleading or inaccurate information about the future benefits
of the plan." Id. In re Unisys also affirmed that the
employer-defendant acted as fiduciary when its employees, acting
with "apparent, if not actual authority," communicated with
plaintiffs about retiree medical benefits; HR representatives
advised them about the duration of benefits; and testimony
showed that the employer had delegated authority to do so. 579
F.3d at 230.

Both James and In re Unisys found that the defendant
employers were plan fiduciaries when they delegated
responsibility to their representatives to explain future
benefits. Neither case held that the representatives themselves
were fiduciaries. Without evidentiary support from plaintiffs
in the present case, the court will not speculate who these
unnamed "representatives of CONSOL" might include.

However, this does not address whether CONSOL, through
its representatives, undertook a fiduciary duty by affirmatively
explaining plan benefits to its employees. Plaintiffs assert

that HR personnel, such as Chase Elswick, Gerald Kowzan, and/or Craig Campbell, acted as non-fiduciary agents who had apparent authority to speak on CONSOL's behalf regarding benefits when they made misrepresentations regarding lifetime benefits at training sessions.  Pls.' Opp. 14.[17]  In support of the latter assertion, plaintiffs cite the cover letter enclosed with the SPDs distributed to plaintiffs that explained "[y]our local HR representative is available for any questions that you may have regarding your benefits.".  See Pls.' Opp. 14 n.8 (citing Ex. 12, CONSOL 004541).[18]

Defendants point to Adams v. Brink's Co., which held that "[m]inisterial administrative acts are not fiduciary acts" and that "an employer/plan administrator does not exercise discretionary authority or control over the administration of the plan merely when employees tell each other about plan benefits."  261 F. App'x 583, 592 (4th Cir. 2008).  Adams, however, emphasized that the "purpose of the meeting" in which a company Vice President answered "nothing will change" in response to an unprompted pension-related question "was not to

---

[17] Fitzwater also testified that Kowzan and Elswick, along with Gary Patterson, President of Fola, held themselves out as the representatives to answer questions regarding plan benefits. ECF No. 66-3 (Fitzwater Dep.) 293:6-24.

[18] The court is unable to substantiate plaintiffs' "Ex. 12" in the record.

offer beneficiaries detailed plan information in order to help them decide whether to remain with the plan." Id. at 591 (distinguishing Varity Corp. v. Howe, 516 U.S. 489, 502 (1996)). The court also rejected arguments that local HR managers were "functional" fiduciaries and had delegated authority to speak on plan benefits because the plan administrators "clearly and accurately communicated the plan benefits to [company] employees in writing" and none of the statements deprived the employees of "any benefits to which they were entitled under the terms of the plan. Id. at 592. The "uncontradicted evidence" showed that employees received multiple notices in writing as to how their pension benefits would be calculated. Id. at 594 n.3. Every witness, other than the plaintiffs themselves, testified that they understood how service dates would be calculated for retirement benefits. Id.

Here, plaintiffs provide ample evidence that CONSOL, through its employees, made assurances that employee welfare benefits will remain unchanged through retirement and that switching to another plan, namely UMWA's, was not a superior option. The Fourth Circuit has recognized that "conveying information about plan benefits to a beneficiary in order to assist plan-related decisions can constitute fiduciary activity." Dawson-Murdock, 931 F.3d at 280; Varity Corp., 516

U.S. 502-04, 511 (1996) ("[A] plan administrator engages in a fiduciary act when making a discretionary determination about whether a claimant is entitled to benefits under the terms of the plan documents."); <u>Aetna Health Inc. v. Davila</u>, 542 U.S. 200, 219 (2004) ("[A] benefit determination is part and parcel of the ordinary fiduciary responsibilities connected to the administration of a plan.").  "[A]n employer act[s] in a fiduciary capacity when making misrepresentations to its employees about their benefit plan."  <u>Sprague v. Gen. Motors Corp.</u>, 133 F.3d 388, 405 (6th Cir. 1998) (citing <u>Varity Corp.</u>, 516 U.S. 502-04).

Plaintiffs point to <u>Curcio v. John Hancock Mut. Life Ins. Co.</u>, which concluded that the defendant — which was listed as the plan administrator in the employee benefits booklet, "announced the new plan to its employees through literature and meetings," and stated in materials that it could terminate the plan at any time — "maintained sufficient discretionary authority and responsibility in the administration of the plan so as to satisfy the statutory definition of a fiduciary."  33 F.3d 226, 233-34 (3d Cir. 1994).

Moreover, an ERISA plan administrator's fiduciary duty can extend to include statements made by its non-fiduciary agents acting with apparent authority.  <u>See</u> <u>Taylor v. Peoples</u>

_Nat. Gas Co._, 49 F.3d 982, 984 (3d Cir. 1995) (holding that "a plan administrator is liable for statements made by individuals who have been selected as non-fiduciary agents by the plan administrator to assist it in discharging its fiduciary obligation to administer a plan, even though such individuals are formally employees of the plan sponsor, who is not a fiduciary").  Insofar as the Vice President-Human Resources was a plan fiduciary, assurances made by HR managers that the welfare plan contained lifetime benefits may be extended to the Vice President-Human Resources.

        Based on the foregoing, the court concludes that CONSOL, through its representatives, can be found on the evidence presented, to have exercised discretionary authority or control respecting plan management by repeatedly informing employees that welfare benefits would continue for life.

        ii.  Material Misrepresentations and Detrimental Reliance

        Even if CONSOL acted as a fiduciary through its representatives, plaintiffs must identify any misrepresentations regarding lifetime benefits.

        First, plaintiffs cite the one-age Benefits Information Sheets addressed in the court's October 2019 opinion.  These sheets state, "Retirement Plan: Vested for early

retirement with Medical. (To be eligible to receive <u>pension</u> <u>payment</u> on 10/1/2013, complete and return benefit application to HR no later than 8/1/2013) . . . .”  ECF No. 72-5 (emphasis added).  Plaintiffs do not address the court’s prior conclusion that the “Retirement Plan” only refers to pension benefits, not welfare benefits.  <u>Fitzwater</u>, 2019 WL 5191245, at *9.  The bottom of each one-page sheet also notes that “[w]hether benefits are payable and the amount of benefits will depend on the actual terms and conditions of the applicable plan documents” and includes an identical reservation of rights clause, stating, “All plans are subject to change or termination by CONSOL at any time.”  ECF Nos. 72-4 and 72-5.

Nonetheless, plaintiffs further assert that defendants made the same misrepresentations at training sessions — including those led by Elswick, Kowzan and/or Campbell — by stating that welfare benefits were “vested” at retirement. Pls.’ Opp. 14.  They cite Prater’s testimony that he was told at his orientation session that once you obtained 10 years of service and reached age 55, “you would have insurance, medical insurance and prescription the rest of your life.”  Prater Dep. 37:18-38:17  66-2; <u>see</u> <u>also</u> Bright Dep. 46-47, ECF No. 72-6 (“[Q.] Going back to Mr. Patterson [President of Fola], you said that you were led to believe that the benefits were vested.

42

And, again, I just want to make sure.  With respect to Mr.
Patterson, that's because he used the word 'vested.' Is that
right?  [A.] Yes").[19]  Finally, Hymes' testimony offers
supplementary evidence that, as of his 1993 departure, CONSOL
developed orientation scripts with the intention "to make
everyone understand that they would not lose their benefits" and
that non-union, CONSOL retiree benefits "were equal to, or
better than the mine workers."  Hymes Dep. 137:24-139:11.

        "Under ERISA, a fiduciary has a duty to provide
beneficiaries with accurate information."  Adams, 261 F. App'x
at 595.  While a reservation of rights clause may preclude the
existence of a Lifetime Plan, this does not mean that it
"necessarily insulates an employer from its fiduciary duty to
provide 'complete and accurate information' when that employer
on its own initiative provides inaccurate and misleading
information about the future benefits of a plan.'"  James v.

---

[19] Plaintiffs also cite purported statements in the SPDs that
"Medical Expense will be continued for yourself and your
dependents if you retire after attaining age 55. These benefits
are provided free, and continue as a supplement to Medicare
after age 65."  Pls.' Opp. 14.  Plaintiffs refer the court to
"Ex. 10 (Consol of Kentucky SPD 1994 -CONSOL 007653); Ex. 11
(CONSOL of Kentucky SPD 1993 -CONSOL 007957, 008042)."  As
defendants note, some of plaintiffs' citations to exhibits are
ambiguous, making it difficult to confirm their source.  Defs.'
Reply 10.  Plaintiffs do not attach an Exhibit 10 or 11 to their
response, and the court in unable to confirm where these
documents are located in the record.

Pirelli Armstrong Tire Corp., 305 F.3d 439, 454–55 (6th Cir. 2002) (citing Sprague v. Gen. Motors Corp., 133 F.3d 388 (6th Cir. 1998)).

In James, the company's HR representative and plan manager testified they told employees that medical benefits would not and could not change in retirement, which was inaccurate under the terms of the plan.  Id. at 443, 456.  The court found that the breach of fiduciary duty claim was not limited only to those plaintiffs who directly inquired about the reservation of rights clause, after which they were incorrectly told "not to worry about that provision."  Id. at 451.  Although the plan itself contained a reservation of rights clause, the court concluded that the employer breached its fiduciary duty by "on its own initiative, provid[ing] all Plaintiffs with materially misleading or inaccurate information about the future benefits of the plan."  Id. at 456.

The Third Circuit in In re Unisys Corp. Retiree Med. Ben. ERISA Litig. affirmed that the company breached its fiduciary duty by promising its employees lifetime benefits even though the benefits plan contained a reservation of rights clause.  57 F.3d 1255, 1266–67 (3d Cir. 1995).  The plan explicitly stated that "[c]overage continues for you for life" and various informal oral and written communications reiterated

that medical benefits extended "for life" or for a retiree's "lifetime." Id. at 1259.   The evidence showed that the company knew that the employees believed that a retiree's benefits would continue for life and were making important retirement decisions based on this understanding.   Id. at 1266-67 (affirming the district court's decision that "findings that the company actively misinformed its employees by affirmatively representing to them that their medical benefits were guaranteed once they retired, when in fact the company knew this was not true and that employees were making important retirement decisions relying upon this information, clearly support a claim for breach of fiduciary duty under ERISA.").

As these cases show, a fiduciary duty claim requires evidence that the company "affirmatively made representations to the effect that retiree benefits were vested and could never be modified or terminated by the company." See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., U.A.W. v. Skinner Engine Co., 188 F.3d 130, 135, 150–51 (3d Cir. 1999) (granting summary judgment to defendants even though CBAs stated that coverage "will continue" and "shall remain" because the phrases did not evince an intent to vest benefits for life and the company was not otherwise "obligated under ERISA to inform its employees that retiree benefits may at some point in the

future be modified or changed"); <u>see also</u> <u>Sprague v. Gen. Motors Corp.</u>, 133 F.3d 388, 405-06 (6th Cir. 1998) (affirming dismissal of fiduciary duty claim because "GM never told the early retirees that their health care benefits would be fully paid up or vested upon retirement," while noting that, "had GM on its own initiative provided misleading information about the future of the plan," it may have committed a breach).

None of the written materials provided that plaintiffs' welfare benefits plan (as distinguished from CONSOL's separate pension plan) would "vest."  Still, this alone does not defeat plaintiffs' claims.  <u>See</u> <u>In re Unisys</u>, 579 F.3d at 231 (finding that even though "the words 'guaranteed' or 'vested' were not used in describing the plaintiffs' retiree benefits  . . ., informing the plaintiffs that they would enjoy 'free or low-cost medical benefits throughout retirement or for life' created the same impression and therefore was a misrepresentation").  The court finds that testimonial evidence offered here, if believed, would show that CONSOL's representatives made affirmative misstatements that the company would maintain retiree welfare benefits for life.  This would be sufficient to satisfy the second element of plaintiffs' claim against CONSOL based on misrepresentations made by its representatives.

With respect to Salvatori, plaintiffs assert that Salvatori and unnamed "executive decisionmakers" acted as fiduciaries or nonfiduciaries who knowingly participated in discriminatory conduct by terminating retiree benefits while offering more favorable transition payments to only some retirees.  <u>See</u> Resp. 13 n.7.  They cite <u>McDannold v. Star Bank, N.A.</u>, which allowed that a plaintiff may bring a claim under "ERISA § 502(a)(3) against a nonfiduciary party-in-interest who knowingly participates in a prohibited transaction," though such claims remain limited to only "appropriate equitable relief" pursuant to ERISA § 502(a)(3).[20]  261 F.3d 478, 486 (6th Cir. 2001) (citing 29 U.S.C. 1132(a)(3)).  Plaintiffs offer no evidence that Salvatori ever made misrepresentations regarding lifetime benefits, which remains the crux of the breach of fiduciary duty here.  Moreover, the decision to terminate benefits does not amount to a fiduciary act, and therefore cannot sustain a claim under Count I.  As will be discussed regarding Count III, the one-time transition payments do not constitute an ERISA plan of which Salvatori or the "executive decisionmakers" could act in breach.

---

[20] Section 502(a)(3) allows ERISA beneficiaries "to obtain other appropriate equitable relief" to remedy ERISA violations, but only to such "equitable relief as will enforce the terms of the ERISA plan at issue or ERISA itself."  <u>Moon v. BWX Techs., Inc.</u>, 577 F. App'x 224, 228 (4th Cir. 2014).

### iii. <u>Materiality and Detrimental Reliance</u>

Turning to materiality and detrimental reliance, being the third and fourth factor, defendants argue that plaintiffs offer no evidence to satisfy these elements.

In the ERISA context, "a misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision in pursuing . . . benefits to which she may be entitled." <u>James</u>, 305 F.3d at 439; <u>DiFelice v. U.S. Airways, Inc.</u>, 397 F. Supp. 2d 758, 770 n.12 (E.D. Va. 2005).  The court finds that the misrepresentations in this case, if believed, would have been material inasmuch as, for example, they would have been a critical factor for plaintiffs in their decision to continue working for CONSOL's non-union mines.

Finally, "detrimental reliance is not limited to the retirement decision alone; rather it may encompass decisions to decline other employment opportunities, to forego the opportunity to purchase supplemental health insurance, or other important financial decisions pertaining to retirement." <u>In re Unisys Corp.</u>, 579 F.3d at 229.  Plaintiffs contend that they detrimentally relied on the misrepresentations "by paying premiums and working for Defendants for at least ten years---thus foregoing other job opportunities, retiring earlier than

they otherwise might have, and/or foregoing union representations."  ECF No. 103 ¶¶ 119-20; ECF No. 36 ¶ 111 (alleging detrimental reliance to include "foregoing  union representations").  Plaintiffs appear to have satisfied this element in their assertion that they detrimentally relied on defendants' misrepresentations when they achieved their equated service date and had their benefits terminated.

Accordingly, the court finds that plaintiffs have created a genuine issue of material fact based on the evidence to support their fiduciary duty claim against the corporate defendants.  However, Salvatori is entitled to summary judgment on this claim.

## C. Count III

On September 30, 2014, CONSOL announced that it was terminating retiree health and welfare benefits for all active employees, effective October 1, 2014.  Fitzwater, 2019 WL 5191245, at *3.  Under that announcement, active employees could still receive health and welfare benefits under the benefit plan for retired employees (the "Retiree Benefit Plan") if they were eligible to retire as of September 30, 2014, and did retire before the plan terminated, but with the plan then being set to terminate entirely on January 1, 2020 for them and for all retirees.  Id.  Active employees who continued working received

a one-time, lump sum transition payment (the "cash transition payment"), based on years of service and whether the employee was engaged in production or was staff, to support their healthcare coverage upon retirement.[21]  Id.  Individuals who had retired prior to the September 2014 announcement were not eligible to receive the cash transition payment as compensation for the termination of their retiree health and welfare benefits as of December 31, 2019.  Id.

Approximately 50 then-active workers who had reached age 55 and attained ten years of service by September 30, 2014, declined the cash transition payment, and instead elected to retire after September 30, 2014 and enroll in the Retiree Benefit Plan for the remaining five years ending December 31, 2019.  See ECF No. 226 at 2-3; see also First Lackovic Decl. ¶ 15, ECF No. 67-5.  When CONSOL then made its June 2015 announcement, terminating the Retiree Benefit Plan effective December 30, 2015, it offered the 50 new retirees, plus nine surviving spouses of workers, "a pro-rated portion of the

---

[21] The transition payments escalated in five-year increments according to employees' years of "credited service."  For example, production employees received $2,500 for 0-4.99 years of credited service, $10,000 for 10-14.99 years of credited service, and $100,000 for 30 years of credited service. "Staff Employees (Over age 50 as of 12/31/2013)" with those same years of credited service received $2,500, $5,000, and $10,000, respectively.  Id.

previously rejected [cash] transition payment." <u>Fitzwater</u>, 2019 WL 5191245, at *4; First Lackovic Decl. ¶ 15.  This pro-rated payment reflected the amount that the employees would have received under the previously rejected cash transition payment, pro-rated to reflect the fact that the employees had already received near one year of benefits under the Retiree Benefit Plan since October 1, 2014.  First Lackovic Decl. ¶ 15 at 3. The pro-rated benefit was paid out from December 2015 through January 2016. <u>See</u> ECF No. 238 at 2.

The court's October 2019 decision denying class certification concluded that "[t]he mere fact that retirees and active employees were treated differently does not support the assertion that they were discriminated against based on their health status under §1182," in relation to plaintiffs' claim that all earlier retired employees were discriminated against when CONSOL provided the one-time transition payment only to active employees who continued in service.  <u>Fitzwater</u>, 2019 WL 5191245, at *17.  Plaintiffs have since dropped this allegation. <u>See</u> Pls.' Opp. 17.

Plaintiffs instead refashion their claim under 29 U.S.C. § 1182 to focus on CONSOL's decision in June 2015 to offer the pro-rated transition payments, to, but only to, the 50 new retirees (and the 9 surviving spouses), who retired after

51

September 30, 2014 and expected to be covered under the Retiree Benefits Plan until January 1, 2020. Plaintiffs argue that the pro-rated transition payment, which they label the "Retiree Transition Benefit," limited eligibility to plan participants with the least claims experience. Pls.' Opp. 17.[22] The distinction plaintiffs draw under this theory is between the 50 newly retired employees given the benefit of the pro-rated payment, and the earlier retirees already in the Retiree Benefits Plan who were not. Plaintiffs allege that CONSOL knowingly drew this distinction and granted benefits to the retirees who had the least claims experience.

This allegedly violated 29 U.S.C. § 1182(a)(1), which prohibits a group health plan from "establish[ing] rules for eligibility . . . to enroll under the terms of the plan based on" health-status related factors, including "claims experience." § 1182(a)(1)(C). Plaintiffs also raise § 1182(b)(1), which bars requirements that force individuals "to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in

---

[22] Plaintiffs concede that this claim no longer applies to Gilbert and Prater who received a transition payment from CONSOL before retiring in 2014. Id.

the plan on the basis of any health status-related factor."  29 U.S.C. §§ 1182(a)(1), 1182(b)(1).

ERISA Section 702(a)(2) clarifies that § 702(a)(1) does not "require a group health plan, or group health insurance coverage, to provide particular benefits other than those provided under the terms of such plan or coverage." 29 U.S.C. § 1182(a)(2)(A).  It further adds that (a)(1) does not  "prevent . . . a plan or coverage from establishing limitations or restrictions on the amount, level, extent, or nature of the benefits or coverage for similarly situated individuals enrolled in the plan or coverage." 29 U.S.C. § 1182(a)(2)(B).  Plan provisions are not impermissibly discriminatory if they apply uniformly to similarly situated plan members.  See Zurich Am. Ins. Co. v. O'Hara, 604 F.3d 1232, 1238 (11th Cir. 2010); 29 C.F.R. § 2590.702(b)(2)(i)(B).

Thus, an insurer may use "claims experience" to set the price for the insurance plan as a whole, but administrators may not discriminate regarding eligibility for benefits within a group of otherwise similarly situated participants based on an individual's claims experience (or any other health status-related factors).  See 29 C.F.R. § 2590.702(c) (Example 1); Nondiscrimination and Wellness Programs in Health Coverage in the Group Market, 71 Fed. Reg. 75038, 75,041 (Dec. 13, 2006).

The Department of Labor regulations provide that ERISA plans "may treat participants as two or more distinct groups of similarly situated individuals if the distinction between or among the groups of participants is based on a bona fide employment-based classification," such as "full-time versus part-time status, different geographic location, membership in a collective bargaining unit, date of hire, length of service, current employee versus former employee status, and different occupations."  29 C.F.R. § 2590.702(d)(1).  These regulations also explain that "rules for eligibility include rules relating to "Eligibility for benefit packages (including rules for individuals to change their selection among benefit packages)," "Continued eligibility," and "Terminating coverage (including disenrollment) of any individual under the plan."  29 C.F.R. § 2590.702(b)(1)(ii).

Defendants' principal argument is that even if the transition payments fall within the scope of the statute, plaintiffs offer no evidence that the individual plaintiffs were subjected to discrimination based on claims experience. Defendants insist that plaintiffs have not shown CONSOL discriminated based on a prohibited health status-related factor when it offered the Retiree Transition Cash Benefit.

Plaintiffs contend that CONSOL's actions need only demonstrate disparate impact or treatment to show a violation of ERISA § 702.  See Warren Pearl Const. Corp. v. Guardian Life Ins. Co. of Am., 639 F. Supp. 2d 371, 379 (S.D.N.Y. 2009) ("Th[e] legislative history suggests that Congress was concerned with the disparate treatment of individuals.").  Therefore, plaintiffs conclude, they do not need to show that CONSOL acted with specific discriminatory intent to sustain Count III.

There remains a longstanding distinction between "disparate impact" and "disparate treatment" standards.  See Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993).  In claims requiring disparate treatment, "[p]roof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment."  Id. (quoting Teamsters v. United States, 431 U.S. 324, 335–336, n. 15 (1977)).  By contrast, proof of discriminatory motive is not necessary to sustain a claim of disparate impact.  Id.; Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 69 (3d Cir. 2017) ("Unlike claims of disparate treatment, disparate-impact claims do not require proof of discriminatory intent."); see generally Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001) ("To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others

with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.").

As ERISA § 702 seeks to prevent "disparate treatment," plaintiffs still need to meet the traditional showing "'that the unequal treatment was the result of intentional or purposeful discrimination.'" Adams v. Trustees of the Univ. of N.C.-Wilmington, 640 F.3d 550, 566 (4th Cir. 2011) (quoting Williams v. Hansen, 326 F.3d 569, 576 (4th Cir. 2003)).

In Warren Pearl Const. Corp. v. Guardian Life Ins. Co. of Am., for example, deposition testimony showed that the defendant had initiated a deliberate strategy "to eliminate [insurance] products or groups of products with high claims experience." 639 F. Supp. 2d 371, 374 (S.D.N.Y. 2009). The effort to determine which health insurance policies to discontinue "involved a state-by-state examination of premiums, claims, and loss ratios," defined as the ratio of incurred claims to earned premiums, of the company's older medical policies. Id. at 374-75. The company's subsequent analysis "examined specific plans and groups by claims experience" and "identified incurred claims and loss ratios on a policy-by-policy basis." Id. The company ultimately discontinued older medical policies in certain states "because policyholders in

those states were generating the highest claims." Id.  The letter alerting the state insurance department regarding the change specifically identified "the very high loss ratios we've experienced over the last two years" as a basis for the discontinuation.  Id.

Here, the only evidence that CONSOL analyzed claims experience comes from plaintiffs' expert witnesses.  Plaintiffs' ERISA expert, Harley Bjelland, defines "claims experience" to mean "the doctor bills, hospital bills, pharmaceutical expenses and surgeries that a specific group has actually incurred over a year or, even better, a number of years."  ECF No. 226-3 at 8 (Report of Harley Bjelland dated February 3, 2020) ("Bjelland Rpt.").  Bjelland asserts that the "primary difference" between those that were offered the Retiree Transition Benefit and the other retirees "was that the claims experience for the Fifty Retirees were better than the claims experience for the [approximately 2,900 earlier retirees who] had many years of claims experience with CONSOL."  Bjelland Rpt. 21 (asserting that the retirees not offered the transition payment were "the most vulnerable groups and their claims experience made them the most expensive group").  Bjelland bases his assertions on his interpretation of documents produced in discovery and his own

experience as an ERISA attorney and welfare benefits plan administrator for several non-parties.

Bjelland has no direct knowledge of whether CONSOL ever analyzed claims experience data before offering the transition payment. He admitted that his testimony only provides general background information that is not necessarily specific to this case. ECF No. 233-1 ("Bjelland Dep.") 255:7–17. His conclusions regarding CONSOL were based on assumptions rather than direct evidence, and he admitted that he lacks direct knowledge regarding why CONSOL offered transition payments. Id. at 70:4–71:24. He testified that he did not know whether the retirees who did not receive the Retiree Transition Benefit were less healthy. Id. at 262:11–263:15. His report acknowledges that whether a group of 50 individuals has a higher or lower claims experience may vary considerably.[23]

Although defendants refer to another of plaintiffs' experts, Daniel L. Selby, in their briefing, plaintiffs do not rely on Selby's testimony in their opposition to summary judgment. His report, even if considered, does not save Count

---

[23] Bjelland's report states, "Where an insurer is considering covering a smaller group (less than 50 participants), the claims and expenses ultimately incurred by the group is less predictable (for example, an expensive medical procedure, like a cancer or a premature birth, can skew the group as a high spending group)." Bjelland Rpt. at 4.

III.   Selby's report attempts to determine whether "retirees generate greater claims experience than active employees" and whether "there is reasonable assurance that the denial of health benefits to retirees is a function of claims experience."  ECF No. 231-25 at 8, 41-42 ("Selby Rpt.").  Selby performs three analyses.  First, using CONSOL's data, Selby's analysis found that pre-Medicare age retirees had higher average healthcare costs than active employees.  Id. at 9.  Second, using publicly available data from the Center for Disease Control website, Selby found that individuals aged 18-64 had higher incidents of certain health issues, deemed "functional limitations," than those aged 65 or older.  Id. at 9-10.  Using functional limitations as a proxy for healthcare costs, he infers that CONSOL retirees over 65 probably had greater claims experience than CONSOL's active employees.  Id.  Finally, in a supplemental report, Selby analyzed publicly available data from the U.S. government's Medical Expenditure Panel Survey, finding that individuals aged 65 or older experience higher healthcare costs than younger cohorts, especially those aged 18 to 44.  Id. at 40-42.  From this he again infers that CONSOL retirees, who are disproportionately in the 65 or older cohort, would have higher costs than active employees.  Id. at 42.

Selby's report only draws comparisons between retired and active employees, rather than between the two groups of retired employees, as plaintiffs otherwise attempt to do.  He does not form any conclusions regarding the difference in claims experience between newly retired employees and the already retired employees.  Even if Selby had shown a difference in claims experience between these two cohorts, his testimony revealed that he could only speculate as to whether CONSOL had actually considered claims experience, and that he did not "know what [CONSOL's] mindset was when they were deciding who to cover and who not to cover."  ECF No. 241-1 ("Selby Dep.") 38-39.

There is no direct evidence that CONSOL ever analyzed claims experience when determining whether to offer the Retiree Transition Cash Benefit.  Plaintiffs "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).  Nor may plaintiffs rely on unsupported assumptions by expert witnesses to prove a specific intent to discriminate.  See Warren Pearl, 639 F. Supp. 2d at 379; see also In re C. R. Bard, Inc., Pelvic Repair Sys. Prod. Liab. Litig., No. MDL 2187, 2018 WL 4220678, at *4 (S.D.W. Va. Sept. 5, 2018) ("Experts may not testify about what other parties did

or did not know, or their supposed intent behind their
actions").

Without evidence that CONSOL ever considered claims
experience data, the court has no basis to question CONSOL's
decision-making. As Salvatori explained in his testimony on why
CONSOL decided to offer the Retiree Transition Cash Benefit:

> [T]he reason we made that decision [to provide the
> Retiree Transition Cash Benefit] is when we announced
> that we were — these would have been active employees
> at the time of the announcement of the one-time
> payment versus the transition for five years for the
> retirees. These — this particular group of employees
> were employees at the time and came to us and asked if
> they could retire before the effective date of the
> change and therefore receive the five years, okay,
> happened — I don't know how many people — you know.
> We're talking several handfuls, I think. Ultimately,
> we then, because of business conditions, had to adjust
> the termination date of the plan from 1/1/20 to
> December 31st, 2015. And in our opinion, we had made
> the representation to these people that it would
> continue for five years. So we went back because of
> that and restored to them the pro-rata portion of the
> transition payment that they would have otherwise
> received.

Salvatori Dep. 116:11–117:5; ECF No. 233-3.[24]  Salvatori further

explained that CONSOL had "labor" or "credibility reasons" for

_____

[24] Salvatori provided the following explanation for the original
decision to offer transition payments in Fall 2014:

> For the retirees that existed at the time, the thinking
> was, if we go five years [before the retiree benefit is
> terminated] most of . . . them will have hit . . . Medicare
> age.  Once they hit [M]edicare age, we only function as the
> supplemental [coverage] . . . So you think of the two
> groups. . . . Group one would get to Medicare, current

offering the transition payments to active employees to "provide a concrete benefit and that was not necessary for our retire[es]".  Id. at 186:10–187:21; 188:13–190:6.

In the letter explaining CONSOL's decision to offer the pro-rated Retiree Transition Cash Benefit to the same 50 new retirees, dated June 26, 2015, it states that "[a]s an active employee at the time of [the September 30, 2014] announcement you were offered a one-time transition payment based on years of service and job classification however you elected to retire and to forgo receipt of this payment." See Third Lackovic Decl., Ex. V.  After notifying the recipient that health coverage under the Retiree Benefits Plan would terminate on December 31, 2015, it adds that "CONSOL is aware of the special circumstances as to why you currently have coverage.  CONSOL Energy has decided to provide you with a payment of $XXXX [sic] representing a pro-rated portion of the one-time transition payment that you previously elected to reject." Id. (highlighting removed).

As the court has previously found and plaintiffs now concede, distinguishing between retired and active employees does not violate 29 U.S.C. § 1182 either.  The Retiree

---

retirees.  They're good.  Group two, actives, we provided payment to but in exchange for that, we get a definite end date to the plan.  So there were just different needs.
Salvatori Dep. 189:16-190:6.

Transition Cash Benefit maintained the distinction between active and retired employees as of September 30, 2014.  It follows that if the initial one-time transition payment did not violate § 1182, offering a pro-rated portion of that offer based on the exact same distinction does not violate the statute either.

The record indicates that CONSOL made a bona fide classification based on the distinction between active and retired employees, and then offered a pro-rated version of the same benefit only to those retirees to whom they had previously made the offer.  See 29 C.F.R. § 2590.702(d)(1).  Speculation by plaintiffs or their experts that this decision was really based on claims experience does not create a genuine issue of material fact.  Accordingly, defendants are entitled to summary judgment as to Count III.[25]

D. Counts IV, V, VI, and VII

Defendants argue that plaintiffs' ERISA claims regarding SPDs (Fitzwater Counts V-VIII, treated as Casey Counts

---

[25] The defendants also argue that CONSOL did not make the transition payments as a fiduciary pursuant to an ERISA-qualified plan, but instead in a "settlor capacity."  The court does not need to, and declines to, reach this argument.

IV-VII) fail because ERISA does not provide substantive remedies for violations of these statutory provisions.

The applicable statute, 29 U.S.C § 1021, creates a duty in the plan administrator to distribute a summary plan description to participants and beneficiaries of an ERISA plan. Section 1022 provides that such SPDs must "be written in a manner calculated to be understood by the average plan participant, and . . . sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan" and must contain, among other requirements, "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." § 1022(a)-(b).

As defendants point out, Counts IV, V, and VI are all necessarily premised on the existence of a Lifetime Plan. Count IV alleges violation of § 1021(a)(1) because any SPDs furnished by defendants were insufficient for lack of accurate and comprehensive information about the benefits and obligations under the alleged Lifetime Plan. ECF No. 103 ¶¶ 135-142. Count V, citing § 1022(a), largely incorporates the allegations of Count IV, adding that the failure to distribute accurate and comprehensive SPDs was knowing and willful, and that information, such as Plan Number and benefits information,

64

contained in distributed SPDs was rendered inaccurate by the omission of the alleged Lifetime Plan.  Id. ¶¶ 143-45.  Count VI alleges that any disclosed SPDs were rendered inaccurate or incomplete for lack of information regarding eligibility requirements for the alleged Lifetime Plan.  Id. ¶¶ 146-152; see 29 U.S.C. § 1022(b).

Naturally, plaintiffs cannot maintain a claim for failure to distribute SPDs for the Lifetime Plan or to include the terms of the Lifetime Plan in SPDs when there was no Lifetime Plan.  Plaintiffs do not attempt to do so, but they do assert generally that Counts IV, V, and VI, as well as Count VII, provide support for the materiality of defendants' misrepresentations and the reasonableness of plaintiffs' reliance on CONSOL's written and oral representations "in the absence of timely production of SPDs."  Pls.' Opp. 19.  Taken as true, this does not support Counts IV, V, and VI surviving summary judgment as independent causes of action.  Without the existence of a Lifetime Plan, defendants are entitled to summary judgment on Counts IV, V, and VI.

With respect to Count VII, plaintiffs argue that CONSOL did not provide SPDs for the Retiree Benefits Plan within 90 days after CONSOL created Plan No. 583 (the Retiree Benefits Plan) in 2011, but only provided them to plaintiffs when they

attended a benefits seminar upon reaching retirement age.  Pls.'
Opp. 18; Pls.' Amend. Compl., ECF No. 108 ¶¶ 33, 34.  Unlike
Counts IV, V, and VI, Count VII does not rely on the existence
of a Lifetime Plan alone.  Rather, the failure to timely provide
SPDs in relation to the Retiree Benefits Plan would violate 29
U.S.C. § 1024(b)(1), which provides that "[t]he administrator
shall furnish to each participant, and each beneficiary
receiving benefits under the plan, a copy of the summary plan
description . . . within 90 days after he becomes a
participant."  29 U.S.C. § 1024(b)(1).

Plaintiffs argue that, under § 1132(a)(3), they are
entitled to equitable relief for violations of ERISA
requirements related to the untimely distribution of SPDs.
Pls.' Opp. 18; see 29 U.S.C. § 1132 (creating a cause of action
for a "participant ... to obtain other appropriate equitable
relief (i) to redress such violations or (ii) to enforce any
provisions of this subchapter...").  In CIGNA Corp. v. Amara,
the United States Supreme Court held that plaintiffs may seek
equitable remedies for ERISA violations under § 1132, which
"invokes the equitable powers of the District Court" and allows
for "other appropriate equitable relief."  563 U.S. 421 (2011);
see Skinner v. Northrop Grumman Ret. Plan B, 673 F.3d 1162, 1165
(9th Cir. 2012) (citing Amara, 563 U.S. 438-41); 29 U.S.C.

§ 1132.  Thus, to survive summary judgment on Count VII, plaintiffs must raise a genuine issue of material fact in support of their demand for "appropriate equitable relief."  <u>See Osberg v. Foot Locker, Inc.</u>, 555 F. App'x 77, 80 (2d Cir. 2014).

The Court in <u>Amara</u> indicated, in dicta, that there are three possible equitable remedies enabled by § 1132(a)(3): estoppel, reformation, and surcharge.  563 U.S. at 439-441; <u>Skinner</u> 673 U.S. at 1165.  Of these remedies, plaintiffs have only pled surcharge specifically, though general reference is made to "such other equitable or remedial relief as may be appropriate."  ECF Nos. 36 & 103, Prayer for Relief.

Defendants' motion for summary judgment does not identify a lack of evidence for the equitable remedies enabled by § 1132(a)(3).  Instead, they argue that plaintiffs' claim fails "as a matter of law because 'ERISA does not provide a substantive remedy for the violation' of 'ERISA-imposed disclosure requirements.'"  Defs.' Mot. Summ. J. at 15 (citing <u>Briggs v. Nat'l Union Fire Ins. Co. of Pittsburgh</u>, 774 F.App'x 943, 949–50 (6th Cir. 2019) (citations omitted); <u>Howard v. HCAThe Health Care Co.</u>, 2003 WL 342333 at *1 (5th Cir. Jan. 31, 2003)).

Neither case cited by defendants limited the availability of appropriate equitable relief for failure to

comply with disclosure requirements, as enumerated by the
Supreme Court, and as sought by plaintiffs.  The Sixth Circuit
in <u>Briggs</u> clarified that the phrase "substantive remedy" in the
above quote refers specifically to "an award of benefits" to the
plaintiff[26], 774 F.App'x at 949, and the Fifth Circuit in <u>Howard</u>
only limited the availability of what it referred to as a
"substantive damage remedy," for SPD disclosure violations.
2003 WL 342333 at *1.

Nor is the court free to interpret <u>Briggs</u> or <u>Howard</u> to
limit the availability of equitable relief for ERISA disclosure
violations, given the Supreme Court precedent.  The plaintiffs
in <u>Amara</u>, like the plaintiffs here, claimed harm from improper
disclosure of SPDs under 29 U.S.C. § 1024(b).  563 U.S. at 424-
25.  The Court held that ERISA allowed plan participants or

---

[26] The phrase "substantive remedy" does not appear in the statute
and whether the phrase "an award of benefits" in <u>Briggs</u> refers
to a legal or equitable remedy is not apparent. However, the
precedents cited in <u>Briggs</u> only use the phrase in reference to
legal remedies, i.e., damages.  <u>See</u> <u>Lewandowski v. Occidental
Chem. Corp.</u>, 986 F.2d 1006, 1009 (6th Cir. 1993) (per curiam)
(using phrase to mean damages); <u>Del Rio v. Toledo Edison Co.</u>,
130 F. App'x 746, 751 (6th Cir. 2005) (using phrase to mean
damages);  <u>Sears v. Union. Cent. Life Ins. Co.</u>, 222 F. App'x
474, 479 (6th Cir. 2007) (using phrase to mean damages).
Moreover, interpreting "substantive remedy" to mean "legal
remedy" would bring these precedents in line with the Supreme
Court's opinion in <u>Amara</u>, which found that ERISA authorizes
equitable remedies but not legal remedies for SPD disclosure
violations. 563 U.S. at 439; <u>see also</u> <u>Mertens v. Hewitt
Associates</u>, 508 U.S. 248, 256 (1993)(no damages authorized under
§ 1132(a)(3)).

beneficiaries suing fiduciaries to pursue traditional equitable
remedies in cases like this.  Id.  at 439-440.

Plaintiffs argue that equitable relief is available to
plan participants who suffered harm from misrepresentations or
untimely production of SPDs.  Pls.' Opp. 18, ECF No. 234.  While
plaintiffs appear to concede in their opposition brief that
equitable estoppel does not apply here, and make no reference to
contract reformation, plaintiffs do specifically seek surcharge
in the Casey complaint and make a general prayer for equitable
relief in both complaints.  ECF Nos. 36 & 103, Prayer for
Relief.

Defendants do not point to an absence of evidence that
CONSOL in fact breached its duty under the statute to timely
provide SPDs for the Retirement Benefit Plan and the prospect of
equitable relief cannot be foreclosed as a matter of law.
Defendants offer no other argument in favor of summary judgment
on Count VII.

Inasmuch as defendants have failed to show that
plaintiffs are not entitled to equitable relief for the alleged
untimely distribution of SPDs for the Retiree Benefit Plan, they
are not entitled to summary judgment on Count VII in Casey and
Count VIII in Fitzwater.

## IV.   Conclusion

Based on the foregoing, it is ORDERED that defendants' motion for summary judgment be, and it hereby is, granted as to Counts II, III, IV, V, and VI of the Casey complaint, and Counts II, III, IV, V, VI, and VII of the Fitzwater complaint.  It is further ORDERED that defendants' motion is granted as to Count I of both the Fitzwater and Casey complaints with respect to Salvatori, and otherwise denied as to Count I.  It is further ORDERED that defendants' motion is denied as to Count VII of the Casey complaint and Count VIII of the Fitzwater complaint.

The Clerk is requested to forward copies of this order to all counsel of record and to any unrepresented parties.

ENTER: October 22, 2020

John T. Copenhaver, Jr.
Senior United States District Judge