<pre>
 1                IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                          AT CHARLESTON

 3   _____x
                                    :
 4   BENNY FITZWATER,               :  CIVIL ACTION
     CLARENCE BRIGHT, TERRY PRATER, :  NO. 2:16-cv-09849
 5   EMMET CASEY, JR.,              :
     CONNIE Z. GILBERT,             :  Consolidated with:
 6   ALLAN H. JACK, SR., and,       :  CIVIL ACTION
     ROBERT H. LONG.,               :  NO. 1:17-cv-03861
 7               Plaintiffs,        :
                                    :
 8                  -vs-            :
                                    :
 9   CONSOL ENERGY, INC.,           :
     CONSOLIDATION COAL CO.,        :
10   FOLA COAL CO., LLC,            :
     CONSOL OF KENTUCKY, INC.,      :
11   CONSOL PENNSYLVANIA COAL CO.,  :
     LLC, and KURT SALVATORI,       :
12                                  : BENCH TRIAL
                 Defendants.        : VOLUME I
13   _____x
</pre>

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.,**
**SENIOR UNITED STATES DISTRICT JUDGE**
**FEBRUARY 9, 2021**

**APPEARANCES:**
**FOR THE PLAINTIFFS:**          **SAMUEL B. PETSONK, ESQUIRE**
                                PETSONK PLLC
                                P. O. Box 1045
                                Beckley, WV  25802

        Proceedings recorded by mechanical stenography, transcript produced by computer.

                        _____
                        CATHERINE SCHUTTE-STANT, RDR, CRR
                            Federal Official Court Reporter
                        300 Virginia Street East, Room 6009
                                Charleston, WV 25301

```
 1    APPEARANCES CONTINUED:

 2    FOR THE PLAINTIFFS:        BREN J. POMPONIO, ESQUIRE
                                 LAURA DAVIDSON, ESQUIRE
 3                               Mountain State Justice, Inc.
                                 1217 Quarrier Street
 4                               Charleston, WV  25301

 5

 6

 7    FOR THE DEFENDANTS:        JOSEPH J. TORRES, ESQUIRE
                                 ALEXIS E. BATES, ESQUIRE
 8                               EMMA J. O'CONNOR, ESQUIRE
                                 KATHERINE M. FUNDERBURG, ESQUIRE
 9                               Jenner & Block LLP
                                 353 N. Clark Street
10                               Chicago, IL  60654

11

12

13    FOR THE DEFENDANTS:        MICHAEL D. MULLINS, ESQUIRE
                                 Steptoe & Johnson PLLC
14                               707 Virginia Street East
                                 17th Floor
15                               Charleston, WV 25301

16

17

18

19

20

21

22

23

24

25
```

```
                                    INDEX
         PLAINTIFF'S
         WITNESSES        DIRECT   CROSS   REDIRECT  RECROSS   EXAMINATION

         ALLAN JACK, SR.   28      49       84        87          ^
         VOIR DIRE         45


         EMMETT CASEY, JR. 89     122      157        158        159



         TERRY PRATER     161     176      201        203          ^



         CONNIE GILBERT   207      ^        ^          ^           ^
         VOIR DIRE        220




         DEFENDANT'S
         WITNESSES        DIRECT   CROSS   REDIRECT  RECROSS   EXAMINATION

         (NONE)            ^        ^        ^          ^           ^




         Plaintiffs' opening statement                         8, 18

         Defendants' opening statement                           10
```

```
1                          INDEX TO EXHIBITS

2    PLAINTIFF'S
     EXHIBITS                              ADMITTED
3
     1                                        49
4    2                                        49
     3                                        46
5    4                                       121
     5                                       176
6    6                                       176
     7                                       224
7

8

9

10   DEFENDANT'S
     EXHIBITS                  ADMITTED
11
     1                                        63
12   3                                        77
     5                                       134
13   6                                       150
     7                                       196
14

15

16

17

18

19

20

21

22

23

24

25
```

FITZWATER vs CONSOL

1            (The following Bench Trial was held before the

2       Honorable John T. Copenhaver, Jr., Senior United States

3       District Judge, in the case of Fitzwater, et. al. versus

4       CONSOL, et. al, commencing on Tuesday, February 9, 2021, at

5       Charleston, West Virginia.)

6                    P-R-O-C-E-E-D-I-N-G-S              9:37 a.m.

7            THE CLERK:  All rise.

8            THE COURT:  Good morning.  Please be seated.

9            THE CLERK:  The case before the Court is *Benny*

10      *Fitzwater, et. al., versus CONSOL Energy, Inc., et. al.,*

11      Civil Action Number 2:16-cv-09849, and *Emmett Casey, Jr.,*

12      *et. al.,* versus *CONSOL Energy, Inc., et. al.,* Civil Action

13      Number 1:17-cv-3861.

14         Would counsel note their appearances for the record.

15            MR. PETSONK:  Sam Petsonk on behalf of Petsonk,

16      LLC, on behalf of the plaintiffs.

17            MR. POMPONIO:  Bren Pomponio from Mountain State

18      Justice on behalf of the plaintiffs.  And, Judge, I'd like

19      to introduce Laura Davidson, who is a new lawyer at Mountain

20      State Justice.  She'll be helping out with the case.

21            THE COURT:  Thank you.

22            MR. PETSONK:  Thank you, Your Honor.

23            MR. TORRES:  Good morning, Your Honor.  Joseph

24      Torres, Jenner & Block, LLP, on behalf of the defendants.

25      And, Your Honor, I'm joined from my firm with Alexis Bates,

FITZWATER vs CONSOL

1    Emma O'Connor, and Katherine Funderburg.  They'll be

2    assisting us today in the trial.

3              THE COURT:  Seems like you're well supported.

4              MR. TORRES:  Yes, Your Honor, very much so.  And

5    this is Matthew Tyree; he's a representative of the

6    defendants, Your Honor.

7              THE COURT:  Thank you.

8              MR. MULLINS:  Michael Mullins on behalf of the

9    defense as well.

10             THE COURT:  Thank you.

11        I understand the parties wish to present opening

12   statements, and the plaintiff may proceed.

13             MR. TORRES:  Your Honor, before they do that, we

14   had a couple of -- and we can deal with this later.  We had

15   a motion to amend the pretrial order.  We can deal with that

16   after the opening statements if Your Honor prefers.

17             THE COURT:  And what is the motion to amend?

18             MS. BATES:  Your Honor, we'd like to move to amend

19   the pretrial order and add one witness and one exhibit.  I

20   think Mr. Torres mentioned the witness yesterday as an

21   additional rebuttal witness.

22             THE COURT:  And what's the name?

23             MS. BATES:  His name is Terry Mason.

24             THE COURT:  And any objection?

25             MR. PETSONK:  No, Your Honor.  We have no

1    objection to that.

2              THE COURT:  Was there another matter?

3              MS. BATES:  Yes.  We'd like to add an exhibit,

4    that is another Summary Plan Description.  And I've

5    conferred with opposing counsel and they suggested they

6    don't have an objection to that either.

7              THE COURT:  All right.  And how do you describe

8    that on the pretrial order that has about 23 listed?

9    Although, I'm not sure that they are necessarily 23

10   different ones, but we'll learn that in due course.

11             MS. BATES:  Well, they are similar.

12             THE COURT:  What's this one?

13             MS. BATES:  This one is a 2009 Active Employee

14   Summary Plan Description for production and maintenance

15   employees.  Slightly different from what we have, but --

16             THE COURT:  Any objection?

17             MR. PETSONK:  No, Your Honor.  We made several

18   points of understanding through the pretrial process and we

19   have no objection to this or for the other arrangements.

20   Thank you.

21             THE COURT:  The amendment is accepted and those

22   two items are deemed included.

23             MS. BATES:  Thank you, Your Honor.

24             THE COURT:  Any other motions before opening?

25             MR. TORRES:  Again, Your Honor, we have two

FITZWATER vs CONSOL

1    Motions in Limine pending.  We can take those up after

2    opening if Your Honor would prefer.

3            THE COURT:  We may not take them up until after

4    today, but we'll see what the need is.

5        And are you ready to proceed, Mr. Petsonk?

6            MR. PETSONK:  Yes, Your Honor.  Thank you.

7            THE COURT:  Very good.  Please go ahead.

8            MR. PETSONK:  Thank you, Your Honor, for the

9    opportunity to make an opening statement here, Your Honor.

10   As the Court is aware, we're here to try claims of breach of

11   fiduciary duty and untimely disclosure of Summary Plan

12   Descriptions; conduct alleged against the defendants, and we

13   have seven plaintiffs who will testify about their work

14   history and what the defendants represented to the

15   plaintiffs about their retiree welfare benefits.

16       We have -- we have a witness, Mike Hymes, who will

17   testify about CONSOL's retiree welfare benefits program for

18   nonunion coal miners.  We have six pattern witnesses.  As

19   the Court is aware, two of those will be presented through

20   video deposition.  And we have four others who have been set

21   forth in our pretrial briefing who will be intent on

22   testifying in person.  And those pattern witnesses will

23   testify about how CONSOL communicated about the retiree

24   welfare benefits with employees and retirees, and who made

25   those communications on behalf of CONSOL.

1    We have one expert witness who will testify as to

2    the value lost by the plaintiffs when CONSOL terminated the

3    retiree welfare benefits.  And Kurt Salvatori, the Plan

4    Administer and CONSOL Vice President of Human Resources at

5    the relevant times, is being called in our case to introduce

6    certain evidence for foundation purposes.

7    I can set forth -- I would like to reserve some time

8    for rebuttal.  I don't mean to elaborate or go on

9    unnecessarily with an opening at this point.  If I may

10   reserve some time for rebuttal in response to whatever my

11   opposing counsel may say in his opening, I would appreciate

12   that, Your Honor.  And as I had requested previously, we'd

13   like the opportunity to give a more full summation at the

14   conclusion of the defendants' case.

15        THE COURT:  Well, if there is no objection from

16   the defendant that you proceed that way.

17   Is there an objection?

18        MR. TORRES:  No, Your Honor.

19        THE COURT:  Very good.  And so you may proceed

20   accordingly.  But I take it you've made a fair statement of

21   your case at the beginning?

22        MR. PETSONK:  Yes, Your Honor.  Our case, it

23   turns, as the Court is aware, on a claim of breach of

24   fiduciary duty, misrepresentations about incredibly

25   significant retiree welfare benefits for which our clients

1    labored for years to earn.  And as a fiduciary, CONSOL, we

2    believe, should be liable for the misrepresentations made by

3    its fiduciary and its agents.

4             THE COURT:  In addition, I understand that you

5    contend that the Summary Plan Descriptions were not

6    delivered --

7             MR. PETSONK:  That is correct.

8             THE COURT:  -- that is, they were not delivered

9    timely?

10            MR. PETSONK:  They were not delivered timely.  And

11   our plaintiffs are prepared to set forth -- the law

12   requires, Your Honor, and we've set forth in our briefing

13   and at length that the Summary Plan Descriptions be tendered

14   within 90 days after a person becomes a participant in a

15   plan.  And our testimony will address that particular

16   allegation as well as the broader evidence regarding the

17   pattern of conduct and the actions comprising the various

18   incidents of breach of fiduciary duty, which we have

19   alleged, and which we intend to prove in the coming days,

20   Your Honor.

21            THE COURT:  Thank you.

22            MR. PETSONK:  Thank you.

23            MR. TORRES:  Good morning, Your Honor.

24        As counsel alluded to a moment ago, there are two

25   remaining issues in this case for trial.  There is a breach

1    of fiduciary duty claim.  And in denying our Motion for

2    Summary Judgment, Your Honor framed the issue at page 46 of

3    your ruling that the issue for trial is whether affirmative

4    misstatements were made by CONSOL regarding the nature of

5    lifetime -- or of the retiree medical benefits.

6         The other claim is Summary Plan Description claim, Your

7    Honor.  You framed at page 65 of your summary judgment

8    ruling as an issue of fact whether CONSOL issued an SPD

9    within 90 days after creating the retiree plan in 2011.

10   That date is significant and I'll get back to that in a

11   moment.

12        Your Honor, the context for resolving these claims will

13   not only consist of the evidence and the testimony that's

14   presented to Your Honor in the coming days, but I think Your

15   Honor needs to keep in mind the concept of your prior

16   rulings and how that further is relevant to resolving the

17   claims that remain before it.

18        As to the breach of fiduciary duty claim, Your Honor,

19   three key points.  First off, as Your Honor has already

20   recognized on Summary Judgment, ERISA provides that the

21   written plan documents issued by a plan sponsor, CONSOL in

22   this case, control.  And that, generally speaking, ERISA

23   does not allow oral modifications to written plan documents.

24   And as Your Honor has already found, such plan documents can

25   be terminated when they contain, among other things,

1    reservation of rights clauses, which Your Honor found

2    included here.  So that's the first key point, Your Honor.

3        The second key point, Your Honor, is that

4    non-fiduciaries under the Department of Labor regulations

5    issued in 1975 or 1976 -- so almost from the inception of

6    ERISA -- the definition of "fiduciary" has been defined to

7    exclude ministerial acts by non-fiduciaries.  That

8    regulation has been repeatedly cited and endorsed by the

9    Fourth Circuit.  The exception to that well-established

10   rule, Your Honor, that you alluded to on Summary Judgment,

11   are encompassed by cases such as *Unisys* from the Third

12   Circuit and *Pirelli* from the Sixth Circuit.

13       And the third key point, Your Honor, there are key

14   features of those cases that will be absent from the

15   evidence presented at trial by both plaintiffs and

16   defendants.

17       That key piece of evidence -- the key feature, Your

18   Honor -- excuse me -- in each of those cases, the Court

19   found evidence of the employer's affirmative action in

20   directing individuals to misrepresent, lie, misstate, the

21   nature of the written benefit documents.  Whereas employers,

22   the evidence of employers affirmatively deciding to direct

23   that that information be disseminated by third parties.

24       There will be no evidence that CONSOL directed any of

25   the individuals named by the plaintiffs to make any alleged

1   misstatements or misrepresentations regarding the nature of

2   retiree medical benefits.

3        So this case, Your Honor, lines up clearly with the

4   default ministerial rule.  And that's particularly bolstered

5   in this case, Your Honor, by your prior findings that there

6   was a clear history throughout the time period we are

7   talking, from the 1970s, when Mr. Casey claims he first was

8   promised something, up until 2014, when Ms. Gilbert and

9   others claim she was made promises, that throughout that

10  entire period, Your Honor, CONSOL consistently issued

11  written documents that specifically advised employees and

12  future retirees that the company reserved the right to

13  terminate those benefits.

14       This Court has already found, and the plaintiffs have

15  already admitted -- or not denied the fact that CONSOL

16  issued such documents.

17       So there will be no evidence in this case, Your Honor,

18  that will bring these claims within the purview of cases

19  such as *Unisys* and *Pirelli*.

20       Similarly, Your Honor, we believe that the rebuttal

21  testimony from the witnesses we would present will confirm

22  that CONSOL never directed any of these individuals to make

23  any sort of affirmative misrepresentations or lies or

24  misstatements regarding the nature of the length of retiree

25  medical benefits.

1          This, Your Honor, assumes that the statements that the

2     plaintiffs will testify to could even be considered lifetime

3     promises or misrepresentations.

4          Obviously, testimony is going to vary, Your Honor, but

5     testimony that someone explained eligibility requirements

6     for retiree medical, is not a statement of lifetime

7     benefits; it's not a misrepresentation.

8          Statements regarding the possibility of whether

9     benefits would remain in the future is not a

10    misrepresentation of a present fact, Your Honor.

11         Statements explaining what the benefits provided at a

12    particular point in time is not a misrepresentation, Your

13    Honor.

14         And as the Sixth Circuit recognized in *Sprague*, there

15    was no requirement under ERISA that every time you're

16    talking about how long benefits may last, that there is some

17    requirement that every instance in which that occurs, the

18    employer is required to say, but, by the way, we also have a

19    reservations of rights clause, particularly when the written

20    documents consistently advised employees that there was a

21    reservation of rights clause.

22         As to the Summary Plan Description claim, Your Honor,

23    the premise of Your Honor's ruling as to an issue of fact

24    turns on the timing of issuing Summary Plan Descriptions

25    after 2011.

1        Well, Your Honor, five of the seven plaintiffs didn't

2   retire until after 2011.  So even if the plaintiffs' theory

3   is correct, that there was an obligation to issue a new SPD

4   after 2011, five of these plaintiffs were not even retirees

5   at the time.  So even if you were to agree that they were

6   participants in a new plan, 90 days after 2011, those five

7   individuals hadn't even yet retired.

8        Mr. Jack -- I mean, Mr. Long retired in 2003, but he

9   admits he knew all along that the plans issued by CONSOL

10   included reservation of rights clauses.  He was quoted in an

11   article where he admitted that that was the way in which

12   CONSOL was able to terminate those benefits.

13        So we also believe, Your Honor, in addition to that

14   factual inaccuracy in plaintiffs' theory that the evidence

15   will show that CONSOL did in fact issue summary --

16   materials -- summaries of material modification, Your Honor,

17   in 2011 and 2012, which would have satisfied their

18   obligation after issuing the 2011 document to advise

19   participants that there had been changes to the plans in

20   2011.

21        So we believe the facts will demonstrate there was no

22   failure to issue any communication that ERISA would allow a

23   sponsor to communicate at the time that the benefit plan was

24   amended in 2011.

25        As to, you know, the observations or statements of

1    counsel, Your Honor, we think that Mr. -- just to deal with

2    a couple of quick points, Your Honor.  Mr. Hymes, Your

3    Honor, has already considered his testimony and found it to

4    be of limited time value and breadth, and as well as the

5    fact that Mr. Hymes himself admits, as I've just stated,

6    that the plans that CONSOL issued did in fact include

7    written reservation of rights clause.  So, if anything, we

8    think Mr. Hymes' testimony will support defendants'

9    position, not satisfy the claim against it.

10        Our positions regarding the apparent witnesses as set

11    forth in our pending motions.  And as to Mr. Selby -- one

12    last point, Your Honor, and I'll sit down.  Counsel

13    suggested that Mr. Selby now is going to testify about the

14    value of lost -- losses to the plaintiffs.  That's not even

15    what they told Your Honor before.  Before, they said that

16    Mr. Selby was going to somehow testify as to the appropriate

17    remedies that would be allowable in this case, but now

18    apparently Mr. Selby is going to offer a damages analysis.

19    And we think that's yet another further reason why he

20    shouldn't be allowed to testify, because Mr. Selby offered

21    no expert testimony regarding the losses the plaintiffs

22    claim to allege.

23        He admitted that he had no knowledge of any facts

24    specific to this case.  He was talking about general

25    principles of claims experience.  And so that, in our view,

1    Your Honor, that just further bolsters the conclusion that

2    Mr. Selby should not be allowed to testify today.

3        I appreciate, Your Honor, the opportunity to set forth

4    our positions on the case.  Thank you.

5            THE COURT:  Mr. Torres, let me ask you one

6    question.  And you may not want to answer it just yet.  But

7    is the defendant prepared to state those individuals who

8    would fall in the fiduciary class?

9            MR. TORRES:  Any of the individuals identified by

10   the plaintiffs, Your Honor?

11           THE COURT:  I'm asking, in effect, what your

12   evidence is going to be as to who it was and was not a

13   fiduciary, which can be solved by learning who is a

14   fiduciary.  And the Court then will assume the defendant

15   takes the position that no one else is.

16           MR. TORRES:  That's correct, Your Honor.  So Mr.

17   Salvatori was the named fiduciary.  And then there was one

18   individual for the time period we are talking about -- there

19   was several other individuals that Mr. Salvatori will

20   testify were the named fiduciaries during the relevant time

21   period.  None of those individuals are any of the people

22   that the plaintiffs are going to identify in the testimony.

23           THE COURT:  Thank you.

24           MR. TORRES:  Thank you, Your Honor.

25           THE COURT:  Mr. Petsonk, you've been given an

1    unusual option, and that is, on opening statement to make a

2    rebuttal.  And as Mr. Torres agreed to it, you may do so.

3         MR. PETSONK:  Thank you, Your Honor.

4         And I had hoped not to belabor the Court with argument

5    during the opening and I don't intend to do that, but I hope

6    if it's helpful.

7         THE COURT:  Well, we are not interested in

8    argument at this stage; but what you expect to prove.

9         MR. PETSONK:  That's exactly what I want to

10   clarify to the Court in light of Mr. Torres' presentation.

11        First of all, as to fiduciaries -- we expect to try an

12   allegation that our clients were misled by the apparent

13   agents of the named fiduciary, Mr. Salvatori, who was the

14   Vice President of the Human Resources Department for CONSOL.

15        And we intend to show that Mr. Salvatori -- the Human

16   Resources Department made misrepresentations to our

17   plaintiffs when they -- when those Human Resources apparent

18   agents conveyed information about the plan's terms and about

19   the length of benefits that the participants or

20   beneficiaries would receive in the future under the plan.

21        And as the Sixth Circuit has also noted in the

22   *Deschamps* case, those are the very actions that comprise --

23   that is, actions that are intended to allow or that

24   purportedly allow a participant to make an informed choice

25   about his continued participation in a plan.  Those are

1    actions of an apparent agent of a fiduciary -- or they may

2    be, and we assert they are here.  So that's what we intend

3    to show in light of Your Honor's order, allowing us to try

4    the case on this theory of apparent agency.

5        And we'll show not only that those -- show those Human

6    Resources fiduciary agents misrepresented and misled the

7    plaintiffs substantially about their likely benefits they

8    would receive in the future, but we'll show that as to the

9    reservation of rights, which you heard about, that they

10   concealed the reservation of rights in addition to

11   misrepresenting the reservation of rights.

12       And, Your Honor, briefly, as to the term of the

13   disclosure of the Summary Plan Description.

14       The law, as we've set forth, does not require that --

15   what we intend to show is not that CONSOL failed to provide

16   the Summary Plan Description within 90 days after our

17   plaintiffs retired; what we intend to show is, rather, what

18   the law does require, that it -- it was not performed by

19   CONSOL, what the law requires, what is relevant to our

20   showing here is in 29, United States Code, 1024(b).

21       And simply, we intend to show that the administrator of

22   the plan failed to furnish to each participant a copy --

23   each participant in the plan, which a participant is anyone

24   who is eligible or may become eligible to receive benefits

25   under a plan.  That is a defined term which we intend to

1    show that our plaintiffs at a certain point in time pursuant

2    to the criteria under the plan did become eligible to

3    receive benefits; they became plan participants upon

4    attaining a certain criteria, and we intend to show that

5    within 90 days after our plaintiffs became a participant in

6    the plan, CONSOL failed to give them a copy of a Summary

7    Plan Description within that 90-day period after our

8    plaintiffs became participants in the retiree benefits plan.

9         That is a distinct showing from a failure to produce

10   the SPD 90 days after they retired.  That is, we'll show

11   that they became participants at one point in time, and then

12   90 days after that, they did not receive a Summary Plan

13   Description.  And then later on, when they retired, and they

14   may or may not, depending on the facts of their situation,

15   have received a Summary Plan Description at that later point

16   in time.

17        We are going to make the prior showing that within 90

18   days after they first became eligible or became possibly

19   eligible -- that is, within 90 days after they became a

20   participant, we'll show they didn't receive a Summary Plan

21   Description.

22        At any rate, Your Honor, I wanted to be clear about the

23   relevant time frames.  And I hope I have been.  And that's

24   what we intend to show as to the timeliness of the Summary

25   Plan Descriptions.

```
 1              THE COURT:  Thank you.
 2          Let me ask you about that.
 3              MR. PETSONK:  Yes, Your Honor.
 4              THE COURT:  What impact is the transfer of an
 5      individual from one company to another insofar as SPDs are
 6      concerned?
 7              MR. PETSONK:  No impact at all, Your Honor.
 8      Because the requirement to produce an SPD, we will --
 9      applies between a plan administrator and the participants in
10      that plan.  And so at any time that a person becomes a
11      participant in a ERISA welfare benefit plan, the
12      administrator of that plan is required to provide a copy of
13      the Summary Plan Description for that individual within 90
14      days after they become a participant.
15          And that's what we allege the defendants failed to do
16      here.  And we allege that because of the misrepresentations,
17      inequity, the Court should provide relief to those
18      individuals who relied on CONSOL's misrepresentations about
19      the welfare benefits.
20              THE COURT:  Thank you.
21          Mr. Torres, you didn't have an opportunity to address a
22      matter that's been raised, and if you wish to, you are
23      welcome to do so.
24              MR. TORRES:  Thank you, Your Honor.  As I
25      understand plaintiffs' new theory, which of course is not
```

1    the theory that they offered at Summary Judgment, they are

2    now claiming that ERISA requires someone to receive, in this

3    case, a retiree Summary Plan Description 90 days after they

4    become retirement eligible, so sometime before they actually

5    retire.

6         And, Your Honor, the law is clear that to the extent

7    that someone has become retirement eligible says nothing

8    about whether they become a participant in a retiree plan.

9    They have to actually retire.  That's the time period when

10   someone goes from being a possible retiree to an actual

11   retiree.

12        So if there is even an argument that these individuals

13   should have received an SPD within 90 days of becoming a

14   participant, then the key time period, Your Honor, is not

15   when they become retirement eligible.  The key point in time

16   is when they, in fact, retire.

17        As I mentioned a moment ago, five of these seven

18   plaintiffs did not retire until after 2011, Your Honor.

19        The other point I would make, Your Honor, as to the --

20   two other points, Your Honor.  First off, the evidence will

21   show that throughout their employment, these individuals

22   will either admit they received multiple Summary Plan

23   Descriptions or can't deny that they would have received

24   Summary Plan Descriptions.  And all of those Summary Plan

25   Descriptions, Your Honor, contained, among other things, the

1   reservation of rights clause that we are talking about.  So

2   there is no showing of any harm here because to the extent

3   they claim they were harmed by the termination of the

4   benefits or the knowledge that the benefits could be

5   terminated, CONSOL's plan consistently advised employees

6   throughout their employment that the reservation applied to

7   not only current employees but current retirees and future

8   retirees, Your Honor.

9        And then as to the effect of someone being transferred

10  to a new company, you're talking about a new company outside

11  of CONSOL.  Well, of course, then, at that point, Your

12  Honor, they are no longer a participant in any CONSOL

13  benefit plan.  That directly relates to Mr. Long's claims.

14       Mr. Long's benefits were not terminated by CONSOL.  He

15  was -- his liabilities were transferred to Murray Energy.

16  And there is no dispute that Murray Energy terminated Mr.

17  Long's benefits before CONSOL announced any of the matters

18  that are at issue before this Court.  So the idea that Mr.

19  Long still had some right to receive information from CONSOL

20  after it's undisputed that his liabilities were transferred

21  to Murray Energy is -- there is no support for that anywhere

22  in ERISA, because he was no longer a participant in any

23  CONSOL ERISA benefit plan at that point.

24       Thank you, Your Honor.

25            THE COURT:  Very good.  And thank you.

1         Let me ask you about the terms by which various

2     entities will be referred.

3         There is some confusion about the use of the term

4     "CONSOL."  And I'd like to understand whether or not CONSOL

5     means nothing but CONSOL Energy?

6         Is that in keeping with the parties' understanding?

7              MR. PETSONK:  Well, not -- not on behalf of the

8     plaintiffs, Your Honor.  At a very minimum, when I refer to

9     CONSOL, and when my witnesses refer to CONSOL, they are

10    referring to the defendants.

11             THE COURT:  That is, all of the defendants?

12             MR. PETSONK:  That's correct.

13             THE COURT:  CONSOL is the parent corporation?

14             MR. PETSONK:  That's correct.

15             THE COURT:  And it's the parent of Fola and

16    Pennsylvania, CONSOL of Kentucky?

17             MR. PETSONK:  Yes, Your Honor.

18             THE COURT:  And Consolidation?

19             MR. PETSONK:  Correct.  And there are predecessor

20    entities at earlier periods of time, but at the time of --

21    of our complaint, we referred to the -- to the legal entity

22    that currently controlled the relevant subsidiaries, and

23    when we refer to "CONSOL," we refer to that parent entity

24    and its subsidiaries, and the predecessor controllers,

25    because we are talking about prior periods of time, the

1    legal entity in the '80s, for instance, or the '90s --

2         THE COURT:  Well, if you are referring to

3    everybody as CONSOL, how does one distinguish CONSOL Energy,

4    the parent, and the subsidiaries?

5         MR. PETSONK:  I believe that the relevant

6    fiduciary here is an employee of CONSOL Energy.  And the

7    relevant fiduciary was always an employee of the parent

8    entity.  And so the apparent agents throughout the course

9    are the apparent agents of the parent entity.  And so it's

10   for that purpose that in our allegation breach of the

11   fiduciary, we are referring to the parent entity.

12       If that answers your question, Your Honor?

13        THE COURT:  And do I understand that during the

14   course of these events, Fola was acquired by CONSOL?

15        MR. PETSONK:  In 2007, yes.

16        THE COURT:  So what's the first date that you

17   begin dealing with Fola?

18        MR. PETSONK:  It is in the year of 2007.  I don't

19   know that I can give you a date within that year, but it

20   would be in the calendar year of 2007.  And I could provide

21   evidence to that.

22        THE COURT:  Well, you've cleared that up.  And I

23   think I understand.

24        MR. PETSONK:  Thank you.

25        THE COURT:  Mr. Torres.

1        MR. TORRES:  Thank you, Your Honor.  Just some

2    clarification on what was just discussed.

3        CONSOL Energy, as one of the defendants, also has a

4    number of subsidiaries that are defendants in this action,

5    Pennsylvania, AMVEST, et cetera.  There will be evidence

6    that none of those entities acted or had their own

7    fiduciaries, but that they were all provided the same

8    benefits that CONSOL Energy provided to its employees,

9    regardless of what subsidiary they perhaps fell within.

10       So, in our view -- and we think the evidence will show

11   this -- there is no evidence that any of those entities took

12   any different actions or engaged in some different conduct

13   than CONSOL Energy, the parent.

14       So we think they rise and fall together, if you will,

15   Your Honor, in terms of the actions we're talking about.

16   Again, AMVEST was not purchased until July of 2007.  Some of

17   these assets were sold to Murray Energy, et cetera.

18       The only other point I would make, Your Honor, is that

19   at some of the earlier points in time, CONSOL was not a

20   parent; CONSOL was owned by other entities, and we'll get

21   into that in testimony.  So at one point, it was owned by

22   DuPont during some of the time periods we're talking about,

23   and other points in time, it was owned by Conoco.  And we

24   think that that's relevant, Your Honor, also as to some of

25   the claims that the individuals here raise, but we can get

1    into that in the testimony as things progress.

2              THE COURT:  Well, let me ask you, is it correct

3    that CONSOL is deemed a parent of all of the entities that

4    are parties to this case; that is, defendants, from 2007,

5    on?

6              MR. TORRES:  Yes, with one exception, Your Honor,

7    and that is, Consolidation Coal was sold to Murray Energy.

8    It was referring to what happened to Mr. Long.  So there is

9    that.

10             THE COURT:  What year was that?

11             MR. TORRES:  2014, Your Honor.  But as to CONSOL

12   of Pennsylvania, CONSOL of Kentucky, and AMVEST, it would be

13   accurate -- and I believe Mr. Salvatori will cover this in

14   his testimony, that those entities continued on, at least up

15   until the time that the benefits were terminated.

16             THE COURT:  Thank you.  I think that covers that

17   aspect of it.

18        And I take it that the plaintiff is ready to proceed

19   with its case?

20             MR. PETSONK:  Yes, Your Honor, we are.

21             THE COURT:  We'll be just a moment.

22        Let me see you a moment.

23        (Pause.)

24             THE COURT:  Mr. Petsonk, you may call your first

25   witness.

JACK - DIRECT

```
 1                    MR. PETSONK:  The plaintiffs call Allan Jack.

 2                    THE CLERK:  Mr. Jack, if you'd please step up to

 3     the microphone.

 4                    THE COURT:  Direct him to the lectern.

 5                    THE CLERK:  I'm sorry -- to the lectern.

 6           Would you please state your full name and spell it for

 7     the record.

 8                    MR. JACK:  Allan, A-L-L-A-N, Harvey, H-A-R-V-E-Y,

 9     Jack, J-A-C-K, Sr.

10                    THE CLERK:  Please raise your right hand to be

11     sworn.

12                ALLAN HARVEY JACK, SR., PLAINTIFF, SWORN

13                    THE CLERK:  Please take the stand, thank you.

14                             DIRECT EXAMINATION

15     BY MR. POMPONIO:

16     Q.   Morning.

17     A.   Morning.

18     Q.   You've already stated your name for the record.  Could

19     you tell us where you live?

20     A.   I live in Washington, Pennsylvania.

21     Q.   And are you married?

22     A.   Yes.

23     Q.   What's your birth date and current age?

24     A.   April 5th, 1949.  I'm 71.

25     Q.   Are you currently retired?
```

JACK - DIRECT

1    **A.**   Yes, I am.

2    **Q.**   And when did you retire?

3    **A.**   In December of 2009.

4    **Q.**   And what was your occupation at the time of your

5    retirement?

6    **A.**   I was a mine examiner at Enlow Fork Mine.

7    **Q.**   And who owned Enlow Fork Mine?

8    **A.**   CONSOL Energy.

9    **Q.**   And where is the mine located?

10   **A.**   The mine was part of the Enlow Bailey complex on the

11   border of Washington and Greene County in Pennsylvania.

12   **Q.**   How long did you work for CONSOL?

13   **A.**   I had a few years in the early '70s, and then 18 years

14   from 1991 to 2009 at Enlow.

15   **Q.**   So 20 years?

16   **A.**   20 years.

17   **Q.**   Were you paid a salary or hourly basis?

18   **A.**   I was hourly.

19   **Q.**   During your employment with CONSOL, were there

20   occasions when the company discussed with you or explained

21   to you your entitlement to retirement welfare benefits?

22   **A.**   There was several times.

23   **Q.**   What times were those?

24   **A.**   Well, the first time was during our initial orientation

25   when you were first hired at the mine.

JACK - DIRECT

1   **Q.**   Okay.  And when was that?

2   **A.**   That would have been in July of 1991.

3   **Q.**   Okay.  Who led the orientation meeting with regard to

4   explanation of your retirement welfare benefits?

5   **A.**   It was the human resource manager, and his name was

6   Luke Gianato.

7   **Q.**   What, if anything, did Mr. Gianato say in these

8   meetings regarding your retirement welfare benefits?

9   **A.**   There was the stipulation that if you attained age 55,

10  and 10 years of employment, that you could retire and you

11  would have your healthcare, which was medical, dental, eye,

12  prescription drug, life insurance -- you'd have that for

13  life.

14  **Q.**   Did your wife attend this orientation meeting?

15  **A.**   Yes.  There was one day during the orientation period

16  where all the new hires would bring their wives, and that's

17  the day that they would go over the pay and the benefits.

18  **Q.**   At this meeting, orientation meeting in July of 1991,

19  did Mr. Gianato or anyone else at CONSOL ever tell you and

20  your wife that CONSOL reserved the right to terminate your

21  retirement welfare benefits?

22  **A.**   We were never told that.

23  **Q.**   Did you ask any meetings [sic] at this orientation --

24  did you ask any questions at this orientation meeting?

25  **A.**   Yes, I did.  Specifically, I asked -- well, the reason

1    I asked was I still had a job.  I lived 112 miles away.  And

2    this would be the single most decision of our lifetime to

3    make a move away from home.  Our parents were still living

4    there.  And as I said, I still had a good job.  And whenever

5    I -- my job had no retirement benefits whatsoever.  That's

6    what I was looking for.

7         And whenever I asked Luke that day -- because he was

8    going over all the retirement benefits -- I said, "Are you

9    telling me that when I retire with the 10 years and age 55,

10   that my wife and I will have our healthcare for life?  Is

11   that what you are telling me?"

12        And he had a overhead screen, he shown all the details,

13   and he said, "Yes.  That's what it says right here."

14   **Q.**   What was Mr. Gianato's position with the company?

15   **A.**   He was the human resource manager at the mine.

16   **Q.**   Did Mr. Gianato appear to have authority to offer

17   information about the meeting of the retiree welfare benefit

18   plan terms?

19             MR. TORRES:  Objection, Your Honor.  Calls for a

20   legal conclusion.

21             THE COURT:  You may answer.

22   BY MR. POMPONIO:

23   **Q.**   You may answer.

24   **A.**   Yes, he did.  He would tell us, if you have any

25   questions concerning anything about your retirement, your

1    healthcare, retirement, you come to him, he would have the

2    answer.

3    **Q.**   Did Mr. Gianato appear to have authority to convey

4    information about the likely future of plan benefits?

5    **A.**   He was the one that told us.  I mean, we had no reason

6    to doubt that.

7    **Q.**   Did you rely on Mr. Gianato's representations regarding

8    your retirement welfare benefits?

9    **A.**   Yes, I did, because that was the sole reason I made up

10   my mind to take that job.  I made more money at the job I

11   had before.  I really didn't need to go for another job.

12   But that was the sole reason I relied on that.

13   **Q.**   Did Mr. Gianato ever at orientation meetings ever

14   compare your retirement welfare benefits to those offered by

15   the United Mine Workers plan?

16   **A.**   Yes.  It was -- CONSOL was very adamant, the Enlow and

17   Bailey complex would soon be the biggest complex in the

18   United States, but we were nonunion.  They wanted us to call

19   it union free.  And they were very adamant about us

20   remaining union free.  They had slide presentations that

21   would show the union salaries or hourly wages compared to

22   ours, which were better, and healthcare which would be as

23   good; pension -- union had a pension, we had a pension, and

24   we had a 401(k), which they didn't, and the union had

25   healthcare for life, and that's what we would have,

1    healthcare for life.  They always stressed that we would

2    always have better benefits than what the Mine Workers have.

3    And the Mine Workers still have healthcare for life.

4    **Q.**   Were you ever a member of the United Mine Workers?

5    **A.**   I was a member of Mine Workers from 1971 to '75.

6    **Q.**   Okay.  Let's talk about subsequent meetings after your

7    orientation.  Were there times in which you met with

8    employees of CONSOL and your retirement welfare benefits

9    were discussed?

10   **A.**   There were annual refresher meetings every year where

11   you would go over things, like, first aid, safety, roof

12   control, ventilation, and also during that meeting, there

13   was a time when Luke would come in and go over our benefits

14   and stress that we would have the healthcare for life.  I

15   mean, that was always a question.

16   **Q.**   Were there other meetings in relation to union activity

17   at the mine in which CONSOL would make representations about

18   your retirement welfare benefits?

19           MR. TORRES:  Objection, Your Honor.  The questions

20   are leading.

21           THE COURT:  Let me ask you to restate your

22   question without leading.

23   BY MR. POMPONIO:

24   **Q.**   Were there times in which there was union activity at

25   the mine in which CONSOL representatives discussed your

1    retirement welfare benefits?

2              MR. TORRES:  Your Honor, it's still leading.

3              THE COURT:  See if you can restate it.

4              MR. POMPONIO:  Okay.

5    BY MR. POMPONIO:

6    **Q.**   Were there or -- were there any meetings in which there

7    was union -- in connection with union activity at the mine

8    in which CONSOL discussed your retirement welfare benefits?

9              THE COURT:  And you may answer.

10             THE WITNESS:  Yes, in 1992 or '93.

11             THE COURT:  Wait just a moment.  Let me just ask

12   that you answer, yes or no, and then you can proceed.

13             THE WITNESS:  Yes, there was.

14   BY MR. POMPONIO:

15   **Q.**   Okay.  Well, tell us about those meetings, please.

16   **A.**   In 1992 or '93, the mines -- the Enlow and Bailey

17   were -- they were a unit.  They were hiring a lot of people.

18   And the Mine Workers wanted us to become mine workers for

19   obvious reasons; they wanted the dues and wanted the

20   loyalties.  And there was -- they set up encampment up the

21   road.  There were pickets along the road calling us scabs,

22   throwing things at our vehicles.  I personally had two flat

23   tires.  But during this time, we had several meetings where

24   we were shown overheads, again, with our wages compared to

25   union wages, and the fact that we didn't pay dues, and they

1    did.  And we had 401(k); they didn't.  And the comparison

2    that they had healthcare for life, and we would always have

3    the healthcare for life.  Our benefits would always -- pay

4    and benefits would always be better than the Mine Workers,

5    always.

6    **Q.**   Did anyone at these meetings of which you are

7    testifying regarding the union activity ever mention to you

8    or explain that CONSOL reserved the right to terminate the

9    retirement welfare benefits?

10   **A.**   No, that would have been a nonstarter.  Because there

11   were a lot of people that wanted to go union because they

12   might have needed a few more years' time.  And we all talked

13   about this.  But if they would have said that, well, we are

14   going to give you something, but we might take it away, that

15   would have -- that would have just totally destroyed what

16   they wanted to do.  They wanted to keep us union free.

17           MR. TORRES:  Your Honor, I move to strike.  He

18   can't testify as to what CONSOL's intent was.  He can

19   testify as to what he heard and what he said.

20           THE COURT:  The objection is sustained.  And that

21   portion of the witness' response will be disregarded.

22   BY MR. POMPONIO:

23   **Q.**   Did you rely on these representations regarding the

24   retirement welfare benefits as explained to you in these

25   meetings?

JACK - DIRECT

1    **A.**   Yes, I did.

2    **Q.**   Okay.  You previously testified about getting

3    refresher meetings.  Do you recall that?

4    **A.**   Yes.

5    **Q.**   And what, if anything, was said in these annual

6    refresher meetings regarding your retirement welfare

7    benefits?

8    **A.**   During the segment -- during these annual refreshers

9    where they would go over our pay and benefits, and

10   retirement qualifications, meeting the 10 years and age 55.

11   We also discussed having our healthcare medical, which was

12   medical, eye, dental, prescription, life insurance, that was

13   for life.

14   **Q.**   Okay.  And who generally participated from the company

15   and explained these retirement welfare benefits in these

16   annual refreshers?

17   **A.**   Human Resources --

18             MR. TORRES:  Object --

19             COURT REPORTER:  Excuse me.

20             MR. TORRES:  I'm sorry, Your Honor.  Object to the

21   form of the question.

22             THE COURT:  That objection is overruled.  And you

23   may proceed.

24   BY MR. POMPONIO:

25   **Q.**   Okay, we'll restate it so the court reporter can get

1    it.

2         Who in these meetings, annual refresher meetings

3    discussed with you your retirement welfare benefits?

4    **A.**   It was Luke Gianato, who was the human resource

5    manager.

6    **Q.**   And going back to the union speech meetings, who

7    discussed, if anyone, your retirement welfare benefits and

8    those in those meetings?

9    **A.**   It would have been Luke Gianato.

10   **Q.**   And what, if anything, did Mr. Gianato say about the

11   duration of your retirement welfare benefits in these annual

12   refresher meetings?

13        MR. TORRES:  Objection, Your Honor.  It's been

14   asked and answered.

15        THE COURT:  Sustained.

16   BY MR. POMPONIO:

17   **Q.**   Did anyone at these annual refresher meetings explain

18   to you that CONSOL reserved the right to terminate your

19   retirement welfare benefits?

20        MR. TORRES:  I'm sorry, Your Honor.  Again, the

21   question is leading.

22        THE COURT:  See if you can restate the question.

23        What, if anything, were you told?

24   BY MR. POMPONIO:

25   **Q.**   What, if anything, were you told about CONSOL's right

JACK - DIRECT

1   to terminate the retirement welfare benefits?

2   **A.**   We were never told that they could terminate the

3   benefits.

4   **Q.**   Okay.  You previously testified you retired in 2009,

5   correct?

6   **A.**   That's correct.

7   **Q.**   Did you attend a meeting around the time of your

8   retirement in which CONSOL explained your retirement welfare

9   benefits?

10  **A.**   Yes, I did.  And I don't remember what year it was.

11  But it was a year or two before I retired.  And they would

12  -- when you got close to retirement, they would send you a

13  letter asking you if you would like to attend a retirement

14  seminar.  And at that point they would go over everything

15  you needed to know for retirement.

16  **Q.**   Okay.  Did your wife attend this retirement seminar?

17  **A.**   Yes, she did.

18  **Q.**   And who, if anyone, was at the retirement seminar to

19  discuss your retirement welfare benefits?

20  **A.**   Well, this was not at the mine site.  This was at --

21  I'm thinking it was at a country club somewhere.  But

22  anyway, there were people there from multiple mines, because

23  CONSOL had multiple mines at that time.  And there was a lot

24  of people there who were there for the retirement seminar.

25  And it was people from CONSOL corporate office that gave the

JACK - DIRECT

1   seminar.

2   **Q.**   Okay.  And what, if anything, did the corporate CONSOL

3   employees say about the retirement welfare benefits?

4   **A.**   Well, this was -- they went over the fact that we would

5   continue to have our healthcare, the medical and the dental,

6   eye, prescription drug, life insurance, we'd continue to

7   have that for life after we retired.

8   **Q.**   Did these corporate employees who you testified appear

9   to have authority to offer information about the meaning of

10  your retiree welfare benefit plan terms?

11          MR. TORRES:  Objection.  It calls for a legal

12  conclusion.

13          THE COURT:  See if you can restate your question.

14          MR. POMPONIO:  Your Honor, I just asked him if

15  they -- these corporate employees appeared to have

16  authority, appeared to him to offer him information about

17  the meaning of the retiree welfare benefit plan terms.

18          THE COURT:  I think you need to drop back and set

19  the stage about who was there and who said what, that is, on

20  behalf of the company.

21          MR. POMPONIO:  Okay.

22  BY MR. POMPONIO:

23  **Q.**   And what, if anything, did these corporate employees

24  which you testified say about their authority to offer

25  information about the meaning of the retiree welfare benefit

1    plan terms?

2    **A.**    Well, I don't remember their names because it was a

3    long time ago, but they would introduce themselves as from

4    CONSOL corporate headquarters and they were there to discuss

5    our retirement benefits which included the healthcare for

6    life.

7            THE COURT:  Let me see if I understand what you

8    are referring to.  Are we talking about a single meeting

9    that you would have had, if it were a single meeting, at the

10   time of your approaching retirement, about your situation,

11   or were you there with a number of others who were in the

12   same posture?

13           THE WITNESS:  We were there with a number of

14   others.  I mean, once a year, they had a seminar that they

15   would invite everybody who was very close to retirement age

16   to come and have their retirement benefits explained to

17   them.

18           THE COURT:  So did you have one such meeting?

19           THE WITNESS:  One meeting with a group of people.

20           THE COURT:  Yes.  And when you said a moment ago

21   that there would be those there who would talk about thus

22   and so, are you talking about the one meeting that you were

23   in?

24           THE WITNESS:  That particular meeting, yes, there

25   was a group of people.

JACK - DIRECT

1              THE COURT:  Yes.  These questions in this area, if

2     you would confine yourself to the one meeting you attended.

3     Please go ahead.

4     BY MR. POMPONIO:

5     Q.   What, if any, importance did you place on the

6     representations at that retirement meeting about the retiree

7     welfare benefits?

8     A.   Well, I was wanting to retire in 2009, and that just

9     made up my mind that I was -- that's a big issue to pay for

10    healthcare.  And I knew I would have that for life.  I knew

11    I didn't have to pay for it.

12    Q.   What, if anything, was said about CONSOL's right to

13    terminate your retirement?

14    A.   Nothing was told us.

15    Q.   Okay.  Do you recall receiving a larger type booklet of

16    a Summary Plan Description in 2011?

17    A.   No.  I was already retired.  I don't remember getting

18    any information.

19    Q.   Mr. Jack, after your retirement in 2009, did you ever

20    come to learn that CONSOL was changing or terminating the --

21    well, changing the retirement and welfare benefits?

22    A.   Yes, I did.  I received a couple letters from them.

23             THE CLERK:  Would you like these marked?

24             MR. POMPONIO:  Yes, please.

25        May I approach, Your Honor?

1          THE COURT:  You may.

2    BY MR. POMPONIO:

3    Q.   Mr. Jack, I've handed you what's been marked as

4    Plaintiff's Exhibit Number 1.  Could you identify this

5    document for the Court, please?

6    A.   Yes.  This is the first letter we received in 2014.

7    Q.   And what, if any, impressions did you have once you

8    read this letter?

9    A.   Well, just for me, again, I see they were wanting to

10   terminate our plan in five years.  They were giving us five

11   more years and then they were going to drop it.  And then

12   they gave this reason that they think there was going to be

13   a nationalized healthcare.  I don't know how they had that

14   idea, but that's the reason they gave.

15          MR. TORRES:  Objection; move to strike, Your

16   Honor.

17          THE COURT:  The motion is granted.

18       You may restate.

19   BY MR. POMPONIO:

20   Q.   Did you rely on CONSOL's representation that you would

21   receive medical benefits for the retirement welfare benefits

22   for the next five years?

23   A.   Well, yeah, I sure did.

24   Q.   Did you, in fact, continue to receive those retirement

25   welfare benefits for the next five years?

 1    **A.**   No, I did not.  We received another letter five or six

 2    months later.

 3            THE COURT:  What are you referring when you're

 4    saying the next five years?  From what date?

 5            THE WITNESS:  Okay.  We got this letter in 2014.

 6    And then on the letter, they said they were going to

 7    terminate our healthcare December 31st of 2019.  So it was

 8    five years.

 9            MR. POMPONIO:  May I approach, Your Honor?

10            THE COURT:  You may.

11    BY MR. POMPONIO:

12    **Q.**   Mr. Jack, I've handed you what's been marked as

13    Plaintiff's Exhibit Number 2.  Could you identify this

14    document?

15    **A.**   Yes.  This is a second letter they sent us in 2015.

16    **Q.**   And what did you understand, having read this letter?

17    **A.**   Well, in the letter it said they are going to just --

18    not extend our benefits until the end of 2019; that at the

19    end of 2015, they were terminating them.

20    **Q.**   Mr. Jack, do you currently have medical expenses that

21    you and your wife incur?

22    **A.**   Yes, I do.

23    **Q.**   Could you describe the expenses?

24    **A.**   Well, for example, I have severe spinal stenosis in my

25    neck and lower back.  I have to go for epidurals every three

1    months and medication.  So it's quite expensive.  I just had

2    to get hearing aids this year, because my hearing is about

3    gone.  And that was $3,500 there.  My wife has a trigeminal

4    nerve issue in her jaw, which is a torn nerve, and she is in

5    constant pain.  She's had to have specialized dental work,

6    specialized dental prosthesis.  She goes for acupuncture and

7    Botox, and year before last that was $25,000.  Yes, we've

8    had a lot of expenses.

9    **Q.**   And have you estimated, since your retirement welfare

10   benefits were terminated, about how much out-of-pocket

11   expenses you've incurred?

12   **A.**   Yeah.

13          THE COURT:  Starting when?

14   BY MR. POMPONIO:

15   **Q.**   Starting in January of 2016?

16   **A.**   Yeah, that would be five years.  And today, it's

17   averaging out five- to- six-thousand-dollars a year.

18          MR. POMPONIO:  May I approach, Your Honor?

19          THE COURT:  You may.

20   BY MR. POMPONIO:

21   **Q.**   Mr. Jack, I'm handing you what's been marked

22   Plaintiff's Exhibit Number 3.  Can you identify this

23   collection of documents, please?

24   **A.**   Yes, these are all the out-of-pocket expenses I had

25   that I could account for.  I'm thinking there is more.  But

1    this is at least what I was able to come up with over the

2    last five years.

3                    MR. TORRES:  Your Honor?

4                    THE COURT:  Go ahead.

5                    MR. TORRES:  Thank you, Your Honor.  Just a minor

6    issue.  Is counsel going to move all of the exhibits at the

7    end of his testimony or offer them as you go along?  I just

8    want to know whether I should ask the voir dire now or deal

9    with admission at some other point in time.  I just wasn't

10   clear because we weren't offered the first two exhibits.

11                   THE COURT:  I think you should make your objection

12   as we receive these into evidence.  And I would ask you

13   first whether or not there is any objection to Plaintiff's 1

14   and 2?

15                   MR. TORRES:  Your Honor, no objections to 1 and 2.

16                   THE COURT:  And with respect to Plaintiff's 3?

17                   MR. TORRES:  Could I just voir dire quickly, Your

18   Honor?

19                   THE COURT:  You may.

20                   **VOIR DIRE EXAMINATION**

21   BY MR. TORRES:

22   **Q.**   Mr. Jack, just so I'm clear, you said these were some

23   of the -- these reflect some expenses you've incurred in the

24   2016 to present time period; is that correct?

25   **A.**    That's correct.

1    **Q.**   And how are we to determine -- I'm sorry.   There is

2    some -- there is a bunch of numbers on these documents, sir,

3    and then there is certain numbers that are circled.

4        Did you make those notations?

5    **A.**   Yes, I did.   The circles are my out-of-pocket expenses.

6    The other items are what would have been paid by Medicare.

7    **Q.**   I see.   So it's just the circled items that we're to

8    view as being your out-of-pocket; did I get that right?

9    **A.**   Yes, as long as I didn't miss any.   But I'm pretty sure

10   everything that's circled is what was out-of-pocket.

11   **Q.**   Okay.

12       MR. TORRES:   Thank you, Your Honor.   No further

13   voir dire.

14       I don't have any objections to 3.

15       THE COURT:   And it is admitted.

16       **Plaintiff's Exhibit 3 admitted.**

17   BY MR. POMPONIO:

18   **Q.**   Did you have the expectation that these medical

19   expenses as reflected in Plaintiff's Exhibit 3 would be

20   covered by your CONSOL retirement welfare benefit plan?

21   **A.**   Yes, I did, because I was retired; I was on Medicare.

22   CONSOL was giving me my supplement, which was the way it was

23   supposed to work, which is the way we were told.   And I

24   expected to have that as long as my wife and I lived.

25   **Q.**   I just have a couple other questions for you, Mr. Jack.

JACK - DIRECT

1    If we could go back to the orientation meeting.  You

2    testified that if you reached age 55 and had 10 years of

3    service, that you were told you would have retirement

4    welfare benefits for the remainder of your life.

5         What, if any, other ways did Mr. Gianato explain that

6    you could qualify for the retiree welfare benefits that he

7    described?

8    **A.**   Other ways?

9    **Q.**   Well, let me ask it this way:  You testified that you

10   are retired, correct?

11   **A.**   That's correct.

12   **Q.**   And what is your -- and you indicated that you are on

13   Medicare?

14   **A.**   That's correct.

15   **Q.**   Correct?  And how did you qualify for Medicare?

16   **A.**   Disability.

17   **Q.**   Okay.  And was there different -- so that's what I'm

18   getting at.  Is there any other ways -- what, if any, other

19   ways did Mr. Gianato say that you could qualify for your

20   retirement welfare benefits?

21   **A.**   I'm not really sure about the disability.  I had 20

22   years with the company when I retired.  I'm not -- I cannot

23   speak directly towards any disability claim.

24   **Q.**   And at the retirement seminar, you testified that

25   corporate employees of CONSOL made certain representations

1    to you about the retirement welfare benefits.  And I think

2    you testified that you don't recall their names.

3         Do you -- did you know -- or did they -- what, if

4    anything, did they tell you about the department at CONSOL

5    where those corporate employees worked?

6    **A.**   All I remember -- like I say, not names -- but they

7    would come and introduce themselves as being from corporate,

8    CONSOL corporate, and they were there to discuss our

9    benefits and retirement.

10   **Q.**   Okay.  Could you go back -- do you have exhibits up

11   there with you still?

12   **A.**   Yes.

13   **Q.**   Could you go back to the letter, Plaintiff's Exhibit 1?

14   **A.**   Yes.

15   **Q.**   And in the second paragraph about midway down, one,

16   two, three, four -- five, starting at "At the same time,"

17   could you read that sentence into the record, please?

18   **A.**   Yes.  It's, "At the same time, we recognize our

19   responsibility to be sensitive to the needs of the people

20   affected by these changes.  As a result and rather than

21   making the termination of retiree group health coverage

22   immediate, CONSOL Energy determined that a transition period

23   of five years would allow retirees and their families an

24   appropriate amount of time to make separate arrangements in

25   a political environment trending towards nationalized

JACK - CROSS

```
 1    healthcare.  CONSOL Energy is making these changes in

 2    conjunction with other adjustments to the post-employment

 3    benefits provided to current and past employees, with the

 4    needs of both affected parties and the company's future

 5    viability in mind."

 6    Q.   Okay.  That's good.  Thank you.

 7            MR. POMPONIO:  No further questions at this time,

 8    Your Honor.

 9            MR. TORRES:  Your Honor, could I have one minute

10    just to grab a document?

11            THE COURT:  You may.

12            MR. TORRES:  Excuse me.  Is this water in here?

13            THE COURT:  Before you begin, I understand there

14    is no objection to Plaintiff's 1 and 2, as well as 3.  And

15    all three are admitted.  I think the Court noted 3 as being

16    admitted.  Now, 1 and 2, as well.

17        Plaintiff's Exhibits 1 and 2 admitted.

18            THE COURT:  You may proceed.

19            MR. TORRES:  Thank you, Your Honor.

20                        CROSS-EXAMINATION

21    BY MR. TORRES:

22    Q.   Mr. Jack, you testified today about alleged statements

23    that were made by Mr. Gianato beginning in 1992 until

24    sometime in 2000 when you left Enlow Fork; is that correct?

25    A.   '91.
```

JACK - CROSS

1    **Q.**   '91?

2    **A.**   That's when I started, in '91.

3    **Q.**   Okay.  But did I get the time period right then, from

4    '91 until sometime in the 2000s, Mr. Gianato was HR at Enlow

5    Fork, correct?

6    **A.**   That's correct.

7    **Q.**   And then you also testified today about some unnamed

8    person during the retirement seminar that you attended

9    sometime before you retired in 2009, correct?

10   **A.**   That's correct.

11   **Q.**   So those are the individuals and alleged statements we

12   are dealing with; is that right?

13   **A.**   That's correct.

14   **Q.**   All right.  And we discussed those same statements when

15   you were deposed in this matter; correct?

16   **A.**   That's correct.

17   **Q.**   And you were under oath at that deposition?

18   **A.**   Yes.

19   **Q.**   And you answered my questions truthfully to the best of

20   your knowledge, correct?

21   **A.**   That's correct.

22   **Q.**   And we also discussed various documents at your

23   deposition, correct?

24   **A.**   Yes.

25   **Q.**   And you were also under oath when you answered my

JACK - CROSS

1    questions regarding those documents, correct?

2    **A.**    Yes.

3    **Q.**    All right.  So during the same time period we are

4    talking about then, from 1991 to 2009, in addition to these

5    statements that you testified to, you received numerous

6    documents from CONSOL that stated it reserved the right to

7    terminate benefits, correct?

8    **A.**    I don't remember reading that.  I don't.

9    **Q.**    Mr. Jack, please answer my question.  During the

10   period, same period of time we are talking about today, 1991

11   until the time you retired, you received from CONSOL

12   documents that stated it reserved the right to terminate

13   benefits, correct?

14   **A.**    I received documents from CONSOL.

15   **Q.**    All right.  And the reservation of rights stated in

16   those documents that it applied to current employees,

17   correct?

18   **A.**    Current.

19   **Q.**    It applied to current retirees, correct?

20   **A.**    I don't know.  I can't answer to that.

21   **Q.**    You don't recall?

22   **A.**    I don't recall.

23   **Q.**    And it also applied to future retirees, correct?

24   **A.**    I don't recall that.

25   **Q.**    Okay.  Well, we'll look at that in a second.  But you

1   disregarded those reservation of rights language as fine

2   print; is that how you described it in your deposition?

3   **A.**   I think I said that.

4   **Q.**   Okay.  And instead of looking or evaluating these

5   written documents, you decided that you were just going to

6   rely upon what Mr. Gianato told you orally during this

7   orientation at these other meetings; is that your testimony?

8   **A.**   That is correct.  I relied on everything I was told.

9   **Q.**   Okay.  And so what you also were told, though, is that

10  CONSOL in these written documents reserved the right to

11  terminate these benefits, correct?

12  **A.**   I was never told that.

13  **Q.**   Okay.  Well, it was in the documents you were provided

14  by CONSOL, correct?

15  **A.**   It may have been.  I don't remember reading it.  I was

16  never told that.

17  **Q.**   I see.  So your distinction is that if someone says

18  this to you orally, then it matters, but if it's in writing

19  from the company that employed you, it doesn't apply to your

20  future benefits; is that your testimony?

21  **A.**   If somebody has the authority to tell me something --

22  coal miners are inherently honest and trusting people, and

23  when somebody tells you something, I believe it.

24  **Q.**   Okay.  So please answer my question, sir.

25          You decided to rely upon what you were told orally, and

1   you decided to disregard what your employer put in writing

2   and provided to you; is that your testimony?

3   **A.**   I believed what was told me orally.

4   **Q.**   Okay.

5   **A.**   Yes.

6   **Q.**   And when you were deposed and you testified about what

7   Mr. Gianato allegedly said to you and this other unnamed

8   individual, you also claimed that there were promises of

9   lifetime benefits that you had been provided in writing as

10   well, correct?

11   **A.**   Yes.

12   **Q.**   Okay.  And you said at the time that there was a

13   booklet that you received during your orientation that

14   contained information regarding retiree medical benefits; do

15   you recall that?

16   **A.**   That's correct.

17   **Q.**   And you didn't have your booklet anymore, so you got a

18   copy of one of your friend's booklets, and you testified

19   under oath at your deposition that the booklet you were

20   provided contained the same information that you had been

21   provided during your orientation, correct?

22   **A.**   That's correct.

23   **Q.**   And that was the orientation when Mr. Gianato allegedly

24   was promising you lifetime benefits, correct?

25   **A.**   That's correct.

JACK - CROSS

1   Q.   But the document that you received from Mr. Ritzko, and

2   that you said was the same material you received, didn't in

3   fact contain any promise of lifetime benefits, correct?

4   A.   Well, I'm sure it spelled out that we have lifetime

5   benefits after attaining 10 years and 55 years of age.

6   Q.   So you don't remember in your deposition that we

7   reviewed that material, that language, and in fact it didn't

8   say anything about lifetime benefits, correct?

9   A.   No, I don't remember.  That was three years ago.  I

10   don't remember that.

11   Q.   Okay.  Well, fair enough.

12        MR. TORRES:  If I could have just one minute, Your

13   Honor.

14     (Pause.)

15        MR. TORRES:  May I approach, Your Honor?

16        THE COURT:  You may.

17   BY MR. TORRES:

18   Q.   Mr. Jack, I'm handing you what's been marked for

19   identification as Defendant's Exhibit 1, and I'll ask you if

20   you remember talking to me about this document during your

21   deposition?

22   A.   It looks like one I think we had a hard cover to it.

23   Q.   So the version that you saw, since this is a copy, was

24   actually hard cover?

25   A.   Yes.

JACK - CROSS

1  **Q.**   Okay.  It was in a three-ring binder?

2  **A.**   That's correct.

3  **Q.**   And you recall that you testified in your deposition

4  that you had asked Mr. Ritzko for his binder because you no

5  longer had yours and that this was the same information you

6  received from Mr. Gianato, correct?

7  **A.**   That's correct.

8  **Q.**   If you turn to -- if you see at the top of the

9  document, Mr. Jack, there is some numbers and some letters.

10  Do you see that at the top of the pages?

11  **A.**   On some of the pages.

12  **Q.**   At the very top, there is a designation "MSJ," and then

13  there is a series of numbers.  Do you see that?

14  **A.**   Yes.

15  **Q.**   And if you'd turn to MSJ 2038, sir.

16  **A.**   MSJ -- zeros in front of it?

17  **Q.**   Yes.

18  **A.**   002038.

19  **Q.**   002038.  Are you there, sir?

20  **A.**   Not yet.

21  **Q.**   Okay.  Take your time.

22  **A.**   Okay.

23  **Q.**   And that page indicates that this is a portion of the

24  binder that deals with medical benefits, correct?

25  **A.**   Medical expense benefits plan, comprehensive.

JACK - CROSS

1   **Q.**   Did I get that right, sir?

2   **A.**   It doesn't really say anything about retirement.

3   **Q.**   Okay.  Well, if you go to the next page, sir, there is

4   a table of contents, correct?

5   **A.**   Yes.

6   **Q.**   And then if you continue on, if you see the bottom

7   numbered pages, Mr. Jack, there is also page numbers at the

8   bottom of the document?

9   **A.**   Mm-hmm.

10  **Q.**   If you turn to Page 14, there is a provision at the

11  bottom of that page, says, "Effect of Retirement Upon

12  Medical Benefits," correct?

13  **A.**   Yes.

14  **Q.**   And that was the language that you -- we discussed at

15  your deposition, correct?  You said that was the language

16  that you remembered in the document that discussed medical

17  benefits when you retire, correct, Mr. Jack?

18  **A.**   I think so.  Like I say, it's two years ago.  I don't

19  remember exactly.

20  **Q.**   But you would agree with me, Mr. Jack, that nothing in

21  that provision says anything about benefits being vested or

22  for life, correct?

23  **A.**   It doesn't say that specifically on that page, no.

24  **Q.**   And if you go back a few pages to -- again, if you stay

25  on the bottom of the pages, you look for page 4.  So 10

1    pages back, sir.  Are you there, sir?

2    **A.**   Yes.

3    **Q.**   And numbered paragraph 8 states that the plan sponsor

4    reserves the right to terminate the benefits, correct?

5    **A.**   That's what that says.  That's what I read there.

6    **Q.**   And it also states that that reservation of rights

7    applies to any active employees, correct?

8    **A.**   Active employees.

9    **Q.**   Or current or future retirees, correct?

10   **A.**   Yes.

11   **Q.**   So that was included in the information, the written

12   information that you received during your orientation in

13   1991, correct?

14   **A.**   Well, I never read that.  I mean --

15   **Q.**   Please answer my question, Mr. Jack.  That's the

16   information that you received during your orientation in

17   1991?

18   **A.**   Assuming this is the same booklet, yes.

19   **Q.**   Okay.  Well, you testified before that this was the

20   same booklet you got from Mr. Ritzko; you reviewed it and

21   you said it was the same material that you received during

22   the orientation, correct?

23   **A.**   Well, the one I had was a three-ring binder.  I don't

24   know if these pages are the same or not.  But -- they are

25   not dated.

JACK - CROSS

1    **Q.**   I'm sorry?

2    **A.**   The page isn't dated.

3    **Q.**   It's not dated?

4    **A.**   No.

5    **Q.**   Okay.  Well, do you --

6    **A.**   If you go to the next page, it says, "The effective

7    date of the benefits described herein is July 1st, 1994."

8    And I started in 1991.

9    **Q.**   Do you recall, I asked you questions about a document

10   from Mr. Ritzko in your deposition, correct?

11   **A.**   Yes.

12   **Q.**   And your testimony during the deposition was that that

13   book was the same book that you had received during your

14   orientation, correct?

15   **A.**   That's correct.

16   **Q.**   Okay.  And so --

17            MR. TORRES:  May I approach, Your Honor?

18            THE COURT:  You may.

19   BY MR. TORRES:

20   **Q.**   Mr. Jack, I'm going to show you what was marked as

21   Deposition Exhibit 2 in your deposition.  Deposition Exhibit

22   2 at the bottom?

23   **A.**   Mm-hmm.

24   **Q.**   And if you look to the pages we were just looking at?

25            THE COURT:  Mr. Torres, let me interrupt you --

1    and you can restate your question -- are you referring now

2    to Defendant's Exhibit 1 as being that which was attached to

3    the depo, or is that something different?

4              MR. TORRES:  It's something different.  Just to

5    show him it's the same document that we are talking about

6    today.

7              THE COURT:  Go ahead.

8              MR. POMPONIO:  Your Honor, if I could get a

9    clarification of that.  You asked Mr. Torres if this

10   Deposition Exhibit 2 is the same document as Defendant's

11   Exhibit 1?

12             THE COURT:  That's what I --

13             MR. POMPONIO:  And he said, "No."

14             MR. TORRES:  No, I said it is.

15             THE COURT:  I misunderstood you.  So what you are

16   referring as an exhibit from the deposition is the same as

17   Defendant's 1?

18             MR. TORRES:  Yes, Your Honor.

19             THE COURT:  Thank you.  Go ahead.

20   BY MR. TORRES:

21   Q.   So, Mr. Jack, we were looking at this reservation of

22   rights language and --

23             THE COURT:  What page are you on?

24             MR. TORRES:  We are on page 4 of Deposition

25   Exhibit -- I'm sorry -- Plaintiff's [sic] Exhibit 1.  So we

JACK - CROSS

1    were talking about the reservation of rights language, sir.

2              THE COURT:  Just one moment.

3         Go ahead.

4              MR. TORRES:  Thank you, Your Honor.

5    BY MR. TORRES:

6    **Q.**   And that's the same language that's included on this

7    page, correct, the language you were just talking about, the

8    reservation of rights, and it applies to current, future,

9    and/or current employees, correct?

10   **A.**   Yes.

11   **Q.**   So that's the document we talked about at your

12   deposition, correct?

13   **A.**   Yes.

14   **Q.**   Thank you.  Now, the other thing you talked about in

15   your deposition was that you received a -- or you were shown

16   a -- you were shown a script during your deposition and you

17   testified after you reviewed it that, when you started

18   reading it, you felt like you were back in your orientation

19   back in 1991 when Mr. Gianato was speaking to you.  Do you

20   recall that testimony?

21   **A.**   Yes.

22   **Q.**   And we reviewed that document at your deposition, and

23   you were unable to identify any actual written lifetime

24   promise in that material, correct?

25   **A.**    In that particular material.  I mean, we didn't have

*Catherine Schutte-Stant, RDR, CRR (304) 347-3151*

JACK - CROSS

1    the whole presentation there for the deposition.

2    **Q.**   So you think that that document was incomplete; that's

3    why you didn't think you could find it as promised?  Is that

4    correct?

5    **A.**   That's correct.

6    **Q.**   And then you said in your deposition that at the

7    retirement seminar, you allegedly saw written materials that

8    said that your benefits would be vested or for life,

9    correct?

10   **A.**   That's correct.

11   **Q.**   And then we looked at the retirement presentation from

12   your seminar, and you admitted that in fact there wasn't any

13   written promise in the materials that you were shown during

14   that seminar, correct?

15   **A.**   I didn't have my -- what I was -- what I was given at

16   that time; I no longer had.

17   **Q.**   Right.  We showed you the materials that were presented

18   during your deposition and, you admitted that there was no

19   promise of vested benefits or lifetime benefits in the

20   materials that you were presented during your retirement

21   seminar, correct?

22         MR. POMPONIO?  Your Honor, I would like to object.

23   This is hearsay.  He's asking him what was said in his

24   deposition.

25         THE COURT:  The objection is overruled.

1    BY MR. TORRES:

2    **Q.**    Is that correct, Mr. Jack?

3    **A.**    So you are asking me, what, again, please?

4    **Q.**    You testified that at your retirement seminar,

5    previously you saw something in writing, in written

6    materials that said that the benefits were vested or for

7    life; do you recall that?

8    **A.**    Yes.

9    **Q.**    And then you recall that you reviewed that

10   presentation, and, in fact, it didn't say anything about

11   benefits being vested or lifetime, correct?

12   **A.**    If I can remember correctly, the paperwork you showed

13   me didn't have anything, but I don't remember if that

14   paperwork is what I had received at that time.

15   **Q.**    I see.  Well, you agree that the paperwork that we

16   looked at didn't contain any promises of lifetime benefits,

17   correct?

18   **A.**    Yes.

19   **Q.**    Okay.  And subsequent to the retirement seminar in

20   2009, there were other materials that you received from

21   CONSOL that were in writing, correct?

22   **A.**    We received stuff in the mail all the time.

23   **Q.**    Okay.  And we looked at some Summary Plan Descriptions

24   and annual enrollment guides and we looked at highlight

25   documents.  Do you recall that?

1    **A.**    I don't remember what all I got in the mail really.

2    **Q.**    Okay.

3              MR. TORRES:  I'm sorry, Your Honor, we move for

4    the admission of Defendant's Exhibit 1.

5              THE COURT:  Any objection?

6              MR. POMPONIO:  None, Your Honor.

7              THE COURT:  It is admitted.

8         **Defendant's Exhibit 1 admitted.**

9              THE COURT:  Let me ask whether, Mr. Torres, if

10   you'll be some time with the witness and whether we should

11   take the morning break?

12             MR. TORRES:  That's fine, Your Honor.  It's a good

13   time to break.

14             THE COURT:  All right.

15        Mr. Jack, during the morning break, treat yourself as

16   though you are on the witness stand in the sense that you

17   are not to discuss your testimony with anyone unless the

18   Court gives you permission to do so.  And if you need any

19   relief from that or if your attorney needs any relief from

20   it, you can let me know.

21        And I'm going to ask you when you leave -- and, Mr.

22   Pomponio, I'm going to leave you to help guide this.  The

23   witnesses as they finish may wish to go to the restroom, and

24   I want the opportunity for the witness to make use of the

25   restroom without anyone else here in the courtroom being in

1  attendance at that point.  And so the other thing that the

2  Court is going to ask all the witnesses is that you exit

3  through the same door that the Court enters, and then you

4  can go down the hallway and be right back out in the lobby.

5  And you can, Mr. Pomponio, either meet him there or Mr.

6  Petsonk, and they can show you where the rest facilities

7  are.  And you'll get the chance to use those before others

8  are using it.

9      The other thing I'm going to ask -- it's going to be

10  very difficult to do, and you may want to tell me what

11  problems you are having, but insofar as we possibly can, we

12  need to continue to try to stay some distance apart.  And

13  one of the things that happens, in particular, is, when we

14  come in and out sessions, particularly, everybody seems to

15  get jammed up at the door.  And so, if you will, just pay

16  attention to what others are doing and give them some space.

17  And then while you are in the lobby before coming back in,

18  try to retain that space.  It's a difficult, awkward time,

19  but do your best to try to be respectful of everyone else

20  and stay as far at a distance as you reasonably can.

21      And so with that, I'm going to ask you, when we leave,

22  to follow me right out this door.  Go around the front.

23          THE WITNESS:  And should I -- how long will we be

24  on break?  How much time is the break?

25          THE COURT:  It will be no more than 15 minutes.

1          THE WITNESS:  When I come back, I should come

2     directly back here?

3          THE COURT:  You can return, if you wish, and take

4     back your witness chair seat and that way you'll be away

5     from everybody else.  So with that, when we recess here in

6     just a moment, just follow me right out this door.  Very

7     good.

8          And we will be back in 15 minutes.

9          THE CLERK:  All rise.

10        (A recess was taken from 11:12 a.m. until 11:31 a.m.)

11         THE CLERK:  All rise.

12         THE COURT:  Please be seated.

13         MR. TORRES:  Thank you, Your Honor.

14                    **CROSS-EXAMINATION RESUMED**

15    **BY MR. TORRES:**

16    **Q.**   Mr. Jack, before we took the break, I was asking you

17    about a document that we reviewed in your deposition and we

18    were determining whether that was the same document I was

19    showing you in Court.

20         Do you recall that testimony?

21    **A.**   Yes.

22    **Q.**   And just so we're clear, the document from your

23    deposition, you received that from one of your -- from a

24    fellow CONSOL employee, correct -- Mr. Ritzko?

25    **A.**   That's correct.

JACK - CROSS

1   **Q.**   And you then turned that over to your lawyers in this

2   case, correct?

3   **A.**   Correct.

4   **Q.**   And then they gave it to us, and we talked about it in

5   your deposition; is that correct?

6   **A.**   That's correct.

7   **Q.**   So just so we are clear -- I wasn't entirely clear

8   before -- one of the pages from your deposition, if you look

9   at the screen, one of the documents you received from Mr.

10  Ritzko included this language at the bottom that I have on

11  the screen, correct?  You were talking about that in your

12  testimony?

13  **A.**   That's correct.

14  **Q.**   And at the top of the page, it indicates -- there is a

15  designation MSJ002045.  Correct?

16  **A.**   Yes.

17  **Q.**   Okay.  And Defendant's Exhibit 1, which I also asked

18  you about, has that same language, correct?

19  **A.**   Yes.

20  **Q.**   And then at the top of this page, it also has the same

21  designation, MSJ002045, correct?

22  **A.**   Yes.

23  **Q.**   Okay.  Thank you for clearing up the confusion I

24  caused.

25       Now, Mr. Jack, as you continued -- I think we were

JACK - CROSS

```
 1    talking before about the fact that you received certain

 2    documents from CONSOL throughout your employment, and you

 3    were looking at one of the ones you received during your

 4    orientation.  Do you recall receiving any other Summary Plan

 5    Descriptions from CONSOL after your orientation in 1991?

 6    A.   No, I don't recall.

 7    Q.   But you recall CONSOL --

 8              MR. TORRES:  May I approach, Your Honor?

 9              THE COURT:  You may.

10    BY MR. TORRES:

11    Q.   Mr. Jack, I'm going to show you what's been marked for

12    identification as Defendant's Exhibit 2.  And this is a

13    document -- first page says, "Plan Document for and Summary

14    Plan Description of the CONSOL Pennsylvania Coal Company

15    Comprehensive Medical Expense Benefits Plan for Production

16    and Maintenance Employees," correct?

17    A.   Yes.

18              MR. POMPONIO:  What page are we on, Joe?

19              MR. TORRES:  The title page.  I'm sorry, Bren, I

20    apologize.  This is --

21              MR. POMPONIO:  This is 2?

22              MR. TORRES:  Yes, Defendant's 2.

23    BY MR. TORRES:

24    Q.   You worked at CONSOL Pennsylvania, correct?

25    A.   That's correct.
```

JACK - CROSS

1   **Q.**   And you were a production and maintenance employee?

2   **A.**   Correct.

3   **Q.**   And the bottom of this document indicates a date of

4   January 1, 2005, correct?

5   **A.**   Correct.

6   **Q.**   And, in fact, we looked at this exhibit during your

7   deposition, and you recalled that the human resources

8   manager reviewed it with you, correct?

9   **A.**   I don't remember that.  I don't remember that.

10  **Q.**   Okay.  Well you don't doubt, though, that you worked at

11  CONSOL Pennsylvania and you were production and maintenance?

12  **A.**   No, that's correct, I did.  I was there -- maintenance

13  at CONSOL Pennsylvania, correct.

14  **Q.**   Okay.  And you don't recall receiving this document?

15  **A.**   No, I don't.

16  **Q.**   Okay.  Is it possible you received it, Mr. Jack?

17  **A.**   I may have.  I don't remember this particular document.

18  **Q.**   And if you turn to -- if you look at the bottom pages,

19  Mr. Jack, there is a page 5; do you see that?

20  **A.**   Page 5?  Mm-hmm.  Yes.

21  **Q.**   And at the bottom, there is a numbered paragraph 21,

22  Mr. Jack?

23  **A.**   Yeah, 21, yes.

24  **Q.**   And it says, "Termination, Suspension, Modification or

25  Amendment of the Plan," correct?

JACK - CROSS

1    **A.**    Yeah, that's correct.

2    **Q.**    And then if you turn to page 9, the title of this page

3    is, "Comprehensive Medical Expense Benefits Plan," correct?

4    **A.**    Yes.

5    **Q.**    And again, towards the bottom of that page, there is

6    another reservation of rights clause, correct?

7    **A.**    Yes.

8    **Q.**    And then if you continue on to page 21, sir -- are you

9    there?

10   **A.**    Yes.

11   **Q.**    At the bottom, there is a section that says, "Effect of

12   Retirement Upon Medical Benefits."

13         Do you see that?

14   **A.**    Yes.

15   **Q.**    And there is a discussion below that about eligibility

16   for retirement benefits, correct?

17   **A.**    I'm reading it, is that okay?

18   **Q.**    Is that correct?

19   **A.**    That's what the title says, yes.

20   **Q.**    Okay.  And if you turn to page 22, it continues to

21   describe other provisions related to retiree medical

22   benefits, correct?

23   **A.**    Yes.

24   **Q.**    So this 2005 document that you don't recall whether you

25   received or not talks about retiree medical benefits?

JACK - CROSS

1    **A.**   Yes, it does.

2    **Q.**   It says that it's a Summary Plan Description?

3    **A.**   Yes.  I don't remember seeing this.  But I started 14

4    years before this.  This is not what I was told when I

5    started to work there and numerous times after that.

6    **Q.**   Please answer my question, sir.

7         This document says it's for employees of CONSOL

8    Pennsylvania?

9    **A.**   That's correct.

10   **Q.**   And it's dated January 1, 2005?

11   **A.**   That's correct.

12   **Q.**   And you were still an employee of CONSOL Pennsylvania

13   Coal Company, correct?

14   **A.**   That's correct.

15   **Q.**   Okay.

16         MR. TORRES:  Your Honor, we would move admission

17   of Defendant's Exhibit 2.

18         MR. POMPONIO:  Your Honor, I don't think there is

19   a proper foundation for this -- for the introduction of this

20   exhibit through this witness.  He says he doesn't ever

21   remember receiving it.

22         THE COURT:  How is it admissible to this witness?

23         MR. TORRES:  Your Honor, I can show him his

24   Deposition Exhibit.  It's the same document where he

25   admitted that he reviewed this document with Mr. Gianato.

JACK - CROSS

```
 1                THE COURT:  I suppose then you best proceed along

 2      those lines.

 3                MR. TORRES:  Yes, Your Honor.

 4                Your Honor, I'll deal with it with Mr. Salvatori.

 5      We can move along.

 6                THE WITNESS:  One thing --

 7                MR. TORRES:  I'll withdraw the exhibit for now,

 8      Your Honor, and deal with it on Mr. Salvatori's examination.

 9           Could you mark this, please?

10                May I approach, Your Honor?

11                THE COURT:  Yes.

12      BY MR. TORRES:

13      Q.   Mr. Jack, I'm going to hand you what's been marked as

14      Defendant's Exhibit 3, and this document on the first page

15      says, "2008 Flexible Benefits Enrollment Guide;" is that

16      correct?

17      A.   That's what it says, yes.

18      Q.   And do you recall discussing this document at your

19      deposition with me?

20      A.   I think so.

21      Q.   Okay.  So you don't recall this document -- ever

22      receiving this document, sir?

23      A.   I'm not sure.  It's 12, 13 years ago.  I don't know.  I

24      may have.  I don't remember this particular document.

25           (An off-the-record discussion was held between
```

JACK - CROSS

1    plaintiffs' counsel Pomponio and defense counsel Torres.)

2              MR. TORRES:  May I approach, Your Honor?

3              THE COURT:  You may.

4    BY MR. TORRES:

5    Q.   Mr. Jack, I'm going to show you what was marked at your

6    deposition as Deposition Exhibit 8.  Do you see that

7    document, sir?

8    A.   Yes.

9    Q.   And that's the same document that is also Defendant's

10   Exhibit 3, correct?

11   A.   Yes.

12             MR. TORRES:  Your Honor, I'm going to show him

13   some deposition testimony regarding some testimony.  Would

14   you like a copy of the transcript?

15             THE COURT:  No.

16   BY MR. TORRES:

17   Q.   Mr. Jack, I'm going to show you deposition testimony.

18   The first page, "Deposition of Allan Jack," and you see here

19   starting Page 13, down to lines 23, if you could review

20   that?

21   A.   (Witness complies.)

22             MR. POMPONIO:  Your Honor, if I could get

23   clarification.  The document -- the exhibit from the

24   deposition references Bates stamp numbers that are different

25   from the proposed Defendant's Exhibit 3.

1                  MR. TORRES:  I think these documents were produced

2       in multiple iterations, Your Honor.  It's the same document,

3       it just was produced multiple times.  If it's unclear, I can

4       certainly withdraw it and refer to the deposition, but it's

5       the same substantive document.

6                  MR. POMPONIO:  Okay.  No objection.

7       BY MR. TORRES:

8       Q.   So, Mr. Jack, on Page 122 of your deposition, I asked

9       you about Deposition Exhibit 8, correct?

10      A.   Yes.

11      Q.   And I indicated that the front page of it said, "2008

12      Flexible Benefits Enrollment Guide, CONSOL Energy," correct?

13      A.   Yes.

14      Q.   And I asked you if you recalled receiving a document

15      like this, correct?

16      A.   Yes, and I said I think I do.

17      Q.   And that's the same document as the color version of

18      Defendant's Exhibit 3 that I've showed you a moment ago,

19      correct?

20      A.   That's correct.

21      Q.   Okay.  And I can take the transcript back from you now.

22      Thank you, Mr. Jack.

23           And you would have received this document when you were

24      still an active employee, correct, because it states this

25      was in 2008, correct?

JACK - CROSS

1    **A.**    Yes.

2    **Q.**    And you didn't retire until 2009?

3    **A.**    That's correct.

4    **Q.**    And if you turn to the second to last page of this

5    exhibit, Mr. Jack.  Do you recall receiving this?

6    **A.**    That's Page 29?

7    **Q.**    Correct.

8    **A.**    Yes.

9    **Q.**    28, second to last page, sir.

10    **A.**    28?

11    **Q.**    I'm sorry.  29.  Bad eyesight.  29.  And that document

12    says at the back that CONSOL can amend or terminate any of

13    its benefit programs at any time for any reason, correct?

14            THE COURT:  At what page does it say that?  Is

15    that the same thing as Defendant's 3?

16            MR. TORRES:  Correct, Your Honor.  Page -- it's

17    the second to last page, Your Honor.

18            THE COURT:  The last page I have is page 28.  And

19    I don't see you talk about 29.

20    BY MR. TORRES:

21    **Q.**    You're looking at the wrong document, sir.  Look at

22    this one.

23    **A.**    It's the same thing.

24    **Q.**    I understand.  It's not the document in evidence.  If

25    you want to look at this one (indicating).

JACK - CROSS

```
 1           It's Page 28, correct, sir?

 2    A.    Page 29.

 3    Q.    The second to last page?

 4    A.    Yeah, 29.

 5    Q.    Correct.  I'm sorry, sir.  29.  And, again, just so --

 6    now I apologize for the confusion.

 7           This says, the second to last sentence, "CONSOL can

 8    amend or terminate any of its benefit programs at any time

 9    and for any reason," correct?

10    A.    Yes.

11    Q.    And you would have received that in 2008 when you were

12    still an active employee, correct?

13    A.    That's what I said before, I think I did.  I don't

14    remember.  I think I did.

15    Q.    Okay.

16           MR. POMPONIO:  I'm sorry, Joe, to interrupt, but I

17    don't have page 29, and I don't know where it is that you

18    are referring to.

19           (An off-the-record discussion was held between

20    plaintiffs' counsel Pomponio and defense counsel Torres.)

21           MR. POMPONIO:  It doesn't say anything about

22    reservation of rights on this page.

23    BY MR. TORRES:

24    Q.    And then you said, Mr. Jack, you --

25           THE COURT:  Let me ask, Mr. Pomponio, do you have
```

JACK - CROSS

```
 1    page 29 in your document?
 2              MR. POMPONIO:  It says 28, but it appears after
 3    28, so -- I have the correct --
 4              THE COURT:  I have 28 also.  I don't have a 29.
 5              MR. TORRES:  Your Honor, my understanding of this
 6    is that this page notes, the page that says, "Notes," says
 7    page 28.  And the next page --
 8              THE COURT:  I see.  They are two pages 28?
 9              MR. TORRES:  Yes, Your Honor.
10              THE COURT:  I see now.  And so I have the
11    information.
12              MR. TORRES:  Thank you.
13    BY MR. TORRES:
14    Q.   Mr. Jack, you said that you retired in 2009, correct?
15    A.   That's correct.
16    Q.   And your counsel asked you some questions about whether
17    you received any Summary Plan Descriptions, correct?
18    A.   That's correct.
19    Q.   Okay.  Now --
20              MR. TORRES:  Mark this exhibit.
21         May I approach, Your Honor?
22              THE COURT:  You may.
23    BY MR. TORRES:
24    Q.   Mr. Jack, I'm going to show you what's been marked as
25    Defendant's Exhibit 4.  You have the document in front of
```

JACK - CROSS

1    you, sir?

2    **A.**   Yes.

3    **Q.**   And on the first page it says, "Summary Plan

4    Descriptions"?

5    **A.**   Yes.

6    **Q.**   And it says, "Production and Maintenance Employees at

7    CONSOL PA Coal Company," correct?

8    **A.**   That's correct.

9    **Q.**   And if you turn to Page 1 of the document?

10   **A.**   Yes.

11   **Q.**   There is a page that says, "Plan Overview"?

12   **A.**   Yes.

13          MR. TORRES:  I'm sorry, I neglected to offer

14   Defendant's Exhibit 3 into evidence.

15          THE COURT:  Did you say 2?

16          MR. TORRES:  3.

17          THE COURT:  Is there an objection to 3?

18          MR. POMPONIO:  No, Your Honor.

19          THE COURT:  Admitted.

20          **Defendant's Exhibit 3 admitted.**

21   BY MR. TORRES:

22   **Q.**   The back of this document, at the top it says, "Plan

23   Overview," correct?

24   **A.**   That's correct.

25   **Q.**   And then below it it talks about the CONSOL Energy

1    retiree medical and prescription drug expense benefits plan;

2    is that correct?

3    **A.**    Yes.  That's what it refers to, yes.

4    **Q.**    And it has a parenthetical that says, (Retiree Medical

5    and Drug Benefits Plan)," correct?

6    **A.**    Yes.

7    **Q.**    And do you recall being shown this document at your

8    deposition?

9    **A.**    No, I don't.

10    **Q.**    Okay.  Do you recall receiving a document like this,

11    Mr. Jack, at any time?

12    **A.**    When?  Do you have a date?  Do you know when I would

13    have gotten this?

14    **Q.**    I'm sorry?

15    **A.**    Do you know when I would have gotten this?  It's not

16    dated, so --

17    **Q.**    After you retired, Mr. Jack, in 2009?

18    **A.**    Oh, yeah.  No, I don't remember getting this after I

19    retired.

20    **Q.**    Okay.

21            MR. TORRES:  I'll withhold the document then, Your

22    Honor, until we speak to Mr. Salvatori.

23    BY MR. TORRES:

24    **Q.**    So, Mr. Jack, regarding the statements that you claim

25    Mr. Gianato made to you, you don't know if anyone from

JACK - CROSS

1   CONSOL told Mr. Gianato to tell you that your benefits would

2   be for life, correct?

3   **A.**   No, he was our HR manager at the mines, and he told us.

4   **Q.**   Mr. Jack, please answer my question.  You don't know if

5   anyone from CONSOL told Mr. Gianato to tell you that you

6   would have benefits for life, correct?

7   **A.**   I would have no way of knowing that.

8   **Q.**   And you don't know if anyone from CONSOL told these

9   unnamed individuals who you testified about at your

10   retirement presentation, you don't know if CONSOL told any

11   of those to tell you that your benefits would be for life,

12   correct?

13   **A.**   No, I have no idea.

14   **Q.**   And you don't know if anyone told Mr. Gianato to tell

15   you at any time that your benefits would be vested, correct?

16   **A.**   No, I do not.

17   **Q.**   And you don't know if CONSOL -- anyone at CONSOL told

18   these unnamed individuals at the retirement seminar to tell

19   you that your benefits were vested, correct?

20   **A.**   No, I don't.

21   **Q.**   And whatever Mr. Gianato told you during this

22   orientation and during these refresher meetings that you

23   testified to, Mr. Gianato never told you he had authority to

24   alter the terms of CONSOL's written benefit plan, correct?

25   **A.**   To alter a plan?  No, he never said that.

1   Q.   Okay.  And none of these unnamed representatives at

2   this retirement seminar that you attended told you that they

3   had any authority to alter the terms of CONSOL's written

4   benefits plan, correct?

5   A.   No, they did not.

6   Q.   And no one from CONSOL ever told you that Mr. Gianato

7   had any such authority, correct?

8   A.   No.

9   Q.   And no one from CONSOL ever told you that any of these

10  unnamed representatives had any such authority, correct?

11  A.   That's correct.

12  Q.   And when you were working for CONSOL in 1991, did you

13  know who -- was CONSOL owned by another company in the

14  1990s; do you know, Mr. Jack?

15  A.   I think CONSOL was owned by DuPont when I first started

16  with them.

17  Q.   Okay.  And do you know what, if any, involvement DuPont

18  had in providing medical benefits that CONSOL was providing

19  to employees at Enlow Fork?

20  A.   No, they -- our benefits changed periodically through

21  administrators.  I think when I first started -- in fact, I

22  just found a card the other day with my picture on it from

23  the day.  So Provident was the name of the company that

24  administered.  And then it went to Blue Cross/Blue Shield,

25  HealthSCOPE.  I don't know who -- it was CONSOL.

JACK - CROSS

1    **Q.**   My question was:  Do you know what involvement DuPont

2    had in the benefits --

3    **A.**   No, I do not.

4    **Q.**   Let me finish my question, sir.

5        Do you know what involvement DuPont had in providing

6    benefits that CONSOL provided to employees at Enlow Fork?

7    **A.**   No, I do not.

8    **Q.**   And when you went to this orientation that you

9    testified to in 1991, you had already accepted your job at

10   CONSOL, correct?

11   **A.**   Okay.  Here's what happened --

12   **Q.**   Sir, it's a yes or no.  Either you had accepted your

13   job or you hadn't accepted your job?

14   **A.**   Yeah, I accepted the job.

15   **Q.**   Okay.  And the material that you submitted when Mr.

16   Pomponio was asking you questions about the out-of-pocket

17   expenses, is it your testimony that all of those expenses

18   were covered by the CONSOL benefit plan before it was

19   terminated?

20   **A.**   Well, we were told -- and, again, we were told that at

21   our retirement we would have our same medical benefits,

22   which would include healthcare, dental, eye, prescription

23   drug, and life insurance.

24   **Q.**   My question is:  Do you in fact know whether the

25   specific items that you circled would in fact have been

JACK - CROSS

1    covered by CONSOL's medical benefit plan before it was

2    terminated?

3    **A.**    Well, it was the same plan that I had when I was

4    working, and it would have been covered then, so they should

5    have been covered in retirement.

6    **Q.**    They should have been?  Do you know for a fact that

7    they were covered or are you just assuming that those

8    expenses were covered, sir?

9    **A.**    Well, if we were told we would have the same coverage

10   in retirement, and they were covered when I was working,

11   they would have, yes; I'm saying they would have been

12   covered.

13   **Q.**    Okay.  Fair enough.  And you said at the beginning of

14   your testimony -- well, strike that.

15        One more quick thing.

16        Mr. Pomponio also asked you about these letters that

17   you received from CONSOL.  The first one was this letter

18   that I've got up on the screen.  Do you see that?  It's

19   Plaintiff's Exhibit 1?

20   **A.**    Yes.

21   **Q.**    And this was the letter that you testified you received

22   that told you that the benefits that CONSOL was providing to

23   you at retirement were going to be terminated in five years,

24   correct?

25   **A.**    That's correct.

1    **Q.**   And at the bottom of that letter that you received, it

2    specifically says, "CONSOL reserves the right to amend,

3    modify or terminate its retiree benefit programs," correct?

4    **A.**   That's correct.

5    **Q.**   So when you received this -- you testified earlier that

6    you relied upon this letter from CONSOL, but, in fact, the

7    letter you received from CONSOL told you that, while you

8    could have benefits for the next five years, they also

9    reserved the right to terminate those benefits as they saw

10   fit, correct?

11   **A.**   This was in 2014.  And I was told this initially in

12   1991.  So -- the difference, there is the difference.

13   **Q.**   My question, sir, is about 2014, not about 1991.

14       You said to Mr. Pomponio that you somehow relied upon

15   this letter you received from CONSOL that they would provide

16   you benefits for five years.  But, in fact, the letter that

17   you relied upon at the bottom says that they reserve the

18   right to amend, modify or terminate retiree benefit programs

19   at any time and for any reason, correct?

20   **A.**   That's what it says.

21   **Q.**   Okay.  And you said at the beginning of your testimony

22   that one of the reasons you joined CONSOL was because of the

23   medical benefits it offered, correct?

24   **A.**   Yes.

25   **Q.**   Okay.  But despite that fact, for the following 15, 20

1    years, sir, you didn't bother to read any of the written

2    materials CONSOL sent you that said they could terminate

3    those benefits at any time, correct?

4    **A.**    Generally, I would never read through a whole pile of

5    stuff like this.

6    **Q.**    So the answer to my question is --

7    **A.**    No.

8            MR. TORRES:  Nothing further, Your Honor.

9                    **REDIRECT EXAMINATION**

10   **BY MR. POMPONIO:**

11   **Q.**    Mr. Jack, when Mr. Torres was asking you about whether

12   you had accepted an offer of employment at the time of your

13   orientation, you appeared to want to fully explain that.

14   Do you want to fully explain that?

15   **A.**    Yes.  As I stated before, I had a very good job, and

16   whenever I applied for the position at Enlow Fork, I was a

17   superintendent of a small coal mine, and I did not have

18   anything -- as a small operation, I didn't have anything

19   towards my future retirement, no pension, no healthcare --

20   nothing.  So I took a week's vacation and I went to -- after

21   I was offered the position, I went to the orientation with

22   full intent that if it wasn't exactly what I was after, my

23   job was still open.

24          So after orientation was completed, then I called and I

25   resigned the company.

JACK - REDIRECT

1    **Q.**   Okay.   Thank you.   Could you turn to Defendant's

2    Exhibit 1?   And if you could flip to -- I don't know --

3    about a third of the way in on the top, it will have the

4    Bates stamp MSJ002055.

5    **A.**   2055?

6    **Q.**   Yes, sir.

7          MR. TORRES:   Hold on a second.

8          I'm sorry, Bren, did you say 2055?

9          MR. POMPONIO:   That's right.

10         MR. TORRES:   Thank you.

11   BY MR. POMPONIO:

12   **Q.**   Okay?

13   **A.**   Okay.

14   **Q.**   All right.   And about halfway down the page, there is a

15   title of sections.   Could you read that section?   Just the

16   title?

17   **A.**   "Effect of Retirement Upon Medical Benefits"?

18   **Q.**   Correct?

19   **A.**   Yes.

20   **Q.**   And then if you go down to the very last line or

21   sentence there, page 14, could you -- could you read that

22   last three lines, please, starting, "If you terminate" --

23   **A.**   If you terminate due to a Separation Retirement,

24   termination of employment after vesting in the Retirement

25   Plan with payments commencing between age 50 and 65, your

1    coverage will cease upon --

2    **Q.**   Okay.  That's good.  And then on the next page, on

3    2056, could you describe what that page is?

4    **A.**   Salary continuance plan.

5    **Q.**   And does it appear -- what does it appear to be?

6    **A.**   It's salary continuance plan for production and

7    maintenance employees of CONSOL, Incorporated.

8    **Q.**   Let me ask you this:  Is it signed?

9    **A.**   Yes, it is.

10   **Q.**   Who is it signed by?

11   **A.**   Luke Gianato.

12   **Q.**   Would you have received document letters like this from

13   Luke Gianato to include in your -- this larger document that

14   we've been discussing here?

15   **A.**   Yes.  We were given papers, and Luke was a manager in

16   Human Resources there, so we would get communications from

17   him.

18   **Q.**   And did Mr. Gianato instruct you to include that --

19   letters like that into your benefit plan --

20   **A.**   Yes.

21   **Q.**   -- documents?

22   **A.**   Yes.

23   **Q.**   Thank you.

24           MR. POMPONIO:  Nothing further.

25

**RECROSS EXAMINATION**

BY MR. TORRES:

Q.   So Mr. Gianato would tell you to put pages into the
document you testified before you never bothered to read; is
that correct?

A.   Well, they gave us papers and they would say to -- if
you want to, add them to your binder.

Q.   But you didn't read these documents, so you wouldn't
have read them, correct?

A.   Sometimes I read them, sometimes I didn't.

          MR. TORRES:  Nothing further, Your Honor.

          MR. POMPONIO:  Nothing further.

          THE COURT:  Let me ask whether or not the witness
is to resume in the courtroom?  Will you be staying?  Will
you be staying in the courtroom?

          THE WITNESS:  I could.  I've got a little bit of a
headache right now, but I could.  I could, if I'm needed.

          THE COURT:  Well, it may be that Mr. Pomponio
could give us some direction.  He said he could stay if he's
needed.  I assume from that that he would like to be
excused.

          MR. POMPONIO:  Certainly.  Certainly, he can be
excused if he's not feeling well and he wants to.

          THE COURT:  And I take it the defendant has no
objection?

JACK - RECROSS

```
 1              MR. TORRES:  Oh, we have no objection to Mr. Jack
 2    leaving, Your Honor.
 3              THE COURT:  Yes, sir.  You are at liberty to
 4    attend or not, as you wish, unless you are given some other
 5    direction.
 6              THE WITNESS:  Okay.  Thank you.
 7              THE COURT:  In the unlikely event you need to be
 8    recalled, will you be available?
 9              THE WITNESS:  Yes.  I'm driving -- I live three
10    and a half hours away.  I'm not going home today.  But if it
11    would be later in the week, I would need a little advance
12    notice.
13              THE COURT:  Very good.  Thank you, sir.
14         And do the parties make a motion with respect to -- I
15    don't know whether you wish to consider that now or not?
16              MR. TORRES:  Yes, Your Honor.  For nonparties, we
17    move that those other witnesses be sequestered.
18              THE COURT:  And so I'm going to ask that you not
19    discuss your testimony with any other nonparty in this case,
20    unless, of course, you're granted permission to do so, until
21    the trial is over.  Thank you.  And you can leave those
22    items at the desk, if you will, and we can collect them in a
23    moment.
24              See whether or not they all seem to be there.
25              MR. TORRES:  Your Honor, I was talking to Mr.
```

CASEY - DIRECT

```
 1    Petsonk.  I would just like a minute to move Mr. Jack's
 2    materials out and get the materials for the next witness.
 3              THE COURT:  You may do that.  Just tell us when
 4    you're ready.
 5              MR. TORRES:  Will do.  Thank you, Your Honor.
 6         (Pause.)
 7              MR. TORRES:  We're ready, Your Honor.  Thank you.
 8              MR. PETSONK:  Your Honor, our next witness will be
 9    Emmett Casey, another plaintiff in this matter.
10         Should I call Mr. Casey up?
11              THE COURT:  Please do.
12              THE CLERK:  Would you please state your full name
13    and spell it for the record.
14              MR. CASEY:  Emmett, E-M-M-E-T-T, Samuel,
15    S-A-M-U-E-L, C-A-S-E-Y, Casey, Junior, J.R.
16              EMMETT SAMUEL CASEY, JR., PLAINTIFF, SWORN
17              THE CLERK:  Please take the stand.  Thank you.
18              MR. PETSONK:  Thank you, Your Honor.
19                        DIRECT EXAMINATION
20    BY MR. PETSONK:
21    Q.    Thank you, Mr. Casey.  Where do you reside?
22    A.    I live in Bluefield, West Virginia.
23    Q.    And are you married?
24    A.    Yes.
25    Q.    And who is your wife?
```

CASEY - DIRECT

1   **A.**   Dona Casey, D-O-N-A.  Dona.

2   **Q.**   And what is your birthday?

3   **A.**   January 20th, 1955.

4   **Q.**   What is your current age?

5   **A.**   66.

6   **Q.**   And are you currently retired?

7   **A.**   Yes.

8   **Q.**   And when did you retire?

9   **A.**   February 1st of 2013.

10  **Q.**   And what was your occupation at the time you retired?

11  **A.**   I was a longwall coordinator.

12  **Q.**   And who was your employer?

13  **A.**   CONSOL Energy.

14  **Q.**   And where did you work at the time of your retirement?

15  **A.**   At the Buchanan operation.

16  **Q.**   And was that a coal mining operation?

17  **A.**   Yes.

18  **Q.**   And where was that mine located?

19  **A.**   It was in Virginia.

20  **Q.**   And how long did you work for CONSOL?

21  **A.**   35 plus years.

22  **Q.**   And were you paid on an hourly or a salary basis during

23  those years when you worked for CONSOL, or both?

24  **A.**   Both.

25  **Q.**   And during what period did you work on an hourly basis?

CASEY - DIRECT

1    **A.**    From '73 to '76 was hourly.  And then from April of '92

2    to November of '92, it was hourly.

3    **Q.**    And while you were an hourly employee, take the first

4    period first from '73 to '76, were you a member of a union?

5    **A.**    Yes.

6    **Q.**    Okay.  And during the second period in which you were

7    working hourly, from April 1992 to November of 1992, were

8    you a member of a union then?

9    **A.**    No.

10   **Q.**    And throughout the rest of the years that you worked

11   for CONSOL, you were a salaried employee; is that right?

12   **A.**    Yes.

13   **Q.**    You were involved in underground production of coal

14   throughout that time; is that right?

15   **A.**    Yes.

16   **Q.**    And during your employment with CONSOL, were there

17   occasions when the company discussed with or explained to

18   you your entitlement to retirement welfare benefits?

19   **A.**    Yes.

20   **Q.**    And when did that first occur?

21   **A.**    First time was in '76.

22   **Q.**    And what was the setting for that discussion or that

23   explanation of benefits?

24   **A.**    Myself and several other young men were taking a

25   salaried position as a foreman, and, we were in a foremen's

*Catherine Schutte-Stant, RDR, CRR (304) 347-3151*

CASEY - DIRECT

1    [sic] class.  And the people that were teaching the class

2    were going over your benefits of being a salaried employee

3    for the company.

4    **Q.**   And as a salaried employee, just to be clear, you were

5    not a union member; is that right?

6    **A.**   That's right.

7    **Q.**   And how many people attended that meeting, the

8    foremen's class?

9    **A.**   In '76?

10   **Q.**   Yes.

11   **A.**   Approximately 12 to 15.

12   **Q.**   Do you remember the names of the individuals who

13   discussed your retirement welfare benefits at that foremen's

14   class?

15   **A.**   The instructors was Jim Jones and Archie Maynard.

16   **Q.**   What department did they work in for CONSOL?

17   **A.**   They were in the Human Resource Department, my

18   understanding.

19   **Q.**   And so did it appear to you that they had the authority

20   to speak about -- on behalf of CONSOL about your retirement

21   welfare benefits?

22          MR. TORRES:  Objection; leading.

23          THE COURT:  See if you can restate it.

24   BY MR. PETSONK:

25   **Q.**   What authority did it appear to you that they had to

*Catherine Schutte-Stant, RDR, CRR (304) 347-3151*

CASEY - DIRECT

1    speak with you about the -- the terms of your retirement

2    welfare benefits?

3    **A.**    They were putting on the class for the company.  They

4    was giving us all the ins and outs of what we was supposed

5    to do as employees, as a salaried employee.

6    **Q.**    What did Jones and Maynard say -- or present to you

7    about the retiree welfare benefits for which you would be

8    eligible as a salaried retiree?

9                MR. TORRES:  Object to the form of the question,

10   Your Honor.  If I --

11               THE COURT:  The witness may answer.

12               THE WITNESS:  Once you reached the age of

13   retirement, you, your wife, and your children would have

14   medical until you deceased, and then your wife would have it

15   until she deceased or was remarried, and your children would

16   have it until they reached a certain age or they were

17   employed by a company that offered healthcare, and that once

18   you reached the age of 65, you had to sign up on Medicare.

19   Then the CONSOL plan would be your supplemental plan.

20   BY MR. PETSONK:

21   **Q.**    And just so I understand, what did they say about the

22   contents of that plan; that is, what was the coverage that

23   they described to you in that plan?

24   **A.**    That you had medical, dental, eye, and you had the

25   option of purchasing your life insurance.

*Catherine Schutte-Stant, RDR, CRR (304) 347-3151*

CASEY - DIRECT

1    **Q.**   What other occasions did the company, did your

2    employer, CONSOL, discuss or explain to you your entitlement

3    to retirement welfare benefits as -- moving forward through

4    your career?

5    **A.**   Periodically, like I worked at several other

6    operations, and once you would go there, you know, then

7    there would be someone from Human Resources that would

8    address the employees and give what benefits you had as an

9    employee of CONSOL.

10   **Q.**   And what do you recollect those HR individuals

11   presented to you or told you in those periodic meetings that

12   you've referenced --

13          MR. TORRES:  Objection.  Objection, Your Honor.

14   It's compound.  It's phrased -- and he hasn't established a

15   foundation for a specific discussion.

16          THE COURT:  Restate it, if you would.

17          MR. PETSONK:  I will restate.  Thank you.

18   BY MR. PETSONK:

19   **Q.**   What was the initial operation where you were employed

20   as a foreman for CONSOL?

21   **A.**   First operation?  Bishop Coal Company, at the 34.

22   **Q.**   And after you left 34, you worked at other coal mining

23   operations with CONSOL, right?

24   **A.**   Yes.

25   **Q.**   So what were those operations?

CASEY - DIRECT

1    **A.**    I left Bishop, went to the Rowland operation.  Left

2    Rowland and went to Jenkinjones.  And then I went to the

3    Itmann, and then I went to the Matthews down in Tennessee,

4    and then Amonate, and then the Buchanan.

5    **Q.**    When you went to Rowland, Jenkinjones, Itmann, Matthews

6    in Tennessee, and Amonate, did you go through another

7    foreman training class like you did at Bishop in '76?

8    **A.**    Not really.  Because I was already -- how you say it --

9    a foreman for CONSOL for those areas, and everything with

10   CONSOL was pretty much the same other than your roof control

11   plan, ventilation plan may be different at different mine

12   sites.  So then you would go over that.  Did that answer?

13   **Q.**    Yes.  I may come back to that.  But let me move on.

14   After Amonate, what was the next coal mining operation where

15   you were employed for CONSOL?

16   **A.**    Buchanan.

17   **Q.**    And where is that located?

18   **A.**    Maysville.

19   **Q.**    Right.  And so did you receive an orientation at that

20   location?

21   **A.**    Yes.  Not at that location, but we received the

22   orientation at the Bluefield offices, in Bluefield,

23   Virginia, at that time.

24   **Q.**    And were there other occasions during the time that you

25   worked at Buchanan -- were there any occasions at the time

CASEY - DIRECT

1    you worked at Buchanan where the company discussed or

2    explained to you your entitlement to retirement welfare

3    benefits?

4    A.   Yes, periodically, yes.

5    Q.   Let's just list them, if you would, and as best you

6    remember, and then I'll ask you about them in turn.  What

7    was the first occasion when you worked at Buchanan where you

8    recall that the company discussed or explained your

9    entitlement to retirement welfare benefits?

10   A.   When I first went to Buchanan, I was what they called a

11   P&M employee.

12   Q.   And --

13   A.   That's whenever I -- HR -- a member of HR came in and

14   explained what our duties was as an employee at Buchanan,

15   what our responsibilities would be, and about our retirement

16   after we reached retirement age.  What was, basically, that

17   you would have healthcare, and it would be from the moment

18   of retirement until you passed away, and then your wife

19   would have it until she passed or remarried.  Your children

20   would have it until they got to a certain age or was

21   employed by a company that offered healthcare.  And once you

22   reached Medicare age, the CONSOL plan would be your

23   supplement.

24   Q.   I'll come back to that.  You mentioned there were other

25   occasions that -- there were periodic occasions where CONSOL

CASEY - DIRECT

1    discussed or explained to you your entitlement to welfare

2    benefits while you were at Buchanan.  If you would, just

3    list for me the other occasions where you recall receiving

4    those explanations from CONSOL?

5    **A.**   Well, when I first was employed there, they had a big

6    drive for -- the UMWA was wanting to organize.  And the big

7    question was, you know, how much better we were being a

8    non-represented mine versus a representative mine.  So they

9    would put up a slideshow, giving you what the good and

10   the -- the good and the bad, you know.

11   **Q.**   Okay.  I'll come back to ask you more about that, but

12   what occasion do you recollect that CONSOL discussed or

13   explained your retirement welfare benefits while you worked

14   at Buchanan?

15   **A.**   They did it at like some of your annual refresher

16   courses.  When you got to the age of getting close for

17   retirement, you had to sign the papers and everything so

18   they could get a package prepared and sent to you.  So at

19   that time, you would discuss it.

20   **Q.**   Okay.  I'll come back and ask you a little bit more

21   about each of those occasions that you described.  At the

22   initial orientation, when you had the initial presentation

23   that you mentioned when you first went to work as an hourly

24   nonunion production and maintenance worker at Buchanan, do

25   you recall who at CONSOL led that orientation meeting?

CASEY - DIRECT

1    **A.**    You had -- the first instance was John Fox, and you had

2    Gene Bailey, and you had Ed Davis, you had Jim Waters, you

3    had Terry Mason was there for a brief period of time.  You

4    had Mike Adams, Nancy Johnson, Gerald Kowzan.  I might have

5    missed someone.

6    **Q.**    I'm asking you specifically as to the orientation

7    meeting, who do you remember was the individual who led the

8    orientation meeting when you first went to work at Buchanan?

9    **A.**    John Fox.

10   **Q.**    Okay.  Thank you.  And what department did John Fox

11   work in for CONSOL?

12   **A.**    He was in Human Resources.

13   **Q.**    And just for clarity sake, those other individuals you

14   just mentioned, what department did they work in for CONSOL?

15   **A.**    Human Resources.

16   **Q.**    And what do you understand was the job of the Human

17   Resource Department at CONSOL there at the Buchanan Mine?

18   **A.**    It was their job to take care of the employees and to

19   explain their rights as an employee of Buchanan.  If you had

20   any questions on your healthcare, your dental, eye, they

21   were the people to go see.

22   **Q.**    What authority did it appear to you that they had to

23   offer you that information about the -- about the retiree

24   welfare benefits?

25           MR. TORRES:  Objection.  Calls for a legal

CASEY - DIRECT

1    conclusion and assumes facts.

2            THE COURT:  Sustained.

3    BY MR. PETSONK:

4    Q.   Did it appear to you that it was -- that -- when you

5    say it was their job to do that, did they, in fact, did the

6    HR Department in fact provide that job function during the

7    time that you worked there?

8    A.   Yes.  HR was -- they were employed by the company.  And

9    that was their job description that was appointed by the

10   officials of Pittsburgh.

11           MR. TORRES:  Objection; move to strike.  Lack of

12   foundation, Your Honor.

13           THE COURT:  Back up and see what the basis is of

14   the witness' knowledge.

15   BY MR. PETSONK:

16   Q.   What made it appear to you that it was the job

17   description of the HR Department to do the things that you

18   have descried here today?

19   A.   They told me it was.

20   Q.   Who told you that?

21   A.   The HR.

22   Q.   Okay.  And you've referenced individuals who were

23   employed by CONSOL in the HR Department at Buchanan while

24   you worked there, correct?

25   A.   That's correct.

1   **Q.**   All right.  So at your orientation meeting,

2   approximately how many people were in attendance at that

3   meeting?

4   **A.**   In '92, you're speaking of?

5   **Q.**   When you were oriented as an hourly P&M worker?

6   **A.**   Approximately 15 or -- 15 people, I'd say.

7   **Q.**   What did John Fox cover in that orientation meeting?

8   What topics?

9   **A.**   Safety, the laws, your responsibility as an employee

10   at Buchanan, your rights as an employee at Buchanan.  He

11   went over absenteeism, your vacation, your medical for you

12   and your family.  I guess that pretty much covers, you know,

13   everything that I can think of.

14   **Q.**   Okay.  What documents did you receive at that

15   orientation meeting in 1992?  If you recall?

16   **A.**   They just handed out some handouts.  As far as signed

17   documents, we didn't have any, to the best of my knowledge,

18   for that.

19   **Q.**   At this meeting, did Mr. Fox or anyone else at CONSOL

20   inform you that CONSOL asserted the right to terminate your

21   retirement welfare benefits?

22   **A.**   No.

23   **Q.**   If they had stated that, would that have affected your

24   decision?

25           MR. TORRES:  Objection; calls for speculation.

1              THE COURT:  Sustained.

2    BY MR. PETSONK:

3    **Q.**   What factors did you consider in determining to go to

4    work at the Buchanan operation?

5    **A.**   The opportunity to keep working for the company to get

6    to retirement age.  The previous sites that I worked at, I

7    knew basically what we was offered.  And it was to provide

8    for my family.

9    **Q.**   And you previously stated what Mr. Fox described

10   regarding the benefits at orientation session.  Did you ask

11   any questions about the retirement welfare portion of the

12   benefits that he described there?

13   **A.**   No.  It was pretty much self-explanatory.

14   **Q.**   And what was it that you understood he had explained?

15   **A.**   That I would have healthcare for me, my wife, and my

16   children until I reached retirement age.  I would have it

17   until I passed away, my wife would have it until she passed

18   away or remarried, and my children would have it until they

19   reached a certain age or was employed by someone that

20   offered healthcare.  And once you got to the age of 65, it

21   was a must you sign up on Medicare, and then CONSOL would be

22   your supplemental healthcare.

23   **Q.**   Okay.  Now, moving on.  You mentioned there were times

24   there was union organizing at Buchanan.  You stated that

25   CONSOL discussed the retirement welfare benefits during that

CASEY - DIRECT

1   union organizing period; is that correct?

2   **A.**   Yes.

3   **Q.**   And how many of those types of discussions about

4   retirement welfare benefits do you recall occurred during

5   the union organizing at Buchanan?

6   **A.**   I'm going to say about three that I attended.

7   **Q.**   Do you recall who specifically at CONSOL led the

8   discussions that you referenced there?

9   **A.**   It was the HR Department, and then you had Gene Bailey,

10  I think he was one of the men that come down and talked.

11  John Fox, of course.  I'm trying to think who was -- there

12  was someone else I can't think of the name --

13  **Q.**   Okay.

14  **A.**   -- that came from Pittsburgh operations.  I can't

15  remember who it was.

16          MR. TORRES:  I'm sorry, Judge.  I didn't hear the

17  last part of the witness' response.

18          THE COURT:  Could you repeat what you just said?

19          THE WITNESS:  I said someone else that came from

20  Pittsburgh that had -- that was in the meeting, but I can't

21  recall who that person was.

22  BY MR. PETSONK:

23  **Q.**   So to be clear, back --

24  **A.**   You could probably go back in '92 and check the

25  records.

CASEY - DIRECT

1    **Q.**    Understood.  Where did Gene Bailey customarily work?

2    **A.**    Gene Bailey, he was out of the Bluefield offices.  We

3    had corporate offices in Bluefield, Virginia, at that time.

4    **Q.**    And yet you testified he worked in the Human Resources

5    Department there at that corporate office in Bluefield,

6    Virginia, correct?

7    **A.**    It's my understanding, yes.

8    **Q.**    Okay.  And tell us about those meetings.  What occurred

9    -- what did Gene Bailey say regarding your welfare benefits

10   in the meetings that you referenced?

11        MR. TORRES:  Objection.  The question assumes

12   facts, Your Honor.

13        THE COURT:  Ask first if he recalls what Gene

14   Bailey said.

15   BY MR. PETSONK:

16   **Q.**    Do you recall what Gene Bailey said in those meetings?

17   **A.**    They were just doing a comparison of the representative

18   and the nonrepresentative operations.

19   **Q.**    Explain what you mean by representative and

20   nonrepresentative operations.

21   **A.**    They classified everything -- representative was

22   represented by UMWA.  The nonrepresentative was like the

23   nonunion operation, such as -- at that time, they had the

24   Buchanan operation, they had the Bailey and Enlow.  I think

25   those three were the only nonrepresentative operations, to

CASEY - DIRECT

1    the best of my knowledge, at that time.

2    **Q.**   Okay.

3            THE COURT:  What do you mean by nonrepresentative?

4            THE WITNESS:  It was a nonunion.

5            THE COURT:  Thank you.

6            THE WITNESS:  Thank you.

7    BY MR. PETSONK:

8    **Q.**   Thank you.  When you say they made a comparison, what

9    did Mr. Bailey say or present by way of comparison between

10   the union and the nonunion as to retiree welfare benefits?

11           MR. TORRES:  Objection, Your Honor.  It's leading.

12   He keeps inferring that there was a topic discussed.  He

13   hasn't established --

14           MR. PETSONK:  Your Honor, if I may respond?  I'm

15   referencing this meeting, because at the outset of my

16   questioning, I asked Mr. Casey to list all the times that he

17   recalled CONSOL made presentations about his retiree welfare

18   benefits.  And I'm only asking him about this one, because

19   he referenced it at the outset of his testimony.

20           THE COURT:  What is the objection to that?

21           MR. TORRES:  I don't believe the question

22   previously was specific to retiree medical benefits, Your

23   Honor.  He was asking him if these gentlemen held other

24   meetings.  And I believe he testified there being

25   discussions with union organizing and that there were three

1    meetings, and he's identified three gentleman who were

2    apparently at these meetings, but none of these elicited any

3    testimony that there was specific discussion of retiree

4    medical benefits at any of those meetings.  He keeps

5    suggesting with his question that that topic was necessarily

6    covered.

7              THE COURT:  I suppose you need to inquire first

8    about the foundation --

9              MR. PETSONK:  Certainly.

10             THE COURT:  -- of the question you're posing.  And

11   establish that first.

12             MR. PETSONK:  Certainly, Your Honor.  I've

13   attempted to do that and I will do it with greater

14   particularity as I reference each meeting as to which I'm

15   questioning Mr. Casey.

16   BY MR. PETSONK:

17   Q.   What do you recall Mr. Bailey saying in the meetings,

18   the three meetings where you testified he compared the UMWA

19   to the nonunion CONSOL operations?

20   A.   Are we speaking of just the healthcare part?

21   Q.   I think that the Court's inviting you to explain what

22   you do remember that he described by way of comparison.

23   A.   The healthcare was the UMWA representative operations;

24   they had healthcare, but they had to pay union dues.  And

25   according to -- back in the John L. Lewis and Truman years,

CASEY - DIRECT

1    it was a guaranteed thing for the UMWA to have healthcare.

2    All right.  By comparing CONSOL's, you had healthcare until

3    you passed, your wife would have it until she passed or

4    remarried, your children would have it until they reached a

5    certain age or was employed by an operation that offered it.

6    And once you reached a certain age, you definitely had to

7    sign up on the Medicare, and then it would have been a

8    supplement.

9    Q.    Did Mr. Bailey or anyone else from CONSOL state during

10   those meetings that CONSOL asserted the right to change or

11   terminate those retiree welfare benefits in the future?

12   A.    No.

13   Q.    If they had made such a statement, how would that have

14   affected your decision about your employment?

15             MR. TORRES:  Objection.  Calls for speculation.

16             THE COURT:  Sustained.

17   BY MR. PETSONK:

18   Q.    If they had made such a statement about their

19   likelihood of terminating retiree welfare benefits, would

20   that have been -- was that significant to you?

21             MR. TORRES:  Calls for speculation, Your Honor.

22   Objection.

23             THE COURT:  The witness may answer that.

24             THE WITNESS:  If we knew that, we would have

25   signed; it would have been organized.

1    BY MR. PETSONK:

2    **Q.**   You stated that you recollect -- let me clarify.

3         I understood that you stated at the outset of my

4    questioning that you recollect other meetings where CONSOL

5    explained your entitlement to retiree welfare benefits while

6    you worked at Buchanan; is that correct?

7    **A.**   Say it again.  I didn't catch it.

8    **Q.**   Did you testify earlier that there are other occasions

9    where you -- where CONSOL explained your entitlement to

10   retirement welfare benefits?

11   **A.**   Periodically, yes.

12   **Q.**   And when you say "periodically," please explain what

13   you recollect as to the additional explanations of

14   retirement welfare benefits?

15   **A.**   It was always the same whenever the question was

16   brought up:  You had healthcare after you retired until you

17   passed, died, your wife would have it until she passed or

18   remarried, your children would have it until they reached a

19   certain age or was employed by someone that offered

20   healthcare.  Once you become eligible for Medicare, then

21   CONSOL would be your supplemental insurance.

22   **Q.**   Okay.  How often do you recollect these periodic

23   meetings occurred?

24   **A.**   Once a year -- once every two, once every three years.

25   As it was going on, because there was questions -- people

1    would get to the point of retirement age.  You had several

2    employees there that, periodically, they would go to the

3    seminars, in Pittsburgh, it was offered, the retirement

4    seminars.  And a group of people would get together and

5    discuss it.  And then next thing you know, you had kind of

6    like a snowball effect; everybody would be discussing it.

7    So they would hold a meeting to calm people down on

8    something, you know.

9    **Q.**   Who do you recall led the annual or semiannual meetings

10   that you have described here?

11   **A.**   HR.

12   **Q.**   Okay.  And to be clear, I think, who was employed in

13   the HR Department during the period when you recollect these

14   meetings occurring?

15   **A.**   Back to -- you had -- you talking about from '92 or

16   back to '76?

17   **Q.**   No, let me clarify.  Thank you.

18        When you're referencing periodic meetings, during what

19   period of time do you recall that they occurred?

20   **A.**   They occurred my whole mining career.

21   **Q.**   Understood.  And you are testifying as to -- at the

22   Buchanan operation, who do you recollect was employed in the

23   Human Resources Department during the years that you were

24   employed at Buchanan?

25   **A.**   You had John Fox, you had Ed Davis, Jim Waters, Mike

CASEY - DIRECT

1  Adams, Terry Mason, Nancy Johnson -- I might have left

2  someone out.

3  Q.   Okay.  That's fine.  Moving along.  Did anyone at any

4  of these annual meetings ever explain that CONSOL asserted

5  the right to terminate or -- or reserve the right to

6  terminate those retirement medical benefits after you

7  retired?

8  A.   Not to my knowledge.  I never did hear that, that they

9  was going to terminate my healthcare.

10  Q.   All right.  Mr. Casey, what was your last date working

11  underground as a coal miner?

12  A.   Last day underground was December 28, 2012.

13  Q.   And when did you retire?

14  A.   February 1st of 2013.

15  Q.   And who did you have to speak with, if anyone, to

16  determine if you were eligible to retire at that time?

17  A.   I spoke with Nancy Johnson and Mike Adams, and they

18  sent in the paperwork to Pittsburgh to send you back a

19  retirement package.

20  Q.   How do you speak with them?  How did you speak with

21  them?

22  A.   I went up and I said, "Ms. Johnson, I need you to get

23  in contact with Pittsburgh and get me a retirement package."

24  Q.   Where did you speak with Ms. Johnson?

25  A.   In her office at Buchanan operations.

CASEY - DIRECT

1    **Q.**   And what did you speak about with Ms. Johnson in that

2    meeting?

3    **A.**   What did I -- about retirement.

4    **Q.**   Okay.  And what did Ms. Johnson say to you about the

5    process you had to follow for retiring in that meeting?

6    **A.**   At that time, we had a -- they had a point system.  And

7    it was your age plus years of service.

8    **Q.**   Okay.  And what understanding did you have as to your

9    obligations in order to retire?  What did you have to do at

10   that point in order to retire from CONSOL?

11   **A.**   I had to sign some documents.  They sent it in.  And

12   sent it back and tell me what I can do.  I mean, what my

13   401(k), my salary would be, what my healthcare would cost.

14   **Q.**   What do you mean when you say what your healthcare

15   would cost?

16   **A.**   We had to pay -- we had to pay a monthly fee for our

17   healthcare.

18   **Q.**   To whom did you have to pay that monthly fee for your

19   healthcare?

20   **A.**   CONSOL.

21   **Q.**   And are you referencing your healthcare as a retiree?

22   **A.**   Yeah.

23   **Q.**   Okay.  And what did you understand that you would

24   receive in exchange for those fees that you paid to CONSOL

25   as a retiree?

1   **A.**   Medical, dental, eye, life insurance, until I died.

2   And my wife would have it until she died or remarried.  And

3   my child would have it until he became a certain age or was

4   employed by another company that offered the healthcare.

5   **Q.**   Okay.  And did you complete the paperwork that Ms.

6   Johnson presented to you there?

7   **A.**   Yes.

8   **Q.**   And what did you do next?

9   **A.**   I waited until they sent me back the retirement package

10   that said I could retire, what I would get, my benefits and

11   so forth.

12   **Q.**   From whom did you receive that retirement package back?

13   **A.**   It came from Pittsburgh.

14   **Q.**   Okay.  Do you recall how much your monthly fee was at

15   the time that you retired?

16   **A.**   For the healthcare?  For my healthcare?

17   **Q.**   For what you've described here today, yes.

18   **A.**   It was four-hundred-and-some-odd dollars a month,

19   starting -- and then it went back -- it went up to -- there

20   at the end, it was like five-hundred-ninety-some dollars a

21   month.

22   **Q.**   What if anything else did Ms. Johnson say to you about

23   the retirement medical benefits at that meeting when you

24   went to retire as you've described?

25   **A.**   She didn't really say anything, sir.

CASEY - DIRECT

1    **Q.**    Other than what you've just described?

2    **A.**    She didn't say anything other than what I just stated.

3    **Q.**    Did Ms. Johnson provide you a plan document or any

4    retiree plan documentation at that retirement meeting?

5    **A.**    You had the paperwork of what you would get, you know;

6    how much money you had in your 401(k); what type of annuity

7    check you would get, your annuity check, your life insurance

8    and your healthcare.  And you could split it up where you

9    got X number of dollars each month.  And then if I die, my

10   wife would get the same amount.  So you had different areas

11   there -- different plans that you could roll over your

12   401(k), leave it with the same company that you had there.

13   You could elect not to even take the healthcare.

14   **Q.**    Okay.  Mr. Casey, after you retired in 2013, did you

15   ever come to learn that CONSOL was making changes to the

16   retirement welfare benefits?

17   **A.**    Yes, in 2014.

18   **Q.**    And I'm going to present the documents to you -- what's

19   been marked as Plaintiff's Exhibit 1.  Is that on your

20   stand?

21   **A.**    On my stand?  Nothing is on my stand.

22            MR. PETSONK:  May I approach the witness, Your

23   Honor?

24            THE COURT:  Did you say Defendant's 1?

25            MR. PETSONK:  Plaintiff's 1.

```
 1              THE COURT:  Plaintiff's 1, excuse me.
 2   BY MR. PETSONK:
 3   Q.   Is this a copy of -- is this document familiar to you,
 4   Mr. Casey?
 5   A.   Yes.
 6   Q.   And what is it?
 7   A.   It's a letter from HealthSCOPE, stating that they were
 8   going to continue our health coverage until December 31st of
 9   2019.  And the way that I interpreted the letter was to say
10   was at the end of 2019, that I guess the government was
11   going to furnish us healthcare.  It says the nationalized
12   healthcare.
13   Q.   And did you believe after receiving this letter that
14   you would still have healthcare coverage, welfare benefit
15   coverage after the five years had concluded at the end of
16   2019?
17   A.   Yes.
18   Q.   And why did you have that belief?  What caused you to
19   have that understanding?
20   A.   Because the way the letter was written and read out
21   here that the nationalized healthcare.
22   Q.   What did you do for healthcare after you retired?
23   Where did you derive your healthcare once you retired?
24   A.   I had healthcare with CONSOL here up until 2015.
25   That's when it was terminated.  And in July the 1st of 2015,
```

CASEY - DIRECT

1    I was on Medicare.  And I contacted HealthSCOPE and that way

2    they were my supplemental insurance up to the end of

3    December of 2015.  After that, I went on my wife's plan

4    where she was employed.  I had to pay a premium to her for

5    an add-on to the plan.  At that time, she got -- I think it

6    was 2017, or something, I think, she was laid off from that

7    employer, so they had to furnish the COBRA.

8    **Q.**   Okay, I'll come back to that.  If I may inquire as to

9    Plaintiff's Exhibit Number 2.

10          MR. PETSONK:  And if I could approach and present

11   that to the witness.  May I approach the witness, Your

12   Honor?

13          THE COURT:  You may.

14   BY MR. PETSONK:

15   **Q.**   Mr. Casey, are you familiar with this document?

16   **A.**   Yes.

17   **Q.**   What does it appear to be?

18   **A.**   At the end of December 31st of 2015, I would no longer

19   have healthcare through CONSOL Energy.

20   **Q.**   Just to clarify, do you believe -- do you recall

21   receiving this document?

22   **A.**   This letter?

23   **Q.**   Yes.

24   **A.**   Yes.

25   **Q.**   When?

CASEY - DIRECT

1    **A.**    It was in -- I believe I received that in September, I

2    think.

3    **Q.**    When I'm referring to this document, I need to be

4    clear, I'm referring to the document that has previously

5    been marked Plaintiff's Exhibit Number 2.

6    **A.**    Oh, that would have been June 16th of 2015.

7    **Q.**    Okay.  You also have in front of you a document labeled

8    Plaintiff's Exhibit Number 1.  Is that right?

9    **A.**    Yes.

10   **Q.**    Did you also receive that document?

11   **A.**    Yes.

12   **Q.**    And when you believe -- do you recall when you received

13   that document?

14   **A.**    I believe the Exhibit 1 was in September of 2014.

15   **Q.**    But is there a date on the document that's marked as

16   Plaintiff's Exhibit 1?

17   **A.**    I don't see it, unless it's under the -- let me look

18   here.  No, there is no date on this one.

19   **Q.**    Okay.  But you've described what you understand about

20   it.  I have just a few final questions for you, Mr. Casey.

21   After you retired, what costs have you incurred for your,

22   you know, for insurance coverage for welfare insurance

23   coverage?

24   **A.**    The payments of the healthcare at my wife's work

25   through Humana, for doctor, prescription.

CASEY - DIRECT

1    Q.    Okay.

2    A.    It's been several dollars spent, yes.

3              MR. PETSONK:  Your Honor, if I may, I'm going to

4    approach with another exhibit.  Mark this.

5         Your Honor, may I present the document to the witness?

6              THE COURT:  Go ahead.

7    BY MR. PETSONK:

8    Q.    Mr. Casey, would you please look through this document?

9              THE COURT:  It's marked, what?

10   BY MR. PETSONK:

11   Q.    Six pages in length?

12             THE COURT:  What's the Exhibit Number?

13             MR. PETSONK:  It's Plaintiff's Exhibit Number 4.

14             And, Your Honor, this covers a number of different

15   years, so I'm glad to address each of them in turn, but I've

16   presented it to the plaintiff -- or the single exhibit.

17   BY MR. PETSONK:

18   Q.    Mr. Casey, have you had a chance to look at it?

19   A.    Yes.

20   Q.    What does it appear to contain?

21   A.    The expenses that I paid out-of-pocket through the

22   years 2016 up to 2019.

23   Q.    Let's look through the document.  Looking first at the

24   first page?

25   A.    Yes.

CASEY - DIRECT

1    **Q.**   What does page 1, Plaintiff's Exhibit 4, appear to

2    contain?

3    **A.**   Okay, you've got the expenses that was paid out.  Do

4    you want the total or  --

5    **Q.**   Well, when you say paid out, who do you understand paid

6    the expenses that are noted in this document?

7    **A.**   This is my out-of-pocket money that I spent.

8    **Q.**   Who prepared this document?

9    **A.**   Myself and my wife.

10   **Q.**   And so what does it show?

11   **A.**   It shows what the Medicare Part B and C, and Part D

12   costs in 2017.  The medical expenses of 2017.  The

13   medication, the COBRA expenses that I had to pay for my

14   wife's insurance through the plan source.  And it gave a

15   total of that, and that's documented with my taxes.

16   **Q.**   Okay.  And so how much does this document state that

17   you paid for those purposes in 2016 in total?

18   **A.**   2016, was $7,416.82.

19   **Q.**   And how much does this document state that you paid for

20   those purposes in 2017 in total?

21   **A.**   $13,077.13 in 2017 .

22   **Q.**   And not to be redundant, but going down, does this

23   document cover the years 2016 through 2019?

24   **A.**   That's correct, yes.

25   **Q.**   And what is the total amount reflected in the document

CASEY - DIRECT

1   that you spent for these purposes that you described during

2   those years 2016 through 2019?

3   **A.**   $35,444.01.

4   **Q.**   Okay.  And as you look through this document, flip

5   back, there is several pages.  There is a letter, the

6   second-to-last page of this document.  It's stamped

7   MSJ000753.

8   **A.**   Yes.

9   **Q.**   And what does this appear to be?

10  **A.**   This is the moneys that I had spent for my coverage

11  with CONSOL.

12  **Q.**   And did you receive this document from CONSOL?

13  **A.**   Yes.

14  **Q.**   Okay.  And what period -- time period is covered,

15  apparently, by this document?

16  **A.**   Went from 2012 up till 2015.

17  **Q.**   Okay.

18  **A.**   It was a Ms. Karen Brown, retirement administrator with

19  CONSOL.

20  **Q.**   Okay.  So as to the out-of-pocket expenses that you've

21  summarized on the first page of this exhibit?

22  **A.**   Yes.

23  **Q.**   You paid those out of pocket in the years after you

24  lost retirement welfare coverage from CONSOL, right?

25  **A.**   Yes.

CASEY - DIRECT

1    **Q.**   Did you have the expectation that those medical

2    expenses would have been covered by your CONSOL retirement

3    welfare plan?

4    **A.**   Yes.

5    **Q.**   And as to the costs that are set forth on the page

6    stamped 753, the second-to-last page of Plaintiff's Exhibit

7    4 -- okay.  What did you understand that you would receive

8    in return for the payment of these sums that are stated in

9    this letter?

10   **A.**   In what?

11   **Q.**   What, if anything?

12   **A.**   This was my out-of-pocket.  This was money I had to

13   spend for my healthcare and my life insurance.

14   **Q.**   Okay.  During those years noted on the --

15   **A.**   On the CONSOL.

16   **Q.**   And what transition benefits did CONSOL provide to you

17   when it terminated your retirement healthcare, if any?

18   **A.**   None.

19   **Q.**   And what transition benefits, if you know, did CONSOL

20   provide to any other retirees when they -- when CONSOL

21   terminated the retirement welfare benefits in 2015?

22           MR. TORRES:  Objection, Your Honor.

23           THE COURT:  What's the basis of the objection?

24           MR. TORRES:  I don't believe that there is an

25   issue in this case about the payment of these transition

CASEY - DIRECT

1  benefits as Your Honor had dismissed that claim on Summary

2  Judgment.

3        THE COURT:  How is it relevant?

4        MR. PETSONK:  It is relevant as to his

5  expectations as to what he was to receive under the

6  retirement welfare benefits plan of which he was a

7  participant and a beneficiary.

8        MR. TORRES:  Your Honor, your finding on Summary

9  Judgment was that was not part of -- as a cash payment.

10  It's not part of any retiree medical benefits plan, and it

11  is a dismissed claim.

12        THE COURT:  Anything further on the point?

13        MR. PETSONK:  Well, Your Honor, I'm not offering

14  it as to that matter that was dismissed.  I'm only offering

15  this testimony to establish Mr. Casey's expectations as to

16  what he received in return for the premiums that he paid in

17  this retiree benefits plan.

18        THE COURT:  The objection is sustained.

19        MR. PETSONK:  Bear with me, Your Honor.  I don't

20  believe -- if I could confer with counsel.  I may have some

21  other questions.

22     (An Off-the-record discussion was held between

23  plaintiffs' counsel.)

24        MR. PETSONK:  No further questions at this time.

25  Thank you, Your Honor.

1          THE COURT:  Thank you.  We'll recess at this point

2     and return at 2:15.

3        Let me mention one other thing, too, that the fifth

4     floor is a duplicate of this floor, and you could take the

5     elevator there for the restrooms on that floor.  It may help

6     alleviate the congestion on those units, and I would just

7     suggest that when you are using the elevators you'll find

8     they work very rapidly in the building, and it would be

9     better if you were on them one at a time.  So see what you

10    can do in that regard as well.

11          MR. TORRES:  Your Honor, I'm sorry to interrupt.

12    Your Honor, just before we break, since I know -- I don't

13    believe that plaintiffs had offered the last exhibit to move

14    it.

15          THE COURT:  Well, thank you.  Is Plaintiff's 4

16    offered?

17          MR. PETSONK:  Yes, we would offer to move

18    Plaintiff's Exhibit 4 into evidence.

19          THE COURT:  Any objection?

20          MR. TORRES:  No objection, Your Honor.

21          THE COURT:  It is admitted.

22          **Plaintiff's Exhibit 4 admitted.**

23          THE COURT:  And let me note to you, sir, that the

24    witness Mr. Casey, during the luncheon break, treat yourself

25    as though you are on the witness stand in the sense that

1    you're not to discuss the case with anyone else unless the

2    Court gives you permission to do so.  And if either you or

3    your attorney needs help in that regard, let me know.  And

4    when you leave, I'm going to have you, as the witnesses will

5    be leaving, and as you will later, you can leave through the

6    same courtroom door that I came in right over here.  And so

7    you can just come around and follow me out and then go down

8    the hallway and you'll be back out to the library.

9              THE WITNESS:  Can I get my jacket before I go out?

10   I'm going to go get lunch.

11             THE COURT:  Well, maybe somebody could hand it to

12   you.  It will be waiting for you here on the jury box.

13             THE WITNESS:  All right.

14             THE COURT:  And so be back at 2:15.  Thank you.

15             THE CLERK:  All rise.

16        (A recess was taken from 1:05 p.m. until 2:15 p.m.)

17        (Afternoon Session, February 9, 2021, 2:23 p.m.)

18             THE CLERK:  All rise.

19             THE COURT:  Good afternoon.  Please be seated.

20   And, Mr. Torres, you may proceed.

21             MR. TORRES:  Yes, Your Honor.

22                      **CROSS-EXAMINATION**

23   **BY MR. TORRES:**

24   **Q.**  Mr. Casey, you said earlier today that you started

25   working for CONSOL in 1976.  Did I get that right?

CASEY - CROSS

1   **A.**   '73.

2   **Q.**   '73, my apologies.  And then you became a foreman in

3   '76, is that when '76 came in?

4   **A.**   I was in a formen's class that CONSOL offered for the

5   employees, so I started salary in April of '76.

6   **Q.**   Thank you.  Do you know who owned CONSOL in 1976, sir?

7   **A.**   At that time, I was working for Bishop Coal Company and

8   Consolidation Coal.

9   **Q.**   Okay.  Do you know --

10   **A.**   It was Pocahontas Fuel and Consolidation Coal.

11   **Q.**   I'm sorry?  I didn't catch that, sir.

12   **A.**   Pocahontas Fuel and Consolidation Coal owned the Bishop

13   operation at that time.

14   **Q.**   Okay.  Do you know if any other company owned

15   Consolidation Coal?

16   **A.**   In '73, '76?

17   **Q.**   Yes.

18   **A.**   Not at the operation where I worked at.  That was the

19   only one I knew.

20   **Q.**   Okay, fair enough.  Thank you.

21       Now, you went to Buchanan in 1992, correct?

22   **A.**   Yes.

23   **Q.**   And when you first went to Buchanan, you were a P&M

24   employee, correct?

25   **A.**   Yes.

1    **Q.**    Production and maintenance?

2    **A.**    Yes.

3    **Q.**    So when you went through your orientation at Buchanan,

4    you were a P&M, correct?

5    **A.**    That's correct.

6    **Q.**    And then in November of that year, 1992, you became a

7    salaried employee, correct?

8    **A.**    Yes.

9    **Q.**    And then you were a salaried employee until you retired

10    from CONSOL, correct?

11    **A.**    Yes.

12    **Q.**    And one of the reasons that you wanted to be a salaried

13    employee is so that if there was a union at the location,

14    you wouldn't have to go on strike, correct?

15    **A.**    Yes.

16    **Q.**    Okay.

17    **A.**    But not the only reason.

18    **Q.**    I understand, sir.  I'm just asking, you wanted to be a

19    salaried employee?  One of the reasons was you didn't want

20    to have to go on strike if there was a union at that

21    location?

22    **A.**    That's correct, one reason.

23    **Q.**    I'm sorry?

24    **A.**    That's one reason.

25    **Q.**    Okay.  And so the presentations that you were talking

CASEY - CROSS

1    about during your direct testimony where the company was

2    talking about union versus nonunion, that wouldn't have

3    applied to you, right, because at that point you were a

4    salaried employee, not a P&M employee, correct?

5    **A.**   At the first meeting, I was a P&M employee.

6    **Q.**   I'm sorry?

7    **A.**   At the first episode, I was a P&M employee.

8    **Q.**   The first time that there was organizing activity?

9    **A.**   There at Buchanan, yes.

10   **Q.**   So that was before November of 1992?

11   **A.**   That's correct.

12   **Q.**   Okay.  So thank you for clarifying that.

13          So after November of '92, you said there were three --

14   you remember three presentations.  So it sounds like one of

15   them occurred while you were still a P&M employee, correct?

16   **A.**   Yes.

17   **Q.**   And the two other presentations you testified to would

18   have occurred after you became a salaried employee there,

19   correct?

20   **A.**   That's correct.

21   **Q.**   So for the second two meetings that you testified to,

22   these comparisons between union, nonunion, those wouldn't

23   have applied to you, because you were a salaried employee at

24   that point in time, correct?

25   **A.**   I was sitting in on the meetings when they done them

1    with the employees.

2    **Q.**   That wasn't my question, sir.

3    **A.**   Okay.

4    **Q.**   Comparisons between union and nonunion would not apply

5    to you -- whether or not you sat in on the meetings, they

6    wouldn't have applied to you because you were a salaried

7    employee; is that correct?

8    **A.**   That's correct.

9    **Q.**   Okay.  Thank you.  And going back to your orientation

10   when you first started at Buchanan, again, you said you were

11   a P&M employee at that time; correct?

12   **A.**   That's correct.

13   **Q.**   Okay.

14            MR. TORRES:  Excuse me, Your Honor, one second.

15            Your Honor, could I have one minute, please?  I'm

16   sorry, Your Honor.  I'm sorry, Your Honor.  Despite having

17   six boxes here, apparently we don't have the one box we

18   needed.  So I'm going to move on to something else and come

19   back to that after we've located our errant box.

20   BY MR. TORRES:

21   **Q.**   When you went to your orientation in 1992, when you

22   were still a P&M employee, they went over your benefits,

23   correct?

24   **A.**   Yes.

25   **Q.**   And they handed you -- they gave you a binder that had

CASEY - CROSS

1    the benefit plan described in it, correct?

2    **A.**    Not a binder.  They gave us a little handbook.

3    **Q.**    Okay.  So we are going to get to this document in a

4    minute, but I can just show it to counsel, one of our

5    designated exhibits.  This is a binder that we were produced

6    and it's got your name in it, sir, Emmett Casey, Jr.,

7    correct?

8    **A.**    That's me.

9            MR. PETSONK:  I'm sorry, Your Honor.  May I just

10   inquire, Joe?  Is there a Bates range, just so I understand.

11           MR. TORRES:  MSJ00755 to Bate stamp -- 957.

12           MR. PETSONK:  Thank you.

13   BY MR. TORRES:

14   **Q.**    Do you remember turning that document over to your

15   lawyers, sir?

16   **A.**    Which document, sir?

17   **Q.**    The one I just showed you, the binder that had your

18   name on the inside cover?

19   **A.**    I guess I give it to him, yes.

20   **Q.**    So, again, I'll ask you some questions.

21           THE COURT:  Let me ask you, would it help you if

22   you saw the document to know?

23           THE WITNESS:  Well, I'm taking his word for it

24   it's got my name.

25           THE COURT:  You said, "I guess."  Perhaps the

*Catherine Schutte-Stant, RDR, CRR (304) 347-3151*

CASEY - CROSS

1    document could be presented to the witness and he could

2    affirm whether or not his guess is correct.

3              MR. TORRES:  Yes, Your Honor.

4              MR. PETSONK:  Your Honor, I don't know if it's

5    constructive to proceed with this line of questioning until

6    we receive the document.  It's hundreds of pages, you know,

7    that he hasn't had the chance to examine.  I'm not going to

8    be able to authenticate the document.

9              MR. TORRES:  I asked you if you wanted to review

10   it before I showed it to your witness.  That would be yes or

11   no.

12             MR. PETSONK:  It appears to be a complete range of

13   Bate-stamped documents.

14             MR. TORRES:  We'll get back to this, Your Honor,

15   when I get the documents, rather than having Mr. Petsonk

16   concerned about authentication of documents he produced in

17   this litigation.

18   BY MR. TORRES:

19   **Q.**   So we'll come back to that in a second, sir, when you

20   have the document.  That way you can look at it and make

21   sure if you have any questions, we can deal with it that

22   way.

23        So during your direct testimony, you testified that --

24   you named a bunch of different individuals who made

25   statements to you during your testimony this morning.

CASEY - CROSS

1          Do you recall that?

2     **A.**   Made statements directly to me?  Is that what you said?

3     **Q.**   Yes, you testified -- you identified some gentlemen and

4     one woman?

5     **A.**   I testified that there was several of the HR employees

6     there making the comments, not per se directly to me, but to

7     the group.

8     **Q.**   Okay.  So during your -- just so I'm clear, because I

9     don't think the record is.  During your initial orientation

10    at Buchanan in 1992?

11    **A.**   Yes.

12    **Q.**   Do you remember who spoke at that presentation?

13    **A.**   Like I said before, we had different individuals.  John

14    Fox was one.  Gene Bailey was one.  Bill Haggy [phonetic]

15    was there.  He was the assistant superintendent at that

16    time.

17    **Q.**   I want to focus on the people who were discussing

18    benefits at that initial orientation that you testified to

19    that occurred in 1992.  You said Mr. Fox was there from HR?

20    **A.**   Yes.

21    **Q.**   And Mr. Bailey was from HR?

22    **A.**   Yes.

23    **Q.**   And can you remember anyone else from HR who was at

24    that first orientation at Buchanan in 1992 in HR other than

25    those two gentlemen?

1    **A.**   Just those two gentlemen that I can vaguely remember.

2    **Q.**   Fair enough.

3    **A.**   There was other people there, but, you know, those two

4    I know for a fact.

5    **Q.**   Got it.  Okay.  You then testified to these union

6    meetings we talked about a moment ago, and you said there

7    was three of them.  And of the individuals you named, I just

8    want to make sure if I'm clear.  For the meetings where the

9    comparisons between the union and the nonunion were being

10   made, were those presentations by Mr. Fox and Mr. Bailey, or

11   were there other people who spoke on the benefit issues

12   during those three union meetings you testified to?

13   **A.**   There was other people also.

14   **Q.**   Okay.

15   **A.**   We had three shifts working.  Okay.  Obviously, if Mr.

16   Bailey was there on the first shift, he wouldn't be there

17   the next two shifts.  They would split it up.

18   **Q.**   Okay.

19   **A.**   All right, then you would have maybe one of the other

20   HR people would come in, and he may be talking to an evening

21   shift.  And then the other two shifts, there would be

22   someone else that would take care of the presentations.

23   **Q.**   I just want to focus on the three meetings that you

24   said you attended, and who was present from HR in those

25   three meetings that you attended that you testified to

CASEY - CROSS

1   earlier today, other than Mr. Fox and Mr. Bailey?

2   **A.**   That's the two that I can remember.

3   **Q.**   Okay.  And that's all I'm trying to do, sir.

4   **A.**   Well, I mean I thought I explained that the first time.

5   **Q.**   You named a number of individuals who were in HR.  I'm

6   just trying to figure out which of those people you recall

7   being at these meetings that you testified to.  And, to the

8   best of your recollection, you said that was Mr. Fox and Mr.

9   Bailey, correct?

10  **A.**   They were there, yes.

11  **Q.**   Do you remember anyone else from HR who were at those

12  meetings other than Mr. Fox and Mr. Bailey?

13  **A.**   From HR?

14  **Q.**   From HR?

15  **A.**   Not to my knowledge.  There may have been someone else

16  there, but I don't know that for a hundred percent.

17  **Q.**   Thank you.  Okay.  All right.  So I think we've fixed

18  our document issue now.

19          MR. TORRES:  Will this be 5 or 6?

20          THE CLERK:  5.

21          MR. TORRES:  May I approach, Your Honor?

22          THE COURT:  Go ahead.

23  BY MR. TORRES:

24  **Q.**   Mr. Casey, I'm going to hand you what's been marked as

25  Defendant's Exhibit 5.  It's in a binder, so it's a little

1    easier to navigate.  But if you turn to the first page of

2    the exhibit, it says, "CONSOL Benefit Plans For Production

3    and Maintenance Employees"; is that correct?

4    **A.**   Yes.

5    **Q.**   And the bottom of that document it says, MSJ000755.

6    Correct?

7    **A.**   Yes.

8    **Q.**   And if you turn to the next page, it's got your

9    signature on it, correct?

10   **A.**   Yes.

11   **Q.**   Okay.  And then if you turn -- do you see the numbers

12   on the bottom of the documents, sir, the MSJ numbers?

13   **A.**   Yes.

14   **Q.**   I'm going to return to these.  Turn to MSJ00759,

15   forward a couple of pages.  Let me know when you are there.

16   **A.**   There.

17   **Q.**   And at the bottom you see there is a date listed, REV

18   and then there's a date?  Do you see that?

19   **A.**   4/92.

20   **Q.**   Right.  So that would have been around the time that

21   you attended your orientation at Buchanan as a P&M employee,

22   correct?

23   **A.**   Yes.

24   **Q.**   And do you recall, Mr. Casey, if this document was

25   given to you during that orientation at Buchanan in 1992?

```
1    A.    I'm sure it was.

2    Q.    It was?

3    A.    I'm sure it was.  I don't recall it.

4    Q.    Okay.

5    A.    You see the imprint there of the smaller section of

6    this writing?

7    Q.    Yes.

8    A.    That was more so the little handbook that we received.

9    This looks like this is copies.

10   Q.    It was, in fact, sir.

11   A.    Okay.  So that this wasn't give to me, but the little

12   handbooks were.

13   Q.    Okay.  Just so we are clear, sir, if you look at the

14   front page, you can sort of see the outline of the color?

15   A.    Yes.

16   Q.    Was that about the size of the document you received?

17   A.    Yes, sir, somewhat.

18   Q.    Okay.

19   A.    Yes.

20   Q.    So this was your document, and you received it during

21   your orientation in 1992, correct?

22   A.    That's correct.

23   Q.    And you provided this to your counsel, correct?

24   A.    Provided to what?

25   Q.    To your lawyers?
```

1    **A.**    Yes.

2    **Q.**    Okay.

3            MR. TORRES:  Your Honor, defendants would offer

4    Exhibit 5.

5            MR. PETSONK:  No objection.

6            THE COURT:  Admitted.

7            **Defendant's Exhibit 5 admitted.**

8    BY MR. TORRES:

9    **Q.**    Okay.  I want to ask you a couple of questions about

10   some of the pages in here, Mr. Casey.  You said that during

11   the orientation you, there -- that you received information

12   about the medical benefits that you were eligible for,

13   correct?

14   **A.**    Yes.

15   **Q.**    And do you recall as part of that presentation they

16   would have reviewed the booklet that we are now looking at

17   as Exhibit 5?

18   **A.**    In particularly the MSJ00760, that was one of the

19   statements that was thrown out to us.

20   **Q.**    Okay.

21   **A.**    Where we had the life insurance, the medical expense

22   benefits.

23   **Q.**    Okay.

24   **A.**    Yes.

25   **Q.**    So when Mr. Fox and Mr. Bailey conducted their

CASEY - CROSS

1    orientation in 1992, one of the things they did was review

2    this booklet with you, correct?

3    **A.**   We didn't go page-by-page.  We went section-by-section,

4    so to speak, you know.

5    **Q.**   Okay.  Understood.

6    **A.**   I mean, it wasn't a word-by-word verbatim.  When you

7    come to a certain part, you know, that pertained to me as an

8    individual or the group as individuals, you know, all our

9    work -- or our salary or medical, what we had to do, yes.

10   **Q.**   Well, speaking of medical, could you turn to MSJ000789?

11   **A.**   789?

12   **Q.**   Correct.  Page 789?

13   **A.**   Got it.

14   **Q.**   And that page says, "Supplemental Information for

15   Consolidation Coal Company Comprehensive Life Insurance and

16   Medical Expense Benefits Plan For Buchanan Mine Production

17   and Maintenance Employees," correct?

18   **A.**   That's what it says, yes.

19   **Q.**   And, in fact, right next to it, there is -- looks like

20   there is a copy of a tab that was in this booklet, and it

21   says, "Medical Insurance"?  That's on 788, right?

22   **A.**   Talking about the next page over?

23   **Q.**   The page before, so it's 788, sir?

24   **A.**   Medical insurance?

25   **Q.**   Correct.

1    **A.**    Okay.

2    **Q.**    So do you remember if this booklet had tabs between

3    each of the sections that sort of stuck out the side of the

4    booklet?

5    **A.**    It probably did.  I don't remember.  I don't recall.

6    **Q.**    Okay.  Fair enough.  So if you then look to the next

7    page, 790, sir, so this is a Table of Contents for the

8    medical benefits, correct?

9    **A.**    Yes.

10    **Q.**    And it had various sections that it lists.  And one of

11    those sections that it lists is "Effect of Retirement."

12        Do you see that, sir?  It says it's on page 18,

13    correct?

14    **A.**    Yes.

15    **Q.**    If you turn to page 18, MSJ000808.  Are you there?

16    **A.**    Okay.

17    **Q.**    And you see there is a section that is entitled,

18    "Effect of Retirement Upon Medical Benefits," correct?

19    **A.**    Right.

20    **Q.**    And it talks about normal retirement and early

21    immediate retirement, correct?

22    **A.**    Yes.

23    **Q.**    And then it has some different ages underneath early

24    and normal retirement, correct?

25    **A.**    Yes.

CASEY - CROSS

1    **Q.**   And so you were testifying before that one of the

2    things that was explained to you was how old you had to be

3    in order to qualify for retiree medical benefits, correct?

4    **A.**   Whenever I retired, we went by the point system.  The

5    point system, when I retired.  This --

6    **Q.**   I understand.

7    **A.**   This is whenever I was a P&M employee.

8    **Q.**   But that's my question.

9    **A.**   But they told me that once I went salary, not to worry

10   about the P&M.  All right.  Well, whenever I went to --

11   **Q.**   Let me stop you there, sir.

12   **A.**   Okay.

13   **Q.**   When you were undergoing this orientation and looking

14   at this booklet in 1992, you were a P&M employee, correct?

15   **A.**   That's correct.

16   **Q.**   Okay.  And my only question is:  This section here

17   explains that for P&M employees how old they had to be in

18   order to qualify for retiree medical benefits, correct?

19   **A.**   That's what -- yes, that's what the book is saying.

20   **Q.**   And one of the things you testified to earlier was that

21   during these orientations that you attended in 1992, one of

22   the things that was covered was the years and -- the age and

23   years of service requirements in order to qualify at that

24   time for retiree medical benefits, correct?

25   **A.**   Not in '92.

CASEY - CROSS

1    **Q.**   So your testimony is that no one told you how to

2    qualify for retiree medical benefits in 1992?

3    **A.**   Yes, but not at this 90-point system.

4    **Q.**   When you became a salaried employee?

5    **A.**   That's correct.

6    **Q.**   So -- but at that time, you would agree with me, when

7    you were a P&M employee, this would have accurately

8    explained what a P&M employee had to do in order to qualify

9    for retiree medical benefits?

10   **A.**   In '92, yes.

11   **Q.**   Okay.  And do you remember if Mr. Bailey or Mr. Fox

12   covered this page during your orientation when you were a

13   P&M?

14   **A.**   No, I do not.

15   **Q.**   Okay.  Now, if you back up, sir, I want you to take a

16   look at MSJ000793.  Okay?

17   **A.**   Okay.

18   **Q.**   And at the bottom of that page is a number paragraph 8.

19   Do you see that?

20   **A.**   Bottom of the -- say it again, sir.

21   **Q.**   Sure.  At the bottom of MSJ000793, there is a paragraph

22   that's got a number 8 in front of it?

23   **A.**   That's correct.

24   **Q.**   And that provision, which was in the document that you

25   received in 1992 during your orientation, your first

1    orientation at Buchanan says, "The right is reserved in the

2    Plan for the Plan Sponsor to terminate, suspend, withdraw,

3    amend or modify the Plan," correct?

4    **A.**   Yes.  But go ahead and read the rest of it.

5    **Q.**   Sure.  It says, "Covering any active Employee,"

6    correct?

7    **A.**   Yes.

8    **Q.**   And covering any current employee -- "or current or

9    future retiree"?  Correct?

10   **A.**   Yes.

11   **Q.**   "In whole or in part at any time."  Correct?

12   **A.**   Yes, and keep going.

13   **Q.**   And -- well, do you remember reading what I just read

14   to you during your orientation in 1992, sir?

15   **A.**   I did not read it, no, sir.

16   **Q.**   Did anyone read that to you during the orientation in

17   1992?

18   **A.**   They may have.

19   **Q.**   Okay.  So as part of your orientation, as they were

20   reviewing these booklets, one of the things that might have

21   happened, they pointed out to you this reservation of rights

22   clause I just read to you, right?

23   **A.**   It could be, yes.

24   **Q.**   Okay.  And I'm sorry, I need to get my glasses here.

25   Hold on a second.  It's challenging for me.

1        And then the next sentence you are interested in says,

2    "Any such change or termination in benefits (a) will be

3    based solely on the decision of the Plan Sponsor."  Correct?

4    **A.**    Yes.

5    **Q.**    "And (b) may apply to all active employees, current

6    retirees or future retirees or other eligible covered

7    persons, as either separate groups or as one group."

8    Correct?

9    **A.**    Yes.

10   **Q.**    Okay.  Thank you.  Now just so we are clear, sir, after

11   you became a salaried employee in 1992, later in the year or

12   November of '92, did you receive another booklet like this

13   that would have explained your benefits as a salaried

14   employee?

15   **A.**    We went back to the existing salary.

16   **Q.**    So my question is, you explained to me that this has

17   some different provisions that just apply to P&M as opposed

18   to salaried employees, right?

19   **A.**    Yes.

20   **Q.**    My question to you, sir, is:  After you became a

21   salaried employee in November of 1992, did CONSOL give you a

22   different book that would have explained the benefits for

23   salaried employees as opposed to P&M employees?

24   **A.**    We received one, but I don't know exactly when.

25   Because, see, where I was salaried before, I just went back

1    to the same plan at the different operations.

2    **Q.**    So just so I make sure I got you clear here.  When you

3    started in -- when you became a foreman in '76 and you went

4    through your orientation with Mr. Maynard and Mr. Nicholson

5    and Mr. Jones, I think, they gave you a booklet then that

6    explained your benefits as a salaried employee?

7    **A.**    They gave us handouts.

8    **Q.**    Okay.

9    **A.**    Yes.

10   **Q.**    So was it similar to this, like a little booklet,

11   three-ring binder with tabs?

12   **A.**    I don't know about the three-ring binder.

13   **Q.**    Okay.

14   **A.**    I'm not sure on that.

15   **Q.**    Okay.  But they did give you something that explained

16   your benefits in writing, correct?

17   **A.**    Yeah.  We had literature for our studies for our tests

18   of becoming a foreman to get our certification papers.

19   **Q.**    Okay.

20   **A.**    And then that -- you would have had different, you

21   know, I guess, papers in there for retirement, for your

22   medical, for your -- whatever the cost factor; what doctors

23   you could go see; what hospitals you could go see; who was

24   in the plan; who wasn't in the plan.

25   **Q.**    So after you became a salaried employee, again, in

1   November of '92, your recollection is you received other

2   materials that described the benefits for salaried employees

3   at some other point in time, correct?

4   **A.**   Yeah.

5   **Q.**   Okay, fair enough.  And as you explained to me, the

6   eligibility criteria for a salaried employee was different

7   -- (interruption in the proceedings).

8        (An off-the-record discussion was held between defense

9   counsel.)

10  BY MR. TORRES:

11  **Q.**   So you testified then that during these presentations

12  that Mr. Fox and Mr. Bailey conducted, one of the things

13  they did was explain to you the requirements to become

14  eligible for retiree medical benefits.  You said when you

15  were a salaried employee, there was a point system, correct?

16  **A.**   For -- at later on in the years, they changed it to, if

17  you had 90 points, that was with your age and your years of

18  service, that you could retire with full benefits.  So

19  whenever I retired, I was at the age of 58; I had 35 years

20  of service.  So that gave me 93 points.  So I was eligible

21  for the top, so to speak, of the retirement.

22  **Q.**   Got it.

23  **A.**   Now, years before that, you didn't really have to have

24  that 90-point system.  I'm talking several years before

25  that.

CASEY - CROSS

1    **Q.**   Okay.

2    **A.**   Now, did that answer your question?

3    **Q.**   Not really, but I'll ask it differently.

4    **A.**   Well, I went through a lot of stuff I shouldn't have

5    then.

6    **Q.**   So when they were explaining to you in these

7    presentations how you became eligible for retiree medical

8    benefits, what you testified to before -- I just want to

9    make sure we are clear -- is that once you reached the

10   eligibility requirements, then you would have medical

11   insurance until age 65 --

12   **A.**   No.

13   **Q.**   -- until you became Medicare eligible, and then

14   CONSOL's benefits would be a supplement to Medicare,

15   correct?

16   **A.**   No.  My answer was I would have healthcare until I

17   died, for me, my wife.  After I died, she would have it

18   until she died, or remarried, and my child.  At the age of

19   65, was whenever you become Medicare.  Then your healthcare

20   would be supplemented.  That was my answer.

21   **Q.**   Got you.  And so at the time that these gentlemen were

22   explaining that to you, that's what the materials that you

23   were provided stated, right, that once you received -- you

24   got to whatever the eligibility requirements were, your

25   benefits would continue on, correct?

1    **A.**    That's correct.

2    **Q.**    Okay.  So that -- what they were saying is the same

3    thing that was contained in the written materials, correct?

4    **A.**    Yes.

5    **Q.**    Okay.

6    **A.**    The same as the letters here that was sent out to us.

7    **Q.**    I'm sorry?

8    **A.**    The same as these letters that was sent out to us.

9    **Q.**    Got it.  Thank you.  And when Mr. Fox and Mr. Bailey

10   were making these statements to you that you testified to,

11   there hadn't been any announcements at that point in time

12   that CONSOL was going to terminate its benefits, correct?

13   **A.**    That's correct.

14   **Q.**    Okay.

15   **A.**    Not to my knowledge.

16   **Q.**    Not to your knowledge, okay?

17   **A.**    Yes.

18   **Q.**    But you had received a document back in '92 that told

19   you that they at least reserved the right to terminate these

20   benefits if they so desired, correct?

21   **A.**    Yes, I guess it's in the book there.

22   **Q.**    Okay.  I think a minute ago you said that there were

23   other materials that you received that described the

24   benefits for salaried employees after you became a salaried

25   employee again, correct?

1    **A.**   Yes.

2    **Q.**   Okay.  Mr. Casey, I'm going to give you a document

3    that's been marked as Defendant's Exhibit 6.

4           MR. PETSONK:  I just have a question.  Is this

5    document the same as the document that was produced to us?

6    I don't see a Bate stamp.  I was just trying to see if you'd

7    identify the production.

8        (An off-the-record discussion was held between

9    plaintiffs' counsel Pomponio and defense counsel Torres.)

10   BY MR. TORRES:

11   **Q.**   So, Mr. Casey, you remember that during this lawsuit

12   you attended a deposition and you were asked questions,

13   correct?

14   **A.**   Yes.

15   **Q.**   And do you recall a lawyer for CONSOL showing you the

16   document I just handed you as Defendant's Exhibit 6?

17   **A.**   Yeah, I guess, yes.

18   **Q.**   Okay.  And this document, the front page of it says,

19   "Benefit Plans For Salaried Employees," correct?

20   **A.**   Yes.

21   **Q.**   And then if you turn forward in the document -- and

22   unfortunately this was turned over by your lawyers and they

23   didn't include any Bates numbers, so you'll have to bear

24   with me here.  But if you turn forward --

25          MR. TORRES:  May I approach the witness, Your

CASEY - CROSS

1      Honor?

2              THE COURT:  Go ahead.

3      BY MR. TORRES:

4      Q.   Mr. Casey, I may just try and help you here just so we

5      get to the same page.  Let me show this to counsel, first.

6            (An off-the-record discussion was held between

7      plaintiffs' counsel Pomponio and defense counsel Torres.)

8      BY MR. TORRES:

9      Q.   So, Mr. Casey, if I could have that document for just

10     one minute.  I'm just going to try and point you to the same

11     page that me and your lawyer are on, just so we are on the

12     same page.  Is that fair?

13     A.   Yeah, fine with me.

14     Q.   Just hold your thumb in there just one second.

15             MR. TORRES:  Your Honor, if I could ask for your

16     version back, I can -- this was presented --

17             THE COURT:  Again, please.

18             MR. TORRES:  If I could have the exhibit back, I

19     could turn it to the right page so we can refer you to where

20     we are going to ask.

21             THE COURT:  Number 6?

22             MR. TORRES:  Yes, Exhibit 6.  Thank you.

23     BY MR. TORRES:

24     Q.   Now, Mr. Casey, the page I asked you to look at says,

25     "Plan Document for and Summary Plan Description of the

CASEY - CROSS

1     CONSOL Energy, Inc. Comprehensive Medical Expense Benefits

2     Plan For Salaried Employees," correct?

3     **A.**   Yes.

4     **Q.**   And at the bottom it says, "Salaried Medical Plan

5     January 1, 2004," correct?

6     **A.**   Yes.

7     **Q.**   And January 1, 2004, you were a salaried employee at

8     CONSOL Energy, correct?

9     **A.**   Yes.

10    **Q.**   And at your deposition, you recognized this as a

11    document that you received while you were a salaried

12    employee, correct?

13    **A.**   If I said so, yes.

14    **Q.**   And if you turn forward, sir, to two pages forward,

15    there is a page that says, "Table of Contents," correct?

16    **A.**   Yes.

17    **Q.**   And it lists a bunch of different sections, correct?

18    **A.**   Yes.

19    **Q.**   And including, if you turn one more page, it has a more

20    comprehensive Table of Contents, including general

21    information and eligibility, correct?

22    **A.**   On the back page you are speaking of?

23    **Q.**   Correct.

24    **A.**   Okay. (Indicating.)

25    **Q.**   Is that correct?

CASEY - CROSS

1    **A.**   Yes.

2    **Q.**   And on that page, sir, under General Information, there

3    is a reference, the second -- the third entry says,

4    "Termination, Suspension, Modification or Amendment of this

5    Plan," correct?

6    **A.**   I don't see that.  Where are you?

7          MR. TORRES:  May I approach the witness, Your

8    Honor?

9          THE COURT:  You may.

10   BY MR. TORRES:

11   **Q.**   Could I have the document one second, sir?  Thank you.

12   We can just take it off and lay it flat.  How about that?

13   Much better, right?

14   **A.**   Yeah.

15   **Q.**   So I'm asking you about the Table of Contents, and it

16   says at the top, it says, "Article I.  General Information,"

17   correct?

18   **A.**   Yes.

19   **Q.**   And then the third entry under that says, "Termination,

20   Suspension, Modification or Amendment of the Plan," correct?

21   **A.**   Yes.

22   **Q.**   And it indicates on the Table of Contents that that

23   information is contained at Page 7, correct?

24   **A.**   Yes.

25   **Q.**   So can you turn forward from that page to page 7 of the

1    document, sir?

2    **A.**    Okay.

3    **Q.**    And the bottom of that page there is the heading:

4    "Termination, Suspension, Modification or Amendment of This

5    Plan."  Correct?

6    **A.**    Yes.

7    **Q.**    And it says, "As Plan Sponsor, CONSOL Energy Inc.

8    reserves the right, by means of resolutions adopted by its

9    Board of Directors, to terminate, suspend, modify or amend

10   this Plan at any time," correct?

11   **A.**    Yes.

12   **Q.**    And then it says, "covering any or all participating

13   employers, active employees, current or future Retirees or

14   other eligible persons, in whole or in part, of any or all

15   participating employers."  Correct?

16   **A.**    Yes.

17   **Q.**    Okay.  And that statement was included in this document

18   that you received while you were a salaried employee in and

19   around 2004, correct?

20   **A.**    Yes.

21   **Q.**    Okay.  And that was before you retired, correct, sir?

22   **A.**    Yes.

23          MR. TORRES:  Your Honor, we'd offer Defendant's

24   Exhibit 6.

25          MR. PETSONK:  Your Honor, we have no objection.

CASEY - CROSS

```
 1              THE COURT:  Admitted.
 2         Defendant's Exhibit 6 admitted.
 3              THE WITNESS:  Are we through with this document?
 4    BY MR. TORRES:
 5    Q.   Yes.  You can put that to the side and we'll clean it
 6    up.
 7              MR. TORRES:  Your Honor, may I have a drink of
 8    water, please?
 9              THE COURT:  Does the defendant -- the witness have
10    the original Exhibit 6 before him?
11              MR. TORRES:  Yes.  I'll fix it, Your Honor.  I'm
12    going to come get it in one second, Mr. Casey.  Thank you,
13    sir.  You can leave the others right in front of you, and
14    we'll just put this to the side, thank you.
15    BY MR. TORRES:
16    Q.   Now, your attorney asked you some questions about the
17    expenses that you incurred after your medical benefits were
18    terminated.  Do you recall that?
19    A.   Yes.
20    Q.   And you turned over these documents.  You said you and
21    your wife prepared the first page, correct?
22    A.   Yes.
23    Q.   And then is the writing on the middle, the next couple
24    pages, is that your handwriting, sir?
25    A.   That's correct.
```

CASEY - CROSS

1    **Q.**   And then the second-to-last page is a letter you got

2    from CONSOL, correct?

3    **A.**   That's correct.

4    **Q.**   And then it looks like the last page is just a mailing

5    envelope or something like that, correct?

6    **A.**   Yeah, where it was mailed.

7    **Q.**   Got it.  So I just want to understand these numbers

8    here.  The first thing, I understand you added up your

9    expenses here by year, so you've got for each year these

10   expenses and then you have the total for $35,000 at the

11   bottom, correct?

12   **A.**   That's correct.

13   **Q.**   Now, what I wasn't clear about, sir, if you look at the

14   letter from CONSOL at the end of this document, it has a

15   total of $23,474, correct?

16   **A.**   Got the total premiums of $25,586.65.

17   **Q.**   Right.  I'm asking about the medical expense of

18   $23,474.  Correct?

19   **A.**   Yes, for medical, yes.

20   **Q.**   Yes, that is what I was asking.

21   **A.**   Okay.

22   **Q.**   And then the next line, the next number is the life

23   insurance payments for that same time period, correct?

24   **A.**   That's correct.

25   **Q.**   All right.  So is it your testimony, sir, that you paid

CASEY - CROSS

1     approximately $25,500 in premiums for CONSOL -- does this

2     $34,500 that you estimated here take into account that

3     amount of money you would have had to pay for CONSOL for

4     health insurance during this time period?

5     **A.**   This money here is what I paid out-of-pocket for those

6     years of service.  That's the moneys I paid out.  That's

7     what comes to me.

8     **Q.**   My question, sir, is during 2012 to 2015, you paid

9     out-of-pocket $25,586, correct?

10    **A.**   Yes, sir.

11    **Q.**   So if we want to know what the difference is between

12    what you paid in 2012 to 2015, we have to deduct the $25,000

13    from the $35,000 you paid, correct?

14             MR. PETSONK:  Objection to the question.

15             THE COURT:  Just a moment.  What's the objection?

16             MR. PETSONK:  My objection is these -- the two

17    sets of dollar figures apply to two separate time periods.

18    I think he lacks a foundation for the conclusions he's

19    seeking to elicit from the witness.

20             MR. TORRES:  He's not explaining his objection;

21    he's testifying.  The question simply was --

22             THE COURT:  Please go ahead.

23             MR. TORRES:  Thank you, Your Honor.

24             THE COURT:  What is your argument?

25             MR. TORRES:  Your Honor, I simply asked the

CASEY - CROSS

1    gentleman if whether the out-of-pocket expenses that he

2    claims he incurred from 2017 to 2019, the $35,000, if he's

3    trying to make a comparison to claim what his losses were,

4    my question is, is he saying we can then -- he compares it

5    to how much he was paying at CONSOL which is $25,000.  So

6    the difference there is $10,000, not -- he doesn't have a

7    $35,000 loss unless you got a $10,000 loss, because he was

8    paying premiums out of his pocket during the period of time

9    reflected on this page.

10                THE COURT:  Well, is that not already in evidence?

11                MR. TORRES:  Well, that was my question is whether

12   this $35,000 takes into account the amount that he was

13   paying out-of-pocket at CONSOL, Your Honor.

14                THE WITNESS:  But, sir --

15                THE COURT:  Just a minute.  You can ask him that

16   question.

17   BY MR. TORRES:

18   Q.   Does the $35,000 that is reflected on the first page as

19   your out-of-pocket expenses for that time period --

20                THE COURT:  Which time period?

21   BY MR. TORRES:

22   Q.   For the time period 2016 to 2019.  If you want to

23   compare it to what you would have paid for while you were at

24   CONSOL from 2012 to 2015, you would have to deduct the

25   $25,000 you paid in premiums from the $35,000 of the

CASEY - CROSS

1    out-of-pocket expenses for this period, correct?

2    **A.**   If you look on the 2016 to the 2019, there is no life

3    insurance added in on that.  And if you look over here on

4    the 2012 to 2015, there was life insurance added in.

5    **Q.**   That's the $2,000?

6    **A.**   $2,112.65.  But since CONSOL terminated our life

7    insurance, then I didn't have that to put in on this one.

8        If I'd bought life insurance over here and added it in

9    from 2016 to 2019 -- I did not put that premium in, which I

10   could do, because I do have those premiums through Prime

11   America.

12   **Q.**   Okay.

13   **A.**   And it is $359.28 every quarter.  Now, if you want to

14   add that in to this to the first page versus the last

15   page --

16   **Q.**   Got it.

17   **A.**   -- then you'll see a big comparison.

18   **Q.**   Okay.  So just to be clear, though, this last page, the

19   $25,586.65, that's the money you paid out-of-pocket for your

20   CONSOL health insurance before it was terminated for the

21   years 2012 through 2015?  Correct?

22   **A.**   The healthcare and life, yes, sir.

23   **Q.**   I understand.  Now, Mr. Casey, when Mr. Bailey and --

24   I'm sorry -- Mr. Bailey and Mr. Fox made those presentations

25   that you testified to?

CASEY - CROSS

1    **A.**    Back in '92?

2    **Q.**    '92, and then the subsequent meetings you said you

3    attended where they talked about benefits?

4    **A.**    They wasn't at all these meetings from '92 to 2013.

5    **Q.**    Okay.  Who would have been at those other meetings?

6    **A.**    You had Nancy Johnson, you had Mike Adams, you had Ed

7    Davis, you had Jim Waters, you had Gerald Kowzan, you had --

8    I can't remember the rest of the HR people that worked

9    there -- Terry Mason, Jerry Beekman.

10   **Q.**    So you testified before the people that you remembered

11   from HR, correct?

12   **A.**    Mm-hmm.  Yes.

13   **Q.**    And is it your testimony that in describing the

14   benefits, the retiree medical benefits, that they described

15   the eligibility in the same way Mr. Bailey and Mr. Fox did?

16   **A.**    Pretty much.  May have been one or two words changed,

17   but it all come down to pretty much the same.

18   **Q.**    Got it.  Okay.  For all those individuals that you

19   identified in your initial testimony, none of those people

20   ever told you that they could change the written terms of

21   CONSOL's benefit plans, correct?

22   **A.**    That is correct.

23   **Q.**    And you don't know if CONSOL told any of those

24   individuals to make any misrepresentations to you or other

25   employees, correct?

CASEY - CROSS

1    **A.**   No, I do not know.

2    **Q.**   And you don't know if CONSOL told any of those

3    individuals who spoke to you to lie about your retiree

4    medical benefits, correct?

5    **A.**   I do not know.

6    **Q.**   And as a foreman, you were part of management at

7    CONSOL, too, correct?

8    **A.**   I was, what?

9    **Q.**   You were part of management at CONSOL, too, as a

10   foreman?

11   **A.**   Yes.

12   **Q.**   And you never lied to your employees either, correct?

13   **A.**   No.

14   **Q.**   Okay.

15   **A.**   You couldn't make that statement.

16           MR. TORRES:  One second, Your Honor.  See if I'm

17   done.

18       Could I have one second to confer with counsel?

19       (An off-the-record discussion was held between defense

20   attorneys.)

21           MR. TORRES:  Thank you, Mr. Casey.  I have no

22   further questions.

23           MR. PETSONK:  Your Honor, just very briefly, if I

24   may?

25

1          **REDIRECT EXAMINATION**

2    **BY MR. PETSONK:**

3    **Q.**   Mr. Casey?

4    **A.**   Yes, sir.

5    **Q.**   During the union organizing period that you testified

6    about at Buchanan, you testified that -- if I understood you

7    correctly -- you testified that Gene Bailey made comparisons

8    between union and nonunion benefits; is that right?

9    **A.**   Yes.

10   **Q.**   And what differences were there, if any, between the

11   nonunion benefits that he described, that is, the CONSOL

12   benefits and the -- what you testified applied to production

13   and maintenance employees; what difference was there between

14   those benefits and the benefits that -- that you were

15   eligible for as a salaried employee?

16   **A.**   The only thing that was -- the UMWA was guaranteed, and

17   we were told that ours was till lifetime.

18   **Q.**   But as between the production and maintenance retiree

19   welfare benefits and the salaried retiree welfare benefits,

20   what differences did you understand that there were?

21          MR. TORRES:  Objection, Your Honor.  It's beyond

22   the scope of the cross-examination.

23          THE COURT:  You may inquire.

24          THE WITNESS:  The difference was they paid union

25   dues -- not answering your question?

1    BY MR. PETSONK:

2    **Q.**   Well, Mr. Torres asked you whether those comparisons

3    between the union and the nonunion benefits -- I believe the

4    words he used were, did they apply to you?  Were the

5    comparisons relevant to you, Mr. Casey?

6    **A.**   In the first meeting, yes.

7    **Q.**   And how about in the subsequent meetings, what I'm

8    asking you is, were they -- was there any difference between

9    the benefits that you were eligible for as a salaried

10   retiree and the benefits that Gene Bailey was describing?

11   **A.**   For the P&M employees?

12   **Q.**   Right.

13   **A.**   There would be no difference.

14   **Q.**   That's all I was trying to clarify.

15   **A.**   Oh.

16          MR. PETSONK:  Thank you, Your Honor.  I don't

17   believe that I have any other questions at this time.

18          MR. TORRES:  One brief follow-up, Your Honor?

19          THE COURT:  You may.

20                    **RECROSS EXAMINATION**

21   **BY MR. TORRES:**

22   **Q.**   Mr. Casey, when counsel was asking you questions about

23   whether those comparisons meant anything to you, you said

24   that they meant something to you in the first meeting,

25   correct, because you were a P&M employee at that point in

CASEY - EXAMINATION BY THE COURT

1    time?

2    **A.**    Yes, because it was guaranteed.

3    **Q.**    Right.  But by the time the second two meetings

4    occurred, you were a salaried employee, correct?

5    **A.**    Salaried employee.

6         MR. TORRES:  Nothing further, Your Honor.

7                    **EXAMINATION**

8    **BY THE COURT:**

9    **Q.**    Let me ask with respect to the three meetings; were

10   there multiple subjects dealt with?

11   **A.**    Multiple subjects?

12   **Q.**    Yes.

13   **A.**    Yes.

14   **Q.**    Aside from those three meetings, what other meeting or

15   seminars or the like did you have with respect to medical

16   benefits?  Any?

17   **A.**    Not that -- just a few over the remaining years that I

18   was there.  You would have one maybe every five years or

19   every three years or something like that.  Whenever

20   something would be changed in your benefits plan or whatever

21   you would go to sign up on your new medical plan.  Is that

22   what you are asking?

23   **Q.**    They would have to do simply with changes that were

24   taking place in the plan?

25   **A.**    On your medical program, like the 80 percent, or your

CASEY - EXAMINATION BY THE COURT

1    deductible.

2    **Q.**    Yes.  That was the subject matter?

3    **A.**    Yes.

4    **Q.**    Thank you.

5            THE COURT:  Any other questions?

6            MR. PETSONK:  No, Your Honor.

7            MR. TORRES:  No, Your Honor.  Thank you.

8            MR. PETSONK:  Not from the plaintiff.

9            THE COURT:  And may Mr. Casey be excused?

10           MR. PETSONK:  Yes, Your Honor.

11           THE COURT:  Mr. Casey, let me caution you not to

12   discuss your testimony with any other witness in this case

13   other than the plaintiffs themselves until the Court's heard

14   all of the evidence at the trial.  If you need any relief

15   from that, either you or your attorney can ask.

16           THE WITNESS:  Yes, sir.

17           THE COURT:  And I'm going to ask you when you

18   leave the courtroom, by going through the courtroom door and

19   down the corridor.  Thank you.

20           THE WITNESS:  Okay.  Thank you.  Leave these here?

21           THE COURT:  Yes, just leave everything there.

22           Your next witness.

23           MR. POMPONIO:  The plaintiffs call Terry Prater.

24           MR. TORRES:  Your Honor, could I grab a few

25   documents before Mr. Pomponio starts?

PRATER - DIRECT

```
 1                    THE COURT:  You may.

 2                    MR. TORRES:  Thank you.

 3                    THE CLERK:  Mr. Prater, if you'd please take the

 4       lectern.

 5            Please state your name and spell it for the record.

 6                    MR. PRATER:  Terry, T-E-R-R-Y, Prater,

 7       P-R-A-T-E-R.

 8                    THE CLERK:  Thank you.  Please raise your right

 9       hand to be sworn.

10                    TERRY PRATER, PLAINTIFF, SWORN

11                    THE CLERK:  Please take the stand.  Thank you.

12                    THE COURT:  Mr. Torres, tell us when you are

13       ready.

14                    MR. TORRES:  Thank you, Your Honor.

15                           DIRECT EXAMINATION

16       BY MR. POMPONIO:

17       Q.   Good afternoon, Mr. Prater.

18       A.   Good afternoon.

19       Q.   Where do you live?

20       A.   I live in Oxford, Kentucky.

21       Q.   And what's your birth date and current age?

22       A.   January 7, 1955.  And I'm 66.

23       Q.   And are you currently retired?

24       A.   Yes, sir.

25       Q.   And when did you retire?
```

PRATER - DIRECT

1    **A.**    January -- September 30th, 2014, was my last shift.

2    **Q.**    And what was your occupation at the time of your

3    retirement?

4    **A.**    Mobile equipment operator.

5    **Q.**    And who was your employer?

6    **A.**    CONSOL Energy.

7    **Q.**    And where did you work?

8    **A.**    Twin Branch Mining Company.

9    **Q.**    How long did you work for CONSOL?

10   **A.**    A little over a month working 14 years.

11   **Q.**    Were you paid a salary or on an hourly basis?

12   **A.**    From 2000 until 2007, I was on salary.

13   **Q.**    And then 2007 to 2014, hourly?

14   **A.**    Yes, sir.

15   **Q.**    Okay.  During your employment with CONSOL, were there

16   occasions when the company discussed with you or explained

17   to you your entitlement to retirement welfare benefits?

18   **A.**    Numerous times.

19   **Q.**    Tell us about the different settings in which you --

20   **A.**    First time, it was discussed with me the day I took my

21   interview.

22   **Q.**    Okay.

23   **A.**    I took my interview in front of HR Manager Craig

24   Campbell, and vice president Jack Richardson.

25   **Q.**    And when was that?

1    **A.**   I'm assuming that was in October, because the company I

2    worked for -- I gave them two weeks' notice once I accepted

3    the job for CONSOL, and I went to work for them first of

4    November -- so probably October.

5    **Q.**   October of?

6    **A.**   2000.

7    **Q.**   2000?

8    **A.**   Mm-hmm.  Yes, sir.

9    **Q.**   And you said that Craig Campbell and Jack Richardson

10   were there at the interview?

11   **A.**   Yes.

12   **Q.**   What was Craig Campbell's position with the company?

13   **A.**   He was HR Manager, Human Resources, at our complex.

14   **Q.**   And what about Jack Richardson?

15   **A.**   The way we were always told, he was the Vice President

16   of Central App.

17   **Q.**   And what, if anything, was said by Craig Campbell

18   and/or Jack Richardson about your entitlement to retirement

19   welfare benefits at your interview?

20   **A.**   Said if I accepted the job with them, and if I got 10

21   years' seniority in and reached 55 years of age, I'd have my

22   hospitalization, my prescription, my dental, and my eye, and

23   my life insurance for the rest of my life.

24   **Q.**   Were you employed elsewhere at the time of this

25   interview?

PRATER - DIRECT

1   **A.**   Yes, sir.

2   **Q.**   And were you offered a job with CONSOL at or after that

3   interview?

4   **A.**   During the interview.

5   **Q.**   Did you consider the offer of employment to include the

6   retirement welfare benefits of which you just described?

7          MR. TORRES:  Objection; leading, Your Honor.

8          THE COURT:  Please undertake to question without

9   leading.

10  BY MR. POMPONIO:

11  **Q.**   What, if any, importance did you place on the

12  lifetime -- promise of lifetime retirement welfare benefits?

13         MR. TORRES:  He's leading again, Your Honor,

14  suggesting that he had some thought about lifetime benefits.

15         MR. POMPONIO:  I said what, if any, did you have.

16         THE COURT:  You might ask whether he took into

17  account in its entirety and you can develop it from there.

18  BY MR. POMPONIO:

19  **Q.**   Okay.  Did you -- what did you take into account when

20  you -- did you accept the offer of employment?

21  **A.**   Yes, sir.

22  **Q.**   Okay.  And what did you take into account in accepting

23  that offer of employment?

24  **A.**   Well, I thought that I -- if I only had a job I could

25  retire from with medical insurance and everything, because

PRATER - DIRECT

1    other companies I worked for, you didn't have no benefits

2    when you retired.

3    **Q.**   Did Mr. Campbell or Mr. Richardson -- what, if

4    anything, did Mr. Campbell or Mr. Richardson say about the

5    company's right to terminate those?

6    **A.**   It wasn't mentioned.

7    **Q.**   Did you subsequently work for more than 10 years and

8    attain the age of 55 at CONSOL?

9    **A.**   Yes, sir.

10   **Q.**   All right.  After you were hired, were there any

11   meetings in which your retirement welfare benefits were

12   discussed?

13   **A.**   Yes.  We had four years of orientation, probably -- I'd

14   say every day or every other day, at the most -- at the

15   least, I mean, during orientation, that Craig Campbell would

16   go over benefits.

17   **Q.**   What, if anything, did Mr. Campbell say about the

18   duration of those retirement welfare benefits?

19   **A.**   We watched films and slides so much over there that for

20   about the first 11 years, CONSOL was a really

21   family-oriented company; keep us up-to-date with films,

22   slides, go over all that.  And at the end, that's when he

23   would go over or talk about the benefits.

24   **Q.**   Are we talking about the orientation meetings?

25   **A.**   No, that is after the orientation.

PRATER - DIRECT

1    **Q.**   Okay, let's talk about -- let's continue to talk about

2    the orientation meeting.  You testified that Mr. Campbell

3    went over your benefits, correct?

4    **A.**   Yes, sir.

5    **Q.**   What specifically did he say about those retirement

6    welfare benefits?

7    **A.**   He said, once you go to work for CONSOL, you don't go

8    to work for a good company, you go to work for a great

9    company.  You'll have -- you get your 10 years' in

10   seniority, you don't have much retirement at that time, but

11   you'll have medical insurance, life insurance, prescription,

12   eye, dental, for the rest of your life.  Every year you get

13   beyond 10 years, your retirement goes up.

14   **Q.**   What, if anything, did Mr. Campbell tell you about his

15   authority to explain and interpret your retirement welfare

16   benefits?

17   **A.**   He never did explain his authority.  He just said he

18   was over Human Resources there.

19   **Q.**   Did you receive any documents at this orientation

20   meeting describing your retirement welfare benefits?

21   **A.**   We might got a few little handouts.  There was four of

22   us got on at the same time; three was hourly, and I was

23   salary.  At the end of the orientation, Craig Campbell gave

24   those three guys hardcover book, but I didn't get one.

25   **Q.**   Did Mr. Campbell go over that booklet that was provided

1    to the other miners at the orientation meeting?

2    **A.**   I think the films -- all the films and slides he showed

3    us, I think that's what consisted that was in that book.

4    **Q.**   What, if anything, in the presentation conducted by

5    Craig Campbell say about CONSOL's right to terminate the

6    retirement welfare benefits?

7    **A.**   He said, "You don't have to worry about that language

8    there; that's attorney's language."

9    **Q.**   Did you rely on Mr. Campbell's representations about

10   your retirement welfare benefits?

11   **A.**   Yes, sir.

12   **Q.**   How so?

13   **A.**   Whole-heartedly.

14            MR. TORRES:  I'm sorry, I didn't hear the answer.

15            THE WITNESS:  I said, whole-heartedly.

16   BY MR. POMPONIO:

17   **Q.**   Did you place any importance on the offer of lifetime

18   retirement welfare benefits?

19   **A.**   Yes, sir.

20   **Q.**   What importance did you place?

21   **A.**   Well, you know, the benefits -- describe this -- as you

22   get older, you -- the medical benefits and your prescription

23   and your dental and the eye and everything like that, that

24   means a lot.

25   **Q.**   All right.  After your orientation meeting, were there

PRATER - DIRECT

1    any other meetings that you had during your employment for

2    CONSOL where you were -- they discussed your retirement

3    welfare benefits?

4    **A.**   Yes, I stated a while ago, for about the first 11

5    years, we had meetings, we had cookouts.  We had meetings,

6    meant a lot -- a lot of meetings.  And every time that the

7    cookouts, lot of times, some of the big people from

8    corporate would be there.  And after the cookouts, they'd

9    leave.  And Craig Campbell would always -- would talk about

10   benefits, and sometimes go in the office and show us slides

11   or films.  But at every one of them, they was always talking

12   about retirement benefits.

13   **Q.**   And what specifically do you recall Mr. Campbell saying

14   about your retirement welfare benefits at these meetings?

15   **A.**   He said, "Once you reach the age of 55 and get 10

16   years' seniority, you get medical, prescription, dental,

17   eye, and life insurance for the rest of your life."

18   **Q.**   What, if anything, did Mr. Campbell say about the

19   company's right to terminate those retirement welfare

20   benefits?

21   **A.**   One time -- the only time I ever heard him say

22   anything, what I said a while ago, that language down there

23   was attorney's language.

24   **Q.**   Did you ever attend any meetings in which CONSOL

25   compared your retirement welfare benefits to those provided

1   by the UMWA?

2   **A.**   Here in orientation, and I think two times after that.

3   **Q.**   Were you ever in the UMWA?

4   **A.**   Yes, sir.

5   **Q.**   And what do you understand the UMWA plan provides to

6   retired miners in terms of welfare benefits?

7   **A.**   Well, back when I was in -- I got eight years in, and

8   if you got enough years in to retire, you would keep your

9   medical benefits the rest of your life after you got in

10   retirement.

11   **Q.**   Okay.  You previously testified that you retired on

12   September 30th, 2014?

13   **A.**   That's correct.

14   **Q.**   What caused you to retire on that day?

15   **A.**   Mr. Kowzan, which we know him as a hatchet man, because

16   ever time he come to our job, he's always got news.  He come

17   in that evening and had a meeting with us, and during the

18   meeting, he told us that if we retired on October 1st, that

19   people had years in and of age, we would not have no

20   retirement.  And people started getting really upset and mad

21   and just getting rowdy and upset.  So he ended the meeting.

22   So we had gone to work.

23       And as we was coming out of the door of the trailers,

24   by the box trailer they made into a place we had meetings,

25   Mr. Kowzan was at the door.  And Doug Jennings, the guy

1    hired on the same day I did, he asked Mr. Kowzan, "What if

2    we retired today?"

3        Mr. Kowzan told him, said, "If you retire before

4    midnight, you'll have five years' insurance.  But you got to

5    tell your foreman before midnight that you are retiring."

6        And that's -- my doctor had been trying to get me to

7    retire anyway.  So that's what made me decide to retire.

8    **Q.**   Okay.  What was your understanding of Mr. Kowzan's

9    position with the company?

10   **A.**   Only thing I knowed was that he was over HR Manager,

11   Craig Campbell.

12   **Q.**   Had you -- you've indicated that you had a nickname for

13   Mr. Kowzan.  Had you ever attended the meetings where Mr.

14   Kowzan discussed your retirement welfare benefits?

15   **A.**   Yes, sir.

16   **Q.**   And what, if anything, did Mr. Kowzan say about your

17   retirement welfare benefits?

18   **A.**   Only thing he said, the ones that got 10 years'

19   seniority in, turn 55 years of age, they'd have their

20   medical, prescription, dental, their eye, and life

21   insurance.

22   **Q.**   What, if anything, did he say about the duration of

23   time you'd have those retirement benefits?

24   **A.**   He never would mention it.  None of them mentioned it.

25   Only time I ever mentioned was, like I said, when Craig

PRATER - DIRECT

1    Campbell said that was attorney's language.  That's the only

2    time.

3    **Q.**   I want to clarify.  I'm asking you about how long, if

4    Mr. Kowzan would say how long you would have your retirement

5    welfare benefits?

6    **A.**   For life.

7    **Q.**   On the day that you retired, in your conversations with

8    Mr. Kowzan, what did Mr. -- did Mr. Kowzan -- what, if

9    anything, did he say about the company's right to terminate

10   the retirement welfare benefits before the five years?

11   **A.**   He didn't -- he didn't even really mention that we'd

12   have it for five years until the meeting was over.  And

13   everybody was wanting to ask him questions:  Why was we lied

14   to?  All that, "Why did you lie to us?"

15        He said, "Guys, don't be mad at me.  Because it's going

16   to affect me, too, and I just told it to you like I'm

17   telling you."

18        But he mentioned that we had it for five years until we

19   started out the door, and that's when Doug Jennings asked

20   him.

21            MR. POMPONIO:  May I approach the witness?

22            THE COURT:  Yes.

23   BY MR. POMPONIO:

24   **Q.**   Well, I thought the exhibits were up there.  I'm

25   looking for Defendant's 1.

PRATER - DIRECT

1        I'm handing you what's been marked as Defendant's

2    Exhibit 1.  Do you recall ever receiving a document like

3    this at any time?

4    **A.**   Yes, I seen this on films.

5    **Q.**   Do you ever remember receiving a document like that?

6    **A.**   No, sir.

7    **Q.**   Have it mailed to you?

8    **A.**   No, sir.

9    **Q.**   At any time when you worked for CONSOL, did you ever

10   receive for your -- a copy for you to have of the document

11   like that?

12   **A.**   No, sir.

13   **Q.**   What about after retirement?

14   **A.**   Only thing I got after retirement is, when I retired, I

15   got a little thing from HealthSCOPE.

16   **Q.**   Okay.  But to be clear, did you receive a large

17   document like that?

18   **A.**   No.

19   **Q.**   Mr. Prater, after you retired on September 30th, 2014,

20   did you ever come to learn CONSOL was terminating your

21   retirement welfare benefits?

22   **A.**   Yes, on -- yes, 2014, September 30th, that's when I

23   found out.

24   **Q.**   No, I mean, after you retired?

25   **A.**   Oh, you mean five years?

PRATER - DIRECT

1    **Q.**   Yes.

2    **A.**   Yes.  2016, I think it was, I got the letter.  Yes.

3              MR. POMPONIO:  May I approach, Your Honor?

4              THE COURT:  You may.

5    BY MR. POMPONIO:

6    **Q.**   I'm handing you what's been marked Plaintiff's Exhibit

7    5.  Can you tell us what this document is?

8    **A.**   This is the document that where -- the letter I

9    received there about where they were going to take our

10   insurance for five years.

11   **Q.**   I beg your pardon?

12   **A.**   This is the paper that we got that says that the

13   December 31st, 2019, the insurance ended, and they were

14   going to take it.

15   **Q.**   And this is a form letter, correct?

16   **A.**   Yes, sir.

17   **Q.**   Okay.  And down in the last paragraph there, it

18   indicates that CONSOL Energy has decided to provide you with

19   a payment of -- and it has just "Xs" there, correct?

20   **A.**   Correct.

21   **Q.**   Did you receive a transition payment with your -- or an

22   offer of a transition payment with your letter in June of

23   2015?

24   **A.**   Yes, sir, I did.

25   **Q.**   Okay.  And how much was that offer?

PRATER - DIRECT

1    **A.**   $8,500.

2    **Q.**   And who signed that letter?

3    **A.**   Kurt Salvatori.

4    **Q.**   Okay.  Mr. Prater, do you have any medical expenses

5    that you have incurred since your benefits were terminated?

6    **A.**   Yes, sir.

7          MR. POMPONIO:  May I approach, Your Honor?

8          THE COURT:  You may.

9    BY MR. POMPONIO:

10   **Q.**   Mr. Prater, I'm handing you what's been marked

11   Plaintiff's Exhibit 6.  Could you describe this document,

12   please?

13   **A.**   Yes.  That's where I went to the bank and got the

14   records of all my cancelled checks that I paid out for

15   prescriptions, co-payments, dental, and my supplement I pay

16   every month.

17   **Q.**   Okay.  So what does the information that is on this

18   document that you compiled represent?

19   **A.**   Well, like how I got a co-pay every time I go to the

20   doctor.  And I got macular degeneration in my left eye, I

21   got to have a shot in it every month.  I got to pay the

22   deductible on it.

23   **Q.**   What time period do these notes reflect?

24   **A.**   This here would be from '17 up till 2020, November

25   2020.

PRATER - DIRECT

1    Q.   Okay.  And then the last two pages that are copies of

2    -- can you tell us what the last few pages are?

3    A.   Last few pages?  My check statements?

4    Q.   What is reflected, if anything, of significance in

5    these check statements?

6    A.   Well, that's where I had to pay -- every year on our

7    insurance, CONSOL had like CONSOL dollars, if we just let

8    that go, we didn't pay nothing for our insurance.  They had

9    two plans.  One was better than the other one.  So I'd

10   always take the best of the -- those two we had to pay for.

11   And they hold so much like out of our check.  I got paid

12   biweekly.  They paid so much out of our check biweekly.

13   Q.   How much were those premiums from the time you retired

14   October of 2014 through December of 2015, how much were they

15   a month?  How much did they take out of --

16   A.   My retirement insurance, $100 a year.

17   Q.   And did you pay those $100 a month premiums with the

18   expectation that you would have your retirement welfare

19   benefits for five years?

20   A.   Yes, sir.

21        MR. POMPONIO:  Thank you, that's all I have.

22        We'd like to move for the introduction of Plaintiff's

23   Exhibits 5 and 6 -- yes, 5 and 6.

24        MR. PETSONK:  I thought you already had 5 in?

25        THE COURT:  Any objection?

Catherine Schutte-Stant, RDR, CRR (304) 347-3151

 1          MR. TORRES:  I'm sorry, Your Honor.  No objection,

 2   Your Honor.

 3          THE COURT:  They are both admitted.

 4   **Plaintiff's Exhibits 5 and 6 admitted.**

 5          THE COURT:  We'll recess at this point for 15

 6   minutes.

 7       Mr. Prater, treat yourself as if you are on the witness

 8   stand in the sense that you are not to talk to anyone about

 9   your testimony.  And we'll be recessed for about 15 minutes.

10          THE WITNESS:  Okay.

11          THE COURT:  And when you leave the courtroom, you

12   can go through the courtroom door right there and down the

13   hallway and back into the lobby.

14          THE WITNESS:  Okay.

15          THE COURT:  And we'll be in recess for 15 minutes.

16          THE CLERK:  All rise.

17       (A recess was taken at 3:47 p.m. until 4:05 p.m.)

18          THE CLERK:  All rise.

19          THE COURT:  Please be seated.

20       Mr. Torres, whenever you're ready.

21          MR. TORRES:  Thank you, Your Honor.

22                    **CROSS-EXAMINATION**

23   **BY MR. TORRES:**

24   **Q.**  Mr. Prater, you testified that Mr. Campbell made

25   statements to you about your benefits being for life,

PRATER - CROSS

1    correct?

2    **A.**    Correct.

3    **Q.**    And that the reservation of rights language can be

4    ignored because it was lawyer talk; is that right?

5    **A.**    I can't hear you.

6    **Q.**    You also testified that Mr. Campbell allegedly told you

7    that the reservation of rights language could be ignored

8    because it was lawyer's talk; is that right?

9    **A.**    That's what he said.

10   **Q.**    So taking the first alleged statement about lifetime

11   benefits, you said that Mr. Prater [sic] said that to you in

12   your initial interview with him and Mr. Blankenship,

13   correct?

14   **A.**    No.  It was Craig Campbell and Jack Richardson.

15   **Q.**    So in the first meeting Mr. Campbell and Mr.

16   Richardson?

17   **A.**    At my interview.

18   **Q.**    In your interview?

19   **A.**    Correct.

20   **Q.**    He made a statement then?

21   **A.**    Yes.

22   **Q.**    And then you claim the statement was made to you in

23   your orientation that the benefits were for life, correct?

24   **A.**    Correct, several times.

25   **Q.**    During the orientation?

1    **A.**    During the orientation.

2    **Q.**    And then after your orientation -- I just wasn't clear.

3    How many other times do you claim Mr. Campbell told you your

4    benefits were for life?

5    **A.**    I wouldn't know how to answer that.  We had a lot of

6    meetings and we had a lot of cookouts.  And about every time

7    we'd have a meeting and cookout, he'd show us films.  And

8    they kept us up-to-date what's going to happen, what to

9    expect.  And at the end of the meetings and the films or

10   whatever, he'd always go over and tell us about our

11   benefits.

12   **Q.**    My question wasn't whether Mr. Campbell went over

13   benefits every meeting.  My question is:  How many times did

14   he tell you your benefits were for life, sir?

15   **A.**    Every time he told -- every time he talked to us.

16   Numerous.  I wouldn't know how to put a number on it.

17   **Q.**    Okay.  So numerous times?

18   **A.**    Numerous times, yes.

19   **Q.**    And how many times did he tell you that you could

20   ignore the reservation of rights clause because it was

21   lawyer's talk?

22   **A.**    Once.

23   **Q.**    One time.  And when was that?

24   **A.**    It was at my orientation.  I don't recall exactly what

25   time it was, but it was after my orientation.  We had a --

PRATER - CROSS

1    he showed us films, and that's when he made the statement.

2    After my orientation.

3    Q.   So before Mr. Campbell made that statement that it was

4    lawyer's talk and it could be ignored, I take it, then, you

5    became aware that there was a reservation of rights clause

6    that applied to the CONSOL benefits plan, correct?

7    A.   Never entered my mind when they talked to us, the way

8    they talked to us.

9    Q.   Mr. Prater, why would Mr. Campbell tell you to ignore a

10   reservation of rights clause if you weren't aware of it?

11   A.   I can't answer what he thought.

12   Q.   Excuse me?

13   A.   I can't answer what Mr. Campbell thought.

14   Q.   So your testimony is that Mr. Campbell told you to

15   ignore a reservation of rights clause as lawyer talk even

16   though you weren't aware that there was a reservation of

17   rights clause; is that your testimony today, sir?

18   A.   He was showing the benefits and that language is down

19   there at the bottom.  Somebody made a statement about that.

20   And that's when he made a statement that's, -- he didn't say

21   lawyer -- he said, "Attorney's language.  Ignore that."

22   Q.   Okay.  So you admit that before Mr. Campbell made that

23   statement, he showed you a document that said CONSOL

24   reserves the right to terminate the benefits, correct?

25   A.   That's on the bottom of the film he's showing us, right

1    on the bottom.

2    **Q.**   Right.  So he did show you that document before making

3    this alleged statement, correct?

4    **A.**   Correct.

5    **Q.**   Okay.  So you knew, at least according to the films,

6    that CONSOL had reserved the right to terminate these

7    benefits, correct?

8    **A.**   That was on the films, but that wasn't what was told to

9    us all the time.  We was told to ignore it.

10   **Q.**   Please answer my question, Mr. Prater.

11   **A.**   Well, I'm telling you the facts, what we was told.

12   **Q.**   My question, which I'll state again, is that the

13   document that Mr. Prater was showing you from CONSOL stated

14   that the company had reserved the right to terminate the

15   benefits, correct?

16   **A.**   Correct.

17   **Q.**   And you claim that Mr. Campbell told you to ignore that

18   because it was lawyer's talk, correct?

19   **A.**   Yes.

20   **Q.**   Okay.  And he said that one time?

21   **A.**   That's all that I ever heard.

22   **Q.**   And when Mr. Campbell was telling you that these

23   benefits would be for life during your orientation, the

24   medical benefits that you understood you could qualify for

25   if you retired provided that if you did retire you would

PRATER - CROSS

1    continue to receive them and then you would become Medicare

2    eligible and that the benefits -- your benefits at CONSOL

3    would be secondary, correct?

4    **A.**    Correct.

5    **Q.**    So when Mr. Campbell said that at that orientation,

6    there had been no announcement that CONSOL was going to

7    terminate its benefits, correct?

8    **A.**    Correct.

9    **Q.**    Okay.  So do you have any reason to believe that Mr.

10   Campbell didn't understand those benefits to, under the

11   terms of the plan at that time, provide that they would

12   continue on as long as the plan was in place, correct?

13   **A.**    That's what -- that's what he told us.

14   **Q.**    Okay.  And then -- so when your lawyer asked you before

15   if the reservation of rights clause was ever mentioned, and

16   you said, "No," that wasn't correct, right?  Because we just

17   determined that, in fact, you saw the reservation of rights

18   clause, but your testimony is that Mr. Campbell allegedly

19   told you to ignore it, correct?

20   **A.**    To be honest with you, I don't know whether I was even

21   paying attention to it because the other person mentioned

22   it.  And that's when Mr. Campbell stated that it was

23   attorney's language, to be honest with you.  I don't want to

24   state -- I don't want to state one way or the other, because

25   I don't remember.

1   **Q.**   Well, your testimony before was that no one had ever

2   mentioned a reservation of rights clause to you?  Right?

3   **A.**   I don't remember.

4   **Q.**   Okay.  Well, we would agree now, given your testimony a

5   moment ago, that, in fact, you were aware of a reservation

6   of rights clause, and at some point right after your

7   orientation, because you saw it on a presentation that Mr.

8   Campbell was making, correct?

9   **A.**   After he made the statement, yes.

10   **Q.**   That's correct, right?

11   **A.**   Yes.

12   **Q.**   And your lawyer also asked you whether or not Mr.

13   Campbell ever told you -- let me make sure I get this

14   correct.  Mr. Campbell -- I think the question was something

15   to the effect, did Mr. Campbell tell you whether he had

16   authority to make the representations he made or something

17   to that effect.  Do you recall those questions from your

18   lawyer?

19   **A.**   I don't know -- only thing I know, he told us he was

20   over Human Resources.

21   **Q.**   So he told you he was over Human Resources.  But Mr.

22   Campbell never told you that he had authority to alter the

23   terms of CONSOL's written benefits plan, correct?

24   **A.**   No, he never told us.

25   **Q.**   Right.  And Mr. Campbell never told you that anyone

PRATER - CROSS

1    from CONSOL ever gave him authority to alter the written

2    terms of CONSOL's benefits plan, correct?

3    **A.**   No.  That's correct.

4    **Q.**   And I know you said that Mr. Campbell made numerous

5    statements that these benefits were for life.  Do you

6    remember the last time Mr. Campbell said that to you?

7    **A.**   Probably the last meeting he had with us.  I don't

8    recall when that was, because the last meeting I was in, it

9    was Kowzan -- Kowzan.

10   **Q.**   Mr. Kowzan?

11   **A.**   Yeah.

12   **Q.**   So I'm asking you when you think the last time you

13   think Mr. Campbell told you these benefits would be provided

14   for life?

15   **A.**   In September, we had that last meeting.  I'm going to

16   say somewhere around probably July -- I'm guessing.  Don't

17   quote me on that, I'm just guessing on that.

18   **Q.**   All right.  So, and just so I'm clear, other than Mr.

19   Campbell, no one else ever told you that these benefits were

20   for life, correct?

21   **A.**   Mr. Kowzan -- a lady came from corporate once and had a

22   meeting with us at Highland, Kentucky, she told us.  Jack

23   Richardson told me when I was in the interview.  That's the

24   only time Jack Richardson mentioned it to me, in my

25   interview.  And seemed to me like there was one other time a

1    guy came from Canonsburg -- I don't recall his name -- that

2    he had a meeting with us and showed us some films and told

3    us about our benefits.

4    **Q.**   He told you about the benefits, but he didn't tell you

5    they were for life, sir?

6    **A.**   Every time they mentioned it, it was either life or

7    death.  Depends on which one stated it -- made the

8    statement.

9    **Q.**   So you remember, prior to today, I took your

10   deposition, correct?

11   **A.**   Yes.

12   **Q.**   And you were testifying under oath back then, correct?

13   **A.**   That's correct.

14   **Q.**   And I asked you during that deposition who promised you

15   lifetime benefits, correct?

16   **A.**   Yes.

17   **Q.**   And during your deposition, you mentioned Mr. Campbell

18   and Mr. Richardson, correct?

19   **A.**   I mentioned Mr. Richardson, I mentioned that lady from

20   Highland, Kentucky.  And I also mentioned -- I told you I

21   thought there was one come from corporate.

22   **Q.**   Okay.  And you don't remember this woman's name?

23   **A.**   No.  Only time I ever seen her.

24   **Q.**   You don't remember exactly what she said?

25   **A.**   Yes -- well, she had this meeting over there with us,

1    and about they thought they was going to -- something was

2    going to happen to the contract.  And they talked about the

3    contract, if -- mostly for the deep mines.  I took care of

4    the coal trucks at that time.  And if something happened to

5    the contract, they didn't know what was going to take place,

6    you know, with the hours -- hourly workers, because they

7    work 24/7; six on, three off.  So the planks were 24/7.  And

8    she explained all that to us.  And then after the end of it,

9    she talked about our benefits.

10   **Q.**   But she didn't tell you she had any authority to alter

11   CONSOL's written benefit plan, correct, sir?

12   **A.**   No.  No one from Human Resources ever told me that they

13   had the authority to change anything.

14   **Q.**   Okay.  And this other gentleman, you can't remember his

15   name --

16   **A.**   No, I don't.

17   **Q.**   -- he didn't tell you he had any authority to alter

18   CONSOL's benefits plan?

19   **A.**   No.

20   **Q.**   Okay.  And just so I'm clear, you were a salaried

21   employee?

22   **A.**   From 2000 to 2007.

23   **Q.**   And in 2007 to '14, you were a P&M?

24   **A.**   Yes.

25   **Q.**   And do you remember -- you said that Mr. Campbell made

PRATER - CROSS

1   some references to the UMWA benefits on three occasions?

2   **A.**   Yes.

3   **Q.**   The first one was during orientation?

4   **A.**   Correct.

5   **Q.**   And at that time, you were a salaried employee,

6   correct?

7   **A.**   That's when I was getting ready to be hired in, get

8   started.

9   **Q.**   You were a salaried employee?

10  **A.**   Yes.

11  **Q.**   So you wouldn't have been able to participate in an

12  organizing campaign, correct?

13  **A.**   No.

14  **Q.**   And so comparisons between P&M benefits and UMWA

15  benefits wouldn't have applied to you, correct?

16  **A.**   Well, if they went on strike, the shift where I was,

17  they would shut the coal trucks down, I would probably been

18  out -- out of a job.

19  **Q.**   The comparison between benefits between P&M employees

20  and --

21  **A.**   No, not -- the benefits should been no difference.

22  **Q.**   Benefits wouldn't have applied to you, correct?

23  **A.**   Correct.

24  **Q.**   So when Mr. Campbell was talking about that in the

25  orientation, he was speaking to the P&M employees, not to

1    you, correct?

2    **A.**   I didn't meet with them, so --

3    **Q.**   I'm sorry?

4    **A.**   There was four of us, and I was in the meeting.  There

5    was four of us together when he was talking to us, so he

6    didn't single me out.

7    **Q.**   But you knew it didn't apply to you because you were a

8    salaried employee?

9    **A.**   No, I said, he talked to all.  He told us that the UMWA

10   was coming down there; don't take no handouts, and he

11   described the benefits about what would be the difference.

12   **Q.**   Mr. Prater, as a salaried employee, you were not able

13   to be part of an organizing campaign, correct?

14              MR. POMPONIO:  Objection; asked and answered.

15              THE COURT:  The witness may answer.

16              THE WITNESS:  I said, he told us to not take no

17   handouts; if they come through there, do not stop, go right

18   on through.  So that's what he told us.  I mean, I'm just

19   telling you what he told you.

20   BY MR. TORRES:

21   **Q.**   I didn't ask you what he told you, sir.  I asked you

22   whether or not, because you were a salaried employee, isn't

23   it correct you would not have been able to participate in an

24   organizing campaign?

25   **A.**   I guess not.

1  **Q.**   Thank you.  One or two times when Mr. Campbell referred

2  to the UMWA; when did that occur?  While you were still a

3  salaried employee?

4  **A.**   Once.  I don't know how long it was after I started.

5  The P&M guys -- they took two or three dollars an hour from

6  them.  They never went on strike.  But they was a lot of

7  talk going on, and the union guys came down there for the

8  guard shack and gave out literature and they had a meeting

9  with us then.  And told us not to participate in it.  Told

10  us not to accept no handouts or -- just come straight on

11  through the guard shack and go on to work.

12  **Q.**   And the comparisons were between the benefits provided

13  to UMWA and the benefits provided to P&M employees, correct?

14  **A.**   Correct.

15  **Q.**   And that was -- it didn't say anything about lifetime;

16  it was just a comparison between the benefits the union got

17  and benefits that CONSOL employees got, correct?

18  **A.**   At which time?

19  **Q.**   All three times?

20  **A.**   All times -- it's always, you have medical benefits

21  with UMWA for life if you got your years in; if you got the

22  seniority in and years in with CONSOL and turn 55, you have

23  lifetime benefits with CONSOL.

24  **Q.**   The comparisons you're talking about didn't say for

25  life; they compared union benefits and CONSOL benefits?

1    Isn't that correct, sir?

2    **A.**   Both times they state each one of them, you know, the

3    UMWA had their insurance for life, and CONSOL had theirs for

4    life if you get your time in.

5    **Q.**   Now, in addition to the reservation of rights language

6    that you admitted you saw a moment ago, there were other

7    documents that you received from CONSOL before you retired

8    that included reservation of rights language, correct?

9    **A.**   We got very little documents over there.  They didn't

10   give us as much literature or anything through the mail.

11   They had films; they showed us films and slides.

12   **Q.**   My question, sir, was:  You saw additional documents

13   and received additional documents that contained reservation

14   of rights language before you retired, correct?

15   **A.**   Correct.

16   **Q.**   Okay.  And you'll recall we discussed some of those

17   documents during your deposition, correct?

18   **A.**   Correct.

19            MR. TORRES:  May I approach, Your Honor?

20            THE COURT:  You may.

21   BY MR. TORRES:

22   **Q.**   Mr. Prater, I'm handing you what's been marked

23   Defendant's Deposition Exhibit 7.  The first page says on

24   the bottom to the right, "Your 2008 Flexible Benefits

25   Enrollment Guide," correct?

PRATER - CROSS

1    **A.**    Yes.

2    **Q.**    And below that, it says, "CONSOL Energy"?

3    **A.**    Correct.

4    **Q.**    And this is one of the documents we discussed in your

5    deposition, correct?

6    **A.**    Correct.

7    **Q.**    And you testified you remember receiving it in

8    2007-2008, correct?

9    **A.**    2000, when?

10   **Q.**    2007 to 2008, correct?

11   **A.**    I would say probably those years, that's when we

12   started getting where we had to change our insurance.

13   **Q.**    So 2007 or 2008?

14   **A.**    Yes, but I'm not going to say what year.

15   **Q.**    Fair enough.

16              MR. TORRES:  Your Honor, we'd offer Defendant's

17   Exhibit 7.

18              MR. POMPONIO:  Could I just ask a question,

19   clarifying question about this exhibit?  Is it different in

20   any way from Exhibit 3, which has already been introduced?

21              MR. TORRES:  I don't know.  I'm trying to see what

22   your prior objection is that you weren't showing in

23   deposition.  So --

24              MR. POMPONIO:  You've already introduced this, it

25   appears to me, as Defendant's Exhibit 3.  Do you want to do

1    it twice?

2             MR. TORRES:  Not if you are not going to object --

3    hold on, Your Honor.

4             Could I have just one minute, Your Honor?

5         (Pause.)

6    BY MR. TORRES:

7    **Q.**   In 2008, you were a P&M employee, correct?

8    **A.**   Yes.

9    **Q.**   Okay.  So I apologize, I'll withdraw the exhibit.

10            THE COURT:  Before we go on, is there a

11   Defendant's 7 or is it agreed that is the same as 3?

12            MR. TORRES:  No, 7 is slightly different.  And Mr.

13   Pomponio was correct that 3 is the correct exhibit to show

14   Mr. Prater.

15            THE COURT:  So I'm uncertain, is Defendant's 7

16   being withdrawn?

17            MR. TORRES:  Yes, Your Honor.

18            THE COURT:  And can it just be deemed cancelled on

19   the record and then do another 7?

20            MR. TORRES:  Yes, Your Honor.

21            THE COURT:  So if it's withdrawn, can you totally

22   ignore it, and the next exhibit, when we get to that point,

23   could be marked 7?  Go ahead.

24            MR. TORRES:  Yes, Your Honor.

25   BY MR. TORRES:

1    **Q.**   So, Mr. Prater, let's start over again.

2             MR. TORRES:  May I approach, Your Honor?

3             THE COURT:  Yes.

4    BY MR. TORRES:

5    **Q.**   I'll take that back from you, sir.  Thank you.

6        If you look at Defendant's Exhibit 3, that also says on

7    the front, "2008," correct, sir?

8    **A.**   Correct.

9    **Q.**   And "CONSOL Energy" towards the bottom?

10   **A.**   Yes.

11   **Q.**   And this is the document that we discussed in your

12   deposition, correct?

13   **A.**   Yes.

14   **Q.**   And if you turn to the last written page, do you see

15   that, Mr. Prater, towards the back?

16   **A.**   Yes.

17   **Q.**   And the second-to-last sentence on that page which we

18   discussed at your deposition states:  "CONSOL can amend or

19   terminate any of its benefit programs at any time and for

20   any reason," correct?

21   **A.**   Correct.

22   **Q.**   That was another time you received written materials

23   from CONSOL advising you that they reserve the right to

24   terminate benefits, correct?

25   **A.**   Correct.

PRATER - CROSS

```
1              MR. TORRES:  And one moment, Your Honor.  I

2    apologize.

3    BY MR. TORRES:

4    Q.   And then one of the other documents that we discussed

5    in your deposition that you recall receiving were Highlights

6    documents, correct?

7    A.   Correct.

8    Q.   And like the document that we just showed you, you

9    agreed with us that those documents also stated that CONSOL

10   reserved the right to terminate benefits, correct?

11   A.   That's what it says on the literature.

12   Q.   Okay.  And you received that document also before you

13   retired, correct?

14   A.   Yes, once they started these, I got one of these every

15   year after that.

16   Q.   Okay.  So every year until you retired, you received

17   these documents from CONSOL, and those documents stated that

18   CONSOL reserved the right to terminate its benefits,

19   correct?

20   A.   Yes, on the literature.  It's on the literature.

21   Q.   So contrary to what Mr. Campbell allegedly said,

22   CONSOL's written materials were telling you that the

23   benefits could be terminated, correct?

24   A.   Mr. Campbell didn't discuss that.  He discussed the

25   benefits.  He didn't go into about it could be terminated or
```

1    cancelled at any time.

2    **Q.**   Right.  But the documents you received --

3    **A.**   The document says -- the document states that correct.

4    **Q.**   Now then, your lawyer asked you a question about

5    whether you ever received -- and he pointed you to a

6    document and asked if you had ever seen it, one of the

7    documents in front of you, and you said that you didn't

8    recall seeing that document.  Correct?  That was Defendant's

9    Exhibit 1.  Do you recall that question?

10   **A.**   The big paper, yeah, I seen it.  I said that's the one

11   that they showed through the orientation, but I didn't

12   receive one.

13   **Q.**   Okay.  So Mr. Campbell actually showed you that

14   document during orientation, but didn't give you a physical

15   one?

16   **A.**   The way it was, he didn't just show it through the

17   papers; he had a film and slides he showed it to from that.

18   **Q.**   And that was one of the documents he showed you that

19   included this language that said the benefits could be

20   terminated, correct?

21   **A.**   He did not mention that.

22   **Q.**   That was subsequent to that when -- in a subsequent

23   meeting when he showed you that language and then allegedly

24   said it was lawyer talk?

25   **A.**   It was after my orientation.

| | |
|---|---|
| 1 | **Q.**   After your orientation? |
| 2 | **A.**   After my orientation. |
| 3 | **Q.**   Got it.  Okay.  And then -- |
| 4 | MR. TORRES:  This will be 7. |
| 5 | BY MR. TORRES: |
| 6 | **Q.**   Mr. Prater, I'm going to show you what's been marked as |
| 7 | Deposition Exhibit 7. |
| 8 | THE COURT:  This is 7? |
| 9 | BY MR. TORRES: |
| 10 | **Q.**   Now, this is a document, the first page says, "Summary |
| 11 | Plan Descriptions"? |
| 12 | **A.**   Yes, sir. |
| 13 | **Q.**   And below that it says, "Production and Maintenance |
| 14 | Employees of CONSOL of Kentucky, Inc.," correct? |
| 15 | **A.**   Correct. |
| 16 | **Q.**   And if you turn to the -- do you see the pages at the |
| 17 | bottom there, sir -- I mean the numbers at the bottom says |
| 18 | CONSOL 24016? |
| 19 | **A.**   Yes, sir. |
| 20 | **Q.**   If you turn to Page CONSOL 24024 -- are you there, sir? |
| 21 | **A.**   Okay. |
| 22 | **Q.**   At the top of the page, it says that this -- describes |
| 23 | this document as "The CONSOL Energy Inc. Retiree Medical and |
| 24 | Prescription Drug Expense Benefits Plan," correct? |
| 25 | **A.**   Yes, sir. |

1    **Q.**   And during your deposition, I showed you this document

2    and asked you if you recall receiving it, and your testimony

3    was that you didn't receive it, but you believe that Mr.

4    Campbell reviewed this with you when you were getting ready

5    to retire?  Correct?

6    **A.**   Yes, sir.

7             MR. TORRES:  I'll offer Defendant's Exhibit 7,

8    Your Honor.

9             THE COURT:  Any objection?

10            MR. PETSONK:  No, Your Honor.

11            THE COURT:  Admitted.

12            **Defendant's Exhibit 7 admitted.**

13   BY MR. TORRES:

14   **Q.**   Now, all these documents that I've shown you, Mr.

15   Prater, the annual enrollment guide that you said you

16   received every year from 2008 until you retired?

17   **A.**   Yes, sir.

18   **Q.**   The Highlights documents we talked about, and the

19   Summary Plan Description, none of them say anything about

20   ignoring reservation of rights language because they are

21   lawyer's talk, correct?

22   **A.**   Correct.

23   **Q.**   And you testified about Mr. Kowzan, and the -- just so

24   I am clear -- you had one conversation with Mr. Kowzan,

25   or -- please correct me if I'm wrong -- but I believe you

1    testified there was a conversation with Mr. Kowzan after

2    they announced the benefits -- let me step back.

3         You had a conversation with -- one conversation with

4    Mr. Kowzan about your medical benefits after they announced

5    they were going to be terminated, and he showed up and said

6    you had to retire before midnight; is that right?

7    **A.**   No, sir.

8    **Q.**   What did I get wrong?

9    **A.**   It wasn't me he had the conversation with, Mr. Kowzan,

10   it was Doug Jennings, as we was going out the door, down the

11   steps.

12   **Q.**   I see.  So you were there when Mr. Kowzan --

13   **A.**   I was right behind Doug Jennings.

14   **Q.**   Okay.  I apologize.  So you were behind Mr. Jennings

15   and Mr. Kowzan, and Mr. Kowzan was talking to Mr. Jennings?

16   **A.**   Correct.

17   **Q.**   Okay.  And he was talking about the need to have to

18   retire by midnight in order to be eligible for this

19   transition payment, correct?

20   **A.**   The -- what Doug Jennings asked him, "What if we

21   retired today?"

22        And Mr. Kowzan said, "If you retire before midnight,

23   you'll have five years' insurance.  But you've got to tell

24   your foreman before midnight that you are retired."

25   **Q.**   So Mr. Kowzan didn't offer you benefits for life; he

1    told Mr. Jennings he had benefits for five years, correct?

2    **A.**    During that meeting -- at that meeting, yes, sir.

3    **Q.**    Okay.  So not for life, but for five years?

4    **A.**    Excuse me?

5    **Q.**    Mr. Kowzan said Mr. Jennings would have benefits for

6    five years, not benefits for life?

7    **A.**    That's the meeting that they said that this -- if we

8    retired the next day, we would not have no insurance at all

9    when we retire.  And Doug Jennings asked him what if he

10   retired before midnight, that day, on September 30th.

11        He said, "As long as you retire before midnight and

12   tell your foreman that you're retired, you would have the

13   five years."

14   **Q.**    Okay.  Just for five years.  Thank you for clarifying

15   it.  And I just wanted to ask you some questions about the

16   document that your attorney asked about.  This is the list

17   of your out-of-pocket expenses?

18   **A.**    Okay.

19   **Q.**    Did you -- I don't know, I don't see a total.  Have you

20   totaled it up?

21   **A.**    I never totaled it.  I didn't total it.

22   **Q.**    Okay.  So if I were to tell you the total on the first

23   four pages were $10,000, would that sound about right?

24   **A.**    I would have to agree with you.  You said you totaled

25   it, I would have to agree with you, because I didn't.

1    **Q.**   I'm not trying to put words in your mouth.  I just

2    wanted to know if you have some figure --

3    **A.**   No, I didn't have no figure in my head.

4    **Q.**   And this is money you said you spent after -- you had

5    to spend this money after CONSOL terminated your benefits?

6    **A.**   Correct.

7    **Q.**   Okay.  And the numbers are whatever they add up?

8    **A.**   Yes, sir.

9    **Q.**   But prior to that, you said that you were paying $100 a

10   month from -- I'm sorry, how much were you paying for CONSOL

11   insurance before it was terminated?

12   **A.**   Well, I have to look at my check statements to make

13   sure, see what my check statement was.

14   **Q.**   Okay.  So that was money you had to pay out-of-pocket,

15   though, before the benefits were terminated, correct?

16   **A.**   Yes.  That's when I was working.

17   **Q.**   Right.  And then were you also -- oh, and so you took

18   the transition payment instead of the retiree medical

19   payments, so that was the amount you were paying as an

20   active employee before you decided to leave and take this

21   money?

22   **A.**   I didn't agree to take the transition payment.  I

23   didn't sign up no paper for them.

24   **Q.**   You were offered the transition?

25   **A.**   I was offered it.  I didn't sign nothing.

PRATER - CROSS

1    **Q.**   Okay.  I understand.  Just so we are clear, Mr. Prater,

2    you don't know if anyone from CONSOL told you -- told Mr.

3    Campbell to tell you that you'd have benefits for life,

4    correct?

5    **A.**   I had no idea about that, no.

6    **Q.**   And you don't know if anyone from CONSOL told Mr.

7    Campbell to lie to you about your retirement medical

8    benefits, correct?

9    **A.**   I wouldn't think he would be lying to us.

10   **Q.**   Well, you don't know whether they told him one way or

11   the other what to say about the retiree medical benefits,

12   correct?

13   **A.**   Well, no, I don't know.

14   **Q.**   Okay.  And Mr. Campbell never told you he had authority

15   to alter the written terms of the CONSOL benefits plan,

16   correct?

17   **A.**   Our complex, we only had one human HR on our complex

18   and that was Craig Campbell.  And I assumed when he told us

19   something or other, he had authority.

20   **Q.**   He never told you he had authority to change the

21   written terms of CONSOL's benefit plan, correct, sir?

22   **A.**   No -- correct.  He didn't do that.

23   **Q.**   And no one from CONSOL ever told you that Mr. Campbell

24   had the authority to change the written terms of the benefit

25   plan, correct?

1    **A.**   No.

2           MR. TORRES:  Could I have one minute, Your Honor?

3        (Pause.)

4           MR. TORRES:  Thank you, Mr. Prater.  Thank you,

5    Your Honor.  I don't have any further questions.

6                     **REDIRECT EXAMINATION**

7    **BY MR. POMPONIO:**

8    **Q.**   Mr. Prater, do you still have Defendant's Exhibit 3 up

9    there?

10          THE COURT:  Was it marked?

11          THE WITNESS:  Yes, sir.

12          THE CLERK:  We have marked Defendant's Exhibit 3.

13   He has the unmarked.

14          MR. POMPONIO:  Okay.  May I approach, Your Honor?

15          THE COURT:  You may.

16   BY MR. POMPONIO:

17   **Q.**   Could you turn to the last page of the document?

18   **A.**   (Witness complies.)

19   **Q.**   Mr. Torres asked you a question about the

20   second-to-last line on that page?

21   **A.**   Yes, sir.

22   **Q.**   And before your deposition, had you ever read that

23   sentence on that particular document?

24   **A.**   I'm not going to say whether I have or not.  I don't

25   recall.

1   **Q.**   So you don't recall having read that statement before

2   your deposition?

3   **A.**   Correct.

4             THE COURT:  So the record will be clear, recite

5   the statement to which you're referring.

6             I'm asking counsel to do that.

7   BY MR. POMPONIO:

8   **Q.**   Go ahead and read that sentence.

9   **A.**   It says, "CONSOL can amend or terminate any of its

10  benefit programs at any time and for any reason.  This

11  booklet does not serve as a guarantee of continued

12  employment."

13            THE COURT:  The only purpose of that was to make

14  it clear what your question was about.

15            MR. POMPONIO:  Yes.  Thank you, Your Honor.

16            THE COURT:  Go ahead.

17  BY MR. POMPONIO:

18  **Q.**   Did you -- do you recall that statement and that 2008

19  booklet ever jumping out at you?

20  **A.**   No, I don't recall it.  No.

21  **Q.**   Mr. Torres asked you some questions about what you knew

22  about Craig Campbell's authority with regard to the

23  retirement welfare benefit plan.  Who would you go to if you

24  had questions about your retirement welfare benefit plan?

25  **A.**   He was our HR -- only HR Manager we had on the complex,

PRATER - RECROSS

1   so he's the one, Craig Campbell is the one we'd go to.

2   Q.   Were you ever invited to go to anybody if you had any

3   questions about your retirement welfare benefit plan?

4   A.   We had to go to Craig Campbell.  I mean --

5   Q.   Did it appear that he could answer questions about the

6   meaning of your retirement welfare benefit plan?

7            MR. TORRES:  Objection; leading, Your Honor.

8            THE COURT:  The witness may answer.

9            THE WITNESS:  Yes, he always had an answer.

10  BY MR. POMPONIO:

11  Q.   What about conveying information about future -- likely

12  future plan benefits?

13  A.   Craig Campbell always told us that we never had nothing

14  to worry about for medical or prescription or dental or eye

15  or life insurance.  As long as we got our 10 years in and 55

16  years of age, we was locked in, that we wouldn't lose it.

17           MR. POMPONIO:  That's all we have.

18                   **RECROSS EXAMINATION**

19  **BY MR. TORRES:**

20  Q.   The exhibit that your lawyer was asking you about,

21  aside from the fact that its words aren't leaping off the

22  page at you, Mr. Prater, no one ever told you to ignore that

23  page, correct?

24  A.   Who told me to ignore it?

25  Q.   No, no one told you, don't read that last page,

1    correct?

2    **A.**    No one told me not to.

3    **Q.**    Okay.  Including Mr. Campbell, right?

4    **A.**    He never told us -- he never told us anything about not

5    reading any of it.

6    **Q.**    Okay.  And the information isn't hidden on that page,

7    sir, it's stated --

8    **A.**    No, sir, it's not hidden.

9    **Q.**    All right.  And Mr. Campbell's statements about --

10   alleged statements about you had nothing to worry about,

11   whether or not he was the person you went to at HR at your

12   mine site; again, you don't know if anyone from CONSOL told

13   Mr. Campbell to go tell you that you had nothing to worry

14   about regarding the retiree medical benefits, correct?

15   **A.**    He was the only one we had to go to at the mine site.

16   I know what you're saying.  But he's the guy that we had to

17   go to.

18   **Q.**    No one told you that -- you don't know if anyone at

19   CONSOL told Mr. Campbell to say that to you, correct?

20   **A.**    I have no idea.

21         MR. TORRES:  Okay.  Nothing further.

22      Thank you, Your Honor.

23         THE COURT:  Let me ask the witness, what do you

24   understand the last page to be in that questioning that Mr.

25   Torres just gave you; is it the last page of this exhibit,

1    that is, 3, Defendant's 3?

2                THE WITNESS:  Yes, sir.

3                THE COURT:  Is that what you were referring to?

4                THE WITNESS:  Yes, sir.  Well, Craig Campbell,

5    when he give us -- he come to the mine site and showed us

6    films on --

7                THE COURT:  I'm going to have you to take that

8    paper down away from the microphone.

9                THE WITNESS:  I'm sorry.  But he would show us

10   films.  He would tell us about the benefits that we had

11   selected for that year.  And he would go over and tell us

12   about our retirement plan.  But when he come down to the

13   language about -- what he's talking about there, that they

14   can terminate any time, Craig Campbell never mentioned that

15   to us.  He -- that just -- it wasn't -- he didn't mention

16   it.

17               THE COURT:  Well, what I'm asking you is, when you

18   were talking about the last page, were you talking about the

19   last page of this exhibit that I'm showing you?

20               THE WITNESS:  Yes.  Yes, this.

21               THE COURT:  Thank you.

22               THE WITNESS:  Yes.

23               THE COURT:  And when the health plan was presented

24   to this witness, it was referred to as Deposition Exhibit 7.

25   Was that intended to be Defendant's 7 in this case?

PRATER - RECROSS

```
1              MR. TORRES:  Yes, Your Honor.

2              THE COURT:  And is it offered?

3              MR. TORRES:  I believe we did offer it, Your

4      Honor.  But if not, we'd offer it now.

5              THE COURT:  And I take it there is no objection?

6              MR. POMPONIO:  No objection, Your Honor.

7              THE COURT:  It is admitted.

8              Any other questions of Mr. Prater?

9              MR. TORRES:  Nothing from defendants, Your Honor.

10             MR. POMPONIO:  Nothing from plaintiffs.

11             THE COURT:  And thank you, Mr. Prater.

12             THE WITNESS:  Thank you.

13             THE COURT:  And let me mention to you, the Court

14     would ask you not to discuss your testimony with any other

15     witness other than one of the plaintiffs in this case

16     until the trial is over, unless the Court excuses you from

17     that.  And if you or your attorney need relief from that,

18     let me know.

19             THE WITNESS:  Okay.

20             THE COURT:  And thank you.

21             THE WITNESS:  Thank you.

22             THE COURT:  You might want to retrieve the

23     exhibits.

24             MR. POMPONIO:  Your Honor, I move to admit Exhibit

25     6.  Did you admit Exhibit 6?
```

```
 1                MR. MULLINS:  Was Defendant's Exhibit 6 admitted?

 2   Yes.

 3                THE COURT:  We have -- let's go about 25 minutes

 4   longer.  We'll get started with the next witness.

 5                MR. POMPONIO:  Plaintiffs call Connie Gilbert.

 6                THE CLERK:  Ms. Gilbert, if you'd go to the

 7   lectern.

 8          Please state and spell your name for the record.

 9                MS. GILBERT:  Connie, C-O-N-N-I-E, Gilbert,

10   G-I-L-B-E-R-T.

11                 CONNIE GILBERT, PLAINTIFF, SWORN

12                THE CLERK:  Please take the stand.

13                        DIRECT EXAMINATION

14   BY MR. POMPONIO:

15   Q.   Good afternoon, Ms. Gilbert.

16   A.   Good afternoon.

17   Q.   Where do you live?

18   A.   I live in Richlands, Virginia.

19   Q.   Are you married?

20   A.   Yes.

21   Q.   What's your husband's name?

22   A.   Dana.

23   Q.   Dana?

24   A.   Yes.

25   Q.   What's your birth date and current age?
```

GILBERT - DIRECT

1    **A.**   8-26-1957, and I'm 63.

2    **Q.**   And how old is your husband, Dana?

3    **A.**   He is 69.

4    **Q.**   And are you currently retired?

5    **A.**   Yes.

6    **Q.**   When did you retire?

7    **A.**   September 30th, 2014.

8    **Q.**   The same day as Mr. Prater?

9    **A.**   Yes.

10   **Q.**   What was your occupation at the time of your

11   retirement?

12   **A.**   P&M worker.

13   **Q.**   And who was your employer?

14   **A.**   CONSOL.

15   **Q.**   And where did you work?

16   **A.**   Buchanan Mine, Maysville, Oakwood, Grundy, Buchanan

17   County.

18   **Q.**   How long did you work for CONSOL?

19   **A.**   A little over 12 years.

20   **Q.**   Were you paid a salary or on an hourly basis?

21   **A.**   Salary.

22   **Q.**   During your employment with CONSOL, were there

23   occasions when the company discussed with you or explained

24   to you your entitlement to retirement welfare benefits?

25   **A.**   Yes.

GILBERT - DIRECT

1    **Q.**    When would they have done that?

2    **A.**    The first time would have been in June of 2005 when I

3    had my 40-hour training and Terry Mason read the whole

4    thing.

5    **Q.**    And so in 2005, you started working at CONSOL, you had

6    an orientation meeting?

7    **A.**    Yeah, at Buchanan.  I worked back in the --

8    **Q.**    So when you came over to the Buchanan Mine --

9    **A.**    Yes.

10   **Q.**    -- in 2005?  And what if -- and who led this meeting --

11   or who at the meeting discussed your retirement welfare

12   benefits?

13   **A.**    Terry Mason.

14   **Q.**    And what, if anything, did Mr. Mason say about your

15   retirement welfare benefits?

16   **A.**    He said that they were good as the union, and that we'd

17   have them for life, and, you know, they was good as the

18   union's -- or -- if not better is how it went.

19   **Q.**    And what retirement welfare benefits are we talking

20   about, what coverage?

21   **A.**    We're talking medical, prescription drugs, we are

22   talking about vision and dental and life.

23   **Q.**    What was Mr. Mason's position in the company?

24   **A.**    He was the HR person at our mine.

25   **Q.**    What did you understand Mr. Mason's job was?

1   **A.**   It was Human Resources, about our benefits, any

2   difficulties that we had there, that kind of thing.

3   **Q.**   Okay.  How did Mr. Mason specifically convey this

4   information to you at the orientation meeting about the

5   retirement welfare benefits?

6   **A.**   Well, after we seen some of the slides or -- any ways,

7   it was some kind of thing like that, he gave us a three-ring

8   binder, and it had little dividers in it, but he then gave

9   us the handouts for each thing, you know, went with it, for

10   safety and retirement and all.  And he gave us a little

11   handout sheet to put in the binder about the retirement

12   benefits and our health and all of that that they give new

13   employees.

14   **Q.**   What, if anything, did Mr. Mason say about CONSOL's

15   right to terminate the retirement welfare benefits?

16   **A.**   I do not recall him saying anything about that.

17   **Q.**   Did you rely on Mr. Mason's representations about the

18   retirement welfare benefits?

19   **A.**   Yes, I did.  I had no reason to not believe he had the

20   authority.

21   **Q.**   All right.  You said that there was comparisons to, to

22   the union retirement welfare benefits.  When did that come

23   up?

24   **A.**   During some of the slide presentations and stuff like

25   that, because he knew I was coming from CONSOL union mines

GILBERT - DIRECT

1    in the area, and some of them were also in the union, about

2    10 or so employees.  And that's how that went.  And so in

3    the union, we would have medical, we would have had a small

4    insurance for life, and he already knew that we understood

5    that much.  So he was trying to explain how much better

6    CONSOL's were than the union.  I'm about to lose my breath.

7    **Q.**   And when did, when did this --

8              THE COURT:  Let me ask, would it help you if you

9    removed your mask?

10             THE WITNESS:  Well, not necessarily.  I'm on an

11   inhaler and all that kind of thing.

12             THE COURT:  Well, just feel free to do so if you

13   wish.

14             THE WITNESS:  Thank you.

15   BY MR. POMPONIO:

16   **Q.**   Do you need to take a break to access your inhaler?

17   **A.**   Well, yeah, I do.  It would help maybe.

18             THE COURT:  Do you have it with you?

19             THE WITNESS:  Yes.

20             THE COURT:  Please go ahead.

21   BY MR. POMPONIO:

22   **Q.**   Better?

23   **A.**   We can try.

24             THE COURT:  Just continue to interrupt and do that

25   if you wish.

1          THE WITNESS:  Okay.  Thank you.

2    BY MR. POMPONIO:

3    **Q.**  Are you okay?

4    **A.**  Yes.

5    **Q.**  All right.  When did Mr. Mason make these comparisons

6    to the union benefits?

7    **A.**  In the orientation class during that week.

8    **Q.**  Any other times?

9    **A.**  Not Mr. Mason, no.

10   **Q.**  Okay.  Anybody else at CONSOL?

11   **A.**  Yes.  Human Resources continued on my -- not that

12   particular time, but every year.  And then every year that

13   -- or every time that the union activity, you know,

14   escalated, then they would have us, you know, meeting again

15   and give us our union talk, they called it.

16   **Q.**  And who would conduct these union talks?

17   **A.**  It would be HR, they would do it.  And they were

18   different depending -- well, I had for HR, I had Terry

19   Mason, I had Nancy Johnson, I had Gerald Kowzan, and I had

20   Mike Adams.  And that's all within the years, you know, they

21   were different.

22   **Q.**  And what was your understanding about the positions of

23   Nancy Johnson, Gerald Kowzan, and Mike Adams?

24   **A.**  They were the HR persons.  Any time we had any

25   problems, to go to them to discuss it like that.  As far as,

1   you know, insurance or vacation time or, you know, all of

2   that.

3   Q.   At any of these meetings in which the HR managers would

4   discuss your -- compare your retirement welfare benefits to

5   the union's, what, if anything, did they say about CONSOL's

6   right to terminate those welfare benefits, retirement

7   welfare benefits?

8   A.   I don't recall anybody saying anything like that.

9   Q.   Okay.  Now, you testified that you retired in 2014; is

10  that correct?

11  A.   Correct.

12  Q.   Did you attend a meeting prior to your retirement in

13  which your retirement welfare benefits were discussed?

14  A.   I did not go to my retirement meeting.  I went to my

15  husband's, but not mine.

16  Q.   When was that retirement seminar that you went with

17  your husband?

18  A.   In 2006, when he turned 25 -- turned 55, that was the

19  standard -- any time anybody turned 55, they automatically

20  was invited to go to Pittsburgh for the retirement seminar.

21  Q.   Okay.  And who -- who led the retirement seminar in

22  2006?

23  A.   Well, I can't remember what their names were.  But they

24  were from -- they said -- they talk about they were from

25  corporate.

1    **Q.**   And what, if anything, did these -- these people from

2    corporate say about the retirement welfare benefits?

3    **A.**   They were explaining that we would have -- well, my,

4    under my husband at that time, they explained to the whole

5    group, like the other man said, they was from different

6    mines -- everybody was there from different places, so we

7    all got the same speech, that our medical and dental and all

8    of our benefits we already were getting, we would continue

9    to get them once you're retired.  And as soon as my husband

10   died, then I would get it.

11   **Q.**   Did any of these individuals from corporate at the

12   retirement seminar -- what, if anything, did they say about

13   CONSOL's right to terminate those retirement welfare

14   benefits?

15   **A.**   I don't recall anybody saying anything.

16         MR. POMPONIO:  May I have Defendant's -- yes, this

17   one.

18       May I approach, Your Honor?

19   BY MR. POMPONIO:

20   **Q.**   I'm handing you what's been marked Defendant's Exhibit

21   6.  Do you recall receiving that, a document substantially

22   similar to that at any time that you were actively working

23   at CONSOL?

24   **A.**   Well, this was for salaried employees.  And I was a P&M

25   worker.  So I was different.

1    **Q.**   How about Defendant's Exhibit Number 7?

2    **A.**   This one is for the Kentucky mine.

3    **Q.**   Let me ask you this:  Did you receive a similar

4    document called a Summary Plan Description at any time that

5    you were active?

6    **A.**   Well, possibly.

7    **Q.**   I mean, do you know or not?

8              MR. TORRES:  Objection; asked and answered, Your

9    Honor.

10             THE WITNESS:  Well, I'm going to say yes.  Yes.

11   BY MR. POMPONIO:

12   **Q.**   When would you have received that?

13   **A.**   I can't tell you when I received that.  I can't

14   remember exactly which time I would have received this.

15   **Q.**   How would you have received it?

16   **A.**   This might have got mailed.  I can't remember.  I don't

17   recall.

18             THE COURT:  Let's go back to the question.  First,

19   you initially said when asked, "possibly" was your answer.

20             THE WITNESS:  Well --

21             THE COURT:  Did you receive it or not?  Do you

22   know?

23             THE WITNESS:  Well, I want to say yes.  I mean --

24   I'm going to say yes.

25             THE COURT:  Why do you say yes?

GILBERT - DIRECT

1          THE WITNESS:  Well, I remember seeing this one

2     word, and I can't remember if this -- if I received this at

3     home or if I -- if my husband did.  That's where the

4     confusion is.

5          THE COURT:  You can develop it further.

6     BY MR. POMPONIO:

7     Q.   Okay.  Do you recall whether you received that, this

8     document we are discussing or one that's substantially

9     similar within 90 days in 2011?

10    A.   I tell you, I can't recall.

11    Q.   That's fine.  Do you recall receiving a copy of a

12    document substantially similar to this at any time after you

13    retired?

14    A.   No.  Not after I retired.

15    Q.   All right.  Did you ever come to learn that CONSOL was

16    changing your retirement?  Well, let me step back.

17         You testified that you retired September 30th, 2014,

18    correct?

19    A.   Yes.

20    Q.   And what -- what caused you to retire on that day?

21    A.   Nancy Johnson called me at home, because I was -- I had

22    been off work on my salary continuance for health reasons.

23    And she said that they was going to offer the five-year

24    plan, and they -- and if I wanted to get it, I would have to

25    retire by the end of September, because, after that, they

1    would not be available to me.

2    **Q.**    That is September of 2014?

3    **A.**    Correct.

4    **Q.**    And did you -- did you end up getting your retirement

5    welfare benefits for five years after you retired?

6    **A.**    Not the full five years, no.

7              MR. POMPONIO:  May I approach, Your Honor?

8              THE COURT:  You may.

9    BY MR. POMPONIO:

10   **Q.**    I'll hand you what's been marked as Plaintiff's Exhibit

11   Number 7.  Can you identify this document, please?

12   **A.**    Yes.

13   **Q.**    Please do that.

14   **A.**    Oh, this is -- excuse me.  This is my letter of -- they

15   offered me $8,000, which this is my second letter, because

16   the first one was $10,000.  And they prorated this one down

17   to $8,000.  And it says, "because the company is aware of

18   circumstances as to why you currently have coverage."  And

19   got me to sign off this payment, prorated.

20       But what got me about this letter was at the bottom

21   paragraph, I felt very threatened when I read it.  It says,

22   "To date, we have not received your acknowledgment form.

23   As a reminder, this acknowledgment form must be returned to

24   the Corporate Benefits Department no later than October

25   31st, 2015, in order to receive your payment."

1     And then it's in black lettering and underlined, "If

2   the acknowledgment form is not received by this date, you

3   will not receive a payment from the Company in relation to

4   this matter.  Please note that your coverage under the plan

5   will end on December 31st, 2015, regardless of whether or

6   not the acknowledgment form is returned and regardless of

7   whether you receive a payment."

8     And it was signed by Kurt Salvatori.

9   **Q.**   Okay.  And did you receive the payment that is

10   identified in Plaintiff's Exhibit 7?

11   **A.**   Yes.

12   **Q.**   Okay.  Do you currently incur medical expenses for you

13   and your husband?

14   **A.**   Yes.

15   **Q.**   Okay.  And what is your insurance situation, medical

16   insurance situation?

17   **A.**   Well, right now, we are both on Medicare and we both

18   have to have a supplement.  And the supplement for our

19   medication also.

20   **Q.**   Okay.  And what -- what's your source of income?

21   **A.**   I draw disability social security, and so does my

22   husband.

23   **Q.**   And you said you're both on Medicare, correct?

24   **A.**   Yes.

25   **Q.**   From the time that your benefits terminated in December

GILBERT - DIRECT

1    of 2015, did you have -- did you incur any costs of medical

2    insurance for a period of time after that?

3    **A.**    Yes.  My husband was under my insurance.  And at that

4    time, after he retired, he filed for Medicare, and he got

5    it.  So part of it was for Medicare.  And then my insurance

6    from CONSOL was supplement to his Medicare at that time.  So

7    when they terminated my insurance, he had to go buy some

8    supplement and then I continued on COBRA for three months,

9    which I paid almost $1,300.

10   **Q.**    So you paid COBRA for insurance for three months for

11   $1,300?

12   **A.**    Yes.

13   **Q.**    And then you went on -- then you got your disability?

14   **A.**    Yes.

15   **Q.**    And do you pay for supplement premiums for a

16   supplement?

17   **A.**    Yes.

18   **Q.**    Go ahead.

19   **A.**    Well, last year, for me -- and it's already taken out

20   of my disability check -- is about $2,000.

21   **Q.**    And what does that cover?

22   **A.**    That covers prescription and supplemental on the

23   Medicare.

24   **Q.**    And the $2,000 is for what time period?

25   **A.**    For last year, like last year it was that.  And then my

1    husband's was $2,400 for the same thing.

2    **Q.**   Okay.

3    **A.**   But we have other -- you know, you have to have your

4    co-payments, you know, and all that other.

5    **Q.**   Sure.

6            MR. POMPONIO:  No further questions, Your Honor.

7            MR. TORRES:  Your Honor, I don't believe that the

8    plaintiffs offered Exhibit 7.

9            THE COURT:  Do you offer it?

10           MR. POMPONIO:  We so move.

11           THE COURT:  And is there any objection?

12           MR. TORRES:  May I voir dire, Your Honor?

13           THE COURT:  You may.

14                       **VOIR DIRE EXAMINATION**

15   **BY MR. TORRES:**

16   **Q.**   Ms. Gilbert, do you have Plaintiff's Exhibit 7 in front

17   of you?

18   **A.**   Yes, I do.

19   **Q.**   And the first page is dated September 17, 2015,

20   correct?

21   **A.**   Correct, mm-hmm.

22   **Q.**   And it's addressed to you, correct?

23   **A.**   Yes.

24   **Q.**   And the second page is entitled "Acknowledgment,"

25   correct?

1    **A.**   Yes.

2    **Q.**   And then that's signed by you on October 4, 2015,

3    correct?

4    **A.**   Yes, mm-hmm.

5    **Q.**   Now, there is a third page there, Ms. Gilbert, and the

6    top of it says, "2011 Plan Choices."  Do you see that?

7    **A.**   Yes.

8    **Q.**   And the bottom of that says, page 2, to the right

9    there, page 2, "Connie Gilbert, Group 5."

10        Do you see that --

11   **A.**   Yes.

12   **Q.**   -- language?  Do you recall if this page that says,

13   "2011" was attached to this September 17th letter or the

14   October 4th, 2015, acknowledgment that you signed?

15   **A.**   No.  I can't recall it both.

16   **Q.**   So if you go to the fourth page of the exhibit, it's

17   another letter to you, and it's dated December 2, 2010,

18   correct?

19   **A.**   Yes.

20   **Q.**   And that one talks about benefit elections effective

21   January 1, 2011, correct?

22   **A.**   Yes, but this has got to do with when we sign up on our

23   insurance every year.

24   **Q.**   Okay.

25   **A.**   And these -- the names on here were my dependents.

1    **Q.**   Right.  And then there is a bold statement in the

2    middle of that fourth page, that says, "Please see the back

3    page of this statement for a listing of your 2011 benefit

4    elections," correct?

5    **A.**   Yes.

6    **Q.**   And if you go back to the third page, is it possible

7    that that is actually just copied backwards and that should

8    be the second page of the December 10 -- December 2nd, 2010,

9    letter?

10   **A.**   Let me check.  I say for how this come to be is we had

11   to fill out our insurance in November, and we would have got

12   a confirmation, that's what it was.

13   **Q.**   Correct.  And so it doesn't appear that the second two

14   pages of this exhibit have anything to do with the first two

15   pages, correct?

16   **A.**   These two are for the -- the offering.  Well, now, this

17   here, this is also -- this here is the second letter of the

18   offering from $10,000.

19   **Q.**   Yes.  So just so the record is clear, when you are

20   saying, "This letter," you are saying the September 17,

21   2015, letter?

22   **A.**   Yes.

23   **Q.**   That relates to the second offer?

24   **A.**   Yes.

25   **Q.**   And then the next page of the exhibit is your

GILBERT - VOIR DIRE

1    acceptance of that?

2    **A.**    Yes.

3    **Q.**    And then my only question, Ms. Gilbert, is whether

4    those two pages are separate from these other two documents

5    from 2010 and 2011?

6    **A.**    They are separate from this letter here (indicating).

7    But this -- we had this coverage, you know, prior.

8    **Q.**    I'm just trying to confirm the first two pages have

9    nothing to do with the second two pages, because they are

10    different time periods, correct?

11    **A.**    Yes.

12          MR. POMPONIO:  Your Honor, we withdraw the second

13    two pages.  That was inadvertently connected to that.

14          MR. TORRES:  With that, if they withdraw the

15    second two pages, we have no objection to Defendant's

16    Exhibit 7 -- or Plaintiff's Exhibit 7.

17          THE COURT:  The Court will let the severance take

18    place.  The first page and the reverse of it as Plaintiff's

19    7, and number that which has been attached to it as exhibit

20    7-A and mark it withdrawn.  So the record will be clear as

21    to what the discussion was about.

22          MR. POMPONIO:  And just for clarification, Judge,

23    the copies -- courtesy copies for counsel and the Court are

24    double-sided, but the actual exhibit is four pages.

25          THE COURT:  I think the record is clear as to what

 1    it is, and I'm not going to talk about it anymore.  So

 2    anything further?

 3                MR. TORRES:  Not on the exhibits, Your Honor.

 4                THE COURT:  And I take it the Plaintiff's 7 is not

 5    objected to as recast, and it is admitted.

 6                MR. TORRES:  Yes, Your Honor.

 7                THE COURT:  Thank you.

 8          **Plaintiff's Exhibit 7 admitted.**

 9                THE COURT:  Anything further of Ms. Gilbert?

10                MR. TORRES:  Your Honor, we can begin our cross.

11    I don't believe we are going to finish quickly.  So I'm

12    happy to start.  I don't know how much longer you want to

13    go.

14                THE COURT:  First of all, does the plaintiff have

15    anything further of Ms. Gilbert?

16                MR. POMPONIO:  Not at this time, Your Honor.

17                THE COURT:  And did you say that you wished to

18    begin your cross or rather defer it?

19                MR. TORRES:  I'd rather defer to tomorrow if

20    that's acceptable to Your Honor.

21                THE COURT:  We'll do that.

22          And, Ms. Gilbert, I'm going to have to have you back

23    tomorrow.

24                THE WITNESS:  Okay.

25                THE COURT:  So treat yourself as though you are on

 1   the witness stand in the sense that you're not to talk to

 2   any other individual in this case, unless the Court gives

 3   you permission to do so.  And by individuals in the case,

 4   I'm talking about everybody in the courtroom right now, all

 5   of the plaintiffs, everyone else.  Just come back tomorrow

 6   and we'll finish up.  And I hope that your trusty inhaler

 7   will get you through it.  Thank you.  And so we'll see you

 8   in the morning.

 9           THE WITNESS:  Thank you.

10           THE COURT:  And then when you leave, you can exit

11   through the courtroom door.

12           THE WITNESS:  Thank you.

13           THE COURT:  Thank you.

14           THE WITNESS:  And the seating and everything will

15   be the same tomorrow?

16           THE COURT:  I still didn't understand.

17           THE WITNESS:  The seating?

18           THE COURT:  Yes, that's correct.  You are going to

19   be back in the witness chair.

20           THE WITNESS:  Yes, that's what I'm afraid of.

21           THE COURT:  Thank you.

22           Let me ask if the parties have anything further

23   before we recess for the evening?

24           MR. PETSONK:  Nothing from the plaintiffs, Your

25   Honor.

1          MR. POMPONIO:  Can we leave our stuff here or

2    should we take it?

3          THE COURT:  You can do it, you can leave

4    everything where it is, and we'll ask that the courtroom be

5    locked once it's clear.

6       Anything further?

7          MR. PETSONK:  No.

8          THE COURT:  If not, we'll see you at 9:30 in the

9    morning.  Good night.

10          MR. POMPONIO:  Thank you, Your Honor.

11          THE CLERK:  All rise.

12       (Proceedings concluded at 5:22 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2          I, Catherine Schutte-Stant, Federal Official Realtime

 3     Court Reporter, in and for the United States District Court

 4     for the Southern District of West Virginia, do hereby

 5     certify that, pursuant to Section 753, Title 28, United

 6     States Code, the foregoing is a true and correct transcript

 7     of the stenographically reported proceedings held in the

 8     above-entitled matter and that the transcript page format is

 9     in conformance with the regulations of the Judicial

10     Conference of the United States.

11

12          s/Catherine Schutte-Stant, RDR, CRR

13          _____  February 26, 2021

14          Catherine Schutte-Stant, RDR, CRR
            Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```