```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                               AT CHARLESTON

 3      _____x
                                        :
 4      BENNY FITZWATER,                :  CIVIL ACTION
        CLARENCE BRIGHT, TERRY PRATER,  :  NO. 2:16-cv-09849
 5      EMMET CASEY, JR.,               :
        CONNIE Z. GILBERT,              :  Consolidated with:
 6      ALLAN H. JACK, SR., and,        :  CIVIL ACTION
        ROBERT H. LONG.,                :  NO. 1:17-cv-03861
 7                  Plaintiffs,         :
                                        :
 8                     -vs-             :
                                        :
 9      CONSOL ENERGY, INC.,            :
        CONSOLIDATION COAL CO.,         :
10      FOLA COAL CO., LLC,             :
        CONSOL OF KENTUCKY, INC.,       :
11      CONSOL PENNSYLVANIA COAL CO.,   :
        LLC, and KURT SALVATORI,        :
12                                      :  BENCH TRIAL
                    Defendants.         :  VOLUME II
13      _____x

14                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.,
15              SENIOR UNITED STATES DISTRICT JUDGE
                         FEBRUARY 10, 2021
16


17


18      APPEARANCES:
        FOR THE PLAINTIFFS:        SAMUEL B. PETSONK, ESQUIRE
19                                 PETSONK PLLC
                                   P. O. Box 1045
20                                 Beckley, WV  25802

21


22           Proceedings recorded by mechanical stenography,
        transcript produced by computer.
23
        _____
24              CATHERINE SCHUTTE-STANT, RDR, CRR
                   Federal Official Court Reporter
25               300 Virginia Street East, Room 6009
                     Charleston, WV 25301
```

```
 1    APPEARANCES CONTINUED:

 2    FOR THE PLAINTIFFS:        BREN J. POMPONIO, ESQUIRE
                                 LAURA DAVIDSON, ESQUIRE
 3                               Mountain State Justice, Inc.
                                 1217 Quarrier Street
 4                               Charleston, WV  25301

 5

 6

 7    FOR THE DEFENDANTS:        JOSEPH J. TORRES, ESQUIRE
                                 ALEXIS E. BATES, ESQUIRE
 8                               EMMA J. O'CONNOR, ESQUIRE
                                 KATHERINE M. FUNDERBURG, ESQUIRE
 9                               Jenner & Block LLP
                                 353 N. Clark Street
10                               Chicago, IL  60654

11

12

13    FOR THE DEFENDANTS:        MICHAEL D. MULLINS, ESQUIRE
                                 Steptoe & Johnson PLLC
14                               707 Virginia Street East
                                 17th Floor
15                               Charleston, WV 25301

16

17

18

19

20

21

22

23

24

25
```

```
1                              INDEX
      PLAINTIFF'S
2     WITNESSES         DIRECT   CROSS   REDIRECT  RECROSS   EXAMINATION

3
      CONNIE GILBERT       ^      232     281        ^          282
4     VOIR DIRE

5
      ROBERT H. LONG     284      310     334       337         ^
6

7     CLARENCE BRIGHT    339      367     387        ^          ^

8
      DEAN MICHAEL HYMES 390       ^       ^         ^          ^
9     VOIR DIRE          440

10

11


12    DEFENDANT'S
      WITNESSES         DIRECT   CROSS   REDIRECT  RECROSS   EXAMINATION
13
      (NONE)               ^       ^       ^         ^          ^
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX TO EXHIBITS

 2     PLAINTIFF'S
       EXHIBITS                              ADMITTED
 3

 4      8                                      310

 5

 6

 7     DEFENDANT'S
       EXHIBITS                   ADMITTED
 8

 9       8                                     236
         9                                     249
10      10                                     254
        11                                     261
11      12                                     264
        13                                     266
12      14                                     312
        15                                     334
13      16                                     377
        17                                     388
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (The following Bench Trial was held before the

 2     Honorable John T. Copenhaver, Jr., Senior United States

 3     District Judge, in the case of Fitzwater, et. al. versus

 4     CONSOL, et. al, on Wednesday, February 10, 2021, at

 5     Charleston, West Virginia.)

 6               P-R-O-C-E-E-D-I-N-G-S            9:51 a.m.

 7               THE CLERK:  All rise.

 8               THE COURT:  Good morning.  Please be seated.

 9     Counsel ready to proceed?

10               MR. POMPONIO:  Yes, Your Honor.

11               MR. TORRES:  Yes, Your Honor.

12          CONNIE GILBERT, PLAINTIFF, PREVIOUSLY SWORN

13                    CROSS-EXAMINATION

14     BY MR. TORRES:

15     Q.   Good morning, Ms. Gilbert.

16     A.   Good morning.

17     Q.   I just wanted to ask you a couple of questions.  You

18     described your work history at the beginning of your

19     testimony.  Do you recall that?

20     A.   Yes.

21     Q.   And I just want to make sure I got this correct.  Your

22     first -- the first time you worked for CONSOL was from '94

23     to '97; is that right?

24     A.   That's right.

25     Q.   Okay.  And then you started at Buchanan in June of
```

1   2005, correct?

2   **A.**   Correct.

3   **Q.**   Okay.  So at that point, you had worked for CONSOL

4   earlier for a three-year period, correct?

5   **A.**   Yes.

6   **Q.**   Okay.  Thank you.  And you testified that at the

7   orientation that Mr. Mason conducted, he provided you some

8   materials about CONSOL benefit plans, correct?

9   **A.**   Yes.

10   **Q.**   Ms. Gilbert, I'm handing you what's been marked as

11   Defendant's Exhibit 8, and I wanted to ask you if that

12   document looks familiar?

13   **A.**   Well, ours was a three-ring binder, and this leaflet

14   with, you know, we put in our dividers.  And I don't

15   remember it being quite this thick.

16   **Q.**   Okay.

17   **A.**   Anyway --

18   **Q.**   That's fine.  So your lawyers produced this to us, Ms.

19   Gilbert, and they indicated it came from you.

20   **A.**   Okay.

21   **Q.**   And I just wanted to -- if you look, do you see, there

22   is some numbers, if you look at the first page up on the

23   right-hand corner, MSJ003329; can you see that?

24   **A.**   Yes, at the bottom.

25   **Q.**   I'm sorry?

1    **A.**    It's down here at the bottom.

2    **Q.**    Right.  So I'm going to use those numbers so we can

3    move around the document a little easier, okay?

4    **A.**    Yes.

5    **Q.**    So if you go to page MSJ003346; when you open the

6    document, then you are at the bottom of the page.  Are you

7    there?

8    **A.**    Yes.

9    **Q.**    And there is a Post-it up in the right-hand corner with

10   some handwriting?

11   **A.**    Yes.

12   **Q.**    Is that your handwriting, Ms. Gilbert?

13   **A.**    Yes.

14   **Q.**    It is?

15   **A.**    It looks like it, yes.

16   **Q.**    Okay.  And if you go to MSJ003357, Ms. Gilbert, this

17   has the document page says, "Plan Document for and Summary

18   Plan Description of the Consolidation Coal Company

19   Comprehensive Medical Expense Benefits Plan for Production

20   and Maintenance Employees of Buchanan Mine," correct?

21   **A.**    Yes.

22   **Q.**    And at the bottom it says, there is some words, but

23   included is a date of January 1, 2005, correct?

24   **A.**    Yes.

25   **Q.**    And that was -- 2005 is the year that you went through

1    your orientation with Mr. Mason?

2    **A.**    Yes.

3    **Q.**    So do you remember this document, Ms. Gilbert, as

4    something you were provided during your orientation with Mr.

5    Mason in 2005 that you provided to your lawyers?

6    **A.**    I remember the three-ring binder.  I got that under Mr.

7    Mason.

8    **Q.**    Okay.

9    **A.**    And it was -- like I said, he gave us leaflets to fill

10   the three-ring binder in the orientation.  Now, it's

11   possible that I got this later, you know, maybe in the year

12   or something, but I originally started out with a three-ring

13   binder.

14   **Q.**    Well, if you look at -- well, Ms. Gilbert, then we just

15   established that your handwriting is in this document,

16   right?

17   **A.**    Yes.  Yes, but I don't know when that I got this

18   particular one.  What I'm saying is -- you asked me when

19   I -- Mr. Mason gave me this.  Mr. Mason did not give me

20   this.  He gave me the three-ring binder with the leaflets.

21   **Q.**    Ms. Gilbert, this is a copy of a document --

22   **A.**    Yes.

23   **Q.**    -- that your lawyers provided to us.  And I'm just

24   asking you whether you deny that this is your document or

25   not?

```
 1    A.   It looks like my document, but not the one that Terry

 2    Mason gave me is what I'm trying to tell you.

 3    Q.   Well, first, let's start off with just --

 4             MR. TORRES:  Defendants would offer Defendant's

 5    Exhibit 8, Your Honor.

 6             MR. POMPONIO:  No objection.

 7             THE COURT:  It's admitted.

 8             Defendant's Exhibit 8 admitted.

 9    BY MR. TORRES:

10    Q.   So let's go back to this question about the three-ring

11    binder, Ms. Gilbert.

12    A.   Okay.

13    Q.   You go to page MSJ003336.  Now, that page, if you are

14    looking at it -- Ms. Gilbert, are you looking at this page?

15    A.   Yes.

16    Q.   It has three holes in the page that was copied,

17    correct?

18    A.   Yes.

19    Q.   And so that page is smaller than the 8 1/2 x 11 page.

20    Did I get that correct?

21    A.   Yes.

22    Q.   So in those smaller pages, even though this is copied,

23    it doesn't look like the size of the binder Mr. Mason gave

24    to you?

25    A.   Well, it's possible.
```

1    **Q.**   Well, the document is dated 2005, Ms. Gilbert, correct?

2    **A.**   Yes.

3    **Q.**   So do you have any real reason to doubt that this isn't

4    the document Mr. Mason gave you in 2005 during your

5    orientation?

6    **A.**   Well, this was January, and I got hired in June.  I

7    don't know.

8    **Q.**   Okay.  And if you turn to MSJ003333.

9    **A.**   Okay.

10   **Q.**   It's got some highlighting, correct?

11   **A.**   Yes.

12   **Q.**   That's your highlighting?

13   **A.**   Yes, it is.

14   **Q.**   And there's highlighting on that page and there is a

15   star.  Is that your star that you made?

16   **A.**   Yes, because I was looking at the information in it.

17   **Q.**   Okay.  So let's look at this information from 2005 that

18   you produced to your lawyers and they produced to us.  So I

19   want to start with when you went to your orientation with

20   Mr. Mason.  Do you know if you were eligible for retiree

21   medical benefits at that point in time?

22   **A.**   No.

23   **Q.**   You were -- you were not?

24   **A.**   No.

25   **Q.**   Why not?

1    **A.**   I didn't have enough time in.  Prior to coming to Buck,

2    I worked at a union mine for CONSOL.  And that was a big

3    difference.  I didn't have enough time in the union.

4    **Q.**   Well, I want to ask -- and you started in Buchanan in

5    June of 2005, correct?

6    **A.**   Yes.

7    **Q.**   So let me just ask you, then, Ms. Gilbert, when you

8    started in 2005, do you remember reading any information

9    telling you that you were not eligible for retiree medical

10   benefits because you had been hired after 2004?

11   **A.**   No.

12   **Q.**   Okay.  So let's turn, Ms. Gilbert, and start at the

13   beginning here.  If you start at page 3333, Ms. Gilbert?

14   **A.**   Mm-hmm.

15   **Q.**   There is at the top of that page is a bullet point, it

16   says, "Medical Plan," correct?

17   **A.**   Yes.

18   **Q.**   And you highlighted part of that sentence, correct?

19   **A.**   Yes.

20   **Q.**   And what it says is the medical plan does not provide

21   retiree medical coverage to employees who are hired or

22   rehired after August 1, 2004.  Correct?

23   **A.**   Yes.

24   **Q.**   And were you hired after August 1 -- you were rehired

25   after August 1, 2004, correct?

1    **A.**   Well, I don't --

2    **Q.**   Yes or no, Ms. Gilbert?

3    **A.**   Yes.

4    **Q.**   Okay.  So according to this document that you had and

5    you gave to your lawyers, it told you that you weren't

6    eligible for retiree medical benefits, at least as of 2005,

7    because you had been rehired after August 1, 2004, correct?

8    **A.**   Yes, it's what it says.

9    **Q.**   Well, you highlighted it, correct?

10   **A.**   Yes.

11   **Q.**   So it's not that you missed that one; you highlighted

12   that one, right?

13   **A.**   Yes.

14   **Q.**   So when Mr. Mason allegedly promised you lifetime

15   retiree medical benefits, in fact, you weren't even eligible

16   for retiree medical benefits in 2005, correct?

17   **A.**   Apparently, according to this.  But being that it

18   was --

19   **Q.**   There is no question pending, ma'am.

20           MR. POMPONIO:  Your Honor, may the witness

21   complete her answer?

22           THE COURT:  Go ahead and say what you were about

23   to say.

24           THE WITNESS:  Well, my understanding was the

25   difference was where they bought Alum Creek out, which was

1   part of the mine I worked for CONSOL for in -- in '94 to

2   '97.  I stayed on at the union panel, so when they called me

3   to Buck, it was to clear up the union panel so they would no

4   longer be, you know, obligated to Alum Creek where they

5   bought Alum Creek out.  So I thought I was being like a new

6   hire is my understanding.  That's all I wanted to say.

7   BY MR. TORRES:

8   **Q.**   Okay.  Well, this says that you are not eligible for

9   retiree medical benefits if you're hired or rehired after

10  August 1, 2004, correct?

11  **A.**   Yes.

12  **Q.**   All right.

13  **A.**   And --

14  **Q.**   If we go back to 3357, Ms. Gilbert.  That was the

15  portion of this document that talks about medical benefits,

16  correct?

17  **A.**   What page again?

18  **Q.**   3357?

19  **A.**   57, okay.  Yes.

20  **Q.**   And we previously discussed that it's dated January 1,

21  2005, so that would have been four months before -- five

22  months before you started, correct?

23  **A.**   Yes.

24  **Q.**   Okay.  So, and then if you turn to page 3361, it has --

25  that's the beginning of the Table of Contents, correct?

 1    **A.**   3361?  Wait a minute.  Okay.

 2    **Q.**   Take your time.

 3    **A.**   I have it.

 4    **Q.**   Okay.  And so that's the Table of Contents and it runs

 5    up to page 3365.  Correct?

 6    **A.**   Mm-hmm, yes.

 7    **Q.**   And then after the Table of Contents at 3367, there is

 8    a heading that says, "Summary Plan Description," correct?

 9    **A.**   Yes.

10    **Q.**   Okay.  So we were talking about this language at the

11    beginning of the document that said you weren't eligible for

12    retiree medical benefits if you were hired or rehired after

13    the 2004 date that we talked about a moment ago, correct?

14    **A.**   Yes.

15    **Q.**   Okay.  Now, in the medical portion of this booklet--

16    let me stop for a second.  One of the things that you said

17    Mr. Mason did during the orientation is review the materials

18    that were in the binder he gave you, correct?

19    **A.**   Yes.

20    **Q.**   So that would have included, among other things, your

21    medical benefits?

22    **A.**   Correct.

23    **Q.**   Okay.  So if you turn to page 3383 of the medical plan,

24    there is a section that says, "Article II.  Eligibility."

25    **A.**   Article II?  Okay.  I got it.

1    **Q.**   And if you look at the third paragraph of the

2    eligibility section there, the first sentence says, "If your

3    most recent date of Company employment was prior to August

4    1, 2004, you and your eligible dependents may be eligible

5    for medical benefits when you retire," but you were hired

6    after August 1, 2004, correct?

7    **A.**   Yes.

8    **Q.**   Okay.  So the next sentence, "If your most recent date

9    of Company employment is on or after August 1, 2004,

10   regardless of years of Company service, you are not eligible

11   for medical benefits as a retiree under this Plan."

12   Correct?

13   **A.**   That's what it says.

14   **Q.**   Okay.  And then again, if you look at page 3387 -- are

15   you there, ma'am?

16   **A.**   Yes.

17   **Q.**   And, again, that's your highlighting there?

18   **A.**   Yes.

19   **Q.**   And that section that you highlighted says, "Limitation

20   on Eligibility for Retiree Medical Benefits."  Do you see

21   that?

22   **A.**   Yes.

23   **Q.**   And that provision says, "Notwithstanding any other

24   provision in this Plan, Retiree medical benefits will not be

25   provided under this Plan to any employee who is first

1    employed or who is reemployed on or after August 1, 2004."

2    Correct?

3    **A.**   Yes.

4    **Q.**   And you highlighted "August 1, 2004," correct?

5    **A.**   Yes.

6    **Q.**   Okay.  And that was before -- that date was before you

7    were hired in 2005, correct?

8    **A.**   Yes.

9    **Q.**   Okay.  And, again, if you turn to page 3394, there is

10   another section that you highlighted in the middle of this

11   page that says, "Retired or Totally Disabled Participants."

12   Do you see that?

13   **A.**   Yes.

14   **Q.**   And the first two words in that paragraph are

15   "Qualified retirees," correct?

16   **A.**   Yes.

17   **Q.**   And then there is a footnote that it refers you to at

18   the bottom of the page, correct?  So after "Qualified

19   retiree" there is a Number 2?

20   **A.**   Yes.

21   **Q.**   And then if you look at the bottom of the page, there

22   is a Number 2?

23   **A.**   Yes.

24   **Q.**   And that says, "To determine your qualification for

25   benefits, refer to the heading 'Effect of Retirement Upon

1    Medical Benefits in Article II,'" and that was a section you

2    were just looking at a moment ago on page 21, correct?

3    **A.**   Yes.

4    **Q.**   Okay.  Now, in addition to these various provisions

5    that explain that you were not eligible for retiree medical

6    benefits when you started at Buchanan in 2005, I want to ask

7    you about a couple of other provisions.  Turn to page

8    MSJ003371.

9    **A.**   3371.

10   **Q.**   Are you there, ma'am?

11   **A.**   Yes.

12   **Q.**   Now, at the bottom of this page there is a number

13   paragraph 21.  Do you see that?

14   **A.**   Yes.

15   **Q.**   And it says, "Termination, Suspension, Modification or

16   Amendment of the Plan," correct?

17   **A.**   Mm-hmm.

18   **Q.**   You have to say yes.

19   **A.**   Yes.

20   **Q.**   I do that all the time, too.  And this says in this

21   document that you received and provided to your lawyer, "As

22   Plan Sponsor Consolidation Coal Company reserves the right,

23   by means of resolutions adopted by its Board of Directors,

24   to terminate, suspend, modify or amend the Plan at any

25   time," correct?

GILBERT - CROSS

1   **A.**   Yes.

2   **Q.**   It goes on to say, "covering any and all active

3   employees, current or future retirees or other eligible

4   covered persons, in whole or in part of the company."

5   Correct?

6   **A.**   Yes.

7   **Q.**   And, in fact, -- I'm sorry, if you go forward to 3375,

8   ma'am.  So we are still in the section of the book dealing

9   with medical benefits, correct?

10   **A.**   Yes.

11   **Q.**   On 3375, at the bottom of that page, there is another

12   heading, "Termination, Suspension, Modification or Amendment

13   of This Plan."  Do you see that?

14   **A.**   Yes.

15   **Q.**   And again, it says, "As Plan Sponsor, Consolidation

16   Coal Company reserves the right, by means of resolutions

17   adopted by its Board of Directors, to terminate, suspend,

18   modify or amend this Plan at any time, covering any or all

19   active employees, current or future retirees or other

20   eligible covered persons, in whole or in part, of the

21   Company," correct?

22   **A.**   Yes.

23   **Q.**   So, basically, the same language you read a couple

24   pages earlier, correct?

25   **A.**   Mm-hmm.

1    Q.    Yes.  You have to say yes.

2    A.    Yes.

3    Q.    And now, if you turn back to page 3340 -- well, in

4    fairness, ma'am, let's start at page 3336, okay?

5          Are you there?

6    A.    Yes.

7    Q.    And this was one -- this was the page we were looking

8    at before where I was showing you the three holes and this

9    was a smaller page from your copy.  But this portion of the

10   booklet deals with life insurance, correct?

11   A.    Yes.

12   Q.    And so your recollection is that these three-ring

13   binders had different sections; one for life, one was for

14   medical, one was for other benefits that the company

15   provided, correct?

16   A.    Yes, mm-hmm.

17   Q.    So in the life insurance portion of this booklet --

18   now, I want you to turn to page 3340.  Are you there, ma'am?

19   And there is a section there that you highlighted also,

20   correct?

21   A.    Yes.

22   Q.    And at paragraph 17.

23   A.    Mm-hmm.  Yes.

24   Q.    And it says, "As Plan Sponsor, Consolidation Coal

25   Company reserves the right, by means of resolutions adopted

1    by its Board of Directors, to terminate, suspend, withdraw

2    or modify the Plan at any time, covering any active employee

3    or current or future retiree or other eligible covered

4    persons, in whole or in part," correct?

5    **A.**   Yes.

6    **Q.**   And you also, in addition to highlighting this, you

7    underlined some words, correct?

8    **A.**   Yes.

9    **Q.**   You underlined, "active," "current," and "future

10   retiree," correct?

11   **A.**   Yes.

12   **Q.**   And you agree that that language in the life insurance

13   section that you highlighted is the same language that we

14   read in the section of the book dealing with medical

15   benefits, correct?

16   **A.**   Yes.

17   **Q.**   Okay.  And isn't it true, Ms. Gilbert, that, in fact,

18   it wasn't until 2007 that you were told that CONSOL was

19   going to allow you to become eligible for retiree medical

20   benefits, correct?

21   **A.**   In -- I don't remember that.  I don't recall that.

22   **Q.**   Okay.  Fair enough.  Now -- excuse me.  One minute.

23   Now, you were at Buchanan for how many years, Ms. Johnson

24   [sic]?

25   **A.**   Ms. Gilbert.

GILBERT - CROSS

1    **Q.**   I'm sorry, Ms. Gilbert.  I apologize.

2    **A.**   I was there from 2005, and I retired in 2014.

3    **Q.**   Okay.  So in addition to the materials we looked at a

4    moment ago that Mr. Mason provided you during your

5    orientation, you received other documents from CONSOL during

6    your employment that talked about benefits, correct?

7    **A.**   Yes.

8    **Q.**   Okay.

9           MR. TORRES:  May I approach, Your Honor?

10          THE COURT:  You may.

11   BY MR. TORRES:

12   **Q.**   Ms. Gilbert, I'm going to give you another document.

13   You can put that one to the side for now.  This one is

14   marked as Defendant's Exhibit 9, okay?

15   **A.**   Yes.

16   **Q.**   And the first page of this document is entitled "CONSOL

17   Energy Buchanan Mine Employee Handbook," correct?

18   **A.**   Yes.

19   **Q.**   And that's your name up in the top left-hand corner,

20   correct?

21   **A.**   Yes.

22   **Q.**   And if you turn to the second page, there is a notice

23   to all Buchanan Mine employees, correct?

24   **A.**   Yes.

25   **Q.**   And it has a date of July 26, 2010, correct?

```
 1    A.    Yes.

 2    Q.    And this is your document, Ms. Gilbert?

 3    A.    Yes.

 4    Q.    And you received it from the company in or around July

 5    of 2010, correct?

 6    A.    Yes.

 7    Q.    And provided it to your lawyers in this litigation,

 8    correct?

 9    A.    Yes.

10    Q.    Okay.

11          MR. TORRES:  Your Honor, defendants move admission

12    of Exhibit 9.

13          MR. POMPONIO:  No objection.

14          THE COURT:  Admitted.

15          Defendant's Exhibit 9 admitted.

16    BY MR. TORRES:

17    Q.    Now, I just have a few questions about this document.

18    It's not as big as the last one we looked at, thankfully.

19          But if you go to -- first off, you read through this

20    document, right, Ms. Gilbert?

21    A.    Probably at some point.

22    Q.    Okay.  In fact, there is highlighting in this document.

23    If you look at page 3301, that's your highlighting, correct?

24    A.    Yes, 33?

25    Q.    3301?
```

1    **A.**    I'm sure it is, yeah.

2    **Q.**    Okay.  And on the page just to the other side or in

3    3301 and 3300 -- I'm sorry, let's back up again.

4          And if you go to the Table of Contents, so that's

5    pages -- starts at page 3296 and goes through 3298.  Right?

6    The Table of Contents?

7    **A.**    Yes.

8    **Q.**    And it has a bunch of different topics that it covers,

9    correct?

10    **A.**    Yes.

11    **Q.**    And including, if you look at page 3297, there is a

12    section on employee benefits, correct?

13    **A.**    Yes.

14    **Q.**    Okay.  Now, if you go back to page 3300, there is a

15    section at the top of that page that says, "About Your

16    Handbook," correct?

17    **A.**    Yes.

18    **Q.**    And the second paragraph says that, "The contents of

19    this handbook are presented as a matter of information only

20    and do not include the full text of the policies, procedures

21    and benefit plans," correct?

22    **A.**    Yes.

23    **Q.**    And then skipping a sentence, the third sentence is,

24    "While Consolidation Coal Company believes wholeheartedly in

25    the plans, policies, and procedures described herein, they

1    are not conditions of employment," correct?

2    **A.**    Yes.

3    **Q.**    And then the next sentence says, "Consolidation Coal

4    reserves the right to modify, revoke, or change any or all

5    such plans, policies, or procedures at any time," correct?

6    **A.**    Yes.

7    **Q.**    Okay.  And you recall seeing that when you read through

8    this document when you received it in 2010, correct?

9    **A.**    Yes.

10   **Q.**    And then yesterday your lawyer asked you whether you

11   remember receiving a retiree SPD, and he showed you a

12   document and said, have you seen something similar to that,

13   and you said you had, correct?

14   **A.**    Yeah, yes.  I said either I did or it was my husband's.

15   I remember now, yes.

16   **Q.**    Yes.  You said this wasn't the exact one but I remember

17   seeing the--

18   **A.**    He showed me the one, yes.

19   **Q.**    -- retiree SPD, and you said you couldn't remember

20   exactly when you saw it, but that you remember receiving it,

21   correct?

22   **A.**    Yes.

23   **Q.**    Now, I wasn't there, but before in this lawsuit, a

24   couple years ago, you attended a deposition, correct?

25   **A.**    Yes.

1    **Q.**   And you, before that, had turned over some documents to

2    your lawyer, correct?

3    **A.**   Yes.

4    **Q.**   And do you recall at your deposition -- tell me if you

5    recall -- you testified that before you retired, you were in

6    Nancy Johnson's office and you saw a retiree Summary Plan

7    Description and you asked Ms. Johnson for it, and she gave

8    it to you?  Do you recall that?

9    **A.**   Yes, it was a partial one.

10   **Q.**   Correct.  But the document she gave you, you gave to

11   your lawyer, correct?

12   **A.**   Yes.

13   **Q.**   Okay.  Hold on one second, please.

14          MR. TORRES:  May I approach, Your Honor?

15          THE COURT:  You may.

16   BY MR. TORRES:

17   **Q.**   Okay, Ms. Gilbert, I'm going to show you what's been

18   marked as Deposition Exhibit 10.

19          MS. BATES:  Not depo exhibit.

20          MR. TORRES:  I'm sorry.  Exhibit 10.  Forget the

21   deposition part of that.

22   BY MR. TORRES:

23   **Q.**   Does this document look familiar to you, Ms. Gilbert?

24   **A.**   Yes.

25   **Q.**   Is this the document you received from Ms. Johnson?

1    **A.**    Yes.

2    **Q.**    And you received it before you retired?

3    **A.**    Correct.  Yes.

4    **Q.**    And you remember -- I realize it's been some time ago,

5    but do you remember how -- how long before your retirement

6    you received it?

7    **A.**    No.  No, I can't.

8    **Q.**    Do you remember at your deposition saying you thought

9    it was around the time your husband retired in 2009 that you

10   received this from Ms. Johnson?  Does that ring a bell?

11   **A.**    It's possible, yes.

12   **Q.**    So possibly you received this around 2009, because

13   that's when your husband was getting ready to retire,

14   correct?

15   **A.**    Yes.

16   **Q.**    At least, that's what your recollection was at your

17   deposition, recognizing it's been some time?

18   **A.**    Yes, it wasn't the same day that he had retired, you

19   know.  It was just --

20   **Q.**    I apologize.  I didn't mean to suggest it was the same

21   day.  It was around the time he was thinking of retiring?

22   **A.**    Yes.

23   **Q.**    You saw it in Ms. Johnson's office and you asked her

24   for it?

25   **A.**    Yes.

1    **Q.**   And Ms. Johnson didn't try and -- didn't refuse to give

2    it to you; she gave it to you willing, right?

3    **A.**   Yes.

4    **Q.**   Okay.  And --

5            MR. TORRES:  Your Honor, move for admission of

6    Defendant's Exhibit 10.

7            MR. POMPONIO:  No objection.

8            THE COURT:  Admitted.

9        **Defendant's Exhibit 10 admitted.**

10   BY MR. TORRES:

11   **Q.**   And this document doesn't have -- your lawyers didn't

12   put those same numbers at the bottom of the pages like the

13   other one we looked at.

14   **A.**   Right.

15   **Q.**   So we have to work with the actual numbered pages at

16   the bottom to keep things clear.  So if you start at the

17   beginning of the document, the first page says, "Medical and

18   Prescription Drug Benefits," correct?

19   **A.**   Yes.

20   **Q.**   Okay.  And if you go into the next two pages, there is

21   a Table of Contents, correct?

22   **A.**   Correct.

23   **Q.**   And then the next page after that just has a little --

24   some writing towards the bottom with some highlighting,

25   correct?

1    **A.**    Yes.

2    **Q.**    And that's your highlighting, correct?

3    **A.**    Yes.

4    **Q.**    And if you go on to the next page then, it says, "Plan

5    Overview," right?

6    **A.**    Yes.

7    **Q.**    At the top, and then after that, it says, "The CONSOL

8    Energy Retiree Medical and Prescription Drug Expense

9    Benefits Plan," correct?  That's what it says?

10   **A.**    Yes.

11   **Q.**    And then at the bottom of this, where it says, Page 1,

12   underneath it says, "Retiree Medical and Prescription Drug

13   Plan SPD, P&M Buchanan," correct?

14   **A.**    Yes.

15   **Q.**    And, I'm sorry, I didn't mean to go backward.

16          The prior page just has the writing towards the bottom?

17   **A.**    Yes.

18   **Q.**    There is a reference there as to SPD, correct?

19   **A.**    Yes.

20   **Q.**    And it says that that stands for "Summary Plan

21   Description," correct?

22   **A.**    Summary Plan Description?  I don't see that.

23   **Q.**    So go to the second sentence says, the middle of the

24   sentence -- or second sentence -- second line says, "make up

25   the summary plan description," and there is a parenthetical

1    that says, "(the SPD)," correct?

2    **A.**    Yes.

3    **Q.**    Okay.  So this document that Ms. Johnson gave you was

4    the retiree SPD for Buchanan P&M employees, correct?

5    **A.**    Yes.

6    **Q.**    Okay.  And you received it at some point before you

7    retired from CONSOL, correct?

8    **A.**    Yes.

9    **Q.**    And I want to ask you to turn to Page 57, Ms. Gilbert.

10   Are you there?

11   **A.**    Just about.

12   **Q.**    Okay.  I don't mean to rush you.  I apologize.  Are you

13   there?

14   **A.**    Yes.

15   **Q.**    Oh, I'm sorry.  So the top of this page says, "Payment

16   of Benefits to Others," correct?

17   **A.**    Yes.

18   **Q.**    And then below that it says, "Future of the Plan,"

19   correct?

20   **A.**    Yes.

21   **Q.**    And then under that it says, "The Board of Directors of

22   CONSOL can amend, modify, suspend, or terminate all or part

23   of the Plan at any time," correct?

24   **A.**    Board of Directors?

25   **Q.**    I'm sorry?

GILBERT - CROSS

1   **A.**   Now what paragraph are you reading there?

2   **Q.**   Under the "Future of the Plan"?

3   **A.**   Okay, I got it.

4   **Q.**   Okay.  "The Board of Directors of CONSOL can amend,

5   modify, suspend, or terminate all or part of this Plan at

6   any time," correct?

7   **A.**   That's what it says.

8   **Q.**   Okay.  And if you go to the very last page of this

9   document, all the way to the back, according to the bottom

10   of this, the bottom of this page says, "page 12, Retiree

11   Life," correct?

12   **A.**   Yes.

13   **Q.**   So this section of the booklet that Ms. Gilbert -- I'm

14   sorry -- Ms. Johnson gave you dealt with life insurance,

15   correct?

16   **A.**   I'm sorry.  Life?

17   **Q.**   Correct.

18   **A.**   Let me read it here.  I'm refreshing my memory.

19   **Q.**   Oh, I'm sorry.  Take your time.

20   **A.**   To the best of my memory.

21   **Q.**   To the best of your memory, it does?

22   **A.**   Well, let me see.

23   **Q.**   Let me do it this way, Ms. Gilbert.  Make it easier.

24   This is page 12 at the bottom?

25   **A.**   It says that, yes.

1   **Q.**   Go back to page 1.  So follow those numbers at the

2   bottom back to page 1.  Just keep going backwards in the

3   document from where you are at, and let me know when you are

4   at page 1.

5   **A.**   In the beginning?

6   **Q.**   No.  No.  Start at the back and just go from page 12 to

7   page 1.

8   **A.**   Okay.  Okay.

9   **Q.**   So this page has a Post-it on to the right, correct?

10  **A.**   Yes.

11  **Q.**   And at the top it says, "Plan Overview," correct?

12  **A.**   Yes.

13  **Q.**   And then below that it says, "The CONSOL Energy Inc.

14  Retiree Life Insurance Plan ("Life Insurance Plan or Plan")

15  offers a flat dollar benefit amount to your beneficiary in

16  the event of your death," correct?

17  **A.**   Yes.

18  **Q.**   And you highlighted that sentence, correct?

19  **A.**   Yes.

20  **Q.**   So would you agree with me that the page we were

21  looking at a moment ago, page 12, is part of this booklet

22  that deals with retiree life insurance, correct?

23  **A.**   Yes.

24  **Q.**   So let's go back to page 12.  And that page in the

25  middle section says, "Future of the Plan," correct?

GILBERT - CROSS

1   A.   Yes.

2   Q.   And you highlighted that "Future of the Plan," correct?

3   A.   Yes.

4   Q.   And you highlighted the entire paragraph below it,

5   correct?

6   A.   Yes.

7   Q.   And it says, "The Board of Directors of the Company can

8   amend, modify, suspend, or terminate all or part of the Plan

9   at any time," correct?

10  A.   Yes.

11  Q.   And that's the same language that we were looking at in

12  the medical benefits section of this booklet earlier,

13  correct?

14  A.   Yes.

15  Q.   Now, you said you retired in 2014, correct?

16  A.   Correct.

17  Q.   And before you retired, you received on an annual basis

18  a Benefits Enrollment Guide from CONSOL, correct?

19  A.   Well, we sign up on our insurance every year, and, you

20  know, like that.

21  Q.   Do you remember receiving any written documents from

22  CONSOL having to do with annual enrollment?

23  A.   They gave us pamphlets to pick out our insurance every

24  year.

25  Q.   Okay.  Do you remember if any of those documents says

1     that CONSOL could terminate those benefit plans at any time?

2     **A.**   I don't recall.

3     **Q.**   Okay.

4              MR. TORRES:  May I approach, Your Honor?

5              THE COURT:  You may.

6     BY MR. TORRES:

7     **Q.**   Ms. Gilbert, I'm going to show you what's been marked

8     as Defendant's Exhibit 11.  Before I ask you -- all right.

9     Have you seen that document before, Ms. Gilbert?

10    **A.**   Yes.

11    **Q.**   Okay.  It has your handwriting on the front page,

12    correct?  It says, "Keep 2011 yr," correct?

13    **A.**   Yes.

14    **Q.**   First page says, "CONSOL Energy," and at the bottom it

15    says, "Your 2011 Benefits Enrollment Guide," correct?

16    **A.**   Yes.

17    **Q.**   And I am correct, Ms. Gilbert, that since this talks

18    about your benefits for 2011, you would have received this

19    some time in 2010, right, because you had to make your

20    decision for what your benefits were going to be the next

21    year, usually in the fall?  Does that sound right?

22    **A.**   Yes.

23    **Q.**   So you think you received this sometime in the fall of

24    2010; does that sound right?

25    **A.**   That sounds right.

1    **Q.**   Okay.

2         MR. TORRES:  Your Honor, we offer Defendant's

3    Exhibit 11.

4         MR. POMPONIO:  No objection.

5         THE COURT:  Admitted.

6    **Defendant's Exhibit 11 admitted.**

7    BY MR. TORRES:

8    **Q.**   And this document would have explained to you how your

9    benefits will look for the coming year, right, so for 2011,

10   correct?

11   **A.**   Our insurance, yes.

12   **Q.**   And at that point you were still on the active

13   insurance, because you hadn't retired yet, correct?

14   **A.**   That's correct.

15   **Q.**   And if you turn to the second page of this document,

16   the bottom it says, MSJ003597; do you see that?

17   **A.**   Yes.

18   **Q.**   And that's the Table of Contents, so it tells you

19   what's in the document, correct?

20   **A.**   Yes.

21   **Q.**   And then there is some language to the left of that; do

22   you see that?

23   **A.**   Yes.

24   **Q.**   And the second-to-last sentence there, right next to

25   the Table of Contents says, "CONSOL can amend or terminate

1    any of its benefit programs at any time and for any reason,"

2    correct?

3    A.   That's what it says.

4    Q.   And you read through this booklet, correct?

5    A.   Well, when we went to sign up for insurance, they have

6    it in the class setting.  And it was like Mr. Casey said

7    yesterday, you had first shift, second shift, and third

8    shift.  And Nancy and them come in and would go through this

9    with what the insurance would be, and we had what plans we

10   need to pick out and that kind of thing.

11   Q.   My question was just, you read through this booklet

12   when you received it?

13   A.   I didn't really pay attention to that, because when

14   they were saying --

15   Q.   Well, Ms. Gilbert, if you turn to page 3603 --

16   A.   3603.

17   Q.   -- you highlighted it there, correct?

18   A.   Yes.

19   Q.   And if you go to page 3605.  At the top there, you made

20   some notations about PPO's, correct?

21   A.   Yes.

22   Q.   And the next page, 3606, you made some notations about

23   2010, correct?

24   A.   Yes.

25   Q.   3607, if you can go there, ma'am.  You highlighted the

1   "Caremark 202" area and you circled a couple areas and made

2   some other notes?

3   **A.**   Yes.

4   **Q.**   And made some additional notations on 3608, correct?

5   **A.**   08?  Yes.

6   **Q.**   And then 3612 -- no, that's not you.

7        So, Ms. Gilbert, you read through this material,

8   correct?

9   **A.**   Well, I read through this, because this was the part

10  that we had to go and pick out our policies.  And I circled

11  these so I would know which ones that I was going to take.

12  **Q.**   And do you remember that you continued to receive these

13  types of materials up until the time that you retired,

14  correct?

15  **A.**   Yes.

16  **Q.**   Okay.

17        MR. TORRES:  May I approach, Your Honor?

18  BY MR. TORRES:

19  **Q.**   Ms. Gilbert, I'm going to show you what's been marked

20  Defendant's Exhibit 12, and ask you if you're familiar with

21  that document?

22  **A.**   Yes.

23  **Q.**   That's your handwriting on the top first page?

24  **A.**   Yes.

25  **Q.**   Is that correct?

GILBERT - CROSS

1    **A.**    Yes.

2    **Q.**    Okay.  And this one says, "Your 2012 Benefits

3    Enrollment Guide," correct?

4    **A.**    Yes.

5    **Q.**    At the top?

6    **A.**    Yes.

7    **Q.**    And, again, since this talks about benefits for 2012,

8    you would have received it sometime in 2011, correct?

9    **A.**    Yes.

10            MR. TORRES:  We would offer Defendant's Exhibit

11   12, Your Honor.

12            MR. POMPONIO:  No objections.

13            THE COURT:  Admitted.

14        **Defendant's Exhibit 12 admitted.**

15   BY MR. TORRES:

16   **Q.**    And, again, if you turn to the second page of this

17   document, Ms. Gilbert, there is a Table of Contents again,

18   correct?

19   **A.**    Correct.

20   **Q.**    And, again, if you look to the left of that, there is

21   some language, correct?

22   **A.**    Yes.

23   **Q.**    And the second to the last sentence says, "CONSOL can

24   amend or terminate any of its benefit programs at any time

25   for any reason," correct?

1    **A.**   Yes.

2         MR. TORRES:  May I approach, Your Honor?

3         THE COURT:  You may.

4    BY MR. TORRES:

5    **Q.**   Ms. Gilbert, I'm going to show you what's been marked

6    Defendant's Exhibit 13.  Are you familiar with this

7    document?

8    **A.**   2013.

9    **Q.**   Why don't you turn to page 3646.

10   **A.**   Yeah.

11   **Q.**   That's your handwriting on the top, correct?

12   **A.**   Yes.

13   **Q.**   And this -- the first page of this one says, "CONSOL

14   Energy" at the top, correct?

15   **A.**   Yes.

16   **Q.**   And it says, "Your 2014 Benefits Enrollment Guide,"

17   correct?

18   **A.**   Yes.

19   **Q.**   And again, because this is for 2014, you would have

20   received this in 2013, which was the year before you

21   retired, correct?

22   **A.**   Yes.

23        MR. TORRES:  Defendants move admission of

24   Defendant's 13, Your Honor.

25        MR. POMPONIO:  No objection.

```
 1              THE COURT:  Admitted.

 2         Defendant's Exhibit 13 admitted.

 3    BY MR. TORRES:

 4    Q.   And again, turn to the second page, Ms. Gilbert, where

 5    the Table of Contents is.  Are you there?

 6    A.   Yes.

 7    Q.   There is some language to the left, it says, "Here's

 8    What's Inside," and under that there is some language,

 9    correct?

10    A.   Yes.

11    Q.   And again, I'm sorry, it's a little bit fainter because

12    of the green color, but the second-to-last sentence on that,

13    in that area again says, "CONSOL can amend or terminate any

14    of its benefit programs at any time and for any reason,"

15    correct?

16    A.   That's what it says.

17    Q.   And again, when you received this document and getting

18    ready to enroll for your benefits, you reviewed it, correct?

19    A.   I didn't -- I reviewed this (indicating).

20    Q.   You didn't read that.  No one told you to ignore it,

21    correct?

22    A.   No.

23    Q.   And you made notes throughout this as you were looking

24    at your benefits, correct?

25    A.   Yeah.
```

1   **Q.**   Did I get that right?

2   **A.**   Yes.

3   **Q.**   Okay, thank you.  So, Ms. Gilbert, so now we've looked

4   at the handbook Mr. Mason gave you in 2005, correct?

5   **A.**   Yes.

6   **Q.**   We've looked at the handbook you got from Buchanan in

7   2010, correct?

8   **A.**   Yes.

9   **Q.**   We have looked at the retiree SPD that you got sometime

10  around 2009 -- and, again, I'm not trying to hold you to a

11  specific -- when your husband was thinking of retiring,

12  correct?

13  **A.**   Yes.

14  **Q.**   And we've looked at some Enrollment Guides you received

15  in 2010, 2011, and 2013, correct?

16  **A.**   Yes.

17  **Q.**   And all of those documents, one way or the other,

18  stated that CONSOL reserved the right to terminate benefits

19  at any time and for any reason, correct?

20  **A.**   That's what they say.

21  **Q.**   Okay.  And so when Mr. Mason was describing your

22  benefits during that initial orientation, your lawyer asked

23  you if he discussed the reservation of rights, and I think

24  your answer was you don't recall?

25  **A.**   I can't recall he ever did, no.

1    **Q.**   Okay.  So it's possible he pointed it out; you just

2    don't recall sitting here today?

3    **A.**   I don't recall.

4    **Q.**   Okay.  Fair enough.  And then in these comparisons --

5    or the comparisons that you said Mr. Mason made about the

6    UMWA benefits, do you remember what years that occurred in?

7    **A.**   It would have been 2005, when he was teaching the

8    class.

9    **Q.**   After 2005, you testified yesterday there were other

10   times when they made comparisons between UMWA and CONSOL

11   benefits?

12   **A.**   Yes.

13   **Q.**   So that would have been during the same time you were

14   receiving documents from CONSOL telling you that they

15   reserved the right to terminate the benefits at any time,

16   correct?

17   **A.**   That's what we did, yes.

18   **Q.**   That's correct?

19   **A.**   Yes.

20   **Q.**   Okay.  And I had a question about the discussions

21   you -- or your testimony yesterday about Mr. Mason.  You

22   were -- you said that when Mr. Mason was comparing the

23   CONSOL benefits to the UMWA, that he knew what you knew

24   about the UMWA benefits or something to that effect?

25        Do you recall that testimony?

GILBERT - CROSS

1    **A.**    Yes.

2    **Q.**    I wasn't sure what you actually meant by that.

3          Did you ask Mr. Mason what he knew, or was this just

4    your assumption?  I just want to make sure I'm clear.

5    **A.**    I didn't specifically ask him, but he had worked

6    through the -- in and around the union people, and he knew

7    that CONSOL had bought out Alum Creek and all the union

8    people had to come to Buck.

9    **Q.**    Okay.  So that's what you were referring to?

10   **A.**    Yes, because he was the one that cleared up the union

11   panel that I was on.

12   **Q.**    Okay.  So he knew that you were formerly a union

13   employee; that's what you meant?

14   **A.**    Yes.  Yes.

15   **Q.**    Okay.  But he never told you that CONSOL benefits were

16   going to be guaranteed like the UMWA's benefits, correct?

17   **A.**    Yes.

18   **Q.**    He did?

19   **A.**    Yes.

20   **Q.**    Okay.  Even though he was also giving you a document

21   that said CONSOL could terminate these benefits at any time?

22   **A.**    Well, all I know is what he said.

23   **Q.**    Okay.

24   **A.**    He said that -- he said that their benefits was good as

25   the union's, if not better.

1    **Q.**   Okay.  Well, if that's all Mr. Mason said; he didn't

2    actually say they were guaranteed, correct?  He just said

3    they were the same, if not better?  That's your testimony?

4    **A.**   Well, that's -- I'm telling you that the

5    interpretation, being that he meant that -- the

6    interpretation he gave us.

7    **Q.**   Got it.  So let me just get this straight.

8        What Mr. Mason actually said, as you recall, is that

9    the benefits were the same, if not better, correct?

10   **A.**   The same, if not better.

11   **Q.**   Right.  And you interpreted what Mr. Mason said to

12   believe that he was saying that they were somehow

13   guaranteed?  Correct?  That's really what happened, isn't

14   it?

15   **A.**   He didn't specify that they weren't going to be

16   guaranteed like the union.

17   **Q.**   He didn't say, "guaranteed," correct?

18   **A.**   He didn't specify.

19   **Q.**   He didn't say the word "guarantee," Ms. Gilbert; isn't

20   that correct?

21   **A.**   I can't recall that exactly.  He said they were going

22   to be as good as -- as the union's, if not better.  That's

23   what I'm --

24   **Q.**   And you interpreted that to mean that the benefits were

25   guaranteed?

1    **A.**   Yes.

2    **Q.**   Okay.  Thank you for clearing that up.  And also, so

3    I'm clear, was Mr. Mason the person who conducted all of

4    those presentations you testified to yesterday we were

5    talking about the comparison between benefits, the UMWA

6    benefits and CONSOL benefits?

7    **A.**   No.  This was only in the orientation that Mr. Mason --

8    **Q.**   Okay.  And so that's what I just want to make clear.

9    So after -- so Mr. Mason just did the initial orientation;

10   is that correct?

11   **A.**   For me, yes.

12   **Q.**   Okay.  And so these other -- these other meetings that

13   you testified to where they were making comparisons after

14   that, were those the ones that Mr. Kowzan presented?  I'm

15   just trying to understand who was doing the other

16   presentations.

17   **A.**   Okay.  I had -- after Terry, I had Nancy Johnson; I had

18   Gerald Kowzan with Nancy a lot of times; I had Mike Adams.

19   **Q.**   Okay.  And those are the people you mentioned yesterday

20   and that's what I was just trying to clear up.  Those are

21   the people who would have done the subsequent presentations

22   after your initial orientation?

23   **A.**   Yes.

24   **Q.**   Got it.  And am I correct that, like Mr. Mason, none of

25   those said that CONSOL benefits were guaranteed; they were

1   saying again the CONSOL benefits were just as good, if not

2   better, than the UMWA benefits?  Did I get that right?

3   **A.**   Yes.

4   **Q.**   And then you interpreted that to mean they were

5   guaranteed, correct?

6   **A.**   Yes.

7   **Q.**   Okay.  And when your lawyer was asking you about these

8   presentations about the comparisons between UMWA and CONSOL,

9   he asked you whether in the course of that presentation

10  anyone mentioned a reservation of rights clause, correct?

11  And you said, "No"?

12  **A.**   Well, I can't remember.  I mean, nobody told us, you

13  know.

14  **Q.**   Okay.  Again, I'm not quibbling with you.  Yesterday,

15  he asked you during these presentations, did anybody mention

16  a reservation of rights clause, and you said, "No"?

17  **A.**   No.

18  **Q.**   You were receiving documents during this period of time

19  that included reservation of rights language that we just

20  established, right?

21  **A.**   Apparently, I was, yes.

22  **Q.**   And, again, he asked you about the retirement seminar

23  that you attended with your husband?

24  **A.**   Yes.

25  **Q.**   And he asked you again, did anyone during that

1    retirement seminar -- when did you attend that seminar with

2    your husband?

3    **A.**    2006.

4    **Q.**    Thank you.  And again, he asked you, did anyone say

5    anything about the reservation of rights clause, and you

6    said, "No."  Correct?

7    **A.**    That's correct.

8    **Q.**    But I think you'll agree with me that during this

9    period, you were -- before and after that seminar, you were

10   receiving documents from CONSOL saying they could terminate

11   the benefits at any time for any reason, correct?

12   **A.**    Yes.

13   **Q.**    And then if I understand correctly, you said that you

14   retired in September of 2014, correct?

15   **A.**    Yes.

16   **Q.**    And at that point, CONSOL had already announced that it

17   was going to eliminate the benefits after five years,

18   correct?

19   **A.**    After five years.  That's what I was told.

20   **Q.**    Right.  And then within a fairly short period of time,

21   they sent another letter saying, it's not going to be five

22   years; it's going to be the end of 2015, correct?

23   **A.**    Yes.  In June.

24   **Q.**    June of 2015?

25   **A.**    Mm-hmm.

1    **Q.**   So nine months after you retired, they told you, we are

2    not doing this for five years; it's just all gone, right?

3    **A.**   Yes.

4    **Q.**   And so by the time you actually retired that, that was

5    all -- CONSOL had already made that announcement.  That's

6    why you were retiring.  Nancy Johnson called and said, this

7    is happening, and so if you want to get benefits for five

8    years, you should retire, correct?

9    **A.**   Yes.

10   **Q.**   And so then I think your counsel asked you if you had

11   received any documents from CONSOL after you retired, so I

12   guess in September 2014, and you said, "No."  Correct?

13   **A.**   Yes, I didn't -- I don't remember that Summary Plan

14   Description he tried to show me yesterday.

15   **Q.**   But the Summary Plan Description that I showed you

16   today was the one for Buchanan P&M, and you received that

17   before CONSOL announced it was terminating these benefits,

18   correct?

19   **A.**   At one point, when we talked about it.  I couldn't

20   remember when, though.

21   **Q.**   Right.  Well, it was sometime before you retired?

22   **A.**   Yes.

23   **Q.**   And you thought it was sometime around when your

24   husband was thinking of retiring?

25   **A.**   Yes.

GILBERT - CROSS

1  **Q.**   And, again, that was before you decided to retire,

2  correct?

3  **A.**   Yes.

4  **Q.**   Okay.  Where did your husband work?

5  **A.**   He worked at Alum Creek and then he -- then when CONSOL

6  bought them out, they kept everybody on, and he went from

7  the -- from there to Buck.

8  **Q.**   Got it.  And then your lawyer was asking you some

9  questions about how much it's cost you to have coverage

10  after CONSOL terminated benefits.  Do you remember that?

11  **A.**   Yes.

12  **Q.**   So just so we are clear, at the time that you retired

13  in September of 2014, how much a month were you paying for

14  your medical insurance?

15  **A.**   I'd have to look back through this to find out.

16  **Q.**   It's not a memory test, Ms. Gilbert.  If you don't

17  recall, that's fine.  I just didn't know if you remembered.

18  Was it a monthly premium you were paying?

19  **A.**   It was all during my working time, and so it was every

20  two weeks, I was paying.

21  **Q.**   Okay.  Do you know when you retired -- so after you

22  said, I'm leaving, in September of 2014, did you continue to

23  have to pay for your medical insurance?

24  **A.**   No, I don't believe I did.  I can't remember that I

25  did.  And I paid for -- only thing I paid for was -- after

GILBERT - CROSS

1    2015, I had to pay for the COBRA.

2    **Q.**   We'll get to the COBRA in a second.  I wanted to

3    understand, between September of 2014 and when you retired

4    in June 2015, when they terminated benefits, whether you

5    were continuing to pay something on a monthly basis for

6    medical insurance?

7    **A.**   I don't recall paying, but I had insurance.

8    **Q.**   Okay.  Was your husband paying for his medical

9    insurance?

10   **A.**   No, he was on mine.

11   **Q.**   He was on yours.  And you just don't recall if you were

12   paying or not?

13   **A.**   No.

14   **Q.**   And then on the COBRA, you said you paid $1,300, and I

15   wasn't clear, was that per month or in total?

16   **A.**   That was for the three-month period.

17   **Q.**   So that covered the three months after CONSOL

18   terminated benefits?

19   **A.**   Yeah.  And that was just for me.

20   **Q.**   Just for you, okay.  And then -- so you don't think you

21   were paying for your medical insurance, and then you paid

22   for COBRA for three months.  And then you were talking about

23   your Medicare supplement that you purchased afterwards,

24   correct?

25   **A.**   Yes.

1    **Q.**   And it's your testimony that you would not have paid

2    that if you were still on CONSOL's medical benefits?

3    **A.**   Not for my supplement, not for the supplement, because

4    when I retired, I -- I got my medical insurance for up until

5    they took it away.

6    **Q.**   Okay.  I just want to be clear.  Your testimony is that

7    the -- whatever you were paying for the Medicare supplement,

8    you believe would have been covered if CONSOL hadn't

9    terminated its benefits?

10   **A.**   Yes.  For the supplement part.

11   **Q.**   For the supplement part, got you.  And other than the

12   supplement -- how much was the supplement costing you?

13   **A.**   Last year, it was around $2,000 for mine, and it was

14   about $2,400 for my husband.

15   **Q.**   And that's $2,000 a year, or a month?

16   **A.**   No, it was for the year.

17   **Q.**   Okay.  Do you know if that's the same amount you were

18   paying in prior years, or you just don't recall?

19   **A.**   I don't believe it was the same amount.  It seems like

20   it went up -- I really don't recall without looking at my

21   paperwork.

22   **Q.**   Okay.

23          MR. TORRES:  Can I have just a minute, Your Honor?

24          THE COURT:  Yes.

25          (Pause.)

GILBERT - CROSS

1    BY MR. TORRES:

2    **Q.**    Sorry about the Medicare supplement questions.  The

3    $2,000 that you are paying for the Medicare supplement,

4    that's coming out of your social security; is that correct?

5    **A.**    Yes.

6    **Q.**    Okay.  And the $2,400 is coming out of your husband's

7    social security?

8    **A.**    Yes.

9    **Q.**    Other than that supplement, are there other moneys that

10   you believe you're paying because CONSOL terminated the

11   benefits?

12   **A.**    Well, we have our out-of-pocket, every time we go, for

13   co-pays and all that type of thing, that Medicare would not

14   cover, the supplement would not cover.  We have to come up

15   with it.

16   **Q.**    But under the CONSOL retiree medical plan, there were

17   co-pays and things like that, correct?

18   **A.**    Yes.

19   **Q.**    Okay.  So you don't know the difference between what

20   your co-pay is now versus what it would have been under the

21   retiree benefit plan?

22   **A.**    No.

23   **Q.**    No?

24   **A.**    No.

25   **Q.**    Okay.  So going back to Mr. Mason and these other

1    people that you identified today, you would agree with me,

2    Ms. Gilbert, that no one from CONSOL ever told you that Mr.

3    Mason had any authority to change the terms of CONSOL's

4    written benefits plan, correct?

5    **A.**    Not to my knowledge.

6    **Q.**    Okay.  And the same is true for Mr. Kowzan, right, no

7    one ever told you he had any authority to change the terms

8    of the written benefits plan?

9    **A.**    No one ever said any of them had any authority or --

10    well, they didn't tell us -- I don't know what kind of

11    classes they went through.  All I know is what me and you

12    talked, what you are telling me, you know.

13    **Q.**    But I'm just asking you so we are clear.  No one ever

14    told you that Mr. Mason had authority to change the written

15    benefits plan, correct?

16    **A.**    No.  And nobody questioned it.

17    **Q.**    And no one ever told you Mr. Kowzan had any such

18    authority, correct?

19    **A.**    No.  They just said they were the representatives we go

20    to.

21    **Q.**    No one ever told you that Ms. Johnson had authority to

22    alter the written benefits plan?

23    **A.**    It would be the same thing; it was the one we went to.

24    **Q.**    And no one said that about Mr. Adams, correct?

25    **A.**    Mr. Who?

GILBERT - CROSS

1    **Q.**   Mr. Adams?

2    **A.**   No.  The same thing.

3    **Q.**   And you don't have any knowledge that anyone at CONSOL

4    ever told any of these individuals you named to lie about

5    CONSOL's benefit plans, correct?

6    **A.**   Not to my knowledge.

7    **Q.**   And you don't know if anyone from CONSOL told these

8    individuals to make any misrepresentations to you regarding

9    your benefit plans, correct?

10   **A.**   I had no idea of what classes they went to.  They had

11   their own classes for their training.

12   **Q.**   My question is:  But you don't know -- you have no

13   knowledge that CONSOL ever told them to go out and lie about

14   these benefits?

15   **A.**   No, I have no knowledge.

16   **Q.**   And/or that CONSOL told them to make misrepresentations

17   about these benefits; you don't have any knowledge that

18   CONSOL ever did that, correct?

19   **A.**   No.

20   **Q.**   And you don't know if CONSOL told any of these

21   individuals to promise you lifetime benefits, correct?

22   **A.**   I have no -- no.

23   **Q.**   You don't know if CONSOL told these individuals to make

24   any misrepresentations to you, correct?

25   **A.**   No.

1    **Q.**   And you don't know if CONSOL ever told these

2    individuals that they had any authority to change any of the

3    written terms of CONSOL's written benefit plan, correct?

4    **A.**   That's correct.

5    **Q.**   Okay.  All right.

6         MR. TORRES:  Thank you, Ms. Gilbert.

7         Your Honor, I have no further questions.

8                    **REDIRECT EXAMINATION**

9    **BY MR. POMPONIO:**

10   **Q.**   Ms. Gilbert, could you turn to Defendant's Exhibit

11   Number 8, please.

12   **A.**   8?  Okay.

13   **Q.**   Do you recall during your testimony -- if you turn to

14   page 3333, MSJ003333?

15   **A.**   3333, what?  All right.

16   **Q.**   You were asked some questions about that highlighted

17   section, correct?

18   **A.**   Yes.

19   **Q.**   If you turn to page 3340, you highlighted that section

20   as well, correct?

21   **A.**   Yes.

22   **Q.**   Do you recall when you made -- when you highlighted

23   these parts of this?  Was it contemporaneously when you

24   received it or was it at a later date?

25   **A.**   Best I can remember was after we found out that they

1    was going to take our insurance and that kind of thing, I

2    was just going through then seeing where -- if my husband or

3    I, either one, qualified for insurance, which it was the

4    things like that, I was going through and trying to

5    understand it.

6    **Q.**   Okay.  Thank you.  Nothing further.

7          MR. TORRES:  No further questions, Your Honor.

8                           **EXAMINATION**

9    **BY THE COURT:**

10   **Q.**   Let me ask you to expand on what you just stated with

11   respect to the highlighting that was specifically asked

12   regarding pages 33, I'll call them, for you.

13         When is it that those were highlighted?  Do you know?

14   **A.**   It was after I retired.

15   **Q.**   Thank you.

16         THE COURT:  Anything further?

17         MR. TORRES:  No.  We are fine, Your Honor.  Thank

18   you.

19         THE COURT:  Anything further, Mr. Pomponio?

20         MR. POMPONIO:  Nothing, Your Honor.

21         THE COURT:  And may Ms. Gilbert be excused?

22         MR. POMPONIO:  Yes, Your Honor.

23         THE COURT:  Mr. Torres, may Ms. Gilbert be

24   excused?

25         MR. TORRES:  Yes, Your Honor.

1          THE COURT:  Let met ask you to not discuss your

2   testimony with any other witness in this case, except the

3   other parties, until we finish this trial, Ms. Gilbert.

4      And I thank you very much for being with us.  You're

5   excused.

6          THE WITNESS:  Thank you.

7          THE COURT:  The next witness.

8          MR. PETSONK:  Your Honor, the plaintiffs would

9   call Bob Long.

10          If possible, Your Honor, I think the parties would

11   benefit for a minute to swap out documents.

12          THE COURT:  Go ahead.

13          MR. PETSONK:  Your Honor, may I step to the side

14   as the defendants are doing this?

15          THE COURT:  You may.

16          THE CLERK:  Mr. Long, if you'd please take the

17   lectern.  Please raise your right hand to be sworn.

18          **ROBERT HEISLEY LONG, PLAINTIFF, SWORN**

19          THE CLERK:  Will you please state your full name

20   for the record and spell it.

21          THE WITNESS:  Robert, R-O-B-E-R-T, Heisley,

22   H-E-I-S-L-E-Y, Long, L-O-N-G.

23          THE CLERK:  Thank you.  And if you would please

24   take the stand.

25

```
 1                      DIRECT EXAMINATION

 2    BY MR. PETSONK:

 3    Q.   Are you situated, Mr. Long?

 4    A.   Yes, sir.

 5    Q.   Thank you.  Where do you reside?

 6    A.   I live in McMurray, Pennsylvania.

 7    Q.   Are you married?

 8    A.   Yes.

 9    Q.   What is your birth date?

10    A.   June 10th, 1948.

11    Q.   And so what's your current age?

12    A.   72.

13    Q.   And are you currently retired?

14    A.   Yes.

15    Q.   When were you last employed?

16    A.   2008.

17    Q.   And who was your employer at that time?

18    A.   Alpha Natural Resources.

19    Q.   And where were you employed before Alpha?

20    A.   84 Mining Company, which was run by CONSOL Energy.

21    Q.   And how long did you work for CONSOL Energy?

22    A.   35 years total.

23    Q.   And where -- and where was the location that you last

24    worked for CONSOL?

25    A.   Last worked for CONSOL at Mine 84.
```

1    **Q.**   And where is that geographically?

2    **A.**   It's in Washington County, Pennsylvania.

3    **Q.**   And how long did you work there?

4    **A.**   Three years.

5    **Q.**   And where did you work next before that?

6    **A.**   I worked at Enlow Fork Mining Company.

7    **Q.**   And who was your employer there?

8    **A.**   CONSOL Energy.

9    **Q.**   And how long did you work -- where was that location?

10   **A.**   That was in Greene County and Washington County,

11   splitting counties, in southwestern, Pennsylvania.

12   **Q.**   And how long did you work at that location?

13   **A.**   Approximately, nine years.

14   **Q.**   And were you paid -- during the entire time that you

15   worked for CONSOL, were you paid on a salaried or an hourly

16   basis, or was it both?

17   **A.**   I was in the union for two years, which would have been

18   an hourly base.  The other 33 years with CONSOL was salary.

19   **Q.**   During your employment with CONSOL, were there

20   occasions when the company discussed with you or explained

21   to you about your entitlement to retiree welfare benefits?

22   **A.**   Yes.

23   **Q.**   And can you list those occasions for me first, and then

24   I'll ask you some questions about them in turn.  What was

25   the first occasion when CONSOL discussed with you or

1    explained to you about your entitlement to retirement

2    welfare benefits?

3    **A.**    Yes, sir.  In 1969, I was employed by Pittsburgh Coal

4    Company, which was a division of Consolidation Coal Company.

5    My first introduction to the healthcare benefits that they

6    provided was with the Human Resources person, and that was

7    located in Albury, Pennsylvania.

8    **Q.**    And I'll come back to that.  What was the next occasion

9    when CONSOL discussed with or explained to you about your

10   entitlement to retirement welfare benefits as you remember?

11   **A.**    That was when I was called to go to Enlow Fork Mining

12   Company.

13   **Q.**    And I'll ask you about that.  What was the next

14   occasion after that initial -- well, let me ask you, what

15   was the setting in which you were presented or explained

16   about your retiree welfare benefits when you came to work at

17   Enlow Fork Coal Mine?

18   **A.**    Enlow Fork, traditionally, when they were hiring or

19   ramping up hires for the new operation, any employee had to

20   be -- whether they be applying for a P&M job or management

21   job, had to start as a P&M.  So my initial benefits review

22   was in 1991, with all the other newly hired employees.

23   **Q.**    Okay.  I'll ask you more about that in a moment.

24   **A.**    However --

25   **Q.**    What is the next occasion where you recall that CONSOL

 1   discussed with or explained to you about your entitlement to

 2   retirement welfare benefits after that initial point that

 3   you referenced in 1991?

 4   A.   There were several occasions -- you have to remember

 5   that, that Enlow, in most mining operations that they

 6   conducted, they had weekly meetings, which they would have

 7   the safety personnel, they would have HR, the mine

 8   superintendent would always speak every Wednesday, and they

 9   would just discuss, you know, conditions at the mine, any

10   pertinent changes that were upcoming, production.  And they

11   were there to answer any questions that anybody may have.

12   Q.   Okay.  And were there any other occasions after that

13   where you recall discussing retirement welfare benefits with

14   a -- with CONSOL -- or let me rephrase.

15        Were there any occasions after that where you recall

16   CONSOL discussed with you or explained to you your

17   entitlement to retirement welfare benefits after that,

18   setting aside those periodic meetings?

19   A.   Well, I was fortunate that Enlow Fork as most of the

20   mines that I worked in, I had a good working relationship

21   with most managers there.

22   Q.   Did you recall that there were any other occasions when

23   CONSOL discussed with or explained to you your retirement

24   welfare benefits?

25   A.   Well, I'm trying to get to that.  What I'm saying is

 1    that I could got to Luke Gianato, the HR representative of

 2    the mine, with any questions I may have, and we often

 3    discussed things informally.

 4    **Q.**   So going with your first reference to 1969, you stated

 5    that CONSOL explained to you your eligibility for your

 6    entitlement to retirement welfare benefits at that time.

 7    Who explained that to you at that time?

 8    **A.**   I'm sorry to say I don't remember.

 9    **Q.**   Do you remember what that person's position was with

10    the company?

11    **A.**   He was the HR representative for Pittsburgh Coal.

12    **Q.**   And what, if anything, did he tell you about those

13    retirement welfare benefits at that time?

14    **A.**   Well, he reviewed all the healthcare benefits,

15    prescription drugs, eye, vision, dental, healthcare

16    insurance, long-term insurance, disability insurance.  They

17    had gone over all of those, all of those programs and the

18    eligibility requirements were the same.

19    **Q.**   And what did he say to you about those eligibility

20    requirements as to the retirement welfare benefits?

21    **A.**   If you attained the age of 55 and had worked, I believe

22    it was 10 years back then, you were able to receive benefits

23    after that.

24    **Q.**   Were those -- did you consider -- what factors did you

25    consider in deciding to become a foreman for CONSOL?

1    **A.**   Well, in 19 -- in the late '60s, there was a lot of

2    turmoil in the industry.  Unions, quite frequently, would go

3    on strike at a drop of a hat.  Somebody dumped their bucket

4    of water out and people would leave.  And you would miss

5    three days work.  I got married in 1969 and I wanted a

6    steady income.  I wanted the ability to have an investment

7    plan and provide for my family in the future.  So that was

8    the impetus for me going on salary.

9    **Q.**   Did you have to pay any premiums in order to receive

10   health insurance when you went on salary?

11   **A.**   Yes, sir.  I paid healthcare premiums for the entire 35

12   years.

13   **Q.**   Okay.  What if anything else did the individual from

14   Human Resources say to you in your initial meeting in 1969,

15   about the -- your entitlement to retirement welfare

16   benefits?

17   **A.**   In 1969, industry-wide, it was known that CONSOL was

18   probably the best coal company in the industry

19   benefits-wise.  They were -- that was a core value of the

20   company, and had been, for the most part of the time that I

21   worked for them.  So I --

22   **Q.**   I'm just asking you what if anything else that Human

23   Resources --

24            MR. TORRES:  Objection, Your Honor; move to

25   strike.  He lacks foundation to testify as to the industry

1      or the corporate knowledge of CONSOL.

2              THE COURT:  As to the foundation, that portion of

3      the response is stricken.

4          You may start anew.

5      BY MR. PETSONK:

6      Q.   Mr. Long, what if anything else beyond -- you testified

7      that the individual from Human Resources informed you that

8      you had to attain the age of 55 and reach 10 years of

9      service with CONSOL in order to retire with welfare

10     retirement benefits; is that accurate?

11     A.   That's correct.

12     Q.   Did that individual state to you that CONSOL reserved

13     the right to terminate retirement welfare benefits after you

14     retired?

15     A.   No, sir.

16     Q.   What else, if anything, did that individual say to you

17     about your entitlement to retirement welfare benefits?  I

18     don't mean to -- I'm just asking you what you remember.  And

19     it may be that you do not remember anything further.

20     A.   I remember the fact that I reviewed the entire benefit

21     packet.  I found it to be substantial insurance.  And I was

22     reassured by the HR personnel there that it was, and I was

23     quite satisfied with that.

24     Q.   What was the next occasion when you recall that CONSOL

25     discussed or explained to you your entitlement to retirement

1   welfare benefits?

2   **A.**   That would have been at Enlow Fork, the initiation

3   process that everybody had gone through.

4          THE COURT:   What year are we speaking of?

5   BY MR. PETSONK:

6   **Q.**   What year are you speaking of?

7   **A.**   Oh, I'm sorry, sir.   That would have been in 1991.

8          THE COURT:   Thank you.

9   BY MR. PETSONK:

10  **Q.**   You said an initiation process.   Who attended that

11  initiation process at Enlow Fork that you've referenced in

12  1991?

13  **A.**   Those would have been potential employees.   Numbers

14  there could have been probably 15 to 20.   They typically had

15  them when we were staffing the mine, probably every week, as

16  we staffed the mine.

17  **Q.**   Anyone else who attended besides employees?

18  **A.**   Yes.   The superintendent of the mine would speak at the

19  orientation.   They would have the safety director speak.   HR

20  would speak to the issues of healthcare and benefits.

21  **Q.**   How many days long was the orientation?

22  **A.**   Orientation was three days.

23  **Q.**   Have you described all the people who attended on each

24  of those three days?

25  **A.**   I think, to the best of my recollection, yes.

1  **Q.**   Do you remember the name of the individual who

2  explained retirement welfare benefits at that orientation?

3  **A.**   That would have been Luke Gianato.

4  **Q.**   And what was his position with the company?

5  **A.**   He was a local HR representative for Enlow Fork.

6  **Q.**   And who did Luke Gianato work for, as far as you

7  understand?

8  **A.**   There was a corporate HR person in '91.  I'm sorry, I

9  can't remember the name.  But it may have been the current

10 HR manager at corporate.

11 **Q.**   That's okay.  If you don't recall, that's fine.

12     What was Luke's role as HR manager at Enlow Fork?

13 **A.**   Well, Luke's role technically would have been anything

14 concerned with HR, whether people would come to him with

15 questions of healthcare, anything involved with healthcare,

16 anything involved with, you know, insurance problems; he was

17 there to assist everyone.  And employment issues, as well.

18 **Q.**   What, if anything, did Mr. Gianato say in the

19 orientation meeting about retirement welfare benefits?

20 **A.**   As everybody else described here, they had visuals at

21 the meetings.  They had comparisons of the UMWA as opposed

22 to the P&M's at the time, and it was a distinct difference

23 they went through and outlined the differences in each of

24 those.  They talked about disability insurance, dental

25 insurance, vision, life insurance.  They spoke of the

 1     investment plan for the employees.  So it was a whole gamut

 2     that he discussed there.

 3              THE COURT:  Let me ask if this is a good stopping

 4     point?

 5              MR. PETSONK:  It may be.  Yes, Your Honor, that's

 6     fine.

 7              THE COURT:  If so, we'll be in recess for 15

 8     minutes.

 9         And, Mr. Long, treat yourself during the recess as

10     though you are on the witness stand and do not discuss your

11     testimony with anyone.  And we'll be back in 15 minutes.

12     I'm going to ask you that you follow me out of the courtroom

13     door, and go down the corridor.

14         And we'll be back in 15 minutes.

15              THE CLERK:  All rise.

16         (A recess was taken at 11:19 a.m. until 11:42 a.m.)

17              THE CLERK:  All rise.

18              THE COURT:  Please be seated.  Counsel may

19     proceed.

20              MR. PETSONK:  Thank you, Your Honor.

21     BY MR. PETSONK:

22     **Q.**  Mr. Long, you were describing an orientation session

23     that you participated in when you went to work at the Enlow

24     Fork mine in 1991.  Do you recall testifying about that

25     before we broke?

1    **A.**    Yes, sir.

2    **Q.**    You referenced that the HR manager named Luke Gianato

3    explained your retirement welfare benefits at that

4    orientation.  What did Mr. Gianato explain that you would

5    receive as to those retirement welfare benefits?

6    **A.**    We would receive hospitalization, dental, vision, eye

7    care, prescription drugs; mentioned the eligibility

8    requirements for retirement, what you can do, how early you

9    can retire.

10   **Q.**    What, if anything, did Mr. Gianato say about CONSOL's

11   right to terminate your retirement welfare benefits?

12   **A.**    There was never any time in my career at CONSOL where

13   anybody verbalized anything like that.

14   **Q.**    Did you ask any questions at the orientation about your

15   benefits?

16   **A.**    I did not ask questions at the orientation in a group

17   session, no.

18   **Q.**    Did CONSOL invite you to bring anyone with you to that

19   orientation session, Mr. Long?

20   **A.**    Yes, my wife attended one of the three days.

21   **Q.**    And just for clarity, what is her name?

22   **A.**    Frances.

23   **Q.**    And which of the three days did she attend?

24   **A.**    I do not -- I don't remember if it was the first or

25   third.  I'm not quite sure.

1    **Q.**   Do you remember the content of the presentation on the

2    day that she attended?

3    **A.**   I think, for the most part, it was review of what we

4    had gone over previously; a brief description of

5    hospitalization, what you are to receive.  That was,

6    essentially, it.

7    **Q.**   Did Mr. Gianato make any characterizations or

8    comparisons to give you an understanding of the retirement

9    welfare benefits that you would receive in that

10   presentation?

11   **A.**   In the presentation with my wife, I really can't

12   remember if that was done or not.  However, I think

13   initially that, on the first day, that comparison was made

14   throughout the entire day between the UMWA, the existing

15   UMWA benefits and the P&M benefits.

16   **Q.**   And what did Mr. Gianato explain about the UMWA

17   benefit, retirement benefits specifically, if anything, as

18   opposed to in comparison to the CONSOL retiree welfare

19   benefits?

20   **A.**   Well, presented it on a chart, it was categorized for

21   both UMWA and the P&Ms.  Particularly of importance to that

22   group, of course, was the ability to retire at 55, with 10

23   years of service, with full benefits.  That was particularly

24   important to those people at the time.

25           MR. TORRES:  Objection.  Objection; move to

```
 1    strike.  Lacks foundation to testify as to what other people
 2    felt was important, Your Honor.
 3              THE COURT:  Sustained.
 4    BY MR. PETSONK:
 5    Q.   Mr. Long, was Mr. Gianato's representation about the
 6    retirement welfare benefits important to you?
 7    A.   Of course.
 8    Q.   And why was it Mr. Gianato's explanation of your
 9    entitlement to receive retiree welfare benefits in that
10    orientation session, why was that presentation important to
11    you, Mr. Long?
12    A.   Well, it was most important -- not that you intended to
13    retire at 55, but that if something should have happened to
14    any one of the employees at that point in time, any family
15    event that may have happened, you had the ability to retire
16    at 55 under the guidelines of the plan.  That was extremely
17    important to me.
18              MR. TORRES:  Same objection, Your Honor.  He keeps
19    saying "they," referring to other individuals as opposed to
20    himself.
21              THE COURT:  Well, the Court will disregard the
22    answer insofar as it relates to anyone other than the
23    defendant -- other than the witness, excuse me.
24              MR. TORRES:  Thank you, Your Honor.
25
```

1    BY MR. PETSONK:

2    **Q.**   Mr. Long, was it your understanding that what you just

3    described, that is, the entitlement to receive retiree

4    benefits applied to you?

5    **A.**   Yes.

6    **Q.**   And how long did you understand based on Mr. Gianato's

7    presentation at the orientation that you would be entitled

8    to receive retirement welfare benefits?

9    **A.**   Throughout life.

10   **Q.**   Going back, you stated -- and I don't know if you

11   remember, you said you struggled to remember the name of Mr.

12   Gianato's supervisor, or Mr. Gianato's superior in the Human

13   Resources Department -- did you remember that name or do you

14   know who that person was?

15   **A.**   The name is still on the tip of my tongue, but I cannot

16   recall his name at this point in time.

17   **Q.**   Do you recall where he worked geographically?

18   **A.**   He worked at CONSOL headquarters.

19   **Q.**   Where was that located?

20   **A.**   Which is on Fort Couch Road in Upper St. Clair.

21   **Q.**   What else do you recall, if anything, Mr. Gianato --

22          THE COURT:  Just a moment.  I simply wanted to

23   clear up one thing.  You said St. Clair?

24          THE WITNESS:  St. Clair.

25          THE COURT:  Ohio?

1            THE WITNESS:  Oh, I'm sorry.  St. Clair,

2    Pennsylvania.  Upper St. Clair, Pennsylvania.

3            THE COURT:  Thank you.

4    BY MR. PETSONK:

5    **Q.**   So it's your testimony, then, that Mr. Gianato worked

6    for the senior HR official, whose name you cannot recall, at

7    CONSOL headquarters in Upper St. Clair at that time in 1991;

8    is that correct?

9    **A.**   That is correct.

10   **Q.**   What, if anything, did Mr. Gianato say in that

11   orientation session about the -- about CONSOL's -- about the

12   likely future of benefits for that CONSOL's retiree welfare

13   benefit plan?

14   **A.**   As I mentioned earlier, I never had a discussion openly

15   in a session there.  I spoke with Luke privately and asked

16   him this question about CONSOL reserving the right to

17   cancel, amend, or suspend the healthcare plan.  And his

18   words essentially were that, "Bob," he said, "if you look

19   around here, we've spent billions of dollars in this

20   operation.  We have one operating right now that exceeds --

21   is close to 10 million tons a year, and we expect it the

22   same for the second.  I don't think that is an issue."

23   **Q.**   Did you receive -- you've addressed documents that you

24   received at the 1991 meeting.  Did Mr. Gianato review

25   documentation with you at that 1991 orientation meeting?

1    **A.**   He reviewed all documentation at that orientation

2    meeting.

3    **Q.**   And did it appear to you that Mr. Gianato had the

4    authority to convey the information that he conveyed to you

5    about the retirement welfare benefits?

6              MR. TORRES:  Objection.  Calls for a legal

7    conclusion.

8              THE COURT:  The witness may answer.

9    BY MR. PETSONK:

10   **Q.**   You can answer.

11   **A.**   Yes.

12   **Q.**   And how did you have that understanding, that is, he

13   had the authority to say what he said to you about the --

14   the terms of the retiree welfare benefit plan?

15   **A.**   Well, he was a company representative in the HR

16   Department, and he was the one that supported Enlow Fork.

17   He was a lifeline in HR for Enlow.

18   **Q.**   And which company did it appear to you you're saying he

19   represented?

20   **A.**   CONSOL Energy.

21   **Q.**   Mr. Long, you testified you previously were a member of

22   the UMWA earlier in your mining career.  If you had remained

23   a member of the UMWA, that is, the United Mine Workers of

24   America Labor Union, what do you know about whether you

25   would still have retirement welfare benefits today?

1          MR. TORRES:  Objection.  Calls for speculation.

2          THE COURT:  The witness may answer.  You might ask

3    him, though, the basis of his knowledge before he does.

4    BY MR. PETSONK:

5    Q.   Mr. Long, what do you know about the retirement welfare

6    benefits that are available to union coal miners today?

7    A.   It is my understanding, that with 10 years of service

8    with the UMWA, you are eligible for retirement benefits,

9    healthcare.  If, in fact, you have 20 years of service, you

10   get the full complement of benefits for life through the

11   UMWA.

12   Q.   So if you had remained a member of the UMWA, is it your

13   understanding that having attained over 35 years of service

14   with your employer, had that been an employer covered by the

15   UMWA's contracts, that you would still have retiree welfare

16   benefits today?

17   A.   Without question.

18   Q.   You referenced periodic meetings, weekly meetings that

19   occurred during the time you worked at Enlow.  Do you recall

20   specifically what CONSOL said about your retirement welfare

21   benefits during those meetings?

22   A.   Typically, at those weekly meetings on Wednesday, there

23   were a host of different topics that were talked about.  If

24   there were changes in a healthcare plan, that would be

25   discussed.  Changes in any type of policy at the mine, that

1    would -- so it ran the whole gamut -- anything of interest

2    to the employees at the mine.  You always had the

3    opportunity to ask questions.

4    **Q.**   And when the topic of retirement benefits came up in

5    these weekly meetings, who do you recall specifically in

6    CONSOL's management made the explanation regarding the

7    retirement welfare benefits?

8    **A.**   Luke Gianato.

9    **Q.**   And did Mr. Gianato ever inform you during those

10   updates in the weekly meetings about your retirement welfare

11   benefits that CONSOL asserted or reserved the right to

12   terminate those retirement welfare benefits?

13   **A.**   As was mentioned before, it was never in my entire

14   career mentioned to any employee.

15   **Q.**   Now, Mr. Long, how old were you when you left Enlow

16   Fork Mine?

17   **A.**   52.

18   **Q.**   Were you employed right away after you left Enlow?

19   **A.**   Well, several months had gone by, and then I had gone

20   to 84.

21   **Q.**   While you were off, what healthcare did you have, if

22   any?

23   **A.**   I obtained healthcare through COBRA.

24   **Q.**   How much did that cost you?

25   **A.**   At that time, I believe it was $1,200 a month.

LONG - DIRECT

1   **Q.**   And for how many months did you pay that $1,200 COBRA

2   premium?

3   **A.**   I believe it may have been three months.  It was

4   unsustainable.

5   **Q.**   Where did you work next?

6   **A.**   84.

7   **Q.**   And who was your employer at 84?

8   **A.**   CONSOL Energy.

9   **Q.**   And just to be clear, is 84 an underground coal mine

10  also?

11  **A.**   That's correct.

12  **Q.**   And was that also located in 84, Pennsylvania?

13  **A.**   That's also correct.

14  **Q.**   And what year did you go back to work at the 84 Mine

15  for CONSOL?

16  **A.**   2001.

17  **Q.**   And why did you go back to work at that time for

18  CONSOL?

19  **A.**   Well, there were several reasons, one of which was that

20  I was short of obtaining the requirements to get healthcare

21  benefits for life.  I needed three years.  That was -- that

22  was the biggest -- biggest determining factor.  But there

23  were also other factors that we -- I don't really think we

24  need to get into at this time.

25  **Q.**   Okay.  Well, just state those other factors for clarity

1    sake.

2    **A.**   Well, after I left Enlow Fork, I stayed in touch with

3    the activities of CONSOL, especially locally.  84 had

4    experienced quite a few problems on their longwall

5    operation.  I went down to engineering and spoke with them,

6    talked with head of engineering to see what was going on,

7    and they suggested that I come back to work for them.

8    **Q.**   Okay.

9    **A.**   That's enough.

10   **Q.**   Who was the Human Resources representative for CONSOL

11   at 84 Mine?

12   **A.**   That was Tex Berlin.

13   **Q.**   And when you went back to work at 84 Mine, what, if

14   anything, did Tex Berlin tell you about your retiree welfare

15   benefit benefits?

16   **A.**   He told me my retiree benefits would continue as they

17   were before, as they were at Enlow; the benefits were the

18   same as CONSOL Energy.

19   **Q.**   When did you notify CONSOL that you wanted to retire?

20   **A.**   I spoke with the superintendent on a Saturday, at the

21   end of May.

22   **Q.**   Of what year?

23   **A.**   2003.

24   **Q.**   And when did your retirement from CONSOL become

25   effective?

1    **A.**    I believe it was effective June 25th, somewhere in that

2    neighborhood.

3    **Q.**    Did you begin receiving retiree welfare benefits at

4    that point?

5    **A.**    Yes.

6    **Q.**    Did Mr. Berlin tell you at that time that CONSOL

7    reserved or asserted the right to terminate your retiree

8    welfare benefits?

9    **A.**    No, sir.

10    **Q.**    Did you continue working after you left CONSOL?

11    **A.**    Yes, sir.

12    **Q.**    Where did you work next?

13    **A.**    I worked for Foundation Coal, which was later purchased

14    by Alpha Natural Resources.

15    **Q.**    Did Alpha Natural Resources offer you healthcare

16    benefits?

17    **A.**    Yes.

18    **Q.**    Did you accept those benefits?

19    **A.**    No.

20    **Q.**    Why not?

21    **A.**    I had had healthcare benefits through CONSOL for 35

22    years.  I had never had an issue with claims of any sort.

23    It was fantastic insurance; you had healthcare, eye, vision.

24    I had no reason to change.

25    **Q.**    And did you keep your CONSOL benefits while you worked

1   at Alpha Natural Resources?

2   **A.**   That is correct; I kept them.

3   **Q.**   And did you work for Alpha long enough to earn a

4   retirement from that company?

5   **A.**   I worked five years for Alpha.

6   **Q.**   Did you work there long enough to earn a retirement

7   from that company?

8   **A.**   Yes.

9   **Q.**   Let me see here.  Mr. Long, bear with me one second.

10          MR. PETSONK:  Your Honor, may I approach the

11   witness to present --

12          THE COURT:  Yes.

13          MR. PETSONK:  -- an exhibit?

14   BY MR. PETSONK:

15   **Q.**   Mr. Long?

16          THE COURT:  What's the exhibit?

17          MR. PETSONK:  That would be marked Plaintiff's

18   Exhibit 8.

19          MR. TORRES:  Do you have a copy?

20          MR. PETSONK:  Yes.

21   BY MR. PETSONK:

22   **Q.**   Mr. Long, does this document look familiar?  Look

23   through it.  It's several pages long.

24   **A.**   Yes, it does.

25   **Q.**   And what does it appear to be?  What does it appear to

LONG - DIRECT

1   contain, Mr. Long?

2   **A.**   Pertains to the notification of termination of

3   healthcare benefits by CONSOL.  And in conjunction with

4   Murray Energy.

5   **Q.**   It's a series of letters; is that right?

6   **A.**   That is correct.

7   **Q.**   And on the first page, did you receive this letter

8   that's presented on the first page of the exhibit?

9   **A.**   Yes.

10  **Q.**   And who did you receive this letter from?

11  **A.**   CONSOL.

12  **Q.**   And at the last sentence on the page, can you read that

13  sentence?

14  **A.**   "As of April 1st, 2014, your coverage under the CONSOL

15  plan is terminated and you will no longer be able to use

16  your CONSOL retiree benefit cards."

17  **Q.**   And what's the date when this letter was issued that

18  you see there at the top?

19  **A.**   March 14, 2014.

20  **Q.**   After April 1st, 2014, do you know whether CONSOL

21  continued to provide benefits or was that, in fact, the end

22  for you?

23  **A.**   During the transition period, CONSOL agreed to pay some

24  of those premiums until Murray Energy actually made that

25  final transition to their plan.

1   **Q.**   Okay.  And when you reference Murray Energy -- look to

2   the second page.  Have you had the chance to look at the

3   second page?  It's stamped MSJ001002.

4   **A.**   Oh, 1002?  Oh, I'm sorry.  Hold on.

5   **Q.**   What's the date of the top of the page that you are

6   looking at there, Mr. Long?

7   **A.**   April 8, 2014.

8   **Q.**   And there is a sentence in bold lettering in this

9   letter; do you see that?

10   **A.**   Yes.

11   **Q.**   Can you read that sentence into the record?

12   **A.**   "This communication is to inform you that your retiree

13   benefits, including any eligibility for such coverage, will

14   end on December 31st, 2014."

15   **Q.**   Now, who was this letter from?

16   **A.**   This was from Murray Energy.

17   **Q.**   Okay.  And look to the next page of the exhibit, if you

18   would.  And this page is stamped MSJ001000?

19   **A.**   Yes, sir.

20   **Q.**   And what is the date of -- well, what does this appear

21   to be to you, Mr. Long?

22   **A.**   This is a notification that -- that the healthcare

23   benefits provided by Murray Energy, Incorporated, will be

24   terminated on December 31st, 2014.

25   **Q.**   And do you remember receiving this letter as well?

1    **A.**   Yes, sir.

2    **Q.**   And did your benefits, your retiree welfare benefits,

3    in fact, come to a close and terminate on December 31st,

4    2014?

5    **A.**   That is correct.

6            MR. PETSONK:  Bear with me one second, Your Honor.

7    I just have a few additional questions.

8    BY MR. PETSONK:

9    **Q.**   What did CONSOL provide you, as far as any benefits, at

10   the time that they terminated your health care?  Did they

11   provide any sort of a terminal benefit?

12   **A.**   No.

13   **Q.**   Mr. Long, have you and your wife incurred medical

14   expenses out-of-pocket since you lost your retiree welfare

15   benefits from CONSOL effective that date that you referenced

16   here, April 1st, 2014?

17   **A.**   Yes.

18   **Q.**   And how much have you paid annually out-of-pocket for

19   medical expenses since that time?

20   **A.**   I just looked at it recently, and it was $39,000.

21   **Q.**   That's cumulative over the years?

22   **A.**   For the entire period, yes, sir.

23            THE COURT:  And what is the entire period?  Of

24   what is the entire period?

25            THE WITNESS:  2014 to 2019.

```
 1              THE COURT:  That is, are you speaking of December

 2     31, '14?

 3              THE WITNESS:  I believe so, yes.

 4              THE COURT:  So starting with January 1, through

 5     what date?

 6              THE WITNESS:  I don't know -- it was the end of

 7     2019.  Those are the records that we submitted.

 8              THE COURT:  And so for the four years of 2015

 9     through 2019, you paid out $39,000 in those benefits that

10     you are telling us you thought would have been covered based

11     on the 55 and 10 arrangement?

12              THE WITNESS:  That is correct.  As a matter of

13     fact, it's a little bit less than $39,000 -- 39,8-something,

14     if I'm not mistaken.

15              THE COURT:  38,8 or 39,8?

16              THE WITNESS:  39,8 -- 39,8.

17              THE COURT:  Thank you.

18              MR. PETSONK:  I don't have any further questions

19     at this time, Your Honor.

20              MR. TORRES:  You didn't offer your exhibit.

21              MR. PETSONK:  Excuse me.  I would move for entry

22     of Plaintiff's Exhibit Number 8, Your Honor.

23              THE COURT:  Any objection?

24              MR. TORRES:  No objection, Your Honor.

25              THE COURT:  Admitted.
```

1          **Plaintiff's Exhibit 8 admitted.**

2               BY MR. TORRES:  Just one minute, Your Honor.

3               (Pause.)

4                    **CROSS-EXAMINATION**

5     **BY MR. TORRES:**

6     **Q.**   Mr. Long, if I understand your testimony, the person

7     who promised you lifetime benefits at CONSOL was Mr.

8     Gianato, correct?

9     **A.**   That's correct.

10    **Q.**   And you worked with Mr. Gianato from 1991 until 1996?

11    **A.**   '99.

12    **Q.**   '99, I apologize.  So whatever Mr. Gianato promised you

13    occurred during that time period, correct?

14    **A.**   Yes.

15    **Q.**   And Mr. Berlin never made you any promises of lifetime

16    benefits, correct?

17    **A.**   No.  That was a pretty quick transition there.  It

18    wasn't necessary.

19    **Q.**   Mr. Berlin never made you any promises of lifetime

20    benefits when you worked at that mine, correct?

21    **A.**   That's correct.

22    **Q.**   Okay.

23               MR. TORRES:  And did I give you a copy for the

24    Judge?

25               THE COURT:  No.

1            MR. TORRES:  I apologize.

2    BY MR. TORRES:

3    **Q.**   After you were advised by Murray Energy that they were

4    terminating your benefits in 2014, CONSOL announced that it

5    was also terminating benefits for employees who hadn't been

6    transferred to Murray Energy, correct?

7    **A.**   I believe so, yes.

8    **Q.**   Right.

9    **A.**   Yes.

10   **Q.**   Your co-plaintiffs all were advised in October of 2014

11   that their benefits would be terminated, correct?

12   **A.**   Yes.

13   **Q.**   And after that announcement, you wrote a letter to

14   CONSOL Energy, correct?

15   **A.**   Correct.

16   **Q.**   And --

17            MR. TORRES:  May I approach, Your Honor?

18            THE COURT:  You may.

19   BY MR. TORRES:

20   **Q.**   I wanted to show you what's been marked as Defendant's

21   Exhibit 14, and ask you if you are familiar with that

22   document?

23        Well, let's do it this way, do you see the document,

24   sir?

25   **A.**   Yes, I do.

```
 1    Q.   It's dated February 2nd, 2015, correct?

 2    A.   That's correct.

 3    Q.   And it's to CONSOL Energy, Inc., correct?

 4    A.   Yes.

 5    Q.   And the second page -- if you turn to the second page,

 6    it has a signature of Robert Long at the top of it, correct?

 7    Second page, Mr. Long?

 8    A.   It doesn't have two pages.

 9    Q.   Turn it over.  It's double-sided, I apologize.

10    A.   I don't see my signature on it, but --

11    Q.   It has your name, correct?

12    A.   Yes, that's correct.

13    Q.   And this is a letter you sent to CONSOL, correct?

14    A.   Yes.

15    Q.   Okay.

16              MR. TORRES:  Your Honor, defendants offer Exhibit

17    15 --

18              THE COURT:  14.

19              MR. TORRES:  14.

20              THE COURT:  Any objection?

21              MR. PETSONK:  No objection.

22              THE COURT:  It's admitted.

23         Defendant's Exhibit 14 admitted.

24    BY MR. TORRES:

25    Q.   And if you turn or look at the fourth paragraph of your
```

1   letter, Mr. Long, the first sentence says, "The

2   justification for this proposal is that Retiree Healthcare

3   and Life Insurance Benefits, although not promised in

4   writing or protected by law, are benefits that were earned

5   during the long working careers of CONSOL employees,"

6   correct?

7   **A.**   That's correct.

8   **Q.**   So you knew as of February 2015, that CONSOL had made

9   no written promises regarding retiree medical benefits,

10   correct?

11   **A.**   Yes.

12   **Q.**   And you knew throughout your career that CONSOL had in

13   writing reserved the right to terminate the benefits it

14   provided to its employees and retirees, correct?

15   **A.**   Could you ask that again, please?

16   **Q.**   Sure.  You knew throughout your career that CONSOL had

17   in writing reserved the right to terminate medical benefits

18   for both its current employees and its retirees, correct?

19   **A.**   That is also correct.

20   **Q.**   Okay.  And, in fact, after you sent your letter to

21   CONSOL, you were interviewed by a reporter for the

22   Pittsburgh Post-Gazette.  Do you recall that?

23   **A.**   Yes, I do.  Let me add this, at our deposition, you

24   asked me that question at the deposition.  I was somewhat

25   taken back by it and surprised at the time.  I did not -- I

 1   did not remember that interview.  However, I went home and

 2   checked my records, and you are 100 percent right; I made

 3   that statement.

 4   **Q.**   Okay.  Well, that's certainly what you testified to at

 5   our deposition as well, sir.  So let's get the article out

 6   and we can let everybody else know what we are talking

 7   about.

 8           MR. TORRES:  May I approach, Your Honor?

 9           THE COURT:  You may.

10   BY MR. TORRES:

11   **Q.**   Mr. Long, I'm showing you what's been marked as

12   Defendant's Exhibit 15.  This is an article from Pittsburgh

13   Post-Gazette, correct?

14   **A.**   Yes.

15   **Q.**   And it was written by an Anya Litvak, correct?

16   **A.**   That's correct.

17   **Q.**   And the article is discussing CONSOL's decision to

18   terminate retiree medical benefits, correct?

19   **A.**   Yes.

20   **Q.**   And you were interviewed for this article, correct?

21   **A.**   Correct.

22   **Q.**   And one of the things that you discussed with this

23   reporter was the fact that the CONSOL benefit plans, the

24   written plans contained reservation of rights clauses; is

25   that correct?

1    **A.**   That is correct.

2    **Q.**   And you said -- you were quoted by Ms. Litvak as

3    saying, "That's the statement that clears them," correct?

4    **A.**   I would like to see it on here.  I'm trying to pick

5    that out.

6    **Q.**   Sure.

7    **A.**   I can't believe that -- that I would have said that

8    that is the statement that clears them.  I thought what I

9    had said was most people think this case is un-winnable due

10   to the wording of the contract.  That's what I remember

11   saying.

12   **Q.**   Well, what Ms. Litvak quoted you as saying -- let's

13   back up.

14        At the deposition, I showed you this article and you

15   agreed with me the quote for your -- the quote was accurate,

16   correct?

17   **A.**   Well, I don't see it in this writing right here, what

18   Litvak quoted me.  I don't see it here.  I'm trying to pick

19   it out.

20   **Q.**   I'm not trying to hide it from you, sir.  It's on the

21   third page, and you see there is a heading says, "Taking the

22   Fight to Court."  Do you see that?

23   **A.**   Yes, I do.  I see it right here.

24   **Q.**   Okay.  And so at your deposition, I showed you this

25   quotation, and you agreed with me that it was accurate,

```
 1   correct?
 2   A.    No, I didn't.  I did not agree with you that that was
 3   accurate.
 4   Q.    Okay.  You testified under oath at your deposition,
 5   correct?
 6   A.    That's correct.
 7              MR. TORRES:  May I approach, Your Honor?
 8              THE COURT:  You may.
 9   BY MR. TORRES:
10   Q.    Let's do this.  I'm going to hand you a copy of your
11   deposition.  The first page -- it's actually the second
12   page.  The bottom says, "Video Deposition of Robert Long,"
13   correct?
14   A.    Yeah.
15   Q.    And you had an opportunity to review your deposition
16   after you took it, correct?
17   A.    Yes.
18   Q.    And you agreed everything in this deposition was
19   accurate, correct?
20   A.    Yes.
21   Q.    Okay.  So let's turn to page 137 of your deposition,
22   Mr. Long.  Are you there?
23   A.    Yes, sir.
24   Q.    And the first question at page 137, Line 2:  The
25   article is by Anya Litvak.  Do you see that?
```

1    **A.**    Yes.

2    **Q.**    And then the next paragraph says -- below that, there

3    is some -- actually some additional language attributed to

4    you in quotations, it says, "'That's the statement that

5    cleared them,'" Mr. Long said."  "Everybody got that when

6    they were hired."

7         That's the question I asked you, correct?

8    **A.**    Yes, that's the question you asked.

9    **Q.**    And then at Line 16, I said:  "To your recollection, is

10   that an accurate quotation of what you told the individual

11   who interviewed you?"

12        Do you see that question?

13   **A.**    Yeah.

14   **Q.**    And if you look at Line 24, your response was: "I

15   believe so."

16        Correct?

17   **A.**    Yes.  That's what it shows.

18   **Q.**    Yes.  So the quotation from Ms. Litvak was, in fact,

19   correct that you testified to under oath in your deposition;

20   isn't that right, Mr. Long?

21   **A.**    Yes.

22   **Q.**    Thank you.  So at the time that Mr. Gianato conducted

23   your orientation, Mr. Long, he handed out materials to you,

24   correct?

25   **A.**    Handed out materials?

 1    **Q.**   Yes.

 2    **A.**   That's correct, yes.

 3    **Q.**   And going back to the article by Ms. Litvak and the

 4    accurate quotation of you we were looking at a moment ago,

 5    you were quoted as saying, "Everybody got that when they

 6    were hired," right?  That is part of the quotation in the

 7    article?

 8    **A.**   That's correct.

 9    **Q.**   And what you're referring to is everyone got a written

10    benefit plan when they were hired, correct?

11    **A.**   That's correct.

12    **Q.**   And what you told Ms. Litvak is that those documents

13    contained a reservation of rights clause, correct?

14    **A.**   That's correct.

15    **Q.**   And so when you were in your orientation with Mr.

16    Gianato and he handed out the materials concerning CONSOL

17    benefits plans, among other things, it included a written

18    reservation of rights clause, correct?

19    **A.**   That's correct.

20    **Q.**   Okay.  And you said after Mr. -- Mr. Gianato made his

21    statement during the orientation that you testified to, you

22    said, "We had a private conversation with Mr. Gianato."

23    Correct?

24    **A.**   Yes.

25    **Q.**   And Mr. Gianato in that conversation said he didn't

```
 1    think it would be an issue -- your quotation, what you
 2    testified to, is you said, "Among other things, I don't
 3    think that is an issue," right?
 4    A.   Yes.
 5    Q.   And what he's referring to is the possibility that
 6    CONSOL might terminate benefits based on that reservation of
 7    rights clause, correct?
 8    A.   Yes.
 9    Q.   But Mr. Gianato didn't say it could never happen; he
10    just expressed his opinion that based upon the state of
11    things at that point in time, he didn't think it was an
12    issue, correct?
13    A.   That's correct.
14    Q.   Okay.  And so other than Mr. Gianato telling you in
15    that initial orientation that benefits would be for life,
16    you didn't have any other conversations with Mr. Gianato
17    where he told you that your benefits were vested or that
18    they would be for life, correct?
19    A.   Well, I mentioned just earlier the conversation I had
20    with him privately about that reservation right.  And as he
21    mentioned, that you can see that we have -- "We've invested
22    billions of dollars in this operation."
23         I just mentioned that earlier, he said, "I don't think
24    that" -- "I really don't think that's an issue.  We are in a
25    good position here."
```

 1       It was a reassuring conversation.  The only -- never

 2   mind.

 3   **Q.**   Go ahead.  Go ahead with your statement, sir.

 4   **A.**   That's all right.

 5   **Q.**   That wasn't a promise; that was an opinion, correct?

 6   **A.**   Yeah.  Yes.

 7   **Q.**   So, again, my question was:  Other than your

 8   orientation that you testified to, Mr. Gianato made you no

 9   other promises of lifetime benefits, correct?

10   **A.**   No, but they demonstrated that the possibility was

11   there.  That's -- that's a procedure they used to hire these

12   people.  That's -- that's the statement that was never

13   referred to in any of the orientations.  Although it was

14   slivered into the healthcare benefits plan, very few people

15   actually saw that.

16           MR. TORRES:  Move to strike as nonresponsive, Your

17   Honor, as to what other people allegedly knew or saw or did.

18           THE COURT:  Sustained.

19   BY MR. TORRES:

20   **Q.**   Mr. Long, answer my question, please.  Other than the

21   orientation that you testified to, Mr. Gianato never made

22   you any other promises of lifetime benefits?

23   **A.**   No.

24   **Q.**   You agree with me; he never did, correct?

25   **A.**   No.

1    **Q.**   Did Mr. --

2              THE COURT:  Excuse me, just a minute.  The answer

3    is ambiguous.  Cover that territory again.

4    BY MR. TORRES:

5    **Q.**   Is it correct, Mr. Long, that other than the

6    orientation you testified to, Mr. Gianato never made you any

7    other promises of lifetime benefits?

8    **A.**   That is correct.

9    **Q.**   Thank you.  And you said in your testimony about that

10   orientation in response to some questions your lawyer asked

11   you, that -- I think the way you said it was -- no one ever

12   verbalized the reservation of rights clause during the

13   orientation?  Did I get that right?

14   **A.**   Yes, you did.

15   **Q.**   But, in fact, whether or not it was verbalized, they

16   were given written documents that contained that reservation

17   of rights clause, correct?

18   **A.**   Yes, they were.

19   **Q.**   I believe at your deposition we had talked about the

20   fact that you remember receiving the written materials.  You

21   no longer had them by the time our deposition took place,

22   correct?

23   **A.**   What written materials are you referring to?

24   **Q.**   That was a bad question.

25              The benefit materials that contained the reservations

1   of rights clause that were distributed to you during the

2   orientation in 1991.  By the time your deposition occurred,

3   you no longer had those materials, correct?

4   **A.**   I may have had the material, but I had known quickly

5   the reservation of rights in the healthcare benefits book.

6   I already read it.  I knew that.

7   **Q.**   My question was:  Did you still have that document

8   after you filed this lawsuit?

9   **A.**   I cannot answer that.  I don't know.

10  **Q.**   Well, you certainly didn't turn one over to us,

11  correct?

12  **A.**   No.

13  **Q.**   And the document that you received during the

14  orientation that described your benefits, that was a Summary

15  Plan Description, correct?

16  **A.**   Yes.

17  **Q.**   And do you remember -- it was in a binder, correct?  Is

18  that correct, a three-ring binder?  Does that sound right?

19  **A.**   Yes.

20  **Q.**   And it had the ability, if there was changes, they

21  might send changes to swap in, to try and keep it current,

22  correct?

23  **A.**   That's correct.  Yes.

24  **Q.**   And as the years progressed, when you showed back up in

25  84 Mine, did you receive a similar booklet when you started

1    at that location?

2    **A.**    I believe I received a booklet, but I think in my

3    discussions with Mr. Berlin, that, essentially, the benefits

4    were the same.

5    **Q.**    I remember you said that earlier.  I'm just trying to

6    talk about -- you continued to receive descriptions of the

7    benefits throughout your employment at CONSOL, correct?

8    **A.**    That's correct.

9    **Q.**    And those written descriptions of the benefits

10   continued to contain reservations of rights language,

11   correct?

12   **A.**    In '69, as well.

13   **Q.**    Oh, you had one in '69 also?

14   **A.**    I remember reading it.  Every one I got, I read.

15   **Q.**    Okay.  So starting in 1969, all the written

16   descriptions of benefits you received contained a

17   reservations of rights clause?

18   **A.**    I believe so.  I think that's customary at most benefit

19   plans.

20   **Q.**    Customary, okay.  Got it.  I want to change topics for

21   a minute.  You said at the orientation meeting that was --

22   please correct me if I'm wrong -- you said you knew you were

23   going to be a salaried employee, but you had to start as a

24   P&M, correct?

25   **A.**    Yes.

LONG - CROSS

1    **Q.**   Did I get that right?

2    **A.**   Yes.

3    **Q.**   And the materials that were presented, if you recall --

4    and I realize it's been a long time ago -- because it was a

5    P&M orientation, did they actually cover anything?

6    **A.**   Salaries.

7    **Q.**   About salaried employees as well?

8    **A.**   No, nothing.  No, sir.

9    **Q.**   And one of the things that you explained that Mr.

10   Gianato put up was some comparisons about the benefits,

11   CONSOL benefits and UMWA benefits, correct?

12   **A.**   Right.

13   **Q.**   So those would have been the comparison of P&M benefits

14   to UMWA, correct?

15   **A.**   Yes.

16   **Q.**   Okay.  And that comparison didn't contain any promise

17   of lifetime benefits, correct?

18   **A.**   The comparison said that if you worked 10 years,

19   attained age 55, that you would have benefits for life.

20   **Q.**   So you think the written terms said, "For life"?

21   **A.**   You know, I'm really not quite sure if it says for

22   life.  But I do know -- I do know for a fact -- well, strike

23   what I was going to say.  Go ahead.

24   **Q.**   So I know you said Mr. Gianato made that oral

25   statement, and I'm just trying to see whether there was

*Catherine Schutte-Stant, RDR, CRR (304) 347-3151*

1    anything on that comparison that said, "For life."  And it

2    sounds like you don't recall if it was?  Is that fair?

3    **A.**   That would be fair.

4    **Q.**   Okay.  And in any event, the comparison of the

5    benefits, whatever it said, would have applied to P&Ms, not

6    to salaried employees, correct?

7    **A.**   Correct.

8    **Q.**   Okay.  And you wanted to be a salaried employee because

9    you were not interested in having your working interrupted

10   by work stoppages, correct?

11   **A.**   Correct.

12   **Q.**   And your counsel also asked you, when Mr. Gianato

13   conducted this orientation, how long you believed the

14   benefits would last.  And you said, "Throughout your life,"

15   correct?

16   **A.**   Yes.

17   **Q.**   But you, in fact -- you also know there was also this

18   possibility that the benefits could be terminated based on

19   the reservation of rights clause, correct?

20   **A.**   Well, I guess that's true.  I guess any company can

21   make that statement.

22   **Q.**   I'm sorry?

23   **A.**   I think that is true.  Any company can make that

24   statement.  That doesn't make it right.

25   **Q.**   Well, we are not here about what's right, Mr. Long;

1    we're here about what the documents provided, and the

2    documents provided, whether you agree with it or not, that

3    the benefits could be terminated, correct?

4    **A.**   That's correct.

5    **Q.**   Okay.  Thank you.  So whatever was being shown to you

6    at orientation regarding the UMWA wouldn't have really

7    affected your job at CONSOL, because you were going to be a

8    salaried employee, correct?

9    **A.**   That's correct.

10   **Q.**   And then you said after you retired from CONSOL -- in

11   2003; is that right?

12   **A.**   Correct.

13   **Q.**   You went to Alpha Resources Mining?  Did I get that

14   right?

15   **A.**   Yes.

16   **Q.**   And there was one thing I didn't catch.  It was

17   probably because I wasn't writing fast enough here, so I

18   apologize.  You said you qualified for retiree medical

19   benefits after five years at Alpha Resources; is that your

20   testimony?

21   **A.**   Yes.

22   **Q.**   Okay.  So you could have retired from them after five

23   years with retiree medical benefits?

24   **A.**    I didn't receive medical benefits at Alpha.

25   **Q.**   Right.  I said you could have elected them; you were

1   eligible for them?

2   **A.**   I could have, yes, but I chose to stick with CONSOL's.

3   **Q.**   Did Alpha's benefit plans have reservations of rights

4   clauses as well?

5   **A.**   I had no need to review their hospitalization plan,

6   because I already decided to stick with CONSOL's.

7   **Q.**   So you don't know one way or the other whether it had a

8   reservation of rights clause; is that your testimony?

9   **A.**   I don't know one way or another, but I would say

10   definitely they do, as well as many other companies -- most

11   companies.

12   **Q.**   Okay.  So your belief is that it did have a reservation

13   of rights clause, like CONSOL's?

14   **A.**   Correct.

15   **Q.**   Okay.  Thank you.  Now, do you still have Plaintiff's

16   Exhibit 8 in front of you, Mr. Long?

17   **A.**   Can I just jump back a minute?  The question you asked

18   me is that -- I should -- do I believe that Alpha should

19   have that clause in their benefits packet.

20          THE COURT:  I think the question is whether or not

21   they had it.  And --

22          MR. TORRES:  Right.

23          THE COURT:  -- not whether they should have.

24          MR. TORRES:  That's right.

25          THE COURT:  But go ahead and state what you were

1    going to say if it falls within that parameter.

2            THE WITNESS:  The idea of having this reservation

3    of rights clause in these plans enables companies to

4    discontinue healthcare insurance for their employees.

5    Supposedly, it's legal.  It depends on how -- how it is

6    done; how the plans are administered.  That's my personal

7    opinion.  I think the clause is wrong and I think it's

8    unlawful.

9            MR. TORRES:  Move to strike as nonresponsive, Your

10   Honor.

11           THE COURT:  Sustained.

12   BY MR. TORRES:

13   **Q.**   Do you have Plaintiff's Exhibit 8 in front of you, Mr.

14   Long?

15   **A.**   Yes.

16   **Q.**   Okay.  So I want to make sure I got the sequence of

17   events right.  The first page says, March 14, 2014, you

18   received a -- or you received a letter from CONSOL dated

19   March 14, 2014; is that correct?

20   **A.**   Yes.

21   **Q.**   And it told you that CONSOL was no longer going to

22   provide you retiree medical benefits, correct?

23   **A.**   Yep.

24   **Q.**   And that Murray Energy was going to start providing you

25   benefits beginning April 1, 2014, correct?

1   **A.**   Yes.

2   **Q.**   So the transition you spoke about earlier was going to

3   last from March 14, 2014 to March 31, 2014, correct?

4   **A.**   Yes.

5   **Q.**   Two weeks, correct?

6   **A.**   Yes.

7   **Q.**   All right.  And then the benefits that you received at

8   Murray beginning April 1, 2014, were the same as the

9   benefits that you were receiving at CONSOL; that was part of

10   the deal between CONSOL and Murray when they sold this

11   business, correct?

12   **A.**   Yes.

13   **Q.**   Okay.  And then on April -- then you got a letter dated

14   April 8th, 2014, from Murray, stating that they were going

15   to terminate your benefits effective December 31, 2014,

16   correct?

17   **A.**   Yes.

18   **Q.**   And you don't know if CONSOL had any involvement in

19   Murray's decision to terminate these benefits, correct?

20   **A.**   I have a lot of opinions on that.  It doesn't mean it's

21   pertinent for me.

22   **Q.**   So you would agree, you have no knowledge that CONSOL

23   had any involvement in Murray's decision to terminate these

24   benefits?

25   **A.**   Well, they stated early on that when this transition

1    had taken place, Murray Energy stated that they do not

2    provide healthcare benefits for their retirees.

3    Consequently, CONSOL knew that, and knew that Murray would

4    not continue healthcare benefits.  So they themselves

5    approved of this, this continuation of the benefits, because

6    Murray had already stated that.  They had already gone

7    through the transition process.  Murray said that they no

8    longer will provide benefits, that's not -- they don't do

9    that to any of their employees.  That was known by CONSOL,

10   and they accepted that.

11   Q.  I'm not asking whether CONSOL knew that they didn't

12   provide benefits.  I'm asking you -- or I'm stating -- and I

13   think it's clear -- you don't have any knowledge that CONSOL

14   had any involvement in the decision to terminate your

15   benefits, whether or not they knew it was going to happen,

16   correct?

17          MR. PETSONK:  I'm going to object -- Mr. Long, I'm

18   objecting.

19          COURT REPORTER:  Excuse me.

20          THE COURT:  Just a moment.  Go ahead.

21          MR. PETSONK:  I'm going to object to a lack of a

22   foundation, and mischaracterizing the document in the prior

23   testimony, Your Honor.

24          MR. TORRES:  I'm asking him whether he has any

25   knowledge, Your Honor.  I'm not asking him anything

1    foundational about this document.  Either he knows that

2    CONSOL was involved in this decision or he doesn't.

3            MR. PETSONK:  Your Honor, I'm just objecting.

4    It's not clear which decision he's referencing.  There are

5    several documents, several notices regarding terminations,

6    and he is referring to the Murray entity and CONSOL entity.

7            THE COURT:  I think you're probably in agreement.

8    Just restate the question.

9            MR. TORRES:  Sure.

10   BY MR. TORRES:

11   Q.   Mr. Long, you don't have any knowledge that CONSOL was

12   involved in Murray's decision to terminate your benefits

13   effective December 31, 2014; isn't that correct?

14   A.   I'm saying CONSOL knew of Murray's intention to do

15   this.

16   Q.   Please answer my question, Mr. Long.  You have no

17   knowledge that CONSOL had any involvement in Murray's

18   decision to terminate your benefits effective December 31,

19   2014; isn't that correct?

20   A.   I don't believe so, no.

21   Q.   You agree with me?

22   A.   No.

23   Q.   So you have knowledge?  Why don't you tell us what it

24   is?  Other than your belief, sir, what evidence do you have

25   that CONSOL had any involvement in Murray's decision to

1    terminate your benefits effective December 31, 2014?

2    **A.**    I have no evidence at this point in time.

3    **Q.**    Thank you.  When you were talking about your -- I just

4    wanted to let -- when you were talking about your

5    out-of-pocket expenses, Mr. Long; do you recall that

6    testimony?

7    **A.**    Yes.

8    **Q.**    The $39,000 -- or 39,800 was the number you ended up

9    at; is that right?

10   **A.**    $38,8 -- $39,000.

11   **Q.**    39, for ease of discussion?

12   **A.**    Right.

13   **Q.**    My question was:  How did you compile that number?  Can

14   you tell us what you actually looked at to come up with that

15   number?

16   **A.**    My wife had gone through all the records that we had

17   had at home on personal expenses, medical expenses, and

18   compiled that record and turned it in to our tax attorney.

19   **Q.**    Okay.  Did you provide it to your lawyers?

20   **A.**    Yes.

21   **Q.**    Okay.  So your lawyers have it as well?

22   **A.**    Yes.

23   **Q.**    Okay.  Fair enough.  And that $39,000, when we are

24   talking about the expenses, what -- can you give me some

25   categories as to what sort of expenses you're talking about?

1    If you recall?  It's not a memory test.

2    **A.**   Well, one expense, fairly major expense was cataract

3    surgery.

4    **Q.**   And, to your understanding, that surgery would have

5    been covered had you continued to receive CONSOL benefits?

6    **A.**   Correct.

7    **Q.**   Are all of these expenses -- or any of these expenses

8    for any supplemental coverage you're getting under Medicare,

9    for example, or is this 39 all really just out-of-pocket for

10   various medical expenses that arose during this time period

11   that you've referenced?

12   **A.**   I believe most of it is out-of-pocket prescription

13   drugs, et cetera.

14   **Q.**   Okay.  And currently you're on Medicare?

15   **A.**   That's correct.

16   **Q.**   You pay for a supplement?

17   **A.**   Yes.

18   **Q.**   Okay.  Are you -- is it just a drug supplement or is it

19   a -- what kind of coverage is it?

20   **A.**   It's a drug supplement.

21   **Q.**   Okay.  So Medicare plus Part D?

22   **A.**   Yeah.

23   **Q.**   Got it.  What -- okay.  Thank you.

24            MR. TORRES:  Could I have just one minute, Your

25   Honor?

```
 1              THE COURT:  You may.

 2          (Pause.)

 3              MR. TORRES:  Thank you, Mr. Long.

 4          Thank you, Your Honor.  No further questions.

 5                    REDIRECT EXAMINATION

 6      BY MR. PETSONK:

 7      Q.  Mr. Long --

 8              MR. TORRES:  I apologize, Your Honor, I think we

 9      neglected to offer our Exhibit 15.

10              MR. PETSONK:  You did -- you did not.

11              MR. TORRES:  I'm sorry.  We move for the admission

12      of Exhibit 15, Your Honor.

13              THE COURT:  Any objection?

14              MR. POMPONIO:  None.

15              MR. PETSONK:  No objection, Your Honor.  Sorry.

16              THE COURT:  It is admitted.

17          Defendant's Exhibit 15 admitted.

18      BY MR. PETSONK:

19      Q.  Mr. Long, as to that exhibit Mr. Torres just

20      referenced, Defendant's Exhibit 15, the Pittsburgh

21      Post-Gazette article from October 27, 2016, do you have that

22      in front of you?

23      A.  Yes.

24      Q.  Would you turn to the second page of that article?  And

25      it's Bate-stamped at the bottom, CONSOL 022389.
```

1    **A.**   Yes.

2    **Q.**   Can you read the paragraph that says, "Mr. Long wasn't

3    buying it"?  Can you -- do you see that paragraph?

4    **A.**   Yes.

5    **Q.**   Do you see there is a sentence that says, "It was

6    CONSOL's mantra."  Could you read that, please?

7    **A.**   Yes.

8              MR. TORRES:  Objection.  It's hearsay, Your Honor.

9              THE COURT:  The witness has read it.  What's your

10   next question?

11   BY MR. PETSONK:

12   **Q.**   Do you see the following paragraph quotation that's

13   attributed to you?  Do you see that?

14   **A.**   The following paragraph?

15   **Q.**   It says, "We are committed"?

16   **A.**   That's correct.  I see that.

17   **Q.**   Can you read that sentence aloud?

18   **A.**   Yes.  "We are committed to getting CONSOL to fix their

19   broken promise."

20   **Q.**   Okay.  Is that something that you said?  Is that

21   quotation accurate?

22   **A.**   I think that quotation is accurate.

23   **Q.**   And what is the broken promise that you're referencing

24   in that quotation?

25   **A.**   To provide long-term healthcare and being able to

1    retire at 55 years of age.

2    Q.   Okay.  And what is the promise -- when did you hear, if

3    ever, did you hear that promise?  You testified your

4    orientation meeting, is that the instance that you're

5    referencing there?

6    A.   What I mentioned earlier was there was -- at the

7    orientation, there was an understanding that those

8    participants recognize that after 10 years' service, 55

9    years of age, that they were eligible for healthcare for

10   life.  That was the understanding of the people.

11   Q.   Okay.  Thank you.  And please turn to the next page,

12   CONSOL 022390.

13   A.   Yes, sir.

14   Q.   Now, at this point, I don't think I have further

15   questions about this document.

16        One other brief question.  At the orientation you've

17   described in 1991, was there any difference between your

18   retiree welfare benefits as a salaried retiree, and the

19   benefits described by Luke Gianato in that presentation?

20   A.   Yes, the salaried employees were required to pay

21   healthcare premiums.

22   Q.   And did you have to, indeed -- did you pay healthcare

23   premiums in order to receive your retiree welfare insurance?

24   A.   Yes.  Yes.

25             MR. PETSONK:  At this point, I don't think I have

LONG - RECROSS

1    any further questions, Your Honor.

2            MR. TORRES:  Just briefly, Your Honor.

3                      **RECROSS EXAMINATION**

4    **BY MR. TORRES:**

5    **Q.**  You just testified a moment ago, Mr. Long, about what

6    people understood during the orientation.  Do you recall

7    that testimony?

8    **A.**  Yes.  Yes.

9    **Q.**  You really don't know what other people understood.  I

10   think what you meant to say is that is what was explained

11   during that orientation; is that correct?

12   **A.**  I think that's what they understood at the orientation.

13   After attending the orientation, seeing the presentation, I

14   think most of them understood the provisions that they had

15   laid out.

16   **Q.**  Okay.  Fair enough.

17           MR. TORRES:  Nothing further.

18       Thank you, Your Honor.

19           THE COURT:  Anything further, Mr. Petsonk?

20           MR. PETSONK:  No, Your Honor.  That concludes our

21   presentation of this witness.

22           THE COURT:  And may Mr. Long be excused?

23           MR. PETSONK:  Yes, he may.

24           MR. TORRES:  Yes, Your Honor.  Thank you.

25           THE COURT:  And, Mr. Long, you are excused.  Let

```
 1    me note to you that you are not to discuss your testimony

 2    with any other witness in this case other than one of the

 3    parties until the trial is over.  And, once again, if you'll

 4    follow me out through the courtroom door.

 5              THE WITNESS:  Yes.

 6              THE COURT:  Let me ask whether the parties will be

 7    ready to return at 2 o'clock?

 8              MR. PETSONK:  We certainly can, Your Honor, as the

 9    plaintiffs.

10              MR. TORRES:  Yes, Your Honor.

11              THE COURT:  We'll be back at 2:00.  Thank you.

12              THE CLERK:  All rise.

13         (A recess was taken at 12:51 p.m. until 2:00 p.m.)

14         (Afternoon Session, February 10, 2021, 2:07 p.m.)

15              THE CLERK:  All rise.

16              THE COURT:  Good afternoon.  Please be seated.

17    The next witness.

18              MR. PETSONK:  Yes, Your Honor.  The plaintiffs

19    would call Clarence Bright.

20              THE COURT:  Is he in the courtroom?

21              MR. PETSONK:  He is.

22              CLARENCE WAYNE BRIGHT, PLAINTIFF, SWORN

23              THE CLERK:  State your full name and spell it for

24    the record.

25              THE WITNESS:  Clarence, C-L-A-R-E-N-C-E, Wayne,
```

```
 1    W-A-Y-N-E, Bright, B-R-I-G-H-T.
 2              THE CLERK:  If you'd please take the stand.
 3                       DIRECT EXAMINATION
 4    BY MR. PETSONK:
 5    Q.   Good afternoon, Mr. Bright.
 6    A.   Good afternoon.
 7    Q.   Where do you reside?
 8    A.   Sutton, West Virginia.
 9    Q.   And are you married?
10    A.   Yes, sir.
11    Q.   And what is your wife's name?
12    A.   Christine.
13    Q.   And what is your birth date?
14    A.   3-6-1955.
15    Q.   Sir, what is your current age?
16    A.   65.
17    Q.   Are you currently retired?
18    A.   Yes.
19    Q.   What was your occupation before you retired?
20    A.   I was a mechanic in a strip job.
21    Q.   Was that hourly or a salaried job?
22    A.   Hourly.
23    Q.   Who was your employer when you retired?
24    A.   CONSOL Energy.
25    Q.   Where did you work geographically at the time of your
```

1    retirement?

2    **A.**    Bickmore, West Virginia.

3    **Q.**    And what was the name of that operation?

4    **A.**    Fola Coal Company.

5    **Q.**    And how long did you work at that site?

6    **A.**    A little over 19 years.

7    **Q.**    And who employed you when you first began working at

8    that site?

9    **A.**    It was AMVEST coal, but it was under Fola Coal.

10   **Q.**    And when did CONSOL become your employer?

11   **A.**    I believe it was in 2007.

12   **Q.**    And were you hourly the whole time that you worked at

13   the Fola site?

14   **A.**    Yes, sir.

15   **Q.**    Have you ever worked at a union coal mine operation?

16   **A.**    Yes, sir.

17   **Q.**    To be clear, were you ever a member of the union during

18   the time that you worked at the Fola site?

19   **A.**    No.

20   **Q.**    How long were you a member of a union?

21   **A.**    Between two and a half, three years.

22   **Q.**    And what years were those?  Let's try it, I can ask,

23   which union were you a member of, Mr. Bright?

24   **A.**    Local 6112, District 17.

25   **Q.**    What was the name of the union organization?

1    **A.**    Pratt Mine.

2    **Q.**    I mean, the name of the labor union?

3    **A.**    The UMWA.

4    **Q.**    The UMWA?

5    **A.**    Yes.

6    **Q.**    That's the United Mine Workers?

7    **A.**    Yes, sir.

8    **Q.**    What do you understand about the benefits that you

9    received from the UMWA?

10          THE COURT:  Let me ask a question before you go

11   on.  When were you a union member?  What years?

12          THE WITNESS:  Let's see, it would have been in

13   mid-to-late '70s.

14          THE COURT:  Mid-to-late '70s?

15          THE WITNESS:  Yes.

16          THE COURT:  And for whom were you working at that

17   time?

18          THE WITNESS:  Pratt Mining.

19          THE COURT:  How do you spell it?

20          THE WITNESS:  P-R-A-T-T, Pratt.

21          THE COURT:  And where was that located?

22          THE WITNESS:  Kingston, West Virginia.

23          THE COURT:  Thank you.

24          MR. PETSONK:  Thank you.

25

1    BY MR. PETSONK:

2    **Q.**    During your employment for CONSOL, were there occasions

3    when the company discussed with you or explained to you your

4    entitlement to retirement welfare benefits?

5    **A.**    Yes, sir.

6    **Q.**    Can you give me the list of the times when that

7    happened and then we'll discuss the times the company did

8    discuss your entitlement to retirement welfare benefits, and

9    then I'll discuss them with you in turn.

10   **A.**    The first time when they first took over in 2007, they

11   took us all in with our spouses and give us orientation on

12   what we were getting.

13   **Q.**    Okay.  And I'll come back to that.  What was the next

14   time you remember CONSOL explaining to you your entitlement

15   to retirement welfare benefits?

16   **A.**    Annual retraining, they generally went over them.

17   Whenever -- that's whenever we revised our insurance.

18   **Q.**    Were there any other times that you remember CONSOL

19   explaining to you your entitlement to retirement medical

20   benefits?

21   **A.**    When I went to Canonsburg for a retirement seminar.

22   **Q.**    What year, best you recall, did that occur?

23   **A.**    When I went to Canonsburg?

24   **Q.**    Yes.

25   **A.**    Somewhere around 2011 or '12 -- I'm not sure.

1    **Q.**   And, again, we'll come back to that.  I'd like to ask

2    you first about the -- well, just to clarify, there are any

3    other occasions when you remember CONSOL discussing or

4    explaining to you your entitlement to retirement welfare

5    benefits?

6    **A.**   Just when -- whenever we renew our insurance; go

7    through the insurance package and pick out what we wanted

8    and what we would have, and what we was qualified to have.

9    **Q.**   Okay.  So let's discuss the first instance that you

10   mentioned, when CONSOL took over the Fola operation.  You

11   mentioned they brought you for a meeting.  Where did that

12   meeting occur, as you recall?

13   **A.**   At Summersville, I believe it was in the Armory over

14   there.

15   **Q.**   And how many individuals attended that meeting, as best

16   you remember?

17   **A.**   That was employees and their spouses, so between four

18   hundred and five hundred.

19   **Q.**   Who do you remember from CONSOL discussing your

20   retirement or explaining your retirement welfare benefits at

21   that meeting?

22   **A.**   They were out of Pittsburgh.  But the one I remember --

23   at the time, I didn't remember his name -- but was Gerald.

24   I don't remember his last name.  He's the one that went over

25   our medical.  I remember him telling us about his

1    prescription drugs, what it cost him, and how much he saved

2    by having their insurance.

3    **Q.**    Do you know what department that individual was there

4    within CONSOL?

5    **A.**    Human Resources.

6    **Q.**    And you remember his name was Gerald, but you just

7    can't remember his last name, right?

8    **A.**    I'm not good on names.

9    **Q.**    That's fine.  What, if anything -- well, you said he

10   spoke about retiree welfare benefits.  What did he tell you

11   and explain to you about your retirement welfare benefits at

12   that meeting at Summersville?

13   **A.**    If we were 55 years of age and we had 10 years'

14   service, we would have our retirement benefits until we died

15   or went on Medicare.  And then that Medicare would be our

16   primary, and CONSOL would be our secondary.

17   **Q.**    Which specific types of retiree welfare benefits are we

18   discussing -- or, rather, did Mr. -- the individual named

19   Gerald discuss?

20   **A.**    Healthcare, and prescription drugs, glasses, dental,

21   life, and medical healthcare, whatever you --

22   **Q.**    And as a person, as an official of CONSOL in the HR

23   Department, did you understand that it was, in fact, his job

24   to convey that very type of information about the meaning of

25   the retiree welfare plan terms?

1          MR. TORRES:  Objection; leading, Your Honor.

2          THE COURT:   The witness may answer.

3          THE WITNESS:  Answer?

4    BY MR. PETSONK:

5    **Q.**   Yes.

6    **A.**   Yes, when the president of the company come and tell

7    you something, you took his word for it.  When their

8    representatives come and tell you something, you take their

9    word that they are representing the coal company and telling

10   you what you are going to have.

11   **Q.**   What did you understand was the purpose for which

12   CONSOL called you to that meeting in Summersville?

13   **A.**   To show us what they was giving on replacement on what

14   we had with Fola.

15   **Q.**   And were you required to do anything in order to stay

16   enrolled with the welfare benefits once you retired?

17   **A.**   We had a monthly premium we had to pay.

18   **Q.**   Was that explained also at the Summersville meeting?

19   If you recall?

20   **A.**   I don't recall that.

21   **Q.**   Did you ask any questions of this individual who you've

22   described from the Human Resources Department at the meeting

23   in Summersville?  Did you ask any questions of him?

24   **A.**   Yes.  I wanted to know for sure that's what he said; 10

25   years and 55 years of age.

1    **Q.**    What did he say in response to your question?

2    **A.**    He said we would have it.  And I started planning my

3    retirement then.

4    **Q.**    Did that individual or anyone else from CONSOL mention

5    at that meeting that CONSOL had the right to terminate your

6    retirement welfare benefits?

7    **A.**    It was never mentioned.

8    **Q.**    All right.  You mentioned next, there were annual

9    trainings or annual meetings where CONSOL described your

10    retiree welfare benefits.  Where did those meetings

11    customarily occur?

12    **A.**    Well, annual retraining was one for sure, because

13    that's when most of us all were all together then.  They

14    come out with something like a medical card or that, do that

15    on the job.

16    **Q.**    Where was the annual retraining located?  Where did

17    that take place?

18    **A.**    It wasn't always in the same place.  Sometimes it would

19    be at Drennen, sometimes it would be at Summersville.

20    **Q.**    What facility or location at Drennen, West Virginia,

21    are you referring to?

22    **A.**    They have an office building over there.

23    **Q.**    Who does?

24    **A.**    CONSOL.

25    **Q.**    And what, if anything, was said in those annual

BRIGHT - DIRECT

1    meetings about your retirement welfare benefits?

2    **A.**    That we would have them.

3    **Q.**    How frequent, when you say -- can you say specifically

4    what you recollect -- well, strike that.

5        Who do you recall explaining your retiree welfare

6    benefits at those meetings?

7    **A.**    That would be our HR person, Susan Osborn, or Chase

8    Elswick.

9    **Q.**    And what do you recall that Susan Osborn and Chase

10   Elswick said about your eligibility to receive retiree

11   welfare benefits at those annual meetings at the Drennen

12   facility of CONSOL?

13   **A.**    10 years and 55 years of age, and we were qualified to

14   have them.

15   **Q.**    And what is it that you would qualify to have?

16   **A.**    Medical, dental, eye, life.

17   **Q.**    Bear with me a second.  To clarify, what were Susan

18   Osborn and Chase Elswick, what were their positions with

19   CONSOL?

20   **A.**    They are human resource persons.

21   **Q.**    And do you understand that it was their job duty to

22   convey that type of information that they did convey as

23   you've testified about the -- about the likely receipt or

24   about the future of your retirement welfare benefits?

25   **A.**    Yes, I did.

1   **Q.**   How many people were typically in attendance at these

2   mine site -- at these meetings at the Drennen site?

3   **A.**   Well, they would bring the whole job in most of the

4   time -- or try to.  So 200, 250, sometimes maybe 300.

5   **Q.**   How did they explain the benefits?  Was it verbally or

6   did they provide documents to you?  By what means did Ms.

7   Osborn and Mr. Elswick explain your entitlement to retiree

8   welfare benefits you referenced at the Drennen Center?

9   **A.**   They would -- at the time the insurance was to be

10  renewed, they would give us packets that we could go through

11  and pick out which type of insurance that best fit our needs

12  for our individual families.

13  **Q.**   What other means did they use to present or explain

14  your benefits?

15  **A.**   They'd just tell us.

16  **Q.**   Verbally?

17  **A.**   Yes.

18  **Q.**   Did Mr. Elswick or Ms. Osborn in these annual or

19  periodic meetings that you've referenced ever explain to you

20  that CONSOL reserved the right to terminate your retiree

21  welfare benefits?

22  **A.**   No, they never.

23  **Q.**   During those -- bear with me a second, Mr. Bright, and,

24  Your Honor.

25       What is the next time that you recollect -- you

1   referenced a retirement seminar around 2011 or 2012.  Is

2   that the next time that you recollect CONSOL describing or

3   explaining your retirement welfare benefits?

4          THE COURT:  When you say, "the next time," what's

5   the last time before it?

6   BY MR. PETSONK:

7   Q.   When Mr. Elswick -- other than the annual benefit

8   explanations that you've referenced here, are there other

9   times at the mine site or at the CONSOL site there around

10  Fola that you recall CONSOL explaining your entitlement to

11  retiree welfare benefits?

12  A.   I don't recall for sure.

13  Q.   Okay.  And then you referenced a seminar in Canonsburg,

14  Pennsylvania; is that right?

15  A.   Yes, sir.

16  Q.   And that occurred around 2011 or 2012, as best you

17  recall?

18  A.   Yes.

19  Q.   How did you learn about that retirement seminar in

20  Canonsburg?

21  A.   It was -- CONSOL informed us that we would -- when we

22  turned 55 and eligible for retirement, they advised us to go

23  to that seminar so we could start planning our retirement.

24  Q.   So you turned 55 in the year 2010; is that correct?

25  A.   Yes, sir.

1    Q.   And when you went to the retirement seminar, in either

2    2011 or 2012, what happened there, as best you recall?

3    A.   They brought people in from all parts of the country.

4    It wasn't just coal mines.  It was a gas company and

5    everybody.  And they give us these big, three-ring binder

6    notebooks and it was divided up into sections for health and

7    retirement, your 401.  They even had a part in there about

8    planning a will.  They went through each part of the book

9    with us.

10   Q.   Do you remember who made the presentation or who

11   reviewed each part of that booklet with you at the

12   Canonsburg seminar?

13   A.   Names, I do not.  They get up and introduce themself

14   [sic] and tell us what department they was from.

15   Q.   Did the presenters at that seminar review the retiree

16   welfare benefits?

17   A.   Yes, sir.

18   Q.   Do you remember what department it was that reviewed

19   the retiree welfare benefits?

20   A.   It would have been health and resources.

21           THE COURT:  The same department you referenced

22   before where Ms. Osborn and Mr. Elswick worked?

23           THE WITNESS:  Yes.

24   BY MR. PETSONK:

25   Q.   What did that presenter say to you about the retiree

1    welfare benefits at the seminar in Canonsburg?

2    **A.**   Said the medical part, and told us we would have that

3    when we was eligible for it, and we would have it until we

4    went on Medicare or die.

5    **Q.**   In presenting the retiree welfare benefits at that

6    seminar in Canonsburg, did the presenter make any statement

7    about CONSOL's right to terminate the retiree welfare

8    benefits?

9    **A.**   No, they never.

10   **Q.**   And you stated your birthday is in March.  Is that

11   correct?

12   **A.**   Yes, sir.

13   **Q.**   March 6th.  And so in 2011, you would have turned 56;

14   is that right?

15   **A.**   Yes.

16   **Q.**   And so you had already been eligible to retire for

17   nearly a year when you went to that seminar -- nearly a

18   year, at the least; is that right?

19   **A.**   Yes.  That's when I went, somewhere around that, yes.

20   **Q.**   What was the last date you worked for CONSOL?

21   **A.**   It was in June of 2013, I believe.

22   **Q.**   And did your employment come to a close?

23   **A.**   They were having a layoff, and if you took a -- if you

24   take a layoff, you could go ahead and retire and get the

25   insurance for a certain period of time or have a scheduled

1    layoff.  And if you didn't, you had to keep working or lose

2    your benefits or something to that effect.  I'm not sure

3    just what they did say.

4    **Q.**   How did you learn about those options with regard to

5    your ability to retire after that layoff?  How did you learn

6    about those options?

7    **A.**   The option about retirement or layoff?

8    **Q.**   At the time of the layoff, how did you receive that

9    information about your options to take a voluntary layoff or

10   to retire, as you described?

11   **A.**   As well as I remember, they come out to the job and

12   told us we had a certain amount of time we could take the

13   layoff and go ahead and retire.

14   **Q.**   When you say they came out on the job, do you remember

15   who it was; who came out and informed you about that?

16   **A.**   No, I don't.

17   **Q.**   Okay.  In that -- was it someone from CONSOL or do you

18   have any recollection about how that -- how that layoff

19   occurred?

20   **A.**   No, not really.  I know they was having a layoff.  And

21   I'm sure it had to come through the human resource people,

22   because they are the ones that took care of all the

23   insurance.  To give you a specific name, time and date that

24   happened, I cannot.

25   **Q.**   Okay.  That's fine.  Thank you.  And did you also --

```
 1    did you retire at that time when you were essentially

 2    taking that voluntary layoff?

 3    A.   No.  Because they give us like a grace period on the

 4    insurance.  And it was like -- let's see -- at the end of

 5    that grace period, I applied for my retirement.

 6         (An off-the-record discussion was held between

 7    plaintiffs' counsel Petsonk and defense counsel Torres.)

 8              MR. TORRES:  I am sorry.  Is it in your exhibit

 9    list?

10              MR. PETSONK:  The Deposition Exhibit list.

11              MR. TORRES:  Is this exhibit in your exhibit list?

12              MR. PETSONK:  The exhibit is the deposition

13    exhibit.  You had it, if you want to cross-examine him on

14    it.

15              MR. TORRES:  I guess.

16              MR. PETSONK:  Your Honor, I presented to the Court

17    an item that I would ask to be marked as Plaintiff's Exhibit

18    9.

19    BY MR. PETSONK:

20    Q.   Mr. Bright, have you had a chance to receive this

21    document that's been marked as Plaintiff's Exhibit 9?

22    A.   Yes, sir.

23    Q.   What does it say at the top of the document?  What's

24    the heading there?

25    A.   "Benefits and Information Sheet."
```

BRIGHT - DIRECT

1    **Q.**   What does it say in the parenthesis after that?

2    **A.**   Over 10 years and under -- or -- over 55.

3    **Q.**   And then does it have your name at the top of the

4    sheet?

5    **A.**   Yes, sir.

6    **Q.**   And does it say, "Effective Date"?

7    **A.**   Yes, sir.

8    **Q.**   What is the effective date that's listed there?

9    **A.**   7-1-2013.

10   **Q.**   And is that the date that you recollect being laid off?

11   **A.**   Somewhere around that date.  I don't know for sure.

12   **Q.**   Okay.  Do you remember seeing this document at that

13   time?

14   **A.**   No, sir, I don't.

15   **Q.**   Okay.  Do you remember receiving this document at a

16   later date?

17   **A.**   Not that I remember, no.  I don't remember seeing it.

18   **Q.**   Okay.  Well then set that document to the side, if you

19   would, please.

20            MR. TORRES:  Excuse me.

21            MR. PETSONK:  Your Honor, I may refrain from

22   moving this document into evidence at this point.

23            MR. TORRES:  I'm fine.  Thank you.

24            THE COURT:  Mr. Bright, what was your retirement

25   date again?

```
 1                THE WITNESS:  Pardon?

 2                THE COURT:  Your retirement date?

 3                THE WITNESS:  According to this, it was 7-1-2013.

 4                THE COURT:  Well, that's called an effective date.

 5     Do you think that's when you did retire?

 6                THE WITNESS:  I think that's when I took the

 7     layoff.  And I don't think I retired until May, but I'm not

 8     sure.

 9                THE COURT:  Until when?

10                THE WITNESS:  May of that year.

11                THE COURT:  Of that year?

12                THE WITNESS:  I think, but I'm not a hundred

13     percent sure on that.  I don't really remember for sure.

14                THE COURT:  May of that year would have come

15     before July 1.

16                THE WITNESS:  Okay.  Well, I took the layoff in

17     May -- I don't remember the day I did retire.

18                MR. PETSONK:  Your Honor, if I may, I could

19     proceed to inquire about his process for retiring?

20                THE COURT:  Go ahead.

21                MR. PETSONK:  Thank you.

22     BY MR. PETSONK:

23     Q.   So, Mr. Bright, as you testified, you did not retire at

24     the time you were laid off in July of 2013, right?

25     A.   No.
```

BRIGHT - DIRECT

 1    **Q.**   And you said you had a grace period from CONSOL in

 2    which you continued to receive health insurance after your

 3    layoff; is that right?

 4    **A.**   Well, as I recollect, yes, sir.

 5    **Q.**   And then did you -- was it at a later date that you

 6    elected to retire?

 7    **A.**   Yes.

 8    **Q.**   And if you were laid off in July of 2013, you

 9    referenced in May, was that May of the following year, 2014,

10    when you decided that you wanted to retire?

11    **A.**   The date, I couldn't tell you, but it's probably about

12    right, because I --

13            MR. PETSONK:  Well, if I may, Your Honor, I'd like

14    to approach with another document?

15            THE COURT:  Perhaps you folks could just stipulate

16    the matter?

17            MR. PETSONK:  Let me -- if I may, confer with

18    counsel?

19            THE COURT:  Go ahead.

20        (An off-the-record discussion was held between

21    plaintiffs' counsel and defense counsel.)

22            MR. TORRES:  What's the stipulation?

23            Could I have this -- one second, Your Honor, to

24    look at it?

25            THE COURT:  You may.

```
 1              MR. TORRES:  Your Honor, I just want to consult

 2     with one of our documents for Mr. Bright.  It will take just

 3     one second.

 4          (Pause.)

 5          (An off-the-record discussion was held between

 6     plaintiffs' counsel and defense counsel.)

 7              MR. TORRES:  Your Honor, I'm fine with

 8     stipulating.  I'm sure there is a date that Mr. Bright

 9     retired.  This doesn't line up with what my records reflect,

10     and I don't want to stop --

11              THE COURT:  You can't stipulate if you are not

12     agreeable to it.  I just thought you could work it out

13     quickly, and that's not working out.

14              MR. PETSONK:  Well --

15              MR. TORRES:  We stipulate that Mr. Bright retired

16     in 2014.  The date that's on this document doesn't line up

17     with what I have, but that's --

18              MR. PETSONK:  I think we can take that

19     stipulation, Your Honor.

20              THE COURT:  Let's go forward with that.

21              MR. PETSONK:  Thank you.

22     BY MR. PETSONK:

23     Q.   Did you have to submit paperwork in order to retire,

24     Mr. Bright?

25     A.   Yes, we did.
```

1   **Q.**   Where did you go to submit that paperwork?

2   **A.**   I don't remember whether I went to the office or

3   whether I had to mail it to Pittsburgh.

4   **Q.**   Whether you mailed it to Pittsburgh --

5   **A.**   I don't remember which one it was.

6   **Q.**   I apologize.  Let me take a step back.

7        What did you do in order to activate your retirement?

8   **A.**   I honestly don't remember.  I know I had to fill out

9   some paperwork to activate it, but how I went about it, I

10   don't remember.

11   **Q.**   Okay.

12        MR. PETSONK:  May I inquire of the Court, where

13   the plaintiffs' prior exhibits are located at this time, if

14   they are on the witness stand or with the clerk?

15        THE COURT:  They would primarily be with the clerk

16   or at the witness stand during the course of this witness'

17   testimony.

18        MR. PETSONK:  May I see Plaintiff's Exhibit Number

19   1?  Thank you.

20      May I approach the witness, Your Honor?

21   BY MR. PETSONK:

22   **Q.**   Mr. Bright, I've presented you with a document that was

23   labeled Plaintiff's Exhibit Number 1.  Take a second and

24   look at that document, please.

25   **A.**   (Witness complies.)

1    **Q.**   Mr. Bright, have you had the opportunity to review that

2    document?

3    **A.**   Just about.

4    **Q.**   After you retired --

5            THE COURT:  I think he's still reading it.

6            MR. PETSONK:  I'm sorry, Mr. Bright.

7        I'm sorry, Your Honor.

8            THE WITNESS:  Okay.

9    BY MR. PETSONK:

10    **Q.**   After you retired, did you receive retiree welfare

11    benefits from CONSOL?

12    **A.**   Yes.

13    **Q.**   What types of coverage did you receive from CONSOL

14    after you retired?

15    **A.**   Medical, dental, eye, life.

16    **Q.**   And what happened next with regard to your retirement

17    healthcare?

18    **A.**   When I retired, I started paying a monthly premium to

19    maintain it.

20    **Q.**   How much was that monthly premium?

21    **A.**   I believe it was $148 a month.

22    **Q.**   Okay.  And did you -- how long did you receive

23    retirement healthcare benefits from CONSOL?

24    **A.**   Until they canceled it in 2015.

25    **Q.**   And I presented you this document that is labeled

1    "Plaintiff's Exhibit 1."  Is this document familiar to you?

2    **A.**   Yes.

3    **Q.**   Did -- and what does it appear to be?

4    **A.**   Where they was going to give us our insurance for

5    another five years, and then cancelled it.

6    **Q.**   Is it a letter?

7    **A.**   Yes.

8    **Q.**   And did you receive this letter?

9    **A.**   I believe I did.

10   **Q.**   And it says that CONSOL will continue your health

11   insurance until -- until December 31st, 2019; is that right?

12   **A.**   Yes, sir.

13   **Q.**   When you received this letter, what was your impression

14   from receiving the letter?

15   **A.**   Well, honestly, I figured I was getting screwed, but

16   there was nothing I could do about it.  If I turned 65 in

17   2020, this run out in December, I could go three months

18   until I was on Medicare.

19   **Q.**   I draw your attention to the sentence in the document

20   that says, "As a result and rather than making the

21   termination," -- do you see where I'm reading, in the last

22   paragraph of the document?

23   **A.**   Second paragraph?

24   **Q.**   Yes, the second paragraph?

25   **A.**   Yes, "As a result" -- yes.

1    **Q.**   And so, "As a result and rather than making the

2    termination of retiree group health coverage immediate,

3    CONSOL Energy determined that a transition period of five

4    years would allow retirees and their families an appropriate

5    amount of time to make separate arrangements in a political

6    environment trending towards nationalized healthcare."

7         Is that right?

8    **A.**   Yes.

9    **Q.**   Is that what the document says?

10   **A.**   Yes.

11   **Q.**   And what did you understand to be the meaning of that

12   sentence?

13   **A.**   I'm supposed to have national healthcare, according to

14   that, until I'm on Medicaid -- or Medicare.

15   **Q.**   So did you expect after reading this letter that you

16   would no longer have medical coverage for the rest of your

17   life?

18   **A.**   Yes, sir.

19   **Q.**   Okay.  Did you expect -- did you -- did you try to

20   enroll in government healthcare?

21   **A.**   Yes, sir.

22   **Q.**   And when you received this letter -- well, strike that.

23        When did you try to enroll in government healthcare?

24   **A.**   After I received the second letter.

25   **Q.**   Okay.

1          MR. PETSONK:  Let me inquire of the Court whether

2     I could present the witness with Plaintiff's Exhibit Number

3     2?

4          Your Honor, may I present this exhibit to the

5     witness, to the plaintiff?

6          THE COURT:  Yes.

7          MR. PETSONK:  Thank you.

8     BY MR. PETSONK:

9     **Q.**   I've handed you what is marked Plaintiff's Exhibit

10    Number 2, Mr. Bright.

11    **A.**   Yes, sir.

12    **Q.**   Please take a second and review this document.

13    **A.**   (Witness complies.)

14    **Q.**   Now, as I was questioning you about Plaintiff's Exhibit

15    1, you referenced the second letter?

16    **A.**   Yes, sir.

17    **Q.**   Just to be clear, do you recall when it was that you

18    received this first letter, Plaintiff's Exhibit Number 1?

19    **A.**   Not the exact date, no.

20    **Q.**   Was it after you were receiving retiree welfare

21    benefits?

22    **A.**   Yes, it was.

23    **Q.**   And is there a date listed on the Plaintiff's Exhibit

24    Number 1?

25    **A.**   I don't see a date on it.

BRIGHT - DIRECT

1   **Q.**   Do you recall, roughly, how long after you retired you

2   received that letter?

3   **A.**   No, I don't.

4   **Q.**   Okay.  So moving to Plaintiff's Exhibit Number 2, do

5   you recall receiving this letter?

6   **A.**   Yes, sir.

7   **Q.**   And there is a date on the top of this Plaintiff's

8   Exhibit Number 2, isn't there?

9   **A.**   Yes.

10  **Q.**   And what is that date?

11  **A.**   June 16th, 2015.

12  **Q.**   Do you recall receiving this letter around that time?

13  **A.**   Yes.

14  **Q.**   And you mentioned that when you received -- well, you

15  mentioned that when you received the second letter, you did

16  try applying for government healthcare benefits; is that

17  right?

18  **A.**   Yes, sir.

19  **Q.**   Is it this letter that you're referring to that

20  triggered your application for federal benefits?

21  **A.**   Yes.

22  **Q.**   And what happened when you looked into the federal --

23  the federal healthcare benefits?

24  **A.**   I couldn't afford it.

25  **Q.**   How much were those federal -- well --

1    **A.**   About $1,200 a month.

2    **Q.**   Okay.  And the federal healthcare benefits would have

3    cost you $1,200 a month; is that right?

4    **A.**   Yes.

5    **Q.**   In Plaintiff's Exhibit Number 2, the letter dated June

6    16, 2015, what does it say, if anything, about CONSOL's

7    continuation of retirement welfare benefits?

8    **A.**   Doing away with them.

9    **Q.**   If you look in the first paragraph there, Mr. Bright,

10   it references a date of December 31st, 2015.  Do you see

11   that?

12   **A.**   Yes, sir.

13   **Q.**   What does the letter convey regarding that date?

14   **A.**   Retiree Healthcare Reimbursement Account Plan CRHRA

15   will terminate December 31st, 2015.

16   **Q.**   Did you understand that to apply to the retiree welfare

17   benefits that you were then receiving?

18   **A.**   Yes, sir.

19   **Q.**   And did you, in fact, lose your retiree welfare

20   benefits?

21   **A.**   Yes, I did.

22   **Q.**   On December 31st of 2015?

23   **A.**   Yes, I did.

24   **Q.**   Did CONSOL provide you with any terminal or final

25   benefit at the time that they ended your retiree welfare

1   benefits on December 31, 2015?

2   **A.**   No, they didn't.

3   **Q.**   When CONSOL terminated your retiree welfare benefits,

4   what did you do for healthcare -- to secure healthcare

5   insurance or healthcare coverage at that time?

6   **A.**   I checked on Obamacare, and I couldn't afford it.  So I

7   opted to pay the fine for the rest of that year and go

8   without insurance.

9   **Q.**   How much were you required to pay a fine for not having

10   health insurance at that time, Mr. Bright?

11   **A.**   A hundred dollars a month.

12   **Q.**   And for how many months did you pay that fine?

13   **A.**   Three months.

14   **Q.**   And did you secure health care then at that point?

15   **A.**   Yes.

16   **Q.**   And what sort of -- when I say healthcare, I mean

17   healthcare insurance.  And what sort of insurance did you

18   secure at that point in 2016?

19   **A.**   My wife is a retired school teacher, and she had kept

20   enough of her life insurance through the PEIA where we could

21   go back and pick her insurance up and be covered under it.

22   **Q.**   You said that she retained life insurance; is that what

23   you mean there or do you mean medical insurance?

24   **A.**   Well, before -- when she cancelled her insurance, the

25   lady advised her to keep the life insurance policy through

1    PEIA, because if something ever happened, she could come

2    back and pick up her medical.  That's what we did.

3    **Q.**   So she -- she had retained life insurance, but because

4    of that retention, you were able to go back and get onto a

5    medical insurance plan through your wife's PEIA insurance;

6    is that right?

7    **A.**   That's right.

8    **Q.**   And since -- did the PEIA insurance cover dental and

9    vision costs?

10   **A.**   No.

11   **Q.**   Since you lost your CONSOL retiree health insurance,

12   have you paid out-of-pocket for dental and vision?

13   **A.**   Yes.

14   **Q.**   And how much would you estimate you paid for dental

15   costs since you lost your CONSOL retiree health insurance?

16   **A.**   Probably $3,000.

17   **Q.**   And how much have you estimated that you paid for

18   vision?

19   **A.**   $1,500.

20   **Q.**   And that's during the years since you lost your retiree

21   insurance from CONSOL, right?

22   **A.**   Yes.

23   **Q.**   And what did you do in order to develop those numbers

24   of your losses?

25   **A.**   My wife went through the checkbook and credit card

1    receipts and added up how much we paid out-of-pocket.

2    **Q.**   Did you expect to have those medical expenses, that is,

3    including the dental and vision services covered by your

4    CONSOL retiree welfare benefits?

5    **A.**   Yes.

6            MR. PETSONK:  Your Honor, other than to briefly

7    confer with my co-counsel -- if I may?

8        (Pause.)

9            MR. PETSONK:  Your Honor, at this point, I will

10   conclude my questioning of the witness.  And I would note

11   I'm not moving to admit Plaintiff's Exhibit -- 9, is it?

12   The Plaintiff's Exhibit 9 which I tendered, I do not move

13   for its admission at this time.

14           MR. TORRES:  May I have just one moment, Your

15   Honor?

16           THE COURT:  You may.

17           MR. TORRES:  I apologize, Your Honor.

18                        **CROSS-EXAMINATION**

19   **BY MR. TORRES:**

20   **Q.**   Mr. Bright, you said you started at CONSOL in 2007; is

21   that correct?

22   **A.**   Yes.

23   **Q.**   And when you were working for AMVEST or Fola, before

24   you became employed by CONSOL, did that company have retiree

25   medical benefits?

BRIGHT - CROSS

1    **A.**   No.

2    **Q.**   And do you recall how soon after you started working at

3    CONSOL in 2007 that you were put on CONSOL's benefits?

4    **A.**   The exact period of time, I can't tell you.  It was

5    shortly after CONSOL took over.

6    **Q.**   But it wasn't immediately; is that correct?

7    **A.**   Not the same day, no.

8    **Q.**   You don't recall?

9    **A.**   Within a short period of time.

10   **Q.**   Okay.  And however long that period of time was, in

11   order to explain to you CONSOL's benefits, they invited you

12   to a meeting in Summersville; is that correct?

13   **A.**   Yes, sir.

14   **Q.**   And some person named Gerald, whose last name you can't

15   remember, allegedly told you in that meeting that you would

16   have benefits for life; is that correct?

17   **A.**   That's right.

18   **Q.**   Okay.  And -- well, did he say, for life, or did he say

19   until you died or went on Medicare?  Just so we are clear.

20   **A.**   Until you died or went on Medicare.

21   **Q.**   So he didn't say until life; he said, until you died

22   and went or Medicare?

23   **A.**   What's the difference between life and death?

24   **Q.**   I'm just trying to understand what your testimony is,

25   sir.

1    **A.**   Okay.

2            THE COURT:  Please just listen to the question and

3    answer it, if you would.

4        And you can restate it.

5            MR. TORRES:  You want me to restate it, Your

6    Honor?

7            THE COURT:  I think you should ask the question

8    again and get the answer.

9    BY MR. TORRES:

10   **Q.**   Your testimony was that the gentleman said you would

11   have retirement benefits until you died, correct -- well,

12   let me back up.  I didn't mean to confuse things, sir.

13       Did the gentleman named Gerald -- just so I'm clear --

14   at this meeting in Summersville, said that once you hit 55

15   and 10 years of service, you would have retirement benefits

16   until you died; is that correct?

17   **A.**   Yes.

18   **Q.**   Okay.  My apologies.  And then you said that you had

19   annual meetings where Susan Osborn and Chase Elswick spoke;

20   is that right?

21   **A.**   Yes.

22   **Q.**   And about how many meetings do you recall that you

23   attended where Mr. Elswick and Ms. Osborn spoke about

24   benefits?

25   **A.**   The yearly meeting we would have for sure, but other

1      than that, I can't speculate how many other than that, but I

2      know at least one a year.

3      Q.   Okay.  So your recollection is there was this

4      once-a-year meeting, and that's where they spoke about

5      benefits, correct?

6      A.   Yes.

7      Q.   And unlike the meeting in Summersville, neither Ms.

8      Osborn nor Mr. Elswick ever told you that you would have

9      your benefits for life, correct?

10     A.   Well, they said we would have them.  They didn't say

11     exactly for life.  They said we would have them.  And led me

12     to believe that that's what I would have.

13     Q.   I didn't catch the last part of that?

14     A.   Leading me to believe that's what I had.

15     Q.   Well, I'm interested in what they said.  So you agree

16     -- your testimony is that they said you would have benefits;

17     they did not say they that you would have them for life,

18     correct?

19     A.   Well, not life, no.  They said we would have them until

20     we was -- what they led me to believe, that I would have

21     them until I was dead.  They didn't just say until I was

22     dead, no.

23     Q.   Well, you remember, you and I spoke at your deposition,

24     correct?

25     A.   Yes, sir.

1   **Q.**   And do you recall testifying at your deposition that

2   you don't recall Ms. Osborn using the word "lifetime" or

3   making any promises about your benefits, correct?

4   **A.**   I don't remember exactly what I told you, but if you

5   got the deposition, that's what I said.

6   **Q.**   Okay.  Well, why don't we be clear about it just so

7   there is not any confusion in the record here.

8           MR. TORRES:  May I approach, Your Honor?

9           THE COURT:  You may.

10   BY MR. TORRES:

11   **Q.**   Mr. Bright, I'm going to hand you a copy of your

12   deposition.  And if you look at the second page in the

13   document, it says, this is a video deposition of Clarence

14   Bright, correct?

15   **A.**   Second page.  Yes.

16   **Q.**   And it says that you testified on May 23rd, 2017,

17   correct?

18   **A.**   Yes.

19   **Q.**   And you were under oath that day?

20   **A.**   Yes.

21   **Q.**   And you swore to tell the truth, correct?

22   **A.**   Yes, sir.

23   **Q.**   And if you turn to page 44 of your deposition -- let me

24   know when you are there.

25   **A.**   Okay.

1   **Q.**   And Line 9 at that page, I asked you:  "To the best of

2   your recollection, what do you recall Ms. Osborn saying?

3   Did she ever use the word "Lifetime"?

4        Do you see that question?

5   **A.**   Yes.

6   **Q.**   And your answer was, "I don't remember," correct?

7   **A.**   Yes.

8   **Q.**   And I asked you at Line 13:  "What do you remember Ms.

9   Osborn saying?"

10       Do you see that?

11  **A.**   Yes.

12  **Q.**   And you testified:  "She just went over the benefit

13  package with us at our annual retraining and stuff

14  sometime," correct?

15  **A.**   Yes.

16  **Q.**   And then I asked you Line 17:  "You don't remember her

17  using the word 'Lifetime,'" correct?

18       And you said:  "That's right."

19       Do you see that?

20  **A.**   Yes, sir.

21  **Q.**   And then at Line 20, I said:  "Do you remember her

22  making any other promises to you other than just simply

23  explaining to you what your benefits were?"

24       And your answer was:  "No."

25       Correct?

BRIGHT - CROSS

1    **A.**   Yes.

2    **Q.**   So Ms. Osborn didn't make you any promises regarding

3    your benefits, correct, Mr. Bright?

4              MR. PETSONK:  I'm going to object to the question,

5    Your Honor.  I think it's mischaracterizing the testimony

6    here, but --

7              THE COURT:  You may continue with your question.

8    BY MR. TORRES:

9    **Q.**   Is that correct, Mr. Bright?

10   **A.**   Repeat it, please.  Repeat it.

11   **Q.**   I said, Ms. Osborn, according to your sworn testimony

12   at your deposition, didn't make any promises regarding your

13   benefits, correct?

14   **A.**   She didn't promise me, no.

15   **Q.**   And she didn't use the word "Lifetime" in describing

16   your benefits, correct?

17   **A.**   Not to my recollection, no.

18   **Q.**   Okay.  And, similarly, Mr. Elswick didn't make you any

19   promises of lifetime benefits, correct?

20   **A.**   No.

21   **Q.**   No?

22   **A.**   He didn't promise me nothing.

23   **Q.**   I'm sorry.  I'm having a hard time hearing you.

24   **A.**   He never promised them, no.

25   **Q.**   Okay.  And he didn't use the word "Lifetime" in

1   describing your benefits, correct?

2   **A.**   I don't think so, no.

3   **Q.**   Okay.

4   **A.**   Not that I can remember, no.

5   **Q.**   Okay.  Thank you.  All right.  So then you said that

6   you attended a retirement seminar just before you were

7   getting ready to retire, correct?

8   **A.**   Yes.

9   **Q.**   That took place in Pennsylvania?

10  **A.**   Yes.

11  **Q.**   And you said that they handed out some information to

12  describe your retiree medical benefits, correct?

13  **A.**   They did, yes.

14  **Q.**   It was a Summary Plan Description?

15  **A.**   Yes.

16  **Q.**   Okay.  And you said in your testimony a moment ago they

17  reviewed that Summary Plan Description with you during that

18  meeting, correct?

19  **A.**   Yes.

20  **Q.**   And you recall I showed you that document at your

21  deposition, correct?

22  **A.**   Yes.

23  **Q.**   And you agree that that document, among other things,

24  stated that CONSOL reserved the right to terminate its

25  benefits at any time, correct?

1    **A.**    It was in small print, but it was not how -- like all

2    the benefits was.  They kind of hid it back, but, yes, it

3    was in there.

4    **Q.**    Yes or no, that it stated that, sir?

5    **A.**    Yes.

6    **Q.**    It did, correct?

7    **A.**    After you pointed it out to me.  I never read it up

8    there.

9    **Q.**    Okay, well, let's do that.  Let's see how fine the

10   print is.

11           MR. TORRES:  Could I have just one moment, Your

12   Honor?

13           THE COURT:  You may.

14           MR. TORRES:  May I approach, Your Honor?

15   BY MR. TORRES:

16   **Q.**    Mr. Bright, I'm showing you what's been marked as

17   Defendant's Exhibit 16.  And this document on the first page

18   says, "CONSOL Energy Summary Plan Description," correct?

19   **A.**    Yes.

20   **Q.**    And below that, it says, Production and Maintenance

21   Employees at AMVEST, West Virginia Coal, correct?

22   **A.**    Yes.

23   **Q.**    And that's where you worked, correct?

24   **A.**    Yes.

25   **Q.**    Do you see on the bottom of the document there is the

1    words "CONSOL," and then some numbers?

2    **A.**    Yes.

3    **Q.**    Can you turn to CONSOL 005609, please.  I'm sorry.

4    Turn to CONSOL 005611.

5    **A.**    Okay.

6    **Q.**    And under the words, "Plan Overview," it says, "The

7    CONSOL Energy Inc. Retiree Medical and Prescription Drug

8    Expense Benefits Plan."  Do you see that?

9    **A.**    Yes.

10   **Q.**    And at the bottom of the page under page 1, it says,

11   "Retiree Medical and Prescription Drug Plan SPD P&M AMVEST,"

12   correct?

13   **A.**    Yes.

14   **Q.**    This is the document I showed you at your deposition,

15   correct?

16   **A.**    Yes.

17   **Q.**    And you agree that you received this during your

18   retirement seminar, correct?

19   **A.**    Yes.

20   **Q.**    And when you attended that retirement seminar, you were

21   retirement eligible, correct?

22   **A.**    Yes.

23            MR. TORRES:  I'm sorry, 15, Josh?

24            THE CLERK:  16.

25         Defendants offer Exhibit 16, Your Honor.

BRIGHT - CROSS

```
 1                 THE COURT:  Any objection?
 2                 MR. PETSONK:  No, Your Honor.  No objection.
 3                 THE COURT:  Admitted.
 4           Defendant's Exhibit 16 admitted.
 5    BY MR. TORRES:
 6    Q.   Now, you said that this document was reviewed during
 7    the retirement seminar, correct?
 8    A.   Yes.
 9                 THE COURT:  Is it agreed when that would have
10    been?
11    BY MR. TORRES:
12    Q.   Do you remember, approximately -- I think you testified
13    that you attended the seminar in either 2010 or 2011,
14    correct?
15    A.   I forget the exact date.  Somewhat right in there, I
16    went to that.
17    Q.   Okay.
18                 MR. PETSONK:  Your Honor, if you're entertaining a
19    stipulation, we can stipulate to 2011.
20                 THE COURT:  How does that relate to Canonsburg?
21                 MR. TORRES:  I'm sorry, sir.
22                 THE COURT:  How does this relate to Canonsburg?
23                 MR. TORRES:  This is the document he testified was
24    handed out to him when he attended the retirement seminar in
25    Canonsburg.
```

```
 1                 THE COURT:  That was in 2011, 2012, according to

 2      the witness' testimony, so I guess you are agreeing to that?

 3                 MR. TORRES:  Yes, Your Honor.

 4                 THE COURT:  Very good.  Go ahead.

 5      BY MR. TORRES:

 6      Q.   And in sticking with the numbers at the bottom of the

 7      page, these pages, if you could turn to CONSOL 5 -- 005667.

 8      Do you see that?

 9      A.   Yes, sir.

10      Q.   And at the top of that page, there is a section that

11      says, "Future of the Plan"?

12      A.   5667?

13      Q.   Right below that?

14      A.   Future plan, yes.

15      Q.   Okay.

16                 THE COURT:  What is the page number?

17                 MR. TORRES:  CONSOL 005667.

18                 THE COURT:  Thank you.

19      BY MR. TORRES:

20      Q.   And the second -- there is some text on this page that

21      is bigger than the rest of the text, correct?

22      A.   Yes.

23      Q.   And the second set of words that are bigger than the

24      rest of the text are the ones that say, "Future of the

25      Plan," correct?
```

1    **A.**    Yes.

2    **Q.**    And under that it says, "The Board of Directors of

3    CONSOL can amend, modify, suspend, or terminate all or part

4    of the Plan at any time," correct?

5    **A.**    Yes.

6    **Q.**    And that text is the same as the text below it,

7    correct?

8    **A.**    Yes.

9    **Q.**    And other than the heading, it's the same size text of

10   the other words on these pages, correct?

11   **A.**    Yes.

12   **Q.**    Okay.  Now, in addition to the document you just

13   testified to, you received other documents even before you

14   went to Canonsburg for CONSOL that we reviewed at your

15   deposition that included reservation of rights language,

16   correct?

17   **A.**    I don't understand what you're saying.

18   **Q.**    Even before you went to Canonsburg in 2011-2012, and

19   you received the document that we were just looking at,

20   which included a reservation of rights language, prior to

21   that, you received other documents from CONSOL that also

22   included reservation of rights language that we reviewed at

23   your deposition, correct?

24   **A.**    I don't remember reading that in any of them.  The only

25   time I remember reading it is when you showed it to me in

1    the deposition.

2    **Q.**   Okay.  You admitted receiving documents at your

3    deposition?

4    **A.**   Yes.

5    **Q.**   I showed you documents at your deposition that you

6    recalled receiving?

7    **A.**   Yes.

8    **Q.**   And you agreed that each of those documents contained

9    reservation of rights language -- whether or not you read

10   it, sir, you agreed that those documents you received

11   contained reservation of rights language, correct?

12   **A.**   No.  I never seen it in them.  I'm taking your word

13   that it's in there.  But I never let them personally tell

14   you they was in there.

15   **Q.**   Okay.

16        MR. TORRES:  Could I have Defendant's Exhibit 3?

17   Thank you.

18       May I approach, Your Honor?

19          THE COURT:  Yes.

20          MR. TORRES:  Let me give that back to you.

21   BY MR. TORRES:

22   **Q.**   Mr. Bright, I'm going to show you what's been marked as

23   Defendant's Exhibit 17.  This document states on the front

24   page on the right side, "Your 2009 Flexible Benefits

25   Enrollment Guide," correct?

1    **A.**    Yes.

2    **Q.**    And below that, it says, "CONSOL Energy," correct?

3    **A.**    Yes.

4    **Q.**    And you recall me showing you this document at your

5    deposition?

6    **A.**    If you showed me -- I don't recall.  I don't recall

7    which documents you showed me.  I'm sure you showed it to

8    me, but as far as me saying, yes, you give it to me -- I

9    can't say that.

10   **Q.**    You still have your deposition transcript, Mr. Bright?

11   **A.**    Yes, sir, I do.

12   **Q.**    So if you could turn to Page 59 of your deposition.

13   Well, actually, I'll withdraw that question.

14        Before you received the retiree SPD that we entered

15   into evidence, you recall at your deposition you testified

16   you also received a similar document that applied to active

17   employees, correct?

18   **A.**    Applied to, what?

19   **Q.**    To when you were an active employee?

20   **A.**    Yes.

21   **Q.**    Okay.  And that document, like the retiree document,

22   that SPD we looked at, included reservation of rights

23   language, correct?

24   **A.**    I -- if you are telling me it's in there, it's in

25   there.  I never looked at it and read it, no.

1    **Q.**    Well, the document says what it says.

2         So you would agree with me, Mr. Bright, that after this

3    gentleman named Gerald made this statement at the meeting in

4    Summersville, you received documents from CONSOL that stated

5    in writing that they reserved the right to terminate your

6    benefits, correct?

7    **A.**    It was possibly in there, but I never read them

8    documents.  What I read in them documents was the benefit

9    plan they was telling me I would have.  And to go through

10   and read all the fine print -- it didn't really interest me.

11   Because they was telling me I would have my retirement, my

12   medical benefits, my life insurance, my health, dental, if I

13   had 55 years' service -- 55 years of age and 10 years'

14   service.  And I didn't have no reason to question it.

15   It's -- whatever they done as far as the insurance, it was

16   what they said it was.

17   **Q.**    My question, sir, was:  After this gentleman Gerald

18   made the statements that you claim he made in Summersville,

19   CONSOL sent you documents, that you admitted receiving, that

20   included language that said they reserve the right to

21   terminate the benefits, correct?

22   **A.**    I'm telling you I never read it in there.  If it's in

23   there, it's in there.  But I never seen it.

24   **Q.**    Sir, I'm not asking you if you read it.

25        You saw the document and admitted what it said, and

1    you've admitted you received it.  So, yes or no, you

2    received the document and it includes reservation of rights

3    language?

4              MR. PETSONK:  Your Honor, I'm going to object.

5    This question has been asked and answered quite a number of

6    times at this point.

7              THE COURT:  Overruled.

8              THE WITNESS:  I received the documents, yes.

9    BY MR. TORRES:

10   Q.   Thank you.  And you said that after you lost your

11   benefits from CONSOL, you were going to sign up for what you

12   called Obamacare, but it was too expensive, correct?

13   A.   Yes, sir.

14   Q.   And that was $1,200 a month; did I get that right?

15   A.   Yes.

16   Q.   Okay.  And then you paid the penalty, and then you went

17   on your wife's insurance, correct?

18   A.   Yes.

19   Q.   And did you -- have you attempted to quantify how much

20   out-of-pocket expenses you incurred as a result -- and I

21   apologize if you testified to this.  I may have missed it

22   earlier.  The total amount you claim you are out-of-pocket

23   as a result of losing these benefits?

24   A.   Somewhere around $28,000.

25   Q.   And the $28,000, what does that -- I mean, can you be

BRIGHT - CROSS

1    more specific as to what that consists of?

2    **A.**   Well, $2,500 for glasses, and I think it was around

3    $4,000 for dental work.  And the rest of it was where I had

4    to pay almost $500 a month for insurance, hospitalization,

5    or --

6    **Q.**   So most of it is $500 a month for insurance, correct?

7    **A.**   Mm-hmm.

8    **Q.**   Do you know how much per month you were paying at

9    CONSOL for medical?

10   **A.**   $148 a month.

11   **Q.**   $148?

12   **A.**   Yes.

13   **Q.**   So is that $28,000, the difference between the $148 and

14   the $500, you're subtracting the amount you paid to CONSOL?

15   **A.**   No.  That's what I had to pay out-of-pocket, and

16   instead of $500 a month -- let's see here -- trying to

17   remember how my wife explained that to me.

18   **Q.**   So you are not sure if the $28,000 is minus the amount

19   you would have had to pay to have CONSOL insurance?  Is that

20   fair?

21   **A.**   Fair enough, yes.

22   **Q.**   Okay.  So it could be less than 28; we'd have to deduct

23   the amount you paid to CONSOL, but that's something your

24   wife calculated, and you are not sure how she did it?

25   **A.**   It could be $148, sir.  It could be $148 more.  I'm not

1     sure what she said.

2              THE COURT:  Just a moment.  Mr. Bright, would you

3     pull the microphone closer to you?

4              THE WITNESS:  Is that better?

5              THE COURT:  It probably will be.  Let's see.

6     BY MR. TORRES:

7     Q.   Okay.  Mr. Bright, so this gentleman by the name of

8     Gerald that you testified about, who used the

9     word "Lifetime," you would agree no one ever told you that

10    Gerald had the authority to change the terms of CONSOL's

11    written benefits plan, correct?

12    A.   I don't know he had a change, but he was telling us

13    what he represented.

14    Q.   That wasn't my question, Mr. Bright.  No one told you

15    that Gerald had the authority to alter the terms of CONSOL's

16    written benefits plan, correct?

17    A.   No.  Why would he?  I wouldn't know why he would try to

18    change it, no.

19    Q.   Okay.  So no one ever told you that, correct?

20    A.   No.

21    Q.   And no one -- Gerald never told you that he had the

22    authority to change the terms of CONSOL's written benefits

23    plan, correct?

24    A.   No.

25    Q.   And CONSOL never gave you any written material stating

BRIGHT - CROSS

1    that Gerald had the authority to change the terms of

2    CONSOL's written benefits plan, correct?

3    **A.**    No.

4    **Q.**    And no one ever told you that -- I'm sorry.

5        You don't have any knowledge that CONSOL ever told

6    Gerald to lie to you about CONSOL's written benefit plan,

7    correct?

8    **A.**    No.

9    **Q.**    And you have no knowledge that CONSOL ever told Gerald

10   to make any misrepresentation to you about CONSOL's written

11   benefits plan, correct?

12   **A.**    No.

13   **Q.**    And you don't know if anyone from CONSOL told Gerald to

14   promise you lifetime benefits, correct?

15   **A.**    No.

16   **Q.**    And you don't know if anyone from CONSOL told Gerald to

17   make any misrepresentations to you, correct?

18   **A.**    No.

19            MR. TORRES:  One minute, Your Honor.

20        (Pause.)

21        (An off-the-record discussion was held between the

22   defense attorneys.)

23   BY MR. TORRES:

24   **Q.**    One last thing, Mr. Bright.  You were testifying about

25   the fact you were paying $500 a month for insurance?

1    **A.**   Yes.

2    **Q.**   You're not paying that still, because you are on

3    Medicare, correct?

4    **A.**   I'm still paying a premium, but I don't know what it

5    is, no.

6    **Q.**   So your current premium isn't $500?

7    **A.**   I don't believe so.  But I'm not sure what it is.

8    **Q.**   You are not sure what it currently is?

9    **A.**   No.

10   **Q.**   And do you remember when you stopped paying the $500

11   per month?  Is that when you went on Medicare?

12   **A.**   Yes.

13   **Q.**   Okay.  Thank you, Mr. Bright.

14          MR. TORRES:  Thank you, Your Honor.  Nothing

15   further.

16          MR. PETSONK:  Your Honor, thank you.

17                    **REDIRECT EXAMINATION**

18   **BY MR. PETSONK:**

19   **Q.**   Mr. Bright, as to your out-of-pocket expenses after

20   CONSOL terminated your retiree welfare insurance, you

21   testified that you had paid about $3,000 of dental costs; is

22   that right?

23   **A.**   Yes.

24   **Q.**   And about $1,500 for vision purposes; is that right?

25   **A.**   I think so, yes.

1          MR. PETSONK:  Your Honor, I don't think I have any

2     further questions at this time.  Thank you.

3          MR. TORRES:  Nothing further, Your Honor.

4          THE COURT:  Is Defendant's 17 to be moved?

5          MR. TORRES:  I'm sorry, Your Honor.  Defendants

6     will move Defendant's 17.

7          MR. PETSONK:  No objection.

8          THE COURT:  Admitted.

9          **Defendant's Exhibit 17 admitted.**

10         THE COURT:  May Mr. Bright be excused?

11         MR. PETSONK:  Yes.  Mr. Bright may be excused,

12    yes.  Thank you, Your Honor.

13         MR. TORRES:  Yes, Your Honor.

14         THE COURT:  Mr. Bright, you're excused.  Let me

15    caution you, however, not to discuss your testimony with any

16    other witness in this case except the other parties, the

17    plaintiffs in the case --

18         THE WITNESS:  Yes, Your Honor.

19         THE COURT:  -- until the trial is over.

20         THE WITNESS:  Yes.

21         THE COURT:  If you need any relief from that

22    direction, you or your attorney can let me know.

23         THE WITNESS:  Thank you.

24         THE COURT:  Thank you, sir.  And I'm going to ask

25    you to follow me out of the courtroom when we recess here in

1    a moment.  And we'll go through that door, and I'll have you

2    go on out through that chamber.

3         Do the parties have anything further at the moment?

4              MR. TORRES:  Nothing, Your Honor.

5              MR. PETSONK:  Your Honor, I just wanted to advise

6    Your Honor that I think the next witness we intend to

7    present will be Mike Hymes, which is -- which is one out of

8    order from what we had expressed at the outset.  We are

9    changing the order to accommodate the schedule of the

10   witnesses, if that's agreeable to Your Honor.

11             THE COURT:  It is alright with me, and I take it

12   is with the defendant as well?

13             MR. TORRES:  Yes, Your Honor.

14             THE COURT:  So we'll return with him.  And perhaps

15   he can be on the witness stand when we return in 15 minutes

16   at a quarter till.

17        And thank you, sir.

18             THE WITNESS:  Thank you.

19             THE CLERK:  All rise.

20        (A recess was taken at 3:30 p.m. until 3:47 p.m.)

21             THE CLERK:  All rise.

22             THE COURT:  Good afternoon.  Please be seated.

23   And I take it the next witness is in the chair, ready to go?

24             MR. PETSONK:  Yes, Your Honor.

25             THE COURT:  And if you'll state your full name,

1    please.

2              MR. HYMES:  Dean Michael Hymes.

3              THE COURT:  And he may be sworn.

4              THE CLERK:  Mr. Hymes, if you would please raise

5    your right hand.

6         **DEAN MICHAEL HYMES, PLAINTIFF'S WITNESS, SWORN**

7              THE CLERK:  Please spell your name for the record.

8              THE WITNESS:  H-Y-M-E-S.

9                        **DIRECT EXAMINATION**

10   **BY MR. PETSONK:**

11   **Q.**   Good afternoon, Mr. Hymes.  What is your occupation?

12   **A.**   I'm a human resource consultant.

13   **Q.**   And who is your employer?

14   **A.**   I'm currently self-employed.

15   **Q.**   How long have you been self-employed?

16   **A.**   A little over five years, I think.

17   **Q.**   Who employed you before that?

18   **A.**   Before that was James River Coal Company.

19   **Q.**   And what was your position with James River Coal

20   Company?

21   **A.**   Corporate Human Resources Director.

22   **Q.**   How many years of experience do you have all together

23   as a director or otherwise as a senior manager of human

24   resources in the Appalachian coal industry?

25   **A.**   Probably 20 years.

1   **Q.**   Were you ever employed by CONSOL?

2   **A.**   Yes.

3   **Q.**   What years were you employed by CONSOL?

4   **A.**   I was employed from February of 1972 until January

5   1993, I think was the date.  Might be in August.  I can't

6   remember for sure.

7   **Q.**   Were you employed in the Human Resources function

8   throughout that time?

9   **A.**   Yes.

10   **Q.**   And where geographically did you work for CONSOL?

11   **A.**   My area of coverage was the Southern Appalachian

12   Region, which included Tennessee, Virginia, and Southern

13   West Virginia, and Eastern Kentucky.

14   **Q.**   Did you also perform work for CONSOL in any other

15   regions?

16   **A.**   I worked for Fairmont Supply as a manager of employee

17   development, and that was all over the country at their

18   warehousing areas.

19   **Q.**   What was the senior most position that you held in the

20   Human Resources function for CONSOL?

21   **A.**   I was Regional Manager of Human Resources for Southern

22   Appalachian Region.

23   **Q.**   And we may revisit the particular chronology of your

24   employment, but for sake of brevity, I'd like to ask you, as

25   it relates to employee benefits in Human Resources, what job

1    duties did you hold during the time that you worked for

2    CONSOL?  If you can summarize the job functions you held

3    during that employment?

4    **A.**   As it applies to benefits or --

5    **Q.**   Yes.

6    **A.**   -- the entire function?  To benefits, the benefits

7    manager worked directly for me.  It was my overall

8    responsibility to ensure the benefits were being managed and

9    administered properly.  We tried to manage the costs, and

10   developed whatever new benefits that we might want to

11   recommend to Pittsburgh for approval in our package.

12   **Q.**   What other job functions did you hold as a Human

13   Resources officer for CONSOL?

14   **A.**   As the senior HR person in Southern App, I had

15   responsibility for employee -- employee development reported

16   to me, the benefits function reported to me.  The salary

17   payroll function reported to me.  The employment function

18   reported to me.  And the industrial relations and union

19   avoidance function reported to me also.

20   **Q.**   When you say, "union avoidance," did CONSOL have both

21   union and nonunion or union-free operations during the time

22   that you worked there?

23   **A.**   Yes.  We were double-breasted.  We had union

24   operations, and we had union-free operations.

25   **Q.**   When you first began to work for CONSOL in 1972, did

1    you have nonunion or union-free operations at that time?

2    **A.**    1972, we were totally represented by the UMWA.

3    **Q.**    What was the first union-free operation that you were

4    involved with for CONSOL, either directly or indirectly,

5    through your work in Human Resources?

6    **A.**    Well, the first one we were involved with was working

7    on just input into the Navajo Reservation Burnham operation.

8    And that was basically input as senior HR person in the

9    company, there were several of us, and we were all asked for

10    input.  But that was the first one that I was involved with.

11    **Q.**    What was the next union-free operation that you were

12    involved with as a Human Resources officer with CONSOL?

13    **A.**    Well, the next one would have been Buchanan One.  Now

14    it's Buchanan, but we called it Buchanan One.

15    **Q.**    And where is that located?

16    **A.**    It's located in Buchanan County, Virginia.

17    **Q.**    I'll come back and ask you about these.  What was the

18    next union-free operation you were involved with at CONSOL?

19    **A.**    I guess the next one would have been our Eastern

20    Kentucky operations, where we made an acquisition of an

21    existing union-free operation that was owned by Utah

22    International, and we acquired that union-free location.

23    **Q.**    And was that -- you said that's in Eastern Kentucky?

24    **A.**    Yes.

25    **Q.**    And was there a principal mine operation that you

 1    referred to or think of as being involved in that

 2    acquisition?

 3    **A.**    Originally, it was the operation located in David,

 4    Kentucky.  And we just called it Eastern Kentucky

 5    operations.  It also included undeveloped property, which

 6    later became the Jones Fork operation of CONSOL.

 7    **Q.**    Thank you.  And then what was the next union-free

 8    operation that you were involved with as a Human Resources

 9    officer for CONSOL?

10    **A.**    Well, directly involved with -- indirectly involved

11    with the Bailey operation and the Enlow operation, both; I

12    had input into those programs, but they were not my direct

13    responsibility.

14    **Q.**    When you say you had input into those programs, please

15    describe what you mean.  What was the nature -- let me ask

16    you this:  What was your involvement with those programs?

17    **A.**    Well, when CONSOL was 100 percent union, they had no

18    experience at union-free operations.  And we, as a group,

19    did a great deal of research; visited other union-free

20    operations, trying to figure out what the secret was, I

21    guess you could say.

22              MR. TORRES:  Object.  I'm sorry.

23          Are you finished, sir?

24              THE WITNESS:  No.

25              MR. TORRES:  Okay.

1          THE WITNESS:  And we would -- we put together the

2     strategy for the union-free operations for CONSOL, including

3     Buchanan, Bailey, Enlow, et cetera.

4          MR. TORRES:  Your Honor, move to strike.  He lacks

5     foundation to testify on behalf of CONSOL.  He can't testify

6     as to what other individuals could do.  He could testify as

7     to what he said and did, but that was testimony as to other

8     individuals, purportedly, on behalf of CONSOL.

9          THE COURT:  When you said, "We as a group," what

10    did you mean by that?

11         THE WITNESS:  Well, there were regions in the

12    company:  The Southern Appalachian Region, the Eastern

13    Region, the Northern West Virginia Region, the Midwest

14    Region.  Each had a senior HR person, like me, and we would

15    all work together for the executive vice president on

16    developing the strategy for Human Resources for CONSOL.

17         MR. TORRES:  Your Honor, he identified four

18    union-free operations he was -- he claims to have been

19    involved in.  He's laid no foundation as to what these other

20    individuals did or didn't do.  And the tone of his testimony

21    was to purport to say, here's what CONSOL was thinking or

22    doing.  And there is no foundation for that.

23         MR. PETSONK:  Your Honor, if I may develop?  I

24    intended to ask him more about who was involved and what the

25    nature of his knowledge and involvement was during this

1    process, his personal knowledge.

2            THE COURT:  Well, lay a foundation.  And then once

3    you get finished with it, see whether or not Mr. Torres

4    still has an objection.

5    BY MR. PETSONK:

6    Q.   You've mentioned various department heads that you

7    managed and the Human Resources functions that you managed.

8    Who did you report to above you in CONSOL while you were

9    a -- during this period, when you described developing the

10   union-free operations at Burnham, Buchanan, Eastern

11   Kentucky, Bailey and Enlow Mines?

12   A.   My direct supervisor was the Senior Vice President of

13   Mining, Eustace Frederick.  But the way CONSOL was designed,

14   you had a dotted-line supervisor, the senior -- the

15   Executive Vice President of Human Resources, who was Roger

16   Haynes.  So I took my direct guidance from Mr. Frederick; I

17   took my dotted-line guidance and human resource issues from

18   Mr. Haynes.

19   Q.   That is, your day-to-day supervisor on the ground was

20   Mr. Frederick, but your supervisor for purposes of human

21   resources, if I'm understanding -- I'm just trying to

22   clarify -- trying to clarify my understanding -- your

23   supervisor for purposes of human resources functions was

24   Roger Haynes?

25   A.   Yes.

1    **Q.**    And his position was Executive Vice President for Human

2    Resources of CONSOL; is that right?

3    **A.**    Yes.

4    **Q.**    Who else did you work with who was senior to you in

5    CONSOL during this period that you've referenced?

6    **A.**    Well, working for Mr. Haynes was -- CONSOL was designed

7    exactly the same from the top to the bottom.  You had

8    Haynes, and he had direct reports on employee development,

9    employment, benefits.  And the labor relations function was

10   not under him; it was separate, under a different person.

11   But it was designed identically the same from the top to the

12   bottom.  So I worked with George Fedlow [phonetic], who was

13   manager of employee development.  I worked with Chris

14   McMillan [phonetic], who was the manager of employment.  I

15   worked with William Waddle [phonetic], who was the benefits

16   and compensation manager.  They were the so-called experts

17   on those issues at the senior level.

18   **Q.**    And did you have a counterpart at your level in other

19   regions of the country?

20   **A.**    Yes.

21   **Q.**    And do you remember the name of the counterpart that

22   you had as to the Bailey and Enlow Mines?

23   **A.**    That was Bill Phillips was the -- my counterpart there.

24   **Q.**    And what specific deliverables were you involved in

25   producing as to the union-free operations at Burnham,

```
 1    Buchanan, Eastern Kentucky, Bailey and Enlow?

 2             MR. TORRES:  Objection.  The question is compound

 3    as phrased because he testified these all happened at

 4    different periods of time.

 5             THE COURT:  Break it down, if you will.

 6    BY MR. PETSONK:

 7    Q.   When CONSOL opened the union-free operation at Burnham,

 8    you were involved with the development of the strategy for

 9    the opening of that operation; is that right?

10    A.   I was involved with a senior manager in industrial

11    relations by the name of Ken Eyler [phonetic].  He developed

12    a handbook with input from all of the senior HR managers

13    across the company, because it was the first one.

14    Q.   The first nonunion or union-free handbook that CONSOL

15    had produced; is that right?

16    A.   Yes.

17    Q.   What other deliverables did CONSOL develop, to your

18    knowledge, besides the handbook for the union -- for that

19    union-free operation in Burnham?

20    A.   Well, they had an employee orientation.  Not as

21    sophisticated as the one we developed for Buchanan and

22    Bailey and Enlow, but it was the first of the orientations.

23    Basically, it was a sales pitch.

24             MR. TORRES:  I'm sorry, I didn't hear what the

25    witness said.
```

1    BY MR. PETSONK:

2    **Q.**   Please restate what you just said.

3    **A.**   I said, basically, it was a sales pitch for the Navajo

4    Tribe at the Burnham operations in Four Corners; it was a

5    Navajo operation, so it was basically a sales pitch.

6    **Q.**   And what was the sales pitch -- what was the sales

7    pitch at the union-free operation there that you developed?

8    **A.**   The basic sales pitch was that you -- if you don't sign

9    a card, okay, this is the benefit package that we will

10   provide you, and this is our promise to you to provide this

11   package.

12           THE COURT:  When you say, "If you don't sign a

13   card," to what are you referring?

14           THE WITNESS:  A union card, so not to organize the

15   location.

16           THE COURT:  And when you said a moment ago you

17   were involved with an individual, what did you mean by that?

18           THE WITNESS:  Well, his primary responsibility was

19   developing a handbook with our input.

20           THE COURT:  Please go ahead.

21           MR. TORRES:  Your Honor, again, I think if this

22   was to establish foundation, he hasn't.  He's just testified

23   some other individual developed the handbook.  He can't

24   testify as to what that person did.

25       All he can say is, here's what I told that individual.

```
1    Other than that, it's hearsay.  And he lacks foundation as
2    to what that gentleman was thinking or doing.
3              THE COURT:  Well, I don't think counsel's gotten
4    to that point yet.  So let's see what the further
5    development is.
6    BY MR. PETSONK:
7    Q.   Well, Mr. Hymes, you referenced the Buchanan location,
8    the second location.  You testified that you provided input
9    to Mr. Ken Eyler regarding the development of an employee
10   handbook and new employee orientation materials at that
11   first Burnham union-free operation.  I'd like to ask you
12   about what you specifically did in connection with the
13   development of the Buchanan operation.
14        And you referenced that you -- what deliverables did
15   you participate in developing for the Buchanan operation?
16   A.   Buchanan operation was in my region and my primary
17   responsibility; therefore, the development of the handbook
18   and the development of the orientation was under my primary
19   responsibility to ensure that it was done and done properly
20   in accordance with the outline that I received from my
21   supervisor in Pittsburgh and from my direct supervisor in
22   Bluefield.
23   Q.   And when you reference your supervisor in Pittsburgh,
24   you are referring to the Executive Vice President of Human
25   Resources, Roger Haynes?
```

1    **A.**   Yes.

2    **Q.**   So your testimony is that you personally drafted and

3    developed the employee handbook and the new employee

4    orientation materials at Buchanan, because that was within

5    your region; is that right?

6    **A.**   Me and the folks that worked directly for me.

7    **Q.**   And that was all pursuant to the guidance you received

8    from Roger Haynes, right?

9    **A.**   Pursuant to the guidance I received, it was basically,

10   here's the direction we are going, here's the strategy, and

11   here's what we want to do.

12   **Q.**   In the development of the Buchanan union-free

13   operations, who else that you supervised -- who was

14   underneath you in your supervision structure did you work

15   with in developing those materials?

16   **A.**   John Fox, Gene Bailey -- let's see who else -- John

17   Fox, Gene Bailey -- I'm trying to remember -- J. W. Jones,

18   who was my employee development manager.  The other names

19   escapes me right now.

20   **Q.**   What were the job classifications held by -- strike

21   that.

22        During what period -- what time period did you develop

23   these, the employee handbook and the new employee

24   orientation materials for the Buchanan operation?

25   **A.**   Well, probably was -- I'm trying to remember -- in the

1    early '80s, because it took a while to do it.  We had not

2    done one before, so it was -- I think Buchanan opened in

3    '86, so it was somewhere in '82, '83, where we started with

4    development of it.  And then before the mine opened, we had

5    a handbook and we had employee orientations.

6    **Q.**   When did Buchanan Number One Mine first open?

7    **A.**   I think '86, but I really can't remember.

8    **Q.**   That's fine.  What was the job classification of John

9    Fox during this period?

10   **A.**   Mr. Fox originally was a manager of benefits and

11   compensation for me, but I asked him -- because the critical

12   piece of union avoidance is making sure the benefits operate

13   properly, on top of making sure you selected the right

14   person.  So I asked him if he would become the supervisor of

15   industrial employee relations at Buchanan, and he agreed to

16   do it.

17   **Q.**   And that was a position at the mine site interfacing

18   with coal miners about human resources and benefit matters

19   at Buchanan?

20   **A.**   Yes.

21   **Q.**   And what job classification did Gene Bailey hold when

22   you developed the union-free strategy operation for

23   Buchanan?

24   **A.**   Well, he was originally the manager of employee of --

25   of employment.  He was over the selection piece of

1    employment.  But then when Fox moved to the benefits, moved

2    to Buchanan, Gene moved into benefits and compensation.

3             MR. PETSONK:  Your Honor, may I proceed with my

4    line of questioning as to other operations, or where do we

5    stand with reference to the foundation for Mr. Hymes'

6    knowledge of the development of the union-free strategy at

7    Buchanan?

8             THE COURT:  I guess it will depend on the question

9    you ask.

10            MR. PETSONK:  I didn't know if there was a

11   standing objection to line of questioning, Your Honor.

12            THE COURT:  Well, there may be one by the time you

13   finish.

14            MR. PETSONK:  Okay.

15   BY MR. PETSONK:

16   **Q.**   With regard to the CONSOL operations in Eastern

17   Kentucky that you referenced earlier, what deliverables did

18   CONSOL call upon you to develop in connection with those

19   union-free operations?

20   **A.**   Well, when we determined we were going to make the

21   purchase, it was my primary responsibility to go and assess

22   the human resources function at the location.  It was --

23   their corporate area was in Lexington.  I went and assessed

24   that.  And then I went to the coal mines and assessed that

25   location to see what their wage and benefit package was and

1    what it looked like.  Bottom-line was, we had a wage and

2    benefits package designed for union-free operations.  And

3    that's the one we implemented at the Eastern Kentucky

4    operations.

5    **Q.**   Now, when you say, we had a benefit package for

6    union-free operations, you mean CONSOL?

7    **A.**   I mean CONSOL, yes.

8              MR. TORRES:  Well, then I'm going to object to

9    lack of foundation, Your Honor.  He can't testify on behalf

10   of CONSOL.  He can testify as to what he did.  He's not --

11   he's a former employee of CONSOL.  He can't purport to stand

12   up there and tell us absent some more specific foundation

13   what the corporation did on anything.

14       And he keeps lapsing into this, "We did this," and "We

15   did that."

16       He can't -- he has no basis for offering that sort of

17   testimony.

18              THE COURT:  The witness can tell us what he did.

19              MR. PETSONK:  Certainly.  Thank you, Your Honor.

20   BY MR. PETSONK:

21   **Q.**   After you developed the union-free strategy that you've

22   described here applied at the Buchanan operations, who held

23   custody of that, the deliverables that you produced in

24   connection with that strategy?

25              THE COURT:  What do you mean by "deliverables"?

```
 1            Is that the handbook?

 2                 MR. PETSONK:  The handbook and the new employee

 3       orientation materials.

 4       BY MR. PETSONK:

 5       Q.   Did your supervisors hold those materials or have

 6       access to those?

 7       A.   Those materials were developed by CONSOL's corporate

 8       Human Resources group in conjunction with the regional

 9       managers of CONSOL, Eastern Region and me, all of those

10       regional managers, and the senior management of Human

11       Resources in CONSOL.  It was a package.  It was a designed

12       package.

13                 THE COURT:  One moment.

14                 (Pause.)

15                 THE COURT:  Mr. Torres.

16                 MR. TORRES:  Your Honor, I am sorry to continue to

17       interrupt.  But, again, he's -- the gentleman is not

18       qualified to be testifying as to CONSOL generally, which he

19       keeps doing.  He can say:  I did this.  I said this.  I

20       drafted this.  I reviewed this.

21            But he cannot testify generally and broadly about

22       numerous individuals, unnamed individuals in the corporation

23       to say this is what CONSOL was doing.

24                 THE COURT:  What is your response to that?

25                 MR. PETSONK:  Your Honor, I am glad to develop
```

1    further the testimony as to Mr. Hymes' particular

2    communications with others and with whom specifically he

3    communicated with about the development of the strategy at

4    the Buchanan Mine.

5              THE COURT:  Mr. Torres.

6              MR. TORRES:  Your Honor, again, this Court has

7    already made findings in this litigation regarding the

8    limits of Mr. Hymes' knowledge about matters that are

9    relevant to this lawsuit.  And what we are hearing is like

10   some examination to try and qualify him as some sort of

11   witness -- expert witness or something, where he's

12   testifying generally about the mindset of the corporation or

13   what its strategy was, and he's just not in a position to do

14   that.  That's hearsay.

15        He's not a representative of the company.  He hasn't

16   been in this company since 1993.  And so I'm not even sure

17   what the relevance of this is.  Your Honor's already found

18   that to the extent he had any knowledge, it ended in 1993.

19   And the only plaintiff remaining in this lawsuit who was

20   around in 1993 was Mr. Casey.

21        So unless he's got some knowledge about what Mr. Casey

22   was told in this lawsuit, this sounds more like testimony

23   that we would be hearing if this was still a class action,

24   but it's not.

25             THE COURT:  Anything further on the point, Mr.

1    Petsonk?

2          MR. PETSONK:  I do not seek to elicit testimony

3    regarding any of our allegations in the class pleadings,

4    certainly, Your Honor.

5      I'm simply seeking to elicit testimony as to who

6    directed Mr. Hymes in his work and who he dealt with in his

7    work, and what his work was during the time that he

8    developed the materials that we've referenced here.  That's

9    the extent of my questioning.

10          MR. TORRES:  Your Honor, we alluded to this

11    before.  They've identified this gentleman in their

12    submissions as some sort of corroborating witness, that's

13    how they described him to you.  He somehow has the ability

14    to speak to the corporate knowledge and intent, which we

15    don't think he can or should be allowed to do, any more than

16    the other corroborating witness.

17      So the fact that Mr. Petsonk currently is just asking

18    him what his job duties are, is just preliminary to him

19    trying to have this gentleman, as they've described it,

20    somehow speak to what -- what the corporation's intent was.

21    That's not relevant in this lawsuit anymore, Your Honor.

22          The question is, what did these seven individuals hear

23    from the people they specifically identified in their

24    testimony.

25          You haven't heard from Mr. Fitzwater, but none of these

1    individuals identified Mr. Hymes as someone who made a

2    statement to them.  And you heard them testify as to what

3    materials they specifically allegedly saw.  And you've heard

4    them testify as to what specific documents they allegedly

5    received.

6         So I don't -- I don't think Mr. Hymes has any knowledge

7    that's relevant to what these individuals experienced, which

8    is the only remaining issue in this litigation.

9         And so the fact that he developed a handbook at

10   Buchanan, and the fact he might have developed a script at

11   Buchanan, again, maybe it's relevant to Mr. Casey, but I

12   don't remember Mr. Casey talking about some orientation

13   script.  He testified that someone explained to him orally

14   that he was going to have benefits until he died.  So I

15   suppose if he wants to try and offer testimony from this

16   gentleman specific to Mr. Casey, which is the only person

17   who was still around, then I suppose we can see what that

18   testimony is.

19        But given the amount of paper that Mr. Petsonk has

20   before him, I don't think that's really the intent here and

21   given how they describe what they think this gentleman is

22   allegedly capable of testifying to.

23        I think they are trying to offer him as to sort of

24   testify as to what the corporate intent was, that is not

25   even relevant, and he's not otherwise qualified to do that.

```
 1              MR. PETSONK:  Your Honor, I agree that the
 2     corporate intent or anybody's intent is not relevant.  But
 3     what is relevant, in my understanding, Your Honor, to the
 4     question as to which you allowed us to try this case, and
 5     that is, the question of whether the apparent agents of
 6     CONSOL's fiduciary in the retiree welfare benefit plan
 7     breached the fiduciary duty by making misrepresentations to
 8     our plaintiffs.
 9         And so my understanding, and what I seek to elicit
10     here, is factual testimony as to -- that pertains to
11     fiduciary actions, because it is a question as to whether
12     fiduciary actions were involved and whether the people
13     involved in the delivery of the representations that are at
14     issue for our plaintiffs were apparent agencies of the
15     alleged fiduciaries as to these alleged misrepresentations.
16         So I seek his testimony simply about the relevant
17     fiduciary acts.  And that's -- that's the scope of my
18     testimony.  And I'm inquiring about which actions were
19     conducted as far as production of these slideshows in the
20     orientation sessions that we heard a lot about in this case.
21     And it bears on the question whether those were fiduciary
22     actions or whether the statements made during the course of
23     those orientations were conveyed by apparent agents of the
24     fiduciary of this company.
25              MR. TORRES:  How does this gentleman testify about
```

1    presentations he didn't participate in?  There's been no

2    testimony he was present for any presentation by any of

3    these gentlemen who were named by any of the witnesses who

4    have testified so far.

5         So if Mr. Petsonk is now conceding that corporate

6    intent is not relevant, Your Honor, then unless this

7    gentleman can testify that he was physically present when

8    one of the alleged statements was made to these plaintiffs,

9    which are the only remaining claims in this lawsuit, then he

10   has absolutely no relevant testimony to the issues before

11   this Court.

12            THE COURT:  Mr. Petsonk, if Mr. Hymes has

13   instructed those who have been referred to in the case as

14   being employee handbooks or conducting a series of meetings

15   which occurred after orientation, then he's at liberty as to

16   what on the one hand he was instructed to design as a course

17   of action, and by whom; and secondly, to whom those

18   instructions were given.

19        Now then, ultimately, one has to relate what he says he

20   was instructed to do to the fiduciary.  And if you can make

21   that line, you can inquire of the witness, if he knows.

22        You may proceed.

23            MR. PETSONK:  Thank you, Your Honor.

24   BY MR. PETSONK:

25   Q.   Mr. Hymes, what were you instructed to design as to the

1    union-free strategy at the Buchanan mine?

2              THE COURT:  The question initially is, by whom?

3    BY MR. PETSONK:

4    Q.   Well, I can certainly ask.  Who instructed you to

5    design the union-free strategy for CONSOL at the Buchanan

6    mine?

7              MR. TORRES:  Same objection, Your Honor.

8              THE COURT:  Overruled.

9              THE WITNESS:  Roger Haynes.

10   BY MR. PETSONK:

11   Q.   And at the time he instructed you to do that, he was

12   the Executive Vice President of Human Resources; is that

13   correct?

14   A.   Yes.

15   Q.   For CONSOL; is that correct?

16   A.   Yes.

17   Q.   And what did Roger Haynes instruct you to design within

18   the union-free strategy for the Buchanan operations?

19   A.   A package that would be equal to or better than the

20   UMWA package.

21   Q.   And who did you instruct to deliver that strategy at

22   the mine level, at the Buchanan operation?

23   A.   John Fox was the -- my functional report at the

24   Buchanan operation.  And assisting him would have been

25   Gerald Nicholson, who was the trainer for our region, who

1    basically managed the orientation for us.  And my regional

2    manager of employee development, J. W. Jones, who was

3    overall responsible for the employee orientations and all

4    our employee training.

5    **Q.**   And when you referenced that Gerald Nicholson was the

6    trainer for your region, what's the geographic region that

7    you reference there?

8    **A.**   The Tennessee, the Eastern Kentucky, Southwest

9    Virginia, and Southern West Virginia.

10   **Q.**   When you say Southern West Virginia --

11   **A.**   Beckley, south.

12   **Q.**   Okay.  That includes all of the mines within the CONSOL

13   of Kentucky operating units; is that right?

14   **A.**   Yes.

15          MR. PETSONK:  Now, may I proceed to inquire about

16   the Eastern Kentucky region and what knowledge Mr. Hymes has

17   about that region?

18          THE COURT:  Before you do that, what area was

19   covered by CONSOL of Kentucky?  Where were those operating

20   mines located?

21          THE WITNESS:  They were in Pike County, Johnson

22   County, Knott County, and Letcher County.

23          THE COURT:  You said, Pike, Johnson, and what

24   else?

25          THE WITNESS:  Pike, Johnson, Knott, K-N-O-T-T.

```
 1    Knott.  And Letcher County.
 2              THE COURT:  And the last one was, what?
 3              THE WITNESS:  L-E-T-C-H-E-R, Letcher County.
 4              THE COURT:  All in Kentucky?
 5              THE WITNESS:  Yes, sir.
 6              THE COURT:  And you said Beckley, south?
 7              THE WITNESS:  Yes, sir.
 8              THE COURT:  And then you equated that with the
 9    Southern District of West Virginia?
10              THE WITNESS:  It would have been Raleigh County,
11    Mercer, McDowell, Wyoming, and Mingo.
12              THE COURT:  And that's referred to alternatively
13    as southern, the Southern District of West Virginia for
14    CONSOL purposes?
15              THE WITNESS:  It would have been called Southern
16    Appalachian Region, yes, sir.
17              THE COURT:  Well, I had Southern Appalachian
18    Region was broader than that.
19              THE WITNESS:  Yes, sir.  I misspoke.  Yes,
20    that's -- the West Virginia part of that Southern
21    Appalachian.
22              THE COURT:  The Southern District of West
23    Virginia, those counties you just last referred to?
24              THE WITNESS:  Yes, sir.
25              THE COURT:  Thank you.  Please go ahead.
```

1    BY MR. PETSONK:

2    Q.   Now, Mr. Hymes, the Court has inquired about which

3    counties were operating within the -- your region of CONSOL,

4    and I want to be clear as to whether CONSOL continued to

5    make acquisitions of additional mining properties throughout

6    the time you worked for them throughout that region?

7              THE COURT:  Within which region?

8              MR. PETSONK:  The region that was known as the

9    eastern -- or the, rather, the Southern Appalachian Region.

10             THE WITNESS:  The last acquisition that was made

11   while I was there was the Eastern Kentucky operations.

12   BY MR. PETSONK:

13   Q.   Did any of those operations --

14             THE COURT:  How do you distinguish between CONSOL

15   of Kentucky and Eastern Kentucky?

16             THE WITNESS:  Well, initially, it was called

17   Eastern Kentucky operations.  And then they changed it to

18   CONSOL of Kentucky.

19             THE COURT:  So it's the same thing?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  Go ahead.

22   BY MR. PETSONK:

23   Q.   Who instructed you to design the union-free strategy

24   for the Eastern Kentucky or CONSOL of Kentucky operations as

25   you've described here?

1    **A.**   It would have been Roger Haynes.

2    **Q.**   And what did Roger Haynes instruct you to design and to

3    deliver with regard to the union-free strategy at the CONSOL

4    of Kentucky operations?

5              THE COURT:  You've already stated that.

6              MR. TORRES:  Well, Your Honor --

7              THE COURT:  Just a moment.  Didn't the witness

8    already answer that question?

9              MR. PETSONK:  I think some of his answer was

10   subject to an objection, so I wanted to restate the

11   question, Your Honor, to lay an adequate foundation, a

12   clearer foundation.

13             THE COURT:  There may be an objection anyway, so

14   let's hear it from Mr. Torres.

15             MR. TORRES:  Your Honor, the question lacks

16   foundation, because the gentleman already testified that,

17   while he was at CONSOL, the only thing at Eastern Kentucky

18   was -- in Davis, Kentucky, at that point in time.  And then

19   they had bought some undeveloped land which later on become

20   Jones Fork, which is where Mr. Prater worked.  So he has no

21   foundation as to what eventually became CONSOL of Kentucky.

22     His knowledge is limited to this single site in Davis

23   County which is what he testified to previously was

24   purchased by CONSOL while he was there.  So they are

25   mixing -- Eastern Kentucky is not the same as CONSOL of

```
 1    Kentucky as it relates to Mr. Prater, because the mine he
 2    was working at didn't even exist when this gentleman was
 3    doing whatever he was doing regarding the Eastern Kentucky
 4    operations.
 5              THE COURT:  Well, is it the case that this
 6    witness' knowledge then as of 1993 when he left, was limited
 7    to Davis?
 8              MR. PETSONK:  Well, Your Honor, I think I can
 9    clarify this if I may make one further question of Mr.
10    Hymes.
11              THE COURT:  Do so.
12    BY MR. PETSONK:
13    Q.   Mr. Hymes, who did you hire or instruct to implement
14    the union-free operations or the union-free strategy at the
15    CONSOL of Kentucky operations?
16    A.   Well, when we acquired that from Utah International --
17              THE COURT:  And if I can interrupt.
18         When would that have been?
19              THE WITNESS:  Oh, gosh, Your Honor.
20              THE COURT:  About when?
21              THE WITNESS:  Probably '89, maybe.
22              THE COURT:  Thank you.
23              THE WITNESS:  We acquired that and -- Craig
24    Campbell was the mine site HR person for Utah International.
25    Okay.  CONSOL's philosophy was, we put our own guys in.  So
```

1    we moved Roger Cutright there and moved Craig Campbell to

2    Bluefield to work for me.  He replaced Gene Bailey.

3    BY MR. PETSONK:

4    **Q.**   Was there --

5    **A.**   I'm sorry.  Let me finish.  The Utah International

6    acquisition included the property which would later be

7    called Jones Fork and property in Mingo County, West

8    Virginia, which I don't remember what CONSOL named it.  But

9    you had the David, Kentucky, property, which was operating

10   with two surface mines and a preparation plant, and then you

11   had the Jones Fork property, which later became Jones Fork

12   mine, and then the mines in Mingo County.

13   **Q.**   What role did Craig Campbell have in implementing the

14   union-free strategy under your supervision at the CONSOL of

15   Kentucky operation?

16          MR. TORRES:  Objection, Your Honor.  Again, the

17   gentleman just testified Mr. Campbell came and worked for

18   him and that they sent someone else to this Kentucky region.

19   So even if Mr. Prater testified that Mr. Campbell allegedly

20   made him a promise, according to this gentleman's testimony,

21   Mr. Campbell came to work for him when he sent Mr. Bailey to

22   work for CONSOL -- work at the Eastern Kentucky operation.

23       But in any event, even if Mr. Campbell was working in

24   Kentucky, the issue is whether this gentleman can testify as

25   to what Mr. Campbell said to Mr. Prater when they had this

1    orientation years after this gentleman left.

2        He's -- Mr. Petsonk is asking these very generic

3    questions without any specific time periods.  It's not as if

4    every one of these plaintiffs was at CONSOL for the same

5    period of time.  They were there at all different points of

6    time.  And Your Honor noted in your Summary Judgment, the

7    only plaintiff who was around when this gentleman was

8    working at CONSOL was Mr. Casey.  So whatever he said to Mr.

9    Campbell in the '90s, quite frankly, I don't know what that

10   does to prove up Mr. Prater's claim as to what Campbell said

11   to him seven, eight, nine years later.  That's the issue in

12   the lawsuit.  It's not what him and Mr. Campbell talked

13   about eight years earlier about union-free operations.

14           THE COURT:  Thank you.

15       Mr. Petsonk, what the Court wants you to do is to trace

16   this, and part of the tracing is timing, when this or that

17   occurred.  And so I'm going to ask you to start anew with

18   that, and let us know what happened, when and where.

19       Now, it may be that an individual such as Mr. Campbell

20   was instructed to follow this course or that which the

21   witness is saying he was instructed in turn to do with Mr.

22   Campbell, for example, being expected to carry it out.  But

23   the necessity here is to isolate on these separate events

24   and take them one at a time so they can be examined.

25       And so I'm going to ask you to start anew on that.  And

1    you can begin with Buchanan, if you wish.

2              MR. PETSONK:  Begin with Buchanan?

3              THE COURT:  I say you can begin with that if you

4    wish.

5    BY MR. PETSONK:

6    **Q.**  Mr. Hymes, do you recollect the date that the Buchanan

7    mine first opened?  And it doesn't need to be exact.  A

8    date?

9    **A.**  In my mind, it would be 1986, but we worked on the

10   package before that.

11   **Q.**  When you said you worked on the package, are you

12   referring to a union-free strategy?

13   **A.**  What I'm referring to is the wage and benefits package

14   and the orientation that was developed as CONSOL's

15   union-free orientation and handbook.

16   **Q.**  During what period do you recollect developing the

17   union-free strategy for application at the Buchanan Number

18   One Mine?

19   **A.**  From probably '82 to '86, it would be my recollection.

20   It took a while for us to do that.

21   **Q.**  Who instructed you to develop that union-free strategy

22   for the Buchanan Mine during the period from 1982 until the

23   opening of the mine in 1986?

24   **A.**  Roger Haynes.

25   **Q.**  And during that period, Roger Haynes -- I should say,

1    throughout that period, as you recall, did Roger Haynes

2    serve in the capacity of Executive Vice President of Human

3    Resources for CONSOL?

4    **A.**    Yes.

5    **Q.**    And what deliverables did Mr. Haynes instruct you to

6    design in that union-free strategy for Buchanan during that

7    period of development that you referenced from 1982 to 1986?

8    **A.**    The new employee union-free orientation and the

9    employee handbook.

10   **Q.**    Did you, in fact, develop a new employee handbook and a

11   new employee orientation during that period?

12   **A.**    I did, with those folks who reported to me.

13   **Q.**    Did you consult with Mr. Haynes during the development

14   of those materials?

15   **A.**    There were many trips to Pittsburgh and many phone

16   calls, yes.

17   **Q.**    And you also worked with your subordinates in the Human

18   Resources Division during that period as you developed the

19   union-free handbook and orientation for Buchanan, correct?

20   **A.**    Yes.

21   **Q.**    And once the Buchanan Mine opened, who did you instruct

22   to carry out the union-free strategy at the Buchanan Mine?

23   **A.**    Mr. Fox -- Mr. Nicholson managed that orientation.  Mr.

24   Fox was on the ground at Buchanan as the primary employee

25   contact.

1   **Q.**   To clarify, what job classification did Mr. Fox hold

2   while he carried out the union-free strategy at the Buchanan

3   Mine?

4   **A.**   The mine -- the job title was Supervisor of Industrial

5   Employee Relations.

6   **Q.**   And that was in your Human Resources Department that

7   you supervised, correct?

8   **A.**   Yes.  He was a dotted-line report to me, and a solid

9   line report to his mine manager.

10  **Q.**   So he reported to you for purposes of HR policy; is

11  that right?

12  **A.**   Yes.

13  **Q.**   And he reported to the mine manager for purposes of

14  day-to-day mine operations; is that right?

15  **A.**   Yes.

16  **Q.**   And, Mr. Bailey, what job classification did he hold

17  during that period when he carried out the union-free

18  strategy, starting in 1986 -- or around 1986, at the

19  Buchanan Mine?

20  **A.**   He originally was manager of employee -- employment,

21  and then when Mr. Fox moved, he became manager of the

22  employee benefits and compensation.

23  **Q.**   And that was a Human Resources function subordinate to

24  you in the Human Resources Department at CONSOL during that

25  period after '86 when they opened the mine and carried out

1    the union-free strategy at the Buchanan operations, right?

2    **A.**    He was a direct report to me, yes.

3         MR. PETSONK:  Your Honor, I would like to inquire

4    about the contents of those employee orientations, but

5    should I move forward and lay a similar foundation as to the

6    CONSOL of Kentucky operations at this time?

7         THE COURT:  I believe it would be well to do that.

8    I understand, in 1989 the Utah International operation was

9    obtained, and I'd like for the witness to go back and define

10   what that was in 1989 down to the time that he left in 1993.

11   BY MR. PETSONK:

12   **Q.**    Mr. Hymes, you testified that CONSOL acquired the

13   Eastern Kentucky operations of Utah International in 1989;

14   is that right?

15   **A.**    That's the best of my knowledge.

16   **Q.**    And you testified that those operations that CONSOL

17   acquired from Utah International around '89 included a part

18   you called the Jones Fork operations; is that right?

19   **A.**    That was part of that acquisition, yes.

20   **Q.**    And who instructed you to develop a union-free strategy

21   for that Jones Fork and other CONSOL of Kentucky operations?

22         THE COURT:  I don't want you to just leave it

23   "other."  I want to know what they are.  Jones Fork is one.

24   If there is more than that, let's find out what they were

25   and, more particularly, do they have any relationship to

```
1    this case.
2              MR. PETSONK:  Well, Your Honor, I would -- I can
3    ask him about that.
4    BY MR. PETSONK:
5    Q.   What other --
6              MR. PETSONK:  But I am not sure the other
7    operations have relationship to the case, Your Honor, so in
8    interest of not belaboring the record, he has testified, I
9    believe, it did include the Jones Fork operations at that
10   time.
11             THE COURT:  Is that the only one relevant here?
12             MR. PETSONK:  It is the only one relevant that he
13   has testified was included within the CONSOL of Kentucky
14   acquisition around 1989.
15             MR. TORRES:  Your Honor, if I may, as it relates
16   to this foundation issue?  What he testified to before was
17   that this acquisition he's testifying to involved --
18   included undeveloped land, which later became the Jones Fork
19   operation.  So the implication of the most recent question
20   is somehow that this was an up-and-running operation, and
21   that's just not accurate, during this period that we are
22   talking about.
23             THE COURT:  And so the focus became, at any rate,
24   some time between 1989 and 1993 on Jones Fork?  Correct?
25             MR. PETSONK:  Correct.
```

1            THE COURT:  And that's part of CONSOL?

2            MR. PETSONK:  CONSOL of Kentucky.

3            THE COURT:  And anything else to be developed

4    beyond Jones Fork?  I'm talking about through this witness'

5    testimony?

6            MR. PETSONK:  No, Your Honor.  What I seek to

7    develop is who was involved in the development of the

8    union-free strategy as to that operation at that time, 1989

9    to 1993, which reference to which Mr. Hymes has direct

10   knowledge.

11           THE COURT:  You may proceed.

12   BY MR. PETSONK:

13   Q.   Mr. Hymes, who instructed you to develop a union-free

14   strategy for the CONSOL of Kentucky operation that you

15   described as having been acquired by --

16           THE COURT:  You're getting away from me now.

17       I want to know specifically what you're talking about.

18   If it's Jones Fork, and if that is all there is to it, then

19   refer to it as Jones Fork.

20   BY MR. PETSONK:

21   Q.   Okay.  Who instructed you to develop the union-free

22   strategy to be applied at the Jones Fork operations within

23   CONSOL of Kentucky that were acquired by CONSOL -- the

24   property for which was acquired by CONSOL around 1989, Mr.

25   Hymes?

 1   **A.**   We had a union-free package in our existing Eastern

 2   Kentucky operations.  That was a surface mine preparation

 3   plan package.  With Jones Fork startup, we had to develop a

 4   deep mine package for the Jones Fork operation.  I argued

 5   with the folks, Mr. Haynes in Pittsburgh, and Mr. Hyler,

 6   Buck Hyler, who was the labor relations manager, that we

 7   need not do an identical package to Bailey and Buchanan,

 8   because the market didn't require it.  And I was instructed

 9   to use the Bailey-Buchanan deep mine package for Jones Fork.

10       So Craig Campbell went to Jones Fork from Bluefield to

11   be the HR manager at Jones Fork with that instruction.

12   **Q.**   And who gave that instruction to you to use the

13   Bailey-Enlow union-free strategy at the Jones Fork operation

14   in Kentucky?

15   **A.**   Haynes and Hyler gave me direct orders.  It was two

16   dollars to three dollars more than necessary to get a good

17   workforce.

18   **Q.**   But you took Mr. Hyler's instructions --

19            THE COURT:  One moment.  We started with Buchanan.

20   And we are ending up now with Bailey and Enlow.  The initial

21   strategy was designed for Buchanan, correct?

22            THE WITNESS:  The initial strategy was done for

23   Buchanan as a union-free strategy, yes, sir.

24            THE COURT:  And that's what was then sought to be

25   applied to Jones Fork?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  And then what did Bailey and Enlow

3     have to do with that?  Did they come on in between those

4     times?

5          THE WITNESS:  Bailey and Enlow came on in between

6     those times and the packages were identical.

7          THE COURT:  To, once again, Buchanan?  What do you

8     call it Buchanan or Buchanan?

9          THE WITNESS:  Buchanan, yes, sir.

10          THE COURT:  Thank you.  Please go ahead.

11     BY MR. PETSONK:

12     **Q.**   Did the handbooks and training materials that Mr. Hyler

13     and Mr. Haynes instructed you to develop and implement at

14     the Buchanan and the CONSOL of Kentucky operations have a

15     common design?

16     **A.**   They were basically all the same as far as what they

17     looked like.  The covers were different.  The first page was

18     signed by whoever the mine superintendent was.  But when you

19     got into the nuts and bolts, they looked identical.

20     **Q.**   And Mr. Hyler instructed you to use the Bailey and

21     Enlow wage rate; is that your testimony, at the CONSOL of

22     Kentucky operations, when you opened those operations in

23     around '89?  Is that your testimony?

24     **A.**   The Eastern Kentucky operations at David were a surface

25     mine, so we used the same strategy to develop the surface

1    mine and preparation plant rates that we used for Bailey,

2    Enlow and Buchanan, that was basically taking the mine

3    worker rate and adding on to it for those things that we

4    didn't give employees that was in the mine worker contract.

5    Q.   You're using the language of "we" again.  When you

6    referred to "We," -- were you involved in the development of

7    the union-free strategy and the materials that supported

8    that strategy as applied to the Bailey and Enlow Mines in

9    Pennsylvania?

10   A.   I use we, because we -- I did Buchanan, I did Eastern

11   Kentucky, and I did Jones Fork.  They were identical to

12   Bailey and Enlow.

13   Q.   How do you know that they were identical to Bailey and

14   Enlow?

15   A.   Because the strategy was designed to be the same across

16   the company.

17   Q.   Who designed the union-free strategy to be used the

18   same across the company as you have described?

19   A.   Mr. Haynes, at the direction of Bobby Brown, our -- the

20   CEO of the company.

21   Q.   What company was Mr. Brown the CEO of during the period

22   that you described before, from 1982 to 1986, when this

23   union-free strategy was developed for the Buchanan

24   operation?

25   A.   It was Consolidation Coal Company.  It wasn't CONSOL

1    Energy.  It was Consolidation Coal Company.

2    **Q.**   And who was the CEO during that period?

3    **A.**   Mr. Brown.

4    **Q.**   And during that period, what was Mr. Hyler's job

5    classification for the entity you've just referenced as

6    CONSOL?

7    **A.**   I think his job title was Senior Vice President of

8    Labor Relations.  That function did not report to Mr.

9    Haynes; it was separate.  And part of that was a

10   double-breasting strategy.

11          THE COURT:  Let me ask you, before you go on.

12       Can the parties agree on what the scope of

13   Consolidation Coal Company was in the 1980s to 1993 period?

14   How did that differ from CONSOL Energy?

15          MR. TORRES:  Well, it differs, because CONSOL --

16   Consolidated Coal was actually owned by DuPont at that time,

17   Your Honor -- or Conoco -- DuPont.  And so it was -- CONSOL

18   Energy became CONSOL Energy when it engaged in an IPO, I

19   believe, in the '90s.  So CONSOL as sort of the corporate

20   parent of these other entities doesn't come into existence

21   until the '90s.

22          THE COURT:  And when in the '90s?  Was it sometime

23   after 1993?

24          MR. TORRES:  No, I believe it was -- it was

25   somewhere in that time period.  I can get the specifics if

HYMES - DIRECT

1    you give me one second, Your Honor.

2              THE COURT:  All right.  I want you to tell me

3    again about, when CONSOL Energy came into being, what did it

4    represent; what did it include?

5              MR. PETSONK:  Your Honor, the witness may have

6    knowledge --

7              THE COURT:  Let Mr. Torres --

8              MR. TORRES:  One second, Your Honor.

9         CONSOL Energy would have become CONSOL Energy, Your

10   Honor, in 1991.  At that point, it didn't own AMVEST-Fola,

11   because that acquisition didn't occur until 2007.

12             THE COURT:  Is AMVEST and Fola the same thing?

13             MR. TORRES:  No, Fola Mine was part AMVEST, which

14   CONSOL purchased in 2007.  And the two plaintiffs in this

15   case, Mr. Bright and Mr. Fitzwater, worked at the Fola mine

16   which was part AMVEST.

17             THE COURT:  So AMVEST, in effect, sold Fola to

18   CONSOL?

19             MR. TORRES:  Well, CONSOL purchased all of AMVEST,

20   including Fola, Your Honor.

21             THE COURT:  Excuse me.  Please go ahead.

22             MR. TORRES:  And I can get you the specific dates

23   when CONSOL of Kentucky and CONSOL of Pennsylvania came into

24   existence, Your Honor.  When CONSOL Energy -- just to

25   continue the thought -- Consolidation Coal was a subsidiary

1  of CONSOL Energy going forward until Consolidation Coal was

2  sold to Murray Energy in 2014.

3  THE COURT:  But prior to the Murray Energy

4  acquisition, CONSOL was the parent.  And did it acquire

5  Consolidation?

6  MR. TORRES:  No.  I think there was a portion of

7  what used to be known of Consolidation Coal -- they sort of

8  renamed themselves.  It used to be known as Consolidation

9  Coal.  But when they spun it out as a separate company,

10  Consolidation Coal became CONSOL Energy, but some of the

11  assets of Consolidation Coal stayed under CONSOL.  They

12  continued to refer to them as Consolidation Coal.  So those

13  are certain mines, including Buchanan, Your Honor, that fell

14  under Consolidation Coal separate from the corporate entity

15  that we refer to as CONSOL of Kentucky and separate from

16  CONSOL of Pennsylvania.

17  And if it's helpful, Your Honor, I can give the

18  Court -- offer the Court a very specific timeline and

19  diagram so you can see where those entities fell, and at

20  what period of time.

21  THE COURT:  I think that would be helpful.

22  MR. TORRES:  Okay.  We can do that, Your Honor.

23  No problem.

24  THE COURT:  Please go ahead.

25

```
 1    BY MR. PETSONK:

 2    Q.    Mr. Hymes, in light of this exchange, do you know

 3    whether the Buchanan operation came under the control of

 4    CONSOL Energy, once CONSOL Energy was created?

 5              MR. TORRES:  Well, I object.  It calls for a legal

 6    conclusion.

 7              MR. PETSONK:  From an operational standpoint, Your

 8    Honor.  I'm just asking what knowledge he has.

 9              MR. TORRES:  Well, this gentleman wasn't there in

10    2001 when that happened, so he wouldn't have any knowledge

11    of that.  He left in '93.

12              THE COURT:  It seems to me the matter you are

13    referring to could be handled by matter of stipulation

14    instead of through this witness.

15              MR. PETSONK:  Thank you, Your Honor.

16         Shall I continue with my questioning of Mr. Hymes?

17              THE COURT:  Go ahead.

18    BY MR. PETSONK:

19    Q.    Is it your testimony that you worked with your

20    superiors Hyler and Roger Haynes, as well as your

21    subordinates you've named during this period from 1982 to

22    1986, to develop the union-free strategy at Buchanan; is

23    that right?

24    A.    Yes.

25    Q.    And is it your testimony that CONSOL acquired what
```

1    became known as CONSOL of Kentucky operations, specifically

2    relevant here, including the Jones Fork property, around

3    1989, right?

4    **A.**   That's the best of my memory.

5    **Q.**   You've also referenced your knowledge of the Bailey and

6    Enlow operations in Pennsylvania.

7    **A.**   Yes.

8    **Q.**   My question is:  Were you involved in the development

9    of the union-free strategy as to those operations; and, if

10   so, when did that development occur?

11   **A.**   The union-free strategy for Bailey, Enlow and Buchanan

12   and Jones Fork and Eastern Kentucky were all the same.  It

13   was one corporate strategy as to how we approached union

14   avoidance -- how the company approached it.

15          MR. TORRES:  Your Honor, I move to strike as

16   nonresponsive.  He's again trying to testify on behalf of

17   CONSOL.

18          THE COURT:  The objection is overruled.

19      You may continue.

20   BY MR. PETSONK:

21   **Q.**   Regarding the orientation at the Buchanan Mine, when

22   during the course of the hiring process did CONSOL present

23   the orientation to new hires or job applicants, as it may

24   have been?

25   **A.**   After the post-offer physical and the offer is made,

1    the employees were brought to our regional office in

2    Bluefield; given a five-day orientation with the employees,

3    and a half a day employee and spouse orientation on Saturday

4    morning.

5    Q.   So it was offered before the individual who had

6    received a job offer were expected to make a decision about

7    whether to accept or reject that offer?

8    A.   No.  It was post-offer.

9    Q.   Right.

10   A.   It was after they had received the offer and accepted

11   the offer, then they were placed in orientation before they

12   went to the coal mine.

13   Q.   Let me clarify that sequence.  Before they went to work

14   at the mine; is that right?

15   A.   They were on the payroll, they received pay for being

16   in the orientation.  They received time-and-a-half for

17   working half-day Saturday.  Then they went to the mines to

18   perform, to see -- to perform their work.

19   Q.   During the union-free orientation program, how many

20   days did CONSOL call the employees to participate in the

21   orientation at Buchanan, beginning when that mine opened in

22   1986?

23   A.   It was a five-and-a-half-day program; 8 hours each day,

24   Monday through Friday with the employee, and then a half a

25   day Saturday with the employee and their spouse where we

HYMES - DIRECT

 1    went over their benefits.

 2    **Q.**    Did the length of the program change over time at all,

 3    to your knowledge?

 4    **A.**    Not while I was there.

 5    **Q.**    Did the design of the program that you've referenced

 6    earlier change at all during the time that you were there?

 7    **A.**    Not while I was there.

 8    **Q.**    What specific components did you develop for the

 9    Buchanan and union-free orientation program; that is, you

10    developed an orientation program, but what materials did you

11    develop as a part of the program?

12    **A.**    There was an actual script which was written for the

13    presenter.  Myself and my employee development manager, Mr.

14    Jones -- Mr. Fox was involved with that.  Mr. Nicholson was

15    involved with that.  It was reviewed and finally approved by

16    Mr. Haynes; my Senior Vice President, Eustace Frederick

17    approved it; and the Operating Vice President, Ron Smith,

18    who had ultimate operating responsibilities for Buchanan,

19    approved that.  There was also input by George Fedlow, who

20    was the manager of employee development corporately, and

21    Bill Waddle, who was the manager of employee compensation

22    for CONSOL.  The whole package had to be signed off on.  And

23    the reason that the orientation was scripted was to make

24    sure that the message was consistent.

25            MR. TORRES:  Objection; move to strike the last

1    portion of his testimony.  Lack of foundation, Your Honor.

2            THE COURT:  Well, the last portion, I take it, has

3    to do with the message?

4            MR. TORRES:  Yes, Your Honor.

5            THE COURT:  And so I'm going to strike that

6    portion of the answer at the end.

7        And you can start again and lay a foundation for it.

8    BY MR. PETSONK:

9    Q.   Who signed off on the -- when you say someone had to

10   sign off on the entire orientation materials before you

11   implemented them at a mine level, who are you referencing

12   who had to sign off on those materials before you used them

13   to train or orient the new miners?

14   A.   The Senior Vice President of Operations, my direct

15   boss, and my functional boss, Roger Haynes, had to finally

16   sign off on the script.

17   Q.   Did Roger Haynes provide you with materials for you to

18   consult and utilize in developing the script?

19   A.   Roger Haynes expected me in working with George Fedlow,

20   his manager of employee development, and my people to

21   develop the script.  He would sign off on it.  But we had

22   many phone calls about how we wanted to communicate.

23   Q.   Okay.

24            MR. PETSONK:  May I approach the witness, Your

25   Honor?

```
 1              THE COURT:  You may.
 2    BY MR. PETSONK:
 3    Q.   Mr. Hymes, I've given you a document that's been
 4    labeled Plaintiff's Exhibit 10.  Please take a look at this
 5    document.  And I would note the very last page of the
 6    document is upside down.  But the document begins with
 7    MSJ -- Bates Number 322, and it ends with the Bates Number
 8    MSJ 462.
 9         Mr. Hymes, is this document familiar to you?
10    A.   Yes.
11    Q.   And what does it say on page 1?
12    A.   It says, "Enlow Fork" on the front page.
13    Q.   And what does it say on the side there?  There is a
14    little tab that is sticking out?
15    A.   "Introduction Supervisor IER," which is industrial
16    employee relations.  That's the mine site supervisor.
17    Q.   And if you flip the document over, is there also a
18    caption on the last page or a title?
19    A.   It says, one day conclusion on the last page.
20    Q.   It says, "Day one conclusion"?
21    A.   "Day one conclusion," yeah.  Mm-hmm.
22    Q.   What is this document, to your knowledge, Mr. Hymes?
23    A.   This is the script I was referring to.
24              MR. TORRES:  Your Honor.
25              THE COURT:  Just a moment.  Go ahead.
```

1            MR. TORRES:  I'd like the opportunity to voir dire

2    this witness on his testimony regarding this document,

3    because he's been referring to activities at your

4    instruction, Your Honor, that he was supposedly taking in

5    connection with the Buchanan Mine.  And now he's been handed

6    a document that relates to Enlow Fork.  And he is saying,

7    well, this is the script I was just talking about, but his

8    testimony for the last half hour related to Buchanan.

9         So if Mr. Petsonk is going to try and pretend like this

10   document applies at Buchanan, I'd like the opportunity to

11   voir dire the witness before we get into testimony that

12   doesn't appear to relate to the topic we're actually

13   discussing.

14           THE COURT:  Very good.  Do you need to develop

15   anything further on the point before Mr. Torres voir dires?

16           MR. PETSONK:  If I may?

17           THE COURT:  Go ahead.

18           MR. PETSONK:  Just briefly.

19   BY MR. PETSONK:

20   **Q.**   Mr. Hymes, is this a document that you consulted in

21   developing or managing the union-free strategy at the

22   Buchanan operation?

23   **A.**   This is the script for Enlow.  Okay.  Enlow was after

24   Bailey and Buchanan.  Buchanan was the first script.  We

25   used the same script everywhere.  I don't have the Buchanan

1    script.  Okay.  But it's my testimony that this script is

2    essentially identical to Buchanan.  Only difference is it

3    plugs in Enlow Fork.

4    **Q.**   And my question is, whether you consulted this document

5    as you -- as you managed the union-free strategy at the

6    Buchanan Mine?

7               MR. TORRES:  Objection.  Your Honor, he just said

8    that this document existed afterwards.  So -- object to the

9    form of the question.

10              MR. PETSONK:  Your Honor, if I may?

11   BY MR. PETSONK:

12   **Q.**   You know, you managed the union-free strategy at the

13   Buchanan Mine after it opened in 1986; is that correct?

14   **A.**   Yes.

15   **Q.**   And you continued to have that job function until you

16   left CONSOL in 1993, correct?

17   **A.**   Yes.

18   **Q.**   And is this a document you utilized in the management

19   of the union-free strategy during that period from 1986 to

20   1993, while the Buchanan Mine was operating, and you managed

21   the union-free strategy as to that mine?

22   **A.**   This is the Enlow Fork document.  It's not the Buchanan

23   document.  But it's identical.

24   **Q.**   And did you -- did you have possession of this document

25   during that period?

```
 1                MR. TORRES:  Object to the form of the question.
 2                THE COURT:   The objection is overruled.  Go ahead.
 3                THE WITNESS:  I'm sure I did.  What would happen
 4    is, the Buchanan documents were given to Bill Phillips, my
 5    counterpart in the Eastern Region.  The Bailey documents
 6    were given to me.  We all had a set of documents.  The only
 7    difference was when you plugged in different names.  It was
 8    one strategy.
 9                MR. PETSONK:  May I inquire further about this
10    document or move for its -- with the intention of moving for
11    its admission, Your Honor?
12                THE COURT:  If you've finished this preliminary
13    part, Mr. Torres will voir dire the witness.
14                MR. PETSONK:  Yes, I have.
15                THE COURT:  One thing I want to ask you, when you
16    say, "plug in," are you suggesting that the only difference
17    between this document and the script that was used for
18    Buchanan was that the names were changed?  Is that what you
19    are saying?
20                THE WITNESS:  Essentially.
21                THE COURT:  You said, "Essentially."  I want to
22    know what the differences are.
23          And is there any difference other than that, that the
24    name "Buchanan" is out and the name "Enlow Fork Mine" is in?
25    Are there any other differences?
```

```
 1              THE WITNESS:  Because of the timing, Buchanan
 2    being first, Bailey being second, Enlow being third, I'm
 3    sure there are some slight differences in maybe the benefits
 4    or something like that, because of the timing of when this
 5    discussion about when CONSOL Energy become Consolidation
 6    Coal.  So I can't tell you they are absolutely identical,
 7    but they were designed to be used for the same purpose.
 8              THE COURT:  Well, with that, Mr. Torres, may
 9    proceed.
10                    VOIR DIRE EXAMINATION
11    BY MR. TORRES:
12    Q.   Did you draft this document, sir?
13    A.   I drafted the one for Buchanan.
14    Q.   That's not my question.  Did you draft this document,
15    sir?
16    A.   No.  No, sir.
17    Q.   When was it drafted?
18    A.   I do not know.
19    Q.   Who drafted it?
20    A.   I cannot tell you who drafted it.
21    Q.   And do you know where this was maintained?
22    A.   This is my copy that I had in my home that was given to
23    me.
24    Q.   Who gave it to you?
25    A.   I'm assuming Bill Phillips, the manager of employee
```

1    relations, but I don't remember.

2    **Q.**   You said you don't have a Buchanan document, correct?

3    **A.**   I don't think I do, no.  If I had, I would have given

4    it to Sam, I'm sure.

5    **Q.**   So we have no way of knowing whether this is, in fact,

6    identical, correct?

7    **A.**   I can't -- all I can tell you is what I know.

8    **Q.**   Which is, you don't know whether they are identical,

9    because we don't have the Buchanan document, correct?

10   **A.**   I know they were designed to be identical.

11   **Q.**   That's not my question, sir.  Whether they were

12   designed to be identical, whether you wanted this to convey

13   a uniform message, you don't know whether, in fact, this

14   document is identical to any document that you used at

15   Buchanan, correct?

16   **A.**   I can't say that I do.

17   **Q.**   So you agree with me, correct?

18   **A.**   No, I don't agree with you.  I'm not trying to be

19   argumentative.  The point of this is -- and I understand

20   what you say, it's not identical -- but I can't tell you

21   exactly what's not identical.  But I can tell you that the

22   organizing part is identical.

23   **Q.**   Okay.

24   **A.**   Because the organizing part is identical across the

25   company.

1    **Q.**   And you would know about the organizing portion of this

2    from 1983, or whenever you started working at the Buchanan

3    Mine, until you left in '93, right?

4    **A.**   Yes, sir.

5    **Q.**   All right.  So you didn't draft this?

6    **A.**   No.

7    **Q.**   You don't know whether it's identical to what you used

8    at Buchanan?

9    **A.**   No.

10   **Q.**   And the only reason you have it is because Mr. Phillips

11   gave it to you?

12   **A.**   That's right.

13   **Q.**   Do you know who this was presented to that's a witness

14   in this lawsuit?

15   **A.**   I don't know who -- I don't know who is a witness in

16   this lawsuit.

17   **Q.**   Who is a plaintiff in this lawsuit?  I apologize.

18   **A.**   I don't really know who the plaintiffs are in this

19   lawsuit.

20   **Q.**   So you don't know if any of the plaintiffs in this

21   lawsuit ever were read this or presented this, correct?

22   **A.**   If they worked at Enlow, they saw this -- they heard

23   this script.

24   **Q.**   Mr. Hymes, you don't know, in fact, whether any

25   plaintiff in this lawsuit was ever presented this material,

1    correct?

2    **A.**   I don't know who was presented the material.  I know

3    that the strategy at CONSOL was to present this orientation

4    at the union-free location.  So if you worked there, you

5    heard it.

6    **Q.**   Do you know what the date of this document is?

7    **A.**   No, I do not.

8    **Q.**   Okay.  And so if someone was working at Enlow Fork at

9    some period other than when this document was used, they

10   wouldn't have seen any of this, correct?

11   **A.**   I don't -- I don't know what they would have seen or

12   not seen.  They wouldn't have seen the script anyway; they

13   would only heard it.

14   **Q.**   You don't know whether they heard it, because you don't

15   know when this was created, and you don't know when these

16   individuals attended the orientation, correct?

17   **A.**   That's right.

18            MR. TORRES:  Your Honor, there is no foundation

19   for the introduction of this document.  And so, again, it

20   doesn't relate to Buchanan.  You can't testify that this is

21   the same as Buchanan.  He wasn't involved in developing it.

22   And he hasn't -- there is no evidence that any of the

23   plaintiffs ever heard what was contained in this script.

24   There was absolutely no testimony from any of the Buchanan

25   witnesses about this document.

1       So I don't think there is a basis for introducing it;

2   certainly not through this gentleman.

3           THE COURT:  Thank you.

4           MR. PETSONK:  Your Honor, please instruct me as to

5   whether I should respond to Mr. Torres.

6           THE COURT:  Sure.

7           MR. PETSONK:  Well, Your Honor, Mr. Hymes has

8   testified he was involved in the consultation and the

9   development process for the union-free strategy at the

10  Bailey and Enlow Mines, even though he might not have

11  personally drafted out this particular script, as a product

12  of that consultation process.  And he did testify he was a

13  part of it.  And he testified he instructed and managed that

14  development process, and he was a part of it, and he

15  received the same instruction as the other people who were

16  involved in developing the Bailey and Enlow script.

17      And Mr. Hymes testified he received this script, to the

18  best of his recollection, from his counterpart, Mr.

19  Phillips, who had a similar role to him in the development,

20  although perhaps Mr. Phillips may have been the one who took

21  pen to paper to fill in the blanks that Mr. Hymes has

22  referenced regarding names.

23      And so I believe that Mr. Hymes not only had custody of

24  and knowledge of this script, and has testified that he used

25  it during the course of his management of union-free

1   strategy during the period of 1986 to '93, when he carried

2   out that strategy at the Buchanan Mine; he had custody of

3   this document.  He referred to it.  He used it.  And he was,

4   in fact -- he testified he was involved in the development

5   of this document, even though he may not have been the

6   scribe.

7        So for those reasons, I urge that there is sufficient

8   foundation to admit the document and allow me to inquire

9   further of Mr. Hymes about it.

10            MR. TORRES:  Your Honor, could I just make one

11   more point?  I'm sorry.

12            THE COURT:  Yes.

13            MR. TORRES:  Again, even if this gentleman had

14   some knowledge of this document secondhand, the issue here

15   for at least this document is whether anyone at Enlow Fork,

16   which would be, I guess Mr. Jack -- excuse me, Your Honor --

17   was promised lifetime benefits.  Mr. Jack's testimony was

18   that the only promise of lifetime benefits that he heard

19   during his orientation at Enlow Fork was from the gentleman

20   who was speaking, who orally stated the benefits would be

21   for life.  And he admitted on cross-examination that he

22   wasn't -- he didn't -- wasn't aware of any written promises

23   that were presented to him during orientation.

24        So again, even if this gentleman has some passing

25   knowledge of this document, because it's argued, allegedly,

1    similar.  Coming back to this lawsuit, what does the fact

2    that he knows about this orientation prove anything

3    regarding Mr. Jack's claim, because he admits he has no idea

4    who actually was presented this information.  And Mr. Jack

5    testified that he wasn't aware of any written promises of

6    lifetime benefits; he just was promised it orally by the

7    gentleman who conducted the orientation.

8         So I'm not sure how that's even relevant.  The fact

9    that -- the fact that CONSOL allegedly wanted to remain

10   union free is a perfectly lawful, appropriate thing for a

11   company to want to do.  Other companies wanted to unionize;

12   others don't.  That's their prerogative.

13        The issue in this lawsuit is not whether CONSOL had the

14   right to remain union free.  The issue is whether these

15   gentleman that were identified by seven plaintiffs were

16   promised lifetime benefits and whether, in doing so, they

17   can be considered fiduciaries under ERISA.

18        I'm not sure what any of that has to do with the fact

19   that CONSOL preferred not to have union at his mine

20   operations.  And the way that these gentlemen and woman are

21   going to prove their claim is by establishing that these

22   individuals, A., in fact, made a promise of lifetime

23   benefits; and B., as a matter of law under ERISA could be

24   considered fiduciaries.

25        So again, Your Honor, I don't see how any of this

1    speaks to that issue.  And certainly this gentleman is not

2    competent to testify to this, because he's admitted he

3    doesn't know who drafted it, who it was presented to.  So it

4    doesn't relate to the issues in this lawsuit.

5            THE COURT:  Thank you.

6        One final word, Mr. Petsonk?

7            MR. PETSONK:  Yes, Your Honor.  Mr. Hymes is being

8    offered as a corroborating witness, to corroborate the

9    veracity or the lack thereof of the testimony tendered by

10   other witnesses in the case.

11       Mr. Torres is objecting to the admission of this

12   exhibit for the purpose of corroborating -- or for the

13   purpose of reference of this witness and his corroborating

14   testimony.  Mr. Torres has not established that this witness

15   fails to adequately authenticate that exhibit.

16       I don't understand there is any defect with Mr. Hymes'

17   ability to authenticate what this is.  He's been a custodian

18   of it.  He has possessed it.  He provided it.  He has

19   knowledge of its origin and contents.  And he knows how he

20   used it in his job for CONSOL.  And so it -- and it's

21   certainly relevant, because of the -- because of the need to

22   corroborate the testimony of the other witnesses in this

23   case.  This is a document that was utilized in the -- in the

24   presentation of the orientation sessions that people have

25   testified about in this case.  And the document tends to

1    support the truth of what these other individuals have said.

2    It serves as a useful piece of corroborating evidence; it's

3    relevant, and it's certainly part of the authentication by

4    Mr. Hymes.  So I would urge it be admitted.

5              THE COURT:  Thank you.

6         Let me ask you, Mr. Hymes, are you able to go through

7    this document and discern what the differences are?  I

8    recognize, of course, it's been 27 years since you were with

9    the company.  Before undertaking to answer that question,

10   let me ask you another one.

11        When did you get this from Mr. Phillips?

12             THE WITNESS:  Probably right before I left CONSOL.

13             THE COURT:  So you've had it in your file ever

14   since?

15             THE WITNESS:  Yes, sir.

16             THE COURT:  And back to my initial question.

17   After this length of time, are you able to go through this

18   and discern what the differences are between this and what

19   was at Buchanan?

20             THE WITNESS:  Yes, sir, I'm pretty sure I could.

21   Nobody's ever asked me to do that.

22             THE COURT:  I take it that probably Mr. Hymes was

23   brought on today so he could be free after today.  Is that

24   the case?

25             MR. PETSONK:  That was certainly the hope, Your

 1    Honor, but -- yes.

 2              THE COURT:  And so I simply wonder whether or not

 3    we could recess at this point and have Mr. Hymes go through

 4    the document to see whether or not he can speak --

 5    ultimately speak to what the differences are between this

 6    and what he aided and designed at Buchanan.

 7         And I would ask the parties whether or not you have

 8    anything further with respect to that suggestion?

 9              MR. PETSONK:  Well, speaking for myself, Your

10    Honor, if I may?  I don't object to that.  I can proffer for

11    Your Honor that this document as lengthy, though it is, does

12    not even represent the entirety of the script that was

13    utilized in these orientations.

14              THE COURT:  I hope that, however, you'll be

15    content with this.

16              MR. PETSONK:  This is all we have.  So, yes, this

17    is a part that Mr. Hymes was able to find that he still had.

18    And, Your Honor, I don't intend to go page-by-page through

19    this document.  I simply want to use it to bolster and

20    corroborate the testimony about the actions of the alleged

21    fiduciary agents in this case.  And so I do not intend to go

22    through it exhaustively, but waiting for the witness to

23    examine it more closely is helpful, I certainly don't oppose

24    that.

25              THE COURT:  Mr. Torres.

1              MR. TORRES:  Your Honor, I mean, before we put

2    this gentleman to the task of reviewing this document to

3    identify differences, I ask Mr. Petsonk to identify a single

4    word in there that corroborates the testimony of his

5    clients.  There is no promises of lifetime benefits in that

6    document, Your Honor.  That is the issue.

7         If there is -- there is not even a comparison, if I

8    recall correctly, between the UMWA benefits and, Your Honor,

9    the retiree medical plan.  But even if they do, there is no

10   promise that the benefits will never change.

11        So that's the issue.  Unless Mr. Petsonk can say,

12   here's the lifetime promise, it doesn't corroborate

13   anything.  And again, it only relates to Enlow Fork.  So the

14   only thing this document can do is allegedly corroborate Mr.

15   Jack's testimony.  And, as I said before, Your Honor, Mr.

16   Jack said the only promises he received were oral.  So that

17   document wouldn't do anything to proffer it.

18              THE COURT:  Let me ask, Mr. Petsonk, is there

19   nothing in this document with respect to the benefits being

20   lifetime?

21              MR. PETSONK:  Your Honor, I can -- I would like to

22   proffer some examples of what is relevant and what I seek to

23   elicit from Mr. Hymes as to this document.

24        First, on the page stamped 344, the document reads,

25   "Part of this is lawyer talk."  We've referenced the -- the

1    use of the phrase "Lawyer Talk."

2         And it says, "And there is another point, just as

3    important as I talked about.  And this is primarily what the

4    lawyer talk is about.  This handbook doesn't create an

5    employment contract between the company and its people.  If

6    you are terminated and want to sue us in court and say that

7    we violated your employment contract, then you are going to

8    see us waving this handbook at the Judge and pointing to

9    page -- blank.  Now, I guess that sounds pretty blunt,

10   but -- and it goes on -- pretty blunt.  I probably could

11   have thought about it for a few minutes and found a nicer

12   way to say it.  But, that's what it means."

13        And it goes on to say, the other thing I want to do

14   before we start looking in detail at your pay and benefits

15   is turn over the floor to -- blank, and the name is

16   missing -- for a few minutes.  He has a few things he wants

17   to share with us.

18        That's the portion before the benefits are presented

19   when the unnamed presenter named fill-in-the-blank goes on

20   to make some explanation.

21        I would like to elicit testimony about that from Mr.

22   Hymes and there are one or two other points, Your Honor, but

23   I don't want to belabor this.  It's a several-hundred page

24   document.  But another instance on page stamped 401, it

25   says, it compares the CONSOL retiree wage and benefit

1    package to the 1988 Bituminous Coal Wage Agreement, which is

2    the national union contract that CONSOL was a party to at

3    all relevant times here, and it says, as you can see, the --

4    it says, so why do I say that wages and benefits is one

5    reason why you are better off at Enlow Fork without a union?

6    And it goes on to explain about the benefits package, and it

7    says, you know that this wage and benefit package is clearly

8    superior to any wage and benefit package negotiated by the

9    UMWA for anybody anywhere.

10        Next, you do not have to go through a prolonged,

11   possibly bitter negotiations to receive these benefits, and

12   so forth.

13        So, you know, there are a couple of explicit

14   comparisons, including with charts and relevant slides that

15   are contained here.  And that's what I would question Mr.

16   Hymes about, how these comparisons were presented to new

17   employees during the orientation.  And that's all been the

18   subject of the testimony.

19            THE COURT:  Getting back to Mr. Torres' comments a

20   moment ago.  He says there is nothing in there about a

21   lifetime benefit.  And I take it that must be true, because

22   I haven't heard you point it out.

23            MR. PETSONK:  The phrase "Lifetime Benefits" is

24   not used in this script.  But the comparison --

25            THE COURT:  Anything comparable to it?

1          MR. PETSONK:  Well, Yes, Your Honor, there is.

2     The presentation of the particular terms of the UMWA plan

3     and the representation here that the CONSOL plan is superior

4     to the UMWA benefits.

5          THE COURT:  Beyond that, I understand that this is

6     not all that was presented.  This is just simply part.  Was

7     there a script more than this?

8          MR. PETSONK:  This is the script for day one of

9     the orientation.  And I can set that forth.  And then what

10    you heard, Your Honor, is that on day three of the

11    orientation, the miners were asked to bring their wives in.

12    This is not the script for that day.  That was the

13    summation.  That was the end of the dog and pony show, as it

14    were, and the wives -- and that's what I would like to

15    elicit testimony about, as well.

16         THE COURT:  This is day one and there are

17    five-and-a-half days or just three days, whatever the length

18    may have been.  What about the other days?

19         MR. PETSONK:  I can ask Mr. Hymes to testify.  I

20    don't have the other days.  I think Mr. Hymes doesn't have

21    the other days.  This was all 30 years ago, so not all the

22    documents survived.  And certainly we sought them in

23    discovery and we didn't get them from CONSOL.  So I gather

24    CONSOL doesn't have them either.

25         THE COURT:  Mr. Torres.

1          MR. TORRES:  Your Honor, first off, just to

2     correct one misstatement by counsel that MSJ 324 says, "I

3     would like to welcome all of you as employees and your

4     spouses to the Enlow Fork."  So I guess this is the day that

5     he claims this was all discussed.

6          But, in any event, Your Honor, comparing benefits

7     between CONSOL and the UMWA -- obviously, Mr. Petsonk is

8     unwilling to concede that it doesn't make any promise of

9     lifetime benefits.

10          And the other thing, Your Honor, and you recognize this

11     under Summary Judgment in the class certification ruling,

12     this gentleman has no evidence of what actually was said in

13     any of these presentations.  All he can say is that he was

14     involved in developing some of them, but he wasn't the

15     individual who actually presented them.

16          So if this issue in the lawsuit is what was said to the

17     plaintiffs, -- this could say all sorts of things, but

18     unless he can say, I know that they were told X and Y, he

19     has no personal knowledge of anything that's relevant to

20     corroborating the testimony of these witnesses.

21          And Mr. Petsonk keeps generically saying he can

22     corroborate their testimony.

23          He wasn't there after 1993.  So the only person he

24     could have -- that was around was Mr. Casey.  He clearly

25     wasn't there when Mr. Jack attended his orientation.

1    So how is any of that even corroborating?  Even if he

2    can say, yeah, this is similar to the script used at

3    Buchanan.

4    What is relevant is not what the written document is,

5    but what the individuals were actually shown and told.  And

6    he has absolutely no personal knowledge of what happened in

7    the exchanges between these plaintiffs and the individuals

8    that they specifically identified.  They had all the

9    opportunity to say all the things that they were shown and

10    what they were told.  You've heard all that testimony.  And

11    none of it involved Mr. Hymes.  And he has no personal

12    knowledge of any of that.

13        THE COURT:  Anything further?

14        MR. PETSONK:  Well, Your Honor, in addition to

15    corroborating the veracity of what the plaintiffs say that

16    they heard, this exhibit in this line of testimony also

17    corroborates another significant, legally significant fact,

18    which is the reasonableness or the -- of the plaintiffs'

19    understanding about the apparent authority carried by the

20    individuals who made these misrepresentations that we've

21    alleged about the benefits.

22    And so Mr. Hymes is corroborating not only the fact of

23    who said what to whom, but what was the -- the role of the

24    people who made these representations, and was it

25    reasonable.  What may the Court conclude that those HR

 1    managers were, in fact, apparent agents, it was reasonable

 2    for the miners to understand they were the apparent agents

 3    of the fiduciary, the named fiduciary, and the other legal

 4    fiduciaries that we've alleged here in this plan.

 5         So we seek to corroborate as to that fact, as well.  I

 6    took your direction from Your Honor, that is a significant

 7    fact that proves our theory that they are apparent agents of

 8    the fiduciary.  And so it corroborates for that important

 9    purpose as well.

10         MR. TORRES:  How can he testify as to their

11    apparent authority when he wasn't present when they made the

12    presentations?  Your Honor, whether someone -- the test for

13    fiduciary under ERISA, when you are looking at whether it is

14    a functional fiduciary, is whether the individual in their

15    actions assumed the fiduciary responsibility.  And that

16    requires in all the cases that evaluate this, looking at

17    what the individual said, is there evidence that the

18    corporation provided them -- as in the *Pirelli* case  --

19    inaccurate information that they admittedly disseminated to

20    the plaintiffs in that case.

21         That's how you determine whether someone is considered

22    a functional fiduciary.

23         Alternatively, on this theory that there is some status

24    of, you know, someone with apparent authority.  How does he

25    testify to that when he wasn't present when any of these

1    presentations were made?  And there is nothing in this

2    document -- which, again, he didn't draft and doesn't know

3    who prepared -- that says, "Hey, I have apparent authority

4    to make you lifetime promises."

5        So again, how does Mr. Hymes corroborate the apparent

6    authority of people who he wasn't present for when they

7    actually made the presentation?  Unless he's going to say,

8    Mr. Fox came to me and said, "Hey, I promised these people

9    lifetime benefits.  And I told him he had the authority to

10   do that."

11       But he's not going to do that, Your Honor.

12           THE COURT:  I think insofar as the authority is

13   concerned, the latter will show who is the fiduciary at the

14   time.  And whether it extends to agents even several rungs

15   down the line will suffice, for if the fiduciary it seems to

16   have authorized these statements, then the fiduciary is

17   simply bound by them.

18       The exhibit itself -- I'm disturbed, because I hear

19   that not only it's not identical, but there are other parts

20   of it.  And whether those other parts have any bearing on

21   this, perhaps Mr. Hymes could tell us.  But I go back to

22   what I suggested.

23       If the effort is to be made to go through this and find

24   out whether or not it is indeed essentially the same, by

25   scanning through it for the differences, then the Court can

1    evaluate those differences once it hears them and decide

2    whether or not this can come in.  If you want to try it

3    overnight, you're welcome to do it.

4         If not, we need to -- you need to conclude with this

5    witness on whatever grounds you have in the morning.

6         It's now 5:30.  And we need to recess for the evening.

7    I'm sorry to inconvenience you, Mr. Hymes, but we are going

8    to have to have you back in the morning and after having

9    spent I hope some time to look through this, to see whether

10   or not you can be more specific about the differences.

11         MR. PETSONK:  Your Honor, if I may?  There are a

12   couple other exhibits that we wish to present through Mr.

13   Hymes.  And I can present them to the Court now if the Court

14   would like to give me instruction about them, or leave it

15   with the Court.  I'll present them to Mr. Hymes to review

16   this evening so he can make a similar representation based

17   on some benefit of time to review before court tomorrow.

18         THE COURT:  And so what do you suggest now?

19         MR. PETSONK:  That I will give Mr. Hymes the

20   remainder of the exhibits I seek to admit through him so he

21   can review them.  They are somewhat lengthy, and he can

22   review them this evening and resume his testimony tomorrow

23   with the benefit of that review.

24         THE COURT:  Well, there is no basis to objecting

25   to that, is there?

1          MR. TORRES:  No, Your Honor.  I want to make sure

2     Mr. Hymes is required to do that without consulting with

3     counsel.

4          THE COURT:  It's going to be at his scrutiny

5     unaided by counsel, but you might identify those additional

6     exhibits to which you're referring.

7          MR. POMPONIO:  Your Honor, may I make a suggestion

8     or comment?  Could we identify the portions of these

9     documents that we seek to elicit testimony about and then

10    have the witness determine if there is anything different

11    from the Buchanan script that he created, rather than going

12    through the entirety of these documents?

13        And if the defendants would like to point to some

14    difference in the documents that we are not designating,

15    then they certainly have the opportunity to do that on

16    cross-examination.

17         THE COURT:  Mr. Torres, do you wish to respond?

18         MR. TORRES:  Yes, Your Honor.  I mean, again, I

19    guess the problem is that if these -- it seems to me we'll

20    end up with sort of the same exercise if he's not asked to

21    review the entire document.  Because if we then get into

22    other pages that he's saying are different -- just seems to

23    me if he's reviewing it to identify the differences, it's

24    hard for me to guess right now whether I point to some page

25    and we are going to end up in the same exercise we are

1    asking him to review it and tell us the differences.  It

2    seems to be a laborious process for cross-examination.

3         THE COURT:  Thank you.

4         The Court appreciates that suggestion, and I would like

5    the witness to be particularly attentive to that, those

6    sections, but I think the witness needs to go through the

7    entirety of the document.  And so that the witness will

8    expect that the Court will expect that to be done.

9         Anything further?  And do you want to identify those

10   additional exhibits?

11        MR. TORRES:  Could I ask one other clarification,

12   Your Honor?  In addition to that, speaking with counsel, I

13   assume that in the middle of the examination, he's not to

14   speak with anyone else about his testimony as well.

15        THE COURT:  The witness is directed not to discuss

16   this case or his testimony with anyone.  He's to treat

17   himself as though he's on the witness stand overnight.

18        And I think you already understand that part.

19        THE WITNESS:  Yes, sir.

20        THE COURT:  But there is no reason you can't hand

21   him those exhibits now.  And I don't how you are going to

22   get through all this and get any sleep.  But you may have to

23   adjust the time when he returns tomorrow.

24        MR. PETSONK:  Well, I would suggest that he should

25   return at 9:30, if that's when we resume Court at that time.

 1    And so long as Mr. Hymes is comfortable that he can conduct

 2    a sufficient review in the evening and not need time during

 3    the morning for further review.

 4         THE COURT:  Well, if he can't do that, he'll just

 5    have to come in later.  And it's understandable that he

 6    would.  So invite him back at 9:30, but we might not seat

 7    him that soon.  So you need to be ready to go with another

 8    witness.  And I understand you have Mr. Fitzwater, at least,

 9    yet to testify.

10       Again, what other documents aside this one is he to

11    consider?

12         MR. PETSONK:  There is a similar script, a portion

13    of a similar -- a portion of a similar script, the day one

14    presentation from the Bailey Mine that Mr. Hymes still has

15    in his possession.  And that is Bates MSJ 463 through 581.

16         THE COURT:  Does it have a title?

17         MR. PETSONK:  It's simply called, "Bailey

18    Introductions, Supervisor IE&R," like the Enlow exhibit.

19    And there are -- there are three slideshows from Buchanan.

20    And those are Bate-stamped by the defendant.  And --

21         THE COURT:  And so are the three slides in textual

22    form?

23         MR. PETSONK:  Yes.  Well, they are PowerPoint

24    presentations, printed off on 8 1/2 x 11 pages.

25         THE COURT:  So we have a copy of what was perhaps

1    put on a screen?

2                MR. PETSONK:  Yes.  It purports to be that way,

3    yes.

4                MR. TORRES:  Your Honor?

5                THE COURT:  And so let's identify what this is.

6    You said there were three.

7                MR. TORRES:  Your Honor, could I speak?

8                THE COURT:  Do you have a title?

9                MR. PETSONK:  These were, yes, there is a title.

10   These are all exhibits to the defendant's deposition of the

11   witness here.  And the first exhibit is entitled:  "Welcome

12   to Buchanan Orientation Program, Five Days."  And it's

13   Bate-stamped CONSOL 25869 through CONSOL 25887.

14               MR. TORRES:  869, you said?

15               MR. PETSONK:  25869 is the first page, and the

16   last page is CONSOL 25887.

17               MR. TORRES:  Okay.

18               MR. PETSONK:  And the next exhibit, the title on

19   the first page called "Organizing Tactics," and it's stamped

20   CONSOL 25888 through 25905.

21               Your Honor, I have one other item here, our

22   Bate-stamped MSJ 582 through 659.

23               MR. TORRES:  I'm sorry, 582, you said?

24               MR. PETSONK:  MSJ 582 through 659.  I may not need

25   to go through all of these, Your Honor, but I wanted to

 1    present that, as well as the Bates range that I can present

 2    to Mr. Hymes for review.

 3              THE COURT:  So those exhibits, one's about 20

 4    pages, one's about 18 pages, and one is about 80 pages?

 5              MR. PETSONK:  Yes, Your Honor, roughly.

 6              THE COURT:  And you've given us the markings on

 7    them, and that, together with plaintiff's 10, would be what

 8    you would present -- just a moment -- for Mr. Hymes to

 9    review.  Does that cover it?

10              MR. PETSONK:  The other Bates range is 25522, and

11    this is a CONSOL Bates stamp.

12              MR. TORRES:  Hold on a second.  You said 25 --

13              MR. PETSONK:  25522.

14              MR. TORRES:  25522?

15              MR. PETSONK:  Right, CONSOL 25522 through CONSOL

16    25579.

17              MR. TORRES:  79, you said?

18              MR. PETSONK:  Yes.

19              MR. TORRES:  Your Honor, just to try and make --

20    Mr. Petsonk was saying that some of these documents were the

21    subject of a deposition in this case.  Just to show how far

22    afield we are getting.  The documents from CONSOL that he's

23    identified are from 2010 and 2011.  So those would have been

24    some number of years after this gentleman worked at CONSOL.

25          And so even putting aside this other exercise about the

1    documents from the '80s, again, how is this gentleman going

2    to testify competently as to documents that existed more

3    than 10 years after he worked at the company?

4            THE COURT:  Well, when you said 2010, '11, in that

5    area, to what are you referring on these documents that Mr.

6    Petsonk has just noted?  He's given us four items.  Are they

7    all in that time range?

8            MR. TORRES:  All the documents -- the two

9    documents he identified with the CONSOL Bates ranges are

10   from 2010 and 2011.  The documents with the MSJ designations

11   from the plaintiffs, one of them, apparently, is from 1988.

12   So that's when the gentleman was around and it does relate

13   to Buchanan.

14      And we've got this other document that we've been

15   dealing with, which, you know, the gentleman doesn't know

16   exactly what time period it was used, but, you know --

17           THE COURT:  Well, my thought simply is that if in

18   light of that, Mr. Petsonk, still wants Mr. Hymes to review

19   those items, you're welcome to do so, but it does look to me

20   as though it may be questionable as to if they are coming

21   in.  They just may not be in a time when he can vouch for

22   them.

23           MR. PETSONK:  I understand, Your Honor.  I will

24   certainly encourage him to spend the time with the documents

25   that he gave to me which are the ones from his time period

1    of employment with CONSOL.

2         THE COURT:  And that's Plaintiff's 10 and, more

3    particularly, one of those four or five -- I can't remember

4    how many.

5         MR. PETSONK:  There were two more exhibits after

6    Plaintiff's 10 that came from his time period, and those are

7    the ones I will ask him to scrutinize.

8         THE COURT:  Let me ask if the parties have

9    anything further at this time?

10        MR. PETSONK:  Not from the plaintiffs, Your Honor.

11        MR. TORRES:  No, Your Honor.  Thank you.

12        THE COURT:  Mr. Hymes, excuse me.  Since you are

13   the victim here.

14        THE WITNESS:  I was going to say, I would like to

15   be on early in the morning.  I'll spend the time tonight.

16   Because I have another obligation tomorrow evening.  So I

17   would like very much to -- I booked a hotel room for two

18   nights.  I thought this might happen.

19        THE COURT:  Well, you've probably had experience

20   along these lines.

21      What time do you think you can return?

22        THE WITNESS:  What time is the start?

23        THE COURT:  Well, we start at 9:30.

24        THE WITNESS:  I can be here at 9:30.

25        THE COURT:  Well, if you are sure you can go

```
 1    through this and get through all this and do that, too?

 2              THE WITNESS:  Yes, sir.

 3              THE COURT:  But if you need more time -- of

 4    course, you need to get through it, and if you need more

 5    time, then take it.  And just let counsel know that you are

 6    not going to be here at 9:30 and they'll have to have

 7    somebody else.

 8              THE WITNESS:  Okay, sir.

 9              THE COURT:  Thank you.

10              MR. PETSONK:  Thank you, Your Honor.

11              THE COURT:  Let me ask if the parties have

12    anything further at this time?

13              MR. PETSONK:  Not from the plaintiffs.

14              MR. TORRES:  Nothing from the defendants, Your

15    Honor.

16              THE COURT:  If not, we'll resume at 9:30 in the

17    morning.  Thank you.

18              THE CLERK:  All rise.

19         (Proceedings concluded at 5:45 p.m.)

20

21

22

23

24

25
```

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2         I, Catherine Schutte-Stant, Federal Official Realtime

 3    Court Reporter, in and for the United States District Court

 4    for the Southern District of West Virginia, do hereby

 5    certify that, pursuant to Section 753, Title 28, United

 6    States Code, the foregoing is a true and correct transcript

 7    of the stenographically reported proceedings held in the

 8    above-entitled matter and that the transcript page format is

 9    in conformance with the regulations of the Judicial

10    Conference of the United States.

11

12          s/Catherine Schutte-Stant, RDR, CRR

13          _____  February 26, 2021

14          Catherine Schutte-Stant, RDR, CRR
            Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```