1           IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                     AT CHARLESTON

3    _____x
                                    :
4    BENNY FITZWATER,               :  CIVIL ACTION
     CLARENCE BRIGHT, TERRY PRATER, :  NO. 2:16-cv-09849
5    EMMET CASEY, JR.,              :
     CONNIE Z. GILBERT,             :  Consolidated with:
6    ALLAN H. JACK, SR., and,       :  CIVIL ACTION
     ROBERT H. LONG.,               :  NO. 1:17-cv-03861
7              Plaintiffs,          :
                                    :
8                  -vs-             :
                                    :
9    CONSOL ENERGY, INC.,           :
     CONSOLIDATION COAL CO.,        :
10   FOLA COAL CO., LLC,            :
     CONSOL OF KENTUCKY, INC.,      :
11   CONSOL PENNSYLVANIA COAL CO.,  :
     LLC, and KURT SALVATORI,       :
12                                  : **BENCH TRIAL**
            Defendants.             : **VOLUME III**
13   _____x

14              **TRANSCRIPT OF PROCEEDINGS**
        **BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.,**
15          **SENIOR UNITED STATES DISTRICT JUDGE**
                  **FEBRUARY 11, 2021**

16

17

18   **APPEARANCES:**
     **FOR THE PLAINTIFFS:**        **SAMUEL B. PETSONK, ESQUIRE**
19                                  PETSONK PLLC
                                    P. O. Box 1045
20                                  Beckley, WV  25802

21

22        Proceedings recorded by mechanical stenography,
     transcript produced by computer.
23   _____

24            CATHERINE SCHUTTE-STANT, RDR, CRR
                Federal Official Court Reporter
25          300 Virginia Street East, Room 6009
                  Charleston, WV 25301

```
 1    APPEARANCES CONTINUED:

 2    FOR THE PLAINTIFFS:        BREN J. POMPONIO, ESQUIRE
                                 LAURA DAVIDSON, ESQUIRE
 3                               Mountain State Justice, Inc.
                                 1217 Quarrier Street
 4                               Charleston, WV  25301

 5

 6

 7    FOR THE DEFENDANTS:        JOSEPH J. TORRES, ESQUIRE
                                 ALEXIS E. BATES, ESQUIRE
 8                               EMMA J. O'CONNOR, ESQUIRE
                                 KATHERINE M. FUNDERBURG, ESQUIRE
 9                               Jenner & Block LLP
                                 353 N. Clark Street
10                               Chicago, IL  60654

11

12

13    FOR THE DEFENDANTS:        MICHAEL D. MULLINS, ESQUIRE
                                 Steptoe & Johnson PLLC
14                               707 Virginia Street East
                                 17th Floor
15                               Charleston, WV 25301

16

17

18

19

20

21

22

23

24

25
```

```
 1                              INDEX
        PLAINTIFF'S
 2      WITNESSES       DIRECT    CROSS    REDIRECT   RECROSS  EXAMINATION

 3      DEAN MICHAEL HYMES
                476, 588, 601  508, 661      ^          ^             ^
 4
        VOIR DIRE -  482, 532, 597, 652
 5

 6      BENJAMIN FITZWATER 550       ^          ^          ^             ^

 7


 8


 9
        DEFENDANT'S
10      WITNESSES        DIRECT   CROSS   REDIRECT  RECROSS   EXAMINATION

11      (NONE)               ^        ^        ^          ^           ^

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         INDEX TO EXHIBITS

 2      PLAINTIFF'S
        EXHIBITS                          ADMITTED
 3
          10-A                               620
 4
          11                                 568
 5        12                                 587
          13                                 587
 6        14                                 635

 7


 8
        DEFENDANT'S
 9      EXHIBITS                          ADMITTED

10        18                                 679

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (The following Bench Trial was held before the
 2     Honorable John T. Copenhaver, Jr., Senior United States
 3     District Judge, in the case of Fitzwater, et. al. versus
 4     CONSOL, et. al, on Thursday, February 11, 2021, at
 5     Charleston, West Virginia.)
 6                    P-R-O-C-E-E-D-I-N-G-S              9:34 a.m.
 7               THE CLERK:  All rise.
 8               THE COURT:  Good morning.  Please be seated.
 9               MR. PETSONK:  Your Honor, I apologize.  I'm
10     gathering one exhibit that I did not have.
11               THE COURT:  Please go ahead.
12               MR. PETSONK:  Your Honor, I have -- I'm prepared
13     to proceed.  I think I might be shy one or two copies of one
14     of my exhibits, but I'm able to proceed at this point.
15               THE COURT:  Mr. Torres is on his feet.
16               MR. TORRES:  Yes, Your Honor.  I guess I wasn't
17     entirely sure where we left things last night.  I know that
18     this gentleman was going to review the materials, and I
19     didn't know if Mr. Petsonk was going to launch into
20     examination or whether we are going to deal with the results
21     of the gentleman's comparisons?
22               MR. PETSONK:  Your Honor, I can address that.
23               THE COURT:  Go ahead.
24               MR. PETSONK:  There was a substantial amount of
25     exchange at the end of the day yesterday, so I do think it's
```

1   beneficial to revisit.

2       Your Honor, Mr. Torres made several objections, which I

3   took to be directed towards the admissibility of Mr. Hymes'

4   testimony and the exhibit that I presented to Mr. Hymes.  I

5   believe that I addressed the objection insofar as it goes to

6   the admissibility of that evidence before Your Honor.

7           THE COURT:  You can't just say, "that evidence";

8   you have to tell me what you're talking about.

9           MR. PETSONK:  The Plaintiff's Exhibit -- what was

10  marked Plaintiff's Exhibit 15, I believe.

11          THE CLERK:  10.

12          MR. PETSONK:  Plaintiff's Exhibit 10, the first

13  exhibit presented to Mr. Hymes yesterday.

14          THE COURT:  And what about it?

15          MR. PETSONK:  Plaintiff's Exhibit 10 -- I

16  addressed Mr. Hymes' ability to authenticate that exhibit,

17  because he received it personally and possessed it, made use

18  of it in his employment with CONSOL.

19          THE COURT:  What you should do is to ask the

20  witness what he knows about 10 and how it relates to this

21  case --

22          MR. PETSONK:  I can certainly do that.

23          THE COURT:  -- before you get into the essence of

24  what's in it.  And so lay the foundation for that.

25      And what other evidence are you talking about?

```
1            MR. PETSONK:  Mr. Torres objected to, I gather, to

2     the admissibility of -- it was -- the nature of his

3     objection was toward the admissibility of the exhibit.  And

4     I addressed its relevance.

5            THE COURT:  What exhibit?

6            MR. PETSONK:  Plaintiff's Exhibit 10.

7            THE COURT:  Well, that's what I asked you to

8     establish, whether or not this witness is qualified to

9     testify about it --

10           MR. PETSONK:  Yes.

11           THE COURT:  -- and whether the exhibit, in turn,

12    is going to come into evidence.  But the first thing you

13    need to do is to establish all that we talked about last

14    night.  We don't need for us to go over that.  You know

15    exactly what the problem is.

16           MR. PETSONK:  Yes.

17           THE COURT:  So you need to address it.

18           MR. PETSONK:  Certainly, Your Honor.  May I --

19    there was one point of clarity that I wanted to bring to

20    Your Honor, because we discussed the matter of whether this

21    exhibit goes -- whether Plaintiff's Exhibit 10 goes to

22    intent.  And, if I may, at this time, clear up what I had

23    stated yesterday regarding the purpose for which we intended

24    to offer the exhibit -- there was some exchange about

25    that -- before I get to the presentation of the foundation
```

1    for the exhibit.

2              THE COURT:  You can address that, as you wish,

3    now.  As I understand it, you have some argument to make

4    with regard to it?

5              MR. PETSONK:  Yes, Your Honor.

6              THE COURT:  Go ahead.

7              MR. PETSONK:  Mr. Torres had objected that we were

8    offering the -- again, I don't believe it's an objection

9    that goes to admissibility, but he objected because he said

10   we were offering the exhibit for the purpose of showing the

11   intent of the corporation, CONSOL's corporate intent.

12        And I said in response to that -- and I'm meaning to

13   clarify, Your Honor, that we do not seek to make use of this

14   exhibit to show the intent of the apparent agents.  We do

15   not seek to use this exhibit to show the intent of the Human

16   Resource Managers, who we allege to be the apparent agents

17   of the fiduciary, but rather to show the corporate action

18   regarding the presentation of the script, the union-free

19   strategy, and the reservation of rights, Your Honor.

20        And so I didn't mean to be unclear as to whether we

21   were trying to use this script to establish some specific

22   intent on the part of the apparent agents.  That's not the

23   purpose for which we are offering this exhibit.  And there

24   was some exchange about that yesterday, Your Honor, and I

25   wanted to attempt to address that here, if there is some

1    confusion about it.

2             THE COURT:   Thank you.

3        **DEAN MICHAEL HYMES, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**

4                    **DIRECT EXAMINATION RESUMED**

5    **BY MR. PETSONK:**

6    **Q.**   All right.   Mr. Hymes, do you have in front of you what

7    was marked Plaintiff's Exhibit 10?

8    **A.**   If that's the Enlow Fork Introduction Supervisor I&ER,

9    yes.

10   **Q.**   And was this document familiar to you?

11   **A.**   Yes.

12   **Q.**   And what does it appear to be?

13   **A.**   As far as, I went over it last night, it became clear

14   to me exactly why I had it and what it was.

15   **Q.**   Okay.   Why did you have it?

16   **A.**   It is an updated version of the union-free script for

17   Enlow Fork, and it includes at 000388, an addition about the

18   investment plan.   When Buchanan was initially opened,

19   CONSOL's investment plan was not offered to the production

20   and maintenance employees for fear that they might organize,

21   and it was not something that the company wanted to put at

22   risk.

23        Later on, probably a year or year and a half later,

24   that was offered to Buchanan and the script had to be

25   changed.

1    Q.   So --

2              THE COURT:  It was offered, when?

3              THE WITNESS:  About a year and a half later.

4              THE COURT:  What is the year?  What's the time?

5              THE WITNESS:  Well, Your Honor, after looking at

6    one of these exhibits, I realized that the Buchanan Mine --

7    if I can find it, sir -- one of the CONSOL exhibits listed,

8    the Buchanan Mine as opening in 1982.  So based on that

9    exhibit, I would feel like it was probably in '84 or '85.

10             THE COURT:  And what was in '84 or '85?

11             THE WITNESS:  The introduction of the CONSOL

12   investment plan as a benefit option for the Buchanan

13   production and maintenance employees.

14             THE COURT:  And you're saying that investment plan

15   is in this document, Plaintiff's 10?

16             THE WITNESS:  It is in Plaintiff's 10, yes, sir,

17   on Page 000388.

18             THE COURT:  Please go ahead.

19   BY MR. PETSONK:

20   Q.   So, Mr. Hymes, you believe you received this document

21   then in around 1984 or 1985; is that right?

22   A.   Yes.

23   Q.   And who gave this document to you?

24   A.   Well, as I looked at the time frame, it may have been

25   Mr. Phillips, my counterpart in the Eastern Region, or it

1    may have been Greg Dixon, my counterpart in the Eastern

2    Region.  They both were there about that time, but I don't

3    know exactly when.

4    **Q.**   And do you know who drafted this script?

5    **A.**   No, I do not.

6    **Q.**   Were you involved in the development of the script?

7    **A.**   Well, you asked me yesterday to look at the changes,

8    and as I went through it, the only changes that I could

9    determine -- and I have them listed by page -- involved

10   things that were specific to Enlow Fork and the mine in

11   Pennsylvania, including who was in charge, and where it

12   would have said, "Buchanan," it had "Enlow Fork."  And it

13   talked about UMWA District 4, which is the UMWA district

14   there, rather than Buchanan's district would have been UMWA

15   District 28.

16       So those changes were essentially, I guess you would

17   say, the details to make the script exactly on Enlow Fork

18   Mine rather than Buchanan.

19           THE COURT:  When you say specific to Enlow Fork

20   and the Pennsylvania mine, what's the Pennsylvania mine?

21           THE WITNESS:  The Pennsylvania mine is Enlow Fork,

22   sir.

23           THE COURT:  Well, Enlow Fork and the mine of

24   Pennsylvania are the same thing?

25           THE WITNESS:  Yes, sir.  Excuse me.  Enlow Fork is

1    located in Washington County, PA, I think.

2            THE COURT:  Please go ahead.

3    BY MR. PETSONK:

4    Q.   Mr. Hymes, yesterday you testified that you were

5    involved in developing the union-free strategy for CONSOL

6    during the period of 1982 through 1984, or -- is that

7    correct?

8    A.   Yes.

9    Q.   And in the context of developing that union-free

10   strategy, you testified that the deliverables that you

11   developed included a new employee orientation program; is

12   that correct?

13   A.   Yes.

14   Q.   And did you participate during that period from 1982 to

15   '84 in the development of a script as a part of that

16   union-free orientation process?

17   A.   Yes.

18   Q.   So when you reviewed Plaintiff's Exhibit 10, did it

19   appear to you to contain any of the same content as the

20   script with reference to which you participated in the

21   development during that period from 1982 to 1984 that you

22   addressed yesterday?

23   A.   Yes.  With the changes that I listed on this document.

24   Q.   And the Court had given you time to review Plaintiff's

25   Exhibit 10 and to make notes of any differences between the

1   script you originally developed from '82 to '84, and the

2   script that's contained here in Plaintiff's Exhibit 10.

3   Have you done that?

4   **A.**   Yes.

5   **Q.**   And you referenced a document a moment ago that you

6   held up.  What is that document?

7   **A.**   This is -- I took each document and did an Excel

8   spreadsheet on the pages and the changes that I saw from the

9   original Buchanan document, which was my understanding of

10  what you wanted me to do.

11          MR. PETSONK:  Your Honor, if I may?  We provided

12  Mr. Hymes with several of the exhibits yesterday afternoon

13  at your direction, Your Honor.  And Mr. Hymes has testified

14  here that he made notes about any differences between those

15  documents I presented him yesterday and the script that he

16  utilized at the Buchanan Mine.  He has a sheet of notes in

17  front of him, Your Honor.

18      I would like to inquire of the Court as to whether Your

19  Honor would like for that sheet to be entered as an exhibit

20  at this time before I proceed to question Mr. Hymes about

21  the differences that he's noted?

22          THE COURT:  Just one moment.  Let me see you,

23  Josh.

24      (Pause.)

25          THE COURT:  Do I understand you to say that the

```
 1    witness has before him a copy of Plaintiff's 10?

 2              MR. PETSONK:  He has a copy.

 3              THE COURT:  Please let me finish.

 4              MR. PETSONK:  Yes, Your Honor.

 5              THE COURT:  The witness has before him a copy of

 6    Exhibit 10, and he's not marked anything on it.  Is that

 7    correct?

 8              MR. PETSONK:  I don't believe he has marked

 9    anything on that exhibit, no.

10              THE COURT:  But, instead, he has prepared other

11    pages that mark the changes to which he's referring?

12              MR. PETSONK:  Yes, Your Honor.  That's my

13    understanding.

14              THE COURT:  Thank you.

15         Let me hear from Mr. Torres.

16              MR. TORRES:  Your Honor, I'd certainly like to see

17    what we are talking about in order to understand what my

18    position is as to the document.

19              THE COURT:  Well, it could be exhibited to you.

20              MR. TORRES:  That's fine.  But I think as part of

21    that, Your Honor, this is now where we believe Mr. Petsonk

22    believes he's laid his foundation, I'd like an opportunity

23    to voir dire the witness regarding the alleged foundation

24    that Mr. Petsonk has laid.

25              THE COURT:  Any further foundation?
```

1          MR. PETSONK:  Well, Your Honor, my only comment as

2    to further foundation is you did also ask me to present some

3    other exhibits to the witness.

4        Shall I present the additional exhibits to Mr. --

5          THE COURT:  Let's deal with 10 first and then

6    we'll go on to any others.

7          MR. PETSONK:  Nothing further then, Your Honor.

8          MR. TORRES:  Could I have just one minute, Your

9    Honor?

10          THE COURT:  You may.

11          MR. TORRES:  Thank you, so much.

12                    **VOIR DIRE EXAMINATION**

13    **BY MR. TORRES:**

14    **Q.**   Mr. Hymes, you were deposed in this matter, correct?

15    **A.**   Yes.

16    **Q.**   On October 30th, 2018?

17    **A.**   Yes.

18    **Q.**   So two years and a couple months ago?

19    **A.**   Yes, sir.

20    **Q.**   And you were under oath?

21    **A.**   Yes, sir.

22    **Q.**   And when you were asked those questions, you answered

23    truthfully?

24    **A.**   To the best of my knowledge at that time, yes, sir.

25    **Q.**   And back in 2018, you testified that you didn't have in

1   your possession the Buchanan script that you had actually

2   worked on yourself, correct?

3   **A.**   Yes.

4   **Q.**   Is that yes?

5   **A.**   Yes.

6   **Q.**   During that deposition, when you were asked what was

7   contained in that script, you said that you were unable to

8   recall anything that was stated specifically in that script,

9   correct?

10  **A.**   Yes.

11  **Q.**   You said that conceptually you could tell us what the

12  intention was, but what the words were, you didn't know,

13  correct?

14  **A.**   That's correct.

15  **Q.**   Okay.  And despite not knowing in 2018 what was stated

16  in the Buchanan script, you are now able to compare this

17  document to a script you don't have and that you didn't

18  recall what the words were and tell us what the difference

19  is?  Is that your testimony today?

20  **A.**   You asked me to do that, and I focused on it last

21  night, and, based on my memory, this is -- these are the

22  changes from Buchanan.  The Buchanan script was the original

23  script, and these are changes from it.

24  **Q.**   Okay.  My question was:  You were able to make a

25  comparison last night, even though two years ago you told us

1    you didn't remember any of the words contained in the

2    Buchanan script; is that right?

3    **A.**    That's true.

4    **Q.**    And Mr. Petsonk alluded to a few -- how many changes

5    did -- I think you identified four; is that right?

6    **A.**    Four, what?

7    **Q.**    Four changes?

8    **A.**    Well, I identified more changes than that.

9    **Q.**    Okay, we'll get to that.  During your deposition, did

10   you know of any changes in your summary of differences

11   between the discussion of retiree medical in the script you

12   reviewed and what discussion of retiree medical there was in

13   the Buchanan script?

14   **A.**    I don't understand the question.

15   **Q.**    Did you identify any changes in the script you reviewed

16   on the topic of retiree medical as compared to the Buchanan

17   script?

18   **A.**    I'm thinking about reviewing the script last night.  I

19   don't remember there being any retiree medical discussion in

20   the script.  So, no, I didn't identify any changes.

21   **Q.**    Okay.  So you don't think there was any discussion of

22   Buchanan -- in the Buchanan script on retiree medical; is

23   that your testimony?

24   **A.**    There was, but not in this script, and I can't tell you

25   where that script is.

1  **Q.**  So you think that there was a discussion of retiree

2  medical in the Buchanan script, but there is no discussion

3  of retiree medical in this document?

4  **A.**  Not in this one, no.

5  **Q.**  And did you note that as a difference between the

6  scripts in your summary?

7  **A.**  No, because I didn't remember there being any

8  description of retiree medical in this particular area of

9  the script at Buchanan either.

10  **Q.**  But now you remember that there was discussion of

11  retiree medical benefits at Buchanan, and there isn't any

12  mention in this document of retiree medical?

13  **A.**  Somewhere in that, the entire script, which was many,

14  many pages, there was a discussion of retiree medical.  I

15  can't tell you where it was.  I don't have it.

16  **Q.**  So you think that there was a discussion of retiree

17  medical in the documents you are reviewing or in the

18  Buchanan documents?

19  **A.**  There is none in the document I was reviewing, but

20  there is in the Buchanan document somewhere, but I don't

21  have the Buchanan document.

22  **Q.**  Okay.  So all I'm asking you is, did you note in your

23  summary of differences, that this document doesn't include

24  any discussion of retiree medical?

25  **A.**  No, because I was comparing this to what I remembered

1    this particular section being.  Okay.

2    **Q.**   Okay.  This document you reviewed indicates towards the

3    beginning -- well, let me get it -- sorry.

4         So you didn't note that difference, correct?

5    **A.**   Correct.

6    **Q.**   And if you look at -- so you are looking at the Bailey

7    document, correct?

8    **A.**   No, I'm looking at Enlow Fork.  I can look at Bailey.

9    I can look at anything you want me to look at.

10   **Q.**   So if you look at the Bailey document, it's MSJ 324.

11   Are you there?

12   **A.**   My Bailey document starts MSJ 463.

13   **Q.**   Right.  I was asking about Enlow Fork.

14   **A.**   Oh, okay.  Excuse me, I misunderstood you.  What page?

15   **Q.**   MSJ 324?

16   **A.**   Yes, sir.

17   **Q.**   And the top of that page, it says, "On behalf of" --

18   blank -- underline -- sorry, I apologize -- "and all of our

19   management team, I'd like to welcome all of you as employees

20   and your spouses to the Enlow Fork Mine."

21        Do you see that?

22   **A.**   Yes, sir.

23   **Q.**   At your deposition, when you were talking about this

24   script, you indicated that this script was different from

25   Buchanan, because it reviewed organizing, even though the

1    wives were attending the orientation.  Do you recall that

2    sworn testimony?

3    **A.**   Yes.

4    **Q.**   So did you note in your differences between this

5    document and the Buchanan script, that this one covers

6    organizing, even though the Buchanan script for the same day

7    didn't cover organizing?

8    **A.**   I did not note that.  But you are right, it does.  And

9    I did say that in my deposition, because we didn't want to

10   do the organizing tactics with the spouses and scare them to

11   death.

12   **Q.**   But, apparently, at Enlow Fork, they did, correct?

13   **A.**   Apparently, Enlow Fork put it on first -- their spouse

14   thing was on the first day; ours was on the last day.

15   **Q.**   So that's another difference.  Your orientation had the

16   spouses on the last day; Enlow Fork had theirs on the first

17   day?

18   **A.**   Correct.

19   **Q.**   Okay.  And if you look at MSJ 344.

20   **A.**   Okay.  Yes, sir.

21   **Q.**   There is a reference in the middle of the page to

22   "lawyer talk."  Do you see that?

23   **A.**   Yes, sir.

24   **Q.**   And when you were shown this document at your

25   deposition, your testimony was that the language on this

1    page regarding lawyer talk was different than the language

2    of the Buchanan script.  Do you recall that testimony?

3    **A.**    If I said that, I'm sure I believed it.

4    **Q.**    Okay.  And, in fact, when you were asked about that

5    difference, your response was:  "I can just tell you what it

6    was at Buchanan."

7         Correct?

8    **A.**    If that's what my deposition says.

9    **Q.**    Okay.  And the differences between this document and

10   the Buchanan document that you no longer have, that you

11   prepared for the judge, did you indicate that this

12   discussion of reservation of rights in this document was

13   different than the discussion of the documents you prepared

14   at Buchanan?

15   **A.**    No, I did not, because I did not remember that I had

16   said that.

17              THE COURT:  Let me ask you, if you would, where is

18   the reference to lawyer talk?

19              MR. TORRES:  Your Honor -- I'm sorry.  Are you

20   asking me or the witness?

21              THE COURT:  I'm asking you.  Excuse me.

22              MR. TORRES:  It's the third paragraph, it says,

23   "And there is another point, just as important as I just

24   talked about."

25              THE COURT:  I see it now.  Thank you.

```
 1    BY MR. TORRES:

 2    Q.   So you didn't prepare this document, correct?

 3    A.   I didn't prepare the changes that were made to the

 4    document, correct.

 5    Q.   You didn't draft this document.  You already testified

 6    to that under oath?

 7    A.   No, I didn't draft this document.  I don't know who

 8    drafted it.

 9    Q.   You don't remember the specific words in the Buchanan

10    script, correct?

11    A.   No.

12    Q.   And you agree with me, you don't remember the specific

13    words of the Buchanan script?

14    A.   No, I can't tell you specific words in the script,

15    because I don't have it in front of me.

16    Q.   So you'd agree with me, you don't remember the specific

17    words of the Buchanan script?

18    A.   My testimony is I don't have it in front of me.  I

19    don't know what it says.

20              THE COURT:  Please just answer the question.

21         And state it again.

22    BY MR. TORRES:

23    Q.   You don't remember the specific words in the Buchanan

24    script?

25    A.   No.
```

1    **Q.**   And you didn't note in your summary that there were

2    differences between the discussion of reservations of rights

3    clause in this script, correct?

4    **A.**   Where is the reservation of rights?

5    **Q.**   The discussion of lawyer talk?  You didn't list in your

6    summary of differences the different language on lawyer talk

7    in this document as compared to the Buchanan script?

8            THE COURT:  Just a moment.  Listed in the summary,

9    when?

10           MR. TORRES:  I'm sorry, Your Honor?

11           THE COURT:  Did not list it in his summary, when?

12   BY MR. TORRES:

13   **Q.**   The summary you prepared last night, you did not

14   include in that summary the fact that there is different

15   language in this document regarding lawyer's talk as

16   compared to the Buchanan's script, correct?

17   **A.**   Correct, because I did not remember that I had said

18   that in my deposition.

19   **Q.**   And you also didn't list in your summary that you

20   prepared last night that this document is different because

21   it covers organizing on the first day, and the Buchanan

22   script didn't cover organizing on the first day when the

23   wives were present?

24   **A.**   Yes, that's correct.

25   **Q.**   And that's not in your summary either?

 1    **A.**   No.

 2    **Q.**   You never attended any orientations at Bailey or Enlow

 3    Fork, correct?

 4    **A.**   No, I did not.

 5    **Q.**   Okay.  And you don't know whether those individuals

 6    actually read from this script during those orientations --

 7    whoever presented them?

 8    **A.**   I do not.

 9    **Q.**   You don't know if any of the plaintiffs in the case

10    would have been present when this script was read, assuming

11    it was to whomever it was presented to?

12    **A.**   I do not.

13    **Q.**   And you said a moment ago that you thought that you

14    received this document in 1984 or 1985, correct?

15    **A.**   That -- that is what I think, yes.

16    **Q.**   Okay.  But this document -- let's stick with Enlow Fork

17    --

18             MR. TORRES:  One minute, Your Honor.  I apologize.

19    BY MR. TORRES:

20    **Q.**   Okay.  The document, if you look, sir, as an example,

21    at MSJ 383, there is a chart there, correct?

22    **A.**   Yes.

23    **Q.**   And it has a date at the bottom of the chart?

24    **A.**   Yes.

25    **Q.**   It says, "Feb. 1990," correct?

1    **A.**    Yes.  I didn't notice that, you're right.

2    **Q.**    So that would have been six or seven -- five or six

3    years after you claim you received this document, correct?

4    **A.**    Well, I obviously didn't receive it then.  I must have

5    received it after then.  I do not know exactly when I

6    received it.  That was my initial testimony.

7    **Q.**    Okay.

8            MR. TORRES:  Your Honor, I don't think there has

9    been anything close to a foundation laid to allow the

10   introduction of this exhibit through this witness.  He

11   doesn't know when he received it with a variance of five to

12   six years.  He hasn't listed differences in this script to

13   the other script he claimed that he worked on, because he

14   can't remember what the other script said.

15           And he's testified previously under oath, and he's

16   admitted now, that he doesn't even remember what the word --

17   specific words in the Buchanan script were, and that was two

18   years ago.  So the idea that he could off the top of his

19   head definitively tell us the differences in this document;

20   he hasn't shown himself capable of doing that.  And he's

21   also admitted he's never been present when this document was

22   presented to anyone.  And he's admitted that he has no idea

23   whether any of the plaintiffs in this lawsuit were ever made

24   aware of this document.

25           So I don't think there has been an adequate foundation

1    laid for this gentleman to testify as to this document.

2        And we haven't even gotten into the alleged differences

3    he identified, but -- so, anyway, Your Honor, I just don't

4    think that there has been a sufficient foundation laid for

5    the introduction of this document through Mr. Hymes and to

6    allow him to then testify as to what it purportedly says.

7            THE COURT:  Thank you.

8        And, Mr. Petsonk, you may respond.

9            MR. PETSONK:  Your Honor, Mr. Hymes testified

10   yesterday that he was involved in the development of this

11   document.  Mr. Hymes testified yesterday that as a senior

12   human resources manager, he was involved in training

13   CONSOL's lower level HR managers on the -- on how CONSOL

14   expected and guided those subordinate HR managers though the

15   use of these orientation scripts.

16       And Mr. Hymes testified that he, in fact, did

17   participate in the instruction of the subordinates about how

18   Mr. Hymes' superiors instructed Mr. Hymes to use this

19   document.

20           THE COURT:  Excuse me.  The question here is the

21   similarity between this document and that which was

22   furnished to Buchanan that he prepared.

23       And you may want to go through what those differences

24   are.  The witness has stated that he made a list of them.

25   It's been pointed out that, at least, that one of these

```
 1   pages carries the date of 1990, which looks as though there

 2   must have been obvious changes made.

 3            MR. PETSONK:  I can certainly go through that at

 4   this time, Your Honor.  And I would just -- in responding to

 5   Mr. Torres, I would invite Your Honor to consider, we are

 6   offering this document, not to prove specifically what our

 7   clients heard, but, rather, to prove whether or not it was

 8   reasonable for our clients to perceive that the people who

 9   told them the things that our clients testified to have

10   heard, whether those statements were made by apparent agents

11   of the Human Resources fiduciary.

12            THE COURT:  Ultimately, the question is what were

13   they told, and reliance on this script cannot be made with

14   confidence unless this witness can point out the

15   differences.  And if he doesn't know the differences, then

16   we need to go on to the next exhibit.

17            MR. PETSONK:  I can go through the script at this

18   time, Your Honor.  I'm prepared to do that.

19            THE COURT:  Go ahead.

20   BY MR. PETSONK:

21   Q.   Mr. Hymes --

22            MR. TORRES:  Your Honor, before he does that, the

23   gentleman says he's got some summary prepared, and I'd like

24   to see a copy of it.

25            THE COURT:  You may see it.
```

```
1                 MR. PETSONK:  May I approach the witness, Your

2      Honor?

3                 THE COURT:  Do you have a copy of it?

4                 MR. PETSONK:  I do not.

5                 THE COURT:  Let me ask how many pages it is?

6                 MR. PETSONK:  This summary is one, two, three -- I

7      believe, five pages in length.

8                 THE COURT:  Five pages?

9                 MR. PETSONK:  Yes.

10                THE COURT:  And are they in script?

11                MR. PETSONK:  No, Your Honor, they are listed.

12                THE COURT:  And are they looseleaf?

13                MR. PETSONK:  No.  They are stapled.

14                THE COURT:  I think it might be well for us to

15     pause long enough to have copies of that made.

16                MR. PETSONK:  We have four copies, Your Honor.

17                THE COURT:  Well, if you do, that's fine.

18     Distribute them now.

19                MR. PETSONK:  Shall I mark this as a Plaintiff's

20     Exhibit?

21                THE COURT:  Well, we'll see about that.  Suppose

22     you show it to counsel first, whatever it is that you are

23     going to present.

24                Do you have an extra copy?

25                MR. PETSONK:  This is the only other copy we have,
```

HYMES - DIRECT

```
 1    Your Honor.  The witness has one.

 2              THE COURT:  You are only left with one --

 3              MR. PETSONK:  Yes, I'm only left with one.

 4              THE COURT:  -- besides that?

 5              MR. PETSONK:  No.

 6              THE COURT:  Well, you better keep that then.

 7              MR. TORRES:  Your Honor, well, I have a -- sort of

 8    a related inquiry, now that I've seen this document.

 9              THE COURT:  You may inquire.

10              MR. TORRES:  Some of this -- I guess, I can

11    discern what he's trying to convey here, Your Honor, that

12    some of these suggest some changes, and then there is other

13    ones where he says -- well, I guess we can get to my concern

14    in some of the other documents we may or may not see.  We

15    are just dealing with Exhibit 10.

16         I'd just like an opportunity to review this before --

17              THE COURT:  Do you wish to do that now?

18              MR. TORRES:  Yes, Your Honor.

19              THE COURT:  How long do you think it will take you

20    to get through it?

21              MR. TORRES:  10 minutes.

22              THE COURT:  Well, go ahead.

23         (Pause.)

24              THE COURT:  At the moment, let's confine this to

25    the changes from Buchanan.  And do I understand that there
```

1    are different changes that pertain to different mines?

2    What's the relationship of Enlow Fork to Bailey?

3            MR. PETSONK:  Are you asking me, Your Honor?

4            THE COURT:  Yes.

5            MR. PETSONK:  They are essentially adjacent

6    operations.  They shared common management under CONSOL,

7    which is addressed in this script, and in the accompanying

8    Bailey script, which is the next exhibit that we would seek

9    to admit.

10       They are just a massive longwall, tandem longwall

11   mining operation in Washington and Greene County,

12   Pennsylvania, that's been controlled by CONSOL since, you

13   know --

14           THE COURT:  Plaintiff's 10 refers to Enlow Fork.

15           MR. PETSONK:  That's correct.

16           THE COURT:  And do you have another one that

17   refers to Bailey?

18           MR. PETSONK:  Yes, Your Honor.

19           THE COURT:  So the one we're interested in right

20   now is, the first page of the several pages that relate to

21   Enlow?  Is that correct?

22           MR. PETSONK:  That is the page with regard to

23   which Mr. Torres was questioning Mr. Hymes a moment ago.

24           THE COURT:  Plaintiff's 10 is affected by what is

25   set forth on the first of these pages?  Correct?

1          MR. PETSONK:  That's correct.  The pages of --

2          THE COURT:  But not the others?

3          MR. PETSONK:  Page 2 of Mr. Hymes' notes applies

4     to the Bailey script, which would be our next exhibit.

5          THE COURT:  I'm not talking about that.  Please

6     confine it to what we are talking about, which is

7     Plaintiff's 10.

8        Does page 1 relate to Plaintiff's 10?

9          MR. PETSONK:  Yes, Your Honor.

10          THE COURT:  And is that all that relates to

11     Exhibit 10?

12          MR. PETSONK:  Yes, Your Honor.

13          THE COURT:  Well, then, all that Mr. Torres needs

14     to do at the moment is to go through the first pages of

15     this.

16          MR. TORRES:  Yes, Your Honor.

17          THE COURT:  And as soon as you're finished, let's

18     proceed.

19          MR. TORRES:  That's what I'm doing, Your Honor.

20          THE COURT:  By that, I mean, I don't want you

21     going through the rest of them now.  You can do that later.

22     Let's see if we can get on with this evidence.

23          MR. TORRES:  Yes, Your Honor.  I just have a few

24     more to look at, Your Honor.

25          THE COURT:  Go ahead.

1          MR. TORRES:  Thank you.  Just two more minutes,

2     Your Honor.  I apologize.

3          Thank you, Your Honor, for the opportunity to

4     review that.

5          MR. PETSONK:  May I proceed?

6          THE COURT:  You may.

7     BY MR. PETSONK:

8     **Q.**   Mr. Hymes, page 1 of your notes lists a number of

9     Bate-stamped pages in Plaintiff's Exhibit 10, and it

10    includes to the right of the listed page numbers a brief

11    comment about each page; is that right?

12    **A.**   Yes.

13    **Q.**   And is that -- what does that comment reflect?  The

14    noted change you observed between the Enlow script and the

15    Buchanan script?

16    **A.**   What that change denotes is reviewing the Enlow's

17    script -- based on what my memory is, what was in the

18    Buchanan script, and these are specific changes that I

19    identified that related to Enlow, which would not have been

20    in the Buchanan script, obviously.

21    **Q.**   Did reviewing this document last night in detail

22    refresh your memory as to the substantive contents of the

23    Buchanan script?

24    **A.**   Yes.

25    **Q.**   I'm going to go through and just ask you briefly about

1    the nature of the changes, the differences that you noted on

2    page one of your notes here.

3        On MSJ 323, you say there is an organizational chart.

4    And is your meaning that this same organizational chart was

5    not in the Buchanan script, right?

6    **A.**   Correct.  This is an organizational chart that shows

7    DuPont and CONSOL of Pennsylvania and Enlow and Remington

8    and Conoco, so it wouldn't have been in the Buchanan script.

9    **Q.**   Because different subsidiaries were involved at the

10   Buchanan site; is that right?

11   **A.**   Correct.

12   **Q.**   And page 324, it says, "Spouses on first day," in your

13   notes.  And that means --

14   **A.**   It means that the spouses at Enlow were taken in on the

15   first day.  They were not taken -- they were not on the

16   first day at Buchanan.  It was on the last Saturday --

17   Saturday of the week, a half-day Saturday.

18   **Q.**   On page 325, it says, "Transparency A," and

19   "Transparency A-1."  Transparency A and A-1 refers to the

20   map of the Bailey and Enlow Mine facility.

21       So, of course, in the Buchanan presentation, it would

22   not have included a map of the Enlow and Bailey Mine

23   facilities, right?

24   **A.**   No.

25   **Q.**   And on page 326, it says that -- the discussion of the

1    gates and the phone numbers for the Enlow and Bailey mining

2    site.  And, of course, that's a change between Buchanan and

3    Enlow, right?

4    **A.**   Yes.

5    **Q.**   And same thing on page 327, you noted the names of the

6    gates for entry to the mine site are different than the

7    names to the gates of the entry for Buchanan site?

8    **A.**   Yes.

9    **Q.**   And page 328, you noted there is a difference, because

10   page 328 describes that the Enlow site was acquired from

11   Rheinbraun.  And, in fact, the Buchanan site was not

12   acquired by CONSOL from Rheinbraun?

13   **A.**   Buchanan was not a joint venture with Rheinbraun,

14   U.S.A.

15   **Q.**   Okay.  So that's a difference.

16        Page 329, the word "Enlow Fork" is substituted for the

17   word "Buchanan"; is that right?

18   **A.**   Everywhere on this sheet that I had "Enlow Fork," it

19   would have said "Buchanan."

20   **Q.**   So every time you note -- probably half a dozen -- or a

21   dozen or more times on this notes page of yours that says,

22   "Enlow Fork," that means you would have substituted the

23   name "Buchanan" there, right?

24   **A.**   Yes.

25   **Q.**   And on page 352, it mentions "DuPont."  Your notes

1    reflect there is a change regarding DuPont.  Does that mean

2    that DuPont was not mentioned in the Buchanan script?

3    **A.**    That was on 334 and 352.  My memory is that DuPont did

4    not own us when we opened Buchanan.

5    **Q.**    Okay.  And, again, it's a difference with regard to the

6    relevant entities involved in the operation or the ownership

7    of the mine site at that time.

8         On page 381, you note that there is a deductible of

9    $100.  And page 381 states that the CONSOL plan has a $100

10   deductible per year for medical insurance.  Is that right?

11   **A.**    That is the difference, yes.

12   **Q.**    How did that differ from the deductible -- or the

13   relevant term in the Buchanan script, as you recall?

14   **A.**    When the Buchanan Mine was open, we had no deductibles,

15   no co-pays, and no premiums for health insurance.

16   **Q.**    And you testified that Buchanan was opened first; is

17   that right?

18   **A.**    Yes.

19   **Q.**    And so between the time that CONSOL opened Buchanan and

20   the time they opened Enlow, apparently, they added a $100

21   deductible into the CONSOL medical plan; is that right?

22   **A.**    I assume that's why it's in here, yes.

23   **Q.**    So that's an example of a change that does relate to

24   the medical benefits?

25   **A.**    Correct.

1    **Q.**   388 refers to the addition of an investment plan, which

2    you previously characterized.

3         MR. PETSONK:  And, Your Honor, if I may dispense

4    with revisiting that testimony simply by incorporating it by

5    reference here.

6    BY MR. PETSONK:

7    **Q.**   Is that right, Mr. Hymes?

8    **A.**   Yes.

9    **Q.**   You testified that they added an investment plan at

10   Enlow due to the changing organizing dynamics that you

11   testified about earlier.

12        Page 393 mentions DuPont again.

13        397, refers to the safety record of the daily mine and

14   the plant safety record, but what would it have referred to

15   in the Buchanan script?

16   **A.**   It would have talked about Buchanan's mine plan.

17   **Q.**   And as you noted, page 408 mentions UMWA District 4 in

18   the Enlow script, but what UMWA district was Buchanan

19   located in?

20   **A.**   28.

21   **Q.**   Was it 28 or was it -- it was 28 at that time?

22   **A.**   It was 28.

23   **Q.**   And page 415 mentions CONSOL Pennsylvania, CONSOL of

24   Kentucky, and CONSOL.  Why don't you flip to page 415?

25        You see it says that at numerous locations they have

1    not even gotten to an election.  Does that mean an UMWA

2    representation election?

3    **A.**    That is what it's talking about, yes.

4    **Q.**    And in there, it refers to CONSOL Pennsylvania, CONSOL

5    of Kentucky, and CONSOL; is that right?

6    **A.**    Right.

7    **Q.**    So is that referencing those CONSOL of Kentucky

8    operations we discussed yesterday?

9    **A.**    Yes.  These operations would not have been in existence

10    when the Buchanan script was written, so that wouldn't have

11    been in there.

12    **Q.**    So by the time CONSOL developed and/or made the changes

13    to the script for Enlow, they did have UMWA organizing

14    efforts to get a representation election at CONSOL of

15    Kentucky operations, and so, therefore, those Kentucky

16    operations are referenced at this point in this script,

17    right?

18    **A.**    That's my assumption, yeah.

19    **Q.**    Okay.  Page 425 it mentions, again, UMWA District 4, as

20    well as Dilworth Mine and the Robena plant.  Those are mine

21    facilities near Enlow.

22        What would be the difference between this page

23    mentioning those local mine sites at western Pennsylvania

24    and the mine sites referenced in the Buchanan script?

25    **A.**    I don't remember mentioning any of the other union

1    sites.  They may have been in there, but I don't remember

2    them being in there.

3    **Q.**   Okay.  Again, 437, encompasses the addition of an

4    investment plan between the time you first developed the

5    Buchanan script and the time of this Enlow script.

6         May I just inquire, do you recall, once CONSOL added

7    the investment plan, did that investment plan apply the same

8    to the plan participants at Buchanan as it did to the other

9    CONSOL sites?

10   **A.**   Yes, it did, but it wouldn't have been in the original

11   Buchanan script.

12   **Q.**   Was it added to the Buchanan script once it was added

13   to the CONSOL benefit package?

14   **A.**   Any upgrade that was made in the production and

15   maintenance benefit package, whether it be across the

16   company, it was one package.  That would have been included

17   as a change.

18   **Q.**   And I think the only other difference is that on page

19   462, you say, "Day One Conclusion."  And what's the

20   difference that you're referencing there?

21   **A.**   Well, I don't recognize that piece of paper as

22   something that would have been in Buchanan's orientation.

23   **Q.**   That piece of paper appears to be a checklist to review

24   the completion of the various sections of the orientation

25   program for that day; is that right?

1    **A.**    I went over this thing last night as best I could.  Did

2    I get all the changes?  I don't know.  But I went over it

3    three times.

4              MR. PETSONK:  And, Your Honor, if I may make a

5    couple further points of inquiry, briefly?

6              THE COURT:  You may.

7    BY MR. PETSONK:

8    **Q.**    Mr. Hymes, if you turn to page 331, and you look in the

9    first full paragraph on that page -- hang on a minute --

10   okay.

11             MR. TORRES:  What page?

12             MR. PETSONK:  MSJ 331.

13   BY MR. PETSONK:

14   **Q.**    This appears to be a continuation of the remarks of

15   Luke Gianato, who is the speaker, that is for the local --

16   the Supervisor of Industrial Employee Relations, that is, in

17   the Human Resources Department, I gather; is that right?

18   **A.**    Yes.

19   **Q.**    And on page 331, it says in the script, quote, "One of

20   my jobs at this mine will be to get you through all the

21   paperwork that's associated with compensation and benefits.

22   Under our medical plan, we've tried to eliminate much of the

23   paperwork.  We'll talk about this later in the day when we

24   discuss your medical plan."

25             And it goes on to describe what Mr. Gianato may do to

1   help people secure various types of medical coverage from

2   CONSOL's medical department.  Do you see that?

3   **A.**   Yes.

4   **Q.**   Is there any substantial difference between that

5   section of this script and the Buchanan script that you have

6   described?

7   **A.**   I didn't denote it as a change.  Luke Gianato is a

8   different person than John Fox or whoever -- John Fox.  Luke

9   Gianato spent three years in Southern Appalachian Region

10  working for me.  So based upon -- there was some -- there

11  was some ability for the local Human Resources guys to kind

12  of say it in his own words when he had his own speech.  This

13  is his own speech.

14  **Q.**   And if you look at page 401, it says, "So, why do I say

15  that wages and benefits is one reason why you are better off

16  at Enlow Fork without a union?"

17          MR. TORRES:  Objection, Your Honor.  The question

18  was what differences there were in the document.  Now he's

19  just reading portions of this document that he likes into

20  evidence.

21          MR. PETSONK:  Well, I'm asking him if they differ,

22  Your Honor.

23          MR. TORRES:  He's identified what he thought the

24  differences were.

25          THE COURT:  Are there any other differences?  And

1    if there aren't, then let Mr. Torres take the witness.

2             MR. PETSONK:  I don't believe there are any other

3    material differences that the witness has identified.

4        Thank you, Your Honor.

5             THE COURT:  Thank you.

6                        **CROSS-EXAMINATION**

7    **BY MR. TORRES:**

8    **Q.**   So, according to your last answer, even though there

9    was a script, the supervisors or the individuals presenting

10   these orientations had the ability to say -- conduct this

11   orientation in their own words, correct?

12   **A.**   They could -- their speech about what they were going

13   to do, they could do.  They were instructed at Buchanan to

14   go through this script specifically and make sure that they

15   went through this script specifically, because it was

16   written to be done specifically.  And the directions I

17   received was this is the script and this is what you better

18   do.

19   **Q.**   Right.  At Buchanan, right?

20   **A.**   Yes, sir.

21   **Q.**   You don't know whether Mr. Gianato followed this script

22   at Enlow Fork, correct?

23   **A.**   I don't know, but I know Luke Gianato worked for me,

24   and when he worked for me, he followed directions.

25   **Q.**   You don't know if Mr. Gianato read this script or

1    followed the words on this script, correct?

2    **A.**    No, I don't.

3    **Q.**    Okay.  So I was flipping through here and I saw quite a

4    number of additional references to DuPont and Enlow

5    throughout here that you didn't mention in your summary.  So

6    we should add those to the list as being differences, too,

7    correct?

8    **A.**    Anywhere where it mentions DuPont or Enlow.  I may have

9    missed some, I'm sorry, but I did the best I could.

10   **Q.**    Sure.  Well, let's talk about some of the more

11   substantive differences, rather than wasting time on that.

12        So page 344 has this discussion of the reservation of

13   rights language, which you said was different than the one

14   in Enlow Fork, correct?

15   **A.**    Yes, that's what my deposition was, yes.  I did not

16   include that in the list, no.

17   **Q.**    So this discussion on 344 is different than the one you

18   remember at Buchanan, correct?

19   **A.**    Yes.

20   **Q.**    And, in fact, if you go back to 343, there is a list of

21   topics that were -- that they say they are going to cover:

22   Job, pay, benefits, working conditions, right?

23   **A.**    Yes.

24   **Q.**    And, in fact, at your deposition, you indicated that

25   you thought that the topics covered in Buchanan were

1    different than the ones that were listed in this script,

2    correct?  You thought there were more topics that were

3    listed in the Buchanan script as being covered?

4    **A.**   If that's what my deposition said, that's true.

5    **Q.**   So that's another difference on page 343, correct?

6    **A.**   I'm sure it is.

7    **Q.**   And turning to page 358 -- are you there, sir?

8    **A.**   Yes.

9    **Q.**   This is different, too, right, because this talks about

10   wage base rates as of February of 1990, correct?

11   **A.**   Yes.

12   **Q.**   So that whole page would be different, correct?

13   **A.**   Yes, I missed that last night.

14   **Q.**   You missed that page?

15   **A.**   Yes, sir.

16   **Q.**   And the next page, 359, Chart 1 references, it says,

17   this chart compares our base rates to the UMWA rates in the

18   1988 NBCWA, correct?

19   **A.**   That's what that says, yes.

20   **Q.**   That would be different, correct?

21   **A.**   Yes.  The chart would be different, but the context was

22   the same.

23   **Q.**   I'm not asking about concepts.  I'm talking about the

24   differences in the scripts.  It's different, correct?

25   **A.**   That would have been different.

HYMES - CROSS

1   **Q.**   Right.  So the language is different, too, because that

2   refers to '88, and that wouldn't have been in Buchanan

3   script?

4   **A.**   Yes.

5   **Q.**   The next line is referring to 1990, and it's going to

6   talk about holidays.  And that would have been different,

7   because, of course, your script was written eight years

8   earlier, correct?

9   **A.**   Yes.

10  **Q.**   Okay.  So that's another two more differences on 359,

11  correct?

12  **A.**   Mm-hmm.

13  **Q.**   And then on page 380, there is a reference to the 1988

14  Wage Agreement, and it discusses various aspects of that

15  agreement.  Do you see that?

16  **A.**   80?

17  **Q.**   I'm sorry, I apologize.  I should put my glasses on.

18  360?

19  **A.**   Okay.

20  **Q.**   Sorry about that.  So the paragraph that starts with,

21  "Now let's compare holidays and vacation"?

22  **A.**   Yes.

23  **Q.**   And that's discussing the 1988 Wage Agreement, correct?

24  **A.**   Yes.

25  **Q.**   So that would be different, correct?

1    **A.**   Yes.

2    **Q.**   And then Chart 2 right below it talks about additional

3    provisions in the 1988 Wage Agreement, correct?

4    **A.**   Yes.

5    **Q.**   And that would be different, too, correct?

6    **A.**   Yes.

7    **Q.**   And the next page, 361, that entire page would be

8    different, because that's discussing material from 1990,

9    correct?

10   **A.**   Oh, yes.

11   **Q.**   All right.  And then on 363 -- 363, right above the

12   reference to Chart 3, there is some additional discussion of

13   the Blue Book.  That's the union contract, correct?

14   **A.**   The union contact, they referred to it as the Blue

15   Book, yes.

16   **Q.**   That's different, because they are talking about the

17   Blue Book provisions as of the date in which this

18   presentation was made, some eight years after your

19   presentation, correct?

20   **A.**   It doesn't say that, but I'm assuming that's correct.

21   **Q.**   Okay, the next page, 364, is different, because again

22   that refers to February 1990, correct?

23   **A.**   Yes.

24   **Q.**   And on page 365, there is a reference to wage rates for

25   Grade 5 UMWA employees, correct?

1   **A.**   Where is that?

2   **Q.**   "You can see, taking a UMWA Grade 5 employee as an

3   example"?

4   **A.**   Okay.

5   **Q.**   So that's different, right?

6   **A.**   No, I wouldn't say that would be different, because you

7   would have -- other than the absolute -- the actual pay

8   rate.

9   **Q.**   So the pay rates that are being discussed in the

10  presentation at that page are different than the ones that

11  would have been in your presentation eight years earlier?

12  **A.**   They are updated, yes, sir.

13  **Q.**   And then page 363 -- 366 is different, because it talks

14  about February 1990, correct?

15  **A.**   Yes.

16  **Q.**   And 367 is also different, because it talks about

17  February 1990, correct?

18  **A.**   Yes.  Because the clothing allowance amount is higher

19  than it would have been.

20  **Q.**   It's different, sir?

21  **A.**   Yes.

22  **Q.**   And the bottom of 368 talks about a comparison of wage

23  rates in Chart 6, and it lists some numbers there.  And

24  those would be different, too, correct?

25  **A.**   Yes, it would have been updated.

```
 1    Q.   And the next date, 369 is different, because it's

 2    talking about February 1990, correct?

 3    A.   Yes, mm-hmm.

 4    Q.   And 370, Chart 7, all the numbers and discussions of

 5    the UMWA versus P&M comparison would have been different,

 6    correct?

 7    A.   It would have been based on those currents UMWA rates.

 8    Q.   So it's different, right?

 9    A.   Yes.

10    Q.   371 is different because it's from February 1990,

11    correct?

12    A.   Yes.

13    Q.   The discussion on 372 would be all different, because

14    it's talking about information as of 1990, as opposed to

15    eight years earlier, correct?

16    A.   It would be talking about the UMWA rates of 1990, yes.

17    Q.   Okay.  373 is different?

18    A.   Mm-hmm.

19    Q.   374 is different?

20    A.   Yes.  They are all updated rates.

21    Q.   375 is different?

22    A.   Yes.

23    Q.   The discussion on 376 regarding the charts would be

24    different, correct?

25    A.   Yes.
```

1   **Q.**   The top of 377 would be different, because it's talking

2   about the rates in effect at that point in time, correct?

3   **A.**   Yes.

4   **Q.**   378, the discussion of Slides 6, 7, and 8 would be

5   different, because it's talking being the rates in effect in

6   1990, correct?

7   **A.**   It's talking about higher rates, yes.

8   **Q.**   So they are different, right?

9   **A.**   Yes.

10  **Q.**   379, the second full paragraph, discussion about

11  disability would be different, because it was based on

12  different updated information, correct?

13  **A.**   Yes.

14  **Q.**   Discussion at the bottom of Slide 9 would be different,

15  because it's talking about the Blue Book as of that point in

16  time as it carries over to page 380, correct?

17  **A.**   Yes.

18  **Q.**   Bottom of 380 would be different, because it's talking

19  about a discussion of differences between the Blue Book and

20  what was in effect at Enlow Fork, correct?

21  **A.**   Yes.

22  **Q.**   Page 381, Slide 18, the discussion at Slide 18 would be

23  different, because, again, making a comparison of the Blue

24  Book as of 1990, correct?

25  **A.**   And the $100 deductible.

HYMES - CROSS

```
1    Q.   Right, you pointed that one out.  I'll give you that

2    one.

3         Slide, 382, the discussion of Slide 21 and Chart 11

4    would be different, because it's talking about the

5    information in effect as of 1990, correct?

6    A.   It says 1988 -- 1989, yes.

7    Q.   383 is different, right, because it's based on

8    information from February of 1990?

9    A.   Correct.

10   Q.   384 is different, because it's talking about the chart

11   we were just looking at on 383, correct?

12   A.   Yes.  The numbers are different.

13   Q.   All right.  It's different, right?

14        385 is different, because it's based on information

15   from February 1990, correct?

16   A.   Correct.

17   Q.   The calculation being discussed on page 386 regarding

18   Chart 12 would be different, because it's based on 1990

19   information, correct?

20   A.   Yes.

21   Q.   Bottom of 386 is talking about the investment plan you

22   referred to in other places.  It's different here, too,

23   because there was no investment plan at Buchanan, correct?

24   A.   Not originally.

25   Q.   And that's another difference?
```

1    **A.**   Yes.

2    **Q.**   387 is different, because it's information from 1990,

3    correct?

4    **A.**   387?  Yes.

5    **Q.**   The next page doesn't have a Bates-stamp, but it talks

6    about a presentation on the investment plan, and it's

7    discussing DuPont of CONSOL, right?  That's different,

8    correct?

9    **A.**   Yes.

10   **Q.**   And the rest of the discussion on this page on the

11   investment plan would be different as well, correct?

12   **A.**   Yes, sir.

13   **Q.**   390, different, right?  February 1990, correct?

14   **A.**   Yes, sir.

15   **Q.**   391, different; February 1990, correct?

16   **A.**   Yes.

17   **Q.**   394, Slide 2 talks about DuPont, so that would be

18   different, correct?

19   **A.**   Yes.

20   **Q.**   So that's the top discussion there, correct?

21   **A.**   Yes.

22   **Q.**   The discussion of Slides 3 and 4, talks about union

23   membership in 1989.  That's different, correct?

24   **A.**   The numbers are different, yes.

25   **Q.**   Yes.  Slide 5 discussion; also different, because it's

1    talking about union membership as of 1990, correct?

2    **A.**   Yes.

3    **Q.**   395, discussions of Slides 6, 7, and 8 are different

4    because it's talking about union membership as of 1988 and

5    1990, and articles published in 1990?

6    **A.**   Correct.

7    **Q.**   And a strike occurred in 1989, correct?

8    **A.**   Yes.

9    **Q.**   396, the top of that page, discussion of DuPont Company

10   and its experiences with the UMWA; that's different,

11   correct?

12   **A.**   Yes.

13   **Q.**   And then towards the bottom of that same page -- well,

14   that's not different -- I don't know if it's different.  I

15   guess we don't know.

16        387, we already talked about that one.

17        398, bottom of the page, discussion of the 1988 UMWA

18   contracts, so that's different, correct?

19   **A.**   Yes.

20   **Q.**   Next page, 399, discussion of Slide 13.  That's

21   different, right, because it's talking about the '88 UMWA

22   contract, correct?

23   **A.**   Change in the agreement, yes.

24   **Q.**   Yes.  And page 400 is different because, again, it's

25   talking about -- at the top, it's a continuation of this

1    discussion on 399.  So that's different, too?

2    **A.**    Yes.

3    **Q.**    And at the bottom, it's talking about UMWA

4    constitution.  And I guess we don't know whether it was

5    different or not, but it's talking about the constitution as

6    of 1990, correct?

7    **A.**    I don't know if it was different or not.  I don't think

8    so.

9    **Q.**    401 -- page 401, top of the page is talking about the

10   '88 CBA.  That's different, too, right, so that wouldn't

11   have been in effect back in '82?

12   **A.**    Yes.

13   **Q.**    Same thing with the next paragraph, talking about the

14   '88 contract, correct?

15   **A.**    Correct.

16   **Q.**    Same for the next paragraph, talking about Slide 14 and

17   the '88 contract, correct?

18   **A.**    Yes.

19   **Q.**    And at that paragraph, it talks about an agreement with

20   the Benjamin Coal Company in '89, correct?

21   **A.**    Yes.

22   **Q.**    And the next paragraph is talking about the '88

23   contract again.  Different, correct?

24   **A.**    Yes.

25   **Q.**    Okay.  Page 17, talking about the -- I'm sorry, I

1    apologize -- page 409.

2    **A.**    Okay.  Mm-hmm.

3    **Q.**    Slide 19 is talking about an LM-2 report submitted by

4    the UMWA in '88, so that discussion is different, correct?

5    **A.**    Right.

6    **Q.**    Same thing with Slide 20, because it's talking about

7    the same LM-2 report from 1988, correct?

8    **A.**    Yes.

9    **Q.**    The cash receipts discussed in Slide 21; also

10    different, because it's talking about the union's finances

11    in 1988, correct?

12    **A.**    Yes.

13    **Q.**    Same thing with Slide 22, carrying down from 409 to

14    410, that's all different, because it's talking about

15    salaries as of this LM-2 report in '88, correct?

16    **A.**    Yes.

17    **Q.**    Same thing in 23, it's talking about the strike

18    benefits that were paid out as reported in that same 1988

19    report, correct?

20    **A.**    Yes.

21    **Q.**    So that's different.

22          Slide 24 is different because it's talking about the

23    political contributions reported in that 1988 report,

24    correct?

25    **A.**    Yes.

1    **Q.**   And Slide 25 would be different because it's talking

2    about the salaries for the UMWA officials that were reported

3    in 1988, correct?

4    **A.**   Right.

5    **Q.**   And next page, 411, Slide 26, the top of the page is

6    different because it's a carryover from the prior page,

7    correct?

8    **A.**   Yes.

9    **Q.**   And then Slides 26, 27, 28, 29, 30, are all different,

10   because they are talking about salaries and other

11   information contained in that same report, correct?

12   **A.**   Yes.

13   **Q.**   Page 412, Slide 32 is different, because it's talking

14   about a Wall Street Journal article from 1989, correct?

15   **A.**   Yes.

16   **Q.**   And Slide 33 is different because it's talking about a

17   Pittsburgh Press article from 1989, correct?

18   **A.**   Yes.

19   **Q.**   And Slide 34 is different or -- the discussions as far

20   as Slide 34 because it's talking about figures from 1989,

21   correct?

22   **A.**   34?  Yes.

23   **Q.**   Page 414, it's talking about organizing activity during

24   a six-year period, so that's different, obviously, because

25   that's from a different time period than yours and the

1    presentation you prepared, correct?

2    **A.**    Yes.

3    **Q.**    So that would be Slide 37 that's discussing, correct?

4    **A.**    Yes.

5    **Q.**    And then in Slide 415, there is a discussion of

6    membership from comparing -- looking at membership over a

7    time period from '84 to '89, so that's different, correct,

8    because that's a different time period?

9    **A.**    Correct.

10   **Q.**    And then it's talking about election results, so that's

11   Slides 38, apparently, through 43, so that would be

12   different, because that would have been election results

13   from a different period of time, correct?

14   **A.**    Right.

15   **Q.**    Slide 44 would be different, the discussion of that,

16   because it's talking about the number of organizers on the

17   union's payroll from '80 to '88; so that would be different,

18   correct?

19   **A.**    Correct.

20   **Q.**    Bottom of page 416, talking about union dues for active

21   members of $46.  So I guess we don't know if those are the

22   same dues or whether they were the same.  Do you think they

23   went up over time?

24           MR. PETSONK:  Your Honor, I don't know if it's

25   appropriate if I may interject here and offer to stipulate

1    that in every relevant detail CONSOL continued to update the

2    comparisons between the UMWA benefits and CONSOL benefits as

3    time progressed.  And we can stipulate to that.  I have no

4    problem stipulating that.

5              THE COURT:  You may continue.

6              MR. TORRES:  Thank you, Your Honor.

7    BY MR. TORRES:

8    **Q.**   Do you know if the dues went up over time, sir?

9    **A.**   I do not.

10   **Q.**   All right.  Well, let's put that one to the side and

11   turn to page 417, Slide 47 -- I'm sorry -- Slide 46 at the

12   top of the page, that would be different, because it's

13   talking about dues as of 1990, correct?

14   **A.**   Well, obviously, they went up according to this slide.

15   **Q.**   I'm sorry.  I didn't hear that, sir?

16   **A.**   It says, the union dues have increased from $28.50 to

17   46.65.  So they have gone up.

18   **Q.**   Oh, I see.  Thank you.  I guess -- so I guess going

19   back to 416, that is different, because that also would

20   refer to a different number than you would have referred to

21   back in the '80s?

22   **A.**   Yes.

23   **Q.**   And then the discussion of Slides 46 and 47 is

24   different, right, because it's talking about information as

25   of 1990 for Slide 46, correct?

1    **A.**    Yes.

2    **Q.**    And then looks like a calculation based upon

3    information from '82 to '88, correct?  So that would be

4    different?

5    **A.**    Yeah.

6    **Q.**    And then the discussion on Slide 48, showing again

7    discussions of calculations over a 20-year period.  So that

8    would be different also, correct?

9    **A.**    Yes.

10   **Q.**    And then Slide 49 would be different -- well, I guess

11   we don't know if UMWA constitution changed, so let's put

12   that one aside.

13   **A.**    I do not.

14   **Q.**    You don't know if it changed, right?

15   **A.**    No.

16   **Q.**    Okay.  We'll put that one aside then.

17        And then the discussion on page 418, Slide 52 would be

18   different, because it's talking about UMWA District 4 and

19   that's different than the UMWA district that you dealt with

20   at Buchanan, correct?

21   **A.**    Yes.

22   **Q.**    And Slides 53, 54, and 55, are different, because it's

23   based upon this strike fund balance they had as of December

24   31, 1989, correct?

25   **A.**    Yes.

1    **Q.**   And the next page, 419, the discussions at Slide 56 is

2    different because it's talking about events in 1989,

3    correct?

4    **A.**   Yeah.

5    **Q.**   And Slide 57 is different, because it's talking about

6    the strikes over the prior five years; is that correct?

7    **A.**   Yes.

8    **Q.**   And on page 420, Slide 59 is different, because it's

9    doing calculations, annual calculations based upon -- and

10   it's making a calculation based on the number of employees

11   that they expect at Enlow Fork, correct?

12   **A.**   Yes.

13   **Q.**   And 60, the discussion of Slide 60 is different,

14   because it takes those numbers and it extrapolates them

15   forward 20 years, correct?

16   **A.**   Correct.

17   **Q.**   421, Slide 62, that is different, because it's talking

18   about the results of prior union contracts up through 1988,

19   correct?

20   **A.**   A portion of that would have been in Buchanan.

21   **Q.**   But it's different, right?

22   **A.**   Yeah, but it's different.

23   **Q.**   And then carrying over to page 422, the top of that

24   page is different, because it's a carryover from the prior

25   page, correct?

1    **A.**    Yes.

2    **Q.**    And then the Slide 63 is different because the

3    discussions on 63 is based upon that same information up

4    through 1988, correct?

5    **A.**    Yes.

6    **Q.**    And so the rest of that page, down through the next

7    discussion of the slides, also show no contract strikes in

8    '84.  That would be different as well, correct?

9    **A.**    No contract strikes from '84 and '88 would be

10   different, yeah.

11   **Q.**    All right.  423, discussion of Slide 64 is different,

12   because it has information through 1988, correct?

13   **A.**    It has increased tonnage.

14   **Q.**    And then 424, there is a discussion that begins on the

15   third paragraph, it says, this brings us back to 1989,

16   right?

17   **A.**    Yes.

18   **Q.**    And that's different, because it's talking about

19   information regarding strikes in that period, including --

20   related to the agreement in '88, correct?

21   **A.**    Yes.

22   **Q.**    426, the discussion of Slide 65 is different, because

23   it's talking about information regarding strikes in 1989,

24   correct?

25   **A.**    Yes.

1    **Q.**   And 426, and then Slide 66, the discussions at 66 is

2    different, because it's talking about strikes in 1989,

3    correct?

4    **A.**   Mm-hmm.  Yes.

5    **Q.**   433, that whole page is different, because it's talking

6    about information in 1990, correct?

7    **A.**   Upgrading wages, yes, sir.

8    **Q.**   434 is different, because it's talking about

9    information from 1990, correct?

10   **A.**   Yes.

11   **Q.**   And the next page, 435, those slides would be

12   different, too, because it's talking about information based

13   upon the charts we just looked at, correct?

14   **A.**   Yes.

15   **Q.**   436 is different because it's talking about information

16   from 1990, correct?

17   **A.**   Yes.

18   **Q.**   437 is different because it talks about information

19   from 1990, correct?

20   **A.**   Yes.

21   **Q.**   Same as 438, correct?

22   **A.**   Yes.

23   **Q.**   And, again, all of 439 would be different, because it's

24   talking about information based on the charts we just looked

25   at, correct?

1    **A.**   Yes.

2    **Q.**   And 440 is different, because it's from 1990, correct?

3    **A.**   Yes.

4    **Q.**   441 is different, because it's talking about

5    information from the chart, correct?

6    **A.**   Yes.

7    **Q.**   442 is different, because it's information from 1990,

8    correct?

9    **A.**   Yes.

10   **Q.**   443 is different, because it's information talking

11   about the chart you just looked at, correct?

12   **A.**   Yes.

13   **Q.**   444 is different, because it's information from 1990,

14   correct?

15   **A.**   Yes.

16   **Q.**   445 is different because it's again talking about

17   comparisons based on the charts we just looked at, correct?

18   **A.**   Yes.

19   **Q.**   Same with 446, correct?

20   **A.**   Yes.

21   **Q.**   And, again, same for 447, correct?

22   **A.**   Yes.

23   **Q.**   448 is different, correct?

24   **A.**   Yes.

25   **Q.**   So those differences that we just discussed, Mr. Hymes,

1   those aren't included in the summary that you prepared last

2   night, correct?

3   **A.**   No.  No, they are not.

4        MR. TORRES:  Your Honor, there has been no

5   foundation laid to make any sort of inferences about any

6   alleged similarities between this document and whatever Mr.

7   Hymes used eight years earlier.  And if the purported intent

8   of this to somehow show CONSOL was issuing the same

9   information, I think the witness has admitted exactly the

10   opposite.

11        These documents changed over time.  There is no

12   evidence that these were even used.  If they were; how they

13   were used, whether someone read them verbatim, whether they

14   winged it, or any other thing in between.

15        So the idea that this somehow proves that CONSOL was

16   doing the same thing -- it's certainly not borne out by this

17   assumption he has that this document is similar to what he

18   prepared eight years earlier.

19        So no foundation laid for the admission of this

20   document through this witness, Your Honor.

21        MR. PETSONK:  Your Honor, just very briefly.

22   BY MR. PETSONK:

23   **Q.**   Mr. Hymes, did you consult this Enlow script as you

24   went about updating the Buchanan script over the years?

25        MR. TORRES:  Objection.

1          THE COURT:  An objection is pending and you need

2    to respond to what you just heard.

3          MR. PETSONK:  I believe Mr. Hymes testified

4    earlier in response to my question that they made changes to

5    the Buchanan script.  I can ask him to clarify that now.

6          THE COURT:  The question is whether or not changes

7    that have been made and not addressed by the witness are

8    sufficiently material that the document should be refused

9    admission.

10          MR. PETSONK:  My question is, if he did make

11    changes, and if he used the Enlow script in making those as

12    a point of reference in making the changes at the Buchanan

13    Mine, then, yes, Your Honor, if those changes make any

14    material difference in the substance of point of the

15    union-free script at Enlow and Buchanan and the other

16    operations where they deployed this union-free strategy.

17          THE COURT:  What other questions as to the

18    accuracy of the script do you have?

19          MR. PETSONK:  I do not have any other questions.

20    Those are my questions that I had sought to ask at this

21    point.

22          THE COURT:  Anything further, Mr. Torres?

23          MR. TORRES:  No, Your Honor.

24          THE COURT:  It seems to me the exhibit is one that

25    with the aid of others might possibly be admissible, but

 1    it's not at this juncture.  The changes are substantial.

 2    The witness has made very few changes to it, relatively

 3    speaking.

 4         The question beyond that is whether or not the one who

 5    was serving at the lecture followed the script; whether or

 6    not as time went on, the presentation changed.

 7         And the Court's heard nothing about that from any of

 8    the witnesses who would have delivered that information.

 9         Do you have anyone from CONSOL who at one time served

10    with them that delivered these instructions that can state

11    what they said?

12              MR. PETSONK:  I believe that Mr. Hymes can address

13    that, Your Honor.

14              THE COURT:  I'm asking about the individuals who

15    said it.  He wasn't there; he doesn't know.

16              MR. PETSONK:  Well, Your Honor, if I may inquire?

17    I believe Mr. Hymes did attend these orientation sessions as

18    they were delivered.

19              THE COURT:  Well, if that's the case, you can

20    present it.

21         Mr. Torres, do you have anything on that?

22              MR. TORRES:  Yes, Your Honor.  The witness was

23    deposed on that point, so before he starts offering evidence

24    about that, I'd like to voir dire him again on it.

25              THE COURT:  You may.

1              MR. TORRES:  Okay.  Thank you, Your Honor.

2                    **VOIR DIRE EXAMINATION**

3    **BY MR. TORRES:**

4    **Q.**    Earlier today, when I was asking you questions, you

5    admitted that you never attended any orientations at Bailey,

6    Enlow or Fola, correct?

7    **A.**    I never attended those orientations, no.

8    **Q.**    Okay.  And you testified in your deposition that at

9    Buchanan you thought you attended about 25 orientations, but

10   you were in and out of most of those orientations during

11   that time period, correct?

12   **A.**    That's what I remembered, yes.

13   **Q.**    So that would be at Buchanan for about a year, for the

14   first year and a half, so that would have been from '80 --

15   it would have been '86 to '87, when you were doing these

16   orientations initially?

17   **A.**    I think this slide I misstated.  I think this slide

18   says '84.

19   **Q.**    Okay.  So from '84 to sometime in '85, you attended --

20   you were in and out of about 25 orientations?

21   **A.**    What I did was, those orientations were in the same

22   building as my office.

23   **Q.**    Right.  So during that period, '84-'85, the words you

24   used at your deposition is you were in and out.  But you

25   were in and out of about 25 orientations between '84 and

1    '85?

2    **A.**   By in and out, that meant I stayed in a while; I was

3    out a while, but I know what was said.

4    **Q.**   You were in and out of about 25 orientations from '84

5    to '85?

6    **A.**   Yes.

7    **Q.**   Just at Buchanan?

8    **A.**   Just at Buchanan.

9    **Q.**   Okay.  Now then, you attended one orientation at CONSOL

10   of Kentucky, and you thought maybe you might have been at

11   one at Jones Fork, but that was actually -- that operation

12   wasn't up and running until you left the company, correct?

13   **A.**   No, I didn't attend any at Jones Fork.  I was there

14   when they were doing one, but not as an employee.

15   **Q.**   So you think you were at one orientation at CONSOL of

16   Kentucky after you left CONSOL?

17   **A.**   I know I was at the first one when we took over the

18   operations, because I did it.

19   **Q.**   Okay.  So you presented one at CONSOL, and what year

20   would that have been?

21   **A.**   Sir, in --

22   **Q.**   What year would that have been?

23   **A.**   I think I testified yesterday it was '89, but I really

24   can't tell you for sure.

25   **Q.**   Okay.  So you think you might have done an orientation

1    in '89 at CONSOL of Kentucky?

2    **A.**   No, I think I did an orientation, but I don't know

3    exactly when.

4    **Q.**   And so other than those, the one you attended at CONSOL

5    of Kentucky, and the 25 that you were in and out of between

6    '84 and '85, you have no knowledge of what was actually said

7    in any of these orientations, correct?

8    **A.**   Not for Bailey and Enlow, no.

9    **Q.**   Well, you don't know what was said at the Buchanan ones

10   you didn't attend either, correct?

11   **A.**   I know what I said at Eastern Kentucky, and I know what

12   was said when I was in the ones at Buchanan.

13   **Q.**   Other than the ones you were in, sir, you have no idea

14   what was said in any of the other orientations that were

15   presented at any location, correct?

16   **A.**   All I know is that there was a script, and that's all I

17   know.

18   **Q.**   Sir, please answer my question.

19        Other than the orientations you said you attended, you

20   have no idea what was said at any other orientation, at any

21   other CONSOL location, at any other point in time, correct?

22   **A.**   No.

23   **Q.**   So you agree with me?

24            THE COURT:  Please restate the question.

25

1    BY MR. TORRES:

2    **Q.**   Other than the Buchanan orientations in '85 -- '84 and

3    '85, and the one CONSOL of Kentucky orientation you

4    presented in '89, you have no idea what was said in any

5    other orientations, at any other CONSOL location, at any

6    other time; isn't that correct?

7    **A.**   That's correct.

8          MR. TORRES:  Your Honor, again, just to bring it

9    back into the context of this case.  The plaintiffs -- none

10   of the plaintiffs were at Buchanan in '84, '85.  They don't

11   point to that point in time as to when any alleged promises

12   were made to any of them.

13        And at CONSOL of Kentucky, even if this gentleman did

14   present one orientation in 1989, Mr. Prater wasn't there

15   until the 2000s.

16        So, again, he has no evidence as to what would have

17   been used at these other -- during the time when these

18   individuals were actually at CONSOL, he has no knowledge to

19   testify -- even if he testifies as to what he said at his

20   orientation, he has no knowledge as to whether what he said

21   was said by anyone else at any of the orientations he didn't

22   attend.

23        He doesn't have an adequate foundation to offer any

24   meaningful evidence that's relevant to the question of what

25   these individuals were allegedly promised.

 1              MR. PETSONK:  Your Honor is the trier of the facts

 2     in this case.  We'll be calling on Your Honor to draw

 3     reasonable inferences from the evidence that we present to

 4     the Court.

 5         We are offering Mr. Hymes and the exhibits, both the

 6     scripts and the HR supervisory training materials that Mr.

 7     Hymes developed for admission into the record, Your Honor.

 8     And there is a reasonable inference to be drawn that after

 9     Mr. Hymes, Mr. Haynes and Mr. Hyler created this union-free

10     strategy, created the scripts and instructed the CONSOL HR

11     staff to carry out those scripts and those union-free

12     strategies at the operations that Mr. Hymes has described,

13     that those HR staff of CONSOL did, in fact, present those

14     scripts and deploy that very same union-free strategy at the

15     operations that they were trained and instructed by their

16     superiors in CONSOL to do so.

17         And there is a reasonable inference to be drawn that

18     the HR staff of CONSOL concealed the reservation of rights

19     or characterized the reservation of rights in a way that it

20     was characterized in the script that Messrs. Hymes, Haynes,

21     Hyler created and instructed these CONSOL HR staff to read

22     from and follow.

23         And that's the purpose for which we believe this

24     exhibit should be admitted, for the consideration and the

25     weight of Your Honor in considering the evidence, and the

1    inferences can be reasonably drawn from it.  We believe it's

2    authentic and certainly relevant for admission as evidence.

3    And in tandem with the two other exhibits that we have

4    sought to offer.

5            THE COURT:  Anything further on the point?

6            MR. PETSONK:  Not from the plaintiffs at this

7    time.

8            THE COURT:  Mr. Torres, anything further?

9            MR. TORRES:  No, Your Honor.

10           THE COURT:  It seems to me that the witness is

11   able to testify to what he remembers took place.  And

12   insofar as this exhibit is concerned, it's apparent that

13   there have been many changes made from Buchanan to the Enlow

14   Fork script.  In addition to that, he doesn't know what

15   others may have said as time went on.  To the end that he

16   can testify at all, it's going to be with respect to what he

17   remembers as Buchanan, and the exhibit will be limited in

18   that respect.

19       So far, the defendant really -- the witness really

20   hasn't pointed that out.  The witness just lists countless

21   instances where matters in this exhibit have nothing to do

22   with Buchanan.

23       I don't know whether the exhibit can be revised to

24   reflect that which he recalls or not.  You might make that

25   effort to do so.

1            Let me ask if there is anything further on the point at

2    this time?

3            MR. PETSONK:  Well, Your Honor, if I may be

4    permitted to question the witness about the exhibit.  I'm

5    glad to do it in conformity with that instruction, Your

6    Honor.  And I believe the witness will be capable of

7    identifying any material differences in the terms as they

8    are contained in the script, that is, as Your Honor has

9    instructed.

10           THE COURT:  That is, you are saying that the

11   witness would be able to state from Plaintiff's 10 what he

12   read at Buchanan?

13           MR. PETSONK:  Yes, Your Honor.  Because the

14   witness has described that he consulted this script in

15   making similar changes to the numerical terms of the plan at

16   issue at the Buchanan site.  And I think he will be able to

17   identify those changes and characterize the materiality as

18   to the relevant representations.

19           THE COURT:  Anything further on the point?

20           MR. PETSONK:  No, Your Honor, not at this time.

21           MR. TORRES:  Again, Your Honor, it seems to me

22   that unless you can tie even this exercise to something that

23   one of the plaintiffs saw, it has limited value, but --

24           THE COURT:  Well, it may be that what you say is

25   correct, that insofar as it affects the seven plaintiffs, it

1    may not be of value.

2         The Court will let the witness testify to that extent.

3    And we'll recess here shortly.

4         And perhaps you can make some determination during the

5    recess, Mr. Petsonk, as to what portion of this exhibit

6    falls within the parameters that I've mentioned.

7              MR. PETSONK:  I have done so, and I'm prepared to

8    present it after the break, Your Honor.  Yes, thank you.

9              THE COURT:  We'll be in recess for 15 minutes.

10   And, Mr. Hymes, as you may have been instructed before,

11   treat yourself as though you are on the witness stand, and

12   don't discuss your testimony with anyone, unless you need

13   help with that, and you can let me know.

14             THE WITNESS:  Okay.

15             THE CLERK:  All rise.

16        (A recess was taken at 11:21 a.m. until 11:42 a.m.)

17             THE CLERK:  All rise.

18             THE COURT:  Please be seated.

19             MR. PETSONK:  Thank you, Your Honor.

20   BY MR. PETSONK:

21   **Q.**  Mr. Hymes, would you turn to page 429 of Plaintiff's

22   Exhibit 10?

23   **A.**  Okay.

24   **Q.**  What's the caption on the top of that page, the title

25   of the page?

```
 1    A.    "Advantage of working union-free."

 2    Q.    Is that the caption of a section of this training

 3    script or orientation script?

 4              MR. TORRES:  Object to the form of the question.

 5              MR. PETSONK:  Your Honor, I'm happy to restate my

 6    question.

 7              THE COURT:  Go ahead.

 8    BY MR. PETSONK:

 9    Q.    Is that the title of one section of the union-free

10    orientation script?

11    A.    Well, the title of this section, yes.

12    Q.    And does this section -- well, let me ask you about

13    this section.

14          Do you see on Slide 67 on page 429, "You will be the

15    one who makes the decision."

16          "So now I want to talk to you in terms of exactly how

17    important that decision will be.  On a dollar basis, how big

18    is the decision?"

19          Do you see that?

20    A.    Yeah.

21    Q.    And then if you flip forward through these pages to

22    431?

23    A.    Yes.

24    Q.    The last of several bulleted points addressed by the

25    advantage of working union-free section.
```

```
 1              MR. TORRES:  I'm sorry, what page are we on?

 2              MR. PETSONK:  431.

 3              THE WITNESS:  431.

 4    BY MR. PETSONK:

 5    Q.   431, yes, says at the top, "Wages and Benefits."

 6         Do you see that?

 7    A.   Yes.

 8    Q.   And that's the last of several bulleted points from

 9    the -- extending from the preceding page.  Do you see that?

10    A.   Yeah.

11    Q.   It says, "I have tried to give you a good overview and

12    description of your wages and benefits, recognizing that we

13    do have some time constraints.  And I have also tried to

14    show you, fairly and accurately, how these wages and

15    benefits compare to the best wages and benefits that the

16    UMWA has negotiated for any of its members anywhere."

17         Do you see that?

18    A.   Yes.

19    Q.   And if you flip on, through the following pages?

20              MR. TORRES:  Object.  Your Honor, objection.  I

21    thought the purpose of this exercise was to have Mr. Hymes

22    say this was in the Buchanan presentation.

23         These are just Mr. Petsonk reading things in a document

24    he likes, without establishing the premise of what Your

25    Honor instructed.
```

```
 1              THE COURT:  Mr. Torres is correct.

 2              MR. PETSONK:  Your Honor, then I will simply ask

 3   Mr. Hymes --

 4   BY MR. PETSONK:

 5   Q.   Did the Buchanan orientation, that is, the union-free

 6   orientation program that you designed and had testified you

 7   carried out, contain this same section that is Bate-stamped

 8   in Plaintiff's Exhibit 10 as 429 through 448?

 9   A.   Again, it was one of the sections in the Buchanan

10   orientation that was then allowed to be updated that -- as

11   Mr. Torres went through -- we updated the details, but the

12   concept was from the original Buchanan orientation.

13   Q.   During what period did you update the -- the numerical

14   details in this section that you reference?

15              MR. TORRES:  Objection.  He has testified this

16   isn't his document.  And now Mr. Petsonk -- he hasn't

17   actually identified what was in the Buchanan presentation.

18   What he said is the concept was the same.

19        The question Your Honor posed was, what specific pieces

20   of this document could he testify were in the Buchanan

21   presentation from 1982.

22              THE COURT:  Mr. Petsonk, I mentioned before we

23   recessed, you should take the portions of this, what this

24   witness says he developed and he delivered at Buchanan.

25              MR. PETSONK:  Yes, Your Honor.
```

1          THE COURT:  We are not going to go through this

2    page-by-page to do this.  You are going to do it.

3          MR. PETSONK:  I am trying to, yes, Your Honor.

4          THE COURT:  You can do that after developing with

5    the witness what part of this falls within that limitation.

6      And if you are not prepared to do that now, and I think

7    you are not, then we need to get on to another matter, and

8    then you can have Mr. Hymes back, once you have

9    reconstructed what portion of this Plaintiff's 10 is going

10   to be admitted.

11         MR. PETSONK:  Well, Your Honor, I seek for the

12   admission of this portion, and I can identify specifically a

13   few discrete instances within that limited Bates range from

14   where that I just stated here, 429 --

15         THE COURT:  If you are only offering 429 through

16   431, then just say that, that's the extent of it.

17         MR. PETSONK:  And there is one other section that

18   I would seek to enter, Your Honor, as well.

19         THE COURT:  Tell us what the other section is

20   before we address further questioning of the witness.

21         MR. PETSONK:  The other section that I would seek

22   to enter from Plaintiff's Exhibit 10 is -- page 4 -- strike

23   that -- page 343 and 344.

24      And as to the other exhibits, I will have similar

25   excerpts of two relevant sections, which I can tender for

1      the witness to compare.

2             THE COURT:  Do I understand you to say that you

3      propose to offer through this witness only this portion of

4      Plaintiff's 10, in light of the Court's ruling, and that is,

5      343, 344, 429, 430, and 431?  Those five pages?

6             Is that correct?

7             MR. PETSONK:  I would seek to enter 429 -- you are

8      correct as to --

9             THE COURT:  Now, just figure it out before you

10     tell me what the answer is.

11            MR. PETSONK:  343, for entry, and 344, Your Honor.

12     And then moving forward, page 429, page 430, page 431.  And

13     then I would seek to enter pages -- the -- not to take

14     individual pages, pages 432 through page 448, Your Honor.

15     And I will -- I would like to invite the witness to address

16     certain differences that may have been made over time as far

17     as amending those numbers on that page range over time.

18            THE COURT:  Mr. Torres.

19            MR. TORRES:  Your Honor, I apologize for

20     belaboring these points, but I suppose I could do it on

21     cross-examination, but Mr. Hymes' testimony was that pages

22     429 and 431 were different than the Buchanan presentation.

23         And then the 432 -- I'll get to the 429 and 431 in a

24     second, Your Honor -- but the 432 through 440 contains one,

25     two, three, four, five -- six pages that this gentleman has

1    already admitted were not in the Buchanan presentation.  So

2    I don't think that's an appropriate way to try and -- this

3    gentleman keeps saying, something like this was presented at

4    Buchanan, Your Honor.  And that's just not -- how do you

5    cross-examination "something like this," when he said the

6    actual document that he drafted he doesn't have and he

7    doesn't remember exactly what it said.

8         So -- if I can finish, please.

9              MR. PETSONK:  I'm sorry.  I thought you had, Joe.

10             MR. TORRES:  This is an inappropriate way to ask

11   the Court to infer something, when the witness, again, lacks

12   personal knowledge.  Whether the same concept, Your Honor,

13   was addressed union-free, he can testify to that without the

14   document.  He can say, when I worked at Buchanan, we talked

15   about staying union-free in 1982.

16        But to try and bolster that or have the plaintiffs wave

17   this document in front of you as to evidence what was said

18   in '82 is inappropriate for these pages, mostly, because

19   he's admitted that these pages weren't in his presentation.

20        Again, I apologize for retreading old ground, Your

21   Honor, but they are trying to get the very same documents he

22   admitted were not the same into evidence.

23             THE COURT:  The point is well taken.  We have

24   already established these are 1990 documents, not anything

25   that this witness was dealing with the Buchanan

1    presentation.

2        I'm going to ask you to simply withdraw the witness;

3    figure out how what matters the Court's given you can be

4    employed here, and come back with some reasonable

5    presentation of what those pages are.  And we are not going

6    to be able to do it here on the stand.

7        You need to step back and figure out what falls within

8    that limitation.  And 1990 doesn't fall there.  And that's

9    what those pages -- so many of them that you are offering

10   now.  And we've argued about this enough.

11       The Court's told you what to do.  Do it.

12       Now, are you finished with the witness for now?

13           MR. PETSONK:  Well, Your Honor, if I may inquire,

14   Your Honor?  I have not -- what I have not had the chance to

15   do is to inquire of the witness whether -- whether he used

16   this document in making changes to his Buchanan script, and

17   whether the differences in the numbers --

18           THE COURT:  He used this document in making

19   changes to the Buchanan script?

20           MR. PETSONK:  Yes.

21           THE COURT:  This document is Enlow; it comes long

22   after Buchanan.

23           MR. PETSONK:  No, Your Honor.  This -- Mr. Hymes

24   worked at CONSOL during the time that this document was

25   drafted in 1990.  He worked there through 1993.  And he was

 1    given this document by CONSOL, by his counterpart, to -- so

 2    that he could keep his documents current.

 3         THE COURT:  The witness testified earlier that

 4    first it was Buchanan, and then this document flows from it.

 5         MR. PETSONK:  Yes, but, Your Honor -- and I think

 6    the witness has testified that Buchanan continued to hire

 7    miners.  Obviously, our clients were hired during -- you

 8    know, later on.  They continued to use the same --

 9         THE COURT:  Mr. Petsonk, I'm going to tell you one

10    more time, and it's the last time we are going to discuss

11    it.

12      What the Court wants from this witness is what this

13    witness did and said at those meetings.  And I understood

14    them to be at Buchanan; that he had no relationship to

15    lecturing at the others.  Now, if he did, you can add that

16    to it.

17      And so the Court has explained it to you.  I'm not

18    going to go over it again.  If you don't fall within that

19    limitation, the Court is going to deny the entirety of the

20    exhibit.

21      Now, do you have any other questions to ask this

22    witness now before you plan how you are going to present the

23    rest of this?

24         MR. PETSONK:  I don't have any other questions at

25    this time, Your Honor.  So -- but I will -- I also don't

1    know, Your Honor, that another break -- I have identified

2    the portion of the exhibit here that --

3              THE COURT:  Mr. Petsonk, you are having me on the

4    verge of saying I'm denying this exhibit.

5              MR. PETSONK:  I'll go over it with the break, Your

6    Honor.

7              THE COURT:  You're just arguing with the Court

8    now.  You can do what I said or simply abandon the matter in

9    its entirety.

10             MR. PETSONK:  Okay.  I thank you, Your Honor.  And

11   I will -- I will try to further abridge the exhibit as

12   you've instructed.

13             THE COURT:  Thank you.

14             MR. TORRES:  Your Honor, could I ask one

15   clarification?  The witness, even if he's being withdrawn,

16   is still under oath and he shouldn't be discussing his

17   testimony.  Is that accurate?

18             THE COURT:  Again, please.

19             MR. TORRES:  The witness is still presumably under

20   oath, if he's being withdrawn, so I just wanted to ensure

21   that he's still unable to be discussing his testimony with

22   counsel?

23             THE COURT:  Well, of course.  It's going to be up

24   to counsel to plot the limitations of the evidence that's to

25   be sought from this individual as amplified by the portion

 1    of the Plaintiff's 10 admissible.

 2         So during that period of time, Mr. Hymes, I'm sorry to

 3    detain you further, but I will ask you not discuss the case

 4    with anyone, because you are going to be recalled.

 5              THE WITNESS:  Okay, Your Honor.  I'm here to try

 6    to attempt to testify, but I can't stay for days and days.

 7              THE COURT:  Well, we are going to finish this

 8    today; you can rest assured of that.  And what the Court's

 9    going to do is give really an opportunity over the noon hour

10    for the plaintiffs to plot their presentation.

11         And so, we are going to excuse you now and have you

12    back this afternoon.  And I see no reason why you can't be

13    finished with today.

14              THE WITNESS:  Thank you, sir.

15              THE COURT:  Thank you.  And so you may be excused.

16              I would suggest that you be back at 2 o'clock.

17    I'm not sure we'll be ready to proceed at that time, but if

18    you'd be back by that time.

19              THE WITNESS:  Yes, sir.  Thank you.

20              THE COURT:  Thank you.

21              Your next witness.

22              MR. PETSONK:  The plaintiffs call Benny Fitzwater.

23              **BENJAMIN MONROE FITZWATER, PLAINTIFF, SWORN**

24              THE CLERK:  State your name and spell it for the

25    record.

```
 1              THE WITNESS:  My name is Benjamin,
 2    B-E-N-J-A-M-I-N, Monroe, M-O-N-R-O-E, Fitzwater
 3    F-I-T-Z-W-A-T-E-R.
 4              THE CLERK:  Thank you.  And if you'd please take
 5    the stand.
 6                     DIRECT EXAMINATION
 7    BY MR. PETSONK:
 8    Q.   Where do you reside, Mr. Fitzwater?
 9    A.   I live at Maysel, West Virginia, in Clay County.
10    Q.   And are you married?
11    A.   No.
12    Q.   Were you ever married?
13    A.   Yes.
14    Q.   When were you last married?  When was the last date you
15    were married?
16    A.   Probably around 2012, I think that's when it was.  I'm
17    not exactly sure.
18    Q.   And you have not been married to anyone since the date
19    of 2012; is that right?
20    A.   That's correct.
21    Q.   What is your birth date?
22    A.   9-25-54.
23    Q.   What is your current age?
24    A.   66.
25    Q.   And you are currently retired, correct?
```

1    **A.**   Yes.

2    **Q.**   What was your occupation before you retired?

3    **A.**   I was a prep plant operator.

4    **Q.**   And what was the last date that you were employed as a

5    prep plant operator?

6    **A.**   February 14th, 2013.

7    **Q.**   I'll come back to the matter of the conclusion of your

8    employment at a later point in my questioning.

9         Where did you work at the time you were last employed?

10   **A.**   I worked for Fola Coal, which CONSOL owned.  It was

11   located -- the mailing address was Bickmore, West Virginia,

12   but we actually worked at the top of the mountain, which was

13   Fola Road, and it was located -- part of the operation was

14   located in Clay County and part of it in Nicholas County.

15   **Q.**   How long did you work at that site?

16   **A.**   17 and a half years.

17   **Q.**   When did you start there?

18   **A.**   I started working for AMVEST August 28th, 1995.

19   **Q.**   And did you work for AMVEST the entire time that you

20   worked there?

21   **A.**   No.

22   **Q.**   Who was your next employer there?

23   **A.**   CONSOL.

24   **Q.**   And what job application process did you follow for

25   hiring on with CONSOL?

1    **A.**   Everything was the same.  Didn't have to fill out a new

2    application when CONSOL bought it.  It just stayed the same.

3    **Q.**   Were you salaried or hourly while you worked at the

4    Fola site?

5    **A.**   I was hourly.

6    **Q.**   So throughout the entire time you worked there, you

7    were paid on an hourly basis?

8    **A.**   Yes.

9    **Q.**   Where did you work prior to working at Fola?

10   **A.**   I worked for Bethlehem Steel and High Power Mountain

11   Corporation, which was all owned by Bethlehem Steel

12   Corporation.

13   **Q.**   How long did you work at those places that you've

14   referenced altogether?

15   **A.**   Nineteen-and-a-half years.

16            THE COURT:  What years were those?

17            THE WITNESS:  Sir?

18            THE COURT:  What years were those?

19   Nineteen-and-a-half years, from when to when?

20            THE WITNESS:  I started in July of 1976 and was

21   laid off in July -- the best of my recollection -- of 1995.

22            THE COURT:  And that was the entire time you

23   worked there?

24            THE WITNESS:  Yes, sir.  From '76 till '95.

25            THE COURT:  Thank you.

FITZWATER - DIRECT

1   BY MR. PETSONK:

2   **Q.**   Were you a member of a union while you worked at

3   Bethlehem Steel?

4   **A.**   Yes.

5   **Q.**   How many years total time do you have as a member of a

6   union?

7   **A.**   Twenty-three-and-a-half years.

8   **Q.**   And is that all with the United Mine Workers of

9   America?

10  **A.**   Yes.

11  **Q.**   And during your employment with CONSOL, were there

12  occasions when the company discussed with you or explained

13  to you your entitlement to retirement welfare benefits?

14  **A.**   Yes.

15  **Q.**   Can you give me a list of those times when you remember

16  CONSOL discussing your retirement welfare benefits, just

17  list them and then we'll discuss them in turn.

18      When was the first occasion you recall CONSOL

19  discussing your retirement welfare benefits?

20  **A.**   Shortly after CONSOL took over in, I believe, it was

21  2007, Susan Osborn was the Human Resources person and she

22  came to the bathhouse at the prep plant operation.  And she

23  briefly discussed some of the benefits.  She just briefly

24  went over it.

25  **Q.**   What's the next occasion when you recall CONSOL or

1    someone from CONSOL discussing your retirement welfare

2    benefits, explaining them to you?

3    **A.**    At the Armory, in Summersville, West Virginia.

4    **Q.**    And when do you recall that that occurred?

5    **A.**    I do not remember the lady's name, but she was a HR

6    person, to the best of my knowledge.  She was at the

7    meeting.  Susan Osborn was at the meeting.  Anne Adkins,

8    which was -- Susan and Anne worked at the Fola operation, at

9    the main office.  They were present -- Anne Adkins,

10   sometimes would answer questions if Susan was gone, but she

11   was the payroll lady.  And Gerald Kowzan could have been

12   there somewhere in that building, I do not remember.  But

13   the lady had two other people with her.  And they said they

14   wanted to discuss our retirement and medical benefits.

15   **Q.**    Just to be clear, what was Susan Osborn's department at

16   CONSOL?

17   **A.**    She was the HR.

18   **Q.**    And what was Gerald Kowzan's department that he worked

19   in for CONSOL?

20   **A.**    My understanding, he was out of the main office in

21   Pennsylvania, and he was Susan Osborn's boss.

22   **Q.**    In the Human Resources Department?

23   **A.**    Yes.

24          THE COURT:  Let me interrupt to ask, when is it

25   CONSOL took over Fola?

```
 1                THE WITNESS:  2007, best of my recollection.
 2                THE COURT:  And is that when this first instance
 3     of being at the bathhouse with Susan Osborn took place?
 4                THE WITNESS:  The best of my knowledge, shortly
 5     after that, yes.
 6                THE COURT:  And then when was the Summersville
 7     incident?
 8                THE WITNESS:  Sir?
 9                THE COURT:  When was the Summersville Armory?
10                THE WITNESS:  I do not remember the year.  I do
11     not.
12                THE COURT:  About when was it?
13                THE WITNESS:  I would guess 2008.
14                THE COURT:  About a year later than the first
15     encounter at the bathhouse with Susan Osborn?
16                THE WITNESS:  Yes, about a year, best of my
17     knowledge.  Now, I could be wrong on that.
18                THE COURT:  I understand.
19                THE WITNESS:  I don't keep the date.
20                THE COURT:  Thank you.  Please go ahead.
21     BY MR. PETSONK:
22     Q.   What other occasions were there when CONSOL explained
23     to you your retirement welfare benefits while you worked
24     there at Fola, after that?  After that meeting you've
25     referenced at the Summersville Armory?
```

1     **A.**    I remember in the eight-hour retraining, they were

2     briefly discussed.  Not in detail.  And that would have been

3     a little bit by Greg Patterson.  He was a manager of

4     operations.  And Chase Elswick would have been present at

5     some of the eight-hour retrainings.  But I do remember very

6     well of Chase Elswick coming inside the control room, and

7     this was during the union organization, we was trying to

8     organize, and Chase said he wanted to talk to me.  And he

9     said, "I want to talk to you about the retirement and your

10    medical insurance."

11    **Q.**    What position did Chase Elswick have with CONSOL?

12    **A.**    He was a Human Resources man at that time.  Susan had

13    been laid off.

14    **Q.**    Okay.  And then was there any subsequent time when you

15    had a conversation in which someone from CONSOL explained to

16    you about your retirement benefits, your retirement --

17    welfare retirement benefits at any time after that

18    conversation you referenced with Mr. Elswick during the

19    union organizing activity?

20    **A.**    When I got laid off, I was to report to the CONSOL

21    training center, which is at Drennen, West Virginia, and

22    that would have been the following week, to meet with Gerald

23    Kowzan.

24    **Q.**    All right.  Let's take a step back.

25          Do you recollect the date when there was union

1    organizing activity that you referenced and Mr. Elswick

2    spoke with you?  Do you remember chronologically what year

3    that occurred?

4    **A.**    Well, we were trying to organize in 2010.  It could

5    have been '11 when he spoke with me, and it could even been

6    2012, because he spoke with me on two or three different

7    occasions.

8    **Q.**    How long was the period at Fola, when you were aware of

9    active union organizing efforts; how long a period was that?

10   **A.**    I'm not sure.

11   **Q.**    Could it -- you said that you recall it was around 2010

12   to 2012; is that right?

13             MR. TORRES:  Objection.  He's leading the witness,

14   Your Honor.  Misstates the testimony.

15             THE COURT:  The witness may answer that question.

16   You may answer that question.

17             THE WITNESS:  I do know we was organizing in the

18   year 2010.  I do know that.

19   BY MR. PETSONK:

20   **Q.**    And do you remember for how long a period of time those

21   organizing efforts persisted?  Was it a year?  If you don't

22   remember specifically, can you characterize the duration of

23   time?

24   **A.**    No, I cannot.

25   **Q.**    Okay.  So after that period, around 2010, was there any

1   subsequent time that CONSOL explained your retirement --

2   retirement welfare benefits to you?

3   **A.**   I don't remember.

4   **Q.**   Okay.  Let me go through and ask you about the initial

5   meeting that you referenced shortly after CONSOL took

6   ownership of the coal operations in 2007.  You mentioned

7   Susan Osborn explained to you at the bathhouse about your

8   retirement welfare benefits; is that right?

9   **A.**   Yes.

10  **Q.**   Was it just the two of you or were there others

11  present?

12  **A.**   It was the whole shift that worked at the plant,

13  somewhere between 10 to 15 people.

14  **Q.**   And what did Ms. Osborn say or explain in that setting

15  at that time about your entitlement to retirement welfare

16  benefits?

17  **A.**   She explained we had the benefits and how they worked.

18  And if we had any questions, they would tell us at a later

19  date.  She did not get into a lot of detail.  She said she

20  did not have all of that information at that time.

21  **Q.**   Did she explain to you anything specifically about the

22  retirement welfare benefits to which you were entitled at

23  CONSOL's coal operation at that time?

24  **A.**   That it was good benefits and we didn't have to worry

25  about anything.

1    **Q.**   Okay.  Do you recall anything else about that meeting

2    that Ms. Osborn said at that time?

3    **A.**   No.

4    **Q.**   Okay.  And then next you referenced at the Armory in

5    Summersville, there was a meeting where CONSOL explained

6    your retirement welfare benefits.  Who provided the

7    explanation of the retirement welfare benefits at that

8    meeting at the Summersville Armory?

9    **A.**   Best of my knowledge, there was HR lady from the main

10   office in Pennsylvania.  She had two other people with her.

11   I do not know what -- if they actually worked for CONSOL or

12   if they worked for an outside firm that was sent there to

13   explain the benefits.

14   **Q.**   How many people were in attendance at that meeting at

15   the Armory in Summersville?

16   **A.**   I can't tell you exactly that.  That was the day people

17   was supposed to bring their wives, and they divided the

18   shifts up, so they took some off of some shifts and some off

19   of another, and I cannot tell you exactly how many.

20   **Q.**   Did it appear that most all of the working shifts from

21   Fola were represented or present there at that meeting at

22   the Armory in Summersville?

23          MR. TORRES:  Objection; lack of foundation.

24          THE COURT:  Sustained.

25

1    BY MR. PETSONK:

2    **Q.**   You may not remember specifically, Mr. Fitzwater, but

3    generally, do you recall -- are you able to state how many

4    people were in attendance at that meeting at the Armory at

5    Summersville?

6    **A.**   What they did, they divided it up, because we worked

7    four on and four off.  And you had evening shift people, you

8    had day shift people, and they set different days for

9    certain people to be there.  Like, if they told me to come

10   in, and I was a -- it was my off day, they would have

11   scheduled all of the employees at the plant that was on the

12   off day, because we had four crews to be there.  So I'm

13   going to guess -- and I'm guessing again -- 15 to 25 people

14   there.

15   **Q.**   Okay.  Thank you.  What do you recall that the

16   individual from the Human Resources Department at CONSOL

17   explained to that group of people that day about your

18   retirement welfare benefits?

19   **A.**   How that we would receive a retirement, if you was age

20   55, and had 10 years' service and you decided to retire,

21   that you could receive a pension and medical benefits, which

22   was insurance.

23   **Q.**   When you say "insurance," what kind of insurance did

24   they describe that you would receive as you retired from

25   CONSOL?

1    **A.**   That is your medicine, hospitalization, eye care, and

2    dental care -- anything that you might have that would be a

3    physical condition, that you needed to go see a doctor.

4    **Q.**   Do you recall anything else that CONSOL explained to

5    you at that meeting at the Summersville Armory about

6    retirement welfare benefits that you would be eligible for

7    as a retiree from CONSOL besides the medical insurance that

8    you just described?

9    **A.**   I don't understand your question.

10   **Q.**   Did they describe -- was there anything else -- I'm

11   just asking about your recollection.

12        Anything else that they described about your retirement

13   welfare benefits, other than the medical insurance that you

14   just mentioned?  Was there any other coverage or anything

15   else they mentioned to you that day?

16   **A.**   The life insurance, they mentioned it, and just the

17   pension.

18   **Q.**   Did you ask any questions about the retirement welfare

19   benefits during that meeting?

20   **A.**   Yes, I did.

21   **Q.**   What did you ask?

22   **A.**   They never would give us an exact amount that we could

23   draw based upon your years of service of how much money that

24   you would receive when you retired as a monthly check.  And

25   they would not give me a clear answer on that.  And then I

1      asked other questions about the medical, of what the

2      guarantee was of the medical.  And at that meeting, that

3      particular meeting, they said we'll -- we will give you

4      answers at a later date.

5      **Q.**   Who said that at that meeting?

6      **A.**   The lady that was in charge, and Susan Osborn, also,

7      said, we will give you another presentation and get -- tell

8      you what -- or someone from this company that's in HR will

9      give you an explanation of benefits.

10     **Q.**   Did you receive any documents from CONSOL at that

11     meeting at the Summersville Armory regarding your retirement

12     welfare benefits?

13     **A.**   I don't remember.  I don't recall anything.

14     **Q.**   Did you ask for any documents at that meeting from

15     CONSOL regarding the retirement welfare benefits?

16     **A.**   I asked for something in writing that would give me a

17     guarantee that I had these benefits.

18     **Q.**   But you don't recall whether you received that in

19     writing at that time?

20     **A.**   No, I did not get any -- I can say that I did not get

21     anything in writing from the company at that point in time.

22     **Q.**   The next time when you recall someone from CONSOL

23     describing your retirement welfare benefits was during mine

24     site meetings; is that right?

25     **A.**   Yes.

1   **Q.**   And you said that included annual refresher training

2   and also conversations during the union organization drive

3   around the period of 2010; is that right?

4   **A.**   Yes.

5            MR. PETSONK:  Your Honor, may I present the

6   witness with a document for an exhibit?

7            THE COURT:  You may.

8            THE CLERK:  Plaintiff's 11.

9   BY MR. PETSONK:

10  **Q.**   Plaintiff's 11.  Mr. Fitzwater, I've presented you

11  what's been marked as Plaintiff's Exhibit 11.

12  **A.**   Yes.

13  **Q.**   Have you had a chance to look at the document?

14  **A.**   I have not read all the document yet.

15  **Q.**   Let me know when you've had a chance to read it, and if

16  it is familiar to you?

17  **A.**   Okay.

18  **Q.**   What's the title at the top of this document, Mr.

19  Fitzwater?

20  **A.**   "Know the Facts."

21  **Q.**   Does this document, indeed, look familiar to you?

22  **A.**   Oh, yes.

23  **Q.**   Did you receive this document while you worked at Fola?

24  **A.**   Yes.

25  **Q.**   Who gave you this document?

FITZWATER - DIRECT

1    **A.**    I don't know.

2    **Q.**    Do you remember when you received this document?

3    **A.**    Well, these documents was handed out several times, and

4    sometimes the foreman gave it to us, sometimes the

5    superintendent.  And then sometimes someone would give it to

6    the employees and they would pass it on to the other

7    employees.  Usually it was from management.

8    **Q.**    And you see about the middle of the document it says,

9    Fact:  You are eligible for retiree healthcare or a

10   healthcare reimbursement account if you were hired after

11   January 1, 2007, once you have 10 years of service and reach

12   age 55.

13        Do you see that?

14   **A.**    Yes.

15   **Q.**    Do you remember reading that information at the time

16   that you received this document?

17   **A.**    Yes, I do.

18   **Q.**    Do you see at the bottom of the document where it says,

19   "This is a better deal than the UMWA negotiated in the

20   national contract," and then in bold letters it says, "And

21   remember, it didn't cost you a penny in dues or

22   assessments"?

23   **A.**    Yes.  I read this document.  I see that.

24   **Q.**    And you don't remember who specifically, but your

25   testimony is CONSOL -- was it a supervisor or another hourly

1    worker at CONSOL who presented this document to you, the

2    best you recall?

3    **A.**   I can say most of the documents I got -- I can't say

4    this particular document, but most of "Know the Facts" came

5    from management.

6    **Q.**   And did you make any inquiry of management about this

7    fact that you were eligible for retiree healthcare once you

8    have 10 years of service and reach age 55 when you received

9    this Know the Facts during this union organizing drive?

10   **A.**   We had several conversations about the difference in

11   the union and what their -- and what CONSOL's benefits was.

12   **Q.**   Now, who participated in those conversations that

13   you're referencing during this 2010 period of union

14   organizing?

15   **A.**   Superintendent, Wayne Keener.

16   **Q.**   Who else?

17   **A.**   Chase Elswick.

18   **Q.**   Chase Elswick from the HR Department?

19   **A.**   HR Department, yes.

20   **Q.**   And who else?

21   **A.**   At one of our meetings, Clarence Scarbrough [phonetic]

22   which was one of the foremans [sic], he went over some of

23   the facts with us about the difference -- and that

24   particular subject was in the bathhouse and it was about the

25   pension and the healthcare.  And I'm sure there was others,

1    other bosses.  And Bill Waters was the safety man.  And he

2    wouldn't directly talk to me, but in the retraining, the

3    annual retraining, he would put slides up and make little

4    points directing it toward the differences in the union and

5    the nonunion benefits that consol was offering, and that

6    they were better.

7    Q.   And based on the conversations you described with Mr.

8    Elswick and Mr. Keener, and based on the presentation of the

9    slides you described here, what was your understanding about

10   your benefits from CONSOL, your retiree welfare benefits, as

11   you've described, relative to the benefits for retirees from

12   the UMWA retiree medical and welfare plan?

13   A.   That the insurance coverage would be until you die; you

14   could have it -- as long as you paid the premiums, you could

15   have this insurance until you died.

16   Q.   Which insurance are you referring to?

17   A.   The CONSOL insurance that they offered of the medical

18   plan insurance.

19   Q.   And did anyone during the course of the meetings that

20   you've described at the bathhouse at the mine site, or at

21   the Armory , did anyone from CONSOL assert or reserve their

22   right to terminate those retiree welfare benefits?

23   A.   Make sure I understand this question.  You are asking

24   me if anybody ever told me that they could terminate them or

25   had a right to?

1  **Q.**   That's my question.

2  **A.**   No.

3  **Q.**   What year did you turn 55, Mr. Fitzwater?  I don't mean

4  to ask you to do too much math.  I don't mean to direct you,

5  but I could certainly ask you, if you recall what year you

6  turned 55?

7  **A.**   Off the top of my head, probably 2009.

8  **Q.**   That makes sense to me.

9      Do you recall receiving a copy of a retiree healthcare

10  plan document after you turned 55?

11  **A.**   I do not.

12  **Q.**   Now, before, you referenced that the last date you

13  worked at the Fola site was February of 2013; is that right?

14  **A.**   February 14th, 2013, was the last day I worked.

15  **Q.**   On Valentine's Day, right?

16  **A.**   Yes.  We did not work that day, but we had to report

17  out, and they told us we was laid off; they was shutting the

18  plant down.

19          MR. PETSONK:  Thank you, Your Honor.  If I may

20  approach?

21          THE COURT:  Go ahead.

22          MR. PETSONK:  12.

23      Your Honor, before I proceed to question the witness

24  about this document marked Plaintiff's 12, may I move to

25  admit Plaintiff's 11?

```
 1                    THE COURT:  Any objection?

 2                    MR. TORRES:  No objection, Your Honor.

 3                    THE COURT:  Admitted.

 4              Plaintiff's Exhibit 11 admitted.

 5       BY MR. PETSONK:

 6       Q.   Mr. Fitzwater, are you able to take a look and read

 7       what's marked here as Plaintiff's Exhibit 12?

 8       A.   Yes.

 9       Q.   Does this document look familiar to you?

10       A.   It does look familiar, yes.  It's got my name at the

11       top of it.

12       Q.   What's the caption at the top of the document?

13       A.   "Benefits Information Sheet (over 10, over 55)."

14       Q.   And right beneath that, does it note an effective date?

15       A.   Yes.

16       Q.   What's that date?

17       A.   2-14-2013.

18       Q.   And that's the date you testified that you were laid

19       off by CONSOL at Fola, right?

20       A.   Yes.

21       Q.   Who conveyed to you that you were laid off at Fola?

22       A.   Chase Elswick, the HR man, at that Fola site.

23       Q.   And were you eligible for retirement from CONSOL at the

24       time you were laid off here in 2013?

25       A.   Yes.
```

FITZWATER - DIRECT

1   **Q.**   Did you retire at that date?

2   **A.**   No.

3   **Q.**   Why not?

4   **A.**   I wasn't ready to retire.

5   **Q.**   What did you do for healthcare, to procure healthcare

6   coverage for yourself after you were laid off from CONSOL on

7   February 14, 2013?

8   **A.**   CONSOL provided the insurance for us for one year.

9   **Q.**   CONSOL provided the same type of healthcare coverage

10  you had while you were working there?

11  **A.**   Same benefits, because when --

12          THE WITNESS:  If I may, Your Honor, could I

13  elaborate just a little bit to why we got this one-year

14  deal?

15          THE COURT:  Any objection from defendant?

16          MR. TORRES:  No.  We can talk about it on

17  cross-examination some more, Your Honor.  Thank you.

18          THE COURT:  Go ahead.

19          THE WITNESS:  When the union organizing started,

20  they wanted to do the same thing -- to try to do the same

21  thing the union did.  And the union offered -- if you got

22  laid off from the union, you had medical coverage without

23  having to pay for it for a year.  So they gave us a year's

24  worth of insurance.  We did not have to pay for any for one

25  year.

1          MR. TORRES:  Your Honor, I'd only move to strike

2     the beginning of his response where he was purporting to

3     explain what CONSOL's mindset was as to why it was offered.

4          THE COURT:  The Court will sustain the objection

5     to that limited extent.

6     BY MR. PETSONK:

7     **Q.**   Mr. Fitzwater, do you know whether CONSOL was offering

8     -- or whether CONSOL was offering a one-year premium-free

9     health insurance coverage to its UMWA represented miners if

10    they were laid off?

11    **A.**   I don't understand your question.

12    **Q.**   You just testified you were offered insurance from

13    CONSOL for a year after layoff.  Is it your understanding

14    that miners covered by the UMWA contract at that time

15    received one year of free insurance after they were laid off

16    under the contract terms?

17    **A.**   That is correct.

18    **Q.**   So did your health insurance from CONSOL stand to lapse

19    around February 14th of 2014?  The one-year premium-free

20    coverage that you reference, that would have come to a

21    conclusion on February 14th, 2013, right?

22    **A.**   Yes.

23         MR. TORRES:  Did you say '13 or '14?

24         THE COURT:  Restate that, if you would, please.

25    Ask the question again.

1    BY MR. PETSONK:

2    **Q.**    Your one year of premium-free health insurance coverage

3    from CONSOL came to a close around February 14 of 2014,

4    right?

5    **A.**    It was February 14th, 2014, was when that expired, yes.

6    **Q.**    Now, what did you do, if anything, to secure ongoing

7    health insurance coverage at that time?

8    **A.**    Well, when I went to the training center, Gerald Kowzan

9    explained to me that I could keep the insurance if I paid

10   the premium.  So I called the main office in Pennsylvania

11   and I talked to -- I asked to talk to Gerald.  And he wasn't

12   available and a lady talked to me.  I do not remember her

13   name.  And I told her I wanted to sign up on the insurance.

14        And she said, well, Mr. Fitzwater, we will send you a

15   coupon.  You will need to contact the Fola office -- because

16   there was still a few people working reclaiming on the

17   strip -- and she said, we do have people in and out of that

18   office from time-to-time, and you'll need to contact them

19   also.

20        So I did all of the contacting, and I filled the

21   paperwork out.  And they sent me a coupon every month, and I

22   paid the premium, and therefore I had the insurance.

23   **Q.**    And that was the retirement process that you followed,

24   right?

25   **A.**    Yes.

1    **Q.**   And as a person who had over 20 years of union coal

2    mining time, were you also eligible for retiree health

3    insurance from the UMWA at that time?

4    **A.**   Yes.

5    **Q.**   Now, why did you not take that insurance?  Why did you

6    choose to take CONSOL's retiree health insurance and not

7    your union retiree health insurance at that point?

8    **A.**   I wasn't ready to retire at that point, because, when

9    you retire from the union, if you are not 62, then you are

10   going take a cut on your pension.  But you do have your

11   medical.  You can take that at any time you want to after

12   55.  But if you take it early, you are going to lose money

13   on your pension.  So I didn't need to take my pension.  I

14   didn't need to take it right then, because I was relying on

15   CONSOL's insurance until I got age 62, and then I would sign

16   up on my UMWA -- or I might have waited till 65 if I could

17   have.  The longer that you wait, the more money you are

18   going to get.  I didn't want to take -- because if you take

19   the insurance, you got to take the pension at the same time.

20   **Q.**   From the UMWA, right?

21   **A.**   Yes.  I was just waiting.  I wasn't ready to retire.

22   **Q.**   How much more would you have received under your UMWA

23   retirement pension if you had waited until age 65 to retire

24   from UMWA?

25   **A.**   I don't know at 65.  But at 62, I would have got 100

1    more dollars on my pension.

2    **Q.**   Monthly, once you reached the age of 62?

3    **A.**   Every month, I would have got $100 more on my pension.

4    **Q.**   Now, Mr. Fitzwater, I know I'm bad about this, as well,

5    but let's both try not to speak over top of one another for

6    the interest of the court reporter here.

7    **A.**   I'm very sorry.

8    **Q.**   I'm as bad about it as anybody, so I remind myself as

9    well.  Thank you.

10       Did Mr. Kowzan, in speaking with you about your

11   retirement process, ever assert that CONSOL had the right to

12   terminate your retiree welfare benefits?

13   **A.**   No.

14   **Q.**   How long did you receive -- well, did you receive both

15   life insurance and medical insurance, that is, all of the

16   relevant insurance that is covered under CONSOL's retiree

17   plan while you were retired as a CONSOL retiree; did you

18   receive life insurance as well as the medical coverages?

19   **A.**   Yes.

20   **Q.**   And how long did you receive retiree welfare insurance

21   or retiree welfare benefits from CONSOL after you retired?

22   **A.**   After I retired from CONSOL?

23   **Q.**   Well, let me ask you this:  What medical needs did you

24   have in the year of 2014, in the months following your

25   retirement from CONSOL?

1    **A.**    I have an eye disease, and I had to have two eye

2    surgeries, major eye surgeries.

3    **Q.**    And was there --

4              MR. PETSONK:  And, Your Honor, if I may approach

5    and present a document to the witness?

6              THE COURT:  You may.

7              THE CLERK:  Plaintiff's 13.

8    BY MR. PETSONK:

9    **Q.**    Mr. Fitzwater, I've presented you with a five-page

10   document that's been marked Plaintiff's Exhibit 13.

11   **A.**    Bear with me a minute, please.  I'm having a little

12   trouble seeing here.  Yes, I have it in my hand.

13   **Q.**    All right.  Now, I'm going to ask you about each

14   section of the document.  On page 1, what does it appear to

15   be?

16   **A.**    It tells me that I'm a retiree of CONSOL Energy and

17   currently I am enrolled in HealthSCOPE benefits.  And I wish

18   to suspend my HealthSCOPE benefits at the present time

19   beginning on October 1st, 2014.  However, I wish to retain

20   the right to be reinstated into the HealthSCOPE Plan at a

21   future date, if I so desire.

22   **Q.**    Now, by the HealthSCOPE Plan, are you referring to the

23   medical portion of your retiree medical health benefits?

24   **A.**    Yes.

25   **Q.**    And going on through the letter, there is a section in

1    bold that says, "I do not want to discontinue my life

2    insurance plan."  Is that right?

3    **A.**   Yes.

4    **Q.**   And then thereafter, it says, "I knowingly and

5    voluntarily elect to suspend participation under the CONSOL

6    Energy Medical Plan."  Is that right?

7    **A.**   How far are you reading under where I do not want to

8    discontinue my life insurance plan?

9    **Q.**   That's the next line underneath that.

10   **A.**   Okay, I see it now.

11   **Q.**   And is this signed by you at the bottom -- or is it

12   your name, rather, at the bottom of this page?

13   **A.**   Yes.

14        MR. PETSONK:  And, Your Honor, if I may approach

15   the witness?  I've noticed I failed to make the appropriate

16   redaction on the document.

17        THE COURT:  Go ahead.  What are you talking about?

18        MR. PETSONK:  The social security number.

19        THE COURT:  You may make that change.

20        MR. PETSONK:  I'm just going to take this for one

21   second.

22        MR. TORRES:  It's on the second page, also.

23        MR. PETSONK:  These documents were presented in

24   several different fashions throughout the case, and I

25   haven't redacted -- I neglected to bring that pre-redacted

1    edition.  I am presenting the same exhibit with the social

2    security numbers redacted.

3    BY MR. PETSONK:

4    Q.    Now, Mr. Fitzwater, if you flip to the second page of

5    this exhibit, do you see that it's captioned, "Written

6    notice of suspension of medical participation and/or

7    discontinuation of life insurance plan"?

8         Do you see that?

9    A.    Yes.

10   Q.    Is this a standard form document; that is, is this a

11   form document that had been completed, filled in with

12   handwriting in appropriate places?

13   A.    Yes.  This looks like the document that I handed you

14   that I kept a copy when I turned this in.

15   Q.    I would note these documents are Bate-stamped beginning

16   on the first Page MSJ 72 running through the fifth page MSJ

17   76.

18        Looking at MSJ Page 73 -- and did you elect -- did you

19   sign the bottom of this document, Mr. Fitzwater?

20   A.    Not in handwriting, just with the typing with the --

21   when the letter was typed to send a copy.

22   Q.    I mean as to page 2, the page that's stamped 73 at the

23   bottom?  The "Written notice of suspension of medical

24   participation and/or discontinuation of life insurance plan"

25   page, the second page of the exhibit that I presented?

 1    **A.**    Yes.  That's my signature.

 2    **Q.**    And in this document, you signed this on September 8,

 3    2014; is that right?

 4    **A.**    Yes.

 5    **Q.**    And on this document, you specified that you want to

 6    suspend medical participation effective October 1, 2014, and

 7    then you also designate that you do not want to discontinue

 8    your life insurance plan; is that right?

 9    **A.**    I wanted to keep my life insurance.  I specified that

10    with them.

11    **Q.**    Okay.

12    **A.**    They said I could -- they said I could keep the life

13    insurance.

14    **Q.**    Who told you that you could suspend your medical

15    benefits under the CONSOL retiree plan, but keep the life

16    insurance under that plan?

17    **A.**    Well, I don't remember if it was the lady at the main

18    office in Pennsylvania or the lady that I talked to at the

19    office at Fola Coal, but I do know I did talk to a Human

20    Resources man and he said he worked at other operations and

21    they sent him up there two or three days a week.  And he's

22    the one that helped me make sure I got all this in on time.

23    We made copies of it.  I cannot remember his name, but he

24    was backwards and forwards from the Buchanan operation, and

25    he came to the Fola job site.  And I drove over to the job

1    site main office and made sure that I covered everything and

2    got everything in on time.  And he helped me with it.  I

3    cannot remember the man's name.

4    **Q.**   Okay.  And what did you do for health insurance after

5    you suspended your participation in the CONSOL health

6    insurance, effective October 1, 2014?

7    **A.**   You are asking me what I did?

8    **Q.**   Well, how did you secure health insurance or healthcare

9    coverage at that point going forward?

10   **A.**   I signed up for my UMWA.

11   **Q.**   And what caused you to choose to switch from the CONSOL

12   retiree health insurance to UMWA health insurance in

13   September -- or effective October 1, 2014?

14   **A.**   If I may elaborate just a little bit to clear this up?

15   **Q.**   Yes.

16   **A.**   Some of the workers that was still working on the job

17   site -- I cannot name their names -- they just come by and

18   said, "Look, we got inside information that CONSOL is going

19   to make some changes in the insurance plan.  We don't know

20   what changes.  We don't know if they are going to do away

21   with it or cut it in half.  We have no idea, but -- we, we

22   have inside information."

23   **Q.**   And you had --

24           MR. TORRES:  Objection; move to strike as hearsay,

25   Your Honor.

1          THE COURT:  The defendant has simply stated the

2     understanding he had that merited his taking subsequent

3     action.  The Court will leave it in for that purpose only.

4          MR. PETSONK:  Thank you, Your Honor.  I believe I

5     asked him why.  And he testified as to his thoughts and

6     motivation.  Thank you, Your Honor.

7     BY MR. PETSONK:

8     Q.   And did you, in fact, enroll in UMWA retiree welfare

9     medical benefits as of October 2014, going forward?

10    A.   I did.

11    Q.   And do you still have those benefits today?

12    A.   Yes, I do.

13    Q.   Do you have any idea about whether you're likely to

14    continue receiving those benefits into the future?  Those

15    UMWA retiree welfare benefits in the future?  Do you know

16    whether you're likely to continue receiving your UMWA

17    retiree medical going into the future, Mr. Fitzwater?

18    A.   We should.

19    Q.   What causes you to have that understanding?

20    A.   When President Truman and John L. Lewis met, there was

21    an agreement signed, and my understanding was the federal

22    government was in on that, also.  And my understanding is

23    that John L. Lewis spoke to the Senators in Washington,

24    D.C., and they got a document printed up and approved for

25    healthcare from cradle to grave for UMWA employees and their

1    widows.  And the company signed it.  And when a contract is

2    made, the International signs it -- after the rank-and-file

3    votes on it -- it's a contract put together.  You vote on

4    it, and the federal government signs it, the company that's

5    entered into this contract signs it, and the International

6    UMWA signs it.

7    **Q.**   Did CONSOL -- well, when you signed up for the UMWA, as

8    a CONSOL retiree, did you continue receiving your life

9    insurance coverage from them after that?

10   **A.**   I was told I could.  But I never did see no paperwork

11   on it.

12   **Q.**   Well, you're still alive, right, so you haven't filed a

13   claim?

14   **A.**   I haven't filed a claim.  So I was told -- and I did

15   call the main office at Fola, and I did ask Anne Atkins

16   about it.  And at the time, she was the lady I got to talk

17   to.  And she said it was her understanding that we still --

18   we still had it.

19            MR. PETSONK:  Your Honor, if I may approach the

20   witness to point to two exhibits that are up there?  And

21   that will conclude my questioning.

22        Could I have Plaintiff's 1 and 2, please?

23            THE COURT:  Before you leave that matter, let me

24   ask you, do you pay a premium for your life insurance to

25   CONSOL?

```
 1                 THE WITNESS:  No, I do not.
 2                 THE COURT:  But you understand that it exists for
 3     you, correct?
 4                 THE WITNESS:  Sir?
 5                 THE COURT:  Do you understand you have life
 6     insurance through CONSOL?
 7                 THE WITNESS:  That's what I've been told.
 8                 THE COURT:  And you've had that understanding, you
 9     say, since you left, we'll say, sometime in 2014?
10                 THE WITNESS:  Retired, yes.  Probably September of
11     2014, is when I retired.
12                 THE COURT:  But you don't pay a premium for it?
13                 THE WITNESS:  No, I don't have to pay for it.
14                 THE COURT:  Thank you.  Please go ahead.
15     BY MR. PETSONK:
16     Q.   Mr. Fitzwater, following up on the questioning from the
17     Court, when you retired initially under CONSOL's retiree
18     welfare program, which you testified was around -- you think
19     it was around February of 2014, when your grace period
20     coverage came to a close, did you have to begin paying a
21     premium at that time in order to receive retiree welfare
22     coverage from CONSOL, starting in around February of 2014?
23     A.   Let me make sure I understand what you are asking me.
24     You are asking me that when the one-year free insurance
25     lapsed and was discontinued, did I stay in CONSOL's
```

1    insurance plan by paying a premium?

2    **Q.**   Yes.

3    **A.**   Yes, I did.

4          THE COURT:  Just one moment.  When you say

5    CONSOL's insurance plan, to what specifically are you

6    referring?

7          THE WITNESS:  The medical.  We had medical

8    coverage, and you could -- you could keep that medical

9    coverage by paying a premium.  You could keep it up.

10          THE COURT:  And so when you say, "insurance plan"

11    in this instance, are you talking about medical coverage,

12    and are you talking about life as well?

13          THE WITNESS:  The life was included with your

14    dental, eye, and your medical part of it.  It was all --

15    they had you to sign a different form, but it was all

16    included at that time, and when you paid the premium.

17          THE COURT:  Thank you.  Please go ahead.

18          MR. PETSONK:  Thank you, Your Honor.

19    BY MR. PETSONK:

20    **Q.**   And then you continued to, both, receive medical

21    coverage and also receive life insurance coverage under

22    CONSOL's retiree programs going forward from the time you

23    activated your CONSOL retirement in February of 2014 through

24    October 1st of 2014, when you suspended your participation

25    in the medical portion of that retiree welfare program but

1    thereafter continued your participation in the life

2    insurance portion of that retiree program; is that right?

3    **A.**    That was my understanding.

4    **Q.**    And did you continue to pay a premium after October 1st

5    of 2014, in order to maintain your life insurance coverage?

6    If you remember?

7    **A.**    No, I did not.

8    **Q.**    Okay.  And now I'm going to orient you to what's up

9    there called Plaintiff's Exhibit 1.  Take a look at it.  And

10   does it look familiar to you?

11   **A.**    Yes, this documents looks familiar.

12   **Q.**    Do you see the second sentence, it says, "The purpose

13   of this letter is to inform you that the coverage under this

14   plan, which includes any health reimbursement account

15   arrangement and the program known as CONSOL retiree

16   healthcare reimbursement healthcare plan will terminate

17   December 31st, 2019"?

18   **A.**    Yes, I see that.

19   **Q.**    And do you see where it says, in the second paragraph,

20   "At the same time, we recognize our responsibility to be

21   sensitive to the needs of people affected by these changes,"

22   -- and goes on to explain further.  Do you see that?

23   **A.**    Is that at the end of the first paragraph at the top or

24   the second paragraph?

25   **Q.**    I'm referring to the second paragraph, but take the

1   time, Mr. Fitzwater, if you need to read that.

2   **A.**   Please read that again, what you was going to ask.

3   **Q.**   I was going to ask you -- well, drawing your attention

4   to the particular sentence that says, "At the same time, we

5   recognize our responsibility to be sensitive to the needs of

6   the people affected by these changes," -- and it goes on to

7   say, as a result -- and I'm summarizing now, but it says,

8   CONSOL determined a transition period of five years -- and I

9   am reading again -- "would allow retirees and their families

10  an appropriate amount of time to make separate arrangements

11  in a political environment trending towards nationalized

12  healthcare"?

13  **A.**   Yes.

14  **Q.**   Do you recall receiving this letter?

15  **A.**   Yes, I do.

16  **Q.**   And when do you recall that you received this letter

17  for I note there is no date on the top of the letter?

18  **A.**   It would have been after I retired.

19  **Q.**   After you retired from CONSOL?

20  **A.**   Yes, to the best of my knowledge.

21  **Q.**   Do you know whether this was also after you retired on

22  your UMWA retirement or not?  Do you know?  And I know it's

23  confusing because there is no date on the letter.

24  **A.**   I can't say about that.

25  **Q.**   That's fine.  And then proceeding to what's marked as

1    Plaintiffs' Exhibit 2.  Take a look at this.  And I note

2    similarly, the second sentence of this letter, the purpose

3    of this letter is to inform you that your coverage under

4    this plan -- which includes the same specified plans

5    referenced in the prior -- will terminate December 31st,

6    2015.  Do you remember receiving this letter?  Do you

7    remember?

8    **A.**    Yes.

9    **Q.**    And it says, "This change includes retiree medical,

10   prescription drug, vision, dental, and life insurance

11   coverage, but does not affect any pension benefits you may

12   be receiving from CONSOL."

13        Do you know whether your life insurance coverage from

14   CONSOL terminated with the issuance of this letter?

15   **A.**    I do not.

16   **Q.**    Do you continue to receive a pension benefit from

17   CONSOL today?

18   **A.**    Yes, I do.

19             MR. PETSONK:  Your Honor, I don't think -- yes, I

20   do have one other question.

21   BY MR. PETSONK:

22   **Q.**    Mr. Fitzwater, have you incurred any medical costs

23   today that are not covered by your UMWA retirement

24   insurance?

25   **A.**    I don't understand what you are asking me.

1    **Q.**   Do you have any out-of-pocket costs, medical costs

2    today that are not covered by your UMWA retirement

3    insurance?

4    **A.**   Well, we just have a co-pay.  We have a co-pay.  And

5    then you'll pay a little bit for your medicine.  And if you

6    go in the hospital -- it would depend on how the doctor

7    writes it up.  You can wind up paying $20 each time a doctor

8    comes see you, but there is a cap on that.  We don't pay

9    very much.  I might not pay over $200 a year.

10   **Q.**   Okay.

11          MR. PETSONK:  I don't have any further questions

12   at this time, Your Honor.

13          THE COURT:  Thank you, Mr. Fitzwater.  I think the

14   other counsel may have questions.

15          In order for you to formulate Plaintiff's 10 or a

16   substitute for it, would you be able to do that if we are in

17   recess until 2:30?

18          MR. PETSONK:  I most certainly will, Your Honor.

19   I venture to say I can do it in less time if that's

20   preferable to the Court.  I think I understand and have had

21   considerable time to reflect, Your Honor, and I heavily

22   annotated that exhibit and as well as the other exhibits

23   pertinent to that witness, and I can make those changes in

24   as little as a half an hour, Your Honor, but whatever you

25   prefer, Your Honor.

 1              THE COURT:  Well, let's come back at 2:30, and

 2     we'll resume at that time with Mr. Hymes, so that he can be

 3     excused as quickly as we can get him finished today.

 4              MR. PETSONK:  Thank you, Your Honor.

 5              THE COURT:  So, during the interim, Mr. Fitzwater,

 6     you're not to discuss this case with anyone until you get

 7     back here.  Treat yourself as though you are on the witness

 8     stand during the hour.  So we'll see you back at 2:30.  And

 9     when you leave, you can follow me out of the courtroom door

10     there.

11              THE WITNESS:  Thank you.

12              THE COURT:  Thank you.

13              MR. TORRES:  Your Honor, I don't think the last

14     two exhibits were moved into evidence.

15              THE COURT:  Are you talking about 12 and 13?

16              MR. PETSONK:  12 and 13 should be moved, Your

17     Honor.

18              THE COURT:  And is there an objection to either?

19              MR. TORRES:  No, Your Honor.  No objection.

20              THE COURT:  12 and 13 of the Plaintiff are

21     admitted.  Thank you.

22          **Plaintiff's Exhibits 12 and 13 admitted.**

23              THE COURT:  And we'll resume at 2:30.

24              THE CLERK:  All rise.

25          (A recess was taken at 1:04 p.m. until 2:36 p.m.)

1        (Afternoon Session, February 11, 2021 at 2:36 p.m.)

2            THE CLERK:  All rise.

3            THE COURT:  Good afternoon.  Please be seated.

4            MR. PETSONK:  Good afternoon, Your Honor.

5            THE COURT:  You may proceed.

6            MR. PETSONK:  Thank you.

7    **DEAN MICHAEL HYMES, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**

8                **DIRECT EXAMINATION RESUMED**

9    **BY MR. PETSONK:**

10   **Q.**  Mr. Hymes, you testified earlier in the proceedings

11   that you in your capacity as a Human Resources official for

12   CONSOL, you supervised numerous individuals in the Human

13   Resources Department; is that right?

14   **A.**  Yes.

15   **Q.**  And did you have hiring authority for your subordinates

16   in the Human Resources Department while you worked at

17   CONSOL?

18   **A.**  Yes.

19   **Q.**  And I'd like to ask you to set out when you first had

20   attained hiring authority as a Human Resources individual

21   within CONSOL?  Do you recall time-wise when it was you

22   first had hiring authority to hire subordinates within the

23   Human Resources Department?

24   **A.**  1978.

25   **Q.**  Do you remember your first hire?  You may not.

1      Let me ask you, where were you working at CONSOL at

2  that time in 1978?

3  **A.**   Pocahontas, Virginia.

4  **Q.**   And what was your job classification at that time?

5  **A.**   I was the Regional Manager of Southern Appalachian

6  Region.

7  **Q.**   I'd like to ask you with reference to particular

8  individuals you mentioned earlier, John Fox and Gene Bailey,

9  as two individuals who you supervised while you were a Human

10  Resources Manager at CONSOL.

11      Did you hire Mr. Fox and Mr. Bailey?

12  **A.**   No.  They were hired by my predecessor, Mr Hyler.

13  **Q.**   And who was that?

14  **A.**   Buck Hyler.

15  **Q.**   And what job did Buck Hyler take on when you replaced

16  him in your position as Human Resources Manager for the

17  Southern Appalachian Region?

18  **A.**   He moved to the Midwestern Division as

19  administrative -- something -- for a senior vice president.

20  I can't remember what the job was.

21  **Q.**   Do you know what job he held after that?

22  **A.**   He then moved to a corporate industrial relations job.

23  **Q.**   Did he serve as a plan administrator in that job for

24  CONSOL?

25  **A.**   I don't know if he did or not, but he was on the Health

1    and Retirement Fund Board at one time.

2    Q.    Okay.  And so Buck Hyler, your predecessor as a Human

3    Resources Manager for the Southern Appalachian Region, hired

4    Mr. Fox and Mr. Bailey.  You also testified about a couple

5    of other individuals, and I'm going to ask you by name.

6    First of all, you testified to your supervisory relationship

7    with an individual named Craig Campbell.  Do you recall

8    testifying about that?

9    A.    Yes.

10   Q.    And you testified that Mr. Campbell began his

11   employment with CONSOL as part of the Sierra acquisition of

12   the Eastern Kentucky operations that you testified about

13   earlier; is that right?

14   A.    Yes.  We retained him when we acquired the operation.

15   Q.    And you testified that you then transferred Mr.

16   Campbell to the Amonate operation in West Virginia; is that

17   correct?

18   A.    I think that's where he went.  He either came to

19   Bluefield and then to Amonate.  But we did transfer him to

20   get some union experience.

21   Q.    Do you remember how long you supervised Mr. Campbell at

22   the Amonate operations or Bluefield operations to get his

23   union experience?

24   A.    Probably -- he was probably there two years.

25   Q.    And did you transfer Mr. Campbell elsewhere after that

1    two-year period?

2    **A.**   When Jones Fork was being developed and we started the

3    hiring process, we transferred Mr. Campbell back to that

4    area, because he was from Hazard, in that area.  So it was a

5    perfect fit.

6    **Q.**   And what job duty did Mr. -- or job classification did

7    Mr. Campbell hold once he was transferred back to Eastern

8    Kentucky?

9    **A.**   Supervisor of Industrial Employee Relations.

10   **Q.**   And that was, again, subordinate to and supervised by

11   you?

12   **A.**   Correct, from an HR standpoint, yes.  He worked

13   directly with the mine manager.

14   **Q.**   I believe you testified the Sierra acquisition occurred

15   around 1989?

16   **A.**   Best of my knowledge, yes.

17   **Q.**   So if Mr. Campbell was transferred to Bluefield for

18   about a period of two years, then he, as you recall,

19   received a transfer back to Eastern Kentucky at your

20   direction around 1991; is that right?

21   **A.**   Somewhere in that range, yes.

22   **Q.**   Did Mr. Campbell continue to occupy that same Human

23   Resources job classification that you've referenced when he

24   returned to Eastern Kentucky throughout the remainder of the

25   time you were employed by CONSOL?

1    **A.**    Yes.

2    **Q.**    You also referenced that you either supervised or hired

3    a person named Luke Gianato -- and I think that's spelled

4    G-I-A-N-A-T-O -- is that right?

5    **A.**    Yes.

6    **Q.**    When did you hire Mr. Gianato?

7    **A.**    Sometime in the late '80s.  We hired him out of

8    college.

9    **Q.**    And for what position did you hire Mr. Gianato in the

10    late '80s?

11    **A.**    We initially put him out in the workforce to get

12    experience.  And then he eventually was promoted to be the

13    Industrial Employee Relations Manager at Amonate.

14    **Q.**    Where did he serve, if you recall, in the workforce;

15    was it also at Amonate?

16    **A.**    I think it was at Amonate, yes.

17    **Q.**    That's a union operation, right?

18    **A.**    Yes.

19    **Q.**    How long did Mr. Gianato serve as supervisor of

20    Industrial Employee Relations under your supervision at the

21    Amonate site, as you recall?

22    **A.**    I think he replaced Terry Mason when Terry Mason was

23    transferred, but I can't remember.

24    **Q.**    Okay.

25    **A.**    I don't remember the years.

1    **Q.**   That's fine.

2    **A.**   It's been a long time.

3    **Q.**   I understand.  Where did Mr. Gianato work next at

4    CONSOL?

5    **A.**   He was transferred to the corporate office in

6    Pittsburgh.

7    **Q.**   Who ordered that transfer or directed it, if you know?

8    **A.**   CONSOL had a process where they evaluated young talent

9    and moved them around.  It was called a high potential list.

10   Annually, we reviewed the high potential employees and

11   developed a track for them to be developed.  That included a

12   trip to the Pittsburgh Corporate Office.

13   **Q.**   Did you participate in that high performance evaluation

14   of Mr. Gianato?

15   **A.**   It was my job as the regional manager of HR to

16   coordinate it and develop it for all jobs, operations,

17   static -- all jobs.

18   **Q.**   Did you participate in the decision to transfer Mr.

19   Gianato to the corporate office that you referenced here?

20   **A.**   Well, what you would do is you would submit your list

21   of the top three people in a particular field to Pittsburgh.

22   Then we would have a phone conversation between the various

23   regional managers, and basically debate who was the best,

24   which would then end up on Roger Haynes's desk, the best top

25   three people to be promoted.  I had input, but Mr. Haynes

1    was the final decisionmaker.

2    **Q.**   And what job classification did Mr. Gianato hold once

3    he was transferred up to Pennsylvania?

4    **A.**   I think he went to work in the benefits area, but I do

5    not remember for sure.

6    **Q.**   Do you know anything about the job duties that Mr.

7    Gianato held after that point?

8    **A.**   He left there and went into the Eastern Region, I

9    think, as a supervisor of Industrial Employee Relations at

10    Enlow Fork.

11    **Q.**   Okay.  And while Mr. Gianato was working under your

12    direct supervision in the Southern Appalachian Region, did

13    you train Mr. Gianato in his job duties?

14    **A.**   I gave him direction.  As far as training him?  Yes.  I

15    gave him direction on what the company expectations were,

16    but it was an on-the-job training, you know, day after day.

17    **Q.**   Okay.  And let me ask you about two other individuals.

18    First you referenced Terry Mason.

19    **A.**   Yes.

20    **Q.**   Did you hire Terry Mason to work with CONSOL?

21    **A.**   I hired Terry Mason directly out of the mining

22    workforce of U.S. Steel.

23    **Q.**   When did you hire Terry Mason, to the best of your

24    recollection?

25    **A.**   In the early '80s, I think.

1    **Q.**   And what position did you hire Mr. Mason to perform at

2    CONSOL, at that time, in the early '80s?

3    **A.**   Brought Mr. Mason in as the Supervisor of Industrial

4    Employee Relations at Amonate.

5    **Q.**   How long did Mr. Mason hold that position at Amonate?

6    **A.**   I think he stayed there, maybe, two years, and then he

7    was transferred to Pittsburgh as part of that high potential

8    operation.

9    **Q.**   And how long did he remain in Pittsburgh, to your

10   knowledge?

11   **A.**   Probably a couple years, working the tower area, and he

12   ended up back out in the midwest.

13   **Q.**   And how long did he work in the midwest, to your

14   knowledge?

15   **A.**   I think he was still working the midwest when I left.

16   **Q.**   Okay.  Do you know what position he held out in that

17   region of CONSOL?

18   **A.**   No, I do not remember.

19   **Q.**   That's fine.  And you testified that one other

20   individual who you had hired and supervised.  I'd like to

21   ask you about Gerald Kowzan.  Did you hire Gerald Kowzan?

22   **A.**   I did not hire Gerald Kowzan, no.

23   **Q.**   Did you supervise Gerald Kowzan?

24   **A.**   No, he came after me.

25   **Q.**   I must have misunderstood.  You did reference Gerald

 1    Kowzan.  Do you know Mr. Kowzan?

 2    **A.**    I do know Mr. Gerald Kowzan, yes.

 3    **Q.**    How do you know him?

 4    **A.**    I know him from generally the HR function, and meetings

 5    that the regional HR folks would have in southwest Virginia,

 6    and he would attend.

 7    **Q.**    Did you know him during the time he was employed by

 8    CONSOL?

 9    **A.**    Yes.

10    **Q.**    Do you know what job duty or job classification he held

11    for CONSOL?

12    **A.**    Well, Mr. Kowzan came after CONSOL acquired the Alum

13    Creek properties.  And he was employed doing HR work in the

14    union side of the Alum Creek property, but that's the best I

15    can tell you.

16    **Q.**    Okay.  While you were employed at CONSOL, did Craig

17    Campbell, Luke Gianato and Terry Mason have the authority to

18    offer miners information about the meaning of the retirement

19    welfare benefit plan terms at the locations where they

20    served as Supervisors of Industrial Employment Relations

21    under your supervision?

22            MR. TORRES:  Objection.  Lack of foundation.  And

23    it calls for speculation, based upon the time period that

24    he's identified for these gentlemen, Your Honor.

25            THE COURT:  If you want to take the witness on

1    voir dire, for lack of foundation, you can do so.

2              MR. TORRES:  Yes, Your Honor.

3              THE COURT:  And please allow Mr. Torres to do

4    that.

5              MR. TORRES:  Your Honor, could I have the last

6    question read back just so I make sure I have it correctly.

7              THE COURT:  It can be read back.

8              (The court reporter read back the last question.)

9              MR. TORRES:  Thank you.

10                    **VOIR DIRE EXAMINATION**

11   **BY MR. TORRES:**

12   **Q.**   So for Mr. Campbell, when did he serve under your

13   direction; what time period as a supervisor, supervisor of

14   industrial relations?

15   **A.**   Let's see, it was immediately after we made the

16   acquisition of Utah International, and I think I said that

17   was in '89.

18   **Q.**   Right.

19   **A.**   So he would have been under my direct supervision at

20   Amonate to start with.

21   **Q.**   So when he was transferred back to Kentucky, he was --

22   was he under your direction then?

23   **A.**   Yes.

24   **Q.**   And that was only until 1993, correct?

25   **A.**   Until I left, yes.

1    Q.   And Mr. Gianato?

2              THE COURT:   Just one moment, when you say

3    transferred back to Kentucky, where, specifically?

4              THE WITNESS:   The Jones Fork operations.

5              THE COURT:   Thank you.

6    BY MR. TORRES:

7    Q.   And then he was no longer in your supervision in any

8    capacity after '93, because you left the company?

9    A.   Yes.

10   Q.   In fact, to be clear, you actually stopped working in

11   the Southern Appalachian Region in 1992, correct?

12   A.   Yes, you're right, I did.  I did stop working in the

13   Southern Appalachian Region in '92.  I worked at Fairmont

14   Supply, I'm thinking, until the first of the year of '93 --

15   it might have been August of '92.  I can't remember exactly.

16   Q.   I think in your deposition you said January of '93?

17   A.   Yes.

18   Q.   So your tenure at the Southern Appalachian ended in

19   1992, correct?

20   A.   My responsibilities for the Southern App Region ends in

21   1992, yes, sir.

22   Q.   So that's when you would have stopped supervising Mr.

23   Campbell, 1992 then, correct?

24   A.   Yes.  And we were just opening applications -- taking

25   applications for the Jones Fork operations.

1    Q.   Okay.  So whenever it began, '89 or so; by '92, you no
2    longer supervised Mr. Campbell?
3    A.   That's right.
4    Q.   And Mr. Gianato, when was the last year that you
5    supervised Mr. Gianato?  Let me withdraw the question.
6    A.   You know, I'm not sure.  And I don't want to tell you a
7    year and then you come back and say, no, that's not right.
8    Q.   Let's do it this way.  When Mr. Gianato worked at Enlow
9    Fork as a Supervisor of Industrial Relations, he didn't
10   report to you?
11   A.   No.
12   Q.   Okay.  And before he went to Enlow Fork, he was in the
13   corporate office, and he didn't report to you?
14   A.   No.
15   Q.   And before that, he was at Amonate, and that is when he
16   reported to you?
17   A.   Yes.
18   Q.   So sometime in the '80s?
19   A.   Yes.
20   Q.   Okay.  And then Mr. Mason -- the last person that Mr.
21   Petsonk asked you about -- when was the last time you
22   supervised Mr. Mason?
23   A.   When he was Supervisor of Industrial Employee Relations
24   at Amonate.
25   Q.   So that was in the '80s?

1    **A.**   Yes.

2    **Q.**   Do you remember exactly in the '80s when you stopped

3    supervising him?

4    **A.**   No, because it was -- obviously, it was a revolving

5    door as we trained people.  So it was a couple-of-year

6    assignment, and then they moved.

7    **Q.**   So if you hired him in the early '80s, you'd agree, by

8    1985, you no longer supervised Mr. Mason, correct?

9    **A.**   That may be true.  I really do not know the year.

10   **Q.**   Okay.  Fair to say he was hired in the early '80s, and

11   you supervised him directly for a couple years?

12   **A.**   Yes.

13   **Q.**   Okay.  And after that, he went to Pittsburgh and then

14   went to the midwest, and you never supervised that gentleman

15   after that initial couple years in the '80s?

16   **A.**   Not that I remember, no.

17          MR. TORRES:  Your Honor, we are sort of back to

18   where we started again.  We have nothing --

19          THE COURT:  Let me ask you, I take it you have no

20   questions about Luke Gianato?

21          MR. TORRES:  I did ask him, Your Honor.  That was

22   the second individual I asked him about.  Mr. Gianato was

23   the person at Enlow Fork, and he said he didn't supervise

24   Mr. Gianato when he was at Enlow Fork.

25          He said he supervised Mr. Gianato when he hired him in

1    the '80s, and he supervised Mr. Gianato when he worked at

2    Amonate.  And then Mr. Gianato went to the corporate

3    offices, and then he went to Enlow Fork.  And that's when

4    Mr. Gianato held the Manager of Industrial Relations

5    position, and the gentleman testified he didn't supervise

6    him during that period of time.

7                THE COURT:  Thank you.  And you may resume with

8    the witness.

9                    **DIRECT EXAMINATION RESUMED**

10   **BY MR. PETSONK:**

11   **Q.**   Mr. Hymes, the question that I had asked you was:

12   Based on the personal knowledge that you have about the time

13   that you supervised Messers. Craig Campbell, Terry Mason and

14   Luke Gianato, in their positions as Supervisors of

15   Industrial Employee Relations at CONSOL, did those three

16   individuals have the authority to offer miners information

17   about the meaning of their retirement welfare benefit plan

18   terms?

19   **A.**   They each, at the union locations, which was Amonate --

20   each had responsibility for delivering and communicating

21   about the salary retirement plan, the salary medical plan,

22   and all the salary benefits.  They also had responsibility

23   for communicating about the hourly benefits, which were UMWA

24   benefits.

25   **Q.**   Understood.  And you also testified that you developed

1    the union-free strategy and the appurtenant materials, the

2    handbook and orientation program, to implement that strategy

3    during the period in the middle '80s that you served as the

4    Regional Manager of Human Resources in the Southern

5    Appalachian Region; is that right?

6    **A.**   That's when it was developed.

7    **Q.**   And did you train individuals in the implementation of

8    that union-free strategy during that period, that is, did

9    you train CONSOL employees in how to implement orientation

10   strategy when you served as Regional Manager of Human

11   Resources for the Southern Appalachian Region?

12   **A.**   Mr. Gianato and Mr. Mason and Mr. Campbell were working

13   at union locations.  And because of the double-breasting, we

14   kept them separate.  Okay.  John Fox was the guy on the

15   ground at Buchanan.  And he is the person that we trained

16   and developed the script and the handbook and the union-free

17   on the ground stuff at Buchanan.

18        Mr. Gianato and Mr. Mason and Mr. Campbell, at the

19   time, they worked directly in Bluefield, in the Bluefield

20   area, at the union location, and were not trained in the

21   union-free strategy.  So they couldn't be asked about it.

22   Okay.  So there was specifically a reason to keep them

23   separate.

24   **Q.**   Now, you also testified that you then moved Mr.

25   Campbell to the Jones Fork site; is that right?

1    **A.**   Yes.

2    **Q.**   And did you train Mr. Campbell in the union-free

3    strategy at the time you moved him to the Jones Fork site in

4    Eastern Kentucky?  You can answer, Mr. Hymes.

5    **A.**   Oh, he spent time with John Fox.  He spent time with

6    the guy he had on the ground at Eastern Kentucky, Roger

7    Cutright, and then Bill Matthews, who were both there at

8    those union-free locations, training through them.

9    **Q.**   And had you trained Cutright and Matthews in the

10   union-free strategy?

11   **A.**   Matthews worked for me directly; came from Pittsburgh.

12   And I sent him to the Eastern Kentucky operations, which was

13   originally Utah International after Craig Campbell

14   transferred.  And then Matthews got transferred to

15   Pittsburgh, and I sent Roger Cutright there.  And Roger

16   Cutright got transferred.  And we ended up with -- with

17   Craig Campbell in Jones Fork.

18   **Q.**   During the time you worked at CONSOL and in the

19   position of Regional Human Resources Manager, did all the

20   Human Resources Managers at both the union and the

21   union-free operations have the authority to offer miners

22   information about the meaning of their retirement welfare

23   benefit plan terms?  Did they have that authority while you

24   worked there?

25           MR. TORRES:  Objection, Your Honor.  We are so far

1    afield from where Your Honor had directed Mr. Petsonk to

2    address the concerns you expressed earlier.  Mr. Petsonk was

3    told to elicit from this individual any testimony about any

4    orientations that he conducted himself at Buchanan, where he

5    could testify as to what was actually said.

6        And all Mr. Petsonk is doing is dancing around the

7    issue and asking him who he trained, when he trained them;

8    despite the fact that through voir dire, earlier on, we've

9    established that this gentleman didn't oversee any of these

10   other operations when the alleged promises in this lawsuit

11   were made.

12       So I just feel like we are spinning our wheels here and

13   not actually getting to the specific questions you directed

14   him to address, which is:  What did this gentleman say to

15   anyone, so that we can cross him and establish that whatever

16   he said at Buchanan, during the few orientations he may have

17   conducted, that that was not conveyed to any of the

18   plaintiffs in this lawsuit.

19           THE COURT:  Mr. Petsonk, limit your questioning,

20   accordingly.

21           MR. PETSONK:  Yes, Your Honor.

22       I have asked -- I think Mr. Torres in his voir dire

23   earlier asked -- and I can put it again onto the record.

24   BY MR. PETSONK:

25   Q.   Mr. Hymes, how many occasions do you recall personally

1    attending a training, a new miner orientation session at the

2    Buchanan operation?

3    **A.**    I think Mr. Torres read from my deposition.  I said

4    something like 25.  And I was in and out.  I was not there

5    all the time, but I was there.

6    **Q.**    And is it your testimony that you also trained the

7    individuals who delivered those orientations, that is, Mr.

8    John Fox, in how he should go about delivering that new

9    miner orientation session at Buchanan?

10   **A.**    Mr. Fox and I worked together on developing that

11   orientation for CONSOL.  It was the first one in the

12   company.  There were many, many meetings and many, many

13   phone calls with Pittsburgh and lots of input to develop the

14   script and the program.  For me to say I trained him

15   totally, I did not.  But he was -- he received his

16   instructions from me about where we wanted to go.

17   **Q.**    And did you utilize any training document in that

18   process of the supervising -- or did you utilize any

19   supervision documents in the process of supervising Mr. Fox,

20   as the Supervisor of Industrial and Employee Relations at

21   Buchanan Mine?  Is there any sort of supervisors' training

22   that you conducted in your capacity?

23           THE COURT:  Which question are you asking?

24           MR. PETSONK:  I'm asking him whether he provided

25   any supervisors' training while he was the Regional Manager

1    at Human Resources.

2              THE WITNESS:  For Mr. Fox?

3    BY THE PETSONK:

4    Q.   At all, for supervisors in the matter of union

5    avoidance or union-free strategies?

6              MR. TORRES:  I apologize, Your Honor.  I have to

7    object again.

8              THE COURT:  Your objection is sustained.

9              MR. TORRES:  Thank you.

10             MR. PETSONK:  Your Honor, am I permitted to ask

11   Mr. Hymes whether he's trained supervisors in the union-free

12   strategy while he was Regional Human Resources Manager?

13             THE COURT:  Please ask Mr. Hymes what he did.

14   BY MR. PETSONK:

15   Q.   Mr. Hymes, did you train supervisors in the union-free

16   strategy?

17             THE COURT:  Mr. Petsonk, we've been over this time

18   and time again.  Ask him what he did in those orientation

19   sessions, so that he tells us what message was delivered;

20   what he knows.

21        He doesn't know what Mr. Fox did if he weren't there.

22   He doesn't know what Mr. Campbell did if he weren't there.

23   He doesn't know what Mr. Mason did if he weren't there.

24             MR. PETSONK:  Your Honor, I understand.  I am

25   separately trying to inquire of Mr. Hymes --

```
 1              THE COURT:  I told you what area you were limited

 2     to.  And you were to come back here today with the revised

 3     exhibit.  And if you've got one, let's get on with it.

 4              MR. PETSONK:  I absolutely have the revised

 5     exhibit that you invited me to offer.  And if I may offer

 6     it, I can do so at this time.

 7              THE COURT:  If you are at the point of inquiring

 8     of the witness about its use, then you are at liberty to do

 9     that.  But he's only going to be able to testify to what he

10     knows.

11              MR. PETSONK:  Absolutely.  I will only seek to

12     elicit that testimony.  And I will offer --

13              THE COURT:  Did you provide a copy to counsel?

14              MR. PETSONK:  I can provide that.

15              MR. POMPONIO:  Your Honor, may I make an inquiry?

16     We did our best over the break to try to deliver testimony

17     pursuant to your request.  I'm sort of confused.

18        I think that I've gotten confused between the admission

19     of Plaintiff's Exhibit Number 10 and the subtotal of the

20     testimony of Mr. Hymes.

21        We have offered Mr. Hymes as a witness, not only to

22     introduce Plaintiff's Exhibit 10.  We have a number of

23     issues that we were hoping to elicit from him that all

24     relate to us able to prove up our case.  And Mr. Hymes has

25     personal knowledge relevant to the CONSOL operations and how
```

1     the company intended to communicate information about

2     benefits to the miners during the time in which he was

3     employed there, and he was supervising that activity.

4          And so we had hoped that we could get Mr. Hymes in --

5     and yesterday, I believe it was, Your Honor, was asking us

6     to establish a ladder of individuals.  And that was how we

7     were able to get in this information about the particular HR

8     managers that communicated with the plaintiffs.

9          And so we've tried to do that.  And what I'm

10    understanding now is that the Court is not permitting Mr.

11    Hymes to talk about anything except for his communications

12    at orientation meetings.

13         Is that the Court's ruling?

14              THE COURT:  He's able to testify to what he knows

15    and not what he thinks someone else did.

16              MR. POMPONIO:  Sure.

17              THE COURT:  In establishing a ladder, the purpose

18    of that, obviously, is to relate the lower level agent to

19    the fiduciary in order to show, if you can, that there was a

20    chain that links what was said at ground level to what the

21    fiduciary wanted.

22         This witness, though, cannot testify to any more than

23    that to which he knows.  And we've been through it over and

24    over again.  And I don't find any mystery to it.  It just

25    seems to me that we should proceed on that basis or abandon

1    the Exhibit 10, and decide what you wish.

2          MR. POMPONIO:  We are not offering Mr. Hymes to

3    testify about anything except for what his personal

4    knowledge is, but we don't want to be restricted to only

5    testimony from Mr. Hymes about what he personally said in

6    orientations.  We are not asking him to testify what anybody

7    else said, but we are just asking about his general

8    understanding of the program while he was there.

9          THE COURT:  The testimony has to go to what the

10   employees were told, and to the extent he knows that, he can

11   tell it.  To the extent he doesn't know that, you should

12   abandon that area.

13         MR. PETSONK:  May I present this abridged Exhibit

14   10, Plaintiff's Exhibit 10 for examination?

15         MR. TORRES:  All three of these pages are 10 now?

16         MR. PETSONK:  I've inquired as to how to label

17   them.

18         THE COURT:  The three pages that have been

19   presented, I believe, could be marked as Plaintiff's 10-A.

20   And let me ask whether or not those have been exhibited to

21   Mr. Torres and whether there is any objection?

22         MR. PETSONK:  They have been presented to Mr.

23   Torres.

24         MR. TORRES:  Yes, Your Honor.  I have two

25   objections.  One of which I'd like to establish through voir

 1    dire, but I think the first one is fairly straight forward.

 2             THE COURT:   Just one moment.   Let me see the

 3    document again.

 4        Thank you.   Go ahead.

 5             MR. TORRES:   Thank you, Your Honor.   The first

 6    page Mr. Petsonk tendered, MSJ 344, Mr. Hymes has already

 7    testified and -- I think we can confirm this on voir dire --

 8    that this page differed from the material that was

 9    communicated to employees at Buchanan.   He said that so that

10    -- that's obviously -- we are back exactly where we were

11    earlier today.

12        And then secondly, Your Honor, as to the next two

13    pages, I would like to just confirm with Mr. Hymes through

14    voir dire that, in fact, he used this language in his

15    personally communicating with employees.   And then

16    relatedly, Your Honor, establish -- which I believe I can --

17    that he has no idea whether any of this information, since

18    he didn't do it, was ever communicated to any of the

19    plaintiffs in this lawsuit.

20        So I can do that through voir dire, Your Honor, if you

21    prefer.

22             THE COURT:   I think you should cross-examine with

23    respect to it.   It seems to me that this is in keeping with

24    what the Court anticipated.   And the plaintiff may pursue

25    examination of the witness on this matter.

1          Does the witness have a copy of 10-A before him?

2               MR. PETSONK:  No, not yet, Your Honor.

3               THE COURT:  This is the original, at least the one

4     you were using.

5               MR. PETSONK:  May I approach the witness now, Your

6     Honor?

7               THE COURT:  You may.

8     BY MR. PETSONK:

9     Q.   Now, Mr. Hymes, I've handed you what's been marked as

10    Plaintiff's Exhibit 10-A.  And in looking at this, does this

11    appear to be several pages abridged from the lengthier

12    orientation script you were examining earlier that was

13    apparently related to the Enlow Fork Mine?

14    A.   Yes.  This is page 344 of the Enlow Fork Mine.

15    Q.   And to be clear, Plaintiff's Exhibit 10-A includes page

16    stamped 344, a page stamped 429, a page stamped 430, and a

17    page stamped 431; is that right?

18    A.   I only have 430.  Wait -- 431 is on the back.  Sorry.

19    Q.   Do you see that?

20    A.   Yes.

21    Q.   Okay.  Now, Mr. Hymes, you were in at least 25

22    orientation sessions at the Buchanan Mine, for new miners

23    and the union-free orientation program; is that right?

24    A.   Yes.  It wasn't at the mine; it was at the regional

25    office.

HYMES - DIRECT

1    Q.   And --

2              MR. TORRES:  I'm sorry, I didn't hear the witness,

3    Your Honor.

4              THE WITNESS:  It was at the regional office in

5    Bluefield.

6    BY MR. PETSONK:

7    Q.   The new orientations, new miner orientation sessions

8    occurred not at the Buchanan Mine site itself, but occurred

9    at the regional office in Bluefield, right?

10   A.   Correct.

11   Q.   Bluefield, Virginia?

12   A.   Bluefield, Virginia.

13   Q.   And before we go on, when you talk about the new miner

14   orientation sessions, are those the sessions that you've

15   referenced being delivered by John Fox during the time that

16   you worked at Buchanan?

17   A.   Yes.

18   Q.   And apart from your personal observations while you

19   were present on those 25 or more orientation sessions, did

20   you ever review the contents of those orientation sessions

21   with Mr. Fox at other times in your capacity as his

22   supervisor?

23   A.   When this -- when this orientation was written, we

24   spent hours working on the wording.  And one of the issues

25   that people were really worried about was the language in

1    the handbook, which this refers to, about it's not a

2    contract.

3    **Q.**   Well, let me --

4         MR. TORRES:  I'm going to move to strike the

5    testimony as beyond the permissible scope of examination,

6    which is what was stated in the presentation.

7         THE COURT:  Sustained.

8    BY MR. PETSONK:

9    **Q.**   At the top of this Plaintiff's Exhibit 10-A, you see it

10   says, "Part of this is lawyer talk.  And that is important,

11   but let's look at a couple of key points.  First, as it

12   says" -- blank -- "company believes whole-heartedly in the

13   things we have included in the handbook.  But the company

14   does reserve the right to change them."

15        Do you see that?

16   **A.**   Yes.

17   **Q.**   Okay.  Do you recall if you observed that statement

18   being made to Buchanan miners in the new miner orientations

19   presented by your subordinate, John Fox, during the years

20   that you served as Regional Manager of Human Resources for

21   CONSOL's Central Appalachian Region?

22   **A.**   I know that John said this.  I was in meetings when

23   John said this, because it's a critical piece of the

24   orientation that we had difficulty with.

25        MR. TORRES:  I'm sorry, Your Honor.  I'm going to

1    move to strike the last part of the answer as nonresponsive

2    and beyond the scope permissible in court.

3            THE COURT:   The objection is overruled.

4            MR. PETSONK:   Thank you, Your Honor.

5    BY MR. PETSONK:

6    **Q.**   Please turn to page 429, Mr. Hymes, the next page of

7    the exhibit.  The title of this page is, "Advantage of

8    Working Union-Free."  And then the script reads, "We have

9    talked quite a bit about unions.  We have talked about your

10   right to join and your right not to join.  We have talked

11   about the union as an organization," -- and so on.

12           Do you see where I'm reading at the top of the page?

13   **A.**   Yes.

14   **Q.**   And then it says, Slide 67.  Do you see where it says

15   that on the left?

16   **A.**   Yes.

17   **Q.**   And then there is a script that appears to accompany

18   the presentation of the slide; is that right?  The script

19   setting off to the right on the page there?

20   **A.**   I don't have any script setting off to the right.  It

21   just says, Slide 67.

22   **Q.**   Do you see the language that's next to the line it

23   says, Slide 67, "But the most important point"?

24   **A.**   Yes, that's the script line, yes.

25   **Q.**   That's what I'm referring to.  So it says, "But the

1    most important point is that you, as an employee, have the

2    freedom of choice.  You will be the one who makes the

3    decision.  So now I want to talk to you in terms of how

4    important that decision will be.  On a dollar basis, how big

5    is this decision?"

6        And it goes on to list various items that are presented

7    in bullet point fashion on the next two pages.

8        Do you see that?

9    **A.**    Yes.

10   **Q.**    Does this appear to be the same script that you

11   personally observed presented in those 25 or more new miner

12   orientation sessions that you personally observed during the

13   time that you supervised John Fox as the Regional Human

14   Resources Manager for CONSOL Southern Appalachian Region?

15   **A.**    This is what I would refer to as the boilerplate

16   language for this section.  It basically talks about, it's

17   your decision, employee, and it's a financial decision.

18   Then we launched into why it's a financial decision.

19   **Q.**    And the last bullet point set forth on page 431, do you

20   see that at the top of the page, it says, "Wages and

21   Benefits," and then there is a paragraph of text in the

22   script?

23   **A.**    431?

24   **Q.**    Right.

25   **A.**    Yes.

1    **Q.**   And there it says, "I have tried to give you a good

2    overview and description of your wages and benefits,

3    recognizing that we do have time constraints.  And I have

4    also tried to show you, fairly and accurately, how these

5    wages and benefits compare to the best wages and benefits

6    the UMWA has negotiated for any of its members anywhere."

7        Do you recall that as the boilerplate language that

8    you've referenced -- at least, a part of the boilerplate

9    language?

10   **A.**   That's the language we wrote to make sure that the

11   employees knew that they would get equal to or better than

12   what the Mine Workers had.

13   **Q.**   And as you are going down the page --

14        MR. TORRES:  Objection, Your Honor.  He's not

15   testifying as to what was said; he's testifying as to some

16   thought process.  That's not what the purpose of the inquiry

17   was.

18        THE COURT:  Let me ask you to restate the question

19   and have the witness respond.

20   BY MR. PETSONK:

21   **Q.**   Is this the same language that you observed Mr. Fox

22   delivering, the new miner orientation sessions you've

23   testified about here today, Mr. Hymes?

24   **A.**   It's the same language I remember writing into the

25   Buchanan orientation.

```
 1              MR. TORRES:  Objection.  Move to strike.  He said
 2    this is what he wrote.  It's not -- he didn't say this is
 3    what Mr. Fox stated in the presentations he observed.
 4              THE COURT:  And clear it up with the witness.
 5    BY MR. PETSONK:
 6    Q.   Is this the language you observed Mr. Fox convey in the
 7    orientation sessions you observed?
 8    A.   This is the language Mr. Fox used in the orientation.
 9    Q.   And you observed him doing that, right?
10    A.   I observed him doing orientations, at various times.
11    Q.   And is that also the language that your superiors, who
12    you referenced earlier in your testimony, directed you to
13    include in the script that you drafted for the Buchanan
14    operation?
15              MR. TORRES:  Objection, Your Honor.  What he was
16    directed to do has nothing to do with what he heard Mr. Fox
17    say.
18              THE COURT:  The objection is overruled.
19              MR. PETSONK:  Thank you, Your Honor.
20              THE COURT:  Go ahead.
21              THE WITNESS:  The script went completely to
22    Pittsburgh.  My superior read it, edited it, and sent it
23    back and said, this is the message.
24    BY MR. PETSONK:
25    Q.   And is that what you just described also applying to
```

1    the next paragraph in the same script, that says -- that

2    says, "I want you to give me an estimate as to how much

3    better off you will be if you work under the wages and

4    benefits I have presented you today than if you work under

5    the wage and benefits of the" -- blank -- "NBCWA" -- that

6    is, the National Bituminous Coal Wage Agreement.

7         "I want you to estimate how many dollars this would

8    mean to you over 20 years.  I know some of you plan on

9    working less than 20 years.  And some of you plan on working

10   more than 20 years.  But let's just use 20 years."

11        And conduct an estimate about how much money you will

12   have at the end of 20 years working under the CONSOL

13   union-free program.

14        And is that language that you also observed Mr. Fox

15   deliver in those 25 or more orientation sessions?

16   **A.**   That was the start of the language, where he started

17   doing the buildup of how much money the union cost you, and

18   explain what the decision was.

19   **Q.**   All right.

20        MR. PETSONK:  Your Honor, I'd like to move for

21   admission of Plaintiff's Exhibit 10-A.

22        THE COURT:  Is there any objection?

23        MR. TORRES:  Just so I'm clear, Your Honor, the

24   only language that he had Mr. Hymes testify to on 344 was

25   the top paragraph.  So I assume that's the only page of it

1    that is being offered.  So we don't have some later on

2    argument being made on other portions that he didn't

3    identify.

4              THE COURT:  The exhibit includes four pages, the

5    last three numbers of each:  344, 429, 430, 431.  That's the

6    entirety of 10-A.

7              MR. PETSONK:  Thank you, Your Honor.

8              THE COURT:  Mr. Torres, would you like to make

9    inquiry?

10             MR. TORRES:  I'd like to make inquiry, Your Honor.

11             THE COURT:  Have you finished with the witness?

12             MR. PETSONK:  No, Your Honor.  I finished with my

13    line of questioning at this time regarding this exhibit, and

14    as I noted --

15             THE COURT:  Let me go back to Mr. Torres.

16         Do you need to cross-examine before the Court rules on

17    the motion?

18             MR. TORRES:  I'd just like to voir dire, Your

19    Honor.

20             THE COURT:  What is there to voir dire?

21             MR. TORRES:  I wanted to establish that this

22    portion down here that the witness previously testified

23    wasn't in the presentation that was used at Buchanan, so we

24    can actually determine what, in fact, on this document he

25    claims was communicated, given what he admitted to earlier.

1    I can deal with that on cross if Your Honor would prefer.

2              THE COURT:  I think you can do it on cross.

3              MR. TORRES:  Okay.  Then, with that --

4              THE COURT:  Thank you.

5              You had moved 10-A, and it is admitted.

6              MR. PETSONK:  Thank you, Your Honor.

7              **Plaintiff's Exhibit 10-A admitted.**

8              MR. PETSONK:  I have an additional exhibit of

9    exactly the same length and variety.

10        Now, may I approach the witness, Your Honor?

11             THE COURT:  Mr. Torres?

12             MR. TORRES:  I'll let him start.

13             THE COURT:  Go ahead.

14             MR. TORRES:  I'll wait a minute, Your Honor.

15             THE COURT:  And what is this to be marked as?  I

16   seem to have two stapled items.  And do they have numbers?

17             MR. PETSONK:  The pages that are stamped at the

18   bottom 486 and 487.  And the pages that are then thereafter

19   stamped 556, 557, and 558.  Those five pages comprise

20   Plaintiff's Exhibit 14.

21             THE COURT:  You want to mark this?

22   BY MR. PETSONK:

23   **Q.**  Mr. Hymes, have you had a chance to look at this?

24   **A.**  Yes.

25   **Q.**  And do you see at the top of the first page of this

 1    exhibit, page 486, "Part of this lawyer talk.  And that is
 2    important.  But let's look at a couple of key points.
 3    First, as it says, CONSOL" -- and then there is a blank --
 4    "believes whole-heartedly in the things we have included in
 5    the handbook.  But the company does reserve the right to
 6    change them.  As an example, since the handbook was first
 7    printed in 1984, there have been several changes, such as,"
 8    and there are five changes thereafter.
 9        And I'll read those -- or I may just invite, Mr. Hymes,
10    would you take note of those five changes?
11    **A.**    Yes.
12    **Q.**    They relate to pay increases, increased salary
13    continuance, increased life insurance, expanded medical
14    insurance eligibility, and implementation of the new
15    investment plan that you had previously referenced earlier
16    in your testimony.
17        Is that what these five changes represent?
18    **A.**    Yes.
19    **Q.**    And then after listing those five changes, the script
20    says, "So the point is that there will be times when we
21    change the things shown in the handbook.  And this language
22    tells you that."
23        And it goes on to reference more lawyer talk, and
24    states -- do you see at the bottom where it states, "This
25    handbook doesn't create an employment contract"?

1    **A.**   Yes.

2    **Q.**   Is that language that you also observed Mr. Fox deliver

3    in those 25 new miner orientation sessions at the union-free

4    orientations program that you observed in and designed at

5    the Buchanan operations?

6            MR. TORRES:  Objection, Your Honor.  Foundation.

7    He hasn't established where this came from so I know where

8    it comes from.  Second, the language he read to Mr. Hymes is

9    essentially verbatim from the document he's already entered

10   into evidence.  And the purpose of this exhibit was to

11   apparently show what -- you find this amusing -- goes to

12   show what was said at Buchanan.  So the fact that there is

13   two documents that say the same thing, how does that relate

14   to what allegedly was said at Buchanan, Your Honor, which

15   apparently he's already established through this document,

16   unless he's actually trying to argue that the significance

17   of these documents, they came from Enlow and Bailey, as

18   opposed to what the Court placed on the examination, which

19   was to say to him:  "What did you hear?  What did you say at

20   Buchanan?"

21       But if he answers that to this exhibit, he's basically

22   just saying the same thing he said a moment ago with respect

23   to this exhibit, because they are basically the same.

24           THE COURT:  Do both 10-A and 14 come out of the

25   Enlow piece, or is this different?

 1              MR. PETSONK:  Your Honor, and I think we may

 2    stipulate to this, this Plaintiff's Exhibit 14 comes from

 3    the Bailey operation that was adjacent to Enlow in the

 4    Pennsylvania area.

 5              THE COURT:  So there is another booklet, aside

 6    from Enlow, and it's Bailey, and that's what this is coming

 7    from?

 8              MR. PETSONK:  And rather than present that whole

 9    booklet, as well, I summarily abridged the same two limited

10    relevant sections as Your Honor directed me.

11              THE COURT:  Well, what's the point of doing it

12    twice?

13              MR. PETSONK:  Well, Your Honor, this Plaintiff's

14    14 does include an example which I think is significant,

15    because it characterizes the nature of the change as to

16    which the presentation reserves the right for CONSOL to make

17    under the plan, and it lists five increases in the value of

18    the benefit plan.  And so I wanted to see -- inquire whether

19    Mr. Hymes personally observed Mr. Fox make that type of

20    characterization at the Buchanan Mine.

21              MR. TORRES:  Your Honor, this relates to benefits

22    at the Bailey Mine, which this gentleman has admitted he had

23    no involvement in and has admitted he never heard a

24    presentation at.  And he hasn't said anything about these

25    benefits applying at Buchanan.  And, once again, through

1    voir dire, Your Honor, this is a document from 1988 or '89.

2         So he is just asking you to assume that what was stated

3    at Bailey is the same thing that was happening at Buchanan

4    six, seven years later.

5         This is really beginning to border on obstruction, Your

6    Honor.  He knows, in fact, this document doesn't relate to

7    Buchanan.  He knows it relates to Bailey.  Your Honor's

8    already told him the only reason he could offer this

9    document was to the extent he could say, I heard this being

10   communicated at Buchanan.

11        Now he's trying to use this document to bootstrap

12   additional evidence, without any demonstration that it was

13   used in Buchanan, or this person ever heard of it.

14        I think this is really an improper way of trying to ask

15   Your Honor to infer that what happened in these locations

16   has any relevance to what this gentleman did six, seven

17   years earlier, when he admitted he never heard anyone's

18   presentation at Bailey or Enlow.  I think that's a really

19   improper way of proceeding.

20             THE COURT:  And so how do you perceive that, Mr.

21   Petsonk?

22             MR. PETSONK:  Well, Your Honor, I may make one or

23   two relevant inquiries of Mr. Hymes, because it's my belief

24   that the benefits plan as to which this very presentation

25   refers is the same exact benefit plan that was summarized in

1    the union-free presentation at the Buchanan Mine, and so

2    it's a reasonable line of questioning as to -- to ask Mr.

3    Hymes if he heard Mr. Fox make the same representations

4    about the same plan, that applied at both of these sites,

5    and as Mr. Hymes has testified, he believes there is a

6    common origin to these documents that he's testified to at

7    some point.

8              THE COURT:  As I understand it, they are

9    different, only in the sense that one is in Enlow, the other

10   is in Bailey.  They go to the same point, such that one has

11   a greater refinement to it than another.

12             MR. PETSONK:  Yes, Your Honor.

13             THE COURT:  Then why didn't you offer Bailey

14   instead of Enlow?

15             MR. PETSONK:  Well, I'm simply seeking to offer

16   the additional exhibit to corroborate and to assist in my

17   effort to corroborate that this representation was made at

18   the -- by the apparent agents about this plan at the

19   direction of CONSOL, of CONSOL's Human Resources management.

20             MR. TORRES:  Your Honor, that is exactly what you

21   told him he couldn't get into.  He was supposed -- I'm

22   sorry, Your Honor.

23             THE COURT:  It seems to me that 10-A covers the

24   points.  I don't want to keep you from using something that

25   may be pertinent.  If there is something in 14 that should

 1    be in addition to this, then you can point it out.

 2            MR. PETSONK:  I will, Your Honor, because one of

 3    the principal representations that we are tendering to the

 4    Court is that the apparent agents of the fiduciary during

 5    this plan misrepresented the scope and the meaning of the

 6    reservation of rights that was set forth in these plan

 7    documents.

 8        So our misrepresentation claim really relates to how

 9    did these presenters characterize the scope of that

10    reservation of rights.  And this document provides specific

11    additional detail about the nature of the representations,

12    about the scope of the reservation of rights.  It says, "We

13    reserve a right to change."

14        It does not say, "We reserve the right to terminate."

15        And, in fact, this document, there's five very

16    favorable changes.

17        So I thought it may be helpful to the Court to inquire

18    as to whether Mr. Hymes heard that type of characterization

19    about the reservation being for the purpose of change or for

20    the purpose of positive change.  And it's the nature of our

21    misrepresentation claim, Your Honor.

22        That's why I thought it may be relevant and not totally

23    duplicative, in fact.

24            MR. TORRES:  Your Honor, it's not -- it's only

25    relevant if there is evidence that either of these scripts

1    were read to any of the plaintiffs in this case.  And there

2    isn't.  He's testifying as to what he heard at Buchanan in

3    the '80s.  So I still, Your Honor, don't understand what the

4    alleged connection is.  If he had a document that Mr. Kowzan

5    admittedly used in a presentation to whomever, to Mr.

6    Bright, and Mr. Kowzan said, "Yes, I used this script, and I

7    said to Mr. Bright whatever I said."

8         But there is no such evidence, because this gentleman

9    admits he has -- he has never talked to any of the

10   plaintiffs.  And this is a document that he is -- that is

11   from a different time period.  And there is no evidence that

12   any of the plaintiffs were ever presented with this

13   language.  And there is no evidence that any of the

14   plaintiffs were presented and whatever was said to people at

15   Buchanan in the '80s.

16        So even if counsel's argument was right, there is no

17   connection to what this gentleman heard in the '80s to what

18   our plaintiffs were told when they were at other locations

19   at other periods of time.

20        So, again, Your Honor specifically said you should have

21   this gentleman testify as to what he said.  But now they are

22   trying to get in documents from other locations so they can

23   suggest, Your Honor, there is some pattern of statements

24   being made, but they still can't connect them to the

25   plaintiffs here and what they heard, because none of them

1    testified to anything remotely related to this.

2            THE COURT:  Anything further, Mr. Petsonk?

3            MR. PETSONK:  Well, Your Honor, I gather that

4    objection goes to the degree of weight that Your Honor may

5    place on this exhibit, just as it went to that same matter

6    on the prior exhibit, and I simply -- I don't have further

7    questions about it.  I think I've, by and large, presented

8    it through Mr. Hymes, and it may be admitted and considered

9    just in the same fashion Your Honor has seen fit to consider

10   the prior exhibit.  I would seek for admission on that

11   basis.

12           THE COURT:  I am going to ask you to ask Mr. Hymes

13   whether or not he routinely stated on any occasion at

14   Buchanan any of that which is set forth in 14.

15   BY MR. PETSONK:

16   **Q.**  Mr. Hymes, did you routinely -- did you observe that,

17   that characterization of the reservation of rights that is

18   set forth --

19           THE COURT:  Please, just don't lead the witness.

20   BY MR. PETSONK:

21   **Q.**  Mr. Hymes, did you hear the Human Resources officer at

22   Buchanan Mine make this type of representation?

23           MR. TORRES:  Objection; leading.

24           THE COURT:  Make what type of misrepresentation?

25           MR. PETSONK:  The type of representation that is

1     set forth in the portion I just read to you on page 486,

2     about the company's reservation of the right to change the

3     benefits in the ways listed here.

4             THE COURT:  I think what you need to do is to

5     start to ask him what he told the employees.  And then you

6     can go to the next step as to what he heard others tell

7     those same employees.

8             MR. PETSONK:  Certainly, Your Honor.

9     BY MR. PETSONK:

10    Q.  Mr. Hymes, during the time that you worked as a Human

11    Resources officer for CONSOL, did you speak with CONSOL

12    employees about the nonunion welfare benefits package,

13    including the retirement welfare benefits?

14    A.  Yeah.

15    Q.  And in those conversations, did you convey the

16    information that you were directed to convey by your

17    superiors regarding the union-free benefits strategy?

18            MR. TORRES:  Objection, Your Honor.

19            THE COURT:  The witness can answer that question,

20    but the question is:  What did you tell them.

21    BY MR. PETSONK:

22    Q.  What did you tell them about the benefits they would

23    receive under the union-free program?

24    A.  We would tell them their benefits --

25            MR. TORRES:  Objection.

1           THE COURT:  Just a moment.

2           MR. TORRES:  He's testifying, "We told them."  And

3      he can't testify as to "we."

4           THE COURT:  Sustained.  Start over.

5           THE WITNESS:  I said, I would tell them that they

6      could expect their benefit and wages to be equal or better

7      than the Mine Workers.  That was the directive that I

8      received and the directive I gave to my direct reports.

9           MR. TORRES:  Objection as to the latter part of

10     the answer, Your Honor.

11          THE COURT:  The objection is overruled.

12     BY MR. PETSONK:

13     Q.   What did you expect that the miners would believe about

14     their future retirement benefits, based on what you told

15     them?

16          MR. TORRES:  Objection; calls for speculation.

17          THE COURT:  Sustained.

18          MR. PETSONK:  May I ask, Your Honor --

19     BY MR. PETSONK:

20     Q.   I'd like to ask you, Mr. Hymes, at the time that you

21     spoke with miners at the union-free operations about their

22     future retiree welfare benefits that you described and

23     testified --

24          THE COURT:  Are you speaking of Buchanan?

25          MR. PETSONK:  Yes.

```
 1              THE COURT:  Well, include that in your question.
 2    BY MR. PETSONK:
 3    Q.   Mr. Hymes, when you spoke to miners at the Buchanan
 4    operation about the non -- the union-free retiree welfare
 5    benefits, as you've testified that you did just now here,
 6    what, at that time, did you expect the miners to believe
 7    about their retirement benefits based on what you told them?
 8              MR. TORRES:  Objection, Your Honor.
 9              THE COURT:  Sustained.
10    BY MR. PETSONK:
11    Q.   Mr. Hymes, did you speak to coal miners who had
12    participated in the union-free orientation program at
13    Buchanan?
14    A.   Yes.
15    Q.   Did they tell you what they understood their -- about
16    their future retirement welfare benefits?  Based on -- when
17    you spoke with them?
18              MR. TORRES:  Objection, Your Honor.
19              THE COURT:  Sustained.
20    BY MR. PETSONK:
21    Q.   Mr. Hymes, what did you intend the miners to understand
22    about their retirement welfare benefits by comparing those
23    benefits to UMWA retiree welfare benefits?
24              MR. TORRES:  Objection, Your Honor.
25              THE COURT:  Sustained.
```

1    BY MR. PETSONK:

2    **Q.**    Bear with me a second.

3            MR. PETSONK:  Bear with me, Your Honor, for one

4    second.

5            MR. POMPONIO:  Your Honor, could I inquire of what

6    the basis of the objection is that was the objection to the

7    last question?

8            THE COURT:  Seems obvious to me.  The witness is

9    to be called upon to tell us what he said and what he heard

10   others say.  It's perfectly simple.  He's not to speculate

11   about what he thinks somebody else believed.  Just confine

12   it to what he said.

13      Why are you so reluctant to do it?  What is the

14   hesitancy, because you certainly have failed time and time

15   again.

16           MR. PETSONK:  Your Honor, I thought I had elicited

17   the extent of what Mr. Hymes had said, and I was trying to

18   get at a subsequent line of questioning at this point, Your

19   Honor.

20           THE COURT:  It seems to me that he didn't answer

21   as you wanted, and so you went back again and again and

22   again to attempt to elicit what is a perfectly simple

23   question and answer.  He understands what it is that he told

24   them.  That's the scope of his testimony.  And when you

25   finish asking him that, it's time to turn him over to cross.

```
1           MR. PETSONK:  May I present an additional exhibit

2    here, Your Honor?

3           THE COURT:  Sure.

4           MR. PETSONK:  It's not apparent to me if

5    Plaintiff's Exhibit 14 is admitted, Your Honor.

6           THE COURT:  What about 14?

7           MR. PETSONK:  Is it admitted?

8           THE COURT:  I think it's objected to.

9           MR. TORRES:  Yes, Your Honor.  It's objected to.

10   And maybe in the interest of moving things along, Your

11   Honor, so again, Plaintiff's 14 is four pages.  He asked him

12   about one section of page 1, so if he wants to offer the

13   first page of 14, limit it to what he asked him about, and I

14   can cross him on it afterwards, then we wouldn't object to

15   that admission, excluding the rest of the pages of this

16   exhibit that he didn't ask him any questions about, which,

17   by the way, Your Honor, are again redundant of what is

18   contained in 10-A.  So it's cumulative as well.

19          THE COURT:  Well, let me ask, are you objecting to

20   all of 14, except the first page?

21          MR. TORRES:  All of 14 except for the specific

22   portion he directed Mr. Hymes' attention to on the first

23   page, Your Honor.

24          THE COURT:  And so what is that?

25          MR. TORRES:  It's the first Paragraph Numbers 1
```

1  through 5 on the first page, and then the last paragraph

2  below that.  That is the specific section he asked Mr. Hymes

3  about.  So we can deal with it on cross and the rest of the

4  exhibit should be rejected.

5          THE COURT:  And so if I understand you, the first

6  page is not objected to down to the words "tells you to

7  that"?

8          MR. TORRES:  Correct, Your Honor.

9          THE COURT:  But the rest of it is objected to?

10          MR. TORRES:  Yes, Your Honor.

11          THE COURT:  The Court will rule on that in due

12  course.

13     What's your next exhibit?

14          MR. PETSONK:  Where do we stand with marking the

15  exhibits?  It's marked.

16     May I present it to the witness, Your Honor?

17          THE COURT:  You may.

18  BY MR. PETSONK:

19  Q.   Is that 15?  This is Plaintiff's Exhibit 15.

20     Mr. Hymes, this is another abridged document here.

21  The coverage page has some handwriting on it.

22          THE COURT:  Just one moment.

23          MR. PETSONK:  Yes, Your Honor.  You need an extra

24  copy.  Your Honor, before I proceed to question the witness

25  with this exhibit, I do have an inquiry about a pending

1    exhibit.

2              THE COURT:  Which pending exhibit?

3              MR. PETSONK:  Plaintiff's 14.  You had reserved

4    judgment as to the admission of the first page of that

5    exhibit.  I do have a couple of pertinent -- or related

6    questions regarding that first page and some subject matter

7    that pertains to it if Your Honor would allow, I may go

8    ahead and ask those questions now.

9              THE COURT:  The Court will accordingly rule on

10   Plaintiff's 14 at this point, to this extent, and that is,

11   it is admissible, the first page down through the words

12   "tells you that."

13        And I understand it, you wish to further examine the

14   witness about some aspect of that part?

15             MR. PETSONK:  Yes, exactly, Your Honor.

16             THE COURT:  And you may do so.  And the Court's

17   reserving judgment on the rest of 14.  First page of 14 is

18   admitted.

19        **Plaintiff's Exhibit 14 admitted.**

20   BY MR. PETSONK:

21   Q.   Mr. Hymes, you testified that you -- as I understand

22   it, that you observed Mr. Fox make these statements to

23   miners at the Buchanan operation; is that right?  You read

24   statements along these lines here, this statement that is

25   set forth in the Plaintiff's Exhibit 14?

1    **A.**   I don't remember testifying to that.  No one asked me

2    that.

3    **Q.**   I'm sorry.  I attempted to ask you.  As to Plaintiff's

4    Exhibit 14, where it says, "The company reserves the right

5    to change"?

6    **A.**   Mm-hmm.

7    **Q.**   And then it lists examples of changes that had occurred

8    since the handbook was printed in 1984.  Do you recall

9    hearing Mr. Fox make that statement in his miner orientation

10   program at Buchanan?

11   **A.**   At Buchanan, he reviewed the pay rate, but I do not

12   remember any discussion about salary continuance, life

13   insurance, or the extended medical.  But we did have

14   discussions about implementing the investment plan, because

15   it was done a year after the original package was put

16   together.  So it was an add-on.

17   **Q.**   Were the nonunion retirees of CONSOL during the period

18   that you worked for CONSOL, were they all a part of the same

19   retiree welfare plan?

20              MR. TORRES:  Objection; foundation, Your Honor.

21              THE COURT:  Find out what the witness knows about

22   it first.

23   BY MR. PETSONK:

24   **Q.**   Mr. Hymes, do you understand in your capacity as Human

25   Resources Manager for the Southern Appalachian Region, did

1    you understand -- have knowledge of the structure of the

2    welfare benefit plan offered by CONSOL, insofar as knowing

3    who was a member of that plan?

4    **A.**   When the union-free package was put together, the

5    health insurance package was similar to the salaried

6    employees health insurance package, but it didn't have a

7    premium and it didn't have deductibles, but it was -- and

8    the reason it was put, they were put in the salaried

9    employee health plan, because it was fully funded.

10           MR. TORRES:  Objection, Your Honor.  He's -- the

11   question is yes or no, does he or does he not know what the

12   benefits were, and not why they were there.  This is all

13   self-serving commentary that has nothing to do with the

14   question.

15           THE COURT:  The objection is sustained.

16   BY MR. PETSONK:

17   **Q.**   Did you know about who was a member of the -- of the

18   welfare benefit plan, during the -- which employees were

19   members of the nonunion retiree welfare benefit plan during

20   the time that you worked as Human Resources Manager?

21   **A.**   Yes.

22   **Q.**   You did?  And what did you understand about which

23   CONSOL employees participated in that nonunion retiree

24   welfare benefit plan?

25   **A.**   The production and maintenance employees at Buchanan,

1    the union-free employees at Buchanan, and all the union-free

2    were in the same plan.

3    **Q.**   When you say all union-free, who are you referring to?

4    **A.**   I'm referring to anyone who was a production and

5    maintenance employee of CONSOL, and no matter where they

6    worked, they were in the same healthcare plan.

7    **Q.**   And do you know whether that healthcare plan that those

8    nonunion CONSOL workers participated in during the period

9    that you worked there at CONSOL was the same health plan

10   that the salaried workers participated in at CONSOL?

11   **A.**   They were funded together, yes.

12   **Q.**   Okay.  And do you know whether this script that I

13   presented in the portion that's been admitted as Plaintiff's

14   Exhibit 14, and the portion that was submitted in

15   Plaintiff's Exhibit 10 -- let me ask you this:  As to those

16   portions of those scripts, did you personally observe that

17   Mr. Fox presented those scripts to both salaried and hourly

18   employees at the Buchanan operation while you worked there?

19   **A.**   I personally observed him presenting it to the hourly

20   employees, to the P&Ms.  I do not remember being in any

21   salaried presentations.  But we promoted from within for the

22   foremen, so they would have already seen it.

23          MR. TORRES:  Objection; move to strike.  It's

24   speculation on the last part of his answer, Your Honor.

25          THE COURT:  Sustained.

1    BY MR. PETSONK:

2    **Q.**   Mr. Hymes, as Human Resources Manager, do you have

3    knowledge about the hiring program by which CONSOL obtained

4    salaried employees during the time that you worked there?

5    Do you know about how CONSOL hired for salaried employees

6    while you worked there as Human Resources Manager in the

7    Southern Appalachian Region?

8    **A.**   Well, yes.

9    **Q.**   And how did CONSOL hire for salaried employees; what

10   steps did they follow to do that?

11   **A.**   Well, you had to make an application and you had to

12   have an interview with the appropriate individuals.  Started

13   at Human Resources, and then you were referred to

14   operations.  Unless you were a current employee, and then

15   you were basically promoted from the hourly workforce and

16   placed on salary.

17   **Q.**   Understood.  Were your subordinates expected to follow

18   the script when they presented their orientation?

19          MR. TORRES:  Object to the form of the question,

20   Your Honor.

21          MR. PETSONK:  I can restate the question, Your

22   Honor.

23   BY MR. PETSONK:

24   **Q.**   Mr. Hymes, while you worked as Regional Manager of

25   Human Resources, did you instruct your subordinates to

```
 1     follow the script that we've referenced here today that you

 2     developed at the Buchanan --

 3               THE COURT:  What script are you speaking of?

 4               MR. PETSONK:  The script, Your Honor, that he

 5     directed his employees -- he gave to his employees at the

 6     Buchanan operation.

 7               THE COURT:  And what is that?  What is in evidence

 8     that he gave them?  I need to confine your question to that

 9     which he has acknowledged he gave or observed the -- I don't

10     know the script you are talking about.  We've got lots of

11     scripts here.  I've got many pages of script.

12        What you need to do is to focus on that which you're

13     referring to so we'll know what the witness means when he

14     answers.

15               MR. PETSONK:  Yes, Your Honor.

16     BY MR. PETSONK:

17     Q.   Mr. Hymes, you've reviewed Plaintiff's Exhibit 10 and

18     Plaintiff's Exhibit 14 -- Plaintiff's Exhibit 10-A, and

19     Plaintiff's Exhibit 14?

20     A.   Yeah.

21     Q.   Are those exhibits the same as the script that you

22     utilized at the Buchanan Mine during the time that you

23     worked there?

24               MR. TORRES:  Objection, Your Honor.

25               THE COURT:  Sustained.
```

 1    BY MR. PETSONK:

 2    **Q.**   Mr. Hymes, you've testified here that you heard Mr. Fox

 3    make certain statements that you described here today to

 4    employees in the new miner orientation at Buchanan.  Now,

 5    did you instruct Mr. Fox to say those things that you've

 6    testified here today that you heard him say to those miners

 7    in the orientation sessions that you observed Mr. Fox

 8    deliver while you worked there at the Buchanan Mine?

 9              MR. TORRES:  Same objection, Your Honor.

10              THE COURT:  Sustained.

11         Let me ask you a question, Mr. Hymes.

12              THE WITNESS:  Yes, sir.

13              THE COURT:  We received in evidence 10-A.

14              THE WITNESS:  Yes, sir.

15              THE COURT:  And I'm going to hand that to you.

16              THE WITNESS:  I've got it.

17              THE COURT:  It's been received in evidence.  The

18    first page of 14.

19              THE WITNESS:  Yes, sir.

20              THE COURT:  Down to, but not including the last

21    paragraph.

22              THE WITNESS:  Yes, sir.

23              THE COURT:  Do you have those before you?

24              THE WITNESS:  Yes, sir.

25              THE COURT:  With respect to all of that, did you

1    inform the employees on the 25 or so occasions that you

2    referred to at Buchanan that that which is set forth in that

3    portion of these two exhibits, did you convey all of that to

4    them?

5            THE WITNESS:  I did not do the orientations.

6            THE COURT:  And so what was your occasion then

7    speaking to them on those 25 occasions?

8            THE WITNESS:  I was there to support John Fox and

9    to answer questions that they might have.  And basically, to

10   audit and make sure that we were doing what we were supposed

11   to be doing with the script.  Because I was being asked in

12   Pittsburgh, you know, "Are we following the script?"

13       And I said, "Yes, we are."

14           THE COURT:  Did you have occasion then to tell any

15   of the employees any of these things that are set forth in

16   those two exhibits to the extent that I noted?

17           THE WITNESS:  I can tell you that I had

18   conversations about the investment plan, because it was a

19   great addition with the employees, because they even asked,

20   what should I invest in and what should I do.  And I had

21   conversations with them about the pay raises.  They said,

22   "When do we get pay raises?"

23       And I said, "You'll get pay raises regularly when we

24   see that we need them."

25           THE COURT:  That doesn't seem to be the essence of

 1   this.  And I'm trying to find out what, if anything, you

 2   told the employees at Buchanan that relates to that which is

 3   in these two exhibits to the extent that I noted them to

 4   you?

 5            THE WITNESS:  Well, I guess I'm trying to be as

 6   honest as I can about it, Judge.  The -- the overriding --

 7   or arching discussion I always had with the P&M's,

 8   production and maintenance employees is that you can expect

 9   to have benefits which are better than or equal to the Mine

10   Workers.  That was always the discussion I had when we

11   started talking about benefits.

12      I don't think that answers your question, and I'm

13   sorry.

14            THE COURT:  Second, with respect to what you heard

15   Mr. Fox say to those same people at Buchanan --

16            THE WITNESS:  Yes, sir.

17            THE COURT:  -- to what extent, if at all, did you

18   hear him relate that which is set forth in the two exhibits

19   to the extent I've noted them to you?

20            THE WITNESS:  Well, I heard him talk about the

21   investment plan, as I said.

22            THE COURT:  Well, let's stop just a moment.

23            THE WITNESS:  Yes, sir.

24            THE COURT:  The investment plan, is that the

25   equivalent of the 401(k)?

```
 1                 THE WITNESS:  No, sir.  It was a CONSOL plan which
 2       was a supplement to the retirement plan, where if you
 3       contributed 3 percent, CONSOL matched it -- well, if you
 4       contributed, CONSOL matched it up to 6 percent if you
 5       contributed 6 percent, and if it was a salaried employee
 6       plan, which we then let production and maintenance,
 7       union-free employees participate in.  It was a significant
 8       add-on for their retirement.
 9                 THE COURT:  Is it fair to say that the investment
10       plan is unrelated to the medical benefits plan for retirees?
11                 THE WITNESS:  The investment plan is, yes, sir, it
12       is unrelated.
13                 THE COURT:  And so the focus here is not on the
14       investment plan.
15                 THE WITNESS:  No, sir.
16                 THE COURT:  Rather, it's on the medical benefits
17       plan and possibly life insurance, I'm not sure about it.
18       But, at any rate, with respect to the medical benefits plan
19       for retirees, did you have occasion to hear what Mr. Fox was
20       telling the employees at Buchanan about that?
21                 THE WITNESS:  He would talk about the retirement
22       plan, and then he would talk about the medical plan as it
23       relates to when you retire.
24                 THE COURT:  When you say the retirement plan, are
25       you talking about the pension?
```

```
 1                    THE WITNESS:  Yes, sir.

 2                    THE COURT:  But he was also talking about retiree

 3      medical benefits?

 4                    THE WITNESS:  Yes, sir, it was -- when you read

 5      the CONSOL retiree medical plan, it dovetailed with whatever

 6      retirement you had.  When I left, I didn't -- I had a vested

 7      retirement, but I got a separation retirement.  I did not

 8      get health insurance benefits.  You had to stay a certain

 9      number of years to get health insurance.

10                    THE COURT:  Back to my question about these two

11      exhibits to the extent I noted them to you, did you hear Mr.

12      Fox tell the employees that which is set forth in those two

13      exhibits -- and you can look at the whole of them if you

14      would, that is, all of 10-A, and the portion I mentioned to

15      you of the first page of 14 -- and tell me what the answer

16      to that question is.

17                    THE WITNESS:  10-A, the "lawyer talk" part.

18                    THE COURT:  What?

19                    THE WITNESS:  That was -- I am positive that he

20      said that every orientation that I was in.

21                    THE COURT:  But that's just one little piece of

22      it.

23                    THE WITNESS:  Yes.

24                    THE COURT:  Look at all of it and tell me whether

25      or not that is or is not what you heard him say.
```

1           THE WITNESS:  He did not say this paragraph about

2    this thing about waving the handbook in the air, that I

3    remember.  Because that was -- that was -- that was

4    something we didn't talk -- we didn't say.

5         As far as the discussion on page 429, I can't say that

6    I did hear him say 429, but I know it was a part of the

7    program.

8           THE COURT:  What, sir?

9           THE WITNESS:  But I know it was a part of the

10   program, but I can't say that I heard him say it, sir.

11          THE COURT:  What about the rest of it?

12          THE WITNESS:  The reasons that starts on the

13   bottom of 429, and the Slide:  "Safety, Job Security, Fair

14   Treatment and Wages and Benefits," I'm 95 percent sure I

15   participated in sitting in a discussion where he was talking

16   about that, but I can't tell you when it was.

17          THE COURT:  But you, what?

18          THE WITNESS:  But I cannot tell you exactly when

19   it was.

20          THE COURT:  Thank you.  But at any rate, still

21   talking about Buchanan?

22          THE WITNESS:  Yeah.

23          THE COURT:  All right.  Anything else?

24          THE WITNESS:  This 14, when the "lawyer talk"

25   piece, you know we've already discussed, but this 1 through

1    5, I can't tell you that I heard him talk about 1 through 5.

2    I've heard him talk about the investment plan and pay

3    increases.

4                    THE COURT:   Thank you.

5         Counsel may now have further questions.

6    BY MR. PETSONK:

7    **Q.**   Relatively few.  And thank you, Your Honor.

8         You've testified that you did hear Mr. Fox reference

9    this part, it says, lawyer -- the part of this says, "lawyer

10   talk," and that CONSOL does reserve the right to change the

11   benefits.  Is that right?

12   **A.**   Yes.

13   **Q.**   During the time that -- well, you worked for CONSOL,

14   did you ever implement a benefit change that eliminated

15   benefits from a plan?

16                   MR. TORRES:  Objection; foundation, Your Honor.

17                   THE COURT:  Maybe as you're speaking about whether

18   or not he was instructed to do so, if you will, refine your

19   question.

20   BY MR. PETSONK:

21   **Q.**   Mr. Hymes, during the time that you worked for CONSOL,

22   were you ever instructed to implement a benefit change that

23   eliminated benefits from a plan maintained by CONSOL?

24   **A.**   Not that I remember, no.

25   **Q.**   During your career as a Human Resources Manager in the

1    Appalachian coal industry, as you described at the outset of

2    your testimony, have you ever implemented a benefit change

3    that eliminated benefits from a welfare benefit plan?

4    **A.**   Yes.

5    **Q.**   And in making that implementation, did you remove or

6    eliminate benefits from all participants in the plan at the

7    same time?

8                MR. TORRES:  Your Honor, I'm sorry, but there is

9    no foundation there.

10               THE COURT:  We are back to generalities and not

11   specific to the issues in this case.

12               MR. PETSONK:  Well, Your Honor --

13               THE COURT:  What does it have to do with this

14   case?

15               MR. PETSONK:  Well, Your Honor, one of the

16   allegations in this case is that CONSOL eliminated benefits

17   for some, but not all of the participants in its retiree

18   welfare program.

19               THE COURT:  Focus on the issues in this case, and

20   not something generally that we don't know what the witness

21   is talking about.

22               MR. PETSONK:  Well, we've alleged that it was

23   unreasonable for CONSOL to make that change and conceal the

24   fact they made the change, Your Honor.

25               THE COURT:  When you are saying, "that change,"

1    you need to say what change, affecting whom?

2              MR. PETSONK:  I'm speaking to -- Your Honor, the

3    change that I'm referencing is the termination of benefits.

4              THE COURT:  You don't need to tell me about it;

5    you need to put it in your question to the witness.

6    BY MR. PETSONK:

7    Q.   Mr. Hymes, I would dispense with that question at this

8    time.

9              MR. PETSONK:  Your Honor, and if I may present

10   then the last exhibit, and then I will conclude my

11   questioning.

12             THE COURT:  Are you talking about Exhibit 15?

13             MR. PETSONK:  Yes.

14             THE COURT:  Go ahead.

15             MR. PETSONK:  Did I give this to you yet?  I think

16   you marked it.

17             THE CLERK:  I believe so.

18             MR. PETSONK:  Does the witness have this exhibit?

19   Yes.  And you have Exhibit 15?

20             Your Honor, I don't need to go on about this

21   exhibit.

22   BY MR. PETSONK:

23   Q.   Mr. Hymes, I briefly would like to ask you, Plaintiff's

24   Exhibit 15, that's in front of you has some handwriting at

25   the top.  It says, "Update and Use It."  Do you recognize

```
 1    that handwriting?

 2    A.   That's my handwriting and my scribbles.

 3    Q.   And the title at the top of the page of this exhibit

 4    is, "Orientation About Unions," and then beneath that

 5    headline there's a parenthesis, and it says, "Bailey

 6    Supervisors"; is that right?

 7    A.   Yes.

 8    Q.   What did you mean when you wrote on this document,

 9    "Update and Use It"?

10    A.   I meant it needed to be updated to be used.  In the

11    1988 version, I don't -- I don't even know when I wrote that

12    on there.  But you can see on the second page, I marked out

13    parts that I didn't want to use.

14         MR. PETSONK:  Actually, Your Honor, I think that

15    is something that I marked out in abridging this exhibit

16    today, if I understand correctly.  So that should not be --

17         THE WITNESS:  I thought I marked it out.

18    BY MR. PETSONK:

19    Q.   You thought you marked that out?

20    A.   Mm-hmm.

21         MR. PETSONK:  I apologize, Your Honor.  I'm

22    inquiring.

23    MR. PETSONK:

24    Q.   Is this something we included?

25    A.   I might be confused.
```

1    **Q.**   No, you are correct, my co-counsel informs me that is

2    not our marks.  So it must be yours.  I apologize.  It was

3    confirmed with my co-counsel about the process of bringing

4    this exhibit for presentation this afternoon.

5         So, Mr. Hymes, who gave you this document?  If you

6    recall?

7    **A.**   In 1988, probably Greg Dixon, but I don't know.

8    **Q.**   And what was Greg Dixon's job at that time?

9    **A.**   I think he was the regional manager of Eastern Region,

10   same job as me, except in the Eastern Region.

11   **Q.**   And what use did you make of this document, if you

12   remember?

13   **A.**   I'm thinking that I gave it to John Fox to redo for

14   Buchanan employees.  No use to reinvent the wheel.

15   **Q.**   And so if you look on page 1, there is a note that

16   says, Slide one, and reads, "Orientation About Unions."

17   And then if you flip through to the page that is

18   Bate-stamped MSJ 640 at the bottom, it notes Slide 71.  And

19   the title of that slide is:  "Think About."  And then there

20   is a text that says, "Think About" and several bullet

21   points, "$100,000 Decision."  Do you see that?

22             MR. TORRES:  Your Honor -- Your Honor --

23             THE COURT:  Yes.

24             MR. TORRES:  May I voir dire before Mr. Petsonk

25   reads the entire document into the record?

```
 1                    THE COURT:  You may.

 2                    VOIR DIRE EXAMINATION

 3       BY MR. TORRES:

 4       Q.   Mr. Hymes, the orientations that you actually witnessed

 5       at Buchanan took place in 1982 and in 1983, correct?

 6       A.   I don't think I said when I witnessed.

 7       Q.   You said that the 25 orientations were in the year or

 8       two after they started?

 9       A.   Yes.

10       Q.   And we agreed that was in the 1982 to 1984 time frame;

11       is that right?

12       A.   I can agree with that.

13       Q.   Okay.  And you received this document sometime after

14       November of 1988, correct?

15       A.   Yes.

16       Q.   So four years or so after the orientations you observed

17       at Buchanan, correct?

18       A.   Yes, sir.

19       Q.   And this document is actually from -- isn't from

20       Buchanan, correct?

21       A.   No.  It's from Bailey.

22       Q.   It's from Bailey.  You didn't have a responsibility for

23       Bailey in 1988, correct?

24       A.   No, I did not.

25       Q.   Or after 1988, correct?
```

1    **A.**   No.

2    **Q.**   And was this information -- and you don't know if this

3    was ever communicated to employees?  It certainly wasn't

4    communicated to the employees at Buchanan before -- before

5    you received it, correct?

6    **A.**   It was not.

7    **Q.**   Okay.  In fact, this was actually provided to

8    supervisors only, correct?

9    **A.**   Yes, this is a supervisors' training.

10   **Q.**   All right.  And whether -- and you don't know who gave

11   it to you.  You've guessed as to who it might have been.

12   And then you gave it to Mr. Dixon -- I'm sorry -- to Mr.

13   Fox, and you asked him to update it, correct?

14   **A.**   I would ask him to update it, because we needed to

15   train the supervisors.

16   **Q.**   Okay.  And you don't have whatever Mr. Fox might have

17   created, correct?

18   **A.**   No, I do not.

19   **Q.**   Okay.  But whatever he created, it obviously didn't

20   exist back in '82 through '83, when you observed those

21   portions of those 25 orientations, correct?

22   **A.**   That's true.

23   **Q.**   Okay.

24          MR. TORRES:  Your Honor, I don't think this goes

25   to anything that you allowed the witness to be questioned

```
 1    about.  It wasn't communicated to employees.  It wasn't
 2    communicated to Buchanan employees, and it wasn't in
 3    existence during the period when he said he actually
 4    attended orientations.
 5              THE COURT:  And respond to that, if you would.
 6              MR. PETSONK:  Yes, Your Honor.  Respond, to you,
 7    Your Honor, or by further questioning the witness?
 8              THE COURT:  Respond to that which Mr. Torres just
 9    stated.
10              MR. PETSONK:  I seek to elicit testimony about
11    what this document was training the supervisors to do and
12    whether Mr. Hymes knows if the supervisors carried out what
13    they were trained to do when they received this training,
14    which I think bears on whether they had Mr. Hymes' direct
15    authority to say the things that they were trained to say in
16    this training document that Mr. Hymes intended to revise and
17    implement in the Buchanan Mine.
18              MR. TORRES:  Their authority to train supervisors
19    doesn't relate to the issues in this lawsuit as to what was
20    allegedly said to employees by specific individuals, Your
21    Honor.  So it doesn't speak to any relevant issue in this
22    lawsuit, even if they had authority to go out and train
23    supervisors.  It also, by the way, Your Honor, doesn't say
24    anything about retiree medical benefits.
25         So, again, Your Honor, it's not in the relevant time
```

1    period; there is no evidence that there was ever -- this is

2    like double-hearsay.  He's got to establish that a manager

3    got this document, updated it for their location, and then

4    communicated it to some unknown group of employees.

5         That's not evidence, Your Honor.  That's guessing.

6              THE COURT:  Mr. Petsonk, how is it relevant?

7              MR. PETSONK:  It's relevant, because it shows that

8    the individuals that we've alleged to be the apparent agents

9    of the fiduciary were trained to say the things that we've

10   alleged that those apparent agents said on behalf of their

11   principal, the fiduciary, and that they were trained to do

12   so by the subordinates of that principal fiduciary, that is,

13   the direct line of authority that traces from the named

14   fiduciary to the apparent agents, who we've alleged made the

15   relevant misrepresentations or representations in the case,

16   Your Honor.

17        It goes to the reasonableness of the miners' perception

18   that they appeared to have the authority to say the things

19   that we've alleged that they have said.

20             MR. TORRES:  First off, Your Honor, just one point

21   of clarification.  Your Honor has noted that the Vice

22   President of Human Resources is the named fiduciary of the

23   benefit plan.  But as Your Honor also knows, a fiduciary is

24   not an all or nothing consent.  A fiduciary sometimes

25   engages in fiduciary actions, and then they can engage in

1    non-fiduciary actions.  So the mere fact that there happens

2    to be a Vice President of Human Resources doesn't ipso facto

3    establish that everything that person does or directs to be

4    done is fiduciary in nature.

5         But, again, the question is not what they were trained,

6    and there is certainly no evidence -- the question is:  Did

7    the fiduciary direct them to go make some misrepresentation

8    to the named plaintiffs in this lawsuit.

9         And most of the named plaintiffs in this lawsuit

10   weren't at CONSOL in November of 1988.  And none of the

11   named plaintiffs were at Bailey in 1988.  And there was only

12   one individual who was even employed by CONSOL, Mr. Casey,

13   when this gentleman was working for CONSOL.

14        So even if that is what they are trying to do, they are

15   asking you to make so many assumptions to get to someone

16   like Mr. Craig, who started working in 2000.  Even if

17   someone was told something under this script in 1988, they

18   have no evidence that that was communicated to Mr. Prater in

19   2000.  They could have asked him that when he was

20   testifying, but they didn't.

21        Instead, they are just asking you to assume this

22   document -- which we don't think it makes any

23   misrepresentations -- somehow is relevant to what these

24   seven individuals claim they heard.

25        Mr. Fitzwater didn't show up until 2007.

1          So I don't think that's an appropriate way to try and

2     infer anything, Your Honor, especially when this gentleman

3     doesn't have any personal knowledge of anything that

4     happened after 1992, when he stopped working in the

5     position.

6               THE COURT:  Anything further on the point?

7               MR. PETSONK:  Well, Your Honor, this is not

8     offered as to Mr. Fitzwater.  This is offered as to the

9     individuals like Craig Campbell, who Mr. Hymes hired, who

10    Mr. Hymes mentored to manage the nonunion operations in

11    Eastern Kentucky.  And Mr. Campbell is the very same person

12    who provided the orientation to Mr. Prater.

13         So all we are seeking to elicit here is -- as to the

14    very things Mr. Torres said at the outset, which I agree

15    with, we want to show that these apparent agents were

16    trained to do -- to make fiduciary statements and they could

17    take fiduciary actions, and then they were trained to do so

18    by the fiduciary or the agent of the fiduciary.

19         That's -- that is the purpose for which we're seeking

20    to offer it, Your Honor.

21              THE COURT:  Mr. Torres, any final word?

22              MR. TORRES:  Yes, Your Honor.  Again, Mr. Campbell

23    started working at Jones Fork sometime in the '90s, Your

24    Honor, nine years before Mr. Prater ever showed up.  There

25    is no link from this document at Bailey to Mr. Campbell at

1    Jones Fork.  And this gentleman is not going to know whether

2    Mr. Campbell used this document; and, if he did, it's not

3    even a document that was used with employees.

4          THE COURT:  Thank you.  Any further questions of

5    the witness on the point?

6          MR. PETSONK:  Your Honor, are we -- may I be

7    permitted to question the witness about the remainder of the

8    document?

9          THE COURT:  You may do so.

10         MR. PETSONK:  Thank you.

11   BY MR. PETSONK:

12   **Q.**   Mr. Hymes, if you flip to the Slide 71, where it says,

13   "$100,000 Decision," and "Think about $100,000 Decision and

14   Wages and Benefits."  Do you see where I'm referring?

15   **A.**   Yes.

16   **Q.**   And then down the page, you see where it says, "We're

17   committed to keep wages and benefits here competitive or

18   better.  That UMWA will have nothing to offer our employees

19   in this area"?

20   **A.**   Yes.

21   **Q.**   Did you use your updated version of this document to

22   train your supervisors at the locations at which you had

23   responsibility about how to speak to employees regarding

24   unions?

25   **A.**   This is a Bailey document, given to me.  I handed it

```
 1    off to my direct report, Mr. Fox.  And said, "Here, we need

 2    to train our supervisors.  This is what Bailey is using.

 3    Update it and use it."  Okay.

 4        I don't know who was trained with it or when they were

 5    trained.  I didn't participate in the training.  That's the

 6    answer -- the only answer I can give.

 7            MR. TORRES:  Your Honor, I renew my objection.

 8            THE COURT:  Understood.

 9        Any further questions of the witness with respect to

10    the document?

11            MR. PETSONK:  Other than to move for its

12    admission, Your Honor, and to secure the Court's opinion as

13    to that, no, Your Honor.

14            THE COURT:  The Court will reserve judgment on 15

15    as well, as well as the balance of 14.

16        Anything further for the witness?

17            MR. PETSONK:  Not for me, Your Honor.  Not at this

18    time.  Thank you.

19            THE COURT:  Mr. Torres, how long will you be with

20    the witness?

21            MR. TORRES:  I've got a bit to cover with the

22    witness, Your Honor.

23            THE COURT:  Let me ask whether or not you want to

24    recess for 15 minutes and then go on until 5:30?

25            MR. TORRES:  Fine with us, Your Honor.
```

```
 1              THE COURT:  Does that work for the parties, with
 2    counsel otherwise?
 3              MR. PETSONK:  It certainly works for us.
 4         I feel apologetic to the witness, but it certainly
 5    works fine for me.
 6              THE COURT:  Mr. Hymes, I told you you'd be through
 7    here this evening.
 8         Mr. Torres, how long do you think you will have with
 9    this witness?
10              MR. TORRES:  Your Honor, I'll do my best to
11    conclude by 5:30.  15 minutes will certainly help me
12    streamline things, and I'll do by best to finish by then if
13    I can, Your Honor.
14              THE COURT:  Well, we'll still work that out some
15    way or another so that you won't have to spend another day
16    here.
17              THE WITNESS:  Thank you, sir.
18              THE COURT:  Are you driving, I take it?
19              THE WITNESS:  Yes, sir.
20              THE COURT:  Very good.
21         We'll be in recess for no more than 15 minutes.
22              THE CLERK:  All rise.
23         (A recess was taken at 4:33 p.m. until 4:47 p.m.)
24              THE CLERK:  All rise.
25              THE COURT:  Please be seated.
```

|     |     |
| --- | --- |
| 1   | **CROSS-EXAMINATION** |
| 2   | **BY MR. TORRES:** |
| 3   | **Q.**   So, Mr. Hymes, so we can give the Judge some context |
| 4   | here.  You started working at CONSOL in what year? |
| 5   | **A.**   1972. |
| 6   | **Q.**   Okay.  So from 1972 until 1992, you were in Human |
| 7   | Resources at various mine sites, correct? |
| 8   | **A.**   I was in the regional office.  I was not at any mine |
| 9   | site. |
| 10  | **Q.**   Okay.  So during '72 to '92, when you were at the |
| 11  | regional office, were you dealing with the coal mines? |
| 12  | **A.**   Yes. |
| 13  | **Q.**   So from '72 to '92, you were -- your job was with Human |
| 14  | Resources involving CONSOL's coal operations, correct? |
| 15  | **A.**   Yes. |
| 16  | **Q.**   And then after '92, you were at CONSOL for |
| 17  | approximately one more year, but your job at that point |
| 18  | didn't have anything to do with coal mines, correct? |
| 19  | **A.**   No, it had to do with industrial distribution at |
| 20  | Fairmont Supply. |
| 21  | **Q.**   So '72 to '92, a 20-year period, and within that |
| 22  | 20-year period, you personally attended orientations between |
| 23  | '82 and '83 at Buchanan? |
| 24  | **A.**   Yes. |
| 25  | **Q.**   Approximately 25? |

1    **A.**    Yes.

2    **Q.**    Where you were in and out, correct?

3    **A.**    Yes.

4    **Q.**    And all of those 25 orientations that you attended were

5    presented by Mr. Fox?

6    **A.**    Yes.

7    **Q.**    Okay.  And you said, I think, earlier you conducted an

8    orientation yourself?

9    **A.**    Yes, I did one.

10   **Q.**    And when was that; what year?

11   **A.**    It was when we bought the Utah International operation

12   and made the benefit change for them to come to the CONSOL

13   production and maintenance benefit package.  So I didn't

14   have an HR person there.  I knew Craig Campbell.  So I was

15   it.

16   **Q.**    Okay.  So that orientation that you conducted didn't

17   involve Buchanan, correct?

18   **A.**    That's right.

19   **Q.**    And it didn't involve Enlow Fork or Bailey or CONSOL of

20   Kentucky, correct?

21   **A.**    It was the Eastern Kentucky operations, which was the

22   forerunner of CONSOL of Kentucky.

23   **Q.**    So prior to CONSOL of Kentucky, that's the one

24   orientation you conducted?

25   **A.**    Yes.

1    **Q.**   All right.  So now going back to Mr. Fox -- do you have

2    Exhibit 10-A in front of you?

3    **A.**   Yes.

4    **Q.**   Okay.  Just so we are clear, what specific words on

5    this page did you hear Mr. Fox say during orientations at

6    Buchanan?

7    **A.**   First paragraph, down to the end to -- you want me to

8    read it?

9    **Q.**   No.  No.  You're doing fine.  Just exactly that way.

10   Just on the first page?

11   **A.**   On the first page, the first paragraph, because we

12   didn't use that language.

13   **Q.**   So the only thing on the first page of Exhibit 10-A

14   that you personally heard Mr. Fox say is the first paragraph

15   of the first page of Exhibit 10-A?

16   **A.**   Yes.

17   **Q.**   Okay.  And because you were never in any other

18   orientations with any other supervisors, you would have

19   never heard them use this language, one way or the other,

20   correct?

21   **A.**   No.

22   **Q.**   And whatever you may believe individuals were supposed

23   to do in conducting orientations, other than the ones that

24   you attended with Mr. Fox, you have no idea whether anyone

25   else in the company ever used any of the language that's

1    contained in that first paragraph, correct?

2    **A.**   I don't know about Bailey; I don't know about Enlow.

3    **Q.**   Well --

4    **A.**   I do know I used it for Eastern Kentucky when I did

5    that.

6    **Q.**   Other than the one you conducted and the ones you saw

7    Mr. Fox conduct, you have no idea whether anyone else ever

8    used that, said anything contained in the first paragraph on

9    the first page of Exhibit 10-A, correct?

10   **A.**   That's correct.

11   **Q.**   Okay.  Now, turning to the second page of Exhibit 10-A,

12   please tell me what specifically on this page you heard Mr.

13   Fox say during the 25 orientations or portions of the 25

14   orientations that you attended at Buchanan?

15   **A.**   This entire piece of the whole page is the setup you

16   have to use to do the calculation.  So you have to say this

17   to make it understood.

18   **Q.**   Are you testifying that you heard these exact words

19   from Mr. Fox during the orientations that you attended?

20   **A.**   Yes.

21   **Q.**   Okay.  And then turning to 430, same question, sir;

22   what on this page do you specifically -- did you

23   specifically hear Mr. Fox say on this page?

24   **A.**   I can't say I specifically heard any of this part,

25   about safety, job security, and fair treatment.  I don't

1    remember that.

2    **Q.**   Okay.

3    **A.**   But I do know he went over the benefits, and to set the

4    benefits up, you have to talk about this one paragraph.

5    **Q.**   Sir, I'm just asking you on this page --

6    **A.**   The wage and benefits.

7    **Q.**   I'm sorry?

8    **A.**   The wage and benefits piece.

9    **Q.**   All right.  So I'm actually -- this is double-sided,

10   sir, so if you go to -- I'm actually on page 430, if you

11   look at the bottom?

12   **A.**   430, I can't specifically say that I remember anything

13   on 430.

14   **Q.**   Okay.  So you don't remember Mr. Fox said anything on

15   page 430?

16   **A.**   I don't remember specifically, no.

17   **Q.**   Okay.  And then on page 431, the back page, you recall

18   Mr. Fox saying the portion that's at the very top of that

19   page, correct?

20   **A.**   Yes.

21   **Q.**   And you don't remember whether he said anything else on

22   this page?

23   **A.**   I'm reasonably sure he said the next paragraph about

24   the dollar value, because it's all about the dollar value.

25   **Q.**   Sir, the question is:  What do you specifically recall

HYMES - CROSS

1   the gentleman saying that is contained on this page?

2   **A.**   I can't tell you absolutely that I heard him say it,

3   okay.

4   **Q.**   So the only thing that you are sure of on this last

5   page is that he said what's contained on that first section

6   involving wages and benefits?

7   **A.**   Yes, to the best of my knowledge, that's true.

8   **Q.**   Okay.  So now -- and then in the 25 orientations that

9   you -- the 25 orientations, portions of which you attended

10  at Buchanan, do you recall if in all 25 of those you heard

11  Mr. Fox make this "lawyer talk" statement?

12  **A.**   I can't say that I heard it in all 25.

13  **Q.**   Do you have any estimate as to how many times you heard

14  it?

15  **A.**   I don't know.  Maybe half of them.  I really don't

16  know.

17  **Q.**   You just don't know, okay.

18  **A.**   But I do know he said it.  Okay.

19  **Q.**   And I understand you've identified on this page what

20  you recall him saying.  The only question was:  You think

21  maybe half, but you -- that's just a guess, right?

22  **A.**   Yeah.

23  **Q.**   Okay.  That's fair enough.  I realize that's a long

24  time ago.  I understand, believe me.

25              THE COURT:  Let me ask with respect to the first

1    page.  I'm not sure I understand.

2        Did you say that with respect to the first page and the

3    top paragraph, that that is the only part of it that you

4    heard Mr. Fox say, or did you say you heard him say the

5    whole thing?

6            THE WITNESS:  No, that's the only part, Your

7    Honor, because, our part --

8            THE COURT:  Just that first paragraph?

9            THE WITNESS:  That's the only part, yes, sir.

10           THE COURT:  Thank you.  That covers it.

11   BY MR. TORRES:

12   **Q.**   And as to those remaining portions of this exhibit, Mr.

13   Hymes, that you identified recalling Mr. Fox saying, you

14   wouldn't have heard anyone else -- you don't know whether

15   anyone else said any of those words at any other

16   orientations that you didn't attend, correct?

17   **A.**   No, I don't.

18   **Q.**   Okay.  Then let's go to Plaintiff's 14.  And again,

19   looking at -- if you recall, Mr. Hymes, the Judge only

20   admitted this portion of the exhibit down to the words "and

21   this language tells you that"?

22   **A.**   Mm-hmm.

23   **Q.**   Do you recall that?

24   **A.**   Yes.

25   **Q.**   So can you tell us on this first page the portion that

 1   was admitted, what specifically you recall Mr. Fox saying

 2   that's contained in that section of the first page of

 3   Plaintiff's 14?

 4   **A.**   Down to "The right to change them," identical to this

 5   one (indicating).  Down to "The right to change them."

 6   **Q.**   Oh, I see.  So what you're saying is you recall hearing

 7   everything in the first paragraph except the last sentence?

 8   **A.**   Yes.

 9   **Q.**   Okay.  And --

10            THE COURT:  So that means, then -- that means that

11   you heard what was said in the paragraph down to the figures

12   1984?

13            THE WITNESS:  No, down to "The right to change

14   them."

15            THE COURT:  Down to where?

16            THE WITNESS:  The period that says, "the right to

17   change them."

18            THE COURT:  Looking at Exhibit 14?

19            THE WITNESS:  Yes, sir.  Right here (indicating).

20            THE COURT:  And so it goes down, just point where

21   it goes to.

22            THE WITNESS:  Right there (indicating).

23            THE COURT:  Excuse me.  I misunderstood you.

24       So what you are saying is that you didn't hear anything

25   about the handbook first printed in 1984, as it is set forth

1    there or that last sentence?

2              THE WITNESS:  No, sir, I didn't.

3              THE COURT:  Nothing past the word "Them."

4              THE WITNESS:  The only testimony I gave originally

5    was I knew he talked about the investment plan change.  But

6    the rest of this -- you know, I said he talked about pay

7    increases and investment plans.  The rest of this I do not

8    remember him talking about.

9              THE COURT:  Very good.  As you said, the last

10   words on that page that you heard was "change them"?

11             THE WITNESS:  Yes.

12             THE COURT:  And nothing with respect to the rest

13   of that page?

14             THE WITNESS:  Not specifically, no.

15             THE COURT:  Thank you.  Excuse me.

16             MR. TORRES:  And then I believe, if I'm recalling

17   correctly, Your Honor, that was the only portion of 14 that

18   was preliminarily admitted?

19             THE COURT:  Correct.  The last paragraph of the

20   one that begins on that page is not included.

21             MR. TORRES:  Right, thank you.  Nor was the

22   remainder of Plaintiff's 14, if I recall, Your Honor.

23             THE COURT:  Correct.

24   BY MR. TORRES:

25   **Q.**   Okay.  And, again, as with Plaintiff's 10-A, with

```
1    respect to that portion of Plaintiff's 14 that you do recall
2    Mr. Fox stating, you don't know whether anyone else ever
3    used that language in any other orientation where you were
4    not present, correct?
5    A.   Other than me, when I did mine.
6    Q.   Other than the one you conducted; is that correct?
7    A.   Yes.
8    Q.   Okay.  And you recall you were previously deposed in
9    this matter, correct?
10   A.   Yes.
11   Q.   And you were asked about the topics that were covered
12   in the scripts that you were familiar with; the ones you
13   don't have, but you remember working on.  And one of the
14   questions that you were asked -- well, strike that.
15        The scripts that you did see or did the work on, when
16   you were deposed, you agreed that you didn't remember what
17   the slides said, if anything, about retiree medical
18   benefits, correct?
19   A.   That's true.
20   Q.   And you also said that you didn't remember whether
21   there was any comparison in those slides between UMWA
22   retiree medical and CONSOL's retiree medical benefits,
23   correct?
24   A.   I said that, yes.
25   Q.   Okay.  And the "lawyer talk" portion of this that you
```

1    recall from Plaintiff's 10-A and 14 doesn't make any

2    reference to retiree medical benefits, correct?

3    **A.**   No.

4    **Q.**   Is that correct?

5    **A.**   Yes.

6    **Q.**   And you don't know if any of -- if other orientations

7    that you didn't attend included any written materials

8    discussing retiree medical benefits, correct?

9    **A.**   Ones I didn't attend, I don't know.

10    **Q.**   Right.  That was my question.  And back to 10-A, again,

11    sir -- I'm sorry.

12         The portions of the rest of 10-A that you were familiar

13    with on page 429 and the top of 431, they don't make any

14    reference to retiree medical benefits, correct?

15    **A.**   No.

16    **Q.**   You agree with me?

17    **A.**   Yes.

18    **Q.**   Okay.  Now, the language in 10-A on the first page that

19    makes a reference to "lawyer talk," right after it says,

20    "This is lawyer talk," what it says is, "And that is

21    important."  Correct?

22    **A.**   That's what it says.

23    **Q.**   Right.  And the same thing in Plaintiff's 14, it says,

24    "Part of this is lawyer talk.  And that is important,"

25    correct?

1    **A.**    Yes.

2    **Q.**    And it goes to say, going back to 10-A, that the

3    company whole-heartedly believes in the things we've

4    included in the handbook, but the company does reserve the

5    right to change them?

6    **A.**    Yes.

7    **Q.**    It doesn't tell employees to ignore that, right, just

8    because it was described as lawyer talk, correct?

9    **A.**    No.

10    **Q.**    You agree with me?

11    **A.**    It does not say that.

12    **Q.**    To the contrary, this says, it is important, pay

13    attention, correct?

14    **A.**    That's what it says.

15    **Q.**    And other than the one orientation you conducted and

16    the portions of the orientations you observed from Mr. Fox

17    in '82 and '84, you don't know if anyone in any other

18    orientation ever told the people attending that they should

19    ignore any reservation of rights clause that CONSOL had in

20    any materials that it distributed, correct?

21    **A.**    I don't know that.  No.  I do not know that.

22    **Q.**    And, in fact, you never heard Mr. Fox in the

23    orientations you observed tell people to ignore the

24    reservation of rights clause in any documents that he

25    distributed, correct?

1    **A.**   No, I did not.

2    **Q.**   And you never told anyone in the one orientation that

3    you conducted that employees should ignore any of the

4    reservation of rights language in any of the materials that

5    were distributed, correct?

6    **A.**   I went right off the script; whatever was written in

7    the script, that's what I went off of.

8    **Q.**   Got it.  And in the time period when you were at CONSOL

9    from '72 to '92 in Human Resources that related to mines,

10   the costs of benefits for employees increased, correct?

11   **A.**   I don't know that.  I don't know that I can answer

12   that.  Which benefit are you talking about?

13   **Q.**   Well, benefit plans include deductibles, correct?

14   **A.**   I don't know that I can say that -- I know that I read

15   in one of these that Bailey had $100 deductible.  But if you

16   ask me what deductibles did what, when, I don't remember.

17   **Q.**   That's fair.  I'm just asking you what you might know.

18   So are you aware of any increased deductibles that occurred

19   during the period '72 to '92 that would have affected P&M

20   employees?

21   **A.**   The only ones I'm aware of is the ones in the script.

22   **Q.**   What about any out-of-pocket changes; are you aware of

23   any changes for that out-of-pocket obligation for P&M

24   employees increased?

25   **A.**   No.

1    **Q.**   What about premiums, were you aware of any premium

2    increases that P&M employees had to bear for their

3    healthcare?

4    **A.**   While I was there, there were no premiums.

5    **Q.**   Okay.  Just for retirees, or no one?

6    **A.**   There were no premiums at all for the production and

7    maintenance employees.

8    **Q.**   Got it.  Now, going back again to paragraph -- I'm

9    sorry -- Exhibit 10-A, the lawyer talk reference, it says,

10    is to a handbook, correct?

11    **A.**   Yes.

12    **Q.**   Okay.  And can you explain to the Judge or all of us,

13    what the handbook looked like?

14    **A.**   Probably about this big (indicating), and about that

15    big, (indicating).  It's small, so it fit in your pocket.

16    **Q.**   Okay.  And that was distributed to employees during the

17    orientation?

18    **A.**   It was given to them at the orientations, and the

19    entire handbook was reviewed.

20    **Q.**   And also during the orientations -- so when this

21    says -- it's talking about the handbook and lawyer talk,

22    it's referring to that little pocket document you just

23    referred to, correct?

24    **A.**   There was a paragraph in there about -- about

25    reservations of rights.

1   **Q.**   Now, the other thing that was distributed during the

2   orientations, according to your prior testimony, were

3   Summary Plan Descriptions, correct?

4   **A.**   You know, I think I said we distributed them.  But I'm

5   not absolutely sure they were distributed.  Early on at

6   Buchanan, I'm not sure they were written when we first had

7   the orientation.

8   **Q.**   Okay.

9   **A.**   But there were Summary Plan Descriptions written later

10   on.

11          MR. TORRES:  Just one minute, Your Honor.  Get my

12   glasses.  Thanks.

13   BY MR. TORRES:

14   **Q.**   The Summary Plan Descriptions that were used at CONSOL,

15   they were in three-ring binders, correct?

16   **A.**   They were in -- the P&M ones were in a little binder

17   about this big (indicating).  I think the first one was

18   yellow.

19   **Q.**   And so when you say this big, just so the court

20   reporter can get it down, maybe five or six inches high, and

21   four inches wide, something like that?

22   **A.**   Yeah, that's about right.

23   **Q.**   Okay.  And they were in three-ring binders so pages

24   could be taken out when there were changes to the benefits

25   and the employees could put those in to replace the prior

HYMES - CROSS

```
1    pages?

2    A.   Yes.

3              MR. TORRES:  May I approach, Your Honor?

4              THE COURT:  You may.

5              MR. TORRES:  18.  Just one second, Your Honor.

6    Sorry about that.

7              THE COURT:  What's the number on it?

8              MR. TORRES:  Defendant's 18.

9    BY MR. TORRES:

10   Q.   Mr. Hymes, I'm showing you what's been marked as

11   Defendant's Exhibit 18.  The first page says, "CONSOL's

12   Buchanan Mine Summary Plan Description and Benefit Plan For

13   Production and Maintenance Employees," correct?

14   A.   Yes.

15   Q.   And the bottom, it says, "Southern Appalachian Region,"

16   correct?

17   A.   Southern Appalachian Region, yes, sir.

18   Q.   That was the region you worked in?

19   A.   Yes, sir.

20   Q.   And then if you turn into the page -- I'm sorry -- if

21   you turn into the exhibit, and you go to just, for example,

22   the first page of the number at the bottom.

23   A.   First page with the number at the bottom?

24   Q.   Number one?

25   A.   Yes.
```

HYMES - CROSS

1    **Q.**   And to the right of that, it says, "REV 3-90."

2          Do you see that?

3    **A.**   Yes.

4    **Q.**   And it's your understanding that that indicates the

5    date the page was revised, so March 1990?

6    **A.**   That -- the code, yes.

7    **Q.**   Okay.  So if you go forward -- bear with me, sir.

8          If you go forward in the document.  Just bear with me.

9             MR. TORRES:  May I have one minute, Your Honor?

10            THE COURT:  You may.

11         (An off-the-record discussion was held between the

12    defense attorneys and the plaintiffs' attorneys.)

13            MR. TORRES:  May I approach the witness one more

14    time, Your Honor?

15            THE COURT:  Yes.

16    BY MR. TORRES:

17    **Q.**   Just try to short-circuit this, but I guess I'm not

18    doing such a good job of it.

19         If you go forward to the "Highlights of Buchanan Mine

20    Production Employee Benefits."

21    **A.**   This one?

22    **Q.**   That page.

23    **A.**   Mm-hmm.

24    **Q.**   So would it be easier if I just put this -- get the

25    Judge to the right page.

```
 1              THE CLERK:  This is the page he's trying to get

 2    to.

 3              THE COURT:  Are there no numbers?

 4              THE CLERK:  It's where the photocopying starts to

 5    look different from this.  Just after that.  Right there.

 6              MR. TORRES:  I apologize.

 7    BY MR. TORRES:

 8    Q.   So I want to direct your attention, Mr. Hymes, to a

 9    page that states, "Highlights of Buchanan Mine Production

10    and Maintenance Employee Benefits."

11         Do you see that?

12    A.   The one with the people in the rocking chair?

13    Q.   Correct, yes.

14    A.   Okay.

15    Q.   Are you there?

16    A.   Yes.

17    Q.   And then if you move forward two more pages, there is a

18    page that says, "The Plan at a Glance."  Do you see that?

19    A.   Yes.

20    Q.   And at the bottom of that, it says, "Buchanan 1-84."

21    Correct?

22    A.   Yes.

23    Q.   Is that correct?

24    A.   Yes.

25    Q.   And your understanding, that refers to the fact that
```

1    this was issued by CONSOL in January of 1984?  Correct?

2    **A.**    Yes.

3    **Q.**    And that's during that time period we were talking

4    about when you were in Southern Appalachia and you were

5    involved in these orientations, correct?

6    **A.**    Yes.

7    **Q.**    And so there were Summary Plan Descriptions back during

8    that time period, correct?

9    **A.**    Yes.

10   **Q.**    And according to your deposition testimony, these SPDs

11   were distributed during orientations, correct?

12   **A.**    If I said that -- I don't remember saying it, but if I

13   said that, then they were.  But I really do not remember

14   them being distributed during the orientations.

15   **Q.**    Okay.  Well, to your knowledge, since you were in HR,

16   you know these were provided to employees?

17   **A.**    These were provided to employees.  I'm not sure when.

18           MR. TORRES:  Your Honor, we offer Defendant's

19   Exhibit 18.

20           MR. PETSONK:  Well, Your Honor, I guess I have no

21   objection.  I don't know what purpose he wants to make of

22   it.  But no objection.

23           THE COURT:  Admitted.

24           **Defendant's Exhibit 18 admitted.**

25

```
 1   BY MR. TORRES:

 2   Q.   And it's your understanding, Mr. Hymes, the Summary

 3   Plan Descriptions that CONSOL issued also included

 4   reservation of rights clauses, correct?

 5   A.   I think they did.  I don't know where they are, but --

 6   Q.   Okay.

 7   A.   You know, my experience, they usually do.

 8   Q.   So if you go back to the section of the medical

 9   benefits we were looking at, Mr. Hymes, after the -- if you

10   keep moving forward.  So we started on the page that has the

11   individual on the rocking chair, correct?

12   A.   Yes.

13   Q.   And we went forwards to the page that says, "Plan at a

14   Glance," correct?

15   A.   Yes.  Mm-hmm.

16   Q.   And then you go forward after that, and it starts

17   having numbered pages, correct?

18   A.   Yes.

19   Q.   And so if you go to page 9, it says, "If you are

20   disabled" at the top, correct?

21   A.   Page 9?  It says, "If you are disabled," yes.

22   Q.   And the next page talks about terminating your

23   employment, correct?

24   A.   If you're disabled.  There is two pages of if you're

25   disabled, 8 and 9.
```

1    **Q.**   Correct, and the next page, 10, when you terminate your

2    employment, correct?

3    **A.**   Yes.

4    **Q.**   And moving forward two more pages, there is another

5    heading that says, "Supplemental Information," and refers to

6    the medical expense benefit plan, correct?

7    **A.**   Mm-hmm.

8    **Q.**   You have to say yes, sir?

9    **A.**   Yes.  Sorry.

10   **Q.**   And the next page after that, it says, "Table of

11   Contents," correct?

12   **A.**   Yes.

13   **Q.**   And number 16 says, "Termination of the Plan," and

14   that's on Page Roman V, correct?

15   **A.**   Yes.

16   **Q.**   And if you page to Roman V, there is a reservation of

17   rights clause for the benefit plan, correct?

18   **A.**   That's what it says, yes.

19   **Q.**   And that's a page dated January 1984, correct?

20   **A.**   Yes.

21   **Q.**   Okay.  And in none of the orientations that you

22   participated in did you ever tell employees to ignore the

23   reservation of rights language in the Summary Plan

24   Description as lawyer talk, correct?

25   **A.**   Lawyer talk was aimed at the handbook.

HYMES - CROSS

1    **Q.**   So the answer to my question is, you never told any

2    employee during any orientation that you conducted to ignore

3    the reservation of rights clause in the SPD as lawyer talk,

4    correct?

5    **A.**   I never discussed it.

6    **Q.**   Well then, that means you never told them?

7    **A.**   Never discussed that issue.

8    **Q.**   Your testimony is that that lawyer's talk language

9    referred to the employee handbook, not to the Summary Plan

10   Description, correct?

11   **A.**   It refers to the handbook.

12   **Q.**   Okay.  And in the orientations that -- the portions of

13   the orientations that you witnessed that Mr. Fox conducted,

14   he never told anyone in those orientations that they should

15   ignore the reservation of rights language in the Summary

16   Plan Description as lawyer talk, correct?

17   **A.**   I never heard him talk about it.

18   **Q.**   And you're not aware of anyone else who told employees

19   to ignore the reservation of rights clause in CONSOL's

20   Summary Plan Description as lawyer talk, correct?

21   **A.**   I don't -- no, I'm not.

22   **Q.**   And, again, just so we are clear on things, you last

23   worked in Human Resources at mines, at the mine portion of

24   CONSOL in 1992, correct?

25   **A.**   Yes.  Well, end of '92.

HYMES - CROSS

1   Q.   Right.  And other than Mr. Fox in '82 to '83, you

2   didn't attend any orientations at any other CONSOL locations

3   except for the one that you conducted yourself, correct?

4   A.   Correct.

5   Q.   And that would have included while you were employed,

6   any orientations that Mr. Campbell might have conducted,

7   correct?

8   A.   No, I didn't attend any Mr. Campbell conducted.

9   Q.   Or Mr. Fox?  Correct?

10  A.   Other than the ones I attended that Fox conducted.

11  Q.   Yes.  And Mr. Gianato?

12  A.   No.

13  Q.   And, again, you didn't attend, while you were employed

14  at CONSOL, orientations at any other locations, correct?

15  A.   No.  That's correct.

16  Q.   And, again, you only worked for CONSOL until 1993,

17  correct?

18  A.   Yes.

19  Q.   And now, Mr. Casey began working for CONSOL at Buchanan

20  in the '80s?

21  A.   I don't know that.

22  Q.   Okay.  Fair enough.  But I take it that you are not

23  aware of any -- you didn't attend any orientations that Mr.

24  Casey might have attended, correct?

25  A.   I don't remember whether he was there or not.  He may

1    have been.  I just don't know.

2    **Q.**   Okay.  And so you don't know what Mr. Casey may have

3    been told at any orientations he attended?

4    **A.**   No.

5    **Q.**   And Mr. Jack, who worked at Enlow Fork in the '90s, you

6    wouldn't beware of whatever he was told during any

7    orientations he attended, correct?

8    **A.**   No.

9    **Q.**   And Mr. Long, who was at Enlow Fork at the same time

10   period, you wouldn't know what he was told during

11   orientations he attended?

12   **A.**   No.

13   **Q.**   And Mr. Prater, who was at CONSOL of Kentucky in 2000,

14   you wouldn't know what he was told during the orientations

15   he attended?

16   **A.**   No.

17   **Q.**   And Mr. -- Ms. Gilbert, who was at Buchanan in 2005,

18   you don't know what she would have been told in any

19   orientations she attended, correct?

20   **A.**   That's correct.

21   **Q.**   And Mr. Fitzwater and Mr. Bright, who joined CONSOL in

22   2007, when AMVEST was acquired by CONSOL, you don't know

23   what, if anything, they would have been told about their

24   benefits in any orientations they attended?

25   **A.**   No.

1   **Q.**   And you don't know what materials would have been used

2   in those orientations that you didn't attend, correct?

3   **A.**   I don't know what materials were used.

4   **Q.**   And you wouldn't know what was said in those

5   orientations?

6   **A.**   I know which materials were used.  I wasn't there.

7   **Q.**   Correct.  You don't know what materials were used,

8   correct?

9           MR. PETSONK:  Your Honor, I'm going to object.

10   He's asking him questions over and over again at this point.

11   It's been asked.  His questions about what Mr. Hymes knows

12   was said or the materials that were used in the

13   orientations.

14           MR. TORRES:  I'm not trying -- we were talking

15   over each other.  I was just trying to make sure the record

16   was clear.

17           THE COURT:  Go ahead.

18   BY MR. TORRES:

19   **Q.**   I'm really not trying to keep you here any longer than

20   necessary, Mr Hymes, but you don't know what materials were

21   used at any of those orientations, correct?

22           MR. PETSONK:  Object, Your Honor.  It's not clear

23   what orientations he is referring to.

24           THE COURT:  Restate the question.

25   BY MR. TORRES:

1    Q.   You are not sure what materials were used in any of the

2    orientations that the plaintiffs in this lawsuit attended,

3    correct?

4            MR. PETSONK:  Objection, Your Honor.  I don't even

5    know that a foundation was laid, whether the witness knows

6    what orientations the plaintiffs in this lawsuit attended.

7            MR. TORRES:  That's the point, Your Honor.

8            THE COURT:  If the witness doesn't know what

9    materials were used, he can say that.  And presumably, he

10   means just that.

11           THE WITNESS:  I don't know what materials were

12   used.  I just know what materials were used while I was

13   there.

14   BY MR. TORRES:

15   Q.   Right.  And you don't know what was said in any of the

16   orientations that the plaintiffs attended, correct?

17   A.   I wasn't in any of the orientations the plaintiffs

18   attended, unless I was in the one that Emmett Casey attended

19   that I did not remember.

20   Q.   And you didn't know if any scripts were used in the

21   orientations that the plaintiffs attended, correct?

22   A.   I know that was the direction.  I don't know if they

23   used them.

24   Q.   And you don't know if anyone described anything in the

25   orientations that these plaintiffs attended as lawyer talk?

1    **A.**   I do know that John Fox said that.  I do not -- and I

2    know that I said it.  I don't know what was said by anyone.

3    **Q.**   But you don't know if anyone said that to any of the

4    plaintiffs in this lawsuit?

5    **A.**   I don't know.

6            MR. TORRES:  I'm sorry, Your Honor.  I'm just

7    trying to make sure I covered everything here.

8    BY MR. TORRES:

9    **Q.**   Now, regarding Plaintiff's Exhibit 15, Mr. Hymes.  This

10   was this Bailey orientation script?

11   **A.**   Yes.

12   **Q.**   So you gave this to Mr. Fox and asked him to update it,

13   correct?

14   **A.**   The best of my knowledge, that's what I remember, yes.

15   **Q.**   And sitting here today, you don't -- do you even recall

16   if it was updated?

17   **A.**   I'm sure we did foremen's training, but I can't tell

18   you for sure.

19   **Q.**   Okay.  And, well, sir, let's start with this document.

20   I mean, this is from Bailey, so this isn't something you

21   used ever, correct?

22   **A.**   No.  It would have had to have been modified for us to

23   be able to use it.  It wasn't unusual to share things back

24   and forth.  But it would have had to have been modified to

25   fit Buchanan.

1   **Q.**   Okay.  So there had to be changes so that whatever they

2   were saying at Bailey wasn't necessarily part of Buchanan,

3   right?

4   **A.**   Generally, the changes that were made were the names

5   and site specific kind of things.  When we talk about

6   foremen training, for union-free, the boilerplate like stuff

7   is the boilerplate like stuff.  It was all the same.

8   **Q.**   The fact that this document, you never -- you never

9   used this Bailey document to conduct any training yourself,

10  correct?

11  **A.**   No, I did not.

12  **Q.**   And you never saw anyone else use this document to

13  conduct training, correct?

14  **A.**   No.

15  **Q.**   And whatever was done to this document to update it

16  for Buchanan, you don't recall; you weren't present for any

17  presentations using whatever might have been updated from

18  the document that you gave Mr. Fox?

19  **A.**   I might have been present, but I don't remember.

20  **Q.**   You don't remember.  And you don't know if Mr. Campbell

21  ever received the training that's reflected in Plaintiff's

22  15, correct?

23  **A.**   No, I do not.

24  **Q.**   And you don't know if Mr. Gianato received training

25  contained in Plaintiff's 15, correct?

1   **A.**   Well, Mr. Gianato was at Enlow, so I don't know.

2   **Q.**   You don't know -- well, this is Bailey, though,

3   correct?

4   **A.**   That's Bailey, but they are connected.

5   **Q.**   You don't know if Mr. Gianato ever received any

6   training using Plaintiff's 15, correct?

7   **A.**   Mr. Gianato didn't work for me, so I don't know.

8   **Q.**   Okay.  And you don't know if Mr. Fox -- Mr. Fox would

9   have received this training, because he was at Buchanan,

10  correct?

11  **A.**   Well, I already answered that.

12  **Q.**   And however this was updated at Buchanan, you don't

13  know if any of those gentlemen would have received any

14  training based upon however this might have been updated,

15  correct?

16  **A.**   No, I do not.

17          MR. TORRES:  Could I have just one minute, Your

18  Honor?

19          THE COURT:  You may.

20          MR. TORRES:  Thank you, Mr. Hymes.

21      Thank you, Your Honor.  I don't have any further

22  questions.

23          I'm sorry, I don't have any further questions,

24  Your Honor.  However, in light of the examination of Mr.

25  Hymes, we would renew our objection to Plaintiff's Exhibit

HYMES - CROSS

1    15, and any portions of 10-A or 14 that he did not identify

2    as having heard Mr. Fox use in training at Buchanan.

3                THE COURT:  Well, is there any exception made on

4    10-A?

5                MR. PETSONK:  There was, Your Honor.  My notes

6    indicate that you had admitted 10-A, but -- 10-A had been

7    admitted.  My understanding, there was an exception made on

8    14.  And you admitted it down to the end of the line that

9    ends with "and this language tells you that."  And then

10   there was some question as to whether the remainder of page

11   486 and the subsequent pages were to be admitted, Your

12   Honor.

13               THE COURT:  Let's go back to what you just stated.

14   Do you agree that there were no exceptions made for 10-A?

15               MR. TORRES:  Yes, Your Honor.

16               THE COURT:  And so you are referring to 14?

17               MR. TORRES:  I apologize.  14 and 15, Your Honor.

18               THE COURT:  And then the 14, starting at the last

19   paragraph on the first page, the Court will reserve the

20   ruling.  It did the same thing on 15.  And will continue

21   with that.  Thank you for your re-objection.

22               MR. TORRES:  Thank you, Your Honor.

23               THE COURT:  Anything further?

24               MR. PETSONK:  Nothing further from the plaintiff,

25   Your Honor.  I want to thank Your Honor.  And I feel

1    compelled to thank the witness myself for --

2              THE COURT:  Well, first of all, Mr. Hymes, I never

3    figured you would be out of here at this hour.  Whenever

4    counsel says a certain time, you frequently have to double

5    it.  So at least it is a respectable time.

6              THE WITNESS:  Thank you for speeding up --

7              THE COURT:  I'm sorry you had to wait so long.

8              THE WITNESS:  Thank you for speeding them up, Your

9    Honor.

10             THE COURT:  Thank you.  And somehow I think it

11   will go faster now.  But thank you so much for being here.

12   And, I take it, that Mr. Hymes is excused?

13             MR. PETSONK:  Yes, Your Honor.

14             MR. TORRES:  Yes, Your Honor.

15             THE COURT:  And let me note to you that you are

16   not to discuss your testimony with any other witness in this

17   case until the trial is over unless the Court indicates

18   otherwise to you.

19             THE WITNESS:  Yes.

20             THE COURT:  And I thank you for your assistance.

21   And you can again follow me out.

22             THE WITNESS:  I'll follow you out.

23             THE COURT:  As a matter of fact, I want to have

24   you go on.

25             THE WITNESS:  I have a bunch of material I need to

 1    give to somebody.

 2              THE COURT:  The clerk will pick those up.  You can

 3    just leave them right there.  Thank you, sir.

 4              THE WITNESS:  Thank you, sir.

 5              THE COURT:  Have a nice trip.

 6        Do the parties have anything further this evening?

 7              MR. POMPONIO:  Your Honor, I just wanted to give a

 8    scheduling update.  The plaintiffs have withdrawn their

 9    proposed expert witness, Dan Selby.  So we won't be calling

10    him.  And tomorrow I have a -- I'm not going to be here in

11    the afternoon.

12              THE COURT:  Again, please.

13              MR. POMPONIO:  I'm not going to be here in the

14    afternoon tomorrow, Judge.  The trial will continue in the

15    capable hands of lead counsel.

16              THE COURT:  There are several of us that would

17    like to join you.

18              MR. POMPONIO:  You're welcome to join me, if you

19    like.

20              THE COURT:  So you'll be here in the morning?

21              MR. POMPONIO:  Yes, Your Honor.

22              THE COURT:  Very good.

23              MR. TORRES:  Your Honor, I think everything else

24    on the witness side that we need to discuss we can probably

25    defer to tomorrow and address it then.

1          So nothing further tonight, Your Honor.

2              THE COURT:  Very good.  Nothing further this

3     evening, Mr. Petsonk?

4              MR. PETSONK:  No, Your Honor.  I thank you.

5              THE COURT:  We'll see you at 9:30 in the morning.

6     I take it Mr. Fitzwater will be back at that time?

7              MR. PETSONK:  Mr. Fitzwater will be back.  And I

8     believe we'll be able to proceed with our other witnesses as

9     well.

10             THE COURT:  Thank you.  Good night.

11             THE CLERK:  All rise.

12         (Proceedings concluded at 5:37 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1               CERTIFICATE OF OFFICIAL REPORTER

2       I, Catherine Schutte-Stant, Federal Official Realtime

3  Court Reporter, in and for the United States District Court

4  for the Southern District of West Virginia, do hereby

5  certify that, pursuant to Section 753, Title 28, United

6  States Code, the foregoing is a true and correct transcript

7  of the stenographically reported proceedings held in the

8  above-entitled matter and that the transcript page format is

9  in conformance with the regulations of the Judicial

10  Conference of the United States.

11

12        s/Catherine Schutte-Stant, RDR, CRR

13      _____   March 4, 2021

14      Catherine Schutte-Stant, RDR, CRR
         Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25