1               IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                         AT CHARLESTON

3    _____x
                                   :
4    BENNY FITZWATER,              :   CIVIL ACTION
     CLARENCE BRIGHT, TERRY PRATER,:   NO. 2:16-cv-09849
5    EMMET CASEY, JR.,             :
     CONNIE Z. GILBERT,            :   Consolidated with:
6    ALLAN H. JACK, SR., and,      :   CIVIL ACTION
     ROBERT H. LONG.,              :   NO. 1:17-cv-03861
7             Plaintiffs,          :
                                   :
8                    -vs-          :
                                   :
9    CONSOL ENERGY, INC.,          :
     CONSOLIDATION COAL CO.,       :
10   FOLA COAL CO., LLC,           :
     CONSOL OF KENTUCKY, INC.,     :
11   CONSOL PENNSYLVANIA COAL CO., :
     LLC, and KURT SALVATORI,      :
12                                 : **BENCH TRIAL**
              Defendants.          : **VOLUME IV**
13   _____x

14               **TRANSCRIPT OF PROCEEDINGS**
          **BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.,**
15           **SENIOR UNITED STATES DISTRICT JUDGE**
                     **FEBRUARY 12, 2021**

16

17

18   **APPEARANCES:**
     **FOR THE PLAINTIFFS:**        **SAMUEL B. PETSONK, ESQUIRE**
19                                 PETSONK PLLC
                                   P. O. Box 1045
20                                 Beckley, WV  25802

21

22        Proceedings recorded by mechanical stenography,
     transcript produced by computer.
23

24        _____
               CATHERINE SCHUTTE-STANT, RDR, CRR
25              Federal Official Court Reporter
             300 Virginia Street East, Room 6009
                    Charleston, WV 25301

```
 1    APPEARANCES CONTINUED:

 2    FOR THE PLAINTIFFS:        BREN J. POMPONIO, ESQUIRE
                                 LAURA DAVIDSON, ESQUIRE
 3                               Mountain State Justice, Inc.
                                 1217 Quarrier Street
 4                               Charleston, WV  25301

 5

 6

 7    FOR THE DEFENDANTS:        JOSEPH J. TORRES, ESQUIRE
                                 ALEXIS E. BATES, ESQUIRE
 8                               EMMA J. O'CONNOR, ESQUIRE
                                 KATHERINE M. FUNDERBURG, ESQUIRE
 9                               Jenner & Block LLP
                                 353 N. Clark Street
10                               Chicago, IL  60654

11

12

13    FOR THE DEFENDANTS:        MICHAEL D. MULLINS, ESQUIRE
                                 Steptoe & Johnson PLLC
14                               707 Virginia Street East
                                 17th Floor
15                               Charleston, WV 25301

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    INDEX
            PLAINTIFF'S
 2          WITNESSES        DIRECT   CROSS   REDIRECT  RECROSS  EXAMINATION

 3

 4          BENJAMIN FITZWATER   ^      705     741      747        ^

 5

 6          JOHN LAWSON        760     765     781      782        783

 7          DONALD HYLTON,SR.  786     795      ^        ^          ^

 8

 9          EDMUND STEPHENSON  825     840     845       ^          ^

10

11          VIDEOTAPED DEPOSITIONS:

12          DORIS JESSO                848

13

14          KIRBY HALL                852

15

16          DEFENDANT'S
            WITNESSES        DIRECT   CROSS   REDIRECT  RECROSS  EXAMINATION

17          (NONE)             ^        ^       ^        ^          ^

18

19

20

21

22

23

24

25
```

INDEX TO EXHIBITS

PLAINTIFF'S
EXHIBITS                              ADMITTED

    16                                    764
    17                                    850


DEFENDANT'S
EXHIBITS                              ADMITTED

    19                                    717
    20                                    722
    21                                    724
    22                                    725

```
 1          (The following Bench Trial was held before the

 2     Honorable John T. Copenhaver, Jr., Senior United States

 3     District Judge, in the case of Fitzwater, et. al. versus

 4     CONSOL, et. al, on Friday, February 12, 2021, at Charleston,

 5     West Virginia.)

 6                    P-R-O-C-E-E-D-I-N-G-S                9:38 a.m.

 7                    THE CLERK:  All rise.

 8                    THE COURT:  Good morning.  Please be seated.

 9                    MR. TORRES:  Your Honor, before we proceed with

10     Mr. Fitzwater today, we had a couple of housekeeping and

11     logistics issues we wanted to bring to the Court's

12     attention, if that's okay?

13                    THE COURT:  Go ahead.

14                    MR. TORRES:  Your Honor had asked the parties to

15     conduct these evidentiary depositions, and we just were

16     looking for some guidance at this point as to how the Court

17     would like to receive them so we could make sure and use the

18     weekend to put them in whatever format the Court prefers so

19     we can get them over here.

20                    THE COURT:  Well, first of all, you have them

21     transcribed?

22                    MR. TORRES:  Yes.

23                    THE COURT:  And are there objections?

24                    MR. TORRES:  I don't remember.

25                    MR. PETSONK:  Well, objections --
```

1           THE COURT:  Excuse me.  If you're not sure about

2      it, just confer with each other and figure it out, and let

3      me know if there are any.  And if there are any, whether the

4      Court is going to have to go through the transcript and pass

5      on those matters.  So just confer with each other first and

6      see if you can work it out.

7           MR. TORRES:  Okay.  The other issue, Your Honor,

8      for next week, currently, we expect to have nine rebuttal

9      witnesses.  We'll confirm that and make sure that we need

10     all of those; and if not, obviously, we'll let counsel aware

11     of the final list.  But there is one -- two potential

12     scheduling issues.  One has to do with Mr. Kowzan, who is

13     traveling from Florida.  We've learned last week that he was

14     scheduled to receive his COVID shot, he and his wife, on

15     Monday evening.  Those are the appointments they were given.

16     They were not able to pick the times.  So in order to come

17     to West Virginia, he's going to have to leave Florida on

18     Tuesday, which would mean he would probably get here

19     sometime Wednesday afternoon.  I'm not sure if it would be

20     in time for him to be on the stand Wednesday.  So that might

21     potentially mean Mr. Kowzan would not be available to

22     testify until next Thursday.

23          The rest of the witnesses right now, we have scheduled

24     to be here on Tuesday and Wednesday.

25          Again, I just wanted to make sure the Court was aware

1    of that one issue regarding Mr. Kowzan's schedule, because

2    he's not comfortable flying.

3            THE COURT:  That's fine.

4            MR. TORRES:  That's it, Your Honor.  Thank you.

5            THE COURT:  With respect to the objections, I'd

6    ask you now to confer and let me know if there are any

7    objections the Court needs to pass upon with respect to what

8    I understand to be the two depositions?  And so just confer

9    privately and let the Court know whether or not you can

10   agree on those matters that may have been objected to at the

11   time the deposition was taken.

12           MR. PETSONK:  Yes.  We'll ascertain which one

13   specifically and confer about those.  Thank you, Your Honor.

14   Which ones are you offering?

15       (An off-the-record discussion was held between

16   counsel.)

17           MR. PETSONK:  Your Honor, as to the two

18   plaintiffs' witnesses to be offered by video deposition, it

19   does not appear there are any unresolved objections that

20   Your Honor would need to address today.

21           THE COURT:  That seems to take care of that.  And

22   I thought those were the only depositions, but it may be

23   that there were others?

24           MR. TORRES:  We have four more that defendants

25   would offer.  And we don't have the transcripts, but per

 1    Your Honor's instruction, we'll make sure there aren't any

 2    objections that need to be addressed by the Court.  I'm

 3    thinking there aren't, but we'll review the transcripts to

 4    double-check, Your Honor.

 5              THE COURT:  Who are the four?

 6              MS. BATES:  They are Wayne Keener, Tom Hudson,

 7    Chase Elswick, and Craig Campbell.

 8              THE COURT:  To what are Keener and Hudson to

 9    testify?

10              MR. TORRES:  Mr. Keener testified about whether or

11    not -- he was named by one of the named plaintiffs, I

12    believe, as -- Mr. Fitzwater might have named him -- don't

13    hold me to that, Your Honor -- but someone from the Fola

14    location, so he's testifying regarding the fact that he

15    didn't make any promises to the benefits.

16         Mr. Hudson was the person who was named by Mr. Jack at

17    Enlow Fork.

18         Mr. Campbell, you may have recalled, was referenced by

19    Mr. Prater in his testimony.

20         And then Mr. Elswick was mentioned by Mr. Fitzwater,

21    and I believe he may be mentioned by one or two of the

22    rebuttal witnesses that you'll hear from, I believe, today.

23              THE COURT:  Why are they unable to be present?

24              MR. TORRES:  Mr. Campbell was the gentleman, Your

25    Honor, who works for the Port Authority in Pennsylvania.

1    And as we explained earlier, Your Honor, he's unable -- he

2    would have to quarantine at home for 14 days if he traveled

3    out of the state, and he was unable to do that.  He was not

4    able -- his job would not allow him to do that and not be

5    present -- physically present at work.

6         THE COURT:  He's beyond the process of the Court,

7    as I understand?

8         MR. TORRES:  Yes, he is, Your Honor.

9         THE COURT:  Who else?

10        MR. TORRES:  Mr. Keener broke his leg.  He had a

11   chain saw kick back and hit him.  We asked Mr. Keener if he

12   could travel, and his leg's not mobilized, and so the doctor

13   was telling him if he traveled, there was a risk that he

14   would have to go in and insert screws to his leg.  So that

15   is why he was unable to travel here.

16      Mr. Elswick, Your Honor, if you recall, works for

17   Volvo, and he's in Charlotte for his job for contract

18   negotiations until the beginning of March.  And that's why

19   Mr. Elswick was unable to be here.  I believe he's also out

20   of the Court's subpoena authority, in any event, as to

21   his --

22        THE COURT:  What are the residences of those other

23   than Mr. Keener?

24        MR. TORRES:  Mr. Campbell is a -- he's in Florida,

25   Your Honor.  Mr. Elswick is in West -- he's in Virginia, I

FITZWATER v CONSOL

```
 1    believe, Your Honor.  And then Mr. Hudson is in Canonsburg,

 2    Pennsylvania.

 3              THE COURT:  Are they residents of West Virginia?

 4              MR. TORRES:  No.

 5              THE COURT:  So they reside in the states that

 6    you've referred to?

 7              MR. TORRES:  Yes.

 8              THE COURT:  How lengthy are their depositions?

 9    Just approximate.

10              MR. TORRES:  I think each of them are 30 minutes,

11    Your Honor.

12              THE COURT:  Pardon?

13              MR. TORRES:  30 minutes.

14              THE COURT:  30 minutes apiece?

15              MR. TORRES:  Yes.

16              THE COURT:  Very good.  While we are on that

17    subject, what's the length of the two depositions that the

18    plaintiff will be presenting?

19              MR. POMPONIO:  Similarly, less than 30 minutes.

20              THE COURT:  And with regard to the depositions of

21    the other four plaintiffs, do the parties have objections to

22    those depositions that need to be resolved?

23              MR. TORRES:  We don't believe so, Your Honor.  But

24    we don't have the transcripts, so I want to give opposing

25    counsel the opportunity to review if there are any.  We can
```

1    probably get that resolved today, Your Honor, and report

2    back later today.

3              THE COURT:  Very good.  Thank you.

4         Anything else?

5              MR. TORRES:  No, but could I have a moment to

6    confer, Your Honor?

7              THE COURT:  You may.

8         (An off-the-record discussion was held between the

9    defense counsel.)

10             MR. TORRES:  Thank you, Your Honor.

11             THE COURT:  Are counsel ready to proceed?

12             MR. PETSONK:  I believe we are all ready to

13   proceed.  Certainly, on our side, yes.

14             THE COURT:  You may do so.

15      **BENJAMIN MONROE FITZWATER, PLAINTIFF, PREVIOUSLY SWORN**

16                     **CROSS-EXAMINATION**

17   **BY MR. TORRES:**

18   **Q.**   Mr. Fitzwater, I want to just get a timeline down since

19   it's been a little while since you testified so you can

20   orient the Judge about your testimony.

21        You were hired at CONSOL in 2007; is that correct?

22   **A.**   I worked -- if I may explain?  I worked for AMVEST; I

23   started there in '95.  1995, I was 28, and then CONSOL

24   bought the AMVEST operation.  I stayed at that same location

25   at that same job from 2007 on to February the 14th, 2013.

1   **Q.**   So my question is correct, you started working for

2   CONSOL in 2007, correct?

3   **A.**   That is correct.

4   **Q.**   All right.  Do you remember what month in 2007?

5   **A.**   That the operation was bought?  Is that what you are

6   asking me?

7   **Q.**   Yes, sir.

8   **A.**   I do not remember.

9   **Q.**   And whenever it was, shortly after you began working,

10  you previously testified about the conversation you had with

11  Ms. Osborn in the bathhouse, correct?

12  **A.**   I didn't have a conversation with her.  She just went

13  over some of the benefits.

14  **Q.**   Okay.  So sometime after the acquisition in 2007, Ms.

15  Osborn went over the benefits in the bathhouse?  Did I get

16  that right?

17  **A.**   That is correct; Ms. Osborn did go over some of the

18  benefits, not all of them.

19  **Q.**   I'm just trying to get the dates down, sir.  And then

20  in 2008, you said you recall a presentation in Summersville,

21  correct?

22  **A.**   I'm not sure it was 2008, but that's what I -- the best

23  of my memory, it probably was 2008.  Yes, at the Armory.

24  **Q.**   Well, that's what you testified to yesterday, correct,

25  sir?

1    **A.**    Yes.

2    **Q.**    And then, to the best of your knowledge, the organizing

3    activity that you referred to occurred in 2010?

4    **A.**    It would have been going on in 2010.

5    **Q.**    All right.  That's what you testified to yesterday,

6    right?

7    **A.**    Yes.

8    **Q.**    And then you were laid off in 2013, correct?

9    **A.**    That is correct.

10   **Q.**    And then your post-layoff insurance ended in 2014,

11   correct?

12   **A.**    Are you asking me when I discontinued the insurance?

13   **Q.**    No, sir.  You testified yesterday that after you were

14   laid off, you were provided healthcare for one year by

15   CONSOL?

16   **A.**    Oh, yes.

17   **Q.**    And that ended in 2014, correct?

18   **A.**    That's correct.

19   **Q.**    And after it ended in February of 2014, in September of

20   2014, you sent in the paperwork to suspend your CONSOL

21   health insurance, correct?

22   **A.**    Yes.

23   **Q.**    And sometime after you suspended your health insurance

24   in September, CONSOL announced in 2014 that it was going to

25   terminate retiree medical benefits five years later,

1    correct?

2    **A.**    Yes.

3    **Q.**    And then in 2015, CONSOL announced that it was actually

4    going to terminate those benefits at the end of 2015,

5    correct?

6    **A.**    Best of my knowledge, yes, that is correct.

7    **Q.**    Okay.  So 2007 to 2015 is the time period we are

8    discussing, correct?

9    **A.**    I don't understand what you are asking me.

10   **Q.**    The time period we just talked about runs from 2007 to

11   2015, correct?

12           MR. PETSONK:  Object, Your Honor.  Mr. Fitzwater

13   testified about a period beginning in 1995.

14           THE COURT:  Sustained.  Just be more specific.

15           MR. TORRES:  That's fine, Your Honor.

16   BY MR. TORRES:

17   **Q.**   So during the period 2007, when you first started

18   working for CONSOL, until you terminated -- suspended your

19   CONSOL benefits, during that period of time, 2007 to 2014,

20   you received documents from CONSOL, Mr. Fitzwater, that

21   stated it had reserved the right to terminate benefits,

22   correct?

23   **A.**    You are -- let me make sure I understand your question.

24   You are asking me if I received any information before 2014

25   or 2015 stating that my benefits would be terminated?

```
 1                  THE COURT:  Restate the question.

 2                  MR. TORRES:  Yes, Your Honor.

 3     BY MR. TORRES:

 4     Q.   Between the period of 2007, when you first started

 5     working for CONSOL, and 2014, when you suspended your CONSOL

 6     insurance, you received documents from CONSOL that stated

 7     they reserve the right to terminate their benefits, correct?

 8     A.   I do not remember receiving any.  I could have, but I

 9     don't remember.

10     Q.   So you were deposed in this matter, correct?

11     A.   I'm not hearing you very well.  Would you please repeat

12     it?

13     Q.   You were deposed in this matter, correct, sir?

14     A.   Explain what you mean by that, please.

15     Q.   Did you testify under oath in this case?

16     A.   Yes.

17     Q.   Before today?

18     A.   Yes.

19     Q.   I asked you questions; you answered them under oath,

20     correct?

21     A.   Yes.

22     Q.   And you swore to tell the truth during that deposition,

23     right?

24     A.   Yes.

25     Q.   And you answered to the best of your recollection,
```

1    correct?

2    **A.**    Yes.

3            MR. TORRES:  I apologize, Your Honor.  May I

4    approach, Your Honor?

5            THE COURT:  You may.

6    BY MR. TORRES:

7    **Q.**    Mr. Fitzwater, I'm going to show you what's been marked

8    Deposition Exhibit 19.

9            THE COURT:  Is that 19 in this case?

10           MR. TORRES:  Yes, Your Honor.  Defendant's Exhibit

11   19.

12   BY MR. TORRES:

13   **Q.**    And do you have the document in front of you, sir?

14   **A.**    Yes, I do.

15   **Q.**    And do you see at the bottom of -- it says, "19" up at

16   the top, correct?

17   **A.**    Yes.

18   **Q.**    And at the bottom, there is also an exhibit sticker

19   that says, "Exhibit 4 Fitzwater"?

20   **A.**    Correct.  Yes.

21   **Q.**    And the first page of this says, "Summary Plan

22   Descriptions Production and Maintenance Employees at AMVEST

23   West Virginia, Coal, LLC and Its Subsidiaries," correct?

24   **A.**    Yes.

25   **Q.**    And I showed this document to you during your

1   deposition, correct?

2   **A.**   Like I said, it's been, what, three years?  2018?  If I

3   said in the deposition that you showed me the document, then

4   you showed me the document.

5          (An off-the-record discussion was held between

6   defense counsel.)

7   BY MR. TORRES:

8   **Q.**   Well, I hate to do this to you, Mr. Fitzwater.

9          MR. TORRES:  May I approach, Your Honor?

10  MR. TORRES:

11  **Q.**   The writing on here is kind of small.  I had a bigger

12  copy and unfortunately didn't bring it over.  I'm going to

13  hand you a copy of your deposition.

14        That says on the first page that it's the Video

15  Deposition of Benjamin Fitzwater, correct?  Up at the top,

16  on the top, left side?

17  **A.**   Are you talking about on the center of it or on the

18  right-hand side?

19  **Q.**   This says it is the Video Deposition of Benjamin

20  Fitzwater, correct?

21  **A.**   Yes.

22  **Q.**   And it says that you were deposed on May 22nd, 2017,

23  correct?

24  **A.**   That's what it says.

25  **Q.**   And if you turn -- if you open the document, sir, each

1   page actually has four deposition pages condensed.

2       Do you see that?

3   A.   Yes.

4   Q.   And you can see at the top of each page the page

5   numbers?  And I apologize they're kind of small.

6   A.   Yes, I see it.

7   Q.   Okay.  And if you turn to page 84, Mr. Fitzwater.  Let

8   me know when you get there.

9   A.   Yes, I see 84.  At the top right-hand top in the square

10  box.

11  Q.   I'm sorry, I apologize.  Can you go to page 83 first,

12  please.

13  A.   I see 83 in the block at the bottom left-hand corner.

14  Q.   Okay.  And do you see on the left side of the page

15  there is numbers, sir?

16  A.   Yes.

17  Q.   So if you go to -- those are line numbers.  So if you

18  go to Line 7?

19  A.   Okay.

20  Q.   It makes a reference to Deposition Exhibit 4, correct?

21  A.   Yes.

22  Q.   Okay.  Now then if you turn back to page 84, if you go

23  down to the bottom to Line 24 -- are you there, sir?

24  A.   Yes.

25  Q.   The sentence at the bottom of that page, the last

```
 1    sentence it starts to say, "This is the actual full
 2    document, which is" -- and if you go to page 85, it finishes
 3    and says, "marked as Exhibit Number 4."  Do you see that?
 4    A.   Yes.
 5    Q.   And then the next question I asked you was:  "So do you
 6    remember receiving or seeing that document before?"
 7         Right?
 8    A.   Yes.
 9    Q.   And your answer was:  "Yeah.  Yes, I do."
10         Correct?
11    A.   Yes.
12    Q.   So Exhibit 18, which is in front of you, which is
13    Fitzwater Deposition Exhibit 4, is the document that you
14    admitted under oath in your deposition that you received,
15    correct?
16              THE COURT:  Just a moment.  Are you referring to
17    Exhibit 18 or 19?
18              MS. BATES:  19.
19              MR. TORRES:  19, I apologize, Your Honor.
20              THE COURT:  So restate the question.
21              MR. TORRES:  Sure.
22    BY MR. TORRES:
23    Q.   Exhibit 19 is the same document you were shown in your
24    deposition, and you admitted receiving it, correct?
25    A.   Yes.
```

FITZWATER - CROSS

1    **Q.**   Thank you.  And if you go to Deposition Exhibit 18,

2    sir?

3            MR. PETSONK:  Your Honor, may I inquire?  What is

4    he referring to?  It's not clear what he is referring to.

5            MR. TORRES:  19.  Sorry.  It's my fault, Your

6    Honor.  I'm not quite sure why I keep saying that.

7            THE COURT:  You're not talking about the

8    Deposition Exhibit now; it's trial Exhibit 19?

9            MR. TORRES:  Yes, trial Exhibit 19.  I apologize,

10   Your Honor.

11   BY MR. TORRES:

12   **Q.**   For trial Exhibit 19, Mr. Fitzwater -- do you have it

13   in front of you?

14   **A.**   Yes, I do.

15   **Q.**   Okay.  And if you go three pages into the document,

16   there is a Table of Contents.  Do you see that?

17   **A.**   I'm looking at 19.  It says, page 19 at the bottom

18   left-hand corner in that block.  So what do you want me to

19   look at now?

20           MR. TORRES:  May I approach, Your Honor?

21           THE COURT:  You may.

22   BY MR. TORRES:

23   **Q.**   I want you to look at Deposition Exhibit 19, sir.  The

24   one that you reviewed in your deposition.

25   **A.**   Sorry.

```
 1                  MS. BATES:  Trial Exhibit.

 2                  MR. TORRES:  I'm sorry.  Trial exhibit.

 3       BY MR. TORRES:

 4       Q.   Do you have that in front of you, sir?

 5       A.   Yes, I do.

 6       Q.   If you open the document to the third page, to the

 7       Table of Contents?

 8       A.   Okay.

 9       Q.   Do you see it?

10       A.   I'm looking, page 3.

11       Q.   Do you see -- are you on the page that says, "Table of

12       Contents" at the top?

13       A.   No, I'm not.

14                  THE COURT:  Point it out.

15       BY MR. TORRES:

16       Q.   Are you there, sir?

17       A.   I'm there.

18       Q.   And at the bottom of this page, there is an entry that

19       says, "Future of the Plan," and that indicates it's on

20       numbered page 53, correct?

21       A.   Yes.

22       Q.   Can you turn to numbered page 53, sir?

23       A.   (Witness complies.)  Okay.  I'm on Page Number 53.

24       Q.   And at the bottom of that page, there is a section

25       entitled "Future of the Plan"; do you see that?
```

1   **A.**   Yes.

2   **Q.**   And that states, "the Board of Directors of CONSOL can

3   amend, modify, suspend or terminate all or part of the Plan

4   at any time," correct?

5   **A.**   That's what it says.

6   **Q.**   And if you go backwards to numbered page 9, sir, if you

7   would, please?

8   **A.**   Page Number 9.

9   **Q.**   Yes, numbered page 9, correct.

10   **A.**   I'm on page number 9.

11   **Q.**   And there is a section on that page that says, "If You

12   Retire," correct?

13   **A.**   Yes.

14   **Q.**   And the second paragraph of that section says, "If you

15   are eligible for coverage under a CONSOL Retiree Medical

16   Plan, you should consult that plan to determine the terms

17   and conditions under which you may be able to receive

18   benefits," correct?

19   **A.**   That's what it says.

20   **Q.**   And then it goes on to say, "Note that any such Retiree

21   Plan is subject to various terms and conditions, including

22   the Company's right to change or terminate the Retiree Plan

23   at any time for any reason," correct?

24   **A.**   That's what it says.

25   **Q.**   Now, you also --

FITZWATER - CROSS

1          MR. TORRES:  Your Honor, we'd offer admission of

2     Defendant's Exhibit 19.

3          MR. PETSONK:  Your Honor, I'm not sure that he's

4     established that the plaintiff -- or the witness has

5     personal knowledge about the contents of that document or

6     that it is appropriate for admission here.

7          MR. TORRES:  Your Honor, he admitted he received

8     it from CONSOL.

9          MR. PETSONK:  Your Honor, I don't know that he did

10    admit that.  He said he recognized the document.  He didn't

11    identify any particular transaction or any moment he

12    understands he received it.

13         MR. TORRES:  Your Honor, he agreed at his

14    deposition -- he admitted to receiving the document.

15         THE COURT:  Defendant's 19 is admitted.

16         MR. TORRES:  Thank you, Your Honor.

17         **Defendant's Exhibit 19 admitted.**

18    BY MR. TORRES:

19    **Q.**   In addition to the document we were just talking about,

20    Mr. Fitzwater, that Summary Plan Description, you received

21    additional documents from CONSOL that also stated that the

22    company reserved the right to terminate the plan, correct?

23    **A.**   Is that what I said in my deposition?

24    **Q.**   As a matter of fact, it is.

25    **A.**   If that's what I said in the deposition, then that is

1    correct.

2    **Q.**   Well, one of the documents -- I'd like to show you one

3    of the other documents we reviewed in your deposition, if

4    that's okay.

5             MR. TORRES:  May I approach, Your Honor?

6             THE COURT:  You may.

7    BY MR. TORRES:

8    **Q.**   Mr. Fitzwater, I'm showing you what's been marked as

9    Defendant's Exhibit 20.  This is a document, at the top, it

10   states, "CONSOL Energy," and then below it that says, "2009

11   CONSOL Healthcare Highlights," correct?

12   **A.**   Where do you see the 2009?  I see 2006.

13   **Q.**   2009.

14   **A.**   Oh, I'm sorry.

15   **Q.**   Do you see that, sir?

16   **A.**   Yes, sir, I do.

17   **Q.**   Do you recall that you looked at this document during

18   your deposition and you admitted you received it from

19   CONSOL, correct?

20   **A.**   I only have one problem with this.

21   **Q.**   Well, sir, the question is whether you received it from

22   CONSOL or not?

23   **A.**   Well, in order for me to answer your question, I need

24   to know why the $158 is marked at the right-hand top of this

25   paper.

1   **Q.**   You can disregard that.  I'm not saying that you wrote

2   that, sir.

3        I'm asking if you received a 2009 CONSOL Healthcare

4   Highlights document from CONSOL?

5   **A.**   Are you asking me if I received this one?

6   **Q.**   I'm asking you if you received a document from CONSOL

7   that is dated "2009 CONSOL Healthcare Highlights" that I

8   showed you at your deposition?

9   **A.**   Well, I'm just having a little problem answering this

10  question.  I don't care to answer your question, but I never

11  did pay a premium -- or remember paying a premium that was

12  that high, even when I was married.  And I don't know why

13  this document would have this marked on the top of it.

14  **Q.**   Well --

15            THE COURT:  Just a moment.  You are referring to

16  the $158?

17            THE WITNESS:  Yes.

18            THE COURT:  Simply disregard that --

19            THE WITNESS:  Okay.

20            THE COURT:  -- for purposes of this question.

21        And you may restate the question.

22            THE WITNESS:  Thank you, Your Honor.

23  BY MR. TORRES:

24  **Q.**   Do you recall admitting at your deposition that you

25  received from CONSOL a 2009 CONSOL Healthcare Highlights

1    document?

2    **A.**   If that's what I said in my deposition, yes.

3            MR. TORRES:  Your Honor, we would offer

4    Defendant's Exhibit 20.

5            THE COURT:  Inquire of the witness whether or not

6    he was asked a question and he answered it and what he said.

7            MR. TORRES:  Okay.

8            THE COURT:  Right now, he's simply saying, "If

9    that's what I said in the deposition."

10        And he's done that a couple of times, and that's not

11   very illuminating.  We need to know what it is that was

12   said.

13           MR. TORRES:  Yes, Your Honor.

14   BY MR. TORRES:

15   **Q.**   Mr. Fitzwater, if you could go back to your deposition

16   that's in front of you.  And if you could turn to page 78 of

17   your deposition.

18   **A.**   Would you please repeat the page?

19   **Q.**   78.

20   **A.**   Okay.  I see 78 at the top of the left-hand corner of

21   the paper.

22   **Q.**   Okay.  And at Line 7, I was making a reference to a

23   2009 CONSOL Healthcare Highlights document.  Correct?

24   **A.**   Yes.

25   **Q.**   And then if you go to the bottom of that page 24, I

1    said, "I asked you before" -- and then if you carry over to

2    page 79 -- "if you remember receiving documents that were

3    called Highlights from CONSOL that discussed your benefits?

4    Do you recall that question?"

5         And you answered:  "Yes, I do."

6         Correct?

7    **A.**   That is exactly correct.

8    **Q.**   And then the next question was:  "And is this one of

9    the documents that you would have received?"

10        And your answer was "By looking at this, yes, this

11   would be one of them."

12        Correct?

13   **A.**   Well, I don't understand what you are asking me,

14   because the next -- the next line I'm talking here, and it

15   says, "And you are asking me, do you know if this was

16   something that you received on an annual basis from them?"

17        And I said, "I'm not sure."

18   **Q.**   Okay.  But the question you admitted to was that you

19   received the 2009 CONSOL Healthcare Highlights documents in

20   your sworn testimony, correct, sir?

21   **A.**   Yes.

22   **Q.**   Okay.

23        MR. TORRES:  Move admission of Defendant's 20,

24   Your Honor.

25        THE COURT:  Any objection?

1          MR. PETSONK:  No objection, Your Honor.

2          THE COURT:  Admitted.

3          **Defendant's Exhibit 20 admitted.**

4          THE COURT:  You referred to 2009 -- I see it now.

5          MR. TORRES:  It's kind of faint, but it's up --

6          THE COURT:  Yes, I see it.

7          MR. TORRES:  Thank you, Your Honor.

8    BY MR. TORRES:

9    **Q.**  And in addition to the 2009 document that we were

10   looking at, do you recall receiving additional documents,

11   Highlights documents from -- I'm sorry.  Going back to the

12   exhibit in front of you, Defendant's 20, Mr. Fitzwater.  Are

13   you there?

14   **A.**  I'm still with the deposition.

15   **Q.**  Can you pick up Deposition Exhibit 20, the Highlights

16   document, sir?

17   **A.**  Oh, yes, I see it.

18   **Q.**  If you look at the very bottom of this document, the

19   last entry on the page at the bottom?  Do you see that?

20   **A.**  Where it says, "Retiree Life," or where it says, "Note"

21   about document?

22   **Q.**  If you go to the box that starts with "Note," are you

23   there, sir?

24   **A.**  Yes, I'm there.

25   **Q.**  Go to the last paragraph, in that box, it starts,

1    "CONSOL Energy," correct?

2    **A.**   Yes.

3    **Q.**   And it states, "CONSOL Energy reserves the right to

4    terminate, suspend, modify or amend the Plan at any time,"

5    correct?

6    **A.**   That's what the document says.

7    **Q.**   "Covering any or all participating employers, active

8    employees, current or future retirees or other eligible

9    covered persons."  Correct?

10   **A.**   Yes.

11   **Q.**   And "in whole or in part, of any or all participating

12   employers," correct?

13   **A.**   Yes.

14   **Q.**   You recall receiving additional Highlights documents

15   from CONSOL, Mr. Fitzwater?

16   **A.**   We received so much stuff from them, I don't know what

17   document you are referring to.

18   **Q.**   Okay.

19           MR. TORRES:  May I approach, Your Honor?

20           THE COURT:  You may.

21   BY MR. TORRES:

22   **Q.**   Mr. Fitzwater, I'm showing you what's been marked as

23   Defendant's Exhibit 21.  Do you have it in front of you?

24   **A.**   Yes.

25   **Q.**   And the top of this document says, "CONSOL Healthcare

1    Highlights 2013"; is that right?

2    **A.**   Yes.

3    **Q.**   And you received this from CONSOL, correct?

4    **A.**   Yes.

5            MR. TORRES:  Your Honor, we'd move admission of

6    Defendant's Exhibit 21.

7            THE COURT:  Any objection?

8            MR. PETSONK:  No objection, Your Honor.

9            THE COURT:  Admitted.

10           **Defendant's Exhibit 21 admitted.**

11   BY MR. TORRES:

12   **Q.**   And if you go to the bottom of this document, sir, it

13   has an entry that says "Note."  Do you see that?

14   **A.**   Yes.

15   **Q.**   And the last paragraph in that box, it says, "CONSOL

16   Energy reserves the right to terminate, suspend, modify or

17   amend the Plan at any time, covering any or all

18   participating employers, active employees, current or future

19   retirees, or other eligible covered persons."  Correct?

20   **A.**   Yes.

21   **Q.**   "In whole or in part, of any or all participating

22   employers."  Is that correct?

23   **A.**   That is correct.

24   **Q.**   And you also received another document, a Highlights

25   document from CONSOL in 2014, correct?

1  **A.**   If I said that in the deposition, yes.

2             MR. TORRES:  May I approach, Your Honor?

3             THE COURT:  You may.

4  BY MR. TORRES:

5  **Q.**   Mr. Fitzwater, I'm handing you what's been marked as

6  Defendant's Exhibit 22.  The top of this document says,

7  "CONSOL Healthcare Highlights 2014," correct?

8  **A.**   Yes.

9  **Q.**   And you received -- you recall receiving this from

10 CONSOL Energy?

11 **A.**   Yes.

12            MR. TORRES:  Defendants move admission of

13 Defendant's Exhibit 22, Your Honor.

14            MR. PETSONK:  No objection, Your Honor.

15            THE COURT:  Admitted.

16        **Defendant's Exhibit 22 admitted.**

17 BY MR. TORRES:

18 **Q.**   And again, Mr. Fitzwater, if you go to the bottom

19 section the Note section of the bottom of the box -- are you

20 there?

21 **A.**   Yes.

22 **Q.**   And the last entry in the box says, "CONSOL Energy

23 reserves the right to terminate, suspend, modify or amend

24 the Plan at any time, covering any or all participating

25 employers, active employees, current or future retirees or

1    other eligible covered persons."  Correct?

2    **A.**   Yes.

3    **Q.**   "In whole or in part, of any or all participating

4    employers."  Correct?

5    **A.**   Where are you at?  Oh, yes -- yes.

6    **Q.**   Okay.  Thank you.

7              MR. TORRES:  And then could I have Plaintiff's

8    Exhibit 12, please.

9    BY MR. TORRES:

10   **Q.**   You testified yesterday about the fact that you were

11   laid off on Valentine's Day 2013.  Do you recall that

12   testimony?

13   **A.**   Yes.

14             MR. TORRES:  May I approach, Your Honor?

15             THE COURT:  You may.

16   BY MR. TORRES:

17   **Q.**   Mr. Fitzwater, I'm handing you Plaintiff's Exhibit 12.

18   You were asked questions about this document yesterday.  Do

19   you recall that?

20   **A.**   It looks familiar, yes.  Yes.

21   **Q.**   Right.  Your lawyer asked you questions about this

22   document yesterday, correct?

23   **A.**   Yes.

24   **Q.**   And you said that you received it when you were -- from

25   CONSOL, when you were told you were being laid off, correct?

1   **A.**   Yes.

2   **Q.**   And at the bottom of this document, Mr. Fitzwater,

3   there is a section that says, "Note," correct?

4   **A.**   Yes.

5   **Q.**   And if you go to the third line of that entry, there is

6   a sentence that says, "All plans are subject to change or

7   termination by CONSOL at any time," correct?

8   **A.**   Yes.

9   **Q.**   And you received this on February 14, when you were

10   being told you were laid off, correct?

11   **A.**   Well, I don't know what I said yesterday.  I don't know

12   what the question was asked.  I don't remember getting it

13   that day.  But I do remember getting it, because we had to

14   go to the training center a week later, and I know for sure

15   I would have got it then.

16   **Q.**   Okay.  So sometime within a week of being laid off, you

17   were presented with the document that you are looking at

18   now?

19   **A.**   Yes.

20   **Q.**   Okay.  Thank you.

21          MR. TORRES:  Now, could I have Defendant's 16,

22   Josh?

23          THE COURT:  What's the number?

24          MR. TORRES:  Plaintiff's 12.

25          THE COURT:  The Exhibit Number?

FITZWATER - CROSS

1          MR. TORRES:  Plaintiff's Exhibit 12, Your Honor.

2          THE COURT:  Thank you.

3     BY MR. TORRES:

4     Q.   I'll take that back, sir, so I can give it back to the

5     clerk.  In addition to the -- strike that.

6          May I approach, Your Honor?

7          THE COURT:  You may.

8     BY MR. TORRES:

9     Q.   Mr. Fitzwater, I'm showing you what's been already

10    introduced as Defendant's Exhibit 16.  Do you have that in

11    front of you?

12    A.   Yes, I do.

13    Q.   And this document says, "Summary Plan Description" on

14    the first page, "CONSOL" -- I'm sorry -- "Summary Plan

15    Description Production and Maintenance Employees at AMVEST

16    West Virginia Coal LLC and its Subsidiaries," correct?

17    A.   Yes.

18    Q.   And then this document, if you look at the bottom -- if

19    you turn to the next page, Mr. Fitzwater, there is a page

20    that says, "Medical and Prescription Drug Benefits,"

21    correct?

22    A.   Yes.

23    Q.   And at the bottom of that page, you'll see it says,

24    "CONSOL," and there is some numbers.

25    A.   Yes.

1   **Q.**   CONSOL 005605, correct?

2   **A.**   Yes.

3   **Q.**   And if you turn then, Mr. Fitzwater, to CONSOL 005611?

4         MR. PETSONK:  Your Honor, I'm going to object to

5   this question as lack of foundation.  This is a different

6   document as to which Mr. Torres has not established any

7   personal knowledge or foundation for this witness.

8         MR. TORRES:  That's the purpose of the question,

9   Your Honor, to have him understand what the document is so I

10  can have him admit he received it.  He admitted at his

11  deposition that he received it.

12        THE COURT:  On that representation, you may

13  continue.

14  BY MR. TORRES:

15  **Q.**   Are you on page 005611, sir?

16  **A.**   Yes.

17  **Q.**   And at the top of the page, it says, "Plan Overview,"

18  correct?

19  **A.**   Yes.

20  **Q.**   And then it -- the first line says, "The CONSOL Energy

21  Retiree Medical and Prescription Drug Expense Benefits

22  Plan"; correct?

23  **A.**   Yes.

24  **Q.**   And at the bottom under -- at the very bottom of the

25  page, there is some additional language, "Retiree Medical

1    and Prescription Drug Plan SPD," and then in parenthesis, it

2    says, "(P&M AMVEST)," correct?

3    **A.**   I don't see that.

4    **Q.**   See where it says, "CONSOL 5611"?  Right to the left of

5    that, there is some text at the bottom of the page?

6    **A.**   Oh, yes, I see it now.

7    **Q.**   So it says, "Retiree Medical and Prescription Drug Plan

8    SPD, (P&M AMVEST)," correct?

9    **A.**   Correct.

10   **Q.**   And you received this from CONSOL, correct?

11   **A.**   If I said I received it in my deposition, I did receive

12   it.

13   **Q.**   Well, let's -- so can you pull up your deposition, sir?

14   **A.**   All right.  I have it in front of me.

15   **Q.**   Okay.  And if you turn to page 153.

16   **A.**   Yes, I have it.

17   **Q.**   Okay.  And at the bottom of 153, I asked you to take a

18   look at what was marked in the deposition as Exhibit 17,

19   correct?  Deposition Exhibit 17, correct?

20   **A.**   Correct.

21   **Q.**   And then I asked you then to look at the -- if you go

22   to the next page, page 154, Mr. Fitzwater.

23   **A.**   Yes, I'm here.

24   **Q.**   I asked you to take a look at a page that was marked

25   5611, correct, and Line 2, I said "CONSOL, Bates Number

1    5611," correct?

2    **A.**   Yes, correct.

3    **Q.**   And I asked -- I asked you to look at that page where

4    it stated who was eligible, correct?

5    **A.**   I don't see where you are.

6    **Q.**   If you look at Line 3, it says -- if you look at the

7    "Who's Eligible" section of this document, correct?

8    **A.**   You are asking me who is eligible in my court

9    deposition, is that correct?

10   **Q.**   That's correct.

11         MR. TORRES:  Can I direct it to him, Your Honor?

12         THE COURT:  You may.

13         THE WITNESS:  You may have to find it for me.  I'm

14   sorry, I'm not seeing very good this morning.

15   BY MR. TORRES:

16   **Q.**   That's okay.  It's small type.  I apologize for that.

17   So we were on page 154 of your deposition, correct?

18   **A.**   Yes.

19   **Q.**   And then I asked you to look at Page Number 5611,

20   correct?

21   **A.**   Correct.

22   **Q.**   And then I said, look at the "Who is Eligible" section

23   of this document, correct?

24   **A.**   Correct.

25   **Q.**   Okay.  So if you go back to the document that you are

1    looking at and you turn to Page CONSOL 5611 -- let me know

2    when you are there.

3    A.    That's in the Summary Plan Description book?

4    Q.    Yes.  If you go to Page CONSOL 005611.

5    A.    Okay.

6    Q.    And that states at the top of it, there is a section

7    that says, "Who is Eligible," right?

8    A.    Correct.

9    Q.    Okay.  And then if you go back to your deposition, Mr.

10   Fitzwater --

11             MR. TORRES:  Your Honor, I have a better copy for

12   Mr. Fitzwater that might help, if I could substitute this

13   for the version of his deposition he's looking at.

14             THE COURT:  I take it there is no objection?

15             MR. PETSONK:  No, Your Honor.

16             THE COURT:  You may do so.

17   BY MR. TORRES:

18   Q.    This might make things a little bit easier.

19   A.    I appreciate that.  Thank you.

20   Q.    No problem.  I apologize for that.  That's a little

21   easier to see?

22   A.    Yes.  Yes.

23   Q.    So if you turn in that version of the deposition, Mr.

24   Fitzwater, if you then turn to page 155.

25   A.    Okay.

FITZWATER - CROSS

1    **Q.**   And if you go to Line 3, I asked you about the first

2    page of the document and where it said, "Summary Plan

3    Description," correct?

4    **A.**   You are asking me if I ever recall seeing this document

5    before?

6    **Q.**   Well, let's start with my question.  At Line 3, I asked

7    you to look at the first page of the document that states,

8    Summary Plan Description, correct?

9    **A.**   Correct.

10   **Q.**   And then at Line 7, I asked you if the document made a

11   reference to production and maintenance employees at AMVEST

12   West Virginia Coal LLC and its subsidiaries; and you agreed,

13   correct?

14   **A.**   Correct.

15   **Q.**   And then I asked you if you ever recall -- ever recall

16   seeing the document, and at Line 13, you said:  "No, this

17   one I don't."

18        Correct?

19   **A.**   Correct.

20   **Q.**   And then you went on to say, "I'm not going to say I

21   don't have it" -- at Line 15 -- "I just don't recall at this

22   time reading this," correct?

23   **A.**   That's correct.

24   **Q.**   And if you turn to page 156, we continue on at Line 5

25   to say, "I could have and probably did.  I just to be fair

1    to answer your question honest, I don't remember."

2        Correct?

3    **A.**   That is correct.

4            THE COURT:  Before you go on, to what question is

5    the answer "I could have and probably did"?

6            MR. TORRES:  Whether he recalls receiving the

7    Summary Plan Description.

8            THE COURT:  Ask the witness the question.

9    BY MR. TORRES:

10   **Q.**   So I was asking you in your deposition if you recall

11   receiving the SPD that's in front of you, which is

12   Defendant's Exhibit 16.  And at your deposition, you

13   testified, "I could have and probably did," correct?

14   **A.**   Yes.  If I might, I can explain that?

15   **Q.**   Well, I have what you testified to, sir.  I'm fine with

16   that.

17          And you would agree with me, Mr. Fitzwater, that all

18   these -- I'm sorry, let's go back to Deposition Exhibit --

19   I'm sorry, Defendant's Exhibit 16, Mr. Fitzwater.

20          And if you could turn to --

21   **A.**   I see 19, 22, 21.

22   **Q.**   Here, let me show it to you, sir.  I think it's

23   underneath the transcript.

24   **A.**   Oh, okay.  Sorry about that.

25   **Q.**   That's not a problem.  I don't think we'll need this

1    one anymore, so I'll take it back.

2         Do you have it?

3    **A.**   Yes.

4    **Q.**   Okay.  So if you could turn, Mr. Fitzwater, to page,

5    CONSOL page 005667.

6    **A.**   That would be toward the end of it, maybe about middle

7    ways?

8    **Q.**   Let me show you, Mr. Fitzwater.

9    **A.**   056?

10   **Q.**   5667.

11   **A.**   Well --

12   **Q.**   Here, I can get you there a little quicker.

13        Do you have it?

14   **A.**   Yes, thank you.

15   **Q.**   Sure.  No problem.  You are at CONSOL 005667, correct?

16   **A.**   Correct.

17   **Q.**   And at the top of this page, there is a section that

18   says, "Future of the Plan," correct?

19   **A.**   Correct.

20   **Q.**   And that states, "The Board of Directors of CONSOL can

21   amend, modify, suspend or terminate all or part of the Plan

22   at any time," correct?

23   **A.**   Correct.

24   **Q.**   Mr. Fitzwater, yesterday you said that -- you were

25   talking about the UMWA retiree medical benefits that you

1    started using -- or when you suspended your participation in

2    the CONSOL benefit plan, you then eventually went on to the

3    UMWA retiree medical plan, correct?

4    **A.**   Correct.

5    **Q.**   And, to your understanding, is there anything that the

6    UMWA retiree medical plan doesn't pay for that would have

7    been paid for by CONSOL's retiree medical plan?

8    **A.**   Yes.  Dental care.

9    **Q.**   So that's different?

10   **A.**   Yes.

11   **Q.**   UMWA plan doesn't have dental; CONSOL's did?

12   **A.**   Yes.

13   **Q.**   And how much do you pay for that dental plan with UMWA?

14   **A.**   I don't have one.

15   **Q.**   I'm sorry?

16   **A.**   I do not have a dental plan under UMWA.

17   **Q.**   You didn't elect it?

18   **A.**   Well, you can't.  There is no provision -- it used to

19   be you did have it, but it changed.  We have every coverage

20   but dental under UMWA.  And it's excellent.

21   **Q.**   The UMWA plan is excellent?

22   **A.**   UMWA plan is way -- far better than what we had with

23   CONSOL.

24   **Q.**   Okay.  And you said the amount of money that you paid

25   per year under the UMWA is about $200 a month -- or $200 a

1    year; is that right?  Do you recall that from your testimony

2    yesterday?

3    **A.**   As I recall, the question was asked of me about how

4    much money would I pay out under the UMWA plan, and that

5    would be for everything except dental care, because I just

6    pay for that out of my pocket.

7    **Q.**   Okay.

8    **A.**   So it would be around -- that is guessing -- depends on

9    if you have anything wrong -- about $200 a year is what you

10   would pay out in co-payments.

11   **Q.**   So the question is:  How much have you paid

12   out-of-pocket in co-pays since you elected the UMWA plan?

13   **A.**   I paid about $4,000 out because of dental work.

14   **Q.**   Okay.

15   **A.**   And then another additional $200, like I said

16   yesterday, a year, for premiums -- or for the co-pays.

17   **Q.**   Okay.  So the $200 out-of-pocket each year, plus this

18   4,000 dental expense?

19   **A.**   And that's just an estimate, sir.

20   **Q.**   That's just an estimate.  So you don't have any records

21   that reflect that?

22   **A.**   I can get the dental records.  And I can get the other

23   records if I want to get them.

24   **Q.**   Okay.  But you haven't gotten them yet, and you haven't

25   provided them to your lawyer, correct?

FITZWATER - CROSS

1    **A.**    I have not.

2    **Q.**    Okay.  Now, Mr. Fitzwater, you mentioned a couple of

3    people in your testimony yesterday.  Ms. Osborn, correct?

4    **A.**    Correct.

5    **Q.**    Ms. Atkins, correct?

6    **A.**    Correct.

7    **Q.**    Mr. Keener, correct?

8    **A.**    Correct.

9    **Q.**    Mr. Elswick, correct?

10   **A.**    Correct.

11   **Q.**    And Mr. Kowzan, correct?

12   **A.**    Correct.

13   **Q.**    Oh, and a Mr. Scarbrough and a Mr. Waters, correct?

14   **A.**    Correct.

15   **Q.**    So, Mr. Fitzwater, no one ever told you that Ms. Osborn

16   had the authority to alter the terms of CONSOL's written

17   benefit plans, correct?

18   **A.**    Correct.

19   **Q.**    And no one ever told you that Ms. Atkins had the

20   authority to alter the terms of CONSOL's written benefit

21   plans, correct?

22   **A.**    That's correct.

23   **Q.**    And no one ever told you that Mr. Keener had the

24   authority to alter the terms of CONSOL's written benefit

25   plans, correct?

1    **A.**   That's correct.

2    **Q.**   And no one ever told you that Mr. Elswick had any

3    authority to alter the terms of CONSOL written benefit

4    plans, correct?

5    **A.**   Correct.

6    **Q.**   And the same is true for Mr. Kowzan, correct?

7    **A.**   Is that what I said yesterday?

8    **Q.**   I'm asking you today.  No one told you that Mr. Kowzan

9    had any authority to alter the terms of CONSOL's written

10   benefit plans, correct?

11   **A.**   Give me just a minute to think about that.  That's

12   correct.

13   **Q.**   And no one ever told you that Mr. Scarbrough had the

14   authority to alter the terms of CONSOL's written benefit

15   plans, correct?

16   **A.**   Correct.

17   **Q.**   And no one ever told you that Mr. Waters had any

18   authority to alter the terms of CONSOL's written benefit

19   plans, correct?

20   **A.**   Correct.

21   **Q.**   And you have no knowledge, Mr. Fitzwater, that CONSOL

22   ever told any of those individuals to make any

23   representations to you regarding -- misrepresentations to

24   you regarding CONSOL's written benefit plans, correct?

25   **A.**   I just know what we were told.

1    **Q.**   My question, sir, is:  You have no knowledge that --

2    you don't know if anyone from CONSOL told any of those

3    individuals to make any misrepresentations about CONSOL's

4    written benefit plan, correct?

5    **A.**   It's a hard question to answer.

6    **Q.**   Well, either you know or you don't know, sir.  You

7    don't know, right?  You don't know if anyone from CONSOL

8    told any of those individuals to make any misrepresentations

9    regarding CONSOL's written benefit plan, correct?

10   **A.**   Correct.

11   **Q.**   And you don't know if anyone from CONSOL -- well, it's

12   -- and you don't know if CONSOL ever told any of the

13   individuals that you named that they had any authority to

14   change the terms of CONSOL's written benefit plans, correct?

15   **A.**   Correct.

16            MR. TORRES:  May I have one minute, Your Honor?

17            THE COURT:  You may.

18       (Pause.)

19            MR. TORRES:  One minute, Your Honor.

20       Thank you, Your Honor.  No further questions.

21            MR. PETSONK:  Your Honor, if I may have a moment

22   to gather my documents?

23              THE COURT:  You may.

24            MR. PETSONK:  Thank you, Your Honor.

25

|   |   |
|---|---|
| 1 | **REDIRECT EXAMINATION** |
| 2 | **BY MR. PETSONK:** |
| 3 | **Q.**   Mr. Fitzwater, Mr. Torres was asking you about a |
| 4 | document up there that's labeled Defendant's Exhibit 16.  Is |
| 5 | that right?  Do you have that document in front of you? |
| 6 | It covers, Summary Plan Descriptions Production and |
| 7 | Maintenance Employees at AMVEST. |
| 8 | **A.**   You say number 16? |
| 9 | **Q.**   Right. |
| 10 | THE COURT:  Let him ask -- |
| 11 | THE WITNESS:  Yes, I have it. |
| 12 | THE COURT:  If I could interrupt.  Was it intended |
| 13 | Defendant's Exhibit 16 -- no, it's already in evidence. |
| 14 | Excuse me, please go ahead. |
| 15 | MR. PETSONK:  It came in through -- at an earlier |
| 16 | juncture, Your Honor. |
| 17 | THE COURT:  Thank you. |
| 18 | BY MR. PETSONK: |
| 19 | **Q.**   And -- |
| 20 | THE COURT:  Excuse me.  Restate your question, if |
| 21 | you would, please. |
| 22 | MR. PETSONK:  Well, I was merely making sure the |
| 23 | witness had the document in front of him. |
| 24 | THE COURT:  Go ahead. |
| 25 | |

FITZWATER - REDIRECT

1   BY MR. PETSONK:

2   **Q.**   And do you recall Mr. Torres asked you a series of

3   questions here today about this document?

4   **A.**   Yes.

5   **Q.**   And then Mr. Torres read from your deposition from

6   2017, some questions he asked you about this document.  And

7   in your deposition in 2017, do you recall stating that you

8   do not recall at that time ever seeing this document before?

9   **A.**   Are you referring to the deposition?

10  **Q.**   Right.  Do you remember saying at your deposition that

11  you do not remember receiving this document that's been

12  labeled Defendant's Exhibit 16?

13  **A.**   Is that what it says in my deposition?

14  **Q.**   Well, I'll present that.  Do you have the deposition

15  transcript up there with you, still?

16  **A.**   No, I do not.

17          MR. TORRES:  Here, we can get it back.  It was

18  just in the way.

19          MR. PETSONK:  Okay.  Thanks.

20          MR. TORRES:  Here you go, sir.

21          THE WITNESS:  Thank you.

22          MR. TORRES:  You're welcome.

23          THE WITNESS:  I do have it.

24      Would you please give me the page?

25

1    BY MR. PETSONK:

2    **Q.**   Go back to pages 154 and 155, which Mr. Torres

3    questioned you about, Mr. Fitzwater, please, sir.

4    **A.**   Okay.  I'm on page 154 right now.

5    **Q.**   All right.  And Mr. Torres asked you a question about a

6    document that's Bates Numbered 5611, there on Line 2 of that

7    page 154 in your 2017 deposition transcript, right?

8    **A.**   Number 2, and it's got "Q" out in front of it.

9    **Q.**   Yes, "Q" for question.  And that's Mr. Torres asking

10   you, "It's CONSOL, Bates Number 5611."

11   **A.**   Yes.

12   **Q.**   And on page 5611 of Defendant's Exhibit 16, it

13   describes the CONSOL Energy Retiree Medical Prescription

14   Drug and Benefits Plan, and states who is eligible.  And you

15   reviewed that in your prior testimony with Mr. Torres.

16         My question for you is going down to page 155.

17   **A.**   Okay.

18   **Q.**   Mr. Torres is asking you about the very first page of

19   Defendant's Exhibit 16.  And he says, this very first page

20   says, Summary Plan Description on the first page.  And it

21   refers to AMVEST production and maintenance employees.

22         And then Mr. Torres says: "Okay.  Do you ever recall

23   seeing this document before, sir?"

24         Do you see that?

25   **A.**   No, I don't.

1    **Q.**    On Line 11, of page 155 of your deposition transcript?

2    **A.**    I see where it says, "Okay.  So do you recall ever

3    seeing this document before, sir?"

4    **Q.**    And then on Line 13, what does it say there?

5    **A.**    It says, "No.  This one, I don't."

6    **Q.**    And then Mr. Torres asked you a couple more times

7    whether you had seen this document, and eventually on page

8    156, he said, "Okay."  He says, "You could have" --

9        On Line 4, page 156, he says, "You could have; you just

10   don't remember?"

11       And you say, "I could have and probably did."

12       And that's what he questioned you about earlier.

13       So what I simply want to ask you is, when you look at

14   the first page of Defendant's Exhibit 16, does it state the

15   coverages that are included in the plan that is summarized

16   and described by the Summary Plan Description that is

17   Defendant's Exhibit 16?

18       If you just look at that first page of Defendant's

19   Exhibit 16, Mr. Fitzwater?

20   **A.**    All right, let me get it out.

21   **Q.**    Go ahead and find it.

22   **A.**    Just a second.  Okay, I see the cover sheet.  Now, what

23   page do you want me to look at, sir?

24   **Q.**    Just the cover sheet.

25   **A.**    Yes, I'm looking at it.

1    **Q.**    Does it list three different types of benefits on the

2    cover sheet?

3    **A.**    It does.

4    **Q.**    Just read out, what are those benefits?

5    **A.**    "Medical and Prescription Drug Benefits, Vision

6    Benefits and Basic Life Benefits."

7    **Q.**    Are those all the benefits that you recall receiving in

8    your retirement welfare benefits plan from CONSOL, or are

9    there others that you received from CONSOL in addition to

10   medical, vision, and life?

11   **A.**    Are we staying within the question of the medical part?

12   **Q.**    No.  I'm asking what other retiree welfare benefits did

13   you receive from CONSOL, if any, beyond medical,

14   prescription drug, vision, and basic life insurance?

15   **A.**    Yes, I received a pension.

16   **Q.**    And was there any other benefit that you received from

17   CONSOL in addition to vision and medical and prescription

18   drug and basic life?

19   **A.**    Yes, 401(k).

20   **Q.**    Any other medical benefit?

21   **A.**    I'm not sure I understand what you are asking me.

22   **Q.**    Well, I'm just asking -- earlier, I think you testified

23   that there were several different types of retiree welfare

24   insurance coverages that you had from CONSOL.  I'm just

25   trying to revisit that testimony to determine what you

1    recall that you did receive from CONSOL once you retired;

2    what coverages you received?

3    **A.**    I received the same coverage I had when I was working.

4    **Q.**    What did that include?

5    **A.**    That included prescription drugs, doctor visits,

6    hospital, surgeries, vision care, dental care.

7    **Q.**    Okay.  So it did include dental care?

8    **A.**    Yes, it did.  CONSOL's plan did include dental care.

9    **Q.**    That's all I was trying to determine.

10        Does it appear that this Defendant's Exhibit 16

11    summarizes then some, but not all of the welfare benefits

12    that you received from CONSOL as a retiree, insofar as it

13    does not summarize dental?

14    **A.**    It does not say dental on this cover, but we did

15    receive -- they usually called you up to the office and

16    they'd say, report to the office and you can go over your

17    plan, what you want to elect.  And I'm sure somebody has a

18    copy of that.  And you have electives that you can take of

19    what kind of plan you want, what kind of co-pay you want to

20    pay.  But you could take the dental, which I did.  I took

21    everything it offered.

22    **Q.**    Okay.  I think that is all I was trying to clear up.

23    And then you said that you -- as to Defendant's Exhibit 19,

24    did CONSOL give you a copy of this document as well?

25        And I think you testified that you think they might

1    have; you just don't remember when?  Is that right?

2    **A.**    Yes.

3    **Q.**    This document, if you look at -- if you looked at what

4    is marked page 1 at the bottom, just to be clear, this is

5    the bottom, this is the active medical benefits plan; is

6    that right?

7    **A.**    Are you reading that off of a sheet or is that coming

8    out of the book?

9    **Q.**    Well, let me go to page 1 of the document.  So if you

10   flip in -- it's actually Defendant's Exhibit 19.

11   **A.**    Yes.

12   **Q.**    Four pages in, it says, "CONSOL Energy Flexible Benefit

13   Program Comprehensive Medical Expense Benefits Plan."

14        Do you see that?

15   **A.**    What page are you on?

16   **Q.**    It's labeled page 1 at the bottom.

17   **A.**    Hold on.  Yes, I see it.

18   **Q.**    Okay.

19        MR. PETSONK:  I don't think I have any more

20   questions about this, Your Honor.  And I thank you very

21   much.

22                    **RECROSS EXAMINATION**

23   BY MR. TORRES:

24   **Q.**    Do you still have Defendant's Exhibit 16 in front of

25   you, Mr. Fitzwater?

1   **A.**   Yes, I do.

2   **Q.**   And that's the retiree Summary Plan Description,

3   correct?

4   **A.**   It says, "Summary Plan Description, Production and

5   Maintenance Employees, AMVEST WV Coal LLC and its

6   Subsidiaries."

7   **Q.**   Why don't you turn to page 5611.

8   **A.**   (Witness complies.)

9   **Q.**   Do you need some help getting there, sir?

10  **A.**   No, I can get there.  Thank you, though.  Appreciate

11  it.

12  **Q.**   No problem.

13  **A.**   This will take me a minute.  It has zeros in front of

14  it?

15  **Q.**   005611.

16  **A.**   I do have it in front of me.

17  **Q.**   And at the bottom of the page, sir, very bottom of the

18  page, it says, "Retiree Medical and Prescription Drug Plan

19  SPD, (P&M AMVEST)," correct?

20  **A.**   Correct.

21  **Q.**   So would you agree with me, this is a Summary Plan

22  Description for retirees, correct?

23  **A.**   Correct.

24  **Q.**   And then if you turn to Page 5630, sir.

25  **A.**   Okay.  I have it in front of me.

1    **Q.**   Page 005630, has a section that states, "Expenses not

2    covered."  Do you see that?

3    **A.**   Yes, I do.

4    **Q.**   And then there is a series of bullet points, correct?

5    **A.**   Please repeat the question.

6    **Q.**   Sure.  Under "Expenses Not Covered," there's a series

7    of bullet points, correct?

8    **A.**   Correct.

9    **Q.**   And if you go down to the one, two, three, four, five

10   six, seven, eight -- the tenth bullet point, there is a

11   reference to dental care, correct?

12   **A.**   Yes.

13   **Q.**   So -- I'm sorry to go back.  I apologize to do this to

14   you, sir.

15        Under the heading "Expenses Not Covered," back up to

16   the top there, sir.

17   **A.**   Yes.

18   **Q.**   And then the next line says, "The following expenses,

19   among others, are not covered under the plan."

20        Do you see that?

21   **A.**   I do see that.

22   **Q.**   And going back down to the tenth bullet point, one of

23   the expenses not covered, according to this document, is

24   dental care, correct?

25   **A.**   Correct.

1   Q.   "Except for services to correct damage to natural

2   teeth," et cetera, there is an exception, but dental care is

3   not covered, and it lists a couple of exceptions, correct?

4   A.   Well, before I answer that question, I have a question.

5   Q.   Well, sir, you don't get to ask questions,

6   unfortunately.  Either it says dental care or it doesn't?

7   A.   What I'm reading off of this paper and what you're

8   saying, that is correct.

9   Q.   Okay.  And under the entry for dental care, the next

10  bullet point says another expense that is not covered is

11  routine eye exams, eyeglasses, contact lenses, or related

12  services, correct?

13  A.   That is correct.

14  Q.   Okay.

15       MR. TORRES:  Thank you, Your Honor.

16       No further questions.

17       MR. PETSONK:  No further questions from the

18  plaintiff, Your Honor.

19       THE COURT:  Thank you.

20       And may Mr. Fitzwater be excused from the trial?

21       MR. PETSONK:  He may, as far as we are concerned

22  on the plaintiffs' side.

23       MR. TORRES:  Yes, Your Honor, we agree.

24       THE COURT:  Mr. Fitzwater, thank you for your

25  testimony.  You are excused now from the trial, but the

```
 1    Court directs you not to discuss your testimony with any

 2    other witness in this case until the trial is over.  And so

 3    you are excused.  And I'll ask you when you leave to go out

 4    the courtroom door, as I think you've done before, and go

 5    down the chamber hallway.  Thank you.

 6              THE WITNESS:  Thank you, sir.

 7              THE COURT:  If the parties have nothing further at

 8    the moment, we'll take the morning recess and return in 15

 9    minutes.

10              MR. PETSONK:  Thank you, Your Honor.

11              THE CLERK:  All rise.

12         (A recess was taken at 11:03 a.m. until 11:20 a.m.)

13              THE CLERK:  All rise.

14              THE COURT:  Please be seated.

15              Are the parties ready?

16              MR. POMPONIO:  Yes, Your Honor.

17              MS. BATES:  Your Honor, I think that plaintiffs

18    intend to call their corroborating witnesses next.  And we

19    have a pending Motion in Limine to exclude all of them.  If

20    Your Honor would like, we have argument prepared, if you'd

21    like us to give that, we can do that, too.

22              THE COURT:  At what length?

23              MS. BATES:  Very brief.

24              THE COURT:  You may proceed.

25              MS. FUNDERBURG:  Your Honor, my name is Katherine
```

FITZWATER - RECROSS

1    Funderburg.  I would just like to briefly address

2    defendant's pending Motion in Limine regarding corroborating

3    witnesses.  We've set forth in our briefing three reasons

4    why we are asking the Court to exclude these witnesses'

5    testimony.  And I'll just briefly go through those for the

6    Court.

7         First, Your Honor, these witnesses lack personal

8    knowledge of any of the statements that were allegedly made

9    to the plaintiffs about their retiree medical benefits.  We

10   discussed in Court yesterday with regard to Mr. Hymes that

11   this case turns on whether employees of CONSOL made any

12   misrepresentations to the plaintiffs about their retiree

13   medical benefits.

14        And in their briefing, plaintiffs have claimed this

15   issue of whether CONSOL made promises to its employees in

16   general about the benefits, but that is no longer a true

17   statement of the issue in this case, because this case is no

18   longer a class action.

19        The only claims that remain in this case are

20   plaintiffs' seven individual claims.

21        And the corroborating witness testimony is not

22   admissible on that issue, because they lack any personal

23   knowledge of misrepresentations that were allegedly made to

24   the plaintiffs.

25        Two of the proposed witnesses have testified that they

 1    do not know any of the plaintiffs.  The others have not

 2    testified that they were present when any of the

 3    misrepresentations at issue were allegedly made to the

 4    plaintiffs.

 5         And that falls short of Rule 602's requirements that

 6    these witnesses have personal knowledge into matters of

 7    which they testify.  Instead, the witnesses' testimony

 8    relate only to their own personal recollections of what they

 9    experienced at CONSOL, and the alleged misrepresentations

10    that were separately made to them.

11         Accordingly, the witnesses cannot testify with any

12    personal knowledge as to anything that's relevant in this

13    litigation, which is the statements that were allegedly made

14    to the plaintiffs.

15         The second issue, Your Honor, is that this testimony

16    runs afoul of Rule 404(b) prohibition on propensity

17    evidence.  The testimony of these witnesses is being offered

18    to suggest that because some employees of CONSOL made some

19    statements to some individuals, on some occasions, they or

20    others also made similar statements to the plaintiffs on

21    other occasions.

22         That is exactly the type of propensity evidence that

23    Rule 404(b) prohibits.

24         The plaintiffs have argued in their response to our

25    motion that the evidence is admissible to show evidence of

1    intent.  But that argument fails to consider that intent is

2    not an element of their fiduciary breach claim.

3         Finally, Your Honor, the witnesses' testimony does not

4    meet the high bar for admission under Rule 406, as habit or

5    a routine practice evidence.

6         To establish this type of evidence, plaintiffs must

7    offer examples that are sufficiently numerous and similar to

8    establish a regular response to a repeated specific

9    situation.

10        But the proposed corroborating witness testimony falls

11   short of meeting that standard.  And simply put, is not the

12   type of systemic regular conduct that would constitute habit

13   or practice.  This is further demonstrated by the fact that

14   the testimony of these witnesses and the plaintiffs vary

15   significantly.

16        We've set forth in our briefing that these witnesses

17   have testified at their depositions as to promises that were

18   allegedly made to them at different times in different

19   contexts and, in many cases, by different people than those

20   who allegedly made the promise to the plaintiffs.

21        Given the thousands of people that CONSOL employed

22   during the relevant period, the alleged statements of a

23   handful of individuals are not sufficient to establish that

24   the company had habit or routine practice of making

25   misrepresentations about retiree medical benefits.

1          For those reasons, we are asking this Court to bar the

2     testimony of the plaintiffs' proposed corroborating

3     witnesses.

4               THE COURT:  Thank you.

5               MS. FUNDERBURG:  Thank you, Your Honor.

6               MS. DAVIDSON:  May it please the Court, Your

7     Honor.  My name is Laura Davidson, and I am here to speak in

8     opposition to the defendant's motion.

9          The three live witnesses and two deposition witnesses

10    will provide very brief testimony regarding CONSOL's HR

11    managers nearly identical promises to them that they would

12    have lifetime retirement welfare benefits if they worked for

13    the company for 10 years and reached age 55.  The evidence

14    of this is admissible under 404(b) and 406.

15         It is admissible under 404(b), under the -- the Fourth

16    Circuit requires that it not be offered to prove character

17    or that the defendants acted in accordance with that

18    character.  It is probative of the claim, it is reliable,

19    and its probative value is not substantially outweighed by

20    its prejudice.

21         First, the testimony is offered for a reason other than

22    to prove character or that the defendants acted in

23    accordance with that character.

24         The testimony is circumstantial evidence of CONSOL's

25    routine pattern and practice of promising miners at nonunion

1     mines lifetime retirement welfare benefits.

2          The testimony is evidence of a company-wide practice

3     across the four mines where the plaintiffs worked that

4     promised miners lifetime retirement welfare benefits, and to

5     conceal the reservation of rights clause.  Therefore, the

6     pattern witness testimony goes to intent, knowledge, and a

7     common plan or design.

8          Additionally, the pattern witnesses will offer

9     testimony about the parent agency of the same HR managers

10    that made representations about retirement welfare benefits

11    to the plaintiffs.

12         Second, the testimony is probative of plaintiffs'

13    breach of fiduciary duty claim.

14         If CONSOL was knowingly misrepresenting to the

15    plaintiffs orally that they would receive lifetime

16    retirement welfare benefits and routinely concealing the

17    reservation of rights clause, plaintiffs may establish a

18    breach of fiduciary duty claim.

19         In the cases resting on claims of misrepresentation and

20    a concealment, pattern witnesses are essential

21    circumstantial evidence for plaintiffs to prove their case.

22    So the evidence is reliable.

23         The pattern witnesses all testify to nearly identical

24    oral representations, identical patterns of concealing the

25    reservation of rights clause, made by the same HR managers

 1    that made oral promises to the plaintiffs at the same mine

 2    sites of the plaintiffs, spanning a period of time that

 3    overlaps the periods of time that the plaintiffs were made

 4    the same promises.

 5         Doris Jesso will testify that while her husband worked

 6    at Enlow, Luke Gianato made representations during the 1990

 7    orientation, and the corporate HR representative made the

 8    same representations to her at the 2010 retirement benefit

 9    meeting.

10         Kirby Hall will testify that while he worked at the

11    Eastern Kentucky mine, Craig Campbell made these same

12    representations during the 1993 orientation and the 2009

13    retirement seminar.

14         The same with Mr. Prater.

15         Mr. Hylton, who was at Buchanan, will testify that Mr.

16    Fox made these same misrepresentations during the periodic

17    meetings that were held during union organizing activity.

18         Mr. Lawson, who was at Fola, will testify that Mr.

19    Elswick made the same representations to him during the same

20    time period, 2007 to 2013; the same as Mr. Bright and Mr.

21    Fitzwater.

22         And Mr. Stephenson, who was also at Fola, will testify

23    that Mr. Elswick and Craig Campbell made the same

24    representations during the 2013 layoff; the same as Mr.

25    Bright and Mr. Fitzwater.

 1          Four, the probative value is not substantially

 2     outweighed by unfair prejudice.

 3          The case is not a jury trial, which would require

 4     limiting instructions.  The Court is able to consider the

 5     testimony for that purpose.

 6          Finally, the evidence is admissible under 406.  The

 7     pattern witnesses will testify that CONSOL, through its

 8     agents habitually and routinely told their employees the

 9     same thing; that if they met the eligibility requirement,

10     they would have lifetime welfare benefits.  These witnesses

11     were told this during the orientation meetings, during their

12     retirement seminars, and during the union organizing period.

13     They were told that these retirement benefits would be

14     better than the UMWA, and that no one ever told them about a

15     reservation of rights clause.

16          Accordingly, under both 404(b) and 406, the witnesses'

17     testimony is admissible.  The context and time frame were

18     the same; therefore, it's admissible under Rule 406.

19          In conclusion, the defendants' argument all relate to

20     the weight of this evidence, not the admissibility.  This

21     Court will afford the testimony the appropriate weight.

22          The defendants' Motion in Limine should be denied.

23     Thank you.

24               THE COURT:  Thank you.

25               MS. FUNDERBURG:  Your Honor, may I briefly

 1    respond?  May I have one minute to confer?

 2              THE COURT:  Yes.

 3         (Pause.)

 4              THE COURT:  Please go ahead.

 5              MS. FUNDERBURG:  Your Honor, defendants are still

 6    of the view that the testimony of these corroborating

 7    witnesses is, in fact, not corroborating for the reasons

 8    that we've articulated.  However, if plaintiffs will agree

 9    that the testimony of these witnesses will be limited to the

10    individuals that Ms. Davidson mentioned in her response,

11    then we are prepared to proceed and deal with those

12    individuals in our rebuttal case.

13              THE COURT:  And so what are you inviting

14    plaintiffs to do, again?

15              MS. FUNDERBURG:  We would propose that plaintiffs

16    limit the testimony of these witnesses to the individuals --

17    I believe there are four, but I only have three names

18    here -- that Ms. Davidson mentioned in her response; that

19    these witnesses testify about statements allegedly made to

20    them by Mr. Fox, Mr. Elswick, Mr. Campbell -- and I believe

21    there was one other one.  Because those are individuals that

22    the plaintiffs have also identified.

23              THE COURT:  You've heard that suggestion.  What's

24    the reaction of the plaintiff?

25              MS. DAVIDSON:  We are fine with that.  The other

1    individual was Luke Gianato.

2             MS. FUNDERBURG:  Thank you.

3             THE COURT:  And so are you in agreement?

4             MS. DAVIDSON:  We are.

5             MS. FUNDERBURG:  Yes.

6             THE COURT:  If you are, then we'll proceed on that

7    basis.

8             MS. FUNDERBURG:  Thank you, Your Honor.

9             THE COURT:  Thank you.

10            MS. DAVIDSON:  Thank you.

11            THE COURT:  Your next witness.

12            MR. POMPONIO:  Plaintiffs call John Lawson.

13            **JOHN LAWSON, PLAINTIFF'S WITNESS, SWORN**

14            THE CLERK:  State your name and spell it for the

15   record.

16            THE WITNESS:  John Roger Lawson.

17            THE CLERK:  Please spell it.

18            THE WITNESS:  L-A-W-S-O-N.

19            THE CLERK:  Thank you.  Please take the stand.

20                      **DIRECT EXAMINATION**

21   BY MR. POMPONIO:

22   **Q.**   Good afternoon, Mr. Lawson.  Where do you live?

23   **A.**   Canvas.  801 Stage, Canvas, West Virginia.

24   **Q.**   Would you mind pulling that microphone closer?

25   **A.**   (Witness complies.)

 1   **Q.**   Are you married?

 2   **A.**   Yes.

 3   **Q.**   What's your birth date and current age?

 4   **A.**   January 26, 1955.  I'm 66.

 5   **Q.**   Are you currently retired?

 6   **A.**   No.

 7   **Q.**   Where do you work?

 8   **A.**   Department of Highways.

 9   **Q.**   Did you previously work for CONSOL?

10   **A.**   Yes.

11   **Q.**   Where did you work?

12   **A.**   Fola.

13   **Q.**   And why did you stop working at Fola?

14   **A.**   Layoff.

15   **Q.**   When was that layoff?

16   **A.**   It was July of 2013.

17   **Q.**   And what was your occupation at the time you were laid

18   off?

19   **A.**   I was a blaster at that time.

20   **Q.**   How long did you work for CONSOL?

21   **A.**   Over 25 years.

22   **Q.**   And when did you first start working -- scratch that.

23        When did you start working at Fola?

24   **A.**   2007.

25   **Q.**   Were you paid salary or on an hourly basis?

1    **A.**    Hourly.

2    **Q.**    During your employment with CONSOL, were there

3    occasions when someone discussed with you your entitlement

4    to retiree welfare benefits?

5    **A.**    Chase Elswick.

6    **Q.**    Okay.  What was Mr. Elswick's position with the

7    company?

8    **A.**    He was HR manager.

9    **Q.**    Okay.  What, if anything, did Mr. Elswick say to you

10   about your retirement welfare benefits?

11   **A.**    He assured me I had lifetime medical.

12   **Q.**    And tell us -- tell the Court about the setting in

13   which Mr. Elswick made these statements to you.

14   **A.**    We was like one-on-one.  I would meet him on the road.

15   I was on the evening shift and he was leaving work, and we'd

16   meet on the road going in to work.

17   **Q.**    Did you ask Mr. Elswick any questions about your

18   retirement medical?

19   **A.**    I asked him for paperwork and he assured me that I

20   didn't need it; I was covered.

21   **Q.**    And when you say retirement medical for life, what

22   benefits are we talking about?

23   **A.**    We had eye, dental, life insurance, medical insurance,

24   prescription.

25   **Q.**    Now, you testified that you requested documentation of

1   your retirement welfare benefits from Mr. Elswick.  Did you

2   ever receive any document during your employment at Fola

3   explaining your retirement welfare benefits?

4   **A.**   I think I had one letter that explained medical.

5   **Q.**   Could you speak up?  I didn't catch that.

6   **A.**   I had a letter with my medical.

7   **Q.**   Okay.  And do you know when you received that letter?

8   **A.**   I don't recall.

9   **Q.**   Okay.  So you said you were laid off in 2013, correct?

10  **A.**   Yes.

11          MR. POMPONIO:  May I approach, Your Honor?

12          THE COURT:  You may.

13  BY MR. POMPONIO:

14  **Q.**   I'm handing you what's been marked as Plaintiff's

15  Exhibit 16.  Could you read to the Court the title of this

16  document?

17  **A.**   "Benefits Information Sheet."

18  **Q.**   And what's it say in the parenthetical there?

19  **A.**   "Over 10 over 55."

20  **Q.**   Do you recognize this document?

21  **A.**   Yes.

22  **Q.**   Is this the document you indicated that you received

23  with your benefits information?

24  **A.**   Yes.

25  **Q.**   Okay.  And it's -- what is the effective date there on

LAWSON - DIRECT

1    the top?

2    **A.**   7-1 of 2013.

3    **Q.**   Okay.  And it has your job title down there, your date

4    of birth, correct?

5    **A.**   Correct.

6    **Q.**   No, no, that's -- yes, that is date of birth.  Okay.

7    I'd like to direct your attention down the page to the

8    "Retirement Plan."  Do you see that?

9    **A.**   Mm-hmm.

10   **Q.**   Will you read for the Court that first sentence up to

11   the parenthetical?

12   **A.**   "Vested for early retirement with Medical."

13   **Q.**   Okay.  Is this Benefit Information Sheet that you

14   received consistent with your understanding about what your

15   retirement welfare benefits would be based on conversations

16   with Mr. Elswick?

17   **A.**   Yes.

18            MR. POMPONIO:  Your Honor, I move for admission of

19   Plaintiff's Exhibit 16.

20            THE COURT:  Any objection?

21            MS. BATES:  No objection.

22            THE COURT:  Admitted.

23        **Plaintiff's Exhibit 16 admitted.**

24   BY MR. POMPONIO:

25   **Q.**   After you were laid off, did you continue -- did you

1    receive any medical benefits, welfare benefits that we

2    discussed here?

3    **A.**   Up to December 31st, 2015.

4    **Q.**   Okay.  What was your understanding of why you continued

5    to receive medical welfare benefits after you were laid off?

6    Do you know?

7    **A.**   My understanding, it was a law they had, we had to

8    receive for a year.

9    **Q.**   Okay.  And so you received them for approximately a

10   year after, after you were laid off, correct?

11   **A.**   Yes.

12   **Q.**   Okay.

13        MR. POMPONIO:  That's all I have.

14                    **CROSS-EXAMINATION**

15   **BY MS. BATES:**

16   **Q.**   Hi, Mr. Lawson.

17   **A.**   Good morning.

18   **Q.**   You were previously deposed in this case, right?

19   **A.**   Yes.

20   **Q.**   Two times?

21   **A.**   Yes.

22   **Q.**   And the most recent time was about two months ago, in

23   December of 2020?

24   **A.**   Yes.

25   **Q.**   And in both of your depositions, you were under oath,

1    weren't you?

2    **A.**   Yes.

3    **Q.**   You promised to tell the truth?

4    **A.**   Yes.

5    **Q.**   And, again, today you're under oath?

6    **A.**   Yes.

7    **Q.**   Mr. Lawson, you believe that you are a plaintiff in

8    this case, don't you?

9    **A.**   Yes.

10   **Q.**   And that is, if the plaintiffs win this case, and

11   CONSOL loses, that you will get your retiree medical

12   benefits back; is that right?

13   **A.**   Yes.

14   **Q.**   At your deposition in December, I asked you about your

15   role in this case, didn't I?

16   **A.**   Yes.

17   **Q.**   And I asked whether you would testify at the trial,

18   right?

19   **A.**   Yes.

20   **Q.**   And you said that you would testify as a witness about

21   the loss of your medical insurance, right?

22   **A.**   Yes.

23   **Q.**   And that's what you've done today, right?

24   **A.**   Yes.

25   **Q.**   You told me that you were going to testify about your

1   own experience, right?

2   **A.**   Yes.

3   **Q.**   And that you couldn't testify about anyone else's

4   experience at CONSOL?

5   **A.**   No.

6   **Q.**   Or anyone else's understanding of the CONSOL retiree

7   medical benefits?

8   **A.**   No.

9   **Q.**   Do you know what the eligibility requirements are for

10  CONSOL's retiree medical benefits?

11  **A.**   No.

12  **Q.**   Do you know if you met the eligibility requirements at

13  the time that you retired from CONSOL?

14  **A.**   I don't know.

15  **Q.**   You described just now receiving medical insurance for

16  the year after you were laid off, right?

17  **A.**   Correct.

18  **Q.**   And you continued to receive medical benefits until,

19  you said, the end of 2015; is that correct?

20  **A.**   Yes.

21  **Q.**   Do you know whether that was your retiree medical

22  benefits that you were receiving during that period from

23  2013 to 2015?

24  **A.**   No.  No.

25  **Q.**   You don't know?

1    **A.**   No.

2    **Q.**   At some point after you were laid off, you started

3    paying premiums for your medical insurance again, right?

4    **A.**   Yes.

5    **Q.**   And that was the same thing that you did when you were

6    an active employee; is that right?

7    **A.**   I wasn't paying at CONSOL; I was paying it with the

8    state.  I got insurance through the state.

9    **Q.**   When you were an active employee?

10   **A.**   No.

11   **Q.**   So did you pay premiums when you were an active

12   employee with CONSOL insurance?

13   **A.**   Yes.

14   **Q.**   And then after you were laid off, did you ever pay

15   premiums for CONSOL insurance again?

16   **A.**   No.

17   **Q.**   Do you know if you ever received retiree medical

18   benefits from CONSOL?

19   **A.**   No.

20   **Q.**   Do you know if you ever signed up for them?

21   **A.**   No.

22   **Q.**   Mr. Lawson, you know Benny Fitzwater personally, right?

23   **A.**   Yes.

24   **Q.**   And you know -- I'm sorry.  I want to ask about other

25   people first.  We'll come back to Mr. Fitzwater.

LAWSON - CROSS

```
 1        You don't know Clarence Bright, do you?
 2   A.   No.
 3   Q.   You don't know Terry Prater?
 4   A.   No.
 5   Q.   You don't know Emmett Casey?
 6   A.   No.
 7   Q.   You don't know Connie Gilbert, do you?
 8   A.   No.
 9   Q.   Allan Jack?
10   A.   No.
11   Q.   Robert Long?
12   A.   No.
13   Q.   And for those six people that I just named, you don't
14   know where those people worked, do you?
15   A.   They was on the strip.
16   Q.   Did they work for CONSOL?
17   A.   Yes.
18   Q.   How do you know that?
19   A.   Word goes around.
20   Q.   You know that because of this lawsuit?
21   A.   No.
22   Q.   Do you know other people?
23   A.   I knew of them working on the strip.
24   Q.   So you had heard those names before?
25   A.   Yes.
```

LAWSON - CROSS

1    **Q.**   Did you personally know any of those six people I just

2    listed?

3    **A.**   No.

4    **Q.**   So you don't know the time periods any of them worked

5    for CONSOL, do you?

6    **A.**   No.

7    **Q.**   You don't know what presentations or meeting they may

8    have attended at CONSOL?

9    **A.**   No.

10   **Q.**   You don't know who from CONSOL they may have spoken to

11   about their retiree medical benefits?

12   **A.**   No.

13          MR. POMPONIO:  Your Honor, we are going to object.

14   This is beyond the scope of direct.  He didn't testify as to

15   any other person's experience.

16          THE COURT:  Overruled.

17   BY MS. BATES:

18   **Q.**   Mr. Lawson, you don't know what any of those six

19   individuals I just named were allegedly promised about their

20   retiree medical benefits, do you?

21   **A.**   No.

22   **Q.**   You don't know who may have made any alleged promises

23   to them about their benefits, right?

24   **A.**   No.

25   **Q.**   You don't know what they may have done in reliance on

1    anything they heard about their CONSOL medical benefits,

2    right?

3    **A.**   No.

4    **Q.**   I want to come back to Benny Fitzwater.  You know him

5    because you worked together; is that correct?

6    **A.**   Yes.

7    **Q.**   At Fola?

8    **A.**   Yes.

9    **Q.**   But you are not close friends with Benny Fitzwater?

10   **A.**   No.

11   **Q.**   And you never discussed CONSOL's retiree medical

12   benefits with Benny Fitzwater until after this lawsuit

13   started; is that right?

14   **A.**   That's right.

15   **Q.**   When he reached out to you and asked you if you wanted

16   to be involved in this case?

17   **A.**   Yes.

18   **Q.**   And that was the first time that you ever discussed

19   CONSOL benefits with him; is that right?

20   **A.**   Yes.

21   **Q.**   You don't know whether Mr. Fitzwater received CONSOL

22   retiree medical benefits, do you?

23   **A.**   No.

24   **Q.**   Or if he did receive those, if those benefits were ever

25   terminated; you don't know that, right?

LAWSON - CROSS

1    **A.**    No.

2    **Q.**    And when you both worked at CONSOL, you and Mr.

3    Fitzwater never attended any meetings together about

4    benefits, did you?

5    **A.**    No.

6    **Q.**    So you never heard anyone directly tell Mr. Fitzwater

7    about his benefits?

8    **A.**    No.

9    **Q.**    Or about how long they would last?

10   **A.**    No.

11   **Q.**    You never heard anyone from CONSOL promise him lifetime

12   retiree medical benefits, did you?

13   **A.**    No.

14   **Q.**    And if anyone ever made any misrepresentations to Mr.

15   Fitzwater, you don't know who that would have been?

16   **A.**    No.

17   **Q.**    Or what they would have said?

18   **A.**    No.

19   **Q.**    You don't know whether Mr. Fitzwater ever received

20   documents from CONSOL describing his retiree medical

21   benefits, do you?

22   **A.**    No.

23   **Q.**    Or when he may have received any of them?

24   **A.**    No.

25   **Q.**    You don't know whether Mr. Fitzwater ever relied on

LAWSON - CROSS

| | |
|---|---|
| 1 | anything he ever heard from CONSOL about his retiree medical |
| 2 | benefits, right? |
| 3 | **A.**   No. |
| 4 | **Q.**   Or what he might have done in reliance, if anything? |
| 5 | **A.**   No. |
| 6 | **Q.**   You testified today that Chase Elswick promised you |
| 7 | lifetime retiree medical benefits; is that correct? |
| 8 | **A.**   Correct.  Yes. |
| 9 | **Q.**   How do you know Mr. Elswick? |
| 10 | **A.**   We he was the HR manager. |
| 11 | **Q.**   At Fola? |
| 12 | **A.**   At Fola. |
| 13 | **Q.**   And you spoke with him on your way in and out of work? |
| 14 | **A.**   Yes. |
| 15 | **Q.**   In passing? |
| 16 | **A.**   Yes. |
| 17 | **Q.**   He never made a presentation about benefits to you? |
| 18 | **A.**   No. |
| 19 | **Q.**   And you mentioned that all of your conversations with |
| 20 | Mr. Elswick about your benefits were just between you and |
| 21 | him, right? |
| 22 | **A.**   Yes. |
| 23 | **Q.**   No one else was present? |
| 24 | **A.**   No. |
| 25 | **Q.**   And when Mr. Elswick told you that you would have |

LAWSON - CROSS

1    medical benefits, that was for after you retired, right?

2    **A.**    Yes.

3    **Q.**    Are those the exact words that Mr. Elswick used?

4    **A.**    Yes.

5    **Q.**    That you would have lifetime medical benefits?

6    **A.**    Yes.

7    **Q.**    So he used the word "Lifetime"?

8    **A.**    Yes.

9           MS. BATES:  Excuse me one minute, Your Honor.

10   BY MS. BATES:

11   **Q.**    Mr. Lawson, I just want to be clear, you're testifying

12   today that Mr. Elswick told you that you would have lifetime

13   benefits?

14   **A.**    Yes.

15   **Q.**    And those were the exact words that you remember he

16   used?

17   **A.**    Yes.

18   **Q.**    Again, I deposed you in December of 2020, right?

19   **A.**    Yes.

20   **Q.**    And we talked about this topic, didn't we?

21   **A.**    Yes.

22   **Q.**    You were under oath during the deposition?

23   **A.**    Yes.

24   **Q.**    And you were truthful?

25   **A.**    Yes.

1    **Q.**    And, again, in 2017, you were deposed?

2    **A.**    Yes.

3    **Q.**    You were under oath then, too?

4    **A.**    Yes.

5    **Q.**    And at that deposition, you were also truthful?

6    **A.**    Yes.

7    **Q.**    Mr. Lawson, I'd like to show you page 86 of your

8    deposition transcript, and this is the one from 2017.

9         At page 86, Line 17, you were asked:  "Okay.  Mr.

10   Lawson, just a few more questions.  So going back to what we

11   talked about earlier today, I think you said that Chase

12   Elswick was the only person who ever made any oral

13   statements to you about your retiree benefits; is that

14   correct?"

15   **A.**    Yes.

16   **Q.**    And you answered:  "Yes."

17        Then you were asked:  "I think you said that Chase

18   Elswick said that you would have retirement medical.  Is

19   that what he said?"

20        And you answered:  "Yes."

21   **A.**    Yes.

22   **Q.**    And then you were asked:  "Do you recall him saying

23   anything else?"

24        And you said: "No."

25        And then you were asked:  "Okay.  Were those the exact

1    words that he used, to the best of your recollection?"

2        And you answered:  "Yes."

3        Didn't you?

4    **A.**   Yes.

5    **Q.**   Do you see the word "Lifetime" in what I just read to

6    you?

7    **A.**   No.

8    **Q.**   Do you see "for life"?

9    **A.**   No.

10   **Q.**   Thank you.  I'll take that back.

11       MR. POMPONIO:  Your Honor, I just want to make an

12   objection.  For point of clarification, my understanding was

13   that the witness was asked about his deposition testimony in

14   December 2020.

15       THE COURT:  He was just asked about, most

16   recently, about 2017.

17       MR. POMPONIO:  Okay, I apologize.

18   BY MS. BATES:

19   **Q.**   Mr. Lawson, sitting here today, you don't remember

20   exactly what Chase Elswick told you exactly about your

21   retiree medical benefits, do you?

22   **A.**   He said I would have them for lifetime.

23   **Q.**   So today you still insist he said the word "Lifetime"?

24   **A.**   Yes.  The reason I asked, because they had had a layoff

25   before.

LAWSON - CROSS

1    **Q.**   That's okay.

2              MS. BATES:  Can I have a minute, Your Honor?

3              THE COURT:  Yes.

4         (Pause.)

5    BY MS. BATES:

6    **Q.**   So, Mr. Lawson, despite the testimony that you and I

7    just looked at from your 2017 deposition, where you didn't

8    recall him saying anything about life or lifetime, you still

9    think that he promised you that, because that is now what

10   you remember?

11   **A.**   That's what he promised me.  He assured me.

12   **Q.**   Mr. Elswick never told you that your retiree medical

13   benefits could never be terminated, did he?

14   **A.**   No.

15   **Q.**   You don't know if anyone from CONSOL told Mr. Elswick

16   to promise you lifetime benefits, do you?

17   **A.**   No.

18   **Q.**   You don't know if CONSOL told him to make any kind of

19   misrepresentations about medical benefits?

20   **A.**   No.

21   **Q.**   Mr. Elswick never told you that he was a fiduciary of

22   CONSOL, did he?

23   **A.**   I don't understand.

24   **Q.**   Do you know what the word "fiduciary" means?

25   **A.**   No.

1    **Q.**   Do you remember Mr. Elswick ever using that word with

2    you?

3    **A.**   No.

4    **Q.**   Mr. Elswick never told you that he had the authority to

5    promise you something outside of the written terms of

6    CONSOL's benefit plans, did he?

7    **A.**   No.

8    **Q.**   And no one else told you that Mr. Elswick had that

9    authority?

10   **A.**   No.

11   **Q.**   You don't know of any documents that would give Mr.

12   Elswick that kind of authority, do you?

13   **A.**   No.

14   **Q.**   You have no reason to believe that Mr. Elswick was

15   intentionally lying to you the day that he told you that, do

16   you?

17   **A.**   No.

18   **Q.**   You testified that you asked Mr. Elswick for paperwork

19   showing that you would have guaranteed lifetime medical

20   benefits; is that right?

21   **A.**   Yes.

22   **Q.**   And you said today that he told you that you didn't

23   need it?

24   **A.**   Yes.

25   **Q.**   But then you also saw in this exhibit that your counsel

LAWSON - CROSS

1    showed you about your retiree lifetime medical benefits.  Is

2    that right?

3    **A.**    Yes.

4    **Q.**    And that was Plaintiff's Exhibit 16?

5    **A.**    Yes.

6    **Q.**    Do you still have that exhibit in front of you?

7    **A.**    Yes.

8    **Q.**    I want you to look at the bottom of Plaintiff's Exhibit

9    16, it says in all capital letters, in bold, "NOTE."

10        In the third line down of Plaintiff's Exhibit 16, it

11    says, "All plans are subject to change or termination by

12    CONSOL at any time."

13        Do you see that language?

14    **A.**    Yes.

15    **Q.**    Was that the only document that you ever received from

16    CONSOL about your retiree lifetime medical benefits?

17    **A.**    Yes.

18    **Q.**    At your deposition in 2017, you brought several

19    documents to the deposition about your retiree lifetime

20    medical benefits, didn't you?

21    **A.**    This one here is the only one I know of.

22    **Q.**    Did you look at any other documents during your 2017

23    deposition that related to your retiree lifetime medical

24    benefits?

25    **A.**    No.

LAWSON - CROSS

1   **Q.**   You didn't look at any documents?

2   **A.**   No.

3   **Q.**   You didn't testify that those documents were handed to

4   you at your work site at Fola?

5   **A.**   I don't recall.

6   **Q.**   So you don't remember if you discussed the documents,

7   or you are sure you didn't?

8   **A.**   I discussed this one.

9   **Q.**   You only discussed the Benefits Information Sheet that

10   is Exhibit 16?

11   **A.**   Yes.

12   **Q.**   You didn't review Enrollment Guides that you received

13   from CONSOL?

14   **A.**   No.

15   **Q.**   You didn't review Summary Plan Descriptions from

16   CONSOL?

17   **A.**   No.

18   **Q.**   So your testimony is that the only document you ever

19   saw about retiree lifetime medical benefits is Plaintiff's

20   Exhibit 16?

21   **A.**   Yes.

22          MS. BATES:  Your Honor, if I could have a minute?

23          THE COURT:  Yes.

24       (An off-the-record discussion was held between defense

25   counsel.)

1    BY MS. BATES:

2    **Q.**   Mr. Elswick never told you to ignore any of the

3    language on Exhibit 16, did he?

4    **A.**   No.

5    **Q.**   He never told you to disregard that piece I read that

6    said, "All plans are subject to change or termination by

7    CONSOL at any time"?

8    **A.**   No.

9    **Q.**   He didn't tell you that language didn't apply to you,

10   did he?

11   **A.**   No.

12          MS. BATES:  No further questions.

13       Thank you, Mr. Lawson.

14          THE WITNESS:  Thank you.

15                      **REDIRECT EXAMINATION**

16   **BY MR. POMPONIO:**

17   **Q.**   Mr. Lawson, when you were asked questions just a moment

18   ago, you started to explain an answer.  You said, "The

19   reason" -- and then you were cut off.  Did you want the

20   opportunity to explain your answer?

21   **A.**   What it was, they had a layoff earlier.  That's why I

22   kept asking about my benefits.

23   **Q.**   Okay.  Now, you were deposed twice in this case, right,

24   once in 2017 and once in 2020?  Correct?

25   **A.**   Yes.

1   **Q.**   Okay.  And do you have a copy of your deposition up

2   there?

3   **A.**   No.

4   **Q.**   Okay.

5           MS. BATES:  I have one here.

6           MR. POMPONIO:  I could just give him mine.

7   BY MR. POMPONIO:

8   **Q.**   Okay.  If you could, I'm handing you page 151 of your

9   December 2020 deposition.  And I'd like to direct your

10  attention to Line 8, and tell the Court what you testified

11  to in that deposition.

12  **A.**   I was told I'd have lifetime medical.

13  **Q.**   Okay.  You were asked whether Chase Elswick ever told

14  you your retirement benefits could never be terminated,

15  okay.  Do you remember that question?

16  **A.**   Yes.

17  **Q.**   Okay.  Did Mr. Elswick ever tell you that CONSOL

18  reserved the right to terminate your benefits?

19  **A.**   No.

20          MR. POMPONIO:  That's all the questions I have.

21                      **RECROSS EXAMINATION**

22  **BY MS. BATES:**

23  **Q.**   Mr. Lawson, you just testified that Mr. Elswick never

24  verbally told you that the company could terminate your

25  benefits; is that right?

LAWSON - EXAMINATION BY THE COURT

1    **A.**    Yes.

2    **Q.**    But he gave you Plaintiff's Exhibit 16?

3    **A.**    Yes.

4    **Q.**    And this document we just discussed says that the

5    company can terminate your benefits; is that right?

6    **A.**    Yes.

7              MS. BATES:  Nothing further.  Thank you.

8              MR. POMPONIO:  Nothing further from the

9    plaintiffs, Your Honor.

10                          **EXAMINATION**

11   **BY THE COURT:**

12   **Q.**    Mr. Lawson, let me ask you, when did you receive this

13   exhibit, Plaintiff's 16?

14   **A.**    I'm not sure the date I received it.

15   **Q.**    Well, the date is -- has an effective date, it says

16   July 1 of 2013.  Do you remember whether you received it

17   about that time?

18   **A.**    I'm not sure, Your Honor.

19   **Q.**    You retired on what date?

20   **A.**    I got laid off in July 2013.

21   **Q.**    And did you ever go back to work?

22   **A.**    No.

23   **Q.**    And did you receive this after you were laid off?

24   **A.**    I'm not sure.

25   **Q.**    When, as I understand it, Mr. Elswick told you in

LAWSON - EXAMINATION BY THE COURT

1   passing that you had, as you said, either retirement medical

2   or lifetime retirement medical, whichever it was, he told

3   you that on only one occasion?

4   **A.**   Several occasions.

5   **Q.**   And so when did those occasions occur?  Were they

6   before or after you retired?

7   **A.**   Before.

8   **Q.**   And do you remember when?

9   **A.**   I don't remember dates, no.

10   **Q.**   And those were always in, as I understand it, side

11   discussions with you that you had with him?

12   **A.**   Yes.

13   **Q.**   And would it be fair to say that you were the only one

14   talking to him at the time?

15   **A.**   Yes.

16   **Q.**   No one else was present?

17   **A.**   No.

18          THE COURT:  Thank you.

19       Any further questions of the witness?

20          MR. POMPONIO:  Nothing further, Your Honor.

21          MS. BATES:  No, Your Honor.

22          THE COURT:  And may Mr. Lawson be excused from the

23   trial?

24          MR. POMPONIO:  Yes, he may.

25          MS. BATES:  Yes.

LAWSON - EXAMINATION BY THE COURT

1          THE COURT:  Mr. Lawson, you're excused from the

2     trial, and I caution you not to discuss your testimony with

3     any other witness in this case until the trial is over, and

4     it is not going to be over until late next week.

5          THE WITNESS:  Okay.

6          THE COURT:  If you need any relief from that

7     direction, let me know.  Thank you, sir, and you're excused.

8     And let me ask you when you leave to go through the

9     courtroom door that I came in, and just go through there and

10    turn left, down the hall through two doors to get back to

11    the lobby.

12         THE WITNESS:  Thank you.

13         THE COURT:  And thank you.

14         THE WITNESS:  Through this door?

15         THE COURT:  Yes.  Thank you.

16         MR. TORRES:  Your Honor?

17         THE COURT:  Yes, sir.

18         MR. TORRES:  Speaking of excused, I was hoping the

19    Court would allow me to be excused for the next witness.

20         THE COURT:  Again, please?

21         MR. TORRES:  I was hoping the Court would allow me

22    to be also excused for the next witness.

23         THE COURT:  Well, surely.  If you wish.

24         MR. TORRES:  Thank you, Your Honor.

25         THE COURT:  And the next witness.

```
 1              MS. DAVIDSON:  Your Honor, we call Donald Hylton,

 2     H-Y-L-T-O-N.

 3          DONALD HYLTON, SR., PLAINTIFF'S WITNESS, SWORN

 4              THE CLERK:  Please state your name for the record

 5     and then spell it.

 6              THE WITNESS:  Donald Hylton, Sr.  Hylton,

 7     H-Y-L-T-O-N.

 8              THE CLERK:  Thank you.  If you'd please take the

 9     stand.

10                        DIRECT EXAMINATION

11     BY MS. DAVIDSON:

12     Q.   Good afternoon, Mr. Hylton.

13     A.   Good afternoon.

14     Q.   Thank you for being here today.  Please tell the Court

15     where you live.

16     A.   I live outside of Bluefield, Virginia, in Tazewell

17     County, Virginia.

18     Q.   Are you married?

19     A.   I am.

20     Q.   What's your wife's name?

21     A.   Vickie.

22     Q.   And what is her birth date and age?

23     A.   She is 63.  Born on January 3rd, 1958.

24     Q.   And what is your birth date and age?

25     A.   I'm 61.  And I was born on March 14, 1959.
```

HYLTON - DIRECT

1   **Q.**   Are you currently working or retired?

2   **A.**   Retired.

3   **Q.**   When did you retire?

4   **A.**   March -- I mean, May of 2014.

5   **Q.**   How old were you when you retired?

6   **A.**   55.

7   **Q.**   Where did you work before you retired?

8   **A.**   At Buchanan Mine, in Buchanan, Virginia, for CONSOL.

9   **Q.**   And what was your occupation?

10  **A.**   I was a conveyor belt coordinator.

11  **Q.**   How long did you work for CONSOL?

12  **A.**   29 years.

13  **Q.**   Were you paid a salary or were you on an hourly basis?

14  **A.**   When I began, I was an hourly employee for 10 years,

15  and then I was a salaried employee for my last 19 years.

16  **Q.**   During your employment with CONSOL, were there ever

17  occasions when the company discussed with you or explained

18  to you your entitlement to welfare retirement benefits?

19  **A.**   Yes.  When I was hired in 1985, May of 1985, when I was

20  employed with them, we had a week-long orientation class; we

21  went over the benefits then.  And also, periodically, at the

22  mine, we would have meetings, and they would go over, you

23  know , different things, particularly, during -- like, if we

24  had a pay raise and improvement in benefits, or in the early

25  years of the mine, we had a lot of union activity, because

1   it was a new operation and they tried to organize us.  They

2   would call us in frequently and compare benefits to what our

3   benefits was to what the union had.

4   **Q.**   Can you pull the microphone closer to you?

5   **A.**   Sure.  How is that?

6   **Q.**   Much better.  Okay.  Let's first talk about the

7   orientation you talked about.  When was that meeting?

8   **A.**   When I was hired, in May of 1985.  And it lasted for a

9   week.  Is this too loud now?

10  **Q.**   No, you are fine.  Who was at that meeting; do you

11  recall?

12  **A.**   The class was taught by John Fox, and Jerry Hickman and

13  Gerald Nicholson.

14  **Q.**   Putting aside right now Mr. Hickman and Gerald

15  Nicholson, let's just focus on John Fox, okay?

16  **A.**   Yes, ma'am.

17  **Q.**   And what was Mr. Fox's position in the company?

18  **A.**   Well, he was HR, when I -- the class wasn't held at the

19  coal mine.  He taught that class but when I went to the

20  mine, he was our HR director, because he was positioned at

21  Buchanan Mine.

22  **Q.**   Do you remember if anyone went over a reservation of

23  rights clause at the 1985 orientation meeting there for the

24  Buchanan Mine?

25  **A.**   I don't recall that.

1    **Q.**   Let's talk about the other periodic meetings that you

2    mentioned earlier.  You said earlier that these meetings

3    were held when you got a pay raise, when there was union

4    activity, and then also when there were changes in your

5    benefits.  Can you elaborate on the time period that you are

6    referring to?

7    **A.**   I would say it was -- those were -- those occurred more

8    often in my first 10 years at Buchanan, from 1985 to around

9    1994, '95.

10   **Q.**   And you mentioned, specifically, you had meetings about

11   when there was union activity happening at the mine.  Can

12   you elaborate on that just very briefly?

13   **A.**   Well, as I mentioned, when we first started, there was

14   a big push for unionization, because we were a union-free

15   operation.  So we -- on occasion, we would have picketers or

16   a union contractor, you know, several things like that, they

17   would just try to organize.  Sometimes they would show up

18   randomly and try to hand out union cards out at the gate.

19   And even times when there was -- when there were other

20   violent strikes happening elsewhere, not in our area, and

21   they would, you know, they would call us up and remind us of

22   our benefits; what they called the Buchanan advantage,

23   because we didn't have to pay union dues.  They always said

24   our benefits would be as good or better than what the union

25   had to offer, things of that nature.

HYLTON - DIRECT

1   **Q.**   Thank you.  Do you remember who was there at these

2   meetings to talk about the welfare retirement benefits

3   during the union organizing campaign you just referenced?

4   **A.**   In the early years, it was definitely John Fox, but it

5   was always an HR representative who was there.

6   **Q.**   At these meetings, what, if anything, was discussed

7   about your welfare retirement benefits?

8   **A.**   That the benefit package including that was always as

9   good as or better than what the union had to offer.

10   **Q.**   What, if anything, did Mr. Fox mention about yourself

11   or dependent children?

12   **A.**   They were included, you know, they were included with

13   our benefit package, dependents, wife, children.  Is that

14   what you are asking?

15   **Q.**   Yes.  What, if anything, were you told about when --

16   when you would be eligible for these retiree benefits?

17   **A.**   Once we had 10 years of service and reached the age of

18   55.

19   **Q.**   What, if anything, did Mr. Fox say about the duration

20   of these benefits?

21   **A.**   Well, they -- you know, we would get the benefits when

22   we retire, and then we would just have them, presumably,

23   until we died.  I mean, that's the way I took it.

24   **Q.**   You said that's the way you took it.  What did Mr. Fox

25   say?

1    **A.**   Well, I would like to say he said lifetime benefits or

2    for life.  I just can't remember the exact terminology, but

3    the presumption was, since the union -- we knew a lot of

4    people that worked at Buchanan were previous union miners,

5    and we knew that they had their benefits until they died.

6    So, you know, the presumption was we had our benefits until

7    we died or lifetime.

8    **Q.**   And what specific welfare retirement benefits are we

9    talking about?

10   **A.**   Retirement medical, you know, insurance and life

11   insurance and, you know, prescriptions, things of that

12   nature.

13   **Q.**   Okay.  What information, if any, did the HR manager,

14   Mr. Fox, convey about the meaning of the retirement welfare

15   benefit plan terms?

16   **A.**   Would you repeat that, please?

17   **Q.**   Sure.  What information, if any, did Mr. Fox convey

18   about the meaning of the retirement welfare benefit plan

19   terms?

20   **A.**   Plan terms?  I'm not sure I understand what you are

21   saying.  I mean -- he told us that we would have retirement

22   medical benefits and then, you know, what that encapsulated.

23   Sometimes he would go over -- it was a 90/10, plan, I think,

24   and, you know, and a normal medical -- it would be similar

25   to the medical insurance we had while we were working.

1   **Q.**   Okay.   Did anyone ever ask any questions during these

2   meetings?

3   **A.**   Not that I recall.

4   **Q.**   Did anybody ever ask you questions?

5   **A.**   Well, in those meetings, no, but some of the positions

6   I held over the years -- I worked there for 29 years.   I was

7   a shift foreman and also the coordinator.   I had a lot of

8   people that I was responsible for that worked for me,

9   especially as a shift foreman.   And they may come in and ask

10  me a question about -- you know, I was responsible for days

11  off, and things of that nature, or they may ask me

12  something, when we got a pay raise or something.   But, you

13  know, most of the times, if someone directed a benefit,

14  especially the long-term benefit question to me, I would

15  always refer them to HR.

16  **Q.**   You said earlier that you were told by Mr. Fox at

17  Buchanan that you would have retirement welfare benefits for

18  life.   What use, if any, did you make of that information

19  that you were told?

20              MS. BATES:   Objection, Your Honor.   It

21  mischaracterizes the witness' testimony.

22              THE COURT:   Again, please .

23              MS. BATES:   She just mischaracterized the witness'

24  testimony.

25              THE COURT:   In what respect?

1              MS. BATES:  She added the word "lifetime."

2              THE COURT:  Restate the question.

3     BY MS. DAVIDSON:

4     Q.   You stated earlier that you were told by Mr. Fox that

5     you would have welfare retirement benefits that were better

6     than or as -- as good or better than the union.  What use

7     did you make of that information that you were told?

8     A.   I planned -- you know, as an employee there, I planned

9     on staying at Buchanan, if I could, and then when I got

10    closer and closer to retirement, then, of course, I

11    considered the benefits I would have after I retired.  So it

12    involved the decision to stay with CONSOL and also, you

13    know, relative to how long I would work.  You know, try to

14    plan my retirement and be able to afford to retire.

15    Q.   And during these meetings at Buchanan that occurred

16    when there was union activity at the mine, did Mr. Fox

17    mention that CONSOL reserved the right to terminate your

18    retirement welfare benefits?

19    A.   At those meetings, when they would compare our benefits

20    to the unions, they never said, oh, yeah, we might take

21    these.  It was never a consideration and it was never

22    mentioned that they would take our benefits.

23    Q.   And did you ever receive documents during these

24    meetings?

25    A.   Not that I recall.

1   **Q.**   Did you have films or a PowerPoint presentation?   How

2   did they --

3   **A.**   Many times, they would have a slide presentation, and,

4   you know, it would be side-by-side, here's what you get,

5   here's what you get an hour, here's what the union gets, and

6   so forth and so on, to do a comparison of the benefits.

7   That was the purpose of the meeting, usually, was to remind

8   us of the Buchanan advantage we had being union-free.

9   **Q.**   And what, if anything, do you remember reading in these

10   slides?

11   **A.**   I don't recall anything specifically, you know.   We had

12   so many of those meetings, particularly, in the early years.

13   **Q.**   And please remind me, again.   When did you retire?

14   **A.**   In May of 2014.

15   **Q.**   Okay.   What, if any, importance did you place on your

16   retirement welfare benefits when you retired -- when you

17   decided to retire?

18   **A.**   Well, you know, I -- of course, a person plans for

19   their retirement and things that they'll be able to do after

20   they are retired.   And had I realized that they would take

21   my medical insurance, I may tried to work longer, even

22   though I did have some health issues when I left.

23   **Q.**   And after you retired, did CONSOL terminate your

24   benefits?

25   **A.**   They did, at the end of 2015.

1    **Q.**   And when CONSOL terminated your benefits, did you

2    receive transition benefits?

3    **A.**   I did not.

4            MS. DAVIDSON:  May I take a moment to confer?

5            THE COURT:  Yes.

6            MS. DAVIDSON:  No more questions at this time,

7    Your Honor.

8                        **CROSS-EXAMINATION**

9    **BY MS. BATES:**

10   **Q.**   Hi, Mr. Hylton.

11   **A.**   Hi.

12   **Q.**   How are you doing?

13   **A.**   Okay.  How are you today?

14   **Q.**   All right.  Mr. Hylton, you started working for CONSOL

15   in 1985?

16   **A.**   Yes, ma'am.

17   **Q.**   And you said for the first 10 years that you worked

18   there, you were hourly?

19   **A.**   Yes, ma'am.

20   **Q.**   So you were eligible to join a union?

21   **A.**   Yes, ma'am.

22   **Q.**   And you had been in a union before you joined CONSOL,

23   right?

24   **A.**   I had worked for the union, but when I joined CONSOL, I

25   was not working in a union mine, no, ma'am.  I wasn't.  But

1    I had been in the union before.

2    **Q.**   For a short time?

3    **A.**   Yes, ma'am.

4    **Q.**   And by the time you joined CONSOL, you had already

5    decided the union wasn't for you; is that right?

6    **A.**   Yes, ma'am.

7    **Q.**   Why was that?

8    **A.**   Well, particularly, I worked in a small operation

9    called punch hole.  I don't know if you've ever heard that

10   terminology.  And I had been laid off and finally got that

11   job.  And while I was working there, the union, you know,

12   decided to initiate a strike fund.  Something that I felt

13   like I would never benefit from.  And I was having a hard

14   time; I was struggling to make ends meet, and then they

15   started taking more money out of my check.

16           MS. DAVIDSON:  Your Honor, I'm going to object.

17   This is outside of the scope of our direct.

18           THE COURT:  Are you finished with this area?

19           MS. BATES:  Yes.

20   BY MS. BATES:

21   **Q.**   Mr. Hylton, you were previously deposed in this case,

22   right?

23   **A.**   Yes, ma'am.

24   **Q.**   Back in December of 2020?

25   **A.**   Yes, ma'am.

1    **Q.**   And at that deposition, you were under oath, weren't

2    you?

3    **A.**   Yes, ma'am.

4    **Q.**   And you told the truth?

5    **A.**   Yes, ma'am.

6    **Q.**   Today, you're also under oath, aren't you?

7    **A.**   Yes, ma'am.

8    **Q.**   Do you remember at your deposition looking at certain

9    documents that CONSOL gave you over the years?

10   **A.**   I do.

11   **Q.**   Some of those documents you testified were mailed to

12   your home; is that right?

13   **A.**   I had documents mailed to my home, but not anything you

14   showed me in the deposition, as far as I know.

15   **Q.**   And you testified that other documents were given to

16   you at your work site; is that right?

17   **A.**   Yes, ma'am.

18   **Q.**   You also sent some documents to Mountain State Justice

19   to produce in this case; is that right?

20   **A.**   Yes, ma'am.

21   **Q.**   And you discussed some of those documents at your

22   deposition, didn't you?

23   **A.**   Yes, ma'am.

24   **Q.**   And at least some of those documents that you received

25   from CONSOL said that CONSOL could terminate your benefits,

1    didn't they?

2    **A.**    Yes, ma'am.

3    **Q.**    You testified today about the orientation that you

4    attended in 1985?

5    **A.**    Yes, ma'am.

6    **Q.**    And you said that John Fox was there?

7    **A.**    Yes, ma'am.

8    **Q.**    And Gerald Nicholson?

9    **A.**    Yes, ma'am.

10    **Q.**    And Jerry Hickman; is that right?

11    **A.**    Yes, ma'am.

12    **Q.**    And the three of them presented to you about your

13    benefits, right?

14    **A.**    Yes, ma'am.

15    **Q.**    Did they also give you a handbook about your benefits

16    at that orientation?

17    **A.**    I believe they did.

18    **Q.**    Is that handbook what you gave to Mountain State

19    Justice to produce in this case?

20    **A.**    I think it is.

21    **Q.**    Did they go through that handbook with you during the

22    orientation?

23    **A.**    I recall going over benefits, yes, ma'am.

24    **Q.**    And they generally explained your medical benefits from

25    CONSOL?

```
 1    A.    Yes, ma'am.

 2    Q.    But you don't remember which of the three men was the

 3    one who explained retiree medical benefits, do you?

 4    A.    No, ma'am.

 5    Q.    So you don't know if it was John Fox?

 6    A.    I cannot recall.

 7    Q.    And whichever person it was who explained your retiree

 8    medical benefits, you don't remember exactly what that

 9    person said, do you?

10    A.    No, ma'am.

11    Q.    You don't remember their exact words from 1985, right?

12    A.    Exactly.  I was 26 years old.

13    Q.    But you remembered that at your orientation, one of

14    those three individuals pointed out to you in the handbook

15    some language that said the same thing, that CONSOL could

16    terminate your benefits; isn't that right?

17    A.    Specifically, at that time, I do not recall them

18    telling me in 1985 that my benefits could be terminated.

19    But as the years went on and I worked, I came to understand

20    that.

21    Q.    So today --

22    A.    That it was in the booklet, not that they would

23    actually do it.

24    Q.    Okay.  I just want to make sure that I understand.

25    A.    Okay.
```

1    **Q.**   Today, you don't specifically remember whether they

2    pointed out that language about reserving the right to

3    terminate benefits in the handbook during the orientation

4    session; is that right?

5    **A.**   Correct.

6    **Q.**   But over your career at CONSOL, you did learn that that

7    handbook reserved the right to terminate retiree medical

8    benefits; is that correct?

9    **A.**   Correct.

10   **Q.**   And John Fox, Gerald Nicholson or Jerry Hickman,

11   whichever -- none of those people told you that your retiree

12   medical benefits could never be terminated, did they?

13   **A.**   They did not.

14   **Q.**   They never told you to ignore that language reserving

15   CONSOL's right to terminate benefits, did they?

16   **A.**   They did not.

17   **Q.**   They didn't tell you that that language didn't apply to

18   you, right?

19   **A.**   They did not.

20   **Q.**   They never told you that CONSOL's medical benefits were

21   Congressionally backed, did they?

22   **A.**   No, ma'am.

23   **Q.**   Or that they would vest?

24   **A.**   Will you explain that, please.

25   **Q.**   "Vest," V-E-S-T.  They didn't use that word to describe

1    the retiree medical benefits that CONSOL offered, did they?

2    **A.**    I've heard that term before relating to our benefits,

3    you know, vested.  Usually meant 10 years and 55 years of

4    age.

5    **Q.**    For your pension?

6    **A.**    Yes, ma'am.

7    **Q.**    They didn't say it about medical benefits, did they?

8    **A.**    Actually, retirement medical benefits were rarely

9    brought up in the terms of not having them.  So, no, they

10   didn't say "vested" or "not vested."  But they also didn't

11   say -- I mean, that terminology that's in that book, as far

12   as them speaking it to us and talking about it, it just

13   didn't happen.  It's in the book -- I'm aware that it's in

14   the book now, particularly, since all that started, but over

15   the years, if they talked about our benefits, and they said,

16   "Here's what the union has.  "Here's what you have."  They

17   never had that addendum where, "Remember, we can terminate

18   these."  They just didn't talk about that.

19   **Q.**    They didn't say it orally?

20   **A.**    They did not tell us when we were having those

21   meetings, particularly in the early years of operations,

22   they didn't -- when they would compare our benefits, they

23   didn't say, "but, remember, we can terminate these."  They

24   just didn't do that.

25          So it really -- it's in the book, but it wasn't

1    something they discussed.

2    **Q.**    Okay.  And are you talking about the meetings that

3    happened periodically after your orientation?

4    **A.**    Yes, ma'am.

5    **Q.**    And at any of those meetings that happened over your

6    career, no one from CONSOL ever told you that CONSOL's

7    retiree medical benefits would never be terminated, did

8    they?

9    **A.**    They did not.

10   **Q.**    So your understanding that you would have retiree

11   medical benefits from CONSOL for life came from you

12   personally knowing people who had retired from CONSOL who

13   enjoyed those benefits for their life; is that right?

14   **A.**    That's correct.

15   **Q.**    But you also knew about other CONSOL's retirees who had

16   lost their benefits -- I'm sorry -- CONSOL employees, I

17   think, who had lost their benefits before; isn't that right?

18   **A.**    There was a time, I think it was three to five years

19   before I retired, that the company terminated retirement

20   medical benefits for what they considered nonessential

21   employees.

22   **Q.**    So you knew that that happened before your retirement?

23   **A.**    To nonessential employees.

24   **Q.**    But you just never thought they would do that to upper

25   management employees?

1    **A.**    No.  To begin with, nonessential employees were like

2    mine workers and things of that nature.  I didn't think that

3    they would take medical benefits from the people that went

4    underground and did the type of work we did and had the

5    exposure to the health issues that underground miners have.

6         And then before I retired, my consideration was, this

7    had happened to those employees three to five years

8    previously, and if they were going to take the underground

9    employees, why didn't they do it at that time?

10   **Q.**    I understand.  But no one ever told you that the

11   termination would never happen, right?

12   **A.**    No, ma'am.

13   **Q.**    Do you know Ed Davidson?

14   **A.**    I do.

15   **Q.**    Did you talk to Ed Davidson about becoming a salaried

16   employee?

17   **A.**    He was the HR manager when I was asked to become a

18   salaried employee.

19   **Q.**    Did he explain your salaried employee benefits to you?

20   **A.**    Not that I recall.

21   **Q.**    So you started thinking about retiring when you were

22   close to 55 years old, right?

23   **A.**    Yes, ma'am.

24   **Q.**    And you talked to Bret Holbrook about it; is that

25   right?

1    **A.**   After I had agreed to take a voluntary layoff, because

2    it was like a buyout of some of the salaried employees.

3    Bret, he talked to me about that -- and I might add, this

4    was after the deposition, I contacted Bret to see if he

5    remembered that conversation that I had at the deposition.

6        He said he didn't recall the conversation, but he felt

7    like if he said those things to me, that were in the

8    deposition, that --

9    **Q.**   Okay.  We'll get to those.

10   **A.**   He didn't have any fore knowledge that they were going

11   to take our insurance.

12   **Q.**   We'll --

13   **A.**   He told me that if he said those things -- he told me

14   that he -- that we had that conversation, the reason he said

15   those things was he was trying to encourage me to stay

16   instead of retiring, and not that he had any fore knowledge

17   they would take our medical insurance.

18   **Q.**   Okay.  Well, I'm going to ask you about what he said,

19   but that I think is what you thought his intention was to

20   try to keep you working?

21   **A.**   Yes, ma'am.

22   **Q.**   When you wanted to maybe retire; is that right?

23   **A.**   And he confirmed that after the deposition.

24   **Q.**   Well, who is Bret Holbrook?

25   **A.**   He was the superintendent at the mine at the time I

1    retired.

2             THE COURT:  Which mine is that?

3             THE WITNESS:  Buchanan.

4    BY MS. BATES:

5    Q.   So this conversation that you had with Bret Holbrook,

6    was it before you retired?

7    A.   Yes, ma'am.

8    Q.   He warned you about the possibility that maybe your

9    retiree medical benefits could be terminated because his own

10   dad had that experience; is that right?

11   A.   Yes, ma'am.  He said -- we had a private conversation,

12   and he said, "You're only 55 years old."  And he said, "My

13   father retired young also and he did not work for the coal

14   mine" -- he worked for some other company, I'm not even

15   aware of who he worked for, but he said he was -- he had

16   left employment, and then a few years before he was 65 to

17   get Medicare, he lost his medical insurance.  And he said,

18   "You're only 55, you need to think about that."

19   Q.   And he didn't know that you had some health things

20   going on and that's maybe why you were thinking of retiring;

21   is that right?

22   A.   No, ma'am.  I never discussed my health issues with the

23   superintendent.

24   Q.   So he just wanted you to keep working, you thought?

25   A.   He confirmed that later, yes, ma'am.  At the time,

1   that's what I thought.  And then I talked to him after the

2   deposition, and he said that's why he told me that.

3   **Q.**   And that's why you went ahead and retired, despite his

4   story of warning; is that right?

5   **A.**   Would you repeat that?

6   **Q.**   I can ask you again.  Even though he warned you that

7   maybe retiring early was risky because you wouldn't be

8   eligible yet for Medicare benefits for about 10 years and

9   perhaps you could lose your medical insurance in retirement,

10  you went ahead and retired anyway at 55, right?

11  **A.**   I retired because I did not believe the company would

12  take our retirement medical insurance.

13  **Q.**   Well, today, you testified that it was also because you

14  had some health issues that you were concerned about, right?

15  **A.**   Yes.  But had I -- had I known I was losing my medical

16  insurance, I would have tried to stay.  I mean, provided

17  that I could do the job that I was required to do, which was

18  a very physical job.

19  **Q.**   So even though you knew that the company could

20  terminate your benefits before you retired, that that was a

21  possibility, you just didn't think that could happen, right?

22  **A.**   I did not believe the company would take our retirement

23  medical insurance.

24  **Q.**   Mr. Hylton, you know Connie Gilbert personally, right?

25  **A.**   I know her because she was an employee at Buchanan.  If

HYLTON - CROSS

```
 1    that's what you mean personally.  We don't socialize or
 2    anything.
 3    Q.   Okay.  I'll come back to her.  You also know Emmett
 4    Casey, right?
 5    A.   Yes, ma'am.
 6    Q.   And I'll come back to him, too.
 7         But first, you don't personally know Benny Fitzwater,
 8    do you?
 9    A.   No, ma'am.  I saw him out in the hall, the first time I
10    think that I may have ever seen the fellow.
11    Q.   You don't know Clarence Bright, right?
12    A.   No, ma'am.
13    Q.   Or Terry Prater?
14    A.   I do not know Terry Prater.
15    Q.   You don't know Allan Jack, right?
16    A.   Correct.
17    Q.   Or Bob Long?
18    A.   Correct.
19    Q.   And for those five people that I just named, you don't
20    know where they worked, do you?
21    A.   No, ma'am.
22    Q.   You don't know the time period that they worked; is
23    that right?
24    A.   I do not.
25    Q.   You don't know what presentation or meetings they may
```

1    have ever been in about any medical benefits they may have

2    received?

3    **A.**    I do not.

4    **Q.**    Or if they spoke to anyone about their medical

5    benefits?

6    **A.**    I know nothing of those gentlemen.

7    **Q.**    So, getting back to Connie Gilbert, you only know

8    Connie Gilbert because of this case, right?

9    **A.**    No.  She worked at Buchanan.

10   **Q.**    So you knew her while you were working?

11   **A.**    She may have worked for me when I was a shift foreman.

12   **Q.**    Okay.  But you said you don't know her very well?

13   **A.**    I don't know her personally, but I know her through

14   work.

15   **Q.**    Okay.  So do you know the time period that she worked

16   at Buchanan?

17   **A.**    I don't recall.

18   **Q.**    Do you know what presentation or meetings Connie

19   Gilbert attended at Buchanan?

20   **A.**    I couldn't specifically say that I remember her in any

21   of our presentations, no, ma'am.

22   **Q.**    So you were never in a presentation with her?

23   **A.**    I can't say that, because I was shift foreman and she

24   may have worked for me when I was a shift foreman.  And if I

25   was her shift foreman, then I would have probably been in

1    meetings with her.  But I don't recall if she worked for me

2    or not.

3    **Q.**   So you don't know for sure, one way or the other?

4    **A.**   Correct.

5    **Q.**   You don't know who, if anyone, she talked to at CONSOL

6    about her retiree medical benefits, do you?

7    **A.**   You mean while she was employed?

8    **Q.**   At any time?  You don't know who she spoke with, right?

9    **A.**   About her medical insurance?

10   **Q.**   Correct.

11   **A.**   Retiree medical insurance?

12   **Q.**   Yes.

13   **A.**   I would assume if she was working at Buchanan, she

14   would have talked to HR managers.

15   **Q.**   But you don't know if she ever did?

16   **A.**   I do not.

17   **Q.**   You don't know what anyone from CONSOL ever said to

18   Connie Gilbert about her retiree medical benefits, do you?

19   **A.**   I do not.

20   **Q.**   Or if they promised her anything outside of her written

21   terms of the benefit plans?

22   **A.**   I do not.

23   **Q.**   You don't know if they told her anything about how long

24   her retiree medical benefits would last, do you?

25   **A.**   I don't know of anything they would have specifically

1   told Connie Gilbert about her retirement benefits.

2   **Q.**   You don't know what, if anything, Connie Gilbert did to

3   rely on anything she may have been told about her retiree

4   medical benefits, do you?

5   **A.**   I do not.

6   **Q.**   And you also know Mr. Casey, right?

7   **A.**   Yes, ma'am.

8   **Q.**   You know him a little better, right?

9   **A.**   Yes, ma'am.

10  **Q.**   How do you know Mr. Casey?

11  **A.**   I first met him, because he came to work at Buchanan.

12  But we actually rode together at one point when we were both

13  on the evening shift.  And then since we retired, we've

14  remained friends and we speak occasionally on the phone.

15  **Q.**   When is the last time you saw Mr. Casey?

16  **A.**   Several months -- I don't recall.

17  **Q.**   Before the pandemic?

18  **A.**   Yes, ma'am.  I would say the last time I saw Casey --

19  we used to have a bunch of retirees get together and have a

20  luncheon at Ryan's every quarter.  I went to maybe a half a

21  dozen of those, and I saw him there.  That may have been the

22  last time I actually saw him.

23  **Q.**   Do you know exactly when Mr. Casey retired from

24  Buchanan?

25  **A.**   No, ma'am.  I'm not sure.

1    **Q.**   While you and Mr. Casey were working at Buchanan, you

2    never discussed your medical benefits during that time, did

3    you?

4    **A.**   Not that I recall.

5    **Q.**   So you don't know what benefits Mr. Casey had from

6    CONSOL, do you, for a fact?

7    **A.**   Not for a fact.  I would presume that we all had the

8    same medical insurance, that he had what I had, you know.

9    **Q.**   You would presume that?

10   **A.**   Yes, ma'am.

11   **Q.**   But you don't know that, right?

12   **A.**   No, ma'am.

13   **Q.**   You don't know what meetings or presentations Emmett

14   Casey ever attended at CONSOL about his benefits, do you?

15   **A.**   The same meetings that I would have attended, because

16   we worked on the same shift for some time, so I'm sure

17   during that time period if we had a meeting, we could have

18   possibly both been in that meeting.

19   **Q.**   You were possibly in that meeting or do you remember

20   specifically that Emmett Casey was in a meeting where you

21   were with discussion of retiree medical benefits?

22   **A.**   I can't tell you specifically we were, no, ma'am.

23   **Q.**   You just think maybe?

24   **A.**   I think that you would assume if you worked with

25   someone on the same shift and you had a meeting, you would

1    be both in that shift -- you know, the entire shift, all the

2    men would be called up to have a meeting, men and women,

3    and, you know, we would more than likely did, but I can't

4    tell you specifically or recall a certain day or what may

5    have been said to him.

6    **Q.**    You don't know who Mr. Casey may have discussed his

7    retiree medical benefits with from CONSOL, right?

8    **A.**    Correct.

9    **Q.**    You don't know if he ever asked anyone from CONSOL

10   about his retiree medical benefits, right?

11   **A.**    I do not.  Not while we were employed.

12   **Q.**    And you don't know what he heard from anyone at CONSOL

13   about his retiree medical benefits, right?

14   **A.**    Correct.

15   **Q.**    Basically, you don't know who told him what; is that

16   fair?

17   **A.**    Yes, ma'am.

18   **Q.**    You don't know what he believed about his retiree

19   medical benefits, right?

20   **A.**    No, ma'am.

21   **Q.**    And you don't know what, if anything, Emmett Casey did

22   in reliance on anything he was told about his retiree

23   medical benefits, right?

24   **A.**    Could you be more specific in that question, please?

25   **Q.**    You don't know if Emmett Casey did anything in reliance

1    on anything he may have been told about retiree medical

2    benefits, right?

3    **A.**   I don't know at the time he was employed, but we've

4    spoken after he retired and I retired, and I think he may

5    have --

6    **Q.**   I see.  So did you discuss Emmett Casey's benefits

7    after the lawsuit started?

8    **A.**   Yes, ma'am.

9    **Q.**   In the context of discussing the lawsuit; is that

10   right?

11   **A.**   Yes, ma'am.

12   **Q.**   But while you were employed, before this lawsuit --

13   actually, even while you were retired, before this lawsuit

14   started, you never discussed benefits with him, right?

15   **A.**   Correct.

16   **Q.**   And just to be clear, Emmett Casey was not at your

17   orientation in 1985, was he?

18   **A.**   He was not there, correct.

19   **Q.**   Because he hadn't started at Buchanan yet, right?

20   **A.**   Correct.

21   **Q.**   And Connie Gilbert also was not there at your

22   orientation in 1985, right?

23   **A.**   Correct.

24   **Q.**   And then you never attended Connie Gilbert's

25   orientation, did you?

1    **A.**    No, ma'am.

2    **Q.**    And you did not attend Emmett Casey's orientation

3    either, right?

4    **A.**    Correct.

5    **Q.**    Now, you mentioned earlier you were a shift foreman for

6    a time?

7    **A.**    Yes.

8    **Q.**    For CONSOL?

9    **A.**    Yes, ma'am.

10   **Q.**    And as part of your job, you may have been asked to

11   relay information to employees on different topic; is that

12   right?

13   **A.**    Yes, ma'am.  Primarily, on safety issues or -- a shift

14   foreman was more concerned of what was occurring

15   underground.  So work assignments, things of that nature.

16   And then, you know, I was responsible for scheduling

17   people's vacation, days off, things of that nature.

18   **Q.**    So you may have discussed benefits with employees as

19   their supervisor; right?

20   **A.**    Benefits, yes, ma'am.

21   **Q.**    Vacation benefits?

22   **A.**    Yes, ma'am.

23   **Q.**    Did you ever discuss any other kinds of benefits with

24   employees as their supervisor?

25   **A.**    Generally, not.

1   **Q.**   And I think you testified today that if anyone had

2   asked you a benefits question, you would have referred them

3   to HR; is that correct?

4   **A.**   Yes, ma'am.

5   **Q.**   When you were instructed to relay information about

6   general benefits to employees, no one from CONSOL ever told

7   you to lie to those employees did they?

8   **A.**   Of course not.

9   **Q.**   No one told you to mislead them about anything, right?

10  **A.**   That is absolutely correct.

11  **Q.**   Or to tell them something about their benefits that was

12  different from what was in the written documents about those

13  benefits?

14  **A.**   I was never told to misinform anyone about benefits.

15  **Q.**   No one ever instructed you to tell employees to

16  disregard anything in the written documents about their

17  benefits, did they?

18  **A.**   They did not.

19  **Q.**   And no one ever told you to tell employees that their

20  retiree medical benefits would last for life, right?

21  **A.**   I never told that to any employees.

22  **Q.**   And CONSOL -- no one from CONSOL ever told you to tell

23  them that, did they?

24  **A.**   Correct.

25  **Q.**   And no one from CONSOL ever told you to tell employees

1    that their retiree medical benefits would never be

2    terminated, did they?

3    A.    They didn't tell me they would never be terminated; to

4    tell me to tell other employees they would never be

5    terminated, and they never told me to tell them that they

6    wouldn't be terminated.  So it wasn't as though we were

7    discussing whether they would be terminated or not.

8         And I'm going to repeat -- if I may -- I didn't deal

9    with people's -- those type of benefits in my position at

10   the mine.  I was more about what was going on underground,

11   scheduling time off, things of that nature.  So I generally

12   didn't talk to any of the employees that worked for me about

13   benefits, those type of benefits.

14   Q.    And if they did, you would have referred them to HR?

15   A.    Yes, ma'am.

16   Q.    But you know if anyone from CONSOL told those HR people

17   to lie to employees, right?

18   A.    Repeat that, please.

19   Q.    You don't know if anyone from CONSOL told the HR people

20   to lie to employees about their benefits?

21   A.    Of course not.  I'm sure that they weren't

22   misrepresenting anything.

23   Q.    And you testified earlier today that Mr. Fox told you

24   that you would have retiree medical benefits; is that

25   correct?

1    **A.**    I don't specifically remember him telling me that.  I

2    do know that during the orientation, we did review benefits,

3    retiree medical was part of it, because it was in the

4    booklet.  But those are things that is hard not to conflate

5    with what you were told at that time and then what you

6    learned, you know, as the years went on.

7        So that was in 1985, I remember going over benefits.

8    Anything specifically, no.  But it's things that -- I don't

9    want to conflate and say they didn't tell me this or they

10   did tell me that, because you learned over the years with

11   the comparison of benefits that they made or pay raises or

12   reminders, you know, where they would have meetings and tell

13   us, "Here's your benefits."  "Here's what the union gets."

14   "This is the Buchanan's advantage."  You know, you don't

15   have to pay certain things to be in the union.  "You don't

16   need representation."  Those types of things usually -- that

17   I learned in meetings.  And I can't say I learned or didn't

18   learn those things during orientation, because, you know, it

19   all -- 1985, it all blended together.

20   **Q.**    I understand.  But whenever Mr. Fox talked to you over

21   the years, even after your orientation in 1985, he did that

22   in his capacity as a Human Resources representative?

23   **A.**    Yes, ma'am.

24   **Q.**    And you don't know whether as a Human Resources

25   representative Mr. Fox had any kind of authority to change

1    any of the terms of CONSOL's retiree medical benefit plans,

2    do you?

3    A.    I'm going to say that if there was a change that was

4    mine-wide, we would usually have a meeting about it.   And

5    Mr. Fox would be the person that represented that

6    information.

7    Q.    Alright.

8    A.    And then when -- in my position, if anyone ever asked

9    me about anything, because I was a salaried person and I had

10   hourly people that worked for me, I would refer them to Mr.

11   Fox.

12   Q.    Okay.

13   A.    Because he represented the benefit package.   He was the

14   person -- he was the go-to person if you wanted to know

15   something about your benefits.

16   Q.    And my question, though, is whether Mr. Fox ever told

17   you that he could change the terms of CONSOL's retiree

18   medical benefits plan?

19   A.    He never told me he could change the terms, no, ma'am.

20   Q.    Did anyone else ever tell you that Mr. Fox could change

21   the terms of the CONSOL's written retiree medical benefits

22   plan?

23   A.    No, ma'am.

24   Q.    So you don't know whether he had that authority, do

25   you?

1    **A.**   I just know that if we had -- I'll answer your

2    question.  I do not know if he had that authority.  But he

3    was the person that represented -- if there was a change,

4    John is the one that told us, while he was there.  And then

5    it would be another HR manager after he left.

6    **Q.**   I understand.  But you don't know whether anyone from

7    CONSOL told Mr. Fox to lie to employees, right?

8    **A.**   I don't know that.  I don't believe that John would lie

9    to us about our benefit package, but I don't know anybody

10   told him to lie or not lie or misrepresent or anything.  I

11   don't know that.

12             MS. BATES:  May I have a minute, Your Honor?

13             THE COURT:  You may.

14        (Pause.)

15   BY MS. BATES:

16   **Q.**   Thank you, Mr. Hylton.  I don't have any more questions

17   for you.

18   **A.**   You're welcome.  Thank you.

19             MS. DAVIDSON:  No more questions, Your Honor.

20             THE COURT:  Thank you.

21        And may Mr. Hylton be excused from the trial?

22             MS. DAVIDSON:  He may, Your Honor.

23             MS. BATES:  Yes, Your Honor.

24             THE COURT:  Mr. Hylton, you're excused.  Thank you

25   for being with us.  Let me note to you that you're not to

 1    discuss your testimony with any other witness in this case

 2    until the trial is over, which will be some time next week.

 3    Thank you for being here and you're excused.  And I'm going

 4    to ask you when you leave to exit through the courtroom door

 5    there, and you can walk down a few steps and then turn left

 6    down the hallway, two doors out, and you'll be back in the

 7    lobby.

 8         Thank you, sir.  And you're excused.

 9         THE WITNESS:  You're welcome.  Thank you, sir.

10         THE COURT:  Unless the parties have anything

11    further, we'll recess for lunch now.

12         And I think, Mr. Pomponio, you're not planning to be

13    here this afternoon.

14         MR. POMPONIO:  That's correct, Your Honor.

15         THE COURT:  So we will return this afternoon.  I

16    take it, based on what we seem to need in the way of time

17    that, we should be able to get these next few witnesses

18    done, and I think we'll probably be through for the day.

19         There are two video depositions that need to be

20    presented as well.  And I take it those are 30 minutes

21    apiece or something like that?

22         MR. POMPONIO:  Yes, Your Honor.  And the

23    plaintiffs only have one more pattern witness to present.

24    And then we are leaving our case open for the

25    cross-examination of Kurt Salvatori.

```
 1              THE COURT:  Well, who'll be coming this afternoon
 2     in person?  Who will the witness be in person?
 3              MR. POMPONIO:  Ted Stephenson.
 4              THE COURT:  Thank you.  And so Mr. Stephenson.
 5     And so let me ask if we can resume at 10 minutes after 2:00.
 6     And if that's enough time for the parties, we'll be back
 7     then.  Thank you.
 8              MR. POMPONIO:  Judge, if I could very quickly.
 9     How are we going to deal with these video depositions?  Are
10     you going to play them in Court?
11              THE COURT:  You can play them if you wish.  It
12     would be better we do that just in case there is any
13     question that is raised about any of them, it can be dealt
14     with right then.  And if they are only going to take 30
15     minutes apiece to run through them, we ought to be able to
16     do that.  And then even at that, with other witnesses, we'll
17     probably finish us up for the day.
18          And I would ask you, does the defendant have any
19     further evidence -- excuse me -- is the plaintiff going to
20     have any other evidence?
21              MR. POMPONIO:  No, just Mr. Stephenson's live
22     testimony and these two depositions.
23              THE COURT:  And so you'll rest your case at that
24     point?
25              MR. POMPONIO:  Well, yes -- I beg your pardon,
```

1    Your Honor.  We are leaving our case open to, to use the

2    cross-examination of the defendant's witness, Kurt

3    Salvatori.

4         THE COURT:  Oh, yes.  But that's understood, the

5    parties have already made that arrangement.  And we all know

6    that that will be part of your case.

7         One thing that I'm uncertain about, are you going to

8    conduct the examination of Mr. Salvatori at the outset of

9    defendant's case or are you simply in agreement that you'll

10   wait and hear the direct from the defendant and then present

11   the cross which will be deemed part of your case?  What's

12   the plan?

13        MR. PETSONK:  My understanding, Your Honor, is

14   that Mr. Salvatori will go first on direct examination from

15   the defendant, but that on subsequent direct examination, I

16   will also have the opportunity to examine him in the nature

17   of an adverse witness directly as well as to cross.

18        THE COURT:  So I understand the parties are in

19   agreement everything is developed by you on

20   cross-examination is to be treated as part of your

21   case-in-chief?

22        MR. PETSONK:  Yes.  The understanding that I'm not

23   constrained by the conventional constraints of

24   cross-examination, I may examine Mr. Salvatori in the nature

25   of my case-in-chief, yes.

```
 1              THE COURT:  I don't understand what you just said.
 2              MR. PETSONK:  That I may introduce exhibits
 3    through Mr. Salvatori that may not be introduced on the
 4    direct examination.
 5              THE COURT:  I see.  And so it's not only
 6    cross-examination, but also the exhibits you introduce
 7    through him are also agreed to be treated as part of the
 8    plaintiffs' case-in-chief?
 9              MS. BATES:  Yes, Your Honor.
10              MR. PETSONK:  Yes, that's my understanding.  Thank
11    you, Your Honor.
12              THE COURT:  Very good.  So we'll see you back at
13    2:10.
14              MR. POMPONIO:  Your Honor, a quick question.
15          As I understand it, we are going to do Mr. Stephenson
16    live and the two video depositions, and we do not anticipate
17    Mr. Salvatori starting today?
18              THE COURT:  I understand we will not reach Mr.
19    Salvatori today?
20              MR. MULLINS:  That's my understanding, yes.  Thank
21    you.
22              THE COURT:  And I take it that is satisfactory
23    from everyone's scheduling standpoint?
24              MS. BATES:  Well, Your Honor, I think Mr.
25    Salvatori is available today if we do get to him, just for
```

1    efficiency.

2              THE COURT:  How long is he going to be?

3              MS. BATES:  I don't think we would finish today.

4              THE COURT:  If he's not going to finish today, I

5    think we better not start with him today.

6              MS. BATES:  Okay.

7              THE COURT:  The afternoon is probably going to be

8    long enough with what we have left, since we are not

9    starting until 2:10.  And I suspect he's going to be a quite

10   consequential witness, and we'll just need to start fresh

11   with him on Tuesday morning.

12             MS. BATES:  Yes, Your Honor.

13             THE COURT:  So welcome him back to Charleston.

14   And we'll see you back at 2:10.

15        (A recess was taken at 1:09 p.m. until 2:10 p.m.)

16        (Afternoon Session, February 12, 2021 2:10 p.m.)

17             THE CLERK:  All rise.

18             THE COURT:  Please be seated.

19        And the witness being called?

20             MR. PETSONK:  Mr. Edmond Stephenson.

21             THE COURT:  And he may be sworn.

22        **EDMOND STEPHENSON, PLAINTIFF'S WITNESS SWORN**

23             THE CLERK:  Please state your name and spell it

24   for the record.

25             THE WITNESS:  Edmond Stephenson, E-D-M-O-N-D,

STEPHENSON - DIRECT

1    S-T-E-P-H-E-N-S-O-N.

2                        **DIRECT EXAMINATION**

3    **BY MR. PETSONK:**

4    **Q.**   Thank you, Mr. Stephenson.

5          Where do you reside, Mr. Stephenson?

6    **A.**   2015 is when I retired.

7    **Q.**   I'm asking you, Mr. Stephenson, where do you live?

8    **A.**   I live in Clay County, Indore, West Virginia.

9    **Q.**   Are you married?

10   **A.**   Yes.

11   **Q.**   And who is your wife?

12   **A.**   Hilda Faye Stephenson.

13   **Q.**   And what is your birth date, Mr. Stephenson?

14   **A.**   Third month, 17th day of '54.

15   **Q.**   So does that make your current age 66?

16   **A.**   66, yes, sir.

17   **Q.**   And you are currently retired, right?

18   **A.**   Yes, sir.

19   **Q.**   What year did you retire?

20   **A.**   2015.

21   **Q.**   And what was your occupation when you retired at the

22   time that you retired?

23   **A.**   I was a welder.

24   **Q.**   What was the company that gave you your retirement?

25   **A.**   CONSOL Energy.

1   **Q.**   And where did you work for CONSOL?  Where was your work

2   site located when you worked for CONSOL?

3   **A.**   Fola Coal operation in Clay County.

4   **Q.**   When did you first work at Fola?

5   **A.**   I started work for them in February of 1996.

6   **Q.**   How long did you work at that site known as the Fola

7   Coal mine?

8   **A.**   I worked until 2013, of February.

9   **Q.**   So is that almost 18 years?

10  **A.**   Yes, sir.

11  **Q.**   And who was your employer when you first began working

12  at Fola back in February of '96?

13  **A.**   AMVEST.

14  **Q.**   And who employed you at the time that you stopped

15  working at Fola?

16  **A.**   CONSOL Energy.

17  **Q.**   When did CONSOL become your employer there at Fola, if

18  you remember?

19  **A.**   I think it right around 2007.  2007.

20  **Q.**   Okay.  And were you paid on an hourly or a salaried

21  basis while you worked at Fola, Mr. Stephenson?

22  **A.**   Hourly wages.

23  **Q.**   During your employment with CONSOL, were there

24  occasions when -- when the company discussed with you or

25  explained to you your entitlement to retirement welfare

1    benefits?

2    **A.**    Yes, sir.

3    **Q.**    And when did that occur first, as you remember?  When

4    did CONSOL first explain to you your retirement welfare

5    benefits?

6    **A.**    They said they would stay the same as our prior company

7    benefits that they give us, and, if anything, they would

8    make them better.  On some things like retirement, the prior

9    company before, I don't think they had a retirement.  You

10   just -- when, you know, like you worked up until you

11   retired, the company didn't pay benefits.  But when CONSOL

12   took it over, they said if we would work for them so long,

13   they would pay retirement benefits, as I understand it.

14   **Q.**    Okay.  So you made reference to the acquisition of Fola

15   by CONSOL.  Was it shortly after CONSOL acquired the Fola

16   mine that you remember CONSOL explaining what you've just

17   described about your retiree welfare benefits?

18   **A.**    Yeah.  They told us when they -- when they bought it

19   that they'd be some upper management come up on the hill to

20   our maintenance trailer and discuss it with us.  And one day

21   we went in to work or -- prior to that, the week before

22   that, they kept telling us what day that the men would come

23   up and explain to us some things.  And so we all get up in

24   the maintenance office.  And they come from Pittsburgh to

25   talk to us about our benefits and our prior benefits that

1    the company before us had give us.

2    **Q.**    Do you know who it was who came from Pittsburgh in

3    upper management to describe your retiree welfare benefits

4    from CONSOL?

5    **A.**    Yeah.

6    **Q.**    Who was that, as best you remember?

7    **A.**    I don't remember their names.  I just know they was

8    dressed in three-piece suits and came in and explained to

9    us.  And some of the other men -- there might have been 15

10   or 20 of us there.  And some of the men would ask questions,

11   like, if they was going to honor our prior insurance and

12   everything.  And they said, yeah, yeah.  They said, if

13   anything, they would make some things better.

14   **Q.**    Did those individuals describe what retiree welfare

15   benefits you would have from CONSOL, what types of benefits

16   you would have in retirement?

17   **A.**    Well, we would get our check and our insurance, that

18   way if we retired, we would get medical insurance, get to

19   keep our medical insurance, and if you worked so long, after

20   you -- if you worked five years for CONSOL, they would pay

21   you a retirement check if you retired if you was at age 55.

22   **Q.**    Did they say how long you had to work in order to get

23   retirement welfare benefits, medical benefits?

24   **A.**    That was supposed to be locked in from the prior

25   company -- if you're talking about insurance, or for your

1   family and stuff.  That was already -- if you had the time

2   in, you was supposed to got to keep it.

3   Q.   What I'm referring to is how much time did CONSOL say

4   you had to have before you qualified to receive retirement

5   welfare benefits?  How many years of service?

6   A.   They -- just -- they didn't.  I mean, I don't have -- I

7   can't quite understand.

8   Q.   Well, I'll come back to that.  Did the representatives

9   of CONSOL that you mentioned here at the meeting at the

10  maintenance shop, did they say anything about whether CONSOL

11  reserved the right to terminate your retirement welfare

12  benefits?

13  A.   No.

14            MR. MULLINS:  Objection.  Leading the witness.

15            THE COURT:  Sustained.

16            THE WITNESS:  No.

17  BY MR. PETSONK:

18  Q.   Let me ask you this, Mr. Stephenson, what did those

19  representatives from CONSOL say about how long you would be

20  entitled to retiree welfare benefits?

21  A.   Well, the way I understood it all, it was for life.  I

22  mean, because the prior company, they -- I mean, the men

23  asked us if they was going to honor the other company

24  that -- what they had told us, because a lot of us -- you

25  had to be there 10 years in order to apply for the medical

1    benefits for life.  And some of us had done been there 10

2    years.  And we was wanting to know if the company was going

3    to honor the prior company's benefits.  And they said, oh,

4    yes, they would do that.

5    **Q.**   And you're talking about those individuals from

6    Pittsburgh, upper management that you referenced earlier,

7    right?

8    **A.**   Yeah, from Pittsburgh, and the prior company bosses and

9    everything, too, always told us that, we had our time in.

10            THE COURT:  When you say prior company bosses, are

11   you talking about CONSOL or Fola?

12            THE WITNESS:  Both companies.

13            THE COURT:  Please go ahead.

14   BY MR. PETSONK:

15   **Q.**   How did your employment at the Fola mine come to a

16   close, Mr. Stephenson?

17   **A.**   I was laid off in 2013.

18   **Q.**   How did you find out about the layoff?

19   **A.**   A layoff slip.

20   **Q.**   Okay.  And who gave you the layoff slip?

21   **A.**   One of the strip bosses.

22   **Q.**   Okay.  And what happened next regarding your layoff?

23   After you got that layoff slip, what happened next?

24   **A.**   I went to -- they told us prior to that that if we need

25   -- if we got laid off and we needed any information, they

STEPHENSON - DIRECT

1    was going to hold meetings at the company training center.

2    So right after that, I went to the company training center

3    when they held the meeting, to see how to sign up on my

4    benefits.

5    **Q.**   Are you referring -- what benefits are you referring

6    to?

7    **A.**   My medical.  My medical insurance for me and my family.

8    **Q.**   And did you go to the training center -- well, let me

9    be clear.

10       What training center are you referring to?  Where is it

11   located?

12   **A.**   It's at Drennan, West Virginia, the training center

13   was.

14   **Q.**   And did you go to the training center to meet with

15   someone from CONSOL?

16   **A.**   They had -- they had -- I don't know if you call them

17   upper management.  They had a man that was over that, his

18   name was Chase Elswick.  He was over it.  And we would go

19   and talk to him about -- like, when we signed up on our

20   medical, he would tell us what our premiums was and

21   everything and how to go about signing up.

22   **Q.**   So did you meet with Mr. Elswick to discuss signing

23   up --

24   **A.**   At the training center, he met with me.

25   **Q.**   I'm sorry.  Let me be clear about my question, Mr.

1    Stephenson.  And for the benefit of the court reporter, I'd

2    ask both of us -- I'll try to do this too -- not to talk

3    over top of one another as we're speaking here.

4    **A.**   Okay.

5    **Q.**   So that she can type down everything we're saying.

6         Did you go to the training center to meet with Mr.

7    Elswick after you were laid off?

8    **A.**   Yeah.

9    **Q.**   And what did Mr. Elswick say to you at the training

10   center about enrolling in medical benefits from CONSOL at

11   that point?

12   **A.**   He told me -- I asked him -- you know, me and my wife

13   asked him, because she was present with me, my wife, it was

14   a family plan, and he said, like, if I went to work

15   somewhere else and they had medical insurance, that I didn't

16   have to sign up for them immediately; I could wait, or go

17   ahead and sign up now, whenever, and start paying the

18   premiums and get my medical insurance.

19        I said, well, I'll wait and see if I can find more

20   employment somewhere else.  Because a lot of companies, they

21   pay medical.  So I couldn't see no reason to make them pay

22   medical, too, and then another company, too.  So I waited

23   until a prior time to sign up on my medical.

24   **Q.**   You are referring to retiree medical insurance from

25   CONSOL, right?

1    **A.**    Yeah.  I got how much it would be and everything for

2    my family plan and everything like that all down.

3    **Q.**    Did Mr. Elswick tell you at that meeting at the

4    training center shortly following the 2013 layoff, did he

5    tell you at that time what your premium would be for retiree

6    welfare benefits from CONSOL?

7    **A.**    Yeah.  It was $158 a month.

8    **Q.**    And did he give you anything to record that number?

9    **A.**    Only he just wrote it on top of a piece of paper.  He

10    give us -- we had papers with questions and stuff, and then

11    he wrote it on top of a memo or something there what it

12    would cost me a month for me and my wife and my boy.

13    **Q.**    And did Mr. Elswick, at that meeting, say anything to

14    you about CONSOL reserving the right to terminate your

15    retiree welfare benefits?

16    **A.**    No, sir.

17    **Q.**    Did he say that there was any limitation on the period

18    of time within which you could come back and retire on the

19    CONSOL retiree welfare plan?

20    **A.**    Whenever I got ready to sign up, to call him and let

21    him know.  It was my understanding, when I got ready to sign

22    up, to call and let them know.

23    **Q.**    So what did you do for employment at that point?  You

24    mentioned you intended to look for other work?  Did you do

25    that?

STEPHENSON - DIRECT

1    **A.**    I went to work for another company, Logan Corp.

2    **Q.**    And how long did you work for Logan Corp?

3    **A.**    About a year.

4    **Q.**    And how did your employment with Logan Corp come to an

5    end?

6    **A.**    Repeat that, please.

7    **Q.**    How did your employment with Logan Corp come to an end?

8    **A.**    I was laid off.

9    **Q.**    And when were you laid off from Logan Corp?

10   **A.**    2015.

11   **Q.**    Do you remember the month of the year?

12   **A.**    2015, I think it was in February.  I ain't a hundred

13   percent sure on the month.  I know it was in 2015.

14   **Q.**    Did you work anywhere else after that?

15   **A.**    No.  That's when I decided to sign up for my medical

16   from Fola, and I wasn't going to work no more.  No.

17   **Q.**    What step did you take to sign up on your retiree --

18   excuse me -- on your retiree insurance from CONSOL?

19   **A.**    I called Pittsburgh.

20   **Q.**    Who did you speak with when you called Pittsburgh?

21   When you say you called Pittsburgh, CONSOL in Pittsburgh?

22   **A.**    Yeah, called the main office in Pittsburgh, and me and

23   my wife done this call together.  And we talked to a Joe

24   Beasley.  And he said that I wasn't eligible for medical

25   benefits.  So -- you want me to go on?

1    Q.   Well, what did you do next?

2              MR. MULLINS:  Your Honor, I think this is going

3    far afield from what we agreed on with corroborating

4    evidence here.  We were talking about four specific people

5    that -- and apparently Mr. Elswick is the only one that's

6    relevant for this witness.  And now he's asking about

7    something that happened in Pittsburgh with somebody that's

8    not one of those four people.

9              THE COURT:  What else is going to be involved out

10   of Pittsburgh other than one of the four?

11             MR. PETSONK:  Craig Campbell, Your Honor.

12             THE COURT:  Is he in Pittsburgh?

13             MR. PETSONK:  Well, he's not in Pittsburgh, but

14   he's one of the CONSOL HR individuals as to which we have

15   sought the ability to provide corroborating testimony.

16             THE COURT:  Well, how does Mr. Campbell relate to

17   this Pittsburgh contact?

18             MR. PETSONK:  Well, because that Pittsburgh -- I

19   mean, I can elicit this from the witness, but I can proffer

20   that the Pittsburgh contact directed Mr. Stephenson to call

21   -- or rather, directed Mr. Campbell to call Mr. Stephenson

22   back.

23             THE COURT:  You may inquire about that.

24   BY MR. PETSONK:

25   Q.   So what did you do next when Mr. Beasley in Pittsburgh

STEPHENSON - DIRECT

1    told you he didn't think -- or told you you weren't eligible

2    for retiree medical insurance from CONSOL?

3    **A.**   I called the main office of Fola Coal and talked to the

4    secretary and asked her about it.  And she give us a phone

5    number of a man with the name of Craig Campbell.  Me and my

6    wife called him, and he said they couldn't do me like that;

7    that I was entitled to it, and he would get back in touch

8    with us.

9    **Q.**   Let me just ask you, what job did Craig Campbell have?

10   **A.**   My understanding, he was over the medical benefits that

11   we were supposed to receive when we got ready to retire.

12   **Q.**   He was an employee of CONSOL; is that right?

13   **A.**   Yes.

14   **Q.**   And what happened next then, Mr. Stephenson?

15   **A.**   Well, then he called us back later that day and said

16   that they had changed it all and we was eligible to get it

17   for five years.  And they would send me my stuff in the mail

18   to where I could sign up for my medical, me and my wife.

19   **Q.**   And what did Mr. Campbell say about any additional

20   actions you had to take in order to sign back up on your

21   retiree medical insurance with CONSOL?

22       You mentioned he said that paperwork would come to you

23   in the mail from CONSOL?

24   **A.**   Oh, that they -- when you pay your insurance, they give

25   you, I guess, what you call vouchers, where you pay your

1   monthly premium, and they come in the mail.

2   **Q.**   How much did you have to pay in those premiums at the

3   time you re-enrolled -- at the time you retired from CONSOL?

4   **A.**   It was $150 a month, but they told me that I owed them

5   backpay, which I couldn't figure out why.  But anyhow, I

6   went ahead and paid them $900 and -- about

7   nine-hundred-forty-some dollars to catch it all up.

8   **Q.**   Was it Craig Campbell that told you you owed CONSOL

9   some backpay?

10   **A.**   No, he didn't tell us that.  It's when I got my

11   paperwork, they said I owed it to him.

12   **Q.**   And who sent you the paperwork?

13   **A.**   I guess come down from Pittsburgh.

14   **Q.**   Did you send that $940 back to Pittsburgh at that

15   point?

16   **A.**   I sent nine-hundred-and-some dollars to catch my

17   premiums up and pay a monthly premium.

18   **Q.**   And did CONSOL begin providing you retiree welfare

19   benefits after that point?

20   **A.**   Yeah.  I paid my premiums.  They -- I had insurance.  I

21   kept it for about, oh, probably four or five months, and

22   then they notified us in the mail they was going to cut us

23   off in December.

24   **Q.**   Okay.  I'm going to present you an exhibit.  Just very

25   briefly, Your Honor.  And then I'll conclude my questioning.

STEPHENSON - DIRECT

1      It's Plaintiff's 2.

2              MR. PETSONK:  May I approach the witness, Your

3      Honor?

4              THE COURT:  Yes.

5      BY MR. PETSONK:

6      Q.   Mr. Stephenson, I've presented you with a document

7      that's been stamped Plaintiff's Exhibit Number 2.

8      A.   Yes.

9              MR. MULLINS:  Never mind.  I thought it was a new

10     one.

11             MR. PETSONK:  No, it's Plaintiff's 2.

12     BY MR. PETSONK:

13     Q.   Take a second and look at this document.  It says,

14     "CONSOL Energy, Incorporated" at the top there; is that

15     right?

16     A.   Yeah.  This is 2013, July.

17     Q.   Does it say July or does it say June there as far as

18     the date, Mr. Stephenson, on the top of the letter?

19     A.   Yeah.

20     Q.   That date there, is it listed as June 16, 2015?

21     A.   Yeah.

22     Q.   And take a second and look at this letter, if you

23     would.

24     A.   (Witness complies.)

25     Q.   In the first paragraph of the letter, it refers to

1   CONSOL Energy Retiree Health and Welfare Plan, as well as

2   some reimbursement accounts.  And it states that this plan

3   and those accounts will terminate December 31st, 2015.

4        Do you see that at the end of the very first sentence

5   in this letter?

6   **A.**   Yeah.  Yeah.

7   **Q.**   Do you see where it says, "December 31, 2015"?  Did you

8   read this letter when you received it, Mr. Stephenson -- or

9   did your wife read it?

10  **A.**   I think my wife read it to me, because I have trouble

11  reading some words.

12  **Q.**   And based on what your wife and you discussed about

13  this letter, what did you understand that it was -- that

14  CONSOL was telling you with this letter?

15  **A.**   That they was cutting my medical off.  I wouldn't have

16  no medical benefits.

17  **Q.**   Did CONSOL provide you with any transitional benefit in

18  connection with the termination letter here?

19           MR. MULLINS:  Your Honor, this is more along the

20  lines of damages for a non-plaintiff than it is --

21           MR. PETSONK:  I can withdraw that question, Your

22  Honor.

23       I don't have any further questions for you at this

24  time, Mr. Stephenson.  The other lawyer here may have a

25  couple.

1        THE WITNESS:  Okay.

2                    **CROSS-EXAMINATION**

3    **BY MR. MULLINS:**

4    **Q.**   Mr. Stephenson, how are you today?

5    **A.**   I'm fair.

6    **Q.**   Good.  As I understand it, you worked at Fola for

7    several years while it was still owned by AMVEST, correct?

8    **A.**   Yeah.

9    **Q.**   And then at some point around 2007, CONSOL bought Fola

10   from AMVEST; fair?

11   **A.**   Yeah.  Yeah.

12   **Q.**   And you talked about getting --

13            MR. MULLINS:  And I'm going to ask to approach the

14   witness, if I can, Your Honor.

15   BY MR. MULLINS:

16   **Q.**   -- about getting a piece of paper from Chase Elswick

17   that was a CONSOL healthcare health rep.  I'm going to show

18   you an exhibit that's been marked Defendant's Exhibit Number

19   20 and ask you to take a look at that.

20   **A.**   Yeah, I see it.

21   **Q.**   Is that exhibit there that you are looking at the one

22   that Mr. Elswick gave you?

23   **A.**   I can't -- it could be a copy or something, I don't

24   know.  I can't remember if Chase signed his or not right

25   off.

1    **Q.**   Okay.

2    **A.**   But I asked him to sign it.  And I can't remember for

3    sure if he did or not at this time.  But I asked him to sign

4    one for me.

5    **Q.**   You talked about Mr. Elswick writing down the amount

6    that your premium would be, correct?

7    **A.**   Yes, sir.

8    **Q.**   And do you see in the upper right-hand corner where it

9    says $158?

10   **A.**   Yeah.

11   **Q.**   Does that sound like what you testified earlier to what

12   that premium was, correct?

13   **A.**   Yeah.

14   **Q.**   And given that this document seems familiar to you and

15   it was produced in your deposition by your attorney, it has

16   that $158 handwritten number on there, do you believe that

17   this Defendant's Exhibit 20 is a copy of the piece of paper

18   Mr. Elswick gave you?

19   **A.**   Well, I couldn't tell you that for a hundred percent

20   for sure or not.  But I know Chase wrote what our premiums

21   would be for me and my wife on the top of this paper.

22   **Q.**   And that premium was $158, correct?

23   **A.**   Yes.

24   **Q.**   Is that the same number that is written on that top of

25   that piece of paper, correct?

1    **A.**    Yes.

2    **Q.**    And is that your handwriting, $158?

3    **A.**    No, that's Chase's.

4    **Q.**    How do you know it's Chase's?

5    **A.**    Because I seen him write it on there -- on one of them.

6    **Q.**    So this Defendant's Exhibit Number 20 is the piece of

7    paper that Chase handed to you with the $158 written on it?

8    **A.**    I know I had one like this that he would have been

9    writing on.  Unless I've got another one at the house.  But

10   I know he wrote that "$158" on one.  But I was thinking that

11   we had wrote some more stuff on it somewhere.  Maybe it was

12   a different one besides this one.  I could have had two of

13   them.

14   **Q.**    You've gotten a lot of paperwork from CONSOL during the

15   time period in which you were working for them about

16   benefits; fair?

17   **A.**    I kept it all for 17 years -- everything.

18   **Q.**    And they would mail that stuff to you, and sometimes

19   they would hand it to you as well, correct?

20   **A.**    Yes, sir.

21   **Q.**    And your wife sometimes has to read things for you to

22   help you understand them; fair?

23   **A.**    Yeah, some things.

24            MR. PETSONK:  Are we going to inquire about the

25   deposition transcript?  I don't have it here.  I have it on

1    my computer.

2         Do you have a copy if you are going to hand it to him

3    as an exhibit?

4         (An off-the-record discussion was held between

5    Plaintiffs' attorney Petsonk and Defense attorney Mullins.)

6              MR. MULLINS:  Your Honor, I think that me and Mr.

7    Petsonk have worked something out about Defendant's Exhibit

8    20.  I want to make sure, but I think it's correct, but I

9    believe Mr. Petsonk is agreeing to stipulate that

10   Defendant's Exhibit 20 was produced during Mr. Stephenson's

11   deposition by Mr. Stephenson, it's something Mr. Stephenson

12   brought from his home.

13             THE COURT:  Agreed?

14             MR. PETSONK:  This was produced by us in

15   connection with Mr. Stephenson's deposition, yes, Your

16   Honor.

17             MR. MULLINS:  From Mr. Stephenson.

18             MR. PETSONK:  I think this was produced -- it's a

19   Bate-stamped document, so it would have been produced before

20   the deposition, but, yes.

21             MR. TORRES:  From Mr. Stephenson?

22             MR. PETSONK:  I believe that is -- I believe that

23   is, because he gave it to us in connection with Mr.

24   Stephenson's deposition.

25             MR. MULLINS:  Mr. Stephenson gave it to you, and

1    you gave it to us at the deposition?

2              MR. PETSONK:  I believe it was prior, yes.

3              MR. MULLINS:  Or prior.

4              MR. PETSONK:  I believe it was prior.  I can't

5    stipulate to anything further than that.  Mr. Stephenson

6    testifies to what he understands about the document.

7              MR. TORRES:  Could we have a minute, Your Honor?

8              THE COURT:  Yes.

9         (An off-the-record discussion was held between defense

10   counsel and the plaintiffs' counsel.)

11   BY MR. MULLINS:

12   Q.   Mr. Stephenson, you can't read very well, can you?

13             THE COURT:  Before you go on, what is the

14   stipulation?  Let me tell you what I understand -- and you

15   can tell me whether it's correct or not -- and it may not be

16   correct -- that that which constitutes an exhibit that was

17   the same as Defendant's 20 was given by Mr. Stephenson to

18   counsel for the plaintiff prior to his deposition.  And

19   plaintiffs' counsel in turn turned that over then to defense

20   counsel.

21        Is that correct?

22             MR. PETSONK:  That is correct.  We can stipulate

23   to that much, Your Honor.

24             THE COURT:  Then is that what the defendant

25   understands?

```
 1                    MR. MULLINS:  That is my understanding that was

 2      the stipulation, Your Honor.

 3                    THE COURT:  And you may proceed.

 4                    MR. MULLINS:  Thank you.

 5          If I could have one second, Your Honor.

 6                    THE COURT:  Can I ask you, also, when was that

 7      deposition?

 8                    MR. MULLINS:  June 13 of 2017.

 9                    THE COURT:  June 13.

10                    MR. MULLINS:  June 13 of 2017.

11                    THE COURT:  Is that the only deposition of him?

12                    MR. MULLINS:  He had another deposition December

13      11, 2020.

14                    THE COURT:  Thank you.

15          (An off-the-record discussion was held between defense

16      counsel.)

17                    MR. MULLINS:  No further questions, Your Honor.
```

18                              **REDIRECT EXAMINATION**

19      **BY MR. PETSONK:**

```
20      Q.   Mr. Stephenson, the other lawyer had, while he was

21      questioning you, asked you about documents that Mr. Elswick

22      had given to you, and you mentioned you asked him to sign

23      one of those documents, that is, Mr. Stephenson, you

24      testified that you asked Mr. Elswick to sign one of the

25      documents that Mr. Elswick gave to you.
```

STEPHENSON - REDIRECT

1          Which document was it, sir, that you were trying to

2     describe that you had asked Mr. Elswick to sign?

3     A.   Number 20, this one about my medical insurance.

4     Q.   Okay.  So what were you asking Mr. Elswick to sign for

5     when you asked him to sign it?

6     A.   Well, in case I needed it when I went to sign up on it

7     that I could use his name and have his name there so I could

8     verify that he told me that I could sign up for my medical

9     insurance for this price.  Because some prices varied; it

10    depended on what type of medical claim you got.

11    Q.   And do you recall whether Mr. Elswick did sign the

12    document that he gave you?

13    A.   He didn't sign this one.  Whether or not I've got one

14    at the house he signed or not, I don't know.  I would have

15    to discuss that with my wife.  But the one I had -- seemed

16    to me like it was wrinkly and maybe had some more stuff on

17    it.

18          MR. PETSONK:  Okay.  I don't have any further

19    questions, Your Honor.

20          THE WITNESS:  But I could have had two of them.  I

21    don't know.  Because my wife was there with me; she had one,

22    I had one.

23          MR. PETSONK:  I understand.  I don't have any

24    further questions, Your Honor.  Thank you.

25          MR. MULLINS:  No further questions.

1          THE COURT:  Thank you.  And may Mr. Stephenson be

2     excused from the trial?

3          MR. PETSONK:  Yes, Your Honor.

4          MR. MULLINS:  Yes, Your Honor.

5          THE COURT:  Thank you.  Mr. Stephenson, you're

6     excused from the trial.  And I caution you not to discuss

7     your testimony with any other witness in this case until the

8     trial is over.  And if you need relief from that direction,

9     let me know.  And so you're excused.

10        And when you leave, Mr. Stephenson, I'd like for you to

11    come around and go through this door over here (indicating).

12    And when you go through that door, go straight down the

13    short hallway and turn left, and then on your way out you'll

14    have to go through a couple more doors to get back to the

15    lobby.

16        Thank you for being with us, sir, and you're excused.

17          THE WITNESS:  I thank you.

18          THE COURT:  Just leave whatever papers you have at

19    the desk.

20        What's next?

21          MR. PETSONK:  We are prepared to present our two

22    video depositions, Your Honor.

23          THE COURT:  All right, let's go ahead with the

24    first one and take a break after it.

25          MR. PETSONK:  Your Honor, just one second, I'll

1    connect my computer to the video monitor.

2                THE COURT:  Go ahead.

3                MS. DAVIDSON:  Your Honor, would you like us to

4    enter the transcript into evidence?

5                THE COURT:  The transcript, yes.  I would like to

6    have a copy of it.

7                MS. DAVIDSON:  17.  Thank you.

8                THE COURT:  What's the name of the witness?

9                MR. PETSONK:  The first --

10               MS. DAVIDSON:  Doris Jesso.

11               THE COURT:  Doris, D-O-R-I-S?

12               MS. DAVIDSON:  Jesso, J-E-S-S-O.

13               THE COURT:  Thank you.

14          (The videotaped deposition of Doris Jesso was played.)

15          (The videotaped deposition of Doris Jesso was paused.)

16               MR. PETSONK:  Shall I advance the tape through the

17    break, Your Honor?

18               THE COURT:  Pardon me?

19               MR. PETSONK:  Shall I advance the tape through the

20    break?

21               THE COURT:  Please do that.

22               MR. PETSONK:  I'm sorry, Your Honor.  I'm trying

23    to find the place to go back on the record.

24               THE COURT:  According to the transcript, that's

25    where you are.

1          MR. PETSONK:  Okay, here we are.

2      (The videotaped deposition of Doris Jesso resumed

3  playing.)

4      (The videotaped deposition of Doris Jesso concluded.)

5          MR. PETSONK:  I believe that concludes the

6  deposition.

7          THE COURT:  Is there any objection?

8          MS. O'CONNOR:  No objection, Your Honor.

9          THE COURT:  And do you have a CD for us or do you

10  just want to simply move in the transcript?

11          MS. DAVIDSON:  I don't have a CD.  I just want to

12  admit the transcript.

13          THE COURT:  Will the transcript suffice for

14  everyone?

15          MS. O'CONNOR:  Yes, Your Honor.

16          MR. PETSONK:  And, Your Honor, we have provided an

17  electronic copy of the transcript to your clerk as well.

18          THE COURT:  You already have it?

19          THE CLERK:  Yes.

20          THE COURT:  So do you want the transcript in

21  evidence as well?

22          MR. PETSONK:  I think it's at the pleasure of the

23  Court.

24          THE COURT:  It would be a convenience to have it.

25          MR. PETSONK:  Let's enter it as a Plaintiff's

```
 1    Exhibit.  It's already been marked as such.  Make it an
 2    exhibit as well.  What's the number?
 3              THE COURT:  What's the CD marked?
 4              THE CLERK:  There's no physical CD.  There is a
 5    link to this recording that they've sent to me.
 6              THE COURT:  I see.  Well, what's the number on
 7    this?
 8              MS. DAVIDSON:  Plaintiff's Exhibit 17.
 9              THE COURT:  Plaintiff's 17.
10              MS. DAVIDSON:  Yes.
11              THE COURT:  Go ahead and mark this, if you will.
12              THE CLERK:  This one is your copy.  The transcript
13    has been marked, but not entered.
14              THE COURT:  Do you have it?
15              THE CLERK:  Yes.
16              THE COURT:  And so I take it there is no
17    objection?
18              MS. O'CONNOR:  No objection, Your Honor.
19              THE COURT:  Have I heard from everybody?
20              MR. PETSONK:  Yes, I believe so.
21              THE COURT:  The defense?
22              MS. O'CONNOR:  No objection, Your Honor.
23              THE COURT:  And so Plaintiff's 17 is admitted.
24              Plaintiff's Exhibit 17 admitted.
25              MS. DAVIDSON:  Your Honor, at this time, we'd like
```

```
 1   to have Mr. Kirby Hall's deposition transcript marked into
 2   evidence.
 3               THE COURT:  All right.  We'll hear that after the
 4   break.  And is the length of it about the same as this one
 5   we just heard?
 6               MR. PETSONK:  The length of this one is less than
 7   25 minutes, Your Honor.
 8               THE COURT:  All right.  And unless there is
 9   something else, that covers all of your evidence, except the
10   cross that we talked about of Mr. Salvatori?
11               MR. PETSONK:  That's correct, Your Honor.
12               THE COURT:  And we'll recess for the day at that
13   time.
14        So we'll return in 15 minutes.
15               THE CLERK:  All rise.
16        (A recess was taken at 3:38 p.m. until 3:58 p.m.)
17               THE CLERK:  All rise.
18               THE COURT:  Please be seated.
19        And you may proceed with the deposition.
20               MS. DAVIDSON:  Thank you, Your Honor.
21        At this time, we'd like to mark Kirby Hall's deposition
22   into evidence as Plaintiff's 18.
23               THE COURT:  I take it there is no expected
24   objection?
25               MS. O'CONNOR:  No objection, Your Honor.
```

FITZWATER   v CONSOL

```
 1                    THE COURT:  Thank you.

 2                    MS. DAVIDSON:  May we move it into evidence,

 3      Exhibit 18?

 4                    THE COURT:  Please go ahead.

 5                    MR. PETSONK:  Your Honor, the video appears to

 6      start a line or two into the deposition where the deponent

 7      is stating his address.  I apologize.

 8                    THE COURT:  And this is Kirby Hall?

 9                    MR. PETSONK:  This is Kirby Hall, that's right.

10                    THE COURT:  Just one moment.

11                    MR. PETSONK:  The video appears to begin on page

12      4, at Line 18.

13                    THE COURT:  Please go ahead.

14                 (The videotaped deposition of Kirby Hall was played.)

15                 (The videotaped deposition of Kirby Hall concluded.)

16                    MR. PETSONK:  That concludes the deposition.  Your

17      Honor, Your Honor.

18                    THE COURT:  Thank you.  And I take it there is no

19      objection to making -- well, no objection to receipt in

20      evidence of the transcript which is Plaintiff's 18; is that

21      correct?

22                    MS. O'CONNOR:  No objection, Your Honor.

23                    THE COURT:  And so it is received and filed.

24                 And that concludes the plaintiffs' evidence short of

25      Mr. Salvatori's cross?
```

```
 1              MR. PETSONK:  Yes, Your Honor.
 2              THE COURT:  And do the parties have anything
 3    further to take up before we recess for the long weekend?
 4              MR. PETSONK:  No, Your Honor, not at this time.
 5    And I thank you.
 6              THE COURT:  Thank you.
 7              MS. O'CONNOR:  Nothing further from defendants.
 8              THE COURT:  And so we'll resume at 9:30 on
 9    Tuesday, and I take it we'll resume with Mr. Salvatori?
10              MS. O'CONNOR:  Yes, Your Honor.
11              THE COURT:  Very good.
12              And so do the parties have anything further at
13    this time?
14              MR. PETSONK:  No, Your Honor.
15              MS. O'CONNOR:  No, Your Honor.
16              THE COURT:  If not, then we'll see you back
17    Tuesday, at 9:30.  I would like to ask finally, based on the
18    current assessment, what time do you think will be required
19    for the defendants' evidence?
20              MR. TORRES:  Your Honor, right now we have, in
21    addition to Mr. Salvatori, seven rebuttal witnesses, plus
22    two deposition transcripts or evidentiary depositions.
23         Other than the issue with Mr. Kowzan that he can only
24    be here on Thursday, we would be hopeful we could get
25    everything done on Tuesday and Wednesday.
```

FITZWATER  v CONSOL

```
 1                THE COURT:  Very good.  Looks like we might be
 2      able to finish up at least Thursday?
 3                MR. TORRES:  Yes, Your Honor.
 4                THE COURT:  That's fine.  And thank you.  And see
 5      you back after the long weekend.
 6           You folks traveling back to Chicago?
 7                MR. TORRES:  Tomorrow, Your Honor.
 8                THE COURT:  And so coming back then on Monday?
 9                MR. TORRES:  Yes, Your Honor.
10                THE COURT:  Yes.  Well, I hope that you'll have a
11      safe trip and we'll see you back here come Tuesday morning.
12                MR. TORRES:  Thank you, Your Honor.
13                THE CLERK:  All rise.
14           (Proceedings concluded at 4:30 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2          I, Catherine Schutte-Stant, Federal Official Realtime

 3     Court Reporter, in and for the United States District Court

 4     for the Southern District of West Virginia, do hereby

 5     certify that, pursuant to Section 753, Title 28, United

 6     States Code, the foregoing is a true and correct transcript

 7     of the stenographically reported proceedings held in the

 8     above-entitled matter and that the transcript page format is

 9     in conformance with the regulations of the Judicial

10     Conference of the United States.

11

12            s/Catherine Schutte-Stant, RDR, CRR

13            _____   March 4, 2021

14            Catherine Schutte-Stant, RDR, CRR
              Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```