```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                        AT CHARLESTON

 3    _____x
                                     :
 4    BENNY FITZWATER,               :  CIVIL ACTION
      CLARENCE BRIGHT, TERRY PRATER, :  NO. 2:16-cv-09849
 5    EMMET CASEY, JR.,              :
      CONNIE Z. GILBERT,             :  Consolidated with:
 6    ALLAN H. JACK, SR., and,       :  CIVIL ACTION
      ROBERT H. LONG.,               :  NO. 1:17-cv-03861
 7              Plaintiffs,          :
                                     :
 8                  -vs-             :
                                     :
 9    CONSOL ENERGY, INC.,           :
      CONSOLIDATION COAL CO.,        :
10    FOLA COAL CO., LLC,            :
      CONSOL OF KENTUCKY, INC.,      :
11    CONSOL PENNSYLVANIA COAL CO.,  :
      LLC, and KURT SALVATORI,       :
12                                   :  BENCH TRIAL
                Defendants.          :  VOLUME V
13    _____x
```

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.,**
**SENIOR UNITED STATES DISTRICT JUDGE**
**FEBRUARY 16, 2021**

**APPEARANCES:**

| | |
|---|---|
| **FOR THE PLAINTIFFS:** | **SAMUEL B. PETSONK, ESQUIRE** |
| | PETSONK PLLC |
| | P. O. Box 1045 |
| | Beckley, WV  25802 |

        Proceedings recorded by mechanical stenography,
transcript produced by computer.

_____
            CATHERINE SCHUTTE-STANT, RDR, CRR
                Federal Official Court Reporter
            300 Virginia Street East, Room 6009
                    Charleston, WV 25301

```
 1    APPEARANCES CONTINUED:

 2    FOR THE PLAINTIFFS:        BREN J. POMPONIO, ESQUIRE
                                 LAURA DAVIDSON, ESQUIRE
 3                               Mountain State Justice, Inc.
                                 1217 Quarrier Street
 4                               Charleston, WV  25301

 5

 6

 7    FOR THE DEFENDANTS:        JOSEPH J. TORRES, ESQUIRE
                                 ALEXIS E. BATES, ESQUIRE
 8                               EMMA J. O'CONNOR, ESQUIRE
                                 KATHERINE M. FUNDERBURG, ESQUIRE
 9                               Jenner & Block LLP
                                 353 N. Clark Street
10                               Chicago, IL  60654

11

12

13    FOR THE DEFENDANTS:        MICHAEL D. MULLINS, ESQUIRE
                                 Steptoe & Johnson PLLC
14                               707 Virginia Street East
                                 17th Floor
15                               Charleston, WV 25301

16

17

18

19

20

21

22

23

24

25
```

```
 1                              INDEX

 2
       DEFENDANT'S
 3     WITNESSES        DIRECT   CROSS   REDIRECT  RECROSS   EXAMINATION

 4
       KURT SALVATORI   861   934, 968      ^        ^            ^
 5
       Voir Dire
 6     951, 1015, 1024, 1026

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                              INDEX TO EXHIBITS

2
        PLAINTIFF'S
3       EXHIBITS                              ADMITTED

4
          19                                     973
5         21                                    1002
          22                                    1008
6         28                                    1045
          29                                    1049
7

8

9

10      DEFENDANT'S
        EXHIBITS                              ADMITTED
11
          23                                     869
12        24                                     879
          25                                     881
13        26                                     891
          27                                     901
14        28                                     905
          29                                     907
15        30                                     911
          31                                     912
16

17

18

19

20

21

22

23

24

25
```

```
 1              (The following Bench Trial was held before the

 2      Honorable John T. Copenhaver, Jr., Senior United States

 3      District Judge, in the case of Fitzwater, et. al. versus

 4      CONSOL, et. al, on Tuesday, February 16, 2021, at

 5      Charleston, West Virginia.)

 6                   P-R-O-C-E-E-D-I-N-G-S             9:36 a.m.

 7                   THE CLERK:  All rise.

 8                   THE COURT:  Good morning.  Please be seated.

 9          Is the defense ready to proceed?

10                   MR. TORRES:  Yes, Your Honor.

11                   THE COURT:  Please do.

12                   MR. TORRES:  Your Honor, defendants call Kurt

13      Salvatori.

14                   THE COURT:  Thank you.

15                   THE CLERK:  Mr. Salvatori, if you'll please take

16      the lectern.

17              KURT SALVATORI, DEFENDANT'S WITNESS, SWORN

18                   THE CLERK:  Please state your name and spell it

19      for the record.

20                   THE WITNESS:  Kurt Salvatori, K-U-R-T,

21      S-A-L-V-A-T-O-R-I.

22                   THE CLERK:  Thank you.  And if you'd please take

23      the stand.

24                   THE WITNESS:  Thank you.

25          Your Honor, may I take my mask off?
```

```
 1              THE COURT:  You may do that.

 2              THE WITNESS:  Thank you.

 3                    DIRECT EXAMINATION

 4    BY MR. TORRES:

 5    Q.   Good morning.  Mr. Salvatori, where are you employed?

 6    A.   CONSOL Energy.

 7    Q.   What is your current position?

 8    A.   I'm currently the Chief Administrative Officer for

 9    CONSOL Energy.

10    Q.   How long have you worked at CONSOL?

11    A.   Right around 29 years.  I started in 1992.

12    Q.   I want to talk about your job history from when you

13    started up until 2015, that is the first period we are going

14    to cover, okay?

15    A.   Okay.

16    Q.   What was your first job at CONSOL?

17    A.   Right after college, I started as an accountant with

18    CONSOL in the company's Controller's Department.

19    Q.   How long did you hold that position?

20    A.   I was in the Controller's Department as an accountant

21    for seven years.

22    Q.   So 1992?

23    A.   From '92 to '99, approximately.

24    Q.   Thank you.  And what were your duties as an accountant

25    with the Controller's Department?
```

SALVATORI - DIRECT

1     **A.**   Typical financial accounting activities, journal

2     entries, account reconciliation, balances, forecasting, cost

3     accounting.  The gamut of what a corporation's controller's

4     department would do for the company.

5     **Q.**   Okay.  What was your next job after accountant?

6     **A.**   I went to -- took a job in around 2000 to become the

7     supervisor of the company's defined benefit plan, pension

8     plan, and also the company's defined contribution plan, the

9     401(k) plan.

10    **Q.**   And what department was that in?

11    **A.**   That was in the Human Resources Department.

12    **Q.**   And that was the beginning of 2000?

13    **A.**   Yes.

14    **Q.**   Who did you report to?

15    **A.**   I reported to Dennis McCracken [phonetic].  At the

16    time, his title was either general manager or director of

17    benefits, I don't recall which.

18    **Q.**   And how long did you hold the position of supervisor of

19    retirement and investment plans?

20    **A.**   Through -- from 2000 through December of 2005.

21    **Q.**   And you said that -- you were responsible for the

22    company's pension and 401(k) plans; is that correct?

23    **A.**   I was.

24    **Q.**   Can you explain what specific duties you had in

25    connection with those plans?

1    **A.**    Sure.  In both cases, I was charged with the

2    responsibility to administer the plans, you know, within the

3    terms of the plan document.  But for the pension plan, my

4    responsibilities included calculating the benefits, when

5    people retired; providing retirement estimates to people who

6    were looking to retiree, and all the necessary requirements

7    of the ERISA plan.

8         In the 401(k), my plan duties, again, were

9    administering the plan, and in accordance with the plan

10   documents, and primarily my role was to calculate the amount

11   of company contributions for each employee to be deposited

12   every couple weeks with payroll into their 401(k) accounts.

13   **Q.**    What, if any, other duties did you have during that

14   time period, other than what you've already testified to?

15   **A.**    The department itself, the benefits department at

16   CONSOL was a small group.  So underneath of that department

17   was health and welfare benefits, what we think of like

18   medical and stuff like that.  Workers' Compensation

19   benefits, black lung benefits.  And then to the extent that,

20   because it was a small group, over time, I would work on

21   things that were related to those as well.  So I would

22   describe myself as having kind of a workable knowledge of

23   those plans by the time I completed my tenure in 2005.

24   **Q.**    Okay.  What was your next job in 2005?

25   **A.**    In January of '06, I accepted a position to become the

```
1    Director of Human Resources for CNX Gas Corporation.  Just
2    as a way to back up and explain.  CNX Gas Corporation at the
3    time was a majority-owned subsidiary of CONSOL Energy.
4    CONSOL Energy owned around 80 percent of it.  The other 20
5    percent was traded on the public market in the New York
6    Stock Exchange.  And my job there was to be responsible for
7    all the aspects of Human Resources for CNX Gas Corporation.
8    You know, and in many cases, the services were contracted
9    back to CONSOL Energy.  And I was a, for lack of a better
10   word, a customer from an HR standpoint.
11   Q.   How long did you hold that position at the gas company?
12   A.   I was in that position through December of 2009.
13   Q.   You said 2009?
14   A.   Correct.
15   Q.   Okay.  And then what was your next job?
16   A.   My next job was the same title, Director of Human
17   Resources, but it was for the entire CONSOL Energy entity,
18   not just the gas company.
19   Q.   And how long did you hold that position as Director of
20   Human Resources for all of CONSOL Energy?
21   A.   18, 20 months.  I think in September of '11, I actually
22   became Vice President of HR for the company.
23   Q.   Okay.  And while you were Director of Human Resources,
24   briefly, what were your duties in that position?
25   A.   You know, I was over labor relations, employee
```

1    benefits, compensation, training -- those type of functions

2    within the HR function.

3    Q.   And you said your next job was Vice President of Human

4    Resources?

5    A.   Correct, in September of 2011, I started in that

6    position.

7    Q.   And for what part of CONSOL were you the Vice President

8    of Human Resources?

9    A.   The entire entity.

10   Q.   And, I'm sorry.  How long did you hold that position?

11   A.   I was VP of HR through May of 2016.

12   Q.   Okay.  And briefly, what were your duties as Vice

13   President of Human Resources?

14   A.   I was responsible for all the HR functions within the

15   company, both at the corporate office and in the field,

16   benefit plans, compensation, training, all of the sorts of

17   general things you'd come across in a company's HR function.

18   Q.   Okay.  Focusing on CONSOL's employee benefit plans for

19   nonrepresentative employees, what, if any, additional duties

20   did you have during that 2011 to 2016 time period?

21   A.   I also functioned as the named fiduciary on those

22   benefit plans.

23   Q.   And what were your duties as the named fiduciary?

24   A.   Administration of the plan documents, issuing Summary

25   Plan Descriptions, SPD, issuing Summary of Material

1    Modification or SMMs and, of course, general participant

2    communications.

3    **Q.**   Okay.  While you were acting as fiduciary during that

4    time period, did you have authority to amend or terminate

5    CONSOL's benefit plans?

6    **A.**   I did not.

7    **Q.**   Who had that authority?

8    **A.**   The Board of Directors of CONSOL Energy.

9    **Q.**   When, if ever, were you delegated that authority, Mr.

10   Salvatori?

11   **A.**   I was delegated that authority on two occasions; once

12   in the fall of 2014, and once in the -- I want to say early

13   summer of 2015, when the Board, through resolution,

14   delegated me the responsibility to terminate the retiree

15   medical plans.

16   **Q.**   And what position were you holding at that time the

17   Board delegated that authority to you?

18   **A.**   I was Vice President of Human Resources.

19   **Q.**   Did they delegate you that authority as fiduciary?

20   **A.**   They did not.

21   **Q.**   Okay.  You mentioned a moment ago that you were

22   delegated authority to terminate CONSOL's benefit plans for

23   nonrepresented employees in 2015; is that correct?

24   **A.**   Correct.

25   **Q.**   So I wanted to focus on some of the jobs you had after

1    2015, and just briefly finish off your history.

2    **A.**    Sure.

3    **Q.**    After you were VP of HR, what was your next position at

4    CONSOL?

5    **A.**    Next position was Vice President of Shared Services.  I

6    was in that position from June of '16 -- 2016, through

7    December of 2016.  It consisted of having responsibility for

8    Human Resources, but also the government and public

9    relations, along with information technology or IT.

10   **Q.**    And you said you held that position for about six

11   months?

12   **A.**    Yes, through the end of 2016.

13   **Q.**    And what was your next position at CONSOL?

14   **A.**    My next position was the title Vice President of

15   Administration.  Just as a way to kind of explain what's

16   going on here.  At that point in time, the company had

17   decided that -- at that time, it had both the coal and gas

18   business -- that we were going to, by the end of 2017, split

19   the company into two independent entities.  So we needed to

20   create two management teams at the time.  I took the

21   position of Vice President of Administration within the coal

22   company, the to-be coal company and one of the terms of the

23   responsibilities for the coal company piece, I had the same

24   type of responsibilities I just described as a Vice

25   President of Administration.

1    **Q.**   Okay.  And after the split of the gas and coal

2    companies that you just referred to occurred, what position

3    did you have after that split?

4    **A.**   So the position I had was Chief Administrative Officer.

5    The company actually officially split at the end of November

6    of 2017.

7    **Q.**   Okay.  And what are your duties as Chief Administrative

8    Officer?

9    **A.**   Today, I have Human Resources under me, employee

10   benefits, information technology, government affairs, public

11   relations, and cyber security.

12   **Q.**   And you continue to hold that position up until today?

13   **A.**   Correct.

14         MR. TORRES:  Your Honor, last week, one of the

15   things you asked us to prepare was a summary of the various

16   locations we've been talking about and when they came into

17   existence.  And so we've done that.  And we thought it would

18   be useful to review that through Mr. Salvatori, who has

19   knowledge of this and can sort of walk us through it.

20         May I approach, Your Honor?

21   BY MR. TORRES:

22   **Q.**   Mr. Salvatori, I'm going to show you what's been marked

23   for identification as Defendant's Exhibit 23.

24         Are you familiar with this document, Mr. Salvatori?

25   **A.**   I am.

SALVATORI - DIRECT

1   **Q.**   At a high level, without getting into details, can you

2   just describe what this document shows?

3   **A.**   This document really shows the timeline of the

4   existence of CONSOL Energy from its beginning in 1860, until

5   today, and it highlights some major events/transactions that

6   occurred during that period of time.

7   **Q.**   Okay.  And did you assist in putting this information

8   together?

9   **A.**   I did.

10  **Q.**   Was that based on your knowledge of these -- in light

11  of your positions at CONSOL for the last 29 years?

12  **A.**   Yes.

13  **Q.**   And is it true and accurate to the best of your

14  knowledge?

15  **A.**   It is.

16  **Q.**   Okay.

17          MR. TORRES:  Your Honor, we'd offer Defendant's

18  Exhibit 23.

19          MR. PETSONK:  No objection, Your Honor.

20          THE COURT:  Admitted.

21      **Defendant's Exhibit 23 admitted.**

22  BY MR. TORRES:

23  **Q.**   So, Mr. Salvatori, I believe you are aware that the

24  lawsuit that we are here about today involves retirees from

25  Buchanan and Enlow Fork, CONSOL of Kentucky, and AMVEST

1    Fola; is that correct?

2    **A.**    Correct.

3    **Q.**    So I wanted to ask some questions about the exhibit

4    relative to those locations.  So if you give me just one

5    second to grab the exhibit.

6        Taking a look at Defendant's Exhibit 23, can you please

7    explain when the Buchanan Mine began operations as reflected

8    on this exhibit?

9    **A.**    So the Buchanan Mine began operating in 1993, with the

10   first production --

11   **Q.**    I'm sorry, did you say 1993?

12   **A.**    I'm sorry.  1983.  I apologize.  I misspoke.

13       1983, that is when the first production occurred.  It

14   would have entered full production in the 1986 time frame.

15   **Q.**    Okay.  And where was the Buchanan Mine located?

16   **A.**    Buchanan Mine is located in the southwestern -- what I

17   would say the southwestern tip of Virginia, in Buchanan

18   County, Virginia.

19   **Q.**    Okay.  And what type of mining operations were

20   conducted at the Buchanan Mine?

21   **A.**    Buchanan was a longwall mining operation that produced

22   anywhere from four to six million tons a year.

23   **Q.**    Let me stop you there.  What is -- for those of us who

24   are not as familiar with mining, what is longwall mining?

25   **A.**    Longwall mining is the extraction -- it is an

SALVATORI - DIRECT

1    extraction method for underground mining, widely recognized

2    as the most efficient form of underground mining.

3    **Q.**   During its operation, approximately how many employees

4    would be employed at the Buchanan operation, Mr. Salvatori,

5    during this time period we are talking about?

6    **A.**   300 or so.

7    **Q.**   And that is on an annual basis?

8    **A.**   Yes.

9    **Q.**   Dose CONSOL still operate the Buchanan Mine?

10   **A.**   No.  We sold the Buchanan Mine in 2015 to an entity

11   called Coronado.

12   **Q.**   Okay.  Prior to selling the Buchanan Mine to

13   Coronado -- you said in 2015?

14   **A.**   Correct.

15   **Q.**   While Buchanan was still part of CONSOL, what was the

16   relationship between Buchanan and CONSOL, the parents?

17   **A.**   Up until December of 2013, Buchanan was an asset that

18   was part of Consolidation Coal Company, which was a

19   wholly-owned subsidiary at the time of the CONSOL Energy.

20   **Q.**   Okay.

21   **A.**   In 2013, at the end of 2013, in December, we sold

22   Consolidation Coal Company to Murray Energy.  But, prior to

23   the sale, we carved out -- Buchanan Mine retained its

24   ownership under an entity called Buchanan Mine Company, I

25   believe.

1    **Q.**   And that was the entity that was sold to Coronado in

2    2015?

3    **A.**   Correct.

4    **Q.**   Okay.  So now turning to Enlow Fork on this chart, what

5    does it show regarding when that location began operations?

6    **A.**   Enlow Fork was developed and began operations in the

7    early '90s -- 1990, '91.  It would have entered full

8    production in, approximately, 1993.  It was the second mine

9    -- second mine to our -- what we called our Pennsylvania

10   mining operations.  The first mine was Bailey Mine put in

11   there.  And that was put in in the early '80s.  It's located

12   in the most southwestern tip of Pennsylvania, in Greene

13   County, Pennsylvania, primarily.

14   **Q.**   Okay.  Let me stop you there.  We are looking at the

15   timeline, and if you look back to '81, there is an entry for

16   June 16, 1981.  Do you see that?

17   **A.**   Yes.

18   **Q.**   And there is a reference to CONSOL Pennsylvania Coal;

19   do you see that?

20   **A.**   Correct.

21   **Q.**   What mines would be associated with CONSOL Pennsylvania

22   Coal?

23   **A.**   Today, the mines associated with CONSOL Pennsylvania

24   Coal are Bailey and Enlow and a third mine called Harvey.

25   Back then, at that time, that was the entity that began the

1    development of Bailey Mine.

2                THE COURT:  So that would have been 1981?

3                THE WITNESS:  Yes.

4    BY MR. TORRES:

5    **Q.**   And the timeline indicates that Enlow Fork began in the

6    '90-'91 time period; is that correct?

7    **A.**   Correct.

8    **Q.**   And you said that CONSOL still operates Enlow Fork?

9    **A.**   Correct.

10   **Q.**   And what's the relationship between -- today, between

11   Enlow Fork and CONSOL?

12   **A.**   Enlow Fork is an asset of CONSOL Pennsylvania Coal

13   Company, which is a wholly-owned subsidiary of CONSOL

14   Energy.

15   **Q.**   And Enlow Fork has been in operation -- approximately,

16   how many people work at that location on an annual basis?

17   **A.**   500, approximately.

18   **Q.**   Okay.  And let's talk about CONSOL of Kentucky.  Please

19   tell us when that location began operating?

20   **A.**   CONSOL of Kentucky was established '86, '87.  The

21   original mines were -- mines referred to as the Jones Fork

22   mines.  They started around 1989.  Much smaller in scale

23   compared to a Buchanan or an Enlow Fork.  Different type of

24   mine for lower seam heights, not as quite efficient.  And we

25   operated CONSOL of Kentucky up through -- or the assets of

1    CONSOL of Kentucky up through 2015.

2    **Q.**    What happened in 2015?

3    **A.**    We sold CONSOL of Kentucky -- we sold the assets of

4    CONSOL of Kentucky to an entity called Booth Energy.

5    **Q.**    Okay.  And what, if anything, today is left of CONSOL

6    of Kentucky?

7    **A.**    I think the company itself still exists.  There are no

8    active operations.  In terms of coal reserves, they would be

9    minimal, at best, in Eastern Kentucky.

10   **Q.**    So despite the fact that there is no ongoing operations

11   today, what's the relationship between CONSOL of Kentucky

12   and CONSOL Energy?

13   **A.**    CONSOL of Kentucky would be a wholly-owned subsidiary

14   of CONSOL Energy.

15   **Q.**    Finally, let's talk about AMVEST.  What does the chart

16   show regarding when CONSOL acquired AMVEST?

17   **A.**    CONSOL acquired AMVEST in late July of 2007.  AMVEST

18   was the name of the company that we purchased, and the Fola

19   mining complex was part of that purchase.

20   **Q.**    Okay.  And where was the Fola Mine located?

21   **A.**    Roughly, in the Summersville area, not too far from

22   there, in Summersville, West Virginia.

23   **Q.**    And does CONSOL still operate the Fola Mine?

24   **A.**    We do not.

25   **Q.**    Why not?

1    **A.**    We, as part of the sale to Booth Energy, in 2015, we

2    also sold the Fola assets.

3    **Q.**    Okay.  Now, looking at the top of this timeline, Mr.

4    Salvatori, I wanted to ask you some additional questions

5    related to those entries.  Who owned CONSOL during the

6    period 1966 to 1981?

7    **A.**    During that period, CONSOL was a wholly-owned

8    subsidiary of a company called Conoco.  It was a trade name

9    for the Continental Oil Company.

10   **Q.**    Okay.  And what about during the period of 1981 to

11   1991, who owned CONSOL?

12   **A.**    CONSOL was owned by DuPont, by virtue of DuPont

13   purchasing Conoco in 1981.

14   **Q.**    And then what happened in 1991?

15   **A.**    In 1991, from the ownership standpoint, DuPont made the

16   decision they wanted to reduce their stake in CONSOL, so a

17   transaction was completed between DuPont and a German mining

18   company called RWE, to basically go into a 50/50 ownership

19   structure between the two companies.

20   **Q.**    And on the timeline, that indicates that's when CONSOL

21   Energy, Inc., was actually incorporated as a joint venture;

22   is that correct?

23   **A.**    Correct.

24   **Q.**    What happened in 1998, then?

25   **A.**    In 1998, DuPont made the decision that they wanted to

1    exit the coal business.  So they sold all but four-percent

2    of their 50 percent stake to RWE, effectively making RWE,

3    the 95/96 owner of the company.

4    **Q.**    Then what happened in April of 1999?

5    **A.**    In April of 1999, RWE, decided that they wanted to

6    reduce their ownership, so they sold off via initial public

7    offering to the public market about 20, 25 percent of CONSOL

8    Energy, at which time that piece of the ownership became

9    actively traded on the New York Stock Exchange.

10   **Q.**    And when did CONSOL become a fully publically-traded

11   company?

12   **A.**    It would have been around '02 that Rheinbraun made the

13   decision to completely exit, and it was accomplished again

14   by another initial public offering or IPO, and CONSOL, as a

15   result, became a completely free-standing public company

16   trading on the New York Stock Exchange.

17   **Q.**    Thank you, Mr. Salvatori.  Mr. Salvatori, the issues in

18   this lawsuit cover the approximate time period of 1980 to

19   2015.  You're familiar with that, correct?

20   **A.**    Correct.

21   **Q.**    During that time period, what was, on an annual basis,

22   CONSOL's total employment?

23   **A.**    Sure.  It would vary.  You know, market conditions

24   would determine which mines operated, which didn't.  But, in

25   general, the rule-of-thumb, we floated around 10,000

SALVATORI - DIRECT

1    employees.

2    **Q.**   And during that same time period, 1980 to 2015,

3    approximately how many human resources personnel would

4    CONSOL have employed?

5    **A.**   Oh, I would say, you know, in the course of that time

6    period, people in the company from the HR function, I would

7    have to characterize it in the hundreds.

8    **Q.**   Okay.  Now, I want to switch topics on you, Mr.

9    Salvatori, and take you back to some earlier testimony.  You

10   testified that you became the supervisor of retirement

11   investment plans in 2000, correct?

12   **A.**   Yes.

13   **Q.**   Do you recall what was one of the first projects you

14   were assigned after assuming that position?

15   **A.**   Sure.  I think as a way to educate me and get me -- I

16   came from the accounting department and didn't have HR or

17   benefits background at that time -- I was instructed to go

18   throughout the company, primarily the HR department and the

19   legal department, and find as far back as I could every

20   health and welfare plan document and to verify that those

21   documents contained what we referred to internally as the

22   reservation of rights language that basically said that the

23   company reserves the right to amend, suspend, change, or

24   terminate the plan at any time.

25   **Q.**   Okay.  And did you actually complete that project?

SALVATORI - DIRECT

1    **A.**   I did.  And I managed to get back to 1980.  I couldn't

2    find any documents before then.  But I got back to 1980.

3    **Q.**   Okay.  And during the period -- what sort of documents

4    were you reviewing as part of that project that took you

5    back to the 1980s?

6    **A.**   At that time, the plan documents and the Summary Plan

7    Description were one in the same.  So I was researching all

8    of those that were kept on file in the company's records.

9    **Q.**   Okay.  And for the time period that you were reviewing,

10   from 2000 back to 1980, how many of the benefit plans or

11   Summary Plan Descriptions you reviewed addressed both active

12   and retired employees?

13   **A.**   All of them.

14   **Q.**   Okay.  And how long, Mr. Salvatori, did CONSOL have a

15   combined plan and Summary Plan Description?

16   **A.**   Up through -- up to 2011.

17   **Q.**   Okay.  And what happened in 2011?

18   **A.**   In 2011 -- might have been 2010 -- but the Affordable

19   Care Act was passed, and it created some benefits to the

20   company.  And I believe our participants -- although I can't

21   remember what they are now -- that made sense to split the

22   active and the retiree plans in terms of plan documents

23   themselves.

24   **Q.**   Okay.

25         MR. TORRES:  That's the wrong one.  Sorry.  Let me

1    do that again.  I apologize.

2         You can give that to the Judge and this one will be 25.

3              THE CLERK:  This one is 24?

4              MR. TORRES:  Yes.

5              Your Honor, may I approach?

6              THE COURT:  You may.

7    BY MR. TORRES:

8    **Q.**   Mr. Salvatori, I'm going to hand you what's been marked

9    for identification as Defendant's Exhibits 24 and 25.

10   **A.**   Okay.

11   **Q.**   Excuse me.  Starting first with Defendant's Exhibit 24,

12   Mr. Salvatori, can you identify that document?

13   **A.**   Yes.  This is the plan document created as part of the

14   splitting of the benefit plan.  It's the plan document for

15   the retirees health and welfare plan, medical.

16   **Q.**   And what's the date of this document?

17   **A.**   January 1, 2011.

18              MR. TORRES:  Your Honor, defendants offer

19   Defendant's Exhibit 24.

20              MR. PETSONK:  No objection, Your Honor.

21              THE COURT:  Admitted.

22         **Defendant's Exhibit 24 admitted.**

23   BY MR. TORRES:

24   **Q.**   Mr. Salvatori, I just wanted to ask you a few questions

25   about this.  I'll direct your attention to page CONSOL 4454.

SALVATORI - DIRECT

1    Let me know when you are there.

2    **A.**   I'm there.

3    **Q.**   And then directing your attention to Section 6.3, do

4    you see that?

5    **A.**   I do.

6    **Q.**   Section called "Amended and Termination"?

7    **A.**   Mm-hmm.

8    **Q.**   You have to say yes.

9    **A.**   Yes, I'm sorry.

10   **Q.**   What does that provision relate to, Mr. Salvatori?

11   **A.**   This is the reservation of rights language, where the

12   company communicates the fact that it maintains the right to

13   amend or terminate any or all of the plan at any time for

14   any reason.

15   **Q.**   Okay.  And then directing your attention to Defendant's

16   Exhibit 25, Mr. Salvatori, are you familiar with this

17   document?

18   **A.**   Yes.  This is the corresponding -- corresponding plan

19   document for the active employees, after we split the plan

20   of the health and welfare plans.

21   **Q.**   And what's the date of this document?

22   **A.**   January 1, 2011.

23         MR. TORRES:  Defendants offer Defendant's Exhibit

24   25, Your Honor.

25         MR. PETSONK:  No objection, Your Honor.

1          THE COURT:  Admitted.

2          **Defendant's Exhibit 25 admitted.**

3     BY MR. TORRES:

4     **Q.**   Mr. Salvatori, directing your attention in the document

5     to Page CONSOL 3882.  Let me know when you are there.

6     **A.**   I'm there.

7     **Q.**   And then directing your attention to Section 6.3; do

8     you see that?

9     **A.**   Yes, I do.

10    **Q.**   And that's entitled "Amendment and Termination,"

11    correct?

12    **A.**   Yes.

13    **Q.**   And what does this provision state, Mr. Salvatori?

14    **A.**   The same reservation of rights that the company put in

15    the retiree document, stating that it can amend or terminate

16    the plan.

17    **Q.**   Thank you.  Mr. Salvatori, when the company split the

18    plan into an active and retiree plan effective January 1,

19    2011, how did the benefits being provided to the active and

20    retired employees change?

21    **A.**   There wasn't a material change in the delivery of

22    benefits.  Like I said before, this was basically done

23    because of the Affordable Care Act.

24    **Q.**   Okay.  Now, I want to go back again to the review of

25    benefit plans that you previously testified that you

1    conducted in 2000.

2    **A.**    Okay.

3    **Q.**    For the documents that you reviewed for that time

4    period in 1980 to 2000, Mr. Salvatori, how many of the

5    documents that you reviewed for that time period stated that

6    CONSOL reserved the right to terminate retiree medical

7    benefits for current or future employees?

8    **A.**    All of them.

9    **Q.**    And how many of the documents you reviewed for that

10   time period in 1980 to 2000 promised lifetime retiree

11   medical benefits?

12   **A.**    None of them.

13   **Q.**    And also now -- how many of those documents you

14   reviewed stated that retiree medical benefits were vested?

15   **A.**    None of them.

16   **Q.**    And now I want to focus on the time period from 2000 up

17   until 2015, when the retiree medical benefit plan was

18   terminated.  Are you with me?

19   **A.**    Yes.

20   **Q.**    Okay.  During that time period, given your various

21   roles at CONSOL, you were familiar with the benefit plans

22   for nonrepresented employees and retirees?

23   **A.**    I was.

24   **Q.**    And based on that knowledge, during that time period,

25   2000 to 2015, what did CONSOL's benefit plan for

1    nonrepresented employees and retirees state regarding the

2    company's right to change or terminate the plan?

3    **A.**    They all contained the language of the reservation of

4    rights, where the company stated they could amend or

5    terminate the plan.

6    **Q.**    And again, based on your duties from 2000 to 2016 -- or

7    2015, what did CONSOL's benefit plans for nonrepresented

8    employees and retirees state about benefits being for life?

9    **A.**    They did not state that.

10   **Q.**    And again, based upon your duties from 2000 to 2015,

11   what did CONSOL's medical benefit plans for nonrepresented

12   employees and retirees state about benefits being vested?

13   **A.**    They did not state any vesting.

14   **Q.**    Okay.  Now, excuse me.  You previously testified that

15   during the time period you were VP of HR, you were also the

16   named fiduciary for CONSOL benefit plans, correct?

17   **A.**    Yes.

18   **Q.**    And during that time period -- well, I'm sorry -- just

19   to refresh or recall -- it was 2011 to 2016; is that right?

20   **A.**    Yes, September of 2011 through May of 2016.

21   **Q.**    So during that time period, on those occasions when you

22   were acting as the fiduciary, in what form would you issue

23   directives regarding the CONSOL benefit plans?

24   **A.**    Obviously, through issuance of plan documents, Summary

25   Plan Descriptions, Summary of Material Modifications, and

1    participant communication.

2    **Q.**    Okay.   Is there a commonly used acronym for Summary

3    Plan Description?

4    **A.**    Yes, SPD.

5    **Q.**    SPD?

6    **A.**    SPD, correct.

7    **Q.**    Is there a commonly used acronym for Summaries of

8    Material Modification?

9    **A.**    Yes, SMM.

10   **Q.**    Okay.   Thank you.   You mentioned a moment ago that one

11   of the things that you -- one of the ways in which you would

12   issue directives as fiduciary was through the issuance of

13   plan documents; is that correct?

14   **A.**    Yes.

15   **Q.**    And just to go back for a moment to Defendant's Exhibit

16   24, what is that document again, just to --

17   **A.**    This is the "Retiree Health and Welfare Plan," plan

18   document.

19   **Q.**    So that's one of the documents that you might issue --

20   **A.**    Sure.

21   **Q.**    -- in the course of your duty as fiduciary?

22   **A.**    Sure.

23   **Q.**    Okay.   And then the next category of documents you

24   mentioned was issuing SPDs, correct?

25   **A.**    Yes.

1    **Q.**   Mr. Salvatori, I'm going to show --

2              MR. TORRES:  May I approach, Your Honor?

3              THE COURT:  You may.

4    BY MR. TORRES:

5    **Q.**   I'm going to show you what's been previously entered

6    into evidence as Defendant's Exhibit 1.  I just have a few

7    questions for you.

8         Are you familiar with this document, Mr. Salvatori?

9    **A.**   Yes, it's a plan document and SPD from the -- I'll call

10   it the '90s era.

11   **Q.**   Okay.  And directing your attention to MSJ 2038 -- let

12   me know when you are there.

13   **A.**   Okay, I am here.

14   **Q.**   Directing your attention to MSJ 2038, what location did

15   this particular SPD relate to, Mr. Salvatori?

16   **A.**   Enlow Fork.

17   **Q.**   Okay.  And you mentioned a moment ago that you believe

18   this document could be from the '90s; is that correct?

19   **A.**   Yes.

20   **Q.**   Why do you say that?

21   **A.**   The books that we put out were updated from time to

22   time to reflect changes, and I'm looking at the revision

23   date here, 7-94.

24   **Q.**   Okay.  Thank you.  And directing your attention back to

25   MSJ 2038, what -- what does this particular section that

 1   begins at MSJ 2038 address?

 2   **A.**   This is the -- one in the same, in this case, because

 3   it's prior to 2011.  This is the Summary Plan Description

 4   and the plan document for the medical benefits that were for

 5   the nonrepresented hourly employees of Enlow Fork Mine and

 6   retirees.

 7   **Q.**   Okay.  And directing your attention to Page MSJ 2045

 8   Mr. Salvatori.  Let me know when you are there.

 9   **A.**   I'm here.

10   **Q.**   Okay.  And so we are still in the medical benefits

11   portion of this document?

12   **A.**   Correct.

13   **Q.**   Okay.  And directing your attention to numbered

14   paragraph 8, what does that provision state -- or what does

15   that provision relate to, Mr. Salvatori?

16   **A.**   Again, it's the reservation of rights language that is

17   informing the reader that the Company/Board of Directors has

18   the right to terminate, suspend, or amend the Plan at any

19   time and for any reason.

20   **Q.**   And based on your -- based on the plan materials and

21   Summary Plan Descriptions you reviewed during your time in

22   Human Resources and in your capacity as a named fiduciary,

23   how does this plan SPD compare to documents that would have

24   applied to other CONSOL nonrepresented locations during this

25   same time period?

1    **A.**    It would have been virtually identical.

2    **Q.**    Thank you.  Now, I want to show you now what's been

3    introduced into evidence as Defendant's Exhibit 8.  And I'll

4    take that one back from you.  I can reconstruct it for you.

5    **A.**    There you go.

6    **Q.**    Give me one second, Mr. Salvatori, so I can get this

7    back where it belongs.  Okay.

8         Mr. Salvatori, looking at Defendant's Exhibit 8 that is

9    in front of you.  Are you familiar with that document?

10   **A.**    Yes.

11   **Q.**    What is it?

12   **A.**    It is a Summary Plan Description for changes -- first,

13   it's for the Buchanan Mine, I should say.  And it's telling

14   the employee of changes to certain benefit plans that they

15   participate in.

16   **Q.**    Well, more generally, what does this entire document

17   contain, Mr. Salvatori?

18   **A.**    Summary Plan Descriptions for the plans mentioned.

19   **Q.**    And you said this one relates to Buchanan?

20   **A.**    Yes.

21   **Q.**    Okay.

22        MR. PETSONK:  Your Honor, I'm sorry, could you

23   clarify which document we're referencing right now?

24        MR. TORRES:  Defendant's Exhibit 8.

25        MR. PETSONK:  8, okay.  Thank you.

```
 1              MR. TORRES:  Sure.

 2   BY MR. TORRES:

 3   Q.    Okay.  Mr. Salvatori, I'd like to direct your attention

 4   to MSJ 3357.  So let me know when you are there.

 5   A.    You said 3357?

 6   Q.    Correct.

 7   A.    Okay.

 8   Q.    And directing your attention to the bottom of this

 9   page, what is this date of this document?

10   A.    January 1, 2005.

11   Q.    And what benefits does this section of the booklet

12   address?

13   A.    Medical benefits for the nonrepresented hourly

14   employees and the nonrepresented retirees of Buchanan Mine.

15   Q.    And directing your attention to MSJ 3371, Mr.

16   Salvatori.  Let us know when you are there.

17   A.    I'm there.

18   Q.    And then directing your attention to paragraph

19   numbered -- paragraph 21.  What does this relate to?

20   A.    Once again, the reservation of rights language,

21   allowing the -- notifying the reader that the company can

22   terminate, suspend, or amend or change the benefits at any

23   time for any reason.

24   Q.    And again, directing your attention to MSJ 3375.

25   A.    Okay, I am there.
```

1    **Q.**   And then directing your attention to the second-to-last

2    heading in the paragraph, under that heading, what does that

3    provision relate to, Mr. Salvatori?

4    **A.**   Once again, reservation of rights language.

5    **Q.**   And based on the plan materials you reviewed during

6    your time in Human Resources, your review of earlier time

7    periods during your initial stint in Human Resources and

8    your role as a named fiduciary, how does this plan SPD

9    compare to documents that would have applied to other CONSOL

10   nonrepresented locations during this same time period?

11   **A.**   Again, virtually identical.

12   **Q.**   Okay.  And based upon those various roles that you held

13   in Human Resources and as the named fiduciary, how were

14   these types of material, these Summary Plan Descriptions

15   provided to employees and retirees?

16   **A.**   Typically, they were mailed via U.S. Mail.

17   **Q.**   What, if any, access might employees have to these

18   materials at the mine sites?

19   **A.**   In many cases, we would send copies to the mine sites

20   in the event that employees would walk in and like a copy.

21   **Q.**   Okay.  Now, Mr. Salvatori, you mentioned earlier in

22   your testimony that the plan -- the CONSOL benefit plan for

23   nonrepresented employees was split in 2011; is that correct?

24   **A.**   Yes.

25   **Q.**   And prior to that split in 2011, Mr. Salvatori, what

1  year was the last SPDs issued for active and retired

2  employees?

3  **A.**    I believe, for the active group, it was 2009, and for

4  the retiree group, I think it was 2010.

5  **Q.**    Okay.

6           MR. TORRES:  May I approach, Your Honor?

7           THE COURT:  You may.

8  BY MR. TORRES:

9  **Q.**    Mr. Salvatori, I'm going to show you what's been marked

10  for identification as Defendant's Exhibit 26.  Do you have

11  that in front of you, sir?

12  **A.**    I do.

13  **Q.**    Can you -- what is this document?

14  **A.**    This is an e-mail from a woman who is now retired named

15  Marlene Majireck, corporate HR person in the corporate

16  office, and she was sending this e-mail to the field HR

17  people at all of the sites, informing them that we will be

18  mailing out the SPDs for the active group in October, early

19  October, and, you know, attaching copies so they have copies

20  for their respective locations.

21  **Q.**    And what's the date of this e-mail?

22  **A.**    September 30th, 2009.

23  **Q.**    And did you receive this e-mail on or about that date?

24  **A.**    I did.

25           MR. TORRES:  Your Honor, we offer Defendant's

1    Exhibit 26.

2              MR. PETSONK:  No objection.

3              THE COURT:  Admitted.

4         **Defendant's Exhibit 26 admitted.**

5              MR. TORRES:  Thank you.

6    BY MR. TORRES:

7    **Q.**   Just a few more questions about this e-mail Mr.

8    Salvatori.  Directing your attention to the second sentence

9    of this e-mail?

10   **A.**   Yes.

11   **Q.**   Are you there?

12   **A.**   Yes.

13   **Q.**   What does the e-mail indicate regarding the manner of

14   distribution?

15   **A.**   Mailed to homes and then she's telling everyone it will

16   probably take one to two weeks.

17   **Q.**   And directing your attention to the first sentence of

18   this e-mail, what does that indicate as to when that process

19   would begin?

20   **A.**   At the -- at the beginning of the following week.

21   **Q.**   So when would that have been?

22   **A.**   Let's see, Wednesday, September 30 -- would have been

23   October 1st, 2nd.

24   **Q.**   Okay.  And then if you -- then directing your attention

25   to the third sentence of that -- sorry -- the third sentence

SALVATORI - DIRECT

1   of the first paragraph, what does that state regarding

2   distribution of SPDs?

3   **A.**   The paragraph starts with "any employees"?

4   **Q.**   No.  The very first paragraph that says, "We have

5   attached the electronic version," but going to the third

6   sentence of that?

7   **A.**   Sorry.  Yes.  "We will be providing supply for you to

8   keep on hand."  So this is her telling HR people that we

9   will be sending them hard copies to keep in their office in

10   the event employees would like a copy from us directly.

11   **Q.**   Okay.  And then directing your attention to the

12   second-to-last sentence of that third paragraph, what does

13   that indicate regarding where else SPDs would be available?

14   **A.**   Indicates that they will be on the CONSOL's benefits

15   website.  So the HR function at that time had an internal

16   site where we could post important documents for HR and go

17   out and go get them.  A good example of that would be a

18   Summary Plan Description or plan document.

19   **Q.**   Were the active SPDs in 2009, in fact, distributed and

20   posted as indicated in Defendant's Exhibit 26?

21   **A.**   Yes.

22   **Q.**   And now, directing your attention to the heading that

23   says, "Attachments."  Do you see that?

24   **A.**   I do.

25   **Q.**   What's listed there to the right, as you're looking at

SALVATORI - DIRECT

```
 1    the document regarding attachments?

 2    A.    Each of the different type of SPDs, so the first one

 3    says, "CON SPD Salary," that would be for the salaried

 4    employees.

 5    Q.    That would be the SPD for the salaried employee?

 6    A.    Yes.

 7    Q.    And looking at "CON SPD P&M," what does that mean?

 8    A.    "P&M" stands for production and maintenance, and it was

 9    our internal nomenclature for the nonunion, nonrepresented

10    hourly employees.

11    Q.    Okay.  And then, to your knowledge, which of these

12    attachments were distributed as described in Defendant's

13    Exhibit 26?

14    A.    All of them, to the appropriate people.

15    Q.    Now, I want to show you what's already been entered

16    into evidence as Defendant's 19.

17              MR. TORRES:  Thank you, Josh.

18         May I approach, Your Honor?

19              THE COURT:  You may.

20              THE WITNESS:  Thank you.

21              MR. TORRES:  I'll take this one back so I can

22    return it.

23              THE WITNESS:  Okay.

24    BY MR. TORRES:

25    Q.    Mr. Salvatori, are you familiar with Defendant's
```

SALVATORI - DIRECT

1    Exhibit 19?

2    **A.**    I am.

3    **Q.**    What is it?

4    **A.**    It's the Summary Plan Descriptions for all of the

5    health and welfare plans that the company offered to the

6    AMVEST nonrepresented hourly employees.

7    **Q.**    Okay.  And if you turn to the first numbered page in

8    this exhibit, Mr. Salvatori.

9    **A.**    Yes.

10   **Q.**    Under the page 1, there is a footer; do you see that?

11   **A.**    Yes, it says, "Medical Plan SPD," and then in

12   parentheses "(P&M)."

13   **Q.**    So for which population would this SPD apply to?

14   **A.**    This would have applied to the nonrepresented hourly

15   employees.

16   **Q.**    Okay.  And if you go back to the first page of this

17   document, you indicated that this one relates to the

18   employees at AMVEST or Fola, correct?

19   **A.**    Correct.

20   **Q.**    And so this would have been 2009, so this would have

21   been a year and a half after that acquisition; is that

22   correct?

23   **A.**    Correct.

24   **Q.**    Okay.  And referring back to your testimony a minute

25   ago about the e-mail in September of 2009, when was this

1    document that's Defendant's Exhibit 19 distributed?

2    **A.**   It would have been the beginning of '09.

3    **Q.**   Well, if you go back to this prior exhibit?

4    **A.**   I'm sorry.  Yes, it was actually issued in October of

5    '09.

6    **Q.**   Thank you.  And other than the individuals who would

7    have received the AMVEST version of this SPD, which is

8    Defendant's Exhibit 19, what other nonrepresented

9    populations would have received Summary Plan Descriptions in

10   October of '09?

11   **A.**   All them.

12   **Q.**   And directing your attention to page 53 of Defendant's

13   Exhibit 19 -- let me know when you are there.

14   **A.**   I am there.

15   **Q.**   And then directing your attention to the heading

16   entitled Future of the Plan; do you see that?

17   **A.**   Yes.

18   **Q.**   What does that provision address, Mr. Salvatori?

19   **A.**   Once again, the reservation of rights language that was

20   seen in the other documents that state the Board of

21   Directors of CONSOL can amend, modify, suspend or terminate

22   the benefits at any time.

23   **Q.**   Okay.  And directing your attention back now to Page 9,

24   Mr. Salvatori.  Let me know when you are there.

25   **A.**   I'm here.

SALVATORI - DIRECT

1    **Q.**   And directing your attention to the section entitled

2    "If You Retire."  Do you see that?

3    **A.**   Yes.

4    **Q.**   And then under that, the second full paragraph?

5    **A.**   Yes.

6    **Q.**   What does that provision address, Mr. Salvatori?

7    **A.**   It addressed the reservation of rights language for the

8    retiree medical plan.

9    **Q.**   For the retiree medical plan?

10   **A.**   Yes.

11   **Q.**   And then -- one second, please.

12       The versions of this document, Mr. Salvatori, that

13   would have been sent to other P&M populations, how did they

14   at all differ from the document we are looking at as

15   Defendant's Exhibit 19?

16   **A.**   They would be virtually identical.

17   **Q.**   Okay.  Now, you mentioned a moment ago in your

18   testimony that a new retiree SPD was issued in 2010; is that

19   correct?

20   **A.**   Correct.

21   **Q.**   And I'm going to show you what's been marked as

22   Defendant's Exhibit 16.

23         MR. TORRES:  May I approach, Your Honor?

24         THE COURT:  You may.

25   BY MR. TORRES:

SALVATORI - DIRECT

1    **Q.**   Mr. Salvatori, there is a document that was previously

2    entered into evidence as Defendant's Exhibit 16.  Are you

3    familiar with this document, sir?

4    **A.**   Yes.

5    **Q.**   And if you direct your attention to CONSOL -- the page

6    CONSOL 5611 -- let me know when you are there.

7    **A.**   I am.

8    **Q.**   And if you look at the introductory paragraph and

9    footer at the bottom, can you tell what this document

10   relates to, Mr. Salvatori?

11   **A.**   This would have been the document for retiree medical

12   benefits at the time for retirees from the nonrepresented

13   P&M hourly employees at AMVEST.

14   **Q.**   Okay.  And which other retiree nonrepresented

15   populations would have been sent SPDs in 2010, in addition

16   to the ones who would have received the AMVEST version of

17   the document?

18   **A.**   All of them.

19   **Q.**   And how would the documents those other retiree

20   populations receive differ from Defendant's Exhibit 16?

21   **A.**   They would be virtually identical.

22   **Q.**   And direct your attention to Page CONSOL 5716.  CONSOL.

23   **A.**   Okay, I am here.

24   **Q.**   And directing your attention to the heading entitled

25   "Future of the Plan."  Do you see that?

     1    **A.**    I do.

     2    **Q.**    What does this provision relate to, Mr. Salvatori?

     3    **A.**    Once again, the reservation of rights language,

     4    allowing the company to amend, suspend, terminate the plan

     5    at any time.

     6    **Q.**    Okay.  And, to your knowledge, were these retiree SPDs,

     7    in fact, distributed to the retirees, people who would have

     8    been retired in 2010, Mr. Salvatori?

     9    **A.**    Yes.

    10    **Q.**    2010.  Let me take those back to make sure they get

    11    back where they belong.  You mentioned one of the other ways

    12    in which fiduciaries can indicate or issue directives was

    13    through the issuance of SMMs; is that correct?

    14    **A.**    Yes.

    15    **Q.**    And I'm going to show you -- well, give me a second.

    16    27.

    17                    MR. TORRES:  May I approach, Your Honor?

    18                    THE COURT:  You may.

    19    BY MR. TORRES:

    20    **Q.**    Mr. Salvatori, I'm going to show you what's been marked

    21    for identification as Defendant's Exhibit 27.  Focusing

    22    first on the first two pages of this document, Mr.

    23    Salvatori.

    24    **A.**    Okay.

    25    **Q.**    Bear with me.  I just need to move a binder out of the

1    way here and get some water.

2         Directing your attention to the first two pages of the

3    exhibit first, Mr. Salvatori.  Can you identify what that

4    is?

5    **A.**   Yes.  Once again, it is an e-mail from Marlene

6    Majireck, corporate HR person, to HR people in the field,

7    alerting them to the fact that we will be issuing a summary

8    of material modification that will be mailed to all of our

9    employees beginning in -- beginning at the end of August.

10   **Q.**   Okay.  And what's the date of this e-mail?

11   **A.**   August 26.

12   **Q.**   And did you receive this e-mail?

13   **A.**   I did.

14   **Q.**   And now, directing your attention to the attachment to

15   this document.  There is a page with some numbers which I

16   think were just a printing -- if you go beyond the page to

17   the next page after that and identify what that is, Mr.

18   Salvatori?

19   **A.**   This is the, the actual Summary of Material

20   Modifications.

21   **Q.**   And how far does that run in the rest of this exhibit,

22   Mr. Salvatori?

23   **A.**   The remainder.

24   **Q.**   Okay.  If you go to the last page, how many pages total

25   is the Summary of Material Modifications?

1    **A.**    13, I think -- 14.

2    **Q.**    Go one more page.

3    **A.**    14.

4    **Q.**    And this summary of --

5                MR. TORRES:  Defendants offer Exhibit 27, Your

6    Honor.

7                MR. PETSONK:  Your Honor, I do have an objection

8    here, because it's not clear -- I don't think he's

9    established which plan this Summary of Material Modification

10   applies to.  It's not clear that this is a -- this is a plan

11   that -- it's just a foundation for the evidence.  What it

12   relates to is not clear, Your Honor.

13               MR. TORRES:  I can fix it, Your Honor.

14               THE COURT:  And if Mr. Torres doesn't, you can

15   take the witness on the point.

16               MR. PETSONK:  Okay, thank you.

17   BY MR. TORRES:

18   **Q.**    Directing your attention to the first sentence of the

19   e-mail, Mr. Salvatori.

20   **A.**    Yes.

21   **Q.**    What does that describe this e-mail and documents

22   relate to?

23   **A.**    It is describing the plan changes for our employees

24   that are non-bargained hourly and salaried that took effect

25   on January 1, 2011.  That is when we split the two plants.

1    **Q.**   Okay.

2           MR. TORRES:  We offer Defendant's Exhibit 27, Your

3    Honor.

4           THE COURT:  Any objection?

5           MR. PETSONK:  I can just address my issues.

6       No objection, Your Honor.  Thank you.

7           THE COURT:  Admitted.

8       **Defendant's Exhibit 27 admitted.**

9    BY MR. TORRES:

10   **Q.**   So, Mr. Salvatori, you said that this document -- what,

11   if any, relation does the Summary of Material Modification

12   that is attached to the e-mail in Defendant's 27, what, if

13   any, relationship is there between that document and the

14   plan split that we talked about in 2011?

15   **A.**   This is the required mailing to participants, informing

16   them of the plan split.

17   **Q.**   Okay.  And drawing your attention to the first two

18   sentences of the e-mail.  So you were looking at them a

19   moment ago.

20   **A.**   Yes.

21   **Q.**   But the first two sentences of the e-mail below the

22   heading "Required documentation is being mailed"; do you see

23   that?

24   **A.**   I do.

25   **Q.**   Directing your attention to the first two paragraphs,

1    what are those -- what do those sentences explain regarding

2    the materials that are being distributed?

3    **A.**   They are explaining that these are materials for the

4    company's employees of non-bargained hourly employees and

5    salary, for the splitting or changing of the plan made on

6    January 1, 2011.  And in the last sentence, it is telling

7    the HR person at the mine sites just for information

8    purposes that these -- this is legal documentation

9    representing those plan changes.

10   **Q.**   Okay.  And what about the third sentence -- I'm

11   sorry -- the third and fourth sentences of that first

12   paragraph, what do those sentences explain?

13   **A.**   One is telling -- in the third sentence, it's just

14   telling the recipient what it is, a Summary of Material

15   Modifications, and it explains that in the rest of the

16   sentence.  And then it tells them this is a requirement of

17   the Department of Labor.

18   **Q.**   And then directing your attention to the first sentence

19   of the following paragraph, what does that reflect regarding

20   when these -- sorry -- strike that.

21        Directing your attention to the second paragraph of

22   this e-mail, Mr. Salvatori, what does that indicate as to

23   when this information was going to be sent out?

24   **A.**   It says, "The mailings will begin August 26th."

25   **Q.**   And then back to the first sentence of the second

```
 1    paragraph, in addition to documents being mailed, what, if
 2    anything, else does this reflect as to where this
 3    information would also be sent?
 4    A.   It said we will include them in our black boxes.  So,
 5    to explain, our new hires received what we call in HR, a
 6    black box.  It was literally a box that had all the
 7    different plan documents, SPDs, things that a new hire would
 8    need to know and learn, and that's the vehicle we gave it to
 9    them in during orientation, was what we called the black
10    box.
11    Q.   Okay.  Thank you.  Directing your attention to the
12    subject line of the e-mail, to whom was this information
13    being provided?
14    A.   Salary and non-bargained hourly employees.
15    Q.   And directing your attention to the last paragraph of
16    this e-mail, Mr. Salvatori, what does this also reflect
17    regarding where this information would also be contained?
18    A.   Again, it's referencing the CHRP, that's what we
19    called -- it'S a website, it's the internal website for the
20    HR Department and HR personnel to use to be able to
21    retrieve, print off important documents that are relevant
22    for our employees.
23    Q.   Okay.  And again, just to go back to the summary -- the
24    actual Summary of Material Modification that's attached to
25    the e-mail in Defendant's Exhibit 27, that's the 14-page
```

1    document you had identified earlier, correct?

2    **A.**   Yes.

3    **Q.**   And just briefly, what types of changes are being

4    discussed in this Summary of Material Modification?

5    **A.**   You know, looks like we were setting up another option

6    to choose from.  This is in addition to the split, which is

7    the primary reason we did it.  But outside of that, I would

8    say nothing of note.

9    **Q.**   Okay.  And, to the best of your knowledge, was the SMM

10   included in Defendant's Exhibit 27 distributed as described

11   in that exhibit?

12   **A.**   Yes.

13   **Q.**   Now, Mr. Salvatori, what, if anything, would have been

14   provided regarding the 2011 plan with regard to existing

15   retirees?

16   **A.**   A similar document would have been mailed to their

17   homes.  A similar Summary of Material Modification, to be

18   more exact.

19   **Q.**   Thank you.

20          MR. TORRES:  May I approach Mr. Salvatori?

21          May I approach, Your Honor?

22          THE COURT:  You may.

23   BY MR. TORRES:

24   **Q.**   Mr. Salvatori, I'm going to hand you what's been marked

25   for identification as Exhibits 28 and 29.  Start with

1    Exhibit 28, start with Defendant's 28.

2        Regarding Defendant's Exhibit 28, Mr. Salvatori, can

3    you identify this document?

4    **A.**    Yes, it's a Summary of Material Modifications that was

5    to be sent to our non -- our nonrepresented hourly retirees.

6    **Q.**    Okay.  And looking at the two photos at the bottom of

7    the documents, what does the one to the left indicate?

8    **A.**    It says, "Retiree P&M."  Again, P&M was the company's

9    internal nomenclature for nonrepresented hourly coal miners.

10   **Q.**    And above the numbers and CONSOL, there is a date

11   there; do you see that?

12   **A.**    I do.

13   **Q.**    What does that reflect?

14   **A.**    March 2012.

15   **Q.**    Okay.  And how does this document, Mr. Salvatori,

16   relate to the plans which you previously testified about?

17   **A.**    This is the legally required notice, we call it a

18   Summary of Material Modifications, that we needed to provide

19   to the participants in the plan at that time.

20   **Q.**    Okay.

21        MR. TORRES:  Your Honor, defendants offer Exhibit

22   28.

23        MR. PETSONK:  No objection.

24        THE COURT:  Admitted.

25        **Defendant's Exhibit 28 admitted.**

1    BY MR. TORRES:

2    **Q.**   And can you explain, Mr. Salvatori, what this document

3    actually reflects?  And again, I'm not asking you to go into

4    a lot of detail, but just generally, what is this general

5    information contained in the Summary of Material

6    Modification?

7    **A.**   Again, it primarily deals with highlighting coverage

8    levels, which would not have been materially changed from

9    the year before that, prior to the split.

10   **Q.**   Okay.

11   **A.**   So it was just a notice of the fact that it now existed

12   as its own separate plan.

13   **Q.**   Thank you.  And to the best of your knowledge, was this

14   SMM distributed to retirees on or about the date indicated?

15   **A.**   Yes.

16          MR. PETSONK:  Objection, Your Honor.  It's not

17   clear what date he's referenced.

18   BY MR. TORRES:

19   **Q.**   The date on the document is March '12, you previously

20   testified to, correct?

21   **A.**   Yes.

22   **Q.**   To your knowledge, was the SMM distributed to retirees

23   on or about March '12?

24   **A.**   Correct.

25   **Q.**   Yes.  Thank you.  Now, if you look at Exhibit 29, Mr.

1    Salvatori?

2    **A.**    Okay.

3    **Q.**    Can you identify this document?

4    **A.**    Corresponding Summary of Material Modifications that

5    was sent to the salaried retirees, regarding the splitting

6    of the benefit plans between active and retired.

7    **Q.**    And what's the date indicated on this document, Mr.

8    Salvatori?

9    **A.**    March 2012.

10   **Q.**    Okay.

11           MR. TORRES:  Defendants offer Exhibit 29, Your

12   Honor.

13           MR. PETSONK:  No objection, Your Honor.

14           THE COURT:  Admitted.

15       **Defendant's Exhibit 29 admitted.**

16   BY MR. TORRES:

17   **Q.**    And, Mr. Salvatori, again briefly, can you tell us what

18   this Summary of Material Modification generally addresses?

19   **A.**    It was generally addressing the fact that we just

20   created a new plan separated out of the one single plan.

21   Lays out for the reader, primarily, the benefit coverage

22   levels which would have been -- I'm pretty sure --

23   relatively unchanged from when it was a combined plan.

24   **Q.**    To the best your knowledge, was this SMM distributed to

25   salaried retirees on or about March 2012?

1    **A.**   Yes.

2    **Q.**   And, to your recollection, how would -- how would

3    Defendant's 28 and 29 have been distributed to retirees?

4    **A.**   U.S. Mail.

5    **Q.**   Okay.

6            MR. TORRES:  Could I have Defendant's Exhibit 8,

7    again, Josh?  Thank you.

8        May I approach, Your Honor?

9            THE COURT:  You may.

10   BY MR. TORRES:

11   **Q.**   Mr. Salvatori, we were talking before about Defendant's

12   8 and some of the medical plan provisions in it.  I wanted

13   to actually ask you, if you'd turn to the second page of

14   that exhibit, Mr. Salvatori.

15   **A.**   Yes.

16   **Q.**   There is a letter there.  Do you see that?

17   **A.**   I do.

18           THE COURT:  Mr. Salvatori, hold it up for me.

19           THE WITNESS:  (Witness complies.)

20           THE COURT:  Thank you.

21   BY MR. TORRES:

22   **Q.**   The two pages I was asking about, MSJ 3331 and MSJ --

23   and actually runs to MSJ 3333.  Do you see that?

24   **A.**   Yes.

25   **Q.**   And this is a letter entitled "Important Information

1   About Benefit Changes," correct?

2   **A.**   Yes.

3   **Q.**   And you testified that one of the ways that you would

4   communicate directives as fiduciary was to issue employee

5   communications, correct?

6   **A.**   Yes.

7   **Q.**   Looking at this particular letter -- I realize this

8   isn't from the time period that you were a fiduciary, but,

9   my question, Mr. Salvatori, about this document is, if you

10   turn to Page MSJ 3333, there is a reference at the top of

11   that document to "Medical Plan."  Do you see that?

12   **A.**   Yes.

13   **Q.**   And what does that state regarding the medical plan

14   that would have applied to nonrepresented employees at the

15   Buchanan Mine?

16   **A.**   It states that, effective August 1, 2004, the company

17   was changing the plan to exclude participation of anyone

18   hired or rehired after August 1, 2004.

19   **Q.**   Okay.  And when you became fiduciary, were you familiar

20   with that exclusion as it existed as of that point in time?

21   **A.**   Yes.

22   **Q.**   Okay.  And do you recall if CONSOL ever rescinded that

23   exclusion for nonrepresented employees?

24   **A.**   We did.  I think it was approximately three years or so

25   later, we retraced our steps and we put it back in.

```
 1                    MR. TORRES:  30.

 2                    May I approach, Your Honor?

 3                    THE COURT:  You may.

 4      BY MR. TORRES:

 5      Q.   Mr. Salvatori, I'm going to show you what's been marked

 6      for identification as Exhibit 30.  I'll take this back from

 7      you.

 8      A.   Okay.

 9      Q.   Please take a look at that document.  Are you familiar

10      with it?

11      A.   Yes.  This is the actual memo that I mentioned

12      previously that we put the benefits back in about three

13      years later.  The memo here is dated March 16, 2007.

14      Q.   Okay.  And how would you -- under what circumstances

15      did you become familiar with this type of communication, Mr.

16      Salvatori?

17      A.   Through the standard communication to HR personnel and

18      the like.

19      Q.   When you became fiduciary several years later, how did

20      you become familiar with this type of information?

21      A.   Oh, just reviewing the documents that we kept on file

22      in the employee benefits group.

23                    MR. TORRES:  Your Honor, defendants offer exhibit,

24      Defendant's 30.

25                    MR. PETSONK:  No objection.
```

```
 1              THE COURT:  Admitted.
 2         Defendant's Exhibit 30 admitted.
 3              MR. TORRES:  May I have just one moment, Your
 4    Honor?
 5              THE COURT:  You may.
 6              MR. TORRES:  Thank you.
 7    BY MR. TORRES:
 8    Q.   Other than the letters that we've been looking at, Mr.
 9    Salvatori, what other means of -- what other types of
10    materials would you use to communicate with employees
11    regarding their benefits?
12    A.   Summary Plan Descriptions and SMMs.
13    Q.   Anything else during the annual enrollment period,
14    what, if any, information would you use to communicate with
15    employees?
16    A.   For our active employees, I guess maybe somewhere
17    between 10 and 15 years ago, we put in an annual enrollment
18    process to allow employees to select from a menu of plans
19    that dealt with different levels of benefits and things like
20    that.  That enrollment process would always occur in the
21    fall, to be effective January 1 of the following year.  So
22    we've had enrollment documents be issued, like I said, for
23    the last 10 to 15 years.
24              MR. TORRES:  May I approach, Your Honor?
25              THE COURT:  You may.
```

1    BY MR. TORRES:

2    **Q.**   Mr. Salvatori, I'm going to show you what's been marked

3    for identification as Defendant's Exhibit 31.  Review that

4    document and tell me if you're familiar with it.

5    **A.**   I am.

6    **Q.**   What is it?

7    **A.**   This is the Enrollment Guide for the benefits that

8    would be effective in 2013.  So this typically would have

9    been mailed out in the fall of 2012, and later in the fall,

10   we would usually have a two-week what we called open

11   enrollment period for our employees to go in and make their

12   benefit elections for, in this case, 2013.

13   **Q.**   In this particular one dated 2013, you said this would

14   have been issued some time in 2012?

15   **A.**   Yes.  Probably September, October time frame.

16   **Q.**   Okay.  And that's -- that's during the time period when

17   you were the named fiduciary, correct?

18   **A.**   Yes.

19           MR. TORRES:  Your Honor, defendants offer

20   Defendant's 31.

21           MR. PETSONK:  No objection.

22           THE COURT:  Admitted.

23           **Defendant's Exhibit 31 admitted.**

24   BY MR. TORRES:

25   **Q.**   Then, Mr. Salvatori, if you would turn to the second

1    page of this document, which is CONSOL 18886?

2    **A.**   Yes.

3    **Q.**   And directing your attention to the -- there is a

4    picture, and then there is some text below that.  Do you see

5    that?

6    **A.**   I do.

7    **Q.**   Directing your attention to the second-to-last sentence

8    in that text area.  Are you there?

9    **A.**   Yes.

10   **Q.**   What does that sentence relate to, Mr. Salvatori?

11   **A.**   Again, the reservation of rights language that says the

12   company can amend or terminate, suspend the programs at any

13   time for any reason.

14   **Q.**   To your recollection, Mr. Salvatori, how many of the

15   Enrollment Guides that were issued over that 15-year period

16   you just testified to would have included this reservation

17   of rights language?

18   **A.**   All of them.

19          MR. TORRES:  Could I get Defendant's 21, Josh?

20   Thank you.

21       May I approach, Your Honor?

22          THE COURT:  You may.

23   BY MR. TORRES:

24   **Q.**   Mr. Salvatori, I'm going to show you what's already

25   been introduced into evidence as Defendant's Exhibit 21.

1    Are you familiar with this document?

2    **A.**   I am.

3    **Q.**   What is it?

4    **A.**   Well, different than the employees that did an open

5    enrollment every year, the retirees plans remained -- I

6    won't say unchanged, but they didn't have to enroll in them

7    each year to continue to participate.  We'd send these out

8    periodically, I'd say roughly yearly, just to summarize the

9    benefits they were eligible for, as, you know, as a

10   participant in the plan.

11   **Q.**   Okay.  And directing your attention to the last --

12   there is a box at the bottom of the page?

13   **A.**   Yes.

14   **Q.**   And it starts with "Note"; do you see that?

15   **A.**   Yes.

16   **Q.**   And then the last sentence that begins, "CONSOL

17   Energy," do you see that?

18   **A.**   I do.

19   **Q.**   What does that provision and what does that language --

20   without reading it verbatim -- what does that language

21   relate, Mr. Salvatori?

22   **A.**   Once again, the reservation of rights language that we

23   talked about before that stipulate that the company can

24   terminate, suspend, modify, or amend the Plan at any time.

25   **Q.**   And, to your knowledge, Mr. Salvatori, how many of the

SALVATORI - DIRECT

1    benefits in -- I'm sorry -- how many of the Highlights

2    documents that CONSOL issued contained that language?

3    **A.**   All of them.

4            MR. TORRES:  Could I see Plaintiff's 12, Josh?

5    Plaintiff's 12.

6            THE CLERK:  Oh, Plaintiff's 12.

7            MR. TORRES:  Thank you.

8        May I approach, Your Honor?

9            THE COURT:  You may.

10   BY MR. TORRES:

11   **Q.**   Mr. Salvatori, I'm going to show you what's already

12   been introduced into evidence as Plaintiff's Exhibit 12.  If

13   you could look at that document?

14   **A.**   Okay.

15   **Q.**   Are you familiar with it?

16   **A.**   I am.

17   **Q.**   What is it?

18   **A.**   This is a document that was typically prepared when we

19   were going through a layoff to be provided to the affected

20   employee.

21   **Q.**   Okay.  And if you look at the bottom of this page,

22   there is a section that starts, "Note."  Do you see that?

23   **A.**   I do.

24   **Q.**   And then if you go to the third line of that entry, Mr.

25   Salvatori -- are you there?

1    **A.**    Yes.

2    **Q.**    There is a sentence that begins, "All Plans."  Do you

3    see that?

4    **A.**    I do.

5    **Q.**    What does that language state to the reader?

6    **A.**    It states that all plans are subject to change or

7    termination by CONSOL at any time.  Again, the reservation

8    of rights language.

9    **Q.**    And how many of the Benefits Information Sheets that

10   CONSOL issued included that same language?

11   **A.**    All of them.

12   **Q.**    I'll take that.

13        MR. TORRES:  Thank you, Josh.

14   Josh, could I see Plaintiff's Exhibit 8, please?

15   May I approach, Your Honor?

16        THE COURT:  You may.

17   BY MR. TORRES:

18   **Q.**    Mr. Salvatori, I'm going to show you what's already

19   been introduced into evidence as Plaintiff's Exhibit 8.  And

20   before I ask you about this specific document, you had

21   previously testified that CONSOL sold certain assets to

22   Murray Energy, correct?

23   **A.**    They were in the form of a stock sale, but, yes.

24   **Q.**    Okay.  I apologize.  There was a stock sale to Murray

25   Energy.  Do you remember when that sale became effective?

1   **A.**   Yes, early December of 2013.

2   **Q.**   Okay.  And in connection with that stock sale to Murray

3   Energy, what specific parts of CONSOL were sold via that

4   stock sale?

5   **A.**   Primarily, it was Consolidation Coal Company, that was

6   the largest subsidiary, and, as I remember, these

7   subsidiaries that had all, at the time, currently producing

8   assets, coal mines.

9   **Q.**   Okay.  And in connection -- in addition to the sale

10   of -- most of Consolidation Coal Company, what, if any,

11   retiree liabilities were sold to Murray or transferred to

12   Murray in connection with that 2013 sale?

13   **A.**   So since it's a stock sale, they obviously acquired

14   the ownership of all of the assets, but they also acquired

15   all the liabilities that were associated with them as well,

16   which would have included for the personnel that had been

17   employed by Consolidation Coal Company previously, their

18   retiree medical liability.

19   **Q.**   Okay.  And then directing -- and you said that that

20   deal closed in 2013?

21   **A.**   It did.

22   **Q.**   And if you look at Plaintiff's Exhibit 8, the first

23   page of that document is a letter.  This one to Mr. Long,

24   but from CONSOL Energy; is that correct?

25   **A.**   It is.

1    **Q.**   So focusing on the first page -- well, let me -- just

2    to be clear, Plaintiff's Exhibit 8, there is -- before I ask

3    you the question -- there is a series of letters in this

4    exhibit, correct?

5    **A.**   Yes.

6    **Q.**   Okay.  Of the letters that are contained in Plaintiff's

7    Exhibit 8, which of these letters were issued by CONSOL?

8    **A.**   Only the one on the front page.

9    **Q.**   So just the one on -- that is indicated as MSJ 987?

10   **A.**   Correct.

11   **Q.**   So looking at MSJ 987, it's got CONSOL Energy at the

12   top of the page, correct?

13   **A.**   Correct.

14   **Q.**   And what's the date of this?

15   **A.**   March 14th, 2014.

16   **Q.**   Okay.  And can you explain what this was communicating

17   -- what was this letter communicating to -- strike that.

18        This is addressed to Mr. Long, correct?

19   **A.**   Yes.

20   **Q.**   How was Mr. Long affected by the sale of the

21   Consolidation Coal assets to Murray?

22   **A.**   His eligibility for retiree medical was part of that

23   liability of Consolidation Coal Company, so it went to

24   Murray Energy as a part -- you know, condition of the sale.

25   **Q.**   Okay.  So this letter to Mr. Long from CONSOL, can you

1    explain briefly what this was communicated?

2    **A.**   Yeah.  Normally, in transactions -- this was a very

3    large transaction that took months to complete.  At the

4    point of closing, very often the company doing the acquiring

5    is not yet set up to be able to administer the benefits, in

6    this case, if they've agreed to do that.

7    **Q.**   Okay.

8    **A.**   So we entered a contractual agreement with Murray

9    Energy where we would administer the benefits for a period

10   of time, I believe that was through March 31, 2014.  Of

11   course, Murray Energy had to reimburse us for the costs

12   incurred.  But that simply allowed them time to get their

13   systems up-to-date and ready to take this group, in this

14   case, of retirees.

15   **Q.**   Okay.  And so what was this letter informing Mr. Long?

16   **A.**   It was telling him that that contractual period that we

17   had with Murray to administer benefits on Murray Energy was

18   ending, and effective March 31, he would become part of

19   Murray Energy benefit plan.

20   **Q.**   Got it.  Thank you.  And if you turn to the second page

21   of this exhibit, there is, this is an April 8, 2014, letter

22   from Murray Energy, correct?

23   **A.**   It is.

24   **Q.**   And who at CONSOL had any role in preparing this April

25   8 letter, Mr. Salvatori?

1    **A.**    No one.

2    **Q.**    Okay.  And this letter from Murray Energy is stating

3    that they are intending to terminate retiree medical

4    benefits that they assumed from CONSOL as of December 31,

5    2014; is that correct?

6    **A.**    That's correct.

7    **Q.**    And at the time of this sale, you were the VP of HR,

8    correct?

9    **A.**    I was.

10   **Q.**    And what, if any, involvement did CONSOL have in the

11   Murray Energy decision to terminate the retiree medical

12   benefits that are being discussed in Murray's April 8, 2014,

13   letter?

14   **A.**    None.

15   **Q.**    Did anyone from Murray Energy advise CONSOL that they

16   were going to terminate these benefits?

17   **A.**    No.

18   **Q.**    Was the termination of those benefits by Murray Energy

19   a condition of the sale of these assets to Murray Energy?

20   **A.**    No.

21   **Q.**    I'll take that back, Mr. Salvatori.  Thank you.

22           MR. TORRES:  May I have Plaintiff's Exhibit 10-A

23   and 12 -- I'm sorry -- 10-A and 14, I apologize.

24           THE COURT:  Mr. Torres, how much longer will you

25   be with the witness?

```
 1              MR. TORRES:  I probably have another 20 to 30
 2   minutes, Your Honor.  If you would like to break --
 3              THE COURT:  Is this a good point to break?
 4              MR. TORRES:  This is a perfectly good time, Your
 5   Honor.
 6              THE COURT:  We'll do that.
 7        Mr. Salvatori, during the break, treat yourself as
 8   though you are on the witness stand in the sense that you
 9   are not to discuss the case with anyone unless the Court
10   gives you permission to do so.  And if you need any relief
11   from that direction, let me know.
12        We'll be back in 20 to 30 minutes.
13        And if you need to go to the lobby, I'm asking the
14   witnesses to go through the Court's chambers, that is, the
15   hallway, and that is right through this door here.
16              THE WITNESS:  Okay.
17              THE COURT:  If you wish to get back to the lobby
18   now, you're welcome to come right through that way now.
19              THE WITNESS:  Okay.
20              THE COURT:  Thank you.
21              THE WITNESS:  Thank you.
22              THE CLERK:  All rise.
23        (A recess was taken at 11:04 a.m. until 11:31 a.m.)
24        (Proceedings resumed at 11:31 a.m.)
25              THE CLERK:  All rise.
```

```
1              THE COURT:  Please be seated.

2                 DIRECT EXAMINATION RESUMED

3    BY MR. TORRES:

4    Q.   Mr. Salvatori, based on the various roles that you've

5    held at CONSOL that you testified about today, are you

6    familiar with employee orientation materials that were used

7    at the various mine locations that we've been discussing

8    today?

9    A.   Yes.

10   Q.   I wanted to show you what's been previously introduced

11   as Plaintiff's Exhibit 10-A.  And I wanted to, in

12   particular, direct your attention to the top paragraph of

13   these two pages?

14   A.   Okay.

15   Q.   Have you seen this information before, Mr. Salvatori?

16   A.   Yes.  I've seen it as part of a larger script that was

17   used the late '80s, early '90s at orientation, orientation

18   script at some of our coal mines.

19   Q.   Do you remember which coal mines?

20   A.   I saw Enlow Fork, and I saw one reference to CONSOL

21   Pennsylvania Coal Company, but, at the time, that would have

22   been Bailey Mine.

23   Q.   Okay.  Let's stick with Plaintiff's Exhibit 10-A for a

24   moment, the top paragraph, top language in this document.

25   And I think you answered my question, but just to make it
```

 1    clear, do you recall based on your prior review of this

 2    information what time period it related to?

 3    **A.**   Late '80s, early 1990s.

 4    **Q.**   And, to your knowledge, what other time periods was

 5    this document used at CONSOL?

 6    **A.**   I'm unaware of any other time period that it was used

 7    at CONSOL.

 8    **Q.**   And based on the records that you are aware of, what

 9    other locations was this information used at Bailey Mine?

10    **A.**   In addition to Bailey Mine -- I can't say.  I don't

11    know if it was used at other locations, frankly.  I've only

12    seen those two.

13    **Q.**   For Bailey Mine and Enlow Fork?

14    **A.**   Yes.

15    **Q.**   And directing -- I want to show you what's been

16    introduced as Plaintiff's Exhibit 14.  And, again, have you

17    seen this information before?

18    **A.**   Yes.

19    **Q.**   Okay.  And again, we're just focused on the top of the

20    first page?

21    **A.**   Okay.

22    **Q.**   And the -- really up to the words "Right to change."

23          Do you see that?

24    **A.**   Yes.

25    **Q.**   And the first page, the first -- top of the page there

1    are five lines -- six lines, we are just looking at the top

2    five lines after the words, "The right to change them."

3         Do you see that?

4    **A.**   Yes.

5    **Q.**   And again, do you recall, do you recall seeing this

6    information before?

7    **A.**   I do.

8    **Q.**   Okay.  What was it part of?

9    **A.**   It was part of a larger script that was used at the

10   mine sites in this case, Bailey Mine and Enlow, as part of

11   the orientation process for new employees.

12   **Q.**   And do you recall what time period Plaintiff's Exhibit

13   14 relates to?

14   **A.**   Same time period.  It would have been late '80s, early

15   '90s.

16   **Q.**   And, to your knowledge, what other time periods was

17   this document used?

18   **A.**   I have no knowledge of it used other than that time

19   period.

20   **Q.**   Okay.  And again, to your knowledge, what other

21   locations are you aware of that document being used?

22   **A.**   I've only seen it related to these two locations.

23   **Q.**   Okay.  Thank you.  I'll take those back.

24        And, Mr. Salvatori, I believe that you are aware of, in

25   addition to at one point being a defendant in this matter ,

1    there are several other corporate defendants other than

2    CONSOL; is that correct?

3    **A.**    Yes.

4    **Q.**    Consolidation Coal, right?

5    **A.**    Yes.

6    **Q.**    Fola Coal Company, correct?

7    **A.**    Correct.

8    **Q.**    CONSOL of Kentucky?

9    **A.**    Correct.

10    **Q.**    And CONSOL of Pennsylvania Coal Company, correct?

11    **A.**    Correct.

12    **Q.**    Based upon the various positions you've held during the

13    time period you've testified today, Mr. Salvatori, what, if

14    any, independent actions were those other corporate

15    defendants I just listed able to take regarding CONSOL's

16    benefit plans?

17    **A.**    They were not able to take any actions related to

18    CONSOL's benefit plans.  That was reserved for the Board of

19    Directors of CONSOL Energy.

20    **Q.**    Okay.  Mr. Salvatori, in the time period that you were

21    VP of HR from 2011 to 2016 --

22    **A.**    Yes.

23    **Q.**    -- you testified you were also the named fiduciary,

24    correct?

25    **A.**    Correct.

SALVATORI - DIRECT

1    **Q.**    Were all actions that you took during that time period

2    in your capacity as a fiduciary of CONSOL's benefit plans?

3    **A.**    No.

4    **Q.**    When during that time period would you act as a

5    fiduciary?

6    **A.**    Only in the situations where -- that were related to

7    the administration of the benefit plans themselves.

8    **Q.**    Okay.  And, Mr. Salvatori, at any time while you were

9    acting as a fiduciary for CONSOL, CONSOL's medical benefit

10   plans for nonrepresented employees, what, if any, authority

11   did you delegate to anyone else to alter the written terms

12   of any CONSOL -- any of CONSOL's medical benefit plans?

13   **A.**    None.

14   **Q.**    And at any time while you were acting as fiduciary for

15   any CONSOL medical benefit plan for nonrepresented

16   employees, what, if any, misrepresentations did you directly

17   communicate to employees or retirees regarding the terms of

18   any of CONSOL's medical benefit plans?

19   **A.**    None.

20   **Q.**    At any time while you were acting as fiduciary for any

21   CONSOL medical benefit plan for nonrepresented employees,

22   what, if any, incomplete information did you directly

23   communicate to employees or retirees regarding the terms of

24   any CONSOL medical benefit plan?

25   **A.**    There was none.

1    **Q.**   And at any time when you were acting as a fiduciary for

2    any CONSOL's medical benefit plan for nonrepresented

3    employees, what, if any, lies did you directly communicate

4    to employees or retirees regarding the terms of any CONSOL's

5    medical benefit plans?

6    **A.**   None.

7    **Q.**   And at any time while you were acting as a fiduciary

8    for any CONSOL nonrepresented -- for any CONSOL medical

9    benefit plan for nonrepresented employees, what, if any,

10   promises of lifetime benefits did you directly communicate

11   to employees or retirees regarding the terms of any such

12   plan?

13   **A.**   None.

14   **Q.**   At any time while you were acting as a fiduciary for

15   any of CONSOL's medical plans for nonrepresented employees,

16   what, if any, promises of vested benefits did you directly

17   communicate to employees or retirees regarding the terms of

18   any such plan?

19   **A.**   None.

20   **Q.**   At any time while you were acting as a fiduciary for

21   any of CONSOL's medical benefit plans for nonrepresented

22   employees, what, if any, statement did you directly

23   communicate to employees or retirees that the reservation of

24   rights clause did not apply to retiree medical benefits?

25   **A.**   None.

 1    **Q.**   Mr. Salvatori, before you were the named fiduciary, are

 2    you familiar with the other individuals who served in that

 3    capacity in the time period 1980, up until the time that you

 4    were appointed fiduciary?

 5    **A.**   I am.

 6    **Q.**   Okay.  Who was the named fiduciary immediately prior to

 7    yourself?

 8    **A.**   From January 2010 to September of 2011, the named

 9    fiduciary was Michael McClean [phonetic].

10    **Q.**   Okay.  And other than being a fiduciary, what other

11    positions did he hold at CONSOL?

12    **A.**   Vice President of Human Resources.

13    **Q.**   Prior to Mr. McClean, who was the named fiduciary?

14    **A.**   An individual named Albert Aloia.

15    **Q.**   How do you spell his last name?

16    **A.**   A-L-O-I-A.  That was from around 2008 up through 2009,

17    and he also functioned as the Vice President of Human

18    Resources.

19    **Q.**   Okay.  Prior to Mr. Aloia, who was the fiduciary for

20    CONSOL's benefit plans?

21    **A.**   An individual named Patricia Lang.  She was the

22    fiduciary and the VP of Human Resources, from approximately

23    2004 through 2007.

24    **Q.**   Okay .  And prior to Ms. Lang, who was the fiduciary

25    for CONSOL's benefit plans?

1    **A.**    That individual was Jack Holt.  He was in that position

2    from 2002 to 2003, and he was also the Vice President of

3    Human Resources.

4    **Q.**    Before Mr. Holt, who was the fiduciary for CONSOL's

5    benefit plans?

6    **A.**    From mid-'99 up through when Mr. Holt took the job in

7    '01 or '02, it was Karen Ziemba, Z-I-E-M-B-A.  And she was

8    also the Vice President of Human Resources.

9    **Q.**    Who was the fiduciary for CONSOL's benefit plans prior

10   to Ms. Ziemba?

11   **A.**    Buck Hyler, H-Y-L-E-R.

12   **Q.**    And what time period did Mr. Hyler serve as the

13   fiduciary for CONSOL's benefit plans?

14   **A.**    From '91 up through his retirement in '99.

15   **Q.**    Prior to Mr. Hyler, who was the named fiduciary for

16   CONSOL's benefit plans?

17   **A.**    An individual named Roger Haynes.

18   **Q.**    Okay.  And what time period did he serve?

19   **A.**    Up to 1991, but during the 1980s.

20   **Q.**    Okay.  And when you became named fiduciary, Mr.

21   Salvatori, what kind of records existed regarding the prior

22   actions of the other individuals who had functioned as a

23   fiduciary of CONSOL's benefit plans?

24   **A.**    Those records primarily resided -- or did reside with

25   our employee benefits group.

1    **Q.**    And what types of records did they consist of?

2    **A.**    Plan documents, Summary Plan Descriptions, Summary of

3    Material Modifications, some participant communications --

4    just the general stuff that I've mentioned before that I've

5    dealt with in my own position.

6    **Q.**    And you said those documents are maintained in the

7    Employee Benefits Department?

8    **A.**    Correct.

9    **Q.**    And are they maintained in the ordinary course of

10   CONSOL's business?

11   **A.**    Yes.

12   **Q.**    And would you have occasion to review those historical

13   records in the course of your duties as named fiduciary?

14   **A.**    Yes.  Primarily, in times when, you know, a retiree or

15   employee made an ERISA type claim and we had to research,

16   there were times we'd go back and look.  And so things like

17   that.

18   **Q.**    Okay.  Based on your familiarity with the records you

19   just identified, Mr. Salvatori, what directives exist in

20   those records from any fiduciary for CONSOL's medical

21   benefit plan that delegate to anyone else the authority to

22   alter the written terms of any such plan?

23           MR. PETSONK:  I'm going to object, Your Honor.

24           THE COURT:  Sustained.

25           MR. TORRES:  Your Honor, he's testified he

 1     referred to those documents in the course of his business.

 2     He's allowed to testify as to what he --

 3          THE COURT:  Well, if you want to make an elaborate

 4     foundation as to what those records were and what his

 5     knowledge of them would be, you may undertake to do that,

 6     but the question is not to be asked until the Court rules on

 7     the objection.

 8          MR. TORRES:  Understood, Your Honor.

 9     BY MR. TORRES:

10     **Q.**   For what period of time, Mr. Salvatori -- in the course

11     of your duties as fiduciary, for what period of time did you

12     review the records regarding the prior actions of other

13     fiduciaries who served at CONSOL?

14     **A.**   It would have been periodically throughout my service

15     as the fiduciary of the plan and Vice President of HR.

16     **Q.**   Okay.  And for what time period would you have reviewed

17     those records?

18     **A.**   It could go back into the '80s and '90s.  Typically, I

19     didn't see much before that, obviously, because many cases

20     were retiree plans.  So -- but in the 2000s -- and we

21     generally needed to have an understanding of the history, as

22     well, as we moved forward with administering the plan and

23     making any changes that we saw fit to be made and propose.

24     **Q.**   And again, you said you -- what types of information

25     would you review then for the -- or have you reviewed from

1    those prior time periods that you identified from 1980 to --

2    throughout your time as the fiduciary of the benefit plan?

3    **A.**   Primarily, plan documents and Summary Plan Descriptions

4    were the primary things that we relied upon.  And in that

5    period of time, as I mentioned in my prior testimony, up

6    until 2011, those documents were one in the same.  So if you

7    had an SPD, you had a plan document.

8    **Q.**   And you previously testified that in addition to --

9    what else other than plan documents and SPDs, based on your

10   role as the named fiduciary, would you use to communicate

11   directives regarding your actions as a named fiduciary?

12   **A.**   Summary of Material Modifications and general plan

13   participant communications, much like we've seen here

14   earlier today that you have put into evidence.

15   **Q.**   Based upon the records that you have reviewed, Mr.

16   Salvatori, in your role as the fiduciary of the plan during

17   the time period you identified, what directives exist in

18   those records you reviewed from any fiduciary for CONSOL's

19   medical benefit plan that delegate to anyone else the

20   authority to alter the written terms of any such plan?

21          MR. PETSONK:  Your Honor, objection.

22          THE COURT:  State the basis of it.

23          MR. PETSONK:  He has identified plan documents,

24   including the plans, the Summary Plan Descriptions and the

25   Summaries of Material Modifications, and Mr. Salvatori has

 1   identified that he reviewed communications to plan

 2   participants.  And so I would -- I would object that his --

 3   to the extent Mr. Torres is attempting to elicit testimony

 4   about communications outside of those plan documents, and

 5   those documents communicating directly to plan participants.

 6        The question is seeking to elicit testimony about other

 7   directives for which he has not established a foundation.

 8             THE COURT:  Mr. Torres, so far this witness has

 9   testified that he's ready to answer that question on the

10   basis of the plan documents that have already been put into

11   evidence.  He's already told us what they contain.  He

12   doesn't seem to have any reference to any other records.

13        And based on that, the objection is sustained.

14             MR. TORRES:  May I be heard, Your Honor?

15             THE COURT:  Pardon?

16             MR. TORRES:  May I be heard on that, Your Honor?

17             THE COURT:  I think we need to go forward.  If you

18   don't have any evidence that this witness knew what other

19   records were than these, and we already know what he's

20   talking about, then we've already heard as much as he can

21   tell us.

22             MR. TORRES:  I understand, Your Honor.

23        May I have just one minute, Your Honor?

24             THE COURT:  You may.

25        (Pause.)

1          MR. TORRES:  Thank you, Your Honor.  Nothing

2     further.

3          MR. PETSONK:  Your Honor, if I may?  Before I

4     begin to inquire of the witness, my inquiry will be relying

5     on a great number of documents, and I wanted to ask the

6     Court whether it may be preferable for me to undertake my

7     questioning from my seat here so that I can have the benefit

8     of my documents without a bunch of back and forth.

9          THE COURT:  It's your option.

10          MR. PETSONK:  Thank you, Your Honor.

11                    **CROSS-EXAMINATION**

12     **BY MR. PETSONK:**

13     **Q.**   Mr. Salvatori?

14     **A.**   Yes, sir.

15     **Q.**   Do you still have in front of you the exhibits that Mr.

16     Torres had questioned you about?

17     **A.**   Some of them.

18     **Q.**   Do you have Defendant's Exhibit 16?

19     **A.**   16, did you say?

20     **Q.**   Correct.

21     **A.**   I do not.

22          MR. PETSONK:  May I approach the witness, Your

23     Honor?

24          THE COURT:  You may.

25          THE WITNESS:  Thank you.

1    BY MR. PETSONK:

2    **Q.**   Do you recall being questioned about this exhibit

3    earlier today?

4    **A.**   I do.

5    **Q.**   And this is labeled on the first page as a Summary Plan

6    Description Employees -- Production and Maintenance

7    Employees at AMVEST West Virginia Coal and its subsidiaries.

8        Do you see that?

9    **A.**   Correct.

10   **Q.**   But inside, on the page stamped 5611, it actually

11   indicates it refers to the retiree benefits for AMVEST; is

12   that right?

13   **A.**   Correct.

14   **Q.**   And if you flip back to page 5646, the page that's

15   Bate-stamped 5646?

16   **A.**   Okay.

17   **Q.**   You see that it lists the Vice President of Human

18   Resources as the Plan Administrator in a box in the middle

19   of the page?  Do you see that?

20   **A.**   I do.

21   **Q.**   And then down in the second-to-last paragraph, it says,

22   the named fiduciary of the Plan is the plan administrator;

23   is that right?

24   **A.**   Correct.

25   **Q.**   And you testified earlier that all these SPDs are

1    virtually identical; is that right?

2    **A.**    Yes.

3    **Q.**    I could go through each of them one-by-one, but is it a

4    fair understanding to say that each of these SPDs that you

5    reviewed today in your testimony similarly identifies the

6    fiduciary as the -- as the Vice President of Human

7    Resources?

8    **A.**    It does.

9    **Q.**    Okay.  So if a plan beneficiary was trying to figure

10   out who his fiduciary was, I guess, he'd just have to ask

11   somebody who was the Vice President of Human Resources,

12   right?

13           MR. TORRES:  Object to the form of the question,

14   Your Honor.

15           THE COURT:  Restate the question.

16   BY MR. PETSONK:

17   **Q.**    If a plan beneficiary was trying to figure out who his

18   fiduciary was, he would have to ascertain somehow who was

19   the Vice President of Human Resources at CONSOL at that

20   time; is that right?

21   **A.**    I'd say that's correct.

22           MR. PETSONK:  Your Honor, if I may approach the

23   witness, again?

24           THE COURT:  You may.

25           MR. PETSONK:  Thank you, Your Honor.

1    BY MR. PETSONK:

2    **Q.**   Mr. Salvatori.

3    **A.**   Thank you.

4           THE COURT:  What exhibit are you handing the

5    witness?

6           MR. PETSONK:  I've just handed the witness an

7    exhibit that's been labeled Plaintiff's 19, Your Honor.

8    BY MR. PETSONK:

9    **Q.**   Now, I have a question first about a document that I

10   believe you also have in front of you, Mr. Salvatori,

11   that was previously labeled Defendant's 24.  Do you see

12   that?

13   **A.**   Yes, I have it here.

14   **Q.**   And if you flip to the page numbered 5 in that

15   document, this is the retiree health and welfare plan,

16   effective as of January 1, 2011, for CONSOL Energy?

17   **A.**   Yes.

18   **Q.**   And you see that page is Bate-stamped 4449.  And it

19   says in paragraph 5.1 that the company is the named

20   fiduciary for the plan.  Do you see that?

21   **A.**   It says, "The Company shall be responsible for the

22   administration of the Plan."

23   **Q.**   Do you see the last sentence?

24   **A.**   Yes, I'm sorry.  "The company is the named fiduciary."

25   **Q.**   And if you flip back to page 2, which is Bate-stamped

```
 1    4446, it states that "Company" means "CONSOL Energy,

 2    Incorporated," right?

 3    A.   What was that number again?

 4    Q.   4446?

 5    A.   Yes, it does.

 6    Q.   And so then what I've marked as Plaintiff's 19 is a

 7    document that summarizes various subject matter regarding

 8    presentations made by CONSOL Energy to its employees.  Can I

 9    ask you, is this document familiar to you?

10    A.   I don't recall seeing it before, but I may have.

11    Q.   Okay.  Earlier, Mr. Torres was asking you about your

12    knowledge of communications made by CONSOL to its employees

13    about their retiree benefits?

14    A.   Yes.

15    Q.   Do you remember that?

16    A.   I do.

17    Q.   And you mentioned you were aware of new employee

18    orientation meetings?

19    A.   Yes.

20    Q.   And you mentioned -- and you are aware that in those

21    meetings, CONSOL described their retiree welfare benefits,

22    right?

23    A.   Yes, to some degree, I would agree, yes.

24    Q.   And you also mentioned in -- beginning around 2010, I

25    think you said, that CONSOL had annual enrollment meetings
```

1    where they described benefits to their employees; is that

2    right?

3    **A.**   We did annual enrollment mailings.  I would

4    characterize whether we did meetings with the employees to

5    go through it only in the years where there was major

6    changes to the benefit plan offerings.  So we did do them; I

7    wouldn't characterize them as every year.

8    **Q.**   Okay.  And if you look on the first page of this

9    document that's labeled Plaintiff's 19 -- well, I'm going to

10   say that, Mr. Salvatori, this is a summary of presentations

11   that CONSOL made to its employees between the years 1984 and

12   2015.  And this summary was tendered by a corporate witness

13   in a 30(b)(6) deposition in this case.  And so I'm going to

14   ask you whether you know if CONSOL described what is known

15   as -- well, step back.

16        Do you know what CONSOL refers to as the union-free

17   advantage?

18   **A.**   I've heard that phrase used, yes.

19   **Q.**   And what do you understand that it means?

20   **A.**   Well, it basically was a -- a comparison of all aspects

21   of the compensation benefits and worksite rules comparing a

22   nonunion worksite with worksites that were signatory to one

23   of the National Bituminous Coal Wage Agreements.

24   **Q.**   And when this document references the contents of new

25   employee orientations, in the fourth line down, is that the

```
1    -- do you see where it says union-free advantages listed in
2    that line as part of the contents of new employee
3    orientations?
4    A.    I do.
5    Q.    Do you have any reason to believe that there is more
6    that was presented in the new employee orientations beyond
7    what's set forth in the contents that are summarized by the
8    company in the document?
9              MR. TORRES:  Objection to the form of the question
10   and for lack of foundation, Your Honor.
11             THE COURT:  Your response?
12             MR. PETSONK:  I'm not sure I understand the form.
13   I can -- I can rephrase the question as to -- as to the
14   foundation for his knowledge, but I'm inquiring about the
15   corporate representation here.
16             MR. TORRES:  Well, he hasn't established that
17   there is a corporate representation here.  It's a hearsay
18   document.  He hasn't established this witness has any
19   personal knowledge of it or -- all he's said is that this
20   was presented during a 30(b)(6) deposition.  He hasn't
21   established that Mr. Salvatori was the witness.  He hasn't
22   established Mr. Salvatori had any role in compiling this
23   information.  And having Mr. Salvatori guess or testify as
24   to what some other individual testified to, Your Honor, is
25   hearsay, and, in addition to not having established any
```

1    adequate foundation to try and get this document in through

2    this witness.

3         So before he starts asking questions about it, I think

4    he needs to satisfy both of them.

5              THE COURT:  And so fundamentally, initially, the

6    admissibility of the document needs to be addressed.

7         And so you can do that now.

8              MR. PETSONK:  Well, Your Honor, the witness has

9    testified that he does have personal knowledge that CONSOL

10   presented the union-free advantage.  He knows -- he knows

11   what the union-free advantage is.  And I intend to ask him

12   with reference to this document what personal knowledge he

13   has about the presentation made by CONSOL to the employees

14   regarding that union-free advantage at various times.

15             MR. TORRES:  But, Your Honor, this doesn't reflect

16   the contents of any union-free advantage.  It's a summary

17   document, which he still hasn't identified the individual

18   has personal knowledge of.

19        If he wants to ask Mr. Salvatori what he recalls or

20   believes was presented in one of those presentations, he's

21   certainly free to do that, but he can't try and get this

22   hearsay document in in the guise of pretending that Mr.

23   Salvatori necessarily knows that it's accurate, was involved

24   in preparing it.

25        So he's trying to use this document, when he should

1    just ask him, what do you recall was covered in the

2    presentation he just asked him about.

3         THE COURT:  Apart from the exhibit itself, if you

4    wish to inquire of the witness about his understanding of

5    the meaning of the term, which has been used in the course

6    of this case, you may do so.

7         MR. PETSONK:  Thank you, Your Honor.

8       I would like to ask him about his -- and I believe I've

9    elicited what I intended to elicit regarding his knowledge

10   of the term.

11   BY MR. PETSONK:

12   **Q.**   But I would inquire, Mr. Salvatori, do you know whether

13   CONSOL presented the union-free advantage to its employees

14   on any occasions other than the new employee orientation

15   sessions that you've described?

16        MR. TORRES:  Object to the form of the question,

17   Your Honor.  What locations; at what time?  I mean, how do

18   you question a witness -- that is sort of a meaningless

19   question, Your Honor.  I mean, we're talking about a 20-year

20   period and talking about 10,000 employees and we're talking

21   about multiple mine sites.  He hasn't established the

22   witness can testify generally as to that topic.  He needs to

23   be more specific.

24        THE COURT:  Undertake to adhere to those

25   limitations.

1          MR. PETSONK:  Yes, Your Honor.

2     BY MR. PETSONK:

3     **Q.**   This document, Plaintiff's 19 is a --

4          THE COURT:  You are back to the exhibit now.  You

5     better make up your mind which way you are going.  If you

6     want to go with the exhibit, you need to lay some foundation

7     for it.  And perhaps this would be helpful.  But if you want

8     to ask him about aspects that are in the exhibit that were

9     referred to during the course of this case, then you simply

10    need to ask that question independently of the exhibit.

11         MR. PETSONK:  I'm going to ask first about the

12    exhibit, Your Honor, and then move towards what -- what else

13    he knows.

14    BY MR. PETSONK:

15    **Q.**   Mr. Salvatori, both you, and as the Vice President of

16    Human Resources and CONSOL Energy, Incorporated, were named

17    as fiduciaries to the CONSOL retiree health and welfare plan

18    simultaneously; is that right?

19         MR. TORRES:  Object to the form of the question.

20    Again, Your Honor, when?  We have documents that

21    specifically say that the fiduciary is the VP of HR.

22     They showed him one document that says CONSOL is the

23    named fiduciary, but he's asking this general question

24    without regard to any specific time period or any specific

25    plan.  That is not an appropriately formed question.

1          THE COURT:  The witness may answer.

2       Do you need the question repeated?

3          THE WITNESS:  Yes, please.

4    BY MR. PETSONK:

5    **Q.**   Mr. Salvatori, during the period that you testified

6    that you were the plan administrator for the welfare plans

7    for CONSOL Energy, Incorporated, and CONSOL Energy,

8    Incorporated, and as to the various plans that CONSOL

9    administered, was it the case that both you and CONSOL

10   Energy, Incorporated, were named as fiduciaries of those

11   plan beneficiaries?

12   **A.**   I would say that the Vice President of Administration,

13   which -- sorry -- Vice President of Human Resources, which I

14   was, was the identified plan administrator and fiduciary on

15   the plan.

16   **Q.**   But I just showed you a moment ago the 2011 -- the new

17   retiree plan that was adopted effective January 1, 2011.

18   That document also names CONSOL Energy, Incorporated, as a

19   fiduciary, doesn't it?

20   **A.**   It does, but I'm relatively sure that ERISA requires

21   the position to be identified as the plan administrator.

22   **Q.**   So I'm asking you now about a document that was

23   produced in this case by CONSOL reflecting its corporate

24   knowledge about the communications that it had with the

25   plan, with welfare plan beneficiaries, and during the period

1  when you were the administrator and the named fiduciary, and

2  so and I will -- I would like to ask you specifically if you

3  know Craig Campbell?

4  **A.**   I do know Craig Campbell.

5  **Q.**   Do you know John Rosnick?

6  **A.**   I do.

7  **Q.**   Do you know Greg Dixon?

8  **A.**   I do.

9  **Q.**   Do you know Mark Hrutkay?

10  **A.**   I do.

11  **Q.**   Do you know John Fox?

12  **A.**   I don't think I've ever met Mr. Fox.

13  **Q.**   Do you know Ed Davidson?

14  **A.**   I do.

15  **Q.**   Do you know John Fox to have been an employee in the

16  Human Resources Group at CONSOL?

17  **A.**   My understanding is he was.

18  **Q.**   How about Terry Mason; do you know Terry Mason?

19  **A.**   I do.

20  **Q.**   Gerald Kowzan; do you know him?

21  **A.**   I do.

22  **Q.**   Chase Elswick; do you know him?

23  **A.**   I do.

24  **Q.**   All right.  Is it your understanding that all of those

25  individuals that I just named, from Craig Campbell to Chase

```
 1    Elswick, were members of the CONSOL Human Resources Group

 2    that you supervised during your time as Vice President of

 3    Human Resources and Director -- and/or Director of Human

 4    Resources for CONSOL?

 5              MR. TORRES:  Object to the form of the question.

 6    It's vague as to time, Your Honor.

 7              THE COURT:  The witness may answer.

 8              THE WITNESS:  I'm going to answer that and it's

 9    going to take a little bit longer, but I want you to hear me

10    out.  All of those personnel you mentioned were for, by and

11    large, field personnel.  In other words, they were typically

12    at mine sites.  Okay.  Their direct reporting relationship

13    was to the superintendent of the mine site.  They had a

14    functional reporting relationship to the Vice President of

15    Human Resources for areas of HR policy and things like that.

16    BY MR. PETSONK:

17    Q.   So out of the areas of HR policy, it was the Vice

18    President of Human Resources to have the authority to

19    provide guidance and direction to these field Human

20    Resources individuals about plan related communications that

21    they had with beneficiaries?  Is that right?

22              MR. TORRES:  Object to the form of the question.

23    It assumes facts and calls for speculation.  And it's,

24    again, vague as to time, Your Honor.

25              THE COURT:  The witness can answer if he knows.
```

```
 1              THE WITNESS:  Can you repeat that?
 2   BY MR. PETSONK:
 3   Q.   Possibly.  The -- let me ask you -- it was --
 4        You've testified to plan participant communications.
 5   You've testified to plan participants communications that
 6   were entered between CONSOL and its plan participants,
 7   right?
 8   A.   Yes.
 9   Q.   And you testified that the field HR personnel had a
10   dotted line relationship with the Vice President of Human
11   Resources for purposes of HR policy; is that right?
12   A.   Correct.
13   Q.   And so as to the plan communications that CONSOL had
14   with its welfare plan participants, is it the Vice President
15   of Human Resources to have the authority to direct the
16   content of those communications made by the HR individuals
17   to the beneficiaries?
18   A.   Okay.  I'll answer that question in a couple ways.
19   First off, if the communications involved plan
20   administration or training changes to the plan themselves
21   from me, they were communications by the fiduciary.  If the
22   communications involved other items, it would be in my role
23   as Vice President of Human Resources.
24   Q.   You testified earlier here today about e-mail
25   communication with the field HR group?
```

1    **A.**    Sure.

2    **Q.**    You had regular communications as Vice President of

3    Human Resources with your subordinates in the field HR

4    group, right?

5    **A.**    Yes.

6    **Q.**    And did you communicate regularly with those

7    subordinates in the field HR group about how -- about what

8    they communicated with plan beneficiaries regarding CONSOL's

9    benefit plans?

10    **A.**    You mean in terms of what they were to communicate and

11    what not to communicate?  The only time that would happen,

12    being instances of essentially changes to the plan.  If the

13    plans are status quo, I don't think I had communications

14    with them.

15    **Q.**    So you've testified that you recall those field HR

16    representatives providing new employee orientations; is that

17    right?

18    **A.**    Field -- I'm sorry.  Field HR personnel typically did

19    the new employee orientation at their sites.

20    **Q.**    Did you personally also participate in new employee

21    orientations at any time?

22    **A.**    No.

23    **Q.**    You never attended a new employee orientation?

24    **A.**    No.

25    **Q.**    And did you have -- do you know of anyone else from

1    your Human Resources Group in Canonsburg or corporate

2    headquarters of CONSOL, who personally attended new employee

3    orientations at any time?

4    **A.**    I can't say whether it did happen or not.  It is

5    certainly possible.

6    **Q.**    But you do have knowledge about what CONSOL HR staff

7    communicated to new employees in those new employee

8    orientations?

9    **A.**    Yes.

10   **Q.**    You testified that you approved those communications,

11   right?

12   **A.**    I testified that I've seen them; the ones that had

13   brought to me -- the scripts that were shown to me.  There

14   were occasions where I did see presentations, as well, yes.

15   **Q.**    All I'm trying to ask you about is -- you reference

16   other presentations.  Do you recall those other

17   presentations beyond the benefit enrollment meetings that

18   you testified about earlier, and beyond the new employee

19   orientations, do you recall any other instances where CONSOL

20   communicated about benefits to its employees?

21   **A.**    I can tell you that outside of those two things, there

22   was never a time we communicated solely about benefits.

23   There were certainly times when we met with our employees

24   and in the form of groups to go over the pay packages they

25   received, in some cases, the benefits they received, and

```
 1    sometimes we did make comparisons to the National Bituminous

 2    Coal Wage Agreement, because, in most cases, the mines

 3    around them were represented by the UMWA.  So it was a

 4    simple comparison to make in terms of letting our employees

 5    know how they were faring with the other -- I know the union

 6    isn't an employer -- but with the other largest sort of

 7    employee group in the respective areas.

 8              MR. PETSONK:  Your Honor, at this point, I would

 9    like to move for admission of Plaintiff's Exhibit 19,

10    because this witness has testified that he was a fiduciary

11    regarding the plans that are at issue in this document.  And

12    this is a document that was produced by his employer, CONSOL

13    Energy, Incorporated, as an exhibit to a 30(b)(6) corporate

14    deposition in this case, and that employer, CONSOL Energy,

15    Incorporated, as Mr. Salvatori's testified, was also itself

16    a fiduciary.

17         And so Mr. Salvatori has personally testified as to his

18    knowledge about the communications made by the corporate

19    fiduciary here by -- and he's testified that he had personal

20    knowledge about each HR individual whose presentations are

21    set forth in this exhibit, and so I move for its entry on

22    that basis at this time.

23              MR. TORRES:  May I voir dire, Your Honor?

24              THE COURT:  You may.

25
```

SALVATORI - CROSS

1                      **VOIR DIRE EXAMINATION**

2     **BY MR. TORRES:**

3     **Q.**   Mr. Salvatori, do you have the exhibit in front of you?

4     **A.**   I do.

5     **Q.**   Were you involved in the preparation of this document?

6     **A.**   No.

7     **Q.**   Have you ever seen it before today?

8     **A.**   Not that I recall.

9     **Q.**   I realize that counsel hasn't actually asked you to

10    look at every aspect of this, but he did ask you about the

11    names of the individuals at the top of the page, correct?

12    **A.**   Yes.

13    **Q.**   And he was asking you about your knowledge of Mr.

14    Campbell?

15    **A.**   Yes.

16    **Q.**   And he was asking you that in connection with your role

17    as the fiduciary of CONSOL's benefit plan, correct?

18    **A.**   Yes.

19    **Q.**   And what time period was that again?

20    **A.**   He didn't say.

21    **Q.**   What time period were you the fiduciary?

22    **A.**   September 2011 through midpoint in 2016.

23    **Q.**   So if we are looking at this entry regarding Mr.

24    Campbell -- do you see that?

25    **A.**   Yes.

SALVATORI - CROSS

1    **Q.**   It indicates at the top of this, it just says, "CONSOL

2    of Kentucky 1992 Miller Creek 2009"?

3    **A.**   Yes.

4    **Q.**   Do you know what that means?

5    **A.**   It tells me that Craig --

6    **Q.**   Well, do you know -- do you have personal knowledge of

7    what it means in this document, sir?

8    **A.**   No, I don't.

9    **Q.**   Was that during the -- were those dates, whatever they

10   are supposed to reflect, during the time you were the

11   fiduciary for the CONSOL's benefit plan?

12   **A.**   No.

13   **Q.**   The next entry is for Mr. Rosnick, and it says, "Bailey

14   Mine," and it says, "1987 to 2009."

15        Do you know exactly what that means, sir?

16   **A.**   No.

17   **Q.**   Was that time period when you were the named fiduciary

18   of the plan?

19   **A.**   No.

20   **Q.**   Then there is some handwriting below the entry for Greg

21   Dixon.  Do you see that?

22   **A.**   Yes.

23   **Q.**   And do you know whose handwriting that is?

24   **A.**   No.

25   **Q.**   And it looks like it says -- I don't know what the

1    first number is, but it says -- something -- "-2002,"

2    correct?

3    **A.**   Yes.

4    **Q.**   And I think next to that -- I'm not sure what that

5    says -- but is that during the time period when you were the

6    fiduciary of any CONSOL benefit plan?

7    **A.**   No.

8    **Q.**   And then it says under that, I think it says, "2002";

9    is that right?

10   **A.**   Yes.

11   **Q.**   Was that during the time period you were the fiduciary

12   of CONSOL's benefit plan?

13   **A.**   No.

14   **Q.**   Under Mr. Hrutkay, it says -- looks like it says, "1995

15   to 2005," correct?

16   **A.**   Yes.

17   **Q.**   And were you the fiduciary during that time period?

18   **A.**   No.

19   **Q.**   And then if you go -- it looks like it's four pages,

20   there is a reference to a Mr. Fox.  Do you see that?

21   **A.**   Yes.

22   **Q.**   And it says -- indicates "1984 to 1992."  Correct?

23   **A.**   Yes.

24   **Q.**   Do you know exactly what that means in relation to Mr.

25   Fox?

1    **A.**    No.

2    **Q.**    Was that during the time period when you were the named

3    fiduciary?

4    **A.**    No.

5    **Q.**    And then below that, it says, "1992 to 2004"; do you

6    see that?

7    **A.**    Are we still on Mr. Fox?

8    **Q.**    Yes.  Still on Mr. Fox.  And then the other time period

9    referenced and there is "'92 to 2000"; do you see that?

10   **A.**    Yes.

11   **Q.**    Do you know what specifically that relates to?

12   **A.**    No.

13   **Q.**    Was that during the time period when you were the named

14   fiduciary?

15   **A.**    No.

16   **Q.**    And then looks like for Mr. Davidson, there is a couple

17   of time periods.  There is one for 1984.  Do you see that?

18   **A.**    Yes.

19   **Q.**    Were you the named fiduciary during that time period?

20   **A.**    No.

21   **Q.**    And "'92 to 2002."  Do you see that?

22   **A.**    Yes.

23   **Q.**    And was that when you were the named fiduciary?

24   **A.**    No.

25   **Q.**    It says, 2016 [sic] to 2013.  Do you see that?

1    **A.**   Yes.

2              THE COURT:  2006 to 2013?

3              MR. TORRES:  2013.

4              THE COURT:  2006 to 2013.

5              MR. TORRES:  I'm sorry, Your Honor.  Yes.

6    BY MR. TORRES:

7    **Q.**   2006 to 2013.  Do you see that?

8    **A.**   I do.

9    **Q.**   And some of that period was when you were the

10   fiduciary, correct?

11   **A.**   Yes.

12   **Q.**   It would have been 2011 to 2013, correct?

13   **A.**   Yes.

14   **Q.**   Do you recall or do you know what Mr. Davidson's role

15   in the corporation was in 2011 to 2013?

16   **A.**   Mr. Davidson, I do not believe, was employed by the

17   corporation in 2011 through 2013.

18   **Q.**   Okay.  Do you know what he was doing during that time

19   period?

20   **A.**   No.

21   **Q.**   Mr. Mason is next, and he's listed as 2002 to 2007,

22   correct?

23   **A.**   Yes.

24   **Q.**   And were you the named fiduciary during that time

25   period?

1    **A.**    No.

2    **Q.**    And then it references Gerald Kowzan, in 2007 to 2015,

3    correct?

4    **A.**    Yes.

5    **Q.**    So you would have been the fiduciary from 2011 to 2015;

6    is that correct?

7    **A.**    Correct.

8    **Q.**    During that period, did you ever witness Mr. Gerald

9    Kowzan conduct any employee orientations?

10   **A.**    No.

11   **Q.**    Did you ever discuss with Mr. Kowzan when you were the

12   named fiduciary any communications that he had provided to

13   employees regarding benefit plans?

14   **A.**    Not that I recall.

15   **Q.**    And do you recall having any specific conversations

16   with -- well, that's fine.

17          And this -- below this, it says -- I think it says,

18   "Buchanan/Fola"?

19   **A.**    Yes.

20   **Q.**    So again, just at least for Mr. Kowzan, from the period

21   whenever you began as the fiduciary in -- 2011; is that

22   right?

23   **A.**    Yes.

24   **Q.**    So from 2011 to 2015, do you know how many

25   presentations Mr. Kowzan may have engaged in communicating

1    benefits to employees?

2    **A.**    I do not.

3    **Q.**    Do you know what he would have covered in those

4    presentations?

5    **A.**    No.

6    **Q.**    Do you know if this document summarizes any information

7    related to Mr. Kowzan?

8    **A.**    No.

9    **Q.**    And then the next entry is for Mr. Elswick.  It looks

10   like it says -- it says, "2008."  And then there is -- and

11   then it doesn't -- I'm not sure what the next notation

12   states, but then it says, "Fola," correct?

13   **A.**    Correct.

14   **Q.**    And then under that, it says, "2014 to 2015," correct?

15   **A.**    Yes.

16   **Q.**    And again, that was during the time period when you

17   were the named fiduciary, correct?

18   **A.**    Yes.

19   **Q.**    Did you ever see Mr. Elswick present any employee

20   orientations?

21   **A.**    No.

22   **Q.**    Do you have any knowledge of what Mr. Elswick may or

23   may not have covered during any such orientations?

24   **A.**    Not offhand, no.

25   **Q.**    Do you recall if you ever had any specific discussions

1    with Mr. Elswick as to what he may have said during any such

2    orientations?

3    **A.**   I did not.

4    **Q.**   Or what materials he may have used?

5    **A.**   I did not.

6    **Q.**   Okay.  And counsel asked you about the phrase,

7    "Buchanan Advantage."  Do you recall that?

8             MR. PETSONK:  Objection, Your Honor.  I don't

9    think that I -- I think that mischaracterizes testimony.

10            THE COURT:  I don't recall the term, "Buchanan

11   Advantage."

12   BY MR. TORRES:

13   **Q.**   Do you recall being asked about advantage in connection

14   with some training that may have been conducted?

15   **A.**   Yes.  The phrase I think was "Union-Free advantage."

16   **Q.**   Okay.  And regarding that phrase, do you know how

17   many -- during the time that you were -- let's take this in

18   two steps.  Well, strike that.  Back up for a minute.

19            MR. TORRES:  Your Honor, I don't think there has

20   been any adequate foundation laid for this document.

21            THE COURT:  Just one moment while counsel confer.

22       (Pause.)

23       (An off-the record discussion was held between

24   plaintiffs' counsel.)

25            THE COURT:  Are you ready?

```
 1                MR. PETSONK:  Yes, Your Honor.

 2                THE COURT:  Go ahead.

 3                MR. TORRES:  I'm sorry, Your Honor.  I don't think

 4     there has been an adequate foundation laid for this

 5     document.  And to the extent that the implication here is

 6     somehow Mr. Salvatori may have directed individuals to do

 7     certain things in his capacity as named fiduciary, as

 8     opposed to his separate capacity as VP of HR, I think with

 9     two exceptions, all of these dates on here indicate,

10     apparently, actions that were being taken at some earlier

11     point in time.

12         And so I guess what's sauce for the goose is sauce for

13     the gander, Your Honor.  If I'm not able to ask questions

14     about earlier time periods because there is no personal

15     knowledge, it would seem that Mr. Salvatori is not in a

16     position to testify as to what some other individual may

17     have told these gentlemen in time periods before he was the

18     named fiduciary.  If that's the status they are trying to

19     question him about, which was in 2011 to 2017.

20         So whether this document came from CONSOL, I don't

21     think that that's sort of an accurate -- this idea that it

22     was produced by CONSOL, I don't think is quite an accurate

23     description.  But, be that as it may, Your Honor, Mr.

24     Salvatori is in no position to testify as to the accuracy of

25     this.
```

1      I don't think he's laid an adequate foundation.  And to

2  the extent the premise is that this relates to some relevant

3  time period, I think it is pretty clear, it doesn't.

4           THE COURT:  Thank you.

5      Your response.

6           MR. PETSONK:  Well, Your Honor, Mr. Torres has

7  omitted to consider the fact that Mr. Salvatori was also the

8  Director of Human Resources with responsibility for the

9  benefits function from '09 to 2011.  So that gets to a much

10 broader period within which this document, Plaintiff's 19

11 tenders the corporate knowledge about presentations

12 regarding the union-free advantage.

13     And there is no issue with the authenticity of this

14 document, Your Honor.  It was prepared to be an exhibit, and

15 it was -- the 30(b)(6) representative was Erica Fisher,

16 whose deposition I have and I plan to enter as well, but she

17 was the subordinate also of Mr. Salvatori, and as Director

18 of Human Resources, and had all the same access to the same

19 documents that Mr. Salvatori testified here today that he

20 reviewed in forming his knowledge about CONSOL's planned

21 communications.

22     And so I simply sought to enter this document, which I

23 think should be regarded as authentic by way of its

24 production as an exhibit by the defendant.  It's, frankly,

25 admissible, I think, Your Honor, as well as an admission

1    against interest.  It's tendered by the defendant, and it

2    should be -- it's authentic.  It's not hearsay.  And it

3    should be admitted, because this witness has testified he

4    has reviewed all the relevant documents that the corporate

5    rep would have had access to, as well, and that, in fact,

6    this witness has knowledge about the contents of the

7    communications set forth in the document and has personal

8    knowledge of the individuals and the -- whose presentations

9    are summarized in this document.

10        So in any event, Your Honor, we would tender it on that

11   basis.

12            THE COURT:  Mr. Petsonk, who is it that provided

13   this script that is shown on this document?

14            MR. PETSONK:  The scripts that are referenced in

15   this document were all tendered by CONSOL as part of the

16   discovery process and they were all subject to

17   cross-examination in the 30(b)(6) deposition.

18            THE COURT:  Are you saying that when this was

19   presented at the 30(b)(6) --

20            MR. PETSONK:  Yes, Your Honor.  As you can see --

21            THE COURT:  -- Mr. Petsonk -- please let me

22   finish --

23            MR. PETSONK:  I'm sorry.

24            THE COURT:  -- before you answer.

25            MR. PETSONK:  I'm sorry, Your Honor.

1          THE COURT:  When this was tendered at the 30(b)(6)

2     deposition of the lady you named -- what was the name again?

3          MR. PETSONK:  Erica Fisher.

4          THE COURT:  Erica Fisher.  Thank you.

5       Did it have those notations that are set forth with

6     respect to Greg Dixon and Mark Hrutkay on it exactly as they

7     appear now?

8          MR. PETSONK:  Yes, Your Honor.  I believe so.

9     That is not my handwriting.  I think this exhibit --

10          THE COURT:  Now, don't tell me you believe so.  I

11     want to know whether it is or isn't.

12          MR. PETSONK:  It is, Your Honor.  This is the

13     exhibit that was entered.  It's stamped as an exhibit to

14     that deposition.  I tendered it exactly as it was.

15          THE COURT:  And with respect to Mr. Kowzan and Mr.

16     Elswick -- well, Mr. Kowzan first, was the Buchanan/Fola

17     script on there when you got it from Erica somebody?

18          MR. PETSONK:  Erica Fisher.  Yes, Your Honor.

19          THE COURT:  And with respect to Chase Elswick, do

20     you understand what the second figure on Fola is supposed to

21     be?

22          MR. PETSONK:  I think it says, "2014," Your Honor,

23     because it's the end of the period that concludes just prior

24     to the commencement of the subsequent period listed beneath

25     it.

1          THE COURT:  It looks like it may have originally

2     said, "2009."  Is that possible?

3          MR. PETSONK:  I think it did say that originally

4     and I think it was corrected, Your Honor, to extend from '08

5     to '14, as I understand it.

6          And as I say, Your Honor, I have the complete

7     deposition transcript from this witness if it's -- if it's

8     helpful, I would like to enter that as an exhibit as well

9     for the avoidance of any doubt.

10          MR. TORRES:  Your Honor --

11          THE COURT:  The objection goes to the apparent

12     fact that Mr. Salvatori is not a fiduciary until 2011.  Is

13     that your understanding as well?

14          MR. PETSONK:  Well, yes, Your Honor.  And as I

15     mentioned, Mr. Salvatori's testified about his knowledge as

16     Director of Human Resources during prior periods as well.

17          THE COURT:  And Mr. Salvatori also said that Mr.

18     Davidson wasn't, in fact, employed in the 2011 to 2013

19     period -- or something to that effect.  He may not have

20     phrased it quite that absolutely, but that's what I

21     generally understood.  Although this exhibit would indicate

22     that Mr. Davidson was there until as late as 2013.

23          What do you know about that?

24          MR. PETSONK:  Your Honor, I believe that Mr.

25     Davidson was employed, but perhaps by a -- by the -- my

1    understanding, employed by the CNX Gas entity during that

2    period.  And I don't seek to elicit -- obviously, Mr.

3    Salvatori is apparently not knowledgeable about that fact,

4    so I wouldn't seek to establish it through him, one way or

5    the other.

6         THE COURT:  Based on what is indicated, it seems

7    to me that it is correct that the script was provided by

8    Erica Fisher, that there is some part of the Gerald Kowzan

9    and Chase Elswick time period that coincides with the

10   witness' role as a fiduciary.

11        And if I understand correctly, that this exhibit was

12   furnished by a corporate representative at a 30(b)(6)

13   deposition, then the inquiry may be made as to those two.

14        Anything further on the point, in light of that, Mr.

15   Torres?

16        MR. TORRES:  Yes, Your Honor.  I understand your

17   point.  One further request, then, Your Honor.  So Mr.

18   Petsonk was suggesting there were accompanying documents

19   that went with this script; there was some presentation he

20   wanted to inquire into.  So it seems to me if he's going to

21   ask about presentations that Mr. Kowzan made or Mr. Elswick

22   allegedly made, then he should be required to actually

23   produce those documents so that we can see what it is

24   allegedly these gentlemen used in these presentations.

25        THE COURT:  What else do you understand was

1    furnished in connection with this?  Were you at that

2    deposition, by any chance?

3        MR. TORRES:  I was there for the beginning of it,

4    Your Honor.  And I can certainly speak to it, if you wish.

5    Ms. Fisher presented orientation materials that the company

6    was able to find, and none of those materials, Your Honor,

7    related to Mr. Elswick or Mr. Kowzan.

8        What this document relates to was Ms. Fisher testifying

9    as to individuals that she spoke with, in the course of

10   trying to understand if there was other materials that might

11   be responsive to the subpoena that -- the request that the

12   plaintiffs made to produce orientation materials.

13       And what Ms. Fisher testified to was that the only

14   materials that they were able to locate in CONSOL's records

15   related to Buchanan from the 2010 time period -- in the

16   2000s, Your Honor.  And I think there was also one document

17   from Enlow Fork that they were able to locate from that time

18   period.

19       But I don't recall -- and I can confirm this, Your

20   Honor -- that there was any documentation that the company

21   found or provided in connection with this that related to

22   any presentations that Mr. Elswick or Mr. Kowzan made of

23   these.

24       THE COURT:  Thank you.

25       Mr. Petsonk, anything further?

1          MR. PETSONK:  No, Your Honor.  Not --

2          MR. TORRES:  Your Honor, I'm sorry.  Go ahead.

3          MR. PETSONK:  That's exactly -- that's exactly the

4     point, we wanted to ask Mr. Salvatori what he knows.  He

5     testified he had looked for -- in his testimony here today,

6     he's testified that he's searched for CONSOL's

7     communications regarding its plans.  And I simply wanted to

8     ask him what he knew about the communications that, that

9     CONSOL had undertaken with its plan beneficiaries.

10        And that's the extent that -- of the purpose for which

11    we submit this as an exhibit for Mr. Salvatori.

12         MR. TORRES:  Your Honor, if I may make one other

13    point?  I apologize.  I should have made this earlier.  If I

14    may be permitted?

15        Two related issues, Your Honor.  One is that I believe

16    the upshot of the questioning before we got to this point

17    was them trying to ask about things Mr. Salvatori did in

18    this fiduciary -- in his capacity as fiduciary.

19        And I think we've demonstrated that most of this time

20    reflected here wouldn't relate to that time period.

21        And we did ask Mr. Salvatori if he was familiar with

22    the other materials that may have existed from the records

23    regarding the fiduciary's prior actions.  And then Your

24    Honor didn't allow me to ask further questions of that.

25        But he didn't identify any orientations as being

 1   anything that he was aware of any fiduciary issue.

 2        So the fact he may have been in Human Resources before

 3   he was a named fiduciary doesn't give them license to start

 4   asking about those questions, because I believe the point of

 5   this was to try to get at actions he may have taken as a

 6   fiduciary.  Did he communicate to individuals and did he

 7   provide materials to conduct orientations.

 8        And they are certainly free to ask him what materials

 9   he may have provided in his capacity as a fiduciary to

10   conduct orientations, but this -- none of this obviously

11   relates to that, because all of it seems to talk about

12   individuals from earlier points in time.

13        So they can't have it both ways.  They can ask him

14   about the time period he was a fiduciary.  That is a much

15   more limited time period.  But if it's as to things he may

16   have done in his capacity as VP of HR, without his fiduciary

17   hat on -- I suppose they can ask that, too, but it's not

18   fair to sort of rush by the fact that there is this

19   legitimate distinction he testified to as to those two

20   actions.

21             THE COURT:  Thank you.

22             MR. PETSONK:  Nothing further.

23             THE COURT:  Mr. Petsonk, you may make inquiry of

24   the witness as to whether or not he has familiarity with

25   these matters that are listed under the Kowzan and Elswick

1    names.

2              MR. PETSONK:  Thank you.

3              THE COURT:  For the time period of 2011 to what

4    seems to be the latest date, 2015, insofar as it relates to

5    a particular individual, Kowzan or Elswick, of the subject

6    matter of the provided information on the chart.

7              MR. PETSONK:  Thank you, Your Honor.  I would just

8    note that this document is not Bate-stamped because it was a

9    deposition Exhibit.  But, for the record and use of

10   reference, the matters regarding Kowzan and Elswick are set

11   forth on page 5 of this exhibit.

12             THE COURT:  As are 6, 7, and 8?

13             MR. PETSONK:  And thereafter, yes, Your Honor.

14             THE COURT:  Go ahead.

15             MR. PETSONK:  And, Your Honor, just one question.

16                    **CROSS-EXAMINATION RESUMED**

17   **BY MR. PETSONK:**

18   **Q.**  Mr. Salvatori, on page 5 of the exhibit, you see it

19   references contents of new employee orientations.

20        Do you see that?

21   **A.**  Yes.

22   **Q.**  On the left-hand side?

23   **A.**  Yes.

24   **Q.**  And as to Mr. Kowzan, there is an indication that the

25   contents of the new employee orientations included

1     pay-benefits, and there is a specific notation regarding

2     medical, dental, short-term disability, Workers'

3     Compensation, life insurance, and the employee handbook.

4          Do you see that?

5     **A.**   I do.

6     **Q.**   And then as to Mr. Elswick, the contents of the new

7     employee orientations include the union-free advantage.

8          Do you see that?

9     **A.**   I do.

10    **Q.**   And various other items.  And if you flip to page 6,

11    you see there is a field for other benefits presentations

12    besides orientations.  Do you see that?

13    **A.**   Yes.

14             MR. TORRES:  Could I have the question read back,

15    Your Honor?

16             THE COURT:  Yes.  Again?

17             MR. TORRES:  I didn't understand the question.

18    And I was asking if it could be read back, Your Honor.

19             THE COURT:  Would you please do that or restate

20    it.

21             MR. PETSONK:  Restate it.

22    BY MR. PETSONK:

23    **Q.**   On Page 6, do you see the field labeled "Other benefits

24    presentation besides orientations"?

25    **A.**   Yes.

1    **Q.**   And in the second column from the right, you understand

2    that refers to Gerald Kowzan?

3    **A.**   Yes.

4    **Q.**   And do you see, it says, "Union awareness - compared

5    wages and active benefit coverage, annual safety refresher,

6    (HR would review any changes)"?  Do you see that?

7    **A.**   And "Bonus Programs" in that, as well.

8    **Q.**   And then under Chase Elswick in the next column to the

9    right, in that same field, of page 6, the field states,

10   "Union awareness - compared to BCOA."

11        Do you see that?

12   **A.**   I do.

13   **Q.**   And BCOA means the Bituminous Coal Operators

14   Association; is that right?

15   **A.**   That's right.

16   **Q.**   That's the national contract that's known as the

17   National Bituminous Coal Wage Agreement, right?

18   **A.**   Technically, the BCOA was the negotiating agent for the

19   member companies.  So they resolved that negotiation,

20   because between the BCOA and UMWA would have resulted in the

21   success of the National Bituminous Coal Wage Agreements.

22   **Q.**   And did you personally know during the time that you

23   were the supervisor of Mr. Kowzan and Mr. Elswick that they

24   did make these presentations regarding union awareness as

25   described on page 6?  What I just read to you?

1              MR. TORRES:  Objection.  Lack of foundation.

2              THE COURT:  The witness can answer if he knows.

3              THE WITNESS:  Yes, in my capacity as the Vice

4     President of Human Resources, I did know that.

5              MR. PETSONK:  I don't think I have any further

6     questions now.  Thank you, Your Honor.

7         (An off-the record discussion was held between

8     plaintiffs' counsel.)

9              MR. PETSONK:  I have more questions for Mr.

10    Salvatori, to be clear.  I'm sorry, Your Honor.

11             MR. TORRES:  Your Honor, could I just ask a

12    question?

13             So I don't know that we sort of resolved the

14    admissibility of this document.

15             THE COURT:  Well, so far, it hasn't been offered.

16             MR. TORRES:  Okay, that's fine, Your Honor.

17    Thank you.

18             MR. PETSONK:  Having concluded my questioning,

19    Your Honor, I would move for admission of this document,

20    Plaintiff's Exhibit 19.

21             THE COURT:  Is there objection to 19?

22             MR. TORRES:  Could I voir dire a little further,

23    Your Honor, on this?

24             THE COURT:  You may, but I think it needs to be

25    clear that if it is to be admitted at all, it relates only

1     to Kowzan and Elswick.

2               MR. TORRES:  Yes, Your Honor.

3               THE COURT:  So if that helps any, go ahead.

4               MR. TORRES:  I was going to limit it to Mr. Kowzan

5     and Mr. Elswick, Your Honor, and not the entire document.  I

6     understand only those portions are admitted.

7               Could I have one minute, Your Honor, and I'll try

8     and narrow this down?

9               THE COURT:  Go ahead.

10        (Pause.)

11              MR. TORRES:  Your Honor, just again, so the record

12    is clear, the portion of this relates to Mr. Elswick and Mr.

13    Kowzan -- this may obviate the voir dire, Your Honor --

14    starts on page 5 of this exhibit and it runs to the end,

15    apparently, of the document.  And then on the left side

16    here, there is a column of questions.

17        And so I just want to understand, Your Honor, the only

18    portion of this that is going to be admitted -- if Your

19    Honor were to admit it -- would be the portions related to

20    Mr. Kowzan and Mr. Elswick.  And I just wanted to be sure we

21    were also able to have reference to what apparently are the

22    questions being asked to the answers on this side.

23              THE COURT:  Necessarily so.

24              MR. TORRES:  Okay.  If that is the only portion of

25    this that is being offered and can be referred to, then we

1    have no objection.

2              THE COURT:  Anything further on the point?

3              MR. PETSONK:  No, Your Honor.

4              THE COURT:  Plaintiff's 19 is admitted.

5         **Plaintiff's Exhibit 19 admitted.**

6              THE COURT:  With the admission limited to Gerald

7    Kowzan and Chase Elswick, as well as the descriptive column

8    at the far left.  That defines that to which they are

9    answering.

10             MR. PETSONK:  I have further questions now, if I

11   may proceed, Your Honor?

12             THE COURT:  How much longer are you likely to be

13   with Mr. Salvatori?

14             MR. PETSONK:  I have a considerable amount yet to

15   cover.  I'd say the better part of 45 minutes or an hour,

16   Your Honor.

17             THE COURT:  This is probably a good time to recess

18   for lunch.  And it's now 10 till 1:00.  We'll return at 2:00

19   o'clock.

20         And, Mr. Salvatori, same instruction as earlier.

21   Thank you.

22             THE WITNESS:  Yes.

23             THE COURT:  Thank you.

24         (A recess was taken from 12:49 p.m. until 2:00 p.m.)

25

1              **(Afternoon Session, February 16, 2021, 2:02 p.m.)**

2                    THE CLERK:  All rise.

3                    THE COURT:  Good afternoon.  Please be seated.

4                    MR. POMPONIO:  Your Honor, may I address a matter

5       before we resume with the witness?

6                    THE COURT:  Go ahead.

7                    MR. POMPONIO:  We were going to try to make every

8       effort to have the presentation of exhibits and witness

9       testimony going forward as soon as possible and closely

10      within the expectations of Your Honor.  But we have several

11      exhibits that we hope to offer in connection with Mr.

12      Salvatori.  He's the only individual appearing on behalf of

13      the company here.  We didn't call the corporate

14      representative or the other representatives of the company

15      that have been deposed in this case.

16          And we have listed our exhibits that we intend to offer

17      in the pretrial order.  We attempted to try to get together

18      with the defendants to go over stipulations as Your Honor

19      had requested that we do.  And we were unable to do that.

20          And so we have a number of exhibits that are similar to

21      the last exhibit we discussed, Plaintiff's 19, which are

22      exhibits that were in depositions of the defendants'

23      representatives, or produced by the defendants through the

24      course of discovery.  They have no authenticity issues with

25      them; they are admissible under all of the Rules of

1    Evidence.  The only question that comes up appears to be

2    foundation type of questions.

3        And so if the Court expects that each exhibit that we

4    seek to offer needs to be -- despite its admissibility,

5    there needs to be a foundation with the witness on the

6    stand, we will happily abide by that.  But we just want a

7    clarification so we don't continue to have these objections

8    and disputes and detracted discussion about the

9    admissibility of these exhibits that we didn't realize,

10   frankly, that there was going to be any objection to.  There

11   had been no Motion in Limine seeking to strike them.

12       So just as a matter of convenience, so that we can

13   proceed as efficiently as possible, we would like to have an

14   understanding about whether these exhibits are going to be

15   limited on a foundation basis, despite they're not having

16   been objected to and no authenticity issues with regard to

17   those exhibits.

18               THE COURT:  Mr. Torres.

19               MR. TORRES:  May I address it, Your Honor?

20               THE COURT:  Yes.

21               MR. TORRES:  Your Honor, strictly speaking, this

22   exhibit that we were talking about before lunch was not

23   listed on the plaintiffs' exhibit list.  What they listed

24   was:  Deposition of Erica Fisher.  There is no reference to

25   any exhibits from that deposition.

1        And so I suppose I could have made a bigger objection

2   to the fact that those documents weren't even properly

3   disclosed in their pretrial order.

4        Second, Your Honor, the plaintiffs only conducted two

5   depositions in the case of Ms. Fisher as a 30(b)(6)

6   representative and Mr. Salvatori.  And that was their

7   election, Your Honor.  So for us to be somehow told they now

8   want to shuffle documents into the record without any

9   foundation, is not how this appropriately works.

10       I mean, the fact that a document is authentic, Your

11  Honor, doesn't hide the fact that they are trying to use

12  these documents for other purposes through witnesses that

13  have never been shown those documents.

14       So, with all due respect, Your Honor, I certainly don't

15  want to spend the afternoon raising additional foundation

16  objections, but I'm certainly going to do so in order to

17  protect the record in this case and make sure whatever

18  information the plaintiffs are trying to enter is admissible

19  under the Federal Rules of Evidence.

20       Now, if they have some specific documents that they

21  want to show us, that they want to try to get into evidence

22  and they want to understand what our position is going to be

23  about them, I'm happy to look at them, Your Honor.

24       But Mr. Pomponio's suggestion that because they

25  proposed written stipulations that there was some inability

1    to reach agreement on these documents is not accurate.  The

2    implication that somehow we refused to review documents they

3    wanted to get in evidence is simply not true.  They never

4    made any such effort.

5        So we are not going to waive our objections to

6    foundation.  They did list Ms. Fisher on their witness list.

7    They made no effort to try and bring her in here.

8        So, Your Honor, I'm not sure what Mr. Pomponio is

9    suggesting is that somehow we should give up on evidence,

10   properly raised evidentiary objections, simply because they

11   don't find themselves prepared to get these documents into

12   evidence under the Federal Rules of Evidence.

13       But again, if they want to show me the documents they

14   are talking about, and we can reach some agreement as to

15   them, to obviate what appears to be an afternoon of

16   objections on foundation, we are happy to look at them;

17   otherwise, they can proceed as they wish and we'll continue

18   to raise the objections we think are appropriate.

19           THE COURT:  Anything further?

20           MR. POMPONIO:  Just to be clear, we, several

21   times, reached out to defendants to try to discuss

22   stipulations as Your Honor directed us, and we had no

23   response to that.  So Mr. Torres' representation that my

24   characterization is just simply untrue, is -- it's not

25   untrue.  It's absolutely true.

1          The rules -- I'm not aware of a rule of evidence -- Mr.

2     Torres can point me to it -- that requires a foundation

3     before there is an admissibility.  I understand that that's

4     how trials work generally, especially, in jury trials, but

5     this -- these documents are all admissible under the Rules

6     of Evidence.  They are not hearsay.  They are authentic.

7     And they, frankly, may come in.

8          But we just want an understanding from the Court if

9     these -- we didn't bring Ms. Fisher here, and there was

10    another defense related witness, accountant that we took as

11    well, and we didn't call Ms. Fisher because we assumed that

12    documents that they produced, that are their documents that

13    are authentic, would be able to come in under the witness

14    that they were bringing.

15         If that's not the case, that's fine.  We just want to

16    deal with it upfront so that we don't have to continue to --

17    if Your Honor expects there to be these foundations laid for

18    all these exhibits, we are happy to abide by that.  We just

19    don't want to go off into an area where -- which is not

20    consistent with Your Honor's expectations.

21             THE COURT:  Thank you.  The exhibits that you're

22    referring to need to have a foundation, unless this witness

23    created them or is intimately involved in them.

24         Mr. Torres suggested that if you were to present these

25    exhibits you have in mind, they could possibly be agreed

1    upon.

2         Can you tell me first the number of exhibits involved?

3    Approximately?

4              MR. POMPONIO:  I would say about 10 to 15, at the

5    most, Your Honor.

6              THE COURT:  Well, I am going to suggest for your

7    consideration, and you can tell me what your reaction is,

8    that we recess long enough for you to go over those with Mr.

9    Torres, to see if you can agree on some, or all of them, for

10   that matter.

11        And so what's your reaction to that suggestion?

12             MR. POMPONIO:  That's fine, Your Honor.

13             MR. TORRES:  Just so we are clear, Your Honor.  I

14   mean, again, the issue is not simply the document itself,

15   it's also the purpose for which it's being offered.  I mean,

16   it's not just:  "Do you agree this document is authentic?"

17        "Okay, we are going to put it in the record."

18             THE COURT:  Well, I'm picking up on what you just

19   said, and if you want to make good on it, you have the

20   opportunity to do it.

21        How much time do you need?

22             MR. TORRES:  Maybe give us the 15 documents, we

23   are happy to look at them in the next 15, 20 minutes, Your

24   Honor, and at least let them know whether we think there's

25   something--

```
 1              THE COURT:  Let's recess for as long as 20
 2    minutes, and see if you can get through them.
 3         Anything further at the moment?
 4              MR. POMPONIO:  No, Judge.  Thank you.
 5              THE COURT:  Mr. Salvatori, you just thought you
 6    were going to testify.  I'm not sure how long this is going
 7    to take.  But I do think, from what I understand, we will at
 8    least finish with you today.
 9              THE WITNESS:  Yes, sir.
10              THE COURT:  And so we'll hope that that's the
11    case.  And during the break, the same instruction.
12              THE WITNESS:  Yes, sir.
13              THE COURT:  Thank you.
14              THE CLERK:  All rise.
15         (A recess was taken at 2:14 p.m. until 2:53 p.m.)
16              THE CLERK:  All rise.
17              THE COURT:  Please be seated.  You may proceed.
18              MR. TORRES:  Your Honor.
19              THE COURT:  Yes.
20              MR. TORRES:  So I just wanted to address where we
21    left off before the break on these documents that were
22    tendered to us.
23              THE COURT:  You are going to say, we got it all
24    worked out?
25              MR. TORRES:  Almost.  So, Your Honor, just a
```

 1    couple of things.  Some of these documents don't appear to

 2    have been on the plaintiffs' pretrial submission, so that's

 3    one potential issue.

 4                THE COURT:  They are not in the pretrial order?

 5                MR. TORRES:  Yes, Your Honor.

 6                Aside from that, Your Honor, it seems to me

 7    that -- I don't see that there is any insurmountable

 8    foundation or certainly not authenticity -- no issue as to

 9    the authenticity of the documents.  Some of these documents

10    seem to be missing attachments.  It's not clear sometimes

11    which documents relate to which, but it seems to me that if

12    the plaintiffs want to offer these documents, we are at

13    least entitled to some explanation for each document for

14    what purpose they are being offered.

15        And if I could explain just briefly, Your Honor.

16        It doesn't appear to us that any of these documents

17    relate to the issues that are still remaining in this

18    litigation; namely, what these individuals were allegedly

19    promised and whether the SPD was properly issued.  I mean,

20    for example, here, this is a draft letter about the

21    transition payments which Your Honor has already found were

22    nondiscriminatory.

23        So it seems to me that, Your Honor --

24                MR. POMPONIO:  Your Honor, I'm sorry.  I don't

25    mean to interrupt Mr. Torres, but if we are going to be

1    taking up substantial arguments about these exhibits, it

2    might be best the witness is released from the stand until

3    we've resolved those.

4            THE COURT:  Well, I suppose we can do that.

5        Mr. Salvatori, I'm sorry to inconvenience you.  If you

6    would be excused and go to the lobby where you could be

7    found quickly to return.

8            THE WITNESS:  Sure.

9            THE COURT:  Thank you.  Go back through the same

10   corridor.

11           THE WITNESS:  Okay.

12       (The witness, Mr. Salvatori, left the courtroom.)

13           MR. TORRES:  What I was going to say, Your Honor,

14   it seems to us that we should be -- we should be afforded

15   some explanation as to how the plaintiffs believe these

16   documents relate to the remaining claims in the litigation

17   so we can at least raise and preserve any relevance

18   objections we may have to them.  But I certainly don't

19   anticipate there being some long, drawn-out fight about

20   authenticity or foundation, since Mr. Salvatori seems to

21   have been a recipient of most of these documents.

22           THE COURT:  Well, normally an objection of that

23   sort would take place in the presence of the witness on the

24   stand.  I don't see any reason not to follow that procedure

25   here.  And looks to me like, unless the defendant -- unless

1    the plaintiff, rather, has got something further to add,

2    that we should get going with the witness and present these

3    items, and the Court will rule on the objections as they

4    come in.

5              MR. PETSONK:  Yes, Your Honor.  The only thing I

6    would say is that as we have been proceeding in this trial

7    so far, exhibits to the depositions that we designated as

8    exhibits, trial exhibits, all have been contemplated as

9    within the scope of the -- of the designated trial exhibit.

10   That is, if we designated a deposition as a trial exhibit,

11   the exhibits to that deposition -- we've been proceeding so

12   far as being, you know, contemplated within that trial

13   exhibit.  So that's the way we designated these exhibits,

14   Your Honor.

15             THE COURT:  The pretrial order should control the

16   case.  And I understand that a number of these items that

17   you propose to offer aren't in the pretrial order?

18             MR. PETSONK:  They are not -- they are in the

19   pretrial order, Your Honor.  I think Mr. Torres --

20             THE COURT:  Well, if they are in there, that's

21   fine.  So we'll see.  Are we ready?

22             MR. TORRES:  Yes.

23             THE COURT:  Do you mind asking Mr. Salvatori to

24   return?

25             MR. TORRES:  Yes, Your Honor.

1          THE COURT:  You may proceed.

2          (Examination of witness Kurt Salvatori resumed.)

3          MR. PETSONK:  Thank you, Your Honor.

4     I was about to approach the clerk.

5     If I may approach the witness and present the next

6     exhibit?

7     BY MR. PETSONK:

8     **Q.**   Mr. Salvatori, I've presented you with a document

9     that's been marked Plaintiff's Exhibit 20.

10    **A.**   Yes.

11    **Q.**   This appears to be an e-mail; is that correct?

12    **A.**   It is.

13    **Q.**   And it's from Deb Lackovic?

14    **A.**   That's correct.

15    **Q.**   It's dated, Thursday, September 4, 2014, right?

16    **A.**   Yes.

17    **Q.**   And to whom is it addressed?

18    **A.**   It's addressed directly to Matthew Woolensack, who also

19    worked in the HR function, and then copied on it are three

20    individuals:  Myself, Lisa Borelli, who at the time was the

21    manager of corporate benefits, and Joe Hazy, who at the time

22    was the supervisor of the company's pension plan.

23    **Q.**   And did you supervise Matthew Wollensack at this time?

24    **A.**   He would have been part of the HR function, so he would

25    have reported up through me.

1    **Q.**   What was his job specifically within HR, if you recall,

2    at this time?

3    **A.**   At this time, Matt's primary role in HR was to be a

4    liaison between HR and the IT Department regarding our

5    internal system we used to transact our business.  He was

6    talented, and so, from time to time, I would use him in

7    other efforts outside of that just to get him experience.

8    **Q.**   Okay.  And Ms. Lackovic states in the e-mail --

9            MR. TORRES:  Objection, Your Honor.  If he's

10   trying to lay a foundation, he hasn't got the document into

11   evidence before he starts eliciting substantive testimony.

12           THE COURT:  Sustained.

13           MR. PETSONK:  Your Honor, I move for admission of

14   Plaintiff's Exhibit 20.

15           THE COURT:  Is there an objection?

16           MR. TORRES:  Yes, Your Honor.  Two objections.

17   First objection is that this document is not listed in the

18   pretrial order, so I don't think it's appropriate to have it

19   entered as evidence.

20       Second, Your Honor, as I mentioned a moment ago, this

21   appears to relate to matters regarding why -- or the

22   termination of these benefits in 2014, which is not an issue

23   that's still before the Court.  The Court found that there

24   was no issue with the termination of the benefits.

25       The only issues are what these individuals were

1    allegedly told about their benefits in the meetings they

2    testified to.  He hasn't in any way demonstrated how this

3    relates to either that or the receipt of the SPD, which is

4    the only other issue that Your Honor said was still at issue

5    in the litigation.

6              THE COURT:  Well, how is it relevant?

7              MR. PETSONK:  Well, Your Honor, it's relevant,

8    because it addresses certain topics that -- that are the

9    subject of what is still at issue here in this litigation,

10   which is whether the fiduciary had certain relevant

11   knowledge about representations that it made to its retiree

12   plan participants.

13         And I can direct the Court's attention to the e-mail,

14   it says, the attachment to the e-mail addresses highly

15   charged topics that we feel would be better addressed

16   case-by-case verbally rather than in print by the company

17   but we can let the group decide.

18         And so I was going to inquire of Mr. Salvatori about

19   what topics are addressed in the attachment, and what

20   decision making process ensued with reference to those

21   highly charged topics.

22             MR. TORRES:  Your Honor, how does that relate to

23   what the seven plaintiffs already testified they were

24   allegedly told, none of which said they received any

25   information from Mr. Salvatori, and none of who pointed to

1    September of 2014, or thereafter, as the time period when

2    they were allegedly promised benefits.

3         It's sort of the flip-side of Mr. Hymes.  Now we are on

4    the other side of when these people claimed they were

5    allegedly promised benefits.  And it doesn't -- it doesn't

6    relate to what these individuals -- none of them testified

7    to this type of document, or receiving it or having any

8    discussions with Mr. Salvatori, or anyone else, for that

9    matter, in 2014.  That is the time the benefits were already

10   being terminated.

11             THE COURT:  Anything further, Mr. Petsonk?

12             MR. PETSONK:  Just briefly.  The principal items

13   that remain in this case are the -- for us to show what

14   knowledge the defendant acted upon in its fiduciary

15   capacity.  And this document goes right to that knowledge,

16   the knowledge that the defendant had when it made the

17   decisions that it made about benefits at issue in this case.

18        And -- and then the other issue is, you know, how the

19   decision affected the defendants and the plaintiffs as to

20   the matter of remedies, Your Honor.

21        And so this goes to the first of the two principal

22   outstanding issues in this case, in my understanding.

23             THE COURT:  Mr. Torres, anything further?

24             MR. TORRES:  Your Honor, what the fiduciary did in

25   some unrelated context has no relevance to what these

 1    individuals testified already under oath they were allegedly

 2    told.

 3         And secondly -- I mean, I certainly -- he hasn't

 4    elicited -- I'm sorry.

 5         Your Honor, as to the issue of remedies, again, the

 6    remedies in this case have to relate back to what these

 7    people allegedly were promised and did in reliance upon

 8    those alleged promises.  And he hasn't demonstrated anything

 9    as to how this relates to either of those two topics.

10         So again, I think we are far afield, Your Honor, in

11    going into matters that Your Honor has already found the

12    company had the right to do, which was to terminate the

13    benefits.

14              THE COURT:  The Court is at least provisionally

15    going to decline to receive Plaintiff's 20 into evidence.

16    It appears as though it is not related to the two issues

17    remaining in this matter.  And I will go through it to see

18    if there is anything there; although, Mr. Petsonk, that's

19    your job.  You're supposed to tell the Court how this

20    relates generally, specifically what it relates to, and I

21    haven't heard that yet.

22         So I'm going to pass on this at this time and you can

23    go on to your next exhibit.

24              MR. PETSONK:  Your Honor, I'd like to proffer.  I

25    had intended to elicit from the witness the contents of the

1    exhibit.  I can tell Your Honor exactly what I intend to ask

2    the witness about that -- but, otherwise, I can move on.

3    But there are specific relevant points, and there are three

4    of them, and they are enumerated in the contents of the

5    exhibit.  They are very plain.  I'm glad to --

6         THE COURT:  Well, you haven't pointed them out.

7         MR. PETSONK:  Well, first, on page 15775, there is

8    an item called "Question Number 3."  And this is in the --

9    this is the attachment to this e-mail, Your Honor.  It is an

10   "Employee Question List."  That was evidently drafted by the

11   HR Department through this -- some sort of collaboration

12   reflected on this e-mail.

13        And the e-mail says, we are going to be meeting to

14   discuss these -- this document, the employee questions.

15        And so the Question Number 3 in the employee question

16   document reads, as follows, many of us -- Question: "Many of

17   us have been counting on these benefits for years and have

18   invested our lives into this company in expectation of them.

19   Why should we just accept this?"

20        That is, the termination of the -- the curtailment of

21   the benefits.  And then there is a comment in brackets after

22   that question, it says, "Question is very controversial -

23   suggest that it be removed."

24        And then there is a prepared answer beneath that which

25   I won't read.

1        But I will point the Court next to Question Number 4 on

2    the following page, and it reads:  "Question:  You talk

3    about adapting, but how are we supposed to know that this

4    isn't a slippery slope to more broken promises to loyal

5    CONSOL employees?"

6        And then after that question, there is another comment,

7    and in brackets, and it says, "Eliminate this question - no

8    reason to create controversy within FAQs which are supposed

9    to be factual in nature and not opinions, many of these

10   questions are leading people down the path of anger and

11   resentment.  Why would we put these thoughts on paper to

12   pass out to everyone?"

13       And again there is another proposed answer.

14       And then the last most significant point in this

15   document is on Page 15777, and that's Question Number 6.

16   And that reads:  "Question:  Unionized employees don't have

17   to put up with broken promises of this magnitude - why

18   shouldn't we just unionize?"

19       And then there is another comment here that "Question

20   is very controversial.  Why we initiating this -  consider

21   eliminating."

22       And again there is a proposed answer beneath that

23   question.

24       So, you know, this is knowledge that the HR group had

25   at the time they curtailed and then thereafter terminated

1       the benefits, which we've alleged to comprise a breach of

2       their fiduciary duty, Your Honor.  And that's the point of

3       this line of questioning.

4               MR. TORRES:  Your Honor, the breach of fiduciary

5       duty in this case does not go to the termination of the

6       benefits in 2014 or 2015.  Your Honor has already held that.

7           The alleged breach in this case that Your Honor found

8       on summary judgment was whether these particular seven

9       individuals were promised benefits orally by various people

10      that they identify as alleged agents of the -- of the named

11      fiduciary.  And those alleged promises occurred in 1991,

12      1992, 2000 -- in various other points in time before the

13      company announced that they were terminating these benefits.

14          So, you can't prove a breach of fiduciary duty based

15      upon individual statements of the plaintiffs by pointing to

16      the fact that when the company was doing this in 2015, they

17      understood that this was going to be an unpopular decision.

18          But an unpopular decision and not wanting to stir up

19      resentment doesn't say anything about, we shouldn't do this

20      because we promised them benefits back in 20 years ago,

21      and -- and the specific individuals that they named

22      allegedly made those promises.

23          So it is afield, Your Honor, and it doesn't relate to

24      the actual fiduciary duty that Your Honor said was still at

25      issue, which has to do with what these specific individuals

1    were told, by the specific individuals they named during

2    their testimony, all of which occurred before this document

3    was ever created.

4            THE COURT:  Anything further, Mr. Petsonk?

5            MR. PETSONK:  Well, Your Honor, we do maintain

6    that it is an ongoing course of conduct constituting a

7    breach here, and that the action by the fiduciary to

8    terminate the plan with knowledge about the nature of their

9    prior representations is part of the actions of breach that

10   we've alleged and that we believe we are here to try.

11       So I would offer it for -- to make that showing.

12       And then it also goes to -- to the equitable remedies,

13   Your Honor, that may be considered in this case, balancing

14   the nature of the conduct with the nature of the harm.  And

15   this is the degree of knowledge that the defendants carried

16   when they made the relevant actions.  It was both to the

17   allegation of the course of breach as well as the relevant

18   remedy that is appropriate here in equity.  And so we

19   believe it applies both to the remaining -- the two

20   remaining issues in the case.

21           THE COURT:  Let me ask, also, of these documents

22   that you are drawing up at this juncture of the witness

23   testimony, were any of them listed in the pretrial order?

24           MR. PETSONK:  They are all exhibits to a

25   deposition of Mr. Salvatori, which is in the pretrial order,

1    Your Honor.

2         THE COURT:  The exhibits are not in the pretrial

3    order, is that what you are saying?

4         MR. PETSONK:  I believe this one may be separately

5    listed, but the way we proceeded here, Your Honor, and the

6    defendants have, as well, is presenting the deposition

7    exhibits as separate -- as, you know, as being subsumed in

8    the deposition and trial exhibits, Your Honor.

9         THE COURT:  The pretrial order is supposed to have

10   the names of the witnesses that are going to be used and the

11   exhibits that are going to be used.  And I understand you to

12   say now that reference is being made to a deposition that

13   itself is not listed, but that there were exhibits to the

14   deposition and it needs to all be pulled in.  That's a

15   strange way to proceed, Mr. Petsonk.

16        MR. PETSONK:  Well, Your Honor, that is the way

17   that the parties have proceeded here.  And, so, I certainly

18   had simply intended to continue with the process that we

19   have both undertaken.

20        MR. TORRES:  That is not accurate, Your Honor.

21   That is a misstatement.  There's never been an agreement

22   between the parties that any exhibit that was attached to a

23   deposition could be used as an exhibit in the case.  We

24   never, ever, ever said that.

25        What they listed in their pretrial order at GGGG was

1    deposition of Kurt Salvatori.  Not deposition of Kurt

2    Salvatori and Exhibits A, B, C, and D, Your Honor.  They

3    just listed the deposition.  I don't know why they want to

4    use the deposition, but they listed it in their pretrial

5    order.

6         Now, we did no such thing in our exhibits that we

7    listed, Your Honor.  There is no depositions listed.  And we

8    haven't attempted to elicit exhibits along those lines, Your

9    Honor.

10         But this idea that somehow, just because you name a

11    deposition -- which appears to be the premise -- that the

12    document can be entered into evidence, I don't think that

13    that's appropriate.

14              THE COURT:  Anything further on the point, Mr.

15    Petsonk?

16              MR. PETSONK:  Well, Your Honor, I believe that

17    they did proceed in exactly that fashion.  They've

18    introduced a number of documents here.  I believe that the

19    healthcare Highlights documents, they questioned Mr.

20    Fitzwater about a number of items that were deposition

21    exhibits.  So it was my understanding that was how the -- in

22    fact, that the defendants had, had cross-examined my clients

23    just in that very nature.

24         So, Your Honor, it was my understanding that we would

25    be permitted to inquire about the exhibits to the

1    depositions that we designated as trial exhibits in our

2    pretrial order.  That was my understanding.  And I think

3    that's been the conduct throughout the case, Your Honor.

4    And certainly now the defendants have had the opportunity to

5    examine this particular exhibit and consider any objections

6    that they have to it.

7         So I would request that we be -- the Court consider

8    allowing us to proceed in that fashion, Your Honor.

9              THE COURT:  Mr. Torres, you heard the statement

10   that the defendant has introduced exhibits that were not

11   listed in the pretrial order, but were merely attached to a

12   deposition as set forth named in the pretrial order.

13        Is that correct?

14             MR. TORRES:  Your Honor, I remember showing Mr.

15   Fitzwater a deposition exhibit to ask him if it was the same

16   document that we were showing him in Court.  But again, Your

17   Honor, if that was the case -- Your Honor, I don't remember

18   that being the case, but if it was, then I suppose we can

19   let them proceed.

20        As I said, for all these documents, Your Honor, we

21   don't dispute their authenticity; we don't dispute that Mr.

22   Salvatori read them.  I think the more salient issue is

23   whether or not they relate to any remaining issue in the

24   litigation.

25             THE COURT:  I'll limit Plaintiff's 20 further, but

```
 1    it seems to me as though it is probably not relevant, and
 2    the Court, though, will study it and let you know.
 3              MR. PETSONK:  Thank you, Your Honor.  Shall I
 4    proceed?
 5              THE COURT:  Go on to the next item, if you would.
 6              MR. PETSONK:  That was labeled as Plaintiff's 20.
 7    That was the e-mail along -- dated September 4, 2014, from
 8    Deb Lackovic to Matt Woolensack, along with the attachments
 9    in the e-mail which were Bate-stamped 15775 through 15784.
10              MR. TORRES:  Your Honor, could I get one other
11    clarification while he's looking for his exhibit?
12         My understanding -- and I just wanted to make sure we
13    are clear on this -- the plaintiffs were going to both do
14    whatever cross-examination they had of Mr. Salvatori, along
15    with whatever testimony they were going to elicit from him
16    in their case at the same time, so that we are not
17    contemplating some multiple examinations of Mr. Salvatori.
18         Do I have that right?
19              MR. PETSONK:  Yes.  That's my contemplation.
20              MR. TORRES:  Thank you.
21              THE COURT:  That is what the parties indicated.
22    Mr. Salvatori, I'm not as optimistic as I was before about
23    your being through today.
24              THE WITNESS:  I'll do whatever is necessary.  I'm
25    more than willing to stay late.
```

```
 1              MR. PETSONK:  If I may approach?  Plaintiff's 21.

 2              THE WITNESS:  Thank you.

 3              MR. PETSONK:  I'm looking at this document 15661.

 4    BY MR. PETSONK:

 5    Q.   15664 is the end of the e-mail.

 6         Mr. Salvatori, I've presented you a document that's

 7    been Bate-stamped -- Plaintiff's 21.  And take a second and

 8    look at it.  It's a series of e-mails that are ultimately

 9    directed to you, a thread of e-mails.

10    A.   Okay.  I see it.

11    Q.   Do you see that the e-mail comes -- the principal

12    e-mail at the top of this series comes from Jessica Kachur?

13    A.   Yes.

14    Q.   And who is she?

15    A.   She is an actuary with Mercer Human Resources

16    Consulting and was the actuary assigned to what I would say

17    CONSOL's account.  So Jessica would ultimately in the normal

18    course of business prepare the actuarial reports that are

19    incorporated into the -- like, the 10-K filings every year

20    and reviewed by our auditors.

21         In addition to that, she also -- her and her team

22    would provide us consulting services, such as the example

23    here, where they are providing us with information regarding

24    the effect of certain changes in this case to the benefit

25    plans.
```

1    **Q.**   On the first page of this document, which is stamped

2    15661, you see it says, "Good morning, Kurt," and then it

3    proceeds to describe APBO liabilities.

4    **A.**   Yes.

5    **Q.**   What does APBO stand for?

6    **A.**   I'm not going to try to pass myself off as an actuary,

7    but "APBO" stands for accumulated projected benefit

8    obligation.

9    **Q.**   And is this table contained on the first page of

10   Plaintiffs' Exhibit 21 Mercer's valuation of the accumulated

11   projected benefit obligation as measured both before and

12   after the plan amendment enacted on October 1, 2014?

13   **A.**   Yes.  And I will say, you know, we have to be careful

14   about points in time on these things.  All of these

15   projections are based on estimates, things like mortality,

16   medical costs, interests rates, being a large one.  So over

17   time, they can vary a little bit.  But this was their

18   estimate of that at that point in time on August 13th.

19   **Q.**   Now, there is a lengthy attachment that I've not set

20   forth here, but I'm just going to ask you about these

21   e-mails, and -- and what involvement you had in reviewing

22   Mercer's valuation of the accumulated participant benefit

23   obligations.  Okay?

24   **A.**   As it pertains to what we were asking them to do in

25   this particular e-mail?

1    **Q.**    Correct.

2    **A.**    I would have reviewed it.

3    **Q.**    Okay.  What would you have reviewed?

4    **A.**    Whatever information they provided to us.  So really

5    how this worked was we asked them under certain scenarios,

6    what would be the impact on the balance sheet of the company

7    if we made certain changes.  To the extent they provide

8    information for that, it would have been sent to me.

9    **Q.**    And based on this e-mail, it was the case that you were

10   not revaluing or remeasuring your APBO for the Mine Workers

11   retirement welfare benefits at this time, were you?

12   **A.**    We weren't doing it in-depth or any detail.  There was

13   some assumed movement from the P&M benefits over to UMWA as

14   a result of the action we were contemplating.

15       In other words, some of our P&M employees had enough

16   union time that they would be able to get a union medical

17   card in lieu of the P&M card.

18   **Q.**    And this table on page 21 evaluates the -- or

19   summarizes the effect on the value of the APBO as to both

20   active and retired individuals who may have participated, or

21   did participate in the retiree health care plan; is that

22   your understanding?

23           MR. TORRES:  Objection.

24           THE COURT:  This is in reference to page 15661?

25           MR. PETSONK:  Correct.

1           THE COURT:  Go ahead.

2           MR. TORRES:  Your Honor, I'd like to object.  If

3    he's going to start eliciting substantive testimony on this

4    document, he should offer it into evidence so we can raise

5    our objection as to its admissibility.

6           MR. PETSONK:  Well, I can offer it at this time,

7    Your Honor.  I think the witness has testified that he

8    received the document and was involved in reviewing the

9    document and the associated analysis accompanying it.

10          THE COURT:  The objection is overruled.

11   BY MR. PETSONK:

12   **Q.**   The change that Mercer had evaluated in this time

13   period in August of 2014, related to a curtailment in the

14   retiree welfare benefit plan that affected both active and

15   retired CONSOL plan beneficiaries, right?

16   **A.**   I'll answer that a little differently.  It affected all

17   the current retirees that were in receipt of benefit status.

18   In other words, they would have been eligible per the terms

19   of the plan before that -- before the change we announced to

20   have those benefits.  And to the extent that we had

21   individuals that were active before we made this change that

22   would have met eligibility requirements within the benefit

23   plan itself, yes, it would have included them.

24   **Q.**   And so on the third page of the document stamped 15663.

25   **A.**   Yes.

1   **Q.**   There is a paragraph numbered 3.

2   **A.**   Yes.

3   **Q.**   And I don't know if you can discern, but there are two

4   shades of text here, an initial -- there is an initial two

5   sentences that is in darker text, and the remainder is in a

6   lighter text, which is reflecting of the commentary, I

7   gather, by the author of this section of the e-mail, Deb

8   Lackovic.  Do you follow that?

9   **A.**   I do.

10   **Q.**   And do you see that Ms. Lackovic in that

11   lighter-colored section of paragraph numbered 3, states, "We

12   estimate the liability reduction for active coverage

13   elimination as of 1-1-15 and retiree coverage elimination as

14   of 1-1-20, is approximately $341 million"?

15   **A.**   Yes.

16   **Q.**   And then it states, "This amount is a prior service

17   credit and is amortized over the 5.25 years from October

18   1st, 2014, to January 1st, 2020," is that right?

19   **A.**   That's what it says, yes.

20   **Q.**   So that comports with what you just described, that

21   Mercer at this point had valued in consultation with Ms.

22   Lackovic the cumulative effect on the value of the APBO as

23   to the impact on both active retiree eligible employees and

24   retired employees, who are retiree plan beneficiaries?  Is

25   that correct?

1    **A.**   What it really is telling us is how the liability that

2    was on the books -- the projected liability as calculated by

3    the actuary would -- how much it would be reduced by and how

4    it would be removed.  Certain aspects of it would be removed

5    immediately; certain aspects of it would be amortized over

6    the remaining life of the plan.  But these are all -- all

7    prescribed rules as required by what we refer to as FASB,

8    Financial Accounting Standards Board.

9         So you'll see Kris Hagedorn's mentioned in this e-mail.

10   At that time, he was our Chief Accounting Officer.  So the

11   communication would have obviously included him.

12   Ultimately, he would have had to be the one to make the call

13   of how we would actually do it from an accounting

14   standpoint.

15           MR. PETSONK:  Your Honor, I'd like to move for the

16   admission of this exhibit, Plaintiff's 21.  I'm sorry --

17   it's already been admitted.  I apologize.

18           THE COURT:  The objection to it was overruled, and

19   the Court now formally admits it.

20           MR. PETSONK:  Okay.

21       **Plaintiff's Exhibit 21 admitted.**

22   BY MR. PETSONK:

23   **Q.**   Mr. Salvatori, did you make a recommendation to your

24   superiors about the adoption of the 2014 Plan Amendment to

25   the Retiree Welfare Benefits Plan?

1    **A.**   I made the recommendation as to the pass forward, that

2    ultimately ended up as a Board approved Plan Amendment,

3    which was delegated to me to sign.  In all of those

4    capacities, I was acting as Vice President of HR and not as

5    fiduciary of the plan.

6    **Q.**   Did you rely on Mercer's valuation of the accumulated

7    post-benefit obligation in making your recommendation that

8    you made to the Board?

9            MR. TORRES:  Objection, Your Honor.  Again, how

10   does this relate to what these individuals were promised

11   during their orientations 20-some years earlier?

12       I just don't see what that relates to in terms of the

13   remaining claims.

14       There is no dispute that they terminated the benefits.

15   Your Honor found that they had the right to do that because

16   the plan reserved the right to allow them to do so.

17           MR. PETSONK:  Your Honor, I think I can move along

18   at this point and possibly return to it if I need to.

19           THE COURT:  Go ahead.

20           MR. PETSONK:  Your Honor, may I approach?

21           THE COURT:  You may.

22   BY MR. PETSONK:

23   **Q.**   Mr. Salvatori.

24   **A.**   Thank you.

25   **Q.**   Plaintiffs' Exhibit 22.  Mr. Salvatori, take a second

1    and look at the document that I presented you, which has

2    been labeled Plaintiff's Exhibit 22.

3    A.    (Witness complies.)  Yes, I've seen this document

4    before.

5    Q.    Is it a slideshow with some notes at the bottom of each

6    slide in the nature of a script?

7    A.    What it is is when, you know -- obviously, when we made

8    these changes -- and I think we've brushed up against this a

9    couple times -- these changes are not popular decisions;

10   they are difficult to make.  And, you know, in the process

11   of making those, you, as a leader of the company, or as an

12   HR person in the field, you have to explain why.  All right,

13   people want to know why.

14        So this presentation, which started with, I think, a

15   short video of myself and my immediate supervisor at the

16   time, Steve Johnson.  Then it would be handed -- like handed

17   off to the HR person, the superintendent of particular mine

18   sites, and they would go through the presentation.

19        The participants would only see the slides.  The

20   write-ups below were to help the HR person navigate the

21   presentation correctly and communicate the information

22   correctly.

23   Q.    All right.  And your role in this presentation, it says

24   on the first page, was to give an overview of some changes

25   in the retirement benefits; is that right?

1    **A.**   Yes.

2    **Q.**   So the only part of this presentation that you

3    personally narrated was the part that related to retirement

4    benefits; is that right?

5    **A.**   That's what it said.  I don't recall the video at this

6    point.

7    **Q.**   Well, this presentation is captioned, "Benefit

8    Changes," and the page 1, which is Bate stamped 3848, is

9    dated October 1, 2014.  Is that right?

10   **A.**   One moment.  Yes.

11   **Q.**   Okay.  And if you flip to the second page, you'll see a

12   slide at the top of the page, it says, "Summary of Benefit

13   Changes-Retiree Medical"?

14   **A.**   It does.

15   **Q.**   Is this the section that you presented?

16   **A.**   I believe so.

17   **Q.**   All right.  And you see on the slide, it says, "Retiree

18   health and welfare benefits are discontinued for employees

19   retiring on or after October 1, 2014," right?

20   **A.**   Yes.

21   **Q.**   And then the next bullet point, "One-time transition

22   payment to be paid on October 22, 2014, to impacted

23   employees based upon years of service as of September 30th,

24   2014."

25         Do you see that?

1     **A.**   Yes.

2     **Q.**   And then there is a table that sets out ranges of

3     payments for employees who are broken out into two

4     categories?

5     **A.**   Yes.

6     **Q.**   And the first category is production employees.  And

7     that range is between $2,500 and $100,000, based on their

8     years of service; is that right?

9     **A.**   That's correct.

10    **Q.**   And does production employees include both hourly and

11    salaried production related employees there?

12    **A.**   Yes.  It was not determined by employee type.  It was

13    determined by whether or not you worked in a production

14    capacity.  So, typically, you can think of that as our staff

15    at our coal mines.  At the time, also our staff that would

16    have been working one the drill rigs on the gas side, et

17    cetera, versus the corporate people that would have been

18    referred to as staff.

19    **Q.**   And those staff are set aside to the right in a

20    different column for a different type of a benefit?

21    **A.**   Correct.

22    **Q.**   And then it says -- the next bullet point beneath the

23    table, "Retirees as of 10-1-2014 will continue with current

24    retiree health coverage until January 1, 2020," right?

25    **A.**   Yes.

1    **Q.**   And down in the paragraph beneath that are these words

2    that you spoke to characterize the slide that is depicted

3    above them?

4    **A.**   I would assume so, yes.

5    **Q.**   And do you see the third from the last sentence states,

6    "To me, basing the transition payment on years of service

7    makes a lot of sense since those that have been here the

8    longest have the greatest expectation of receiving a

9    benefit, typically are closest to retirement, and have also

10   made the largest contribution to date to the success of the

11   company.  For some of you that have relatives that are

12   already retired, you can see that their coverage will

13   continue until January 1, 2020.  Virtually all of our

14   retirees will be 65 and Medicare eligible by that date."

15       Is that right?

16           MR. TORRES:  Objection.

17           THE WITNESS:  Yes.

18           MR. TORRES:  Objection, Your Honor.  Again, I fail

19   to see how any of this relates to what these individuals

20   were promised.  There is no dispute that the company

21   announced its termination of these benefits.  And Your

22   Honor's already found the transition bonus that he's

23   referring to is nondiscriminatory.  I just -- I think the

24   document is fine.  It explains why they terminated the

25   benefits, but I don't think the question of them terminating

1    the benefits is still an issue in the litigation.

2             THE COURT:  The impact of this discontinuation is

3    relevant to the extent of damages.  The objection is

4    overruled.

5             MR. PETSONK:  Thank you, Your Honor.

6    BY MR. PETSONK:

7    **Q.**  Consistent with what you set forth in the section I

8    just read to you, Mr. Salvatori, you believed that five

9    years would transition most of CONSOL's nonunion retirees to

10   the point of being eligible for Medicare at that time,

11   right?

12   **A.**  Yes.

13   **Q.**  Could I have --

14            MR. PETSONK:  I move for admission of Plaintiffs'

15   Exhibit 22, Your Honor.

16            MR. TORRES:  No objection, Your Honor.

17            THE COURT:  Admitted.

18        **Plaintiff's Exhibit 22 admitted.**

19   BY MR. PETSONK:

20   **Q.**  Mr. Salvatori, after CONSOL made the Plan Amendment

21   that you've testified about here today, effective October

22   1st, 2014, you initiated a further consultation with Mercer

23   to secure another remeasurement of the accumulated

24   post-benefit obligations in the CONSOL retiree health and

25   welfare plan in the following calendar year; is that right?

SALVATORI - CROSS

1    **A.**    That's correct.  I would like to put a little context

2    into it, though, for both of these changes, if possible.

3    **Q.**    Well, I -- let me ask you a question, if I could, about

4    that, just so I give you some structure for your

5    presentation here.

6        Mr. Salvatori, when did you initiate this second

7    request to Mercer to remeasure the -- or revalue the

8    accumulated post-benefit obligation based on an additional

9    set of proposed changes?

10   **A.**    I think we made the change in June.  Probably began

11   looking at it in April.  And we announced the change in

12   June, I apologize.

13            MR. PETSONK:  Your Honor, may I approach?

14            THE COURT:  You may.  Is the June date in 2013?

15            THE WITNESS:  2015, sir.

16            THE COURT:  Thank you.

17            MR. PETSONK:  May I approach the witness, Your

18   Honor?

19            THE WITNESS:  Thank you.

20   BY MR. PETSONK:

21   **Q.**    What is this document, 16170 through 16 --

22            MR. TORRES:  I'm sorry.

23   BY MR. PETSONK:

24   **Q.**    It's the document Bate-stamped 16170 through 16 --

25   16203 -- excuse me -- through 16207.

1          MR. TORRES:  This is 23?

2          MR. PETSONK:  Plaintiff's 23.

3     BY MR. PETSONK:

4     Q.   Mr. Salvatori, the document I've given you labeled

5     Plaintiff's Exhibit 23 is dated April 9th, 2015.  And --

6     this is an e-mail from Deb Lackovic to David Khani, and

7     you're cc'd on the e-mail.  Do you see that?

8     A.   I do.

9     Q.   And the e-mail says, "David, per your request, attached

10    is the presentation from today's meeting with Mercer,"

11    signed Deb.

12         And then there is an attachment to this, and the

13    attachment is labeled "CONSOL 0PEB Redesign April 9, 2015,

14    v2."  Meaning, I gather Version 2.

15         Does that document look familiar to you?

16    A.   Yeah, it does.

17    Q.   And does this reflect that second valuation, as you

18    recall, beginning around April of 2015, that you referenced

19    that you requested Mercer to perform?

20    A.   It reflects the fact that business conditions had

21    gotten worse, and, as a result, we were looking at other

22    options related to the five-year run out of the retirement

23    medical benefits that we announced in October of 2014.

24    Q.   And who was -- what position did David Khani hold at

25    this time of April, 2015, in CONSOL?

1    **A.**   David Khani was the Chief Financial Officer.

2    **Q.**   So that's the senior most financial position in the

3    company, right?

4    **A.**   That is correct.

5    **Q.**   He signs off on all of the financial statements issued

6    to investors and ratings agencies and others; is that right?

7    **A.**   Yes.

8    **Q.**   So the document that this e-mail conveyed to Mr. Khani

9    is labeled "CONSOL Energy, Incorporated, Salaried and P&M

10   OPEB Redesign," April 5, 2015?

11   **A.**   April 9.

12   **Q.**   Excuse me, April 9, 2015.  Please explain what does

13   "OPEB" stand for.

14   **A.**   OPEB stands for other post-employment benefits.  So

15   it's a common acronym related to the valuation on balance

16   sheets, a term related to FASB, related to, particularly,

17   retiree medical programs.  Typically, liabilities related to

18   things like defined benefit pension plans will have their

19   own line on the balance sheet itself.

20        So OPEB in this case primarily represented our

21   liability as valued by Mercer for our retiree medical

22   programs at that time.

23   **Q.**   And if you flip to the page -- well, let me ask you,

24   before I start inquiring about the document.

25        Similar to the prior Mercer valuation, did you receive

1    this valuation from Mercer and review it?

2    **A.**   Sure, yes.

3    **Q.**   And did you advise Mr. Khani about its contents?

4    **A.**   To my recollection, what was being talked about here on

5    this e-mail was sharing with David the presentation that

6    Mercer had come in to present to us on March 24th.  So it

7    was a hard copy of the presentation.

8    **Q.**   Okay.  And just to identify, on page stamped 16178, it

9    sets forth a couple of different benefit options that Mercer

10   considered -- or that Mercer valued in this remeasurement or

11   this valuation exercise.  Is that right?

12   **A.**   Yes.  To be clear, I had asked them for options.  I

13   wanted ideas.

14   **Q.**   And they gave you an option for a 50/50 cost sharing,

15   and also an option for health reimbursement accounts

16   structuring, which there would not be a traditional group

17   medical plan, but instead, CONSOL would make defined

18   contributions to an account that the beneficiaries could use

19   for medical expenses, right?

20   **A.**   Correct.

21   **Q.**   On Page 16190, the slide reads -- or the page reads,

22   "Next Steps."  And it says, "Additional analysis?  "CONSOL

23   decision?"  And then it says, "UMWA OPEB"?

24   **A.**   Yes.

25   **Q.**   Now, you testified before that there was not any change

1    to the UMWA OPEB that had occurred at this point, correct?

2    **A.**    That's correct.

3    **Q.**    And if you look towards page stamped 16195, it sets

4    forth various categories of salaried retirees, and on page

5    16196, it sets forth various categories of P&M or hourly

6    retirees, as to whom you were requesting Mercer to revalue

7    the retiree health and welfare plan, right?

8    **A.**    Yes.  And splitting them up in, I'll call it,

9    categories for us to look at, for lack of a better word,

10   I'll say, by asset class.

11   **Q.**    On the pages I just referenced, 16195 and 16196, on the

12   left it sets forth enrollment numbers for traditional

13   retiree medical on both of those pages, right?

14   **A.**    Yes.

15   **Q.**    And on the right, it sets forth enrollment numbers for

16   HRA/CRHRA?

17   **A.**    Yes.

18   **Q.**    And the "CRHRA" refers to the CONSOL Retiree Health

19   Reimbursement Account, right?

20   **A.**    We had put in for our staff retirees, I think, in the

21   time frame of 2011, '12, a HRA arrangement for them.

22   **Q.**    Let me clarify, because I was asking you about CRHRA.

23   And on page 16195, there is two types of HRAs set forth.

24   There is one called HRA, and one is called CRHRA.

25       You mentioned for the office staff, you had an HRA you

1   started some years ago, right?

2   **A.**   Yes.

3   **Q.**   And so that's distinct from what's call CRHRA, which is

4   an HRA available to production retirees?  Do you follow my

5   distinction?  You created an HRA for production retirees; is

6   that right?

7   **A.**   No.

8   **Q.**   There was never any -- what they called a 2250, where

9   you could get contributions to --

10   **A.**   We did, I'm sorry.  We did.  It had very few

11   participants in it just by the nature of its newness.  So

12   there were some -- overwhelming -- this column is referring

13   to the staff level employees that participate in the HRA

14   Program we put in in the 2011, '12, time frame.

15   **Q.**   Okay.  Mr. Salvatori, you -- after this point in April,

16   is it fair to say you engaged in a substantial amount of

17   back and forth with Mercer between your HR group and Mercer

18   to ascertain the structure and the terms of the contemplated

19   2015 Retiree Health and Welfare Plan Amendment that you were

20   attempting to value?

21   **A.**   For the 2015 change, because we ultimately came out at

22   eliminating the benefits, there was not -- there was

23   probably not a ton of data exchanged back and forth, because

24   the answer was relatively straightforward from a financial

25   standpoint, but there would have been some.

SALVATORI - CROSS

1    **Q.**   One of the items that you did have some involvement

2    with was how to account for the costs and the gains

3    associated with the Plan Amendment; is that right?

4         MR. TORRES:  Your Honor, this -- I don't believe

5    the last document, which apparently we are now moving away

6    from, was entered into evidence.  I'd like an opportunity to

7    weigh in on its admissibility before we move on to other

8    topics.

9         MR. PETSONK:  I move for its admission, Your

10   Honor, that is, Plaintiff's Exhibit 23.

11        MR. TORRES:  May I voir dire, Your Honor?

12        THE COURT:  You may.

13      Before you go on, 23 should be presented and marked.

14        MR. PETSONK:  It has been presented and marked,

15   Your Honor.  I believe I neglected to give an additional

16   copy to the clerk.

17        THE COURT:  Then the witness has 23?

18        MR. PETSONK:  Yes.  I apologize.  In the process

19   of moving my exhibits, I misplaced my additional copy of

20   that, Your Honor.

21        THE COURT:  Please go ahead.

22        MR. TORRES:  Thank you, Your Honor.

23                    **VOIR DIRE EXAMINATION**

24   **BY MR. TORRES:**

25   **Q.**   Mr. Salvatori, just a couple of questions so that I can

1   understand the exhibit a little bit better.  If you turn to

2   page 16 -- CONSOL 16174; do you see that?

3   **A.**   I do.

4   **Q.**   And it's referring to certain redesign options.

5         Do you see that?

6   **A.**   I do.

7   **Q.**   And you testified that at some point after this time --

8   just to put this into context -- you ultimately decided to

9   terminate the benefit altogether, correct?

10  **A.**   Yes, we did.

11  **Q.**   So just so I'm clear, this attachment that was provided

12  by Mercer, what, if any, relevant or -- relation -- what, if

13  any, relation does this presentation have to do with your

14  ultimate decision to terminate the benefit in June of 2015?

15  **A.**   Only to the extent that the options offered were not

16  financially significant enough to really reach the outcome

17  we were looking for.

18  **Q.**   So as it relates to the decision to terminate the

19  benefit, what, if any, relation would the numbers and the

20  estimates, and the accounting calculations in this document

21  have to the actual decision you made to terminate the

22  benefit all together?

23  **A.**   None.

24         MR. PETSONK:  Objection.  I think he just answered

25  that question, Your Honor.

1          THE COURT:  The witness may answer.

2          THE WITNESS:  None.

3     BY MR. TORRES:

4     **Q.**   None?

5     **A.**   None.

6          MR. TORRES:  Your Honor, it doesn't seem that this

7     document relates to the decision to terminate the benefits,

8     according to Mr. Salvatori.  And since to the extent these

9     are being offered as a way to try to prove damages, it

10    doesn't seem to have relevance to that.

11        It certainly doesn't have relevance to the merits of

12    the remaining claims.

13         THE COURT:  Mr. Petsonk.

14         MR. PETSONK:  Well, Mr. -- thank you, Your Honor.

15    Mr. Salvatori testified that he considered the cost

16    valuations in the document in determining the final course

17    of action, which was not to provide the transitional options

18    that are presented in this document, because, pursuant to

19    Mr. Salvatori's consideration of this document, those

20    options were too expensive for CONSOL.  So it's a part of

21    the factors he considered in making the decisions he

22    ultimately made regarding the curtailment and termination of

23    the benefits.

24         MR. TORRES:  Your Honor, first off, I think he

25    said exactly the opposite.  This wasn't moving the needle

1    enough for it to be considered, but he can testify himself.

2    I think he said exactly the opposite.

3         But the question is not -- if they are offering these

4    to try and project that they are a measure of damages, Your

5    Honor, then the question is what was the impact on the final

6    action to terminate the benefits.

7         And he just said that this document doesn't have any

8    relation to the impact of the final decision to terminate

9    benefits.  So if the purpose of the document is to try and

10   prove up damages, it doesn't bear relation to the actual

11   termination of the benefits.

12        It is looking at interim options that they ultimately

13   decided not to pursue.  So that -- again, if the sole

14   purpose of this is just to say, we can try and use that as

15   some alleged measure of damages, okay, they can try to do

16   it, but he's testified that this document doesn't actually

17   reflect the impact of the ultimate decision that he made to

18   terminate the benefit.

19             MR. PETSONK:  Your Honor, he's right.  And it's

20   not being offered for measure of damages, but, rather, to

21   show the factors considered by the -- the fiduciary in

22   deciding how to go about its plan curtailment in 2015.

23             MR. TORRES:  Well, but, Your Honor, again, now

24   he's back to the other -- now we are back to the merits,

25   then I would say, how does this relate to what those

 1    individuals who were plaintiffs were promised?

 2        Again, the fiduciary breach here has to do with these

 3    alleged statements by these individuals who were identified,

 4    not by Mr. Salvatori's actions in 2015 deciding to terminate

 5    the benefits.  Unless, of course, they are trying to use it

 6    as damages, and apparently now they are saying they weren't.

 7        So it doesn't seem to relate to either issue, Your

 8    Honor.  It certainly can't prove up the breach of fiduciary

 9    claim.

10            THE COURT:  Anything further, Mr. Petsonk?

11            MR. PETSONK:  No, Your Honor.

12            THE COURT:  The objection is sustained.

13            MR. PETSONK:  May I approach, Your Honor?

14            THE COURT:  Yes.

15            MR. PETSONK:  May I approach the witness, sir?

16            THE COURT:  You may.

17            THE WITNESS:  Thank you.

18            MR. PETSONK:  Plaintiff's 24.

19            MR. TORRES:  I don't think -- counsel, we need to

20    see these documents.

21            THE COURT:  Mr. Petsonk, is it the case that one

22    of the plaintiffs took the transition payment?

23            MR. PETSONK:  Two of the plaintiffs, Your Honor,

24    Plaintiffs Gilbert and Prater, both.

25            THE COURT:  Thank you.

1          MR. PETSONK:  Do you need more time, Joe, or may I

2    proceed?

3    BY MR. PETSONK:

4    **Q.**   Okay.  Mr. Salvatori, have you had the chance to look

5    at what I've given you, which has been marked Plaintiff's

6    Exhibit 24?

7    **A.**   Yes.

8    **Q.**   And that's an e-mail from Mary Stone to you?

9    **A.**   Correct.

10   **Q.**   Various other people are copied on the e-mail.  And the

11   e-mail is dated May 8, 2015; is that right?

12   **A.**   Yes.

13   **Q.**   And the e-mail references financial projections for a

14   proposed one-time cash payment approach.  And is Mary Stone

15   also from Mercer?

16   **A.**   She is.  She's an actuary.

17   **Q.**   Okay.  So is this another proposal or another -- yes,

18   is this another proposal you received from Mercer in 2015

19   for a potential plan curtailment for retiree health and

20   welfare benefits?

21   **A.**   Yes.  Again, I was, first of all, acting in my capacity

22   as Vice President of Human Resources.  And I was, you know,

23   wanting to find a solution that in my mind could -- could in

24   some cases work, right, and I'll have to take that to the

25   management of the company, executive management, and see

1   where they came out on it.  But I was looking at different

2   options.  Ultimately, none of them generated what was

3   expected.  And we ultimately made the decision to recommend

4   eliminating the benefits.  But it wasn't done off-the-cuff.

5   We went through a period of time where we looked at plenty

6   of different options in the hopes that we could find

7   something that would work.

8   **Q.**   All right.  The attachment to this e-mail is a

9   presentation from Mercer entitled "CONSOL Energy,

10  Incorporated, Retiree OPEB Design CASH only No HRA," and

11  it's dated May 8, 2015, and it says, "Supplement."

12        Is that right?

13  **A.**   Correct.

14  **Q.**   And this document contemplates a $25 million transition

15  payment to certain unspecified retirees; is that right?

16  **A.**   It would be the salaried and P&M retirees.

17  **Q.**   Your understanding is this document values the retiree

18  health and welfare benefit plan, based on a plan

19  termination, but one that includes a transition benefit paid

20  to all salaried and P&M retiree welfare beneficiaries?

21  **A.**   That was the proposal that was put in front of me, yes.

22  **Q.**   And the summary of the accounting for that proposal is

23  set forth on page 16637, if you flip to that page.  Does

24  that appear accurate to you, that that page contains a

25  summary of the accounting for the proposal you just

1    described?

2    **A.**   I would have to look at it pretty closely, but assuming

3    it was attached to the same presentation, I'd have to say,

4    most likely, that would have been provided by Mercer.

5    **Q.**   On this page, it specifies that the $25 million

6    transition payment was to be made on January 1, 2016.  Is

7    that right?

8    **A.**   Yes.

9    **Q.**   And then this document represents on that same page a

10   change to what is noted as AOCI; is that right -- or it sets

11   forth the AOCI as of the measurement date?

12       Do you see where I'm referring there on the third line

13   of the table?

14   **A.**   Yes.

15   **Q.**   And what does "AOCI" refer to?

16   **A.**   I think -- I don't know for sure.  The "CI" certainly

17   refers to comprehensive income, which was a section in the

18   equity section of the balance sheet.  Other than that, I'm

19   not an expert in that area.

20   **Q.**   Okay.  But your responsibility was for reviewing

21   Mercer's valuation of the impact of the contemplated change

22   on the income through the plan; is that right?

23          MR. TORRES:  Object to the form of the question.

24   Assumes facts -- I guess I should say, Your Honor, the

25   question lacks foundation.

```
 1              MR. PETSONK:  Well --

 2              MR. TORRES:  The gentleman just said he doesn't

 3    know what "AOCI" meant, but he's now asking him a question

 4    about that measurement.  He didn't establish a foundation

 5    for asking the question.

 6              THE COURT:  If you will, follow that request.

 7    BY MR. PETSONK:

 8    Q.   This table presents an analysis about the anticipated

 9    expense or income arising from the cash transitional

10    amendment that Mercer reviewed at this time; is that right?

11    A.   I would say it's the summary of the accounting

12    treatment for the proposed transaction.  From a management

13    standpoint, outside of the financial accounting department,

14    this page is not the one that anyone would have relied on.

15    Q.   Okay.  Are you able in reviewing the document to

16    identify the page that you relied on in conveying to your

17    superiors your assessment of the cost of this proposed --

18    the cost/benefit analysis, I guess you would say, of this

19    proposed amendment?

20    A.   Probably in the next page.

21    Q.   And it says, "Observations.  Total OPEB.  2015 expense

22    is estimated to change from an expense of $5 million to an

23    income of $195 million"; is that right?

24    A.   Yes.

25    Q.   Okay.  And then that would -- you report that to your
```

1    superior, I gather, that would be the CFO; is that right?

2    A.   No, I didn't report to the CFO; I reported at the time

3    to the Chief Administrative Officer.

4    Q.   And then that, the Chief Administrative Officer would

5    thereafter -- who did they report to?

6    A.   The CEO.

7    Q.   The CEO?

8    A.   Yes.

9    Q.   So, in any event, moving on --

10          MR. PETSONK:  I'd like to present another exhibit,

11   Your Honor, if I may?  I'd like to move for admission of

12   this exhibit, please.

13          MR. TORRES:  May I voir dire, Your Honor?

14          THE COURT:  You may.

15                  **VOIR DIRE EXAMINATION**

16   **BY MR. TORRES:**

17   Q.   Mr. Salvatori, the proposal that is discussed in

18   Plaintiff's Exhibit 24, including the cash and expense

19   estimates that are provided in here, what, if any, relation

20   do these numbers have to the ultimate decision you made to

21   terminate the benefit altogether?

22   A.   None.

23   Q.   And why is that?

24   A.   Because the numbers on the surface did not move the

25   needle enough to be taken seriously as an option to present

SALVATORI - CROSS

1    to executive management.

2    **Q.**   Do you recall if you reported this to any of your

3    superiors?

4    **A.**   I don't recall.

5    **Q.**   Okay.  And just to be clear, there was a prior -- the

6    Judge had asked a question about transitional payments that

7    were made to some of the plaintiffs in the case, Mr. Prater

8    and Ms. Gilbert?

9    **A.**   Yes.

10   **Q.**   And what, if any, relation do the numbers in this

11   presentation have to do with the decision to offer

12   individuals such as Ms. Gilbert and Mr. Prater a

13   transitional benefit at an earlier point in time?

14   **A.**   None.

15             MR. TORRES:  Your Honor --

16             MR. PETSONK:  Object.  Your Honor.  It's -- he's

17   referring to an earlier transition benefit.  But I think

18   it's -- you know, I don't know that that question is -- is

19   adequately founded, because he hasn't established when --

20   whether the witness even knows when Ms. Gilbert and Mr.

21   Prater received the transition benefit.

22             THE COURT:  Mr. Petsonk, what value is this

23   exhibit?

24             MR. PETSONK:  This exhibit, Your Honor -- and I

25   can -- I have an accompanying exhibit.  This exhibit does

1    show the analysis that the defendant used in determining

2    whether to extend transition benefits to Ms. Gilbert and

3    Prater, and how to account for the cost of doing that, of

4    granting or withholding those transition benefits.

5         I have an accompanying exhibit, Your Honor.  The matter

6    of the accounting for the cost, that is, whether the

7    defendant allocated the income that they derived from the

8    decision to terminate the benefits in the way that they did,

9    goes to the matter of the final disposition of that income

10   and its susceptibility to -- to recovery or disgorgement in

11   equity.

12            MR. TORRES:  Your Honor, I can ask one more

13   question about the transition payment to clarify the lack of

14   relationship, if Your Honor wishes.

15            THE COURT:  Go ahead.

16                    **VOIR DIRE EXAMINATION**

17   **BY MR. TORRES:**

18   **Q.**   Mr. Salvatori, when you decided to terminate the

19   benefits -- and you testified that you were involved in the

20   decision to terminate the benefits altogether in 2015,

21   correct?

22   **A.**   In 2015, yes.  Yes.

23   **Q.**   And in connection with that decision, what, if any,

24   transition payments would have been offered to individuals

25   such as Mr. Prater and Ms. Gilbert?

SALVATORI - CROSS

1    **A.**   So we identified -- in '14, when we made the original

2    transition payments, there was some people that came to us

3    and asked us whether or not, you know, if they should

4    retire, will they get the five years.

5         And we couldn't tell them what to do.  But, you know,

6    in our view, in that case, we made statements that, in my

7    view, deemed it necessary to pay those people in lieu of the

8    five years.  And when we made the change to end the benefit

9    program.  It was a very small, limited group, because of a

10   handful of people across the company that used the original

11   decision to eliminate the benefits as a -- I'll call it a

12   retirement decision -- and to those people, we reinstated

13   the transitional payment that they would have otherwise

14   gotten had they stayed.

15   **Q.**   So back to Exhibit 24, what, if any, relation do the

16   numbers in this exhibit have to the decision to offer the

17   transition benefit for the small number of individuals that

18   you just referred to?

19   **A.**   It has none.  This document is, again, a proposal, as I

20   was grappling with approaches to find cost savings

21   sufficient enough to continue the program if we could.  And

22   it was a proposal that was part of that.

23        Ultimately, the proposals we received, like I said

24   before, unfortunately, didn't move the needle enough, and we

25   ultimately made the decision to eliminate the benefit plan

1    program.  It was our right within the plan documents and the

2    SPDs.

3    **Q.**  One final question about the transition payments that

4    you did make in connection with the decision to terminate

5    the benefits in 2015.  From what source did you pay those

6    transition benefits?

7    **A.**  Corporate cash.

8              MR. TORRES:  Again, I would renew my objection,

9    Your Honor.  This doesn't relate to those transition

10   payments.  This document doesn't relate to anything relevant

11   to the remaining issues, including measures of damages.

12             THE COURT:  Anything further, Mr. Petsonk?

13             MR. PETSONK:  Well, yes, Your Honor.  The -- not

14   only -- this document not only relates to the decision about

15   whether to provide transition benefits to Mrs. Gilbert and

16   Mr. Prater, but it also relates to the equally significant

17   decision not to provide those benefits to the others.

18        This document presents the costs that Mr. Salvatori

19   considered if he had provided those types of transition

20   benefits to the other five plaintiffs in the case.  And this

21   document, Mr. Salvatori's testified, was the -- the origin

22   of his knowledge about the cost, which he says was

23   ultimately too great for them to consider.

24             THE COURT:  The objection is sustained.

25             MR. PETSONK:  Your Honor, may I approach?

1                    THE COURT:  You may.

2                    MR. PETSONK:  Your Honor, may I approach the

3      witness?

4                    THE COURT:  You may.

5                    THE WITNESS:  Thank you.

6                    MR. TORRES:  Counsel, what is the document?

7                    MR. PETSONK:  Yes, sir.  This is document 16961.

8                    MR. TORRES:  16961?

9                    MR. PETSONK:  Your Honor, I don't want to belabor

10     my inquiry, but I've presented the witness a document

11     stamped Plaintiff's Exhibit 25.  And this goes to a similar

12     matter, Your Honor, which is Mr. Salvatori's involvement in

13     the accounting and for the 2015 Plan Amendment.

14     BY MR. PETSONK:

15     **Q.**   Mr. Salvatori, do you see this e-mail to you from Deb

16     Lackovic and Lisa Borelli, dated May 12, 2015?

17     **A.**   Yes.

18     **Q.**   And are you suggesting in this e-mail that the

19     $25 million transition payment should be accounted for in

20     the 2015 year, so that it would accrue for this year, but

21     there would be a $25 million liability left on the books,

22     rendering the effect of the plan amendment thus accounted

23     for cash neutral for the 2015 calendar year?

24     **A.**   This is simply me, as I've said before, when it comes

25     to actuarial valued liability, which OPEB is one, there are

1    very particular accounting rules on how transactions are

2    recognized within the company filings, like the 10-K.  I was

3    asking a question related to the timing of the payment and

4    how it would be -- how it would be accounted for.

5        I was not in any way taking a position on the

6    accounting.  That was the Chief Accounting Officer, who you

7    see down below in the e-mail, Kris Hagedorn.

8        I was simply trying to understand, while it may have

9    been one day, how that would interact with the disclosure of

10   things on the balance sheet, income statements, and cash

11   flow for the company.

12   Q.   But you are the accountant, right?

13   A.   I'm not a certified public accountant.  I have a

14   finance degree from Penn State.  I also completed the

15   accounting curriculum at Penn State, and I did work in the

16   accounting department as an accountant with CONSOL from '92

17   to '99.  I do not in any way present to be a FASB expert on

18   actuarial valued liability.

19   Q.   And several accountants looked at this, as well, both

20   your accountant, Kris Hagedorn, and also Ernst & Young

21   outside; is that right?

22   A.   Kris would have definitely.  There is no reason we

23   would not have shared it with Ernst & Young if we wanted to

24   get their opinion on it.

25   Q.   And do you know whether you ultimately accounted for

1   the amendment in the way that you advocated in this e-mail,

2   when you say, in my mind, there shouldn't be an accounting

3   issue by making the payment in '16 and leaving the $25

4   million liability on the books for 2015?

5   **A.**   Well, it never had to be answered, because we did not

6   go down this path, ultimately.  So I don't even know if I

7   ever got an answer on it.

8   **Q.**   But, at any rate, you were involved up to this point in

9   CONSOL's valuation of how such a change would be reported?

10          THE COURT:  Mr. Petsonk, what does this have to do

11   with any of the issues remaining in this case?

12          MR. PETSONK:  It has to do with Mr. Salvatori's

13   knowledge about the manner in which CONSOL ultimately

14   reported the accounting for the plan change that it did

15   make.

16          THE COURT:  So what?  What difference does it

17   make?

18          MR. PETSONK:  Well, I imagine I'm going to be

19   called upon to lay a foundation for subsequent documents

20   that I seek to show Mr. Salvatori, so I'm attempting to

21   demonstrate that Mr. Salvatori was involved throughout the

22   process of determining how CONSOL would account for its

23   ultimate plan change, and so that if I presented him a

24   document that provides the final accounting, he will be

25   understood to have engaged in the process of determining how

1    to account for it, and there would be an adequate foundation

2    for Mr. Salvatori to express his understanding about the

3    final accounting, Your Honor.  That's all.

4         MR. TORRES:  Your Honor, he just testified that

5    this document didn't relate to the ultimate decision that

6    they decided to engage in.  And just in the interest of

7    short-circuiting, Your Honor -- and again, I'm not trying to

8    tell the plaintiffs how to prove this case -- the

9    implications of CONSOL's actions in 2014 and 2015 were

10   reported in their public filings with the Securities and

11   Exchange Commission.  There is a document filed with the

12   government where they explain what the cash and accounting

13   implications were of its decision to terminate the benefits

14   in 2014, and to terminate the benefits in 2015.  We are

15   certainly not going to dispute what we -- what CONSOL said

16   to the SEC.

17        As to what the impact of these changes were in the

18   company, and if the purpose is simply to demonstrate what

19   those numbers are so they can try to argue somehow the

20   relation to damages, it seems to me that we would stipulate

21   to what those numbers are, Your Honor.  And all of these

22   interim steps that he seems interested in taking Mr.

23   Salvatori through are going to nothing -- to nothing

24   ultimately that could be marginally relevant to what the

25   costs, the cash and accounting implications of the decision

```
 1    were.
 2              THE COURT:  Anything further, Mr. Petsonk?
 3              MR. PETSONK:  Your Honor -- I mean, I'm perfectly
 4    open to a stipulation.  And --
 5              THE COURT:  Well, if you want to talk about it
 6    before the Court rules, that's fine with me.
 7         (An off-the-record discussion was held between
 8    plaintiffs' counsel and defense counsel.)
 9              MR. TORRES:  Your Honor, I'm happy to stipulate,
10    but I'm going to need to be able to talk to someone who is a
11    little -- I'm not talking hours, Your Honor -- but if he
12    wants me to stipulate to the numbers that are reported, I'll
13    just want to be sure that I have something else I can verify
14    them against.  It should take us a matter of minutes.
15         If he wants to withdraw the exhibit and have us
16    consider the stipulation, I'm happy to consider it.
17              THE COURT:  Is it something that can be
18    accomplished not through this one exhibit but a series of
19    them?  Can it be accomplished in the next 15 minutes?
20              MR. TORRES:  It's just what's reported to the SEC.
21    I'm confident we can accomplish that in the next 15 minutes.
22              THE COURT:  Well, let's take 15 minutes now, and
23    see if it can be done.
24              MR. PETSONK:  Thank you.
25              THE CLERK:  All rise.
```

 1          (A recess was taken at 4:33 p.m. until 5:01 p.m.)

 2              THE CLERK:  All rise.

 3              THE COURT:  Please be seated.

 4          Have you accomplished something?

 5              MR. PETSONK:  Well, Your Honor, I think we have

 6      accomplished a proposal here, Your Honor, which I may

 7      present at this time.

 8          At issue has been whether the parties could reach a

 9      stipulation about the 2015 10-K form that was filed by

10      CONSOL, Energy, Incorporated.  And what I proposed, which I

11      think addresses a resolution, is that we would enter an

12      abridged version of the 2015 10-K, including page 1 of that

13      document, which is simply the cover page, and pages 139

14      through 141, which are the discussion of other

15      post-retirement benefit plans, and the parties have a

16      limited stipulation regarding the contents of those pages.

17          And I have one matter for questioning Mr. Salvatori

18      about an item within those pages.

19              THE COURT:  Go ahead.

20              MR. PETSONK:  So I would move to admit this

21      exhibit on that basis.

22              THE COURT:  What is the number?

23              MR. PETSONK:  So this would be marked at this

24      point Plaintiff's Exhibit 28.

25              THE COURT:  Go ahead.

```
 1              MR. PETSONK:  Well, I haven't moved for the others
 2     I premarked with you.  Shall we -- let's mark this as 26 in
 3     that case, since I haven't yet moved for those others.
 4         Is that okay, Josh?  I mean, for clarity sake.
 5              THE COURT:  Well, 25 was the last one we had.
 6              MR. PETSONK:  So let's make this 26.
 7              THE COURT:  It will be so understood.
 8              Just one moment.  Did you hand up the other
 9     exhibits?  Did you hand up what are 25, 26, and 27?
10              MR. PETSONK:  I have not tendered those to the
11     witness, yet.
12              THE COURT:  Have they been tendered to the Court?
13              MR. PETSONK:  Yes.
14              THE COURT:  And so is it agreed that 25, 26, and
15     27 are not offered, but what will now be 28 is?
16              MR. PETSONK:  Your Honor --
17              THE COURT:  Just think about that and talk to Mr.
18     Torres about it.
19              MR. PETSONK:  Okay.
20              THE COURT:  Josh, does that cover it?
21              MR. TORRES:  Your Honor, we have a pending
22     objection to 25.  If you want to mark this one as 28, we
23     certainly don't have any objection to that, and leave the
24     other numbers open.
25              THE COURT:  Well, 26 and 27 -- do I understand
```

1    those exhibits were handed to the clerk?

2             MR. PETSONK:  Yes.

3             THE COURT:  Are they withdrawn?

4             MR. PETSONK:  We may be able to withdraw 27.  I

5    didn't expect to withdraw 26 or 25, Your Honor.

6             THE COURT:  The objection is to 25?

7             MR. TORRES:  The objection to 25, Your Honor, has

8    to do with Mr. Salvatori's testimony on voir dire that this

9    didn't relate to the ultimate decisions to terminate the

10   benefits in 2015.

11            THE COURT:  Anything further on 25?

12            MR. PETSONK:  Well, if we have a stipulation as to

13   -- I don't think we have an entire stipulation as to the

14   10-K, so I think I would wait to leave 25 in for that

15   foundational purpose that I had addressed, Your Honor,

16   elucidating Mr. Salvatori's knowledge about the accounting

17   for the plan change.

18            THE COURT:  And are you offering 26?

19            MR. PETSONK:  And I'm offering 26, the 10-K

20   exhibit.

21            THE COURT:  We've already got on the record 25,

22   26, and 27.  The 10-K is going to be 28.

23        What I want to know is what you are doing with 25, 26,

24   and 27?

25            MR. PETSONK:  I'm going to leave 25 on the record.

SALVATORI - CROSS

1       That's the foundation for what I am seeking to offer as 28

2       then, Your Honor.

3           And then as to 26, that's an unrelated issue.  I'll

4       come back, I would like to question the witness about 26.

5           And if -- and I think I can withdraw 27 based on my

6       understanding about the stipulation regarding 28.

7               THE COURT:  Very good.  Now then, before going to

8       28, we are going to address 25.

9           Mr. Torres.

10              MR. TORRES:  25, Your Honor?

11              THE COURT:  Yes.

12              MR. TORRES:  Again?

13              THE COURT:  Just as it the relates to 28.

14              MR. TORRES:  I mean, Your Honor, I think the

15      gentleman testified that he doesn't have any knowledge of

16      accounting principles related to OPEB, so I'm not sure what

17      foundation has been laid by this document that would allow

18      us to go to a 10-K, which we said we don't dispute as

19      authentic.  So I think we stand on our objections to 25.

20          Whatever the 10-K states, Mr. Salvatori has stated that

21      this document in 25 does not bear any relation to the

22      ultimate decision they made regarding the termination of the

23      benefit in 2015.  So it doesn't provide any foundation for a

24      publically filed document, Your Honor.

25              THE COURT:  Thank you.

SALVATORI - CROSS

1          Mr. Petsonk.

2                    MR. PETSONK:  I don't have anything further.

3                    THE COURT:  The objection to 25 is sustained.  And

4     that leaves 26 yet to be dealt with.

5          27 is withdrawn.

6          And you can go to 28 now.

7                    MR. PETSONK:  May I approach the witness, Your

8     Honor?

9                    THE COURT:  You may.

10                   MR. POMPONIO:  Sam, we have a copy here.

11                   MR. PETSONK:  May I present this to the witness?

12                   May I approach, the witness, Your Honor?

13                   THE COURT:  Yes.  As I understand, 28 consists of

14    2015 10-K form, pages 1, 139, 140, and 141?

15                   MR. PETSONK:  That is correct, Your Honor.

16                   THE COURT:  That is an abridged version, as you

17    call it.  So you may present that to the witness.

18                   MR. PETSONK:  Thank you.

19         As an initial matter, I do believe we have a partial

20    stipulation regarding this exhibit.  So I might invite the

21    opposing counsel, Your Honor, with your direction, to tender

22    what it is that he would agree to by stipulation regarding

23    Plaintiff's Exhibit 28.

24                   THE COURT:  You may do so.

25                   MR. TORRES:  Yes, Your Honor.  I believe the

1   stipulation was along the lines that we agreed -- we

2   stipulated that the effect of the 2014 and 2015 amendments

3   to CONSOL's benefit plan for production and maintenance

4   employees in terms of OPEB and other comprehensive income

5   for taxes and curtailment gains are accurately reflected on

6   page 139 of abridged Plaintiff's Exhibit 28.

7              THE COURT:  Is that so stipulated?

8              MR. PETSONK:  The parties reviewed --

9              THE COURT:  I just want the answer to that

10  question; yes or no, is that so stipulated?

11             MR. PETSONK:  Well, I gather, yes, Your Honor.

12             THE COURT:  Very good.  And you may proceed.

13  BY MR. PETSONK:

14  **Q.**   Mr. Salvatori, do you see on page 139 of the

15  Plaintiff's Exhibit 28, that in the third paragraph, the

16  last sentence reads:  "CONSOL Energy recognized income of

17  $235,541 related to amortization of prior service credit,

18  coupled with recognition of actuarial losses in Operating

19  and Other Costs - Coal in the Consolidated Statements of

20  Income for the year ended December 31, 2015, as a result of

21  the changes made to the salaried and P&M OPEB plans"?

22  **A.**   Yes.

23  **Q.**   And do you see that in the prior paragraph, which

24  describes the amendment to the retiree health and welfare

25  plans in 2014, the final two sentences read, "The amendment

1  to the OPEB plans resulted in a $315,439 reduction in the

2  OPEB liability with a corresponding adjustment of $199,252

3  in Other Comprehensive Income, net of $116,187, in deferred

4  taxes"?

5  **A.**   Yes.

6  **Q.**   And the next sentence states, "A curtailment gain of

7  $35,633 was recognized in September of 2014 with a

8  corresponding adjustment of $22,508 in Other Comprehensive

9  Income, net of $13,125 in deferred taxes."

10      And the following sentence says, "The amendment also

11  resulted in a remeasurement of the OPEB plan at September

12  30th, 2014."

13      Is that correct?

14  **A.**   Yes.

15  **Q.**   Now, if you flip forward to page 141, there is a table

16  setting forth the components of net periodic benefits cost.

17  Do you see that?

18  **A.**   Yes.

19  **Q.**   And do you see that for the 2015 year under the column

20  addressing "Other Postretirement Benefits," the table

21  depicts a net periodic benefit cost that is in the nature of

22  a credit rather than a cost?

23  **A.**   Where is that at on the schedule, if you don't mind

24  showing me?

25  **Q.**   Where it says, "Net Periodic Benefit Cost" and in

1    parenthesis it says, (credit).  It's the final line of the

2    table at the top of page 141.

3    A.    I'm sorry.  I'm on the wrong page.  Go ahead.

4    Q.    Do you see that?  "Net Periodic Benefit Cost," the last

5    line of the table at the top of page 141?

6    A.    Yes.

7    Q.    And do you see that that table separated into two

8    parts, the left-hand side for the pension benefits and the

9    right-hand side refers to other postretirement benefits?

10   A.    Yes.

11   Q.    And then --

12         THE COURT:  Mr. Petsonk, do you have an unabridged

13   version of that that I can see so I can follow those pages

14   out?

15         MR. PETSONK:  I do, Your Honor.  My copies -- I

16   gave my extra copy to opposing counsel here.  So I don't

17   have -- I can give Your Honor the abridged copy, but I'll be

18   giving Your Honor my copy.

19         THE COURT:  Well, just let it go then.  The Court

20   will get it after the hearing.

21         MR. PETSONK:  My apologies, Your Honor.  Through

22   the process of stipulating, I relinquished my extra copy.

23         THE COURT:  I understand.  Go ahead.

24   BY MR. PETSONK:

25   Q.    Mr. Salvatori, do you see on the top of page 141, that

1    the table representing the components of net periodic

2    benefit cost encompasses various service and interest costs,

3    and allows for the amortization of prior service credits?

4    **A.**    Yes.

5    **Q.**    There is also represented in this table a recognized

6    net actuarial loss; do you see that?

7    **A.**    I do.

8    **Q.**    And so you've testified that you were familiar, and, in

9    fact, that you consulted repeatedly with the actuaries who

10   conducted the valuation of the 2015 benefits, right?

11   **A.**    I did.

12   **Q.**    And my question is, simply:  Based on your familiarity

13   with that process and that valuation, and based on your

14   testimony about tendering that valuation to your superiors

15   for inclusion in their public reporting, does the net

16   periodic benefit cost, that is, the income -- the credit

17   that is expressed at the bottom of the 2015 column on the

18   top of page 141, under the heading, "Other Postretirement

19   Benefits," that is a credit in the amount of $215,146; does

20   that reflect the financial benefit derived by CONSOL during

21   the -- during the 2015 calendar year as a result of the

22   curtailment that was valued by Mercer?

23   **A.**    It's the accounting -- so there is accounting rules on

24   how you recognize income and expense, and then it's somewhat

25   technical around actuarial valued liabilities.  What I would

1   worry about when I answer that question is, I hesitate to

2   take a snapshot of one year and say that's the whole thing.

3   Because, in many cases, as in the case with this case, cost

4   was amortized over a period of years.  So what I would say

5   as for the year 2015 related to the changes both in '14 and

6   followed on in '15, this would be the accounting income and

7   expense impact for that calendar year.

8   **Q.**   But you previously testified that the plan, the retiree

9   health and welfare plan came to a conclusion at the end of

10  year 2015?

11  **A.**   I did.

12  **Q.**   So you can't amortize cost for a period which a plan

13  doesn't exist, right?

14  **A.**   No.  But I think what you are missing is, in 2014, we

15  did not recognize cost or income related to the change in

16  '14, because we were expected to amortize those savings over

17  five years, which, at that point, was the remainder --

18  remaining life of the plan.  So that when we made the

19  decision in '15 to end the plan at the end of '15, not only

20  did we take the financial impact of that decision by itself,

21  but we also then had to accelerate the recognition of income

22  we would have otherwise received between '15 and '19, as we

23  were amortizing the change we made in '14.

24  **Q.**   So this table on 141 recognizes a net actuarial loss of

25  $102 million dollars -- $102,875,000, which ought to

1    encompass that actuarial loss that you've referenced, right?

2    **A.**    It only encompasses, again -- and I'm not trying to be

3    difficult here -- but actuarial valued liabilities are not

4    always intuitive on how cost and income is recognized.

5    These lines you see here of service cost, interest cost,

6    recognized net actuarial loss, amortization of prior

7    service -- they all mean specific things.  And that $102

8    million, because we were ending the plan, really what it

9    represents is all the variances accumulated by the plan in

10   its entire history that hadn't already been recognized for

11   variances from the assumptions made for the plan.  In other

12   words, things like mortality, things like retirement date.

13        I do not believe that $102 million had anything to do

14   with the -- the decision to end the program in '14 and '15.

15   It was simply accelerating costs that already needed to be

16   recognized.  And it just gave rise to having them recognized

17   now because the program was ended, which required the

18   accounting to accelerate those costs, that -- for that

19   particular component, the $102 million.

20   **Q.**   So it's your testimony then that the $215,146,000

21   represented on page 141, is a net periodic benefit cost, the

22   income recognized in 2015 from the termination of all

23   retiree medical at that point, right?

24   **A.**    It was the income recognized in 2015 for the

25   termination of the retiree medical plan announced in June of

1    2015, but that also necessitated an acceleration of costs

2    that would otherwise have been recognized in future years

3    had we not made that announcement.

4              MR. PETSONK:  Move for admission of this document

5    at this time, Your Honor, Plaintiff's 28.

6              MR. TORRES:  No objection, Your Honor.

7              THE COURT:  28 is admitted.

8              **Plaintiff's Exhibit 28 admitted.**

9              THE WITNESS:  Do you need this, Your Honor?

10             THE COURT:  Yes.  I'm going to ask, Josh, if you

11   would, make a copy of that for me when we finish today.

12             MR. PETSONK:  Your Honor, I presented what was

13   labeled Plaintiff's Exhibit 26.  Is that in evidence?

14             THE CLERK:  Did you want me to show this to the

15   Judge?

16             MR. PETSONK:  If you could, and then I'll present

17   it to the witness.

18             THE CLERK:  You have a copy?

19             MR. PETSONK:  I'm sorry.  I lost track of those.

20             May I approach the witness, Your Honor?

21             THE COURT:  You may.

22             THE WITNESS:  Thank you.

23             MR. TORRES:  Do you have a copy of what you're

24   tendering to him?

25             MR. PETSONK:  You have a copy of it.

1      This is document Bates Numbered 17077 through

2  17083.  This is Plaintiff's 26.

3  BY MR. PETSONK:

4  **Q.**  Mr. Salvatori, does this appear to be an e-mail from

5  Deb Lackovic, addressed to you, among others, and dated June

6  10th, 2015?

7  **A.**  Yes.

8  **Q.**  And does it set forth three attachments representing

9  letters from CONSOL to three groups of retirees who are

10  affected by the 2015 welfare benefit plan amendment?

11  **A.**  Yes.

12  **Q.**  And if you flip to the page stamped 17078, this is a

13  form letter; is that right?

14  **A.**  Yes.

15  **Q.**  Addressed to the survivor of a miner who was fatally

16  injured at a CONSOL mining facility; is that right?

17  **A.**  At some point in the past, yes.

18  **Q.**  And CONSOL paid about a million dollars in such

19  transition benefits to survivors of deceased miners?

20  **A.**  I don't recollect --

21      MR. TORRES:  Objection, Your Honor.  What is the

22  relevance of this to the issues in this lawsuit?  They've

23  already put into evidence the transition letters to the

24  plaintiffs in this lawsuit.  So at least a couple of these

25  documents are already in evidence.  And there is no issue in

1      this lawsuit anymore about these transition payments.  Your

2      Honor found that they were made in a nondiscriminatory

3      fashion, and they don't relate to the remaining claims as to

4      breach of fiduciary duty.

5            THE COURT:  Are these letters dealing with

6      transition payments?

7            MR. PETSONK:  They do deal with transition

8      payments, yes, Your Honor.  But I am offering them -- I can

9      proffer, just in the nature of cross-examining Mr. Salvatori

10     about a statement he made earlier today regarding the

11     providence of funds utilized in the plan.  And I can address

12     that with a simple -- I think one question here, Your Honor.

13           THE COURT:  Well, why do you need the exhibit?

14           MR. PETSONK:  To direct the witness to a statement

15     in the exhibit regarding the providence of certain funds

16     issued by the plan.

17           MR. TORRES:  Your Honor, if I may?  On Summary

18     Judgment, we argued that the health discrimination status

19     failed, because, among other reasons, the payments were not

20     made out of the benefits plan; and instead, Your Honor,

21     simply dismissed the claim based on the argument that there

22     was no evidence of any health status discrimination.

23        So again, how does that relate to whether these seven

24     individuals were promised lifetime benefits orally during

25     the orientations or whether they received an SPD?

1            THE COURT:  Anything further on the point?

2            MR. PETSONK:  Yes, Your Honor.  This relates to

3    the -- really to a matter of remedies, which is the -- and

4    also to the matter of fiduciary breach, because the action

5    of contributing value to a plan for the purpose of providing

6    a specified benefit may be a fiduciary action, and there is

7    an action represented in these documents, an undertaking by

8    the plan while Mr. Salvatori was the fiduciary, that I would

9    like to inquire just very briefly about so that I may

10   elucidate whether -- you know, what action it was; how they

11   were utilizing funds.

12           THE COURT:  Mr. Torres, anything further?

13           MR. TORRES:  Your Honor, this isn't like a

14   free-for-all deposition where you examine people about

15   unrelated topics.  The remaining fiduciary -- breach of

16   fiduciary duty has to deal with what these seven individuals

17   were promised; not what Mr. Salvatori allegedly did in 2015

18   after those alleged statements were made.

19       I mean, this is really far afield, Your Honor, and I'm

20   not sure how it adds anything of any value to the actual

21   discrete issues that Your Honor found necessary for trial.

22           THE COURT:  The objection to 26 is sustained.

23   BY MR. PETSONK:

24   Q.   Lastly, I have one other item.

25           MR. PETSONK:  If I may, approach, Your Honor?

```
 1              THE COURT:  Yes.
 2   BY MR. PETSONK:
 3   Q.   29.
 4   A.   Thank you.
 5              MR. TORRES:  Could I have a copy of the exhibit?
 6   BY MR. PETSONK:
 7   Q.   Mr. Salvatori, have you had a chance to inspect the
 8   document I gave you, which is labeled Plaintiff's Exhibit
 9   29?
10   A.   I have.
11   Q.   And does this appear to be the 2015 Amendment to the
12   CONSOL Energy Retiree Health and Welfare Benefit Plan?
13   A.   Yes.
14   Q.   That directs the termination of retiree health and
15   welfare benefits?
16   A.   It does.
17   Q.   And you signed this plan amendment on the 10th day of
18   June, 2015, right?
19   A.   Yes.
20              MR. PETSONK:  Your Honor, I move that this be
21   admitted into evidence.
22              MR. TORRES:  No objection, Your Honor.
23              THE COURT:  Admitted.
24        **Plaintiff's Exhibit 29 admitted.**
25   BY MR. PETSONK:
```

1  **Q.**   Mr. Salvatori, this document amends the health and

2  retiree health and welfare plans that you testified earlier

3  were first adopted on January 1 of 2011, right?

4  **A.**   Yes.  Yes.

5  **Q.**   And you were the plan administrator of those -- of that

6  plan at the time that you signed this document, right?

7  **A.**   At the time I -- you mean June of 2015?

8  **Q.**   Right.

9  **A.**   Yes.

10  **Q.**   And you were also the plan administrator of other

11  CONSOL plans, welfare plans at that time, weren't you?

12  **A.**   Yes.

13  **Q.**   And one of those plans was an employer plan that

14  provided healthcare benefits to members of the United Mine

15  Workers pursuant to the 2011 National Bituminous Coal Wage

16  Agreement, right?

17  **A.**   That's correct.

18  **Q.**   And like this plan, that plan has been subject to some

19  litigation in the Southern District of West Virginia; is

20  that correct?

21         MR. TORRES:  Objection, Your Honor.  What's the

22  relevance of --

23         THE WITNESS:  Yes.

24         MR. TORRES:  -- what's the relevance of this as to

25  whether these individuals were promised lifetime benefits?

 1          THE COURT:  How is it relevant?

 2          MR. PETSONK:  Well, Your Honor, Mr. Salvatori

 3   testified previously about comparisons that CONSOL made to

 4   the National Bituminous Coal Wage Agreement, and I'd just

 5   like to inquire of him as to -- because he was the plan

 6   administrator of the retiree welfare plan under the 2011

 7   NBCWA -- what he understands about the benefits that he

 8   administered under that plan.

 9          MR. TORRES:  Your Honor, the plaintiffs here

10   testified as to comparisons that were made to the UMWA

11   benefits in 1990, 1980 times, well before Mr. Salvatori was

12   the plan administrator.  And I believe that the testimony

13   that was Mr. Petsonk is referring to is Mr. Salvatori not

14   testifying about actions he took as a plan fiduciary, but

15   the fact that there were comparisons in some of the

16   orientation terms between UMWA and CONSOL benefits.

17      So I'm not quite sure what this current litigation,

18   apparently, Mr. Petsonk is referring to, again, has anything

19   to do with what these plaintiffs may have been told about

20   the UMWA benefits.

21      So the fact that Mr. Salvatori happens to administer

22   another UMWA plan in 2011, doesn't seem to, again, get us

23   back to what's really at issue here, which is what these

24   plaintiffs allegedly were told at earlier points in time.

25   So --

```
 1            THE COURT:  Anything further, Mr. Petsonk?

 2            MR. PETSONK:  Well, I would just like to inquire

 3   of Mr. Salvatori, setting aside the matter of other

 4   litigation, simply to inquire about his personal knowledge

 5   regarding the benefits he administered under the UMWA I

 6   referenced.

 7            THE COURT:  The objection is sustained.

 8   BY MR. PETSONK:

 9   Q.   Mr. Salvatori, do you -- do you know whether CONSOL

10   continues to provide retiree welfare benefits to union coal

11   miners today?

12   A.   Retired union coal miners?

13   Q.   Right.

14   A.   Yes, we do.

15   Q.   And do you provide those benefits pursuant to the last

16   negotiated National Bituminous Coal Wage Agreement?

17   A.   Yes.

18   Q.   Does CONSOL provide retiree welfare benefits to UMWA

19   retirees pursuant to the terms of federal legislation known

20   as the Coal Act?

21   A.   Yes.

22            MR. TORRES:  Your Honor, again, what's the

23   relevance of this as to what they currently provide to

24   anyone?

25            MR. PETSONK:  Your Honor, I think it's -- it's set
```

1    forth already, but its relevant, because the -- the

2    corporate fiduciary has knowledge about the benefits of the

3    Mine Workers that -- that are at issue in our case; that is,

4    all the representations that we've set forth on the record

5    here relate to the benefits provided to the Mine Workers, to

6    the Mine Workers retirees, and I'm just attempting to

7    determine what else Mr. Salvatori knows about those benefits

8    and what else he knew at the time of the plan about those.

9              MR. TORRES:  Your Honor, I feel like I'm a broken

10   record here, but the testimony was about comparisons to the

11   UMWA benefits that occurred at various points in time before

12   the -- before Mr. Salvatori was the fiduciary of the benefit

13   plan.  And they certainly were made before, you know, the

14   current agreement that Mr. Petsonk is relating to.  Those

15   individuals testified as to what comparisons were allegedly

16   made.  None of them indicated that Mr. Salvatori made any

17   such comparisons.

18        And again, for a number of these people, Mr. Salvatori

19   wasn't even employed by CONSOL when the alleged comparisons

20   were made.  And for the other individuals when he -- when

21   those comparisons were made, Mr. Salvatori was not the

22   fiduciary for the CONSOL benefit plans.

23        So again, I just don't see where this is leading to

24   anything marginally relevant to what those individuals were

25   allegedly promised during the meetings that they testified

1    to.

2              THE COURT:  You may restate your question and the

3    witness may answer.

4    BY MR. PETSONK:

5    Q.   At the time CONSOL terminated the nonunion retiree

6    welfare benefits in 2015, was the 2011 NBCWA agreement in

7    force?

8    A.   Yes.

9    Q.   And does -- at that time, did the 2011 NBCWA agreement

10   by its terms obligate CONSOL to provide healthcare to

11   eligible beneficiaries on a permanent lifetime basis in

12   accordance with the standard employer plan incorporated into

13   that Collective Bargaining Agreement?

14   A.   My reading of the contract is that it is ambiguous, at

15   best.

16   Q.   But you've already testified that CONSOL continues to

17   provide those retiree welfare benefits to those union miners

18   today?

19   A.   We do.

20   Q.   And you continue to do so on a continuous basis as to

21   those union retirees from the time of 2011 up until today,

22   right?

23   A.   Correct.

24   Q.   And do you know when that term of the 2011 agreement

25   was -- strike that.

```
 1              MR. PETSONK:  I don't think I have any further

 2     questions, Your Honor.

 3              THE COURT:  Let me ask how long your redirect will

 4     be?

 5              MR. TORRES:  I don't believe it would be very

 6     long, Your Honor.  If I could just have a couple minutes to

 7     review my notes.

 8              THE COURT:  Go ahead.

 9              MR. TORRES:  Can I have just one minute to confer

10     with counsel and we'll see if we're done here?

11              THE COURT:  Yes.

12          (An off-the-record discussion was held between defense

13     counsel.)

14              MR. TORRES:  Thank you, Your Honor, for indulging

15     us.

16          No further questions of the witness.

17              THE COURT:  Thank you.

18          And I take it that covers the questioning of Mr.

19     Salvatori?

20              MR. PETSONK:  Yes, it does, Your Honor.

21              THE COURT:  Let me ask you a question before he

22     retires.

23          As a practical matter, address, if you would, what was

24     as good or better with the benefits CONSOL was providing

25     than those of the UMWA?  And attendant to that, is it the
```

1   case, if you know, that with respect to the UMWA, the

2   benefits provided in the contract are good for the life of

3   the contract, and, once the contract ends, the other

4   benefits or no benefits could be provided?  And address the

5   latter first.

6        Is that the way the UMWA contract works?

7            MR. PETSONK:  No, Your Honor.  And this

8   distinguishes our case from other cases, from all the

9   aluminum workers here in West Virginia, and from others.

10  And, in fact, without getting into litigation, this district

11  has in fact enjoined CONSOL from altering the

12  post-agreement -- from altering any benefits that are

13  negotiated under the National Bituminous Coal Wage

14  Agreement.

15       But setting aside the litigation, the trustees of the

16  UMWA Health and Retirement Fund have received this very

17  question.  And there is a binding arbitration provision

18  under the Mine Workers contract that covers post-agreement

19  disputes.

20       And this question had arisen in what's called a Record

21  of Decision that came before the UMWA Health and Retirement

22  Fund trustees on a record of decision regarding a

23  post-agreement dispute.

24       After the most recent National Bituminous Coal Wage

25  Agreement expires, that is the 2011 agreement, CONSOL sought

1    to challenge whether it had an obligation to provide

2    lifetime benefits to the Mine Workers.

3        And the trustees of the fund, of the Health and

4    Retirement Fund issued a decision that bound CONSOL to --

5    distinct from the consilium workers, distinct from the

6    *Duberry* [phonetic] case, distinct from many other contracts,

7    the trustees of the Mine Workers Fund have bound CONSOL to

8    negotiate post-agreement with the Mine Workers about any

9    changes or curtailment to the retiree health and welfare

10   benefits.

11       So this contract is a John L. Lewis contract, Your

12   Honor.  This is the contract that stands in significant

13   contrast to many other union contracts that don't have

14   binding post-agreement arbitration terms.  And this has been

15   litigated extensively.

16       But as Mr. Salvatori testified, at no time has CONSOL

17   obligated its retirement health and welfare benefits to Mine

18   Workers.  In fact, they've been enjoined by this district

19   for doing so, and the trustees of the health and retiree

20   fund have also ruled as a matter of contract interpretation,

21   that CONSOL is not free and no signatory to the Bituminous

22   Coal Wage Agreement is free to alter benefits at the

23   conclusion of a contract term, without the agreement of the

24   Mine Workers to do so.

25           THE COURT:  Mr. Torres.

FITZWATER v CONSOL

```
 1                MR. TORRES:  Two points, Your Honor.

 2           One, I don't believe that that is an accurate

 3      description of what transpired.  And I don't think it's

 4      anything that CONSOL necessarily has conceded or agreed to,

 5      Your Honor, whether there has been an injunction in

 6      litigation.

 7           But so I think he certainly elicited Mr. Salvatori's

 8      view on that; he's said in his mind it was ambiguous, at

 9      best.  I don't think there has been any determinations along

10      the lines that counsel has presented.

11           And I guess my other point, Your Honor, is who cares at

12      what was provided in 2011, when the question of the

13      comparisons and benefits -- what's relevant here, Your

14      Honor, is what was said to these individuals during these

15      orientations.  And none of these individuals testified that

16      anyone told them that the UMWA benefits could never be

17      terminated.  And so when we're describing them, you should

18      assume, Mr. Casey, that these benefits could never be

19      terminated.

20           There has been no such testimony.

21           So even if it turns out, Your Honor, that the UMWA

22      benefits in 1992 or 2000, or whenever these comparisons were

23      made, could not be terminated, there has been no evidence

24      that anyone ever made any such comparison as to the duration

25      of those benefits in describing them.
```

FITZWATER v CONSOL

1    In fact, Mr. Hymes testified that he didn't remember

2    there being any comparisons to retiree medical benefits in

3    the comparisons that he put together when he was first asked

4    for comparisons.  And I believe the testimony since then has

5    been that there is no evidence of any comparisons to UMWA

6    benefits that occurred at CONSOL.

7         So again, even if the current litigation is disputed,

8    as Mr. Petsonk describes it, in 2011, I'm not sure how that

9    proves what was told to these individuals 20, 30 years ago,

10   during these orientations that they've already testified to.

11            THE COURT:  Thank you.

12       Anything further, Mr. Petsonk?

13            MR. PETSONK:  No, Your Honor.  I think -- except,

14   you asked a prior question, which is the nature of what's

15   better about the -- the nonunion benefits relative to Mine

16   Workers.  Obviously, the difference here is that CONSOL

17   continued to provide the retiree healthcare to the mine

18   workers for 10 years longer than it provided -- or for seven

19   years or so longer at this point than it provided to the

20   nonunion miners.  And so it's this point about lifetime

21   duration that our plaintiffs have testified about, and that

22   is the issue with reference to which we've presented our

23   case.

24            THE COURT:  Thank you.

25       Any further word on that?

```
 1                MR. TORRES:  No, Your Honor.

 2                THE COURT:  Very good.

 3           Do the parties have any other questions from, Mr.

 4      Salvatori?

 5                MR. PETSONK:  Not from the plaintiffs.  Thank you.

 6                MR. TORRES:  Nothing from the defendants, Your

 7      Honor.

 8                THE COURT:  Very good.  And may he be excused?

 9                MR. TORRES:  Yes, Your Honor.

10                MR. PETSONK:  Yes.

11                THE COURT:  And, Mr. Salvatori, you're excused.

12      But please don't discuss your testimony with any other

13      witness in this case until the trial is over.

14                THE WITNESS:  Yes, sir.

15                THE COURT:  And except your -- well, no.  In your

16      case, it would be not with anyone.  I suppose you and CONSOL

17      are the defendants; who else in the case?

18                MR. TORRES:  Just the other corporate entities.

19      There is no other individual defendants, Your Honor.

20                THE COURT:  I think that covers it.  Thank you.

21                THE WITNESS:  Okay.  Thank you, sir.

22                THE COURT:  And you can leave the exhibits at the

23      desk.

24                THE WITNESS:  This is the one you want to get a

25      copy of.
```

```
 1                THE COURT:  Oh, thank you.

 2           What does the defendant expect to offer tomorrow?

 3                MR. TORRES:  Your Honor, we'd like to present a

 4      motion for directed verdict, which I think we can address

 5      briefly now that the plaintiffs --

 6                THE COURT:  You may proceed.

 7                MR. TORRES:  I'm sorry.  Did Your Honor want to

 8      know what we intend to do tomorrow, as well?

 9                THE COURT:  I thought you could just briefly tell

10      me what witnesses you have and where we are in the case.

11                MR. TORRES:  I'm sorry, Your Honor.  So we have

12      tomorrow, Your Honor, we have four live witnesses that will

13      testify, rebuttal witnesses.

14           And then on Thursday, we would submit Mr. Kowzan's

15      testimony.  He's the gentleman driving up from Florida.  And

16      then we have four evidentiary depositions to submit.  We

17      could also submit those evidentiary depositions tomorrow if

18      Your Honor would rather have a full day, meaning we do our

19      rebuttals, and then the video deps.

20                THE COURT:  How lengthy are the four evidentiary

21      depositions?

22                MR. TORRES:  I believe they are all about 25

23      minutes each, Your Honor.

24                THE COURT:  How long?

25                MR. TORRES:  25 minutes each.
```

 1          THE COURT:  Well, it may be that we could go into

 2     those if you finish those other four witnesses.  And so we

 3     could see how that goes.

 4          MR. TORRES:  Yes, Your Honor.

 5          THE COURT:  And then you said on Thursday, you

 6     would have whom?

 7          MR. TORRES:  Gerald Kowzan, Your Honor.  He

 8     would be our last live witness.

 9          THE COURT:  How long will he likely be?

10          MR. TORRES:  I don't believe he would be that

11     long, Your Honor.  I would say less than an hour.

12          THE COURT:  Very good.

13          MR. TORRES:  And we can take up the directed

14     verdict now or take it up tomorrow, whatever you're your

15     Honor's pleasure.

16          THE COURT:  Well, depends on how much time you

17     want to devote to it?  What do you think your time for

18     presenting a motion will be?

19          MR. TORRES:  I would think 15 minutes, 20 minutes,

20     Your Honor.

21          THE COURT:  I expect if that is the case, we

22     probably better wait until tomorrow --

23          MR. TORRES:  Very well, Your Honor.

24          THE COURT:  -- and do that first thing in the

25     morning.

FITZWATER v CONSOL

```
 1              MR. TORRES:  Yes, Your Honor.

 2              THE COURT:  Do the parties have anything further

 3    at this time?

 4              MR. TORRES:  Nothing from defendants, Your Honor.

 5              MR. PETSONK:  Nor from the plaintiffs.  Thank you.

 6              THE COURT:  If not, we'll see you back at 9:30 in

 7    the morning.  Thank you.

 8              MR. TORRES:  Thank you, Your Honor.

 9              THE CLERK:  All rise.

10         (Proceedings concluded at 5:53 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2        I, Catherine Schutte-Stant, Federal Official Realtime

 3   Court Reporter, in and for the United States District Court

 4   for the Southern District of West Virginia, do hereby

 5   certify that, pursuant to Section 753, Title 28, United

 6   States Code, the foregoing is a true and correct transcript

 7   of the stenographically reported proceedings held in the

 8   above-entitled matter and that the transcript page format is

 9   in conformance with the regulations of the Judicial

10   Conference of the United States.

11

12        s/Catherine Schutte-Stant, RDR, CRR

13   _____   March 4, 2021

14        Catherine Schutte-Stant, RDR, CRR
          Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```