1          IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                     AT CHARLESTON

3    _____x
                                    :
4    BENNY FITZWATER,               :   CIVIL ACTION
     CLARENCE BRIGHT, TERRY PRATER, :   NO. 2:16-cv-09849
5    EMMET CASEY, JR.,              :
     CONNIE Z. GILBERT,             :   Consolidated with:
6    ALLAN H. JACK, SR., and,       :   CIVIL ACTION
     ROBERT H. LONG.,               :   NO. 1:17-cv-03861
7              Plaintiffs,          :
                                    :
8                   -vs-            :
                                    :
9    CONSOL ENERGY, INC.,           :
     CONSOLIDATION COAL CO.,        :
10   FOLA COAL CO., LLC,            :
     CONSOL OF KENTUCKY, INC.,      :
11   CONSOL PENNSYLVANIA COAL CO.,  :
     LLC, and KURT SALVATORI,       :
12                                  : **BENCH TRIAL**
             Defendants.            : **VOLUME VI**
13   _____x

14              **TRANSCRIPT OF PROCEEDINGS**
        **BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.,**
15        **SENIOR UNITED STATES DISTRICT JUDGE**
                 **FEBRUARY 17, 2021**

16

17

18   **APPEARANCES:**
     **FOR THE PLAINTIFFS:**        **SAMUEL B. PETSONK, ESQUIRE**
19                                  PETSONK PLLC
                                    P. O. Box 1045
20                                  Beckley, WV  25802

21

22        Proceedings recorded by mechanical stenography,
     transcript produced by computer.
23   _____

24              CATHERINE SCHUTTE-STANT, RDR, CRR
                 Federal Official Court Reporter
25            300 Virginia Street East, Room 6009
                   Charleston, WV 25301

```
 1    APPEARANCES CONTINUED:

 2    FOR THE PLAINTIFFS:        BREN J. POMPONIO, ESQUIRE
                                 LAURA DAVIDSON, ESQUIRE
 3                               Mountain State Justice, Inc.
                                 1217 Quarrier Street
 4                               Charleston, WV  25301

 5

 6

 7    FOR THE DEFENDANTS:        JOSEPH J. TORRES, ESQUIRE
                                 ALEXIS E. BATES, ESQUIRE
 8                               EMMA J. O'CONNOR, ESQUIRE
                                 KATHERINE M. FUNDERBURG, ESQUIRE
 9                               Jenner & Block LLP
                                 353 N. Clark Street
10                               Chicago, IL  60654

11

12

13    FOR THE DEFENDANTS:        MICHAEL D. MULLINS, ESQUIRE
                                 Steptoe & Johnson PLLC
14                               707 Virginia Street East
                                 17th Floor
15                               Charleston, WV 25301

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX

 2
     DEFENDANT'S
 3   WITNESSES      DIRECT  CROSS  REDIRECT RECROSS  EXAMINATION

 4   JAMES WATERS    1070   1080      ^        ^         ^

 5
     GENE BAILEY     1086   1095      ^        ^         ^
 6

 7   GERALD NICHOLSON 1102  1114      ^        ^         ^

 8
     JOHN FOX        1122   1143     1158      ^         ^
 9
     VOIR DIRE  1153, 1160
10

11

12

13   VIDEOTAPED DEPOSITIONS:

14
     TOM HUDSON             1168
15
     CHASE ELSWICK          1169
16
     CRAIG CAMPBELL         1171
17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX TO EXHIBITS

 2
       PLAINTIFF'S
 3     EXHIBITS                              ADMITTED

 4
        (None)
 5

 6

 7     DEFENDANT'S
       EXHIBITS                              ADMITTED
 8
        32                                   1131
 9      33-A & 33-B                          1170
        34-A & 34-B                          1170
10      35-A & 35-B                          1172

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (The following Bench Trial was held before the

2    Honorable John T. Copenhaver, Jr., Senior United States

3    District Judge, in the case of *Fitzwater, et. al. versus*

4    *CONSOL*, et. al, on Wednesday, February 17, 2021, at

5    Charleston, West Virginia.)

6                    P-R-O-C-E-E-D-I-N-G-S                    9:54 a.m.

7                    THE CLERK:  All rise.

8                    THE COURT:  Good morning.  Please be seated.

9          Let me ask you first, what has created the delay

10   this morning?

11                   MR. POMPONIO:  Your Honor, there was an

12   evidentiary deposition scheduled this morning and that is

13   what delayed us.

14                   THE COURT:  Well, it shouldn't have been scheduled

15   to interfere with the trial of this matter.  And we've lost

16   30 minutes waiting for Mr. Petsonk, I take it, who is still

17   not here?

18                   MR. POMPONIO:  That's right, Your Honor.  That is

19   where he is.  He said he was on his way, but I don't have a

20   time frame, but we are prepared to proceed.

21                   THE COURT:  Let's not let this happen again.  It

22   is just such an unnecessary waste.  I've got to get through

23   matters to get to other matters, and this is interfering

24   with that needlessly.  Thank you.

25          And I understood that Mr. Torres indicated that he had

```
 1    a motion to make.  Is he here to make it?

 2              MR. MULLINS:  Your Honor, Mr. Torres is out in the

 3    hallway, but we are going to defer on the motion and proceed

 4    with evidence.

 5              THE COURT:  And you may proceed.

 6              MS. O'CONNOR:  Defendants call Jim Waters.

 7              THE CLERK:  If you would please take the lectern.

 8          JAMES WATERS, DEFENDANT'S WITNESS, SWORN

 9              THE CLERK:  Please state your name and spell it

10    for the record.

11              THE WITNESS:  James Waters, J-A-M-E-S, Waters,

12    W-A-T-E-R-S.

13              THE CLERK:  Thank you, Mr. Waters, if you'd please

14    take the stand.

15                       DIRECT EXAMINATION

16    BY MS. O'CONNOR:

17    Q.   Good morning, Mr. Waters.

18    A.   Good morning.

19    Q.   Thank you for being here today.  Where do you currently

20    live?

21    A.   I live in Grafton, West Virginia.

22    Q.   Are you a party to this lawsuit?

23    A.   No.

24    Q.   So how did you learn about this trial?

25    A.   Some of your colleagues contacted me several years ago
```

WATERS - DIRECT

1    to discuss it.

2    **Q.**   And did you receive a subpoena to be here?

3    **A.**   I did, yes.

4    **Q.**   Thank you.  Did you previously work at CONSOL Energy?

5    **A.**   Yes, I did.

6    **Q.**   And when did you start working at CONSOL?

7    **A.**   First started with them in December of 1990.

8    **Q.**   And when did you stop working for CONSOL?

9    **A.**   I left CONSOL in 1999, initially.  And then I had

10   another time I worked with the company two different periods

11   of time.  The other time was like from probably '98 to 2000

12   or so.

13   **Q.**   Okay.  And then if you combine those two times at

14   CONSOL, approximately how many years did you work in Human

15   Resources at CONSOL?

16   **A.**   10, approximately, mm-hmm.

17   **Q.**   And during your time with CONSOL, did you ever work at

18   the Buchanan Mine?

19   **A.**   Yes, I did.

20   **Q.**   Do you remember what period you were there?

21   **A.**   I believe it was from, like, 1992 to 1995.

22   **Q.**   Okay.  And what was your job title when you were at

23   Buchanan?

24   **A.**   I was a personnel assistant.

25   **Q.**   As a personnel assistant at Buchanan, what were your

1  job duties?

2  **A.**  I did a lot of work with the employees, just helping

3  them with benefits.  I did some training, kind of did all of

4  the day-to-day administration of things at the mine for

5  folks.

6  **Q.**  Okay.  So after you became employed by CONSOL and when

7  you were at Buchanan, did you become familiar with CONSOL

8  retiree medical benefits?

9  **A.**  I did.  Yes.  After I left Buchanan, I was the

10  coordinator of health benefits for the company about three

11  years up in Pittsburgh.

12  **Q.**  So how did you learn about exactly what retiree medical

13  benefits CONSOL was offering?

14  **A.**  We did training with employees, new employee

15  orientations.  Those were like a five-day training program.

16  And part of that five days was going over the benefits, and

17  we also, on occasion, had the spouses come in.  Those

18  usually were conducted on a Saturday, and we would have the

19  spouses of the employees come in, and we would discuss the

20  benefits with them as well.  So I was trained in advance to

21  providing that training.

22  **Q.**  So when you were trained in advance, did you read

23  through the benefit plan documents you saw?

24  **A.**  Yes.  There was a lot of reading and understanding.

25  People who had been around longer than me also provided

WATERS - DIRECT

1    guidance and counsel.

2    **Q.**   Do you remember what the benefit plan stated regarding

3    how long benefits would be provided?

4    **A.**   I do.  All of the benefit plans had disclaimers in

5    them, so to speak, in that the company reserved the right to

6    amend, change, suspend, terminate any of the benefit plans

7    at any time at their sole discretion.

8    **Q.**   Okay.  So did CONSOL's written benefit materials say

9    that retiree medical benefits would be provided for life?

10   **A.**   No.

11   **Q.**   Did CONSOL's written benefit materials say that retiree

12   medical benefits were vested?

13   **A.**   No.  The only time that I was familiar with the vesting

14   principle was with the 401(k) program.  It was a five-year

15   cliff vest at that point in time.  And then, you know,

16   retirement or pension benefits was also a five-year vest.

17   But there wasn't any such language when it came to other

18   qualified benefits.

19   **Q.**   Okay, that makes sense.  And you mentioned doing

20   orientation sessions.  So did you conduct employee

21   orientations at Buchanan?

22   **A.**   I did, yes.

23   **Q.**   Do you know approximately how many orientations you

24   conducted during your time at Buchanan?

25   **A.**   Wow, that was -- you know, we are going back 25, 30

1    years.  I would say something on the order of 10 is my best

2    recollection.

3    **Q.**   Did you use a script when you were giving those

4    orientation presentations?

5    **A.**   We didn't have a script, per se, but we did have a

6    slide deck before the days of PowerPoint.  We actually had

7    slides that we would share with the employees and we would

8    go over the content of those slides.

9    **Q.**   And the sessions of the orientations that you

10   personally conducted, what topics did you cover?

11   **A.**   I conducted, you know, the company's philosophy on

12   maintaining union-free status.  I did the benefits programs.

13   I did some first aid and CPR trainings, as well, things of

14   that nature.

15           THE COURT:  Let me ask if we can get some times

16   when you were doing this.  You were at Buchanan from '92 to

17   '95, did you say?

18           THE WITNESS:  Yes, sir.

19           THE COURT:  Then you were there again from '98 to

20   2000?

21           THE WITNESS:  No, sir.  I was at a different coal

22   mine at that point.

23           THE COURT:  Where was that?

24           THE WITNESS:  That was with Robinson Run Coal Mine

25   in Harrison County.

WATERS - DIRECT

```
1              THE COURT:  It was owned by whom?

2              THE WITNESS:  That was a CONSOL mine, as well,

3    sir.

4              THE COURT:  And you say you were coordinator for

5    the company for benefits; what period of time was that?

6              THE WITNESS:  That would have been from

7    approximately 1995 to '98, sir.

8              THE COURT:  And is that when you were associated

9    with HR?

10             THE WITNESS:  Yes.  I was in HR the majority of

11   the time I was with CONSOL.

12             THE COURT:  Well, you were there from '95 to '98?

13             THE WITNESS:  In the corporate office, I was

14   there.

15             THE COURT:  I'm trying to figure out where you

16   were, when.  When were you in Human Resources?

17             THE WITNESS:  Well, when I started at CONSOL in

18   December of '90, I worked in a warehouse.  And that was

19   until February of 1991.  And just three months, and then

20   they promoted me into Human Resources personnel assistant at

21   those mines in northern West Virginia.

22        And then I ultimately was transferred to the Buchanan

23   Mine in Virginia in about 1993 or so.  Stayed there --

24             THE COURT:  And were you there from '93 to '95?

25             THE WITNESS:  Yes, sir.
```

1    THE COURT:  In what capacity?

2    THE WITNESS:  Personnel assistant, Human

3    Resources.

4    THE COURT:  Thank you.  Please go ahead.

5    THE WITNESS:  Yes, sir.

6    MS. O'CONNOR:  Thank you.

7    BY MS. O'CONNOR:

8    **Q.**   When you were covering benefits at the orientations at

9    Buchanan, did you ever tell employees that CONSOL retiree

10   medical benefits would be provided for life?

11   **A.**   No.  I mean, the rules at the time were, you know, if

12   someone did retire, then, you know, they would have those

13   retiree benefits for the balance of their life, subject to

14   change.  But those were the rules that were in place at the

15   time.  But never promised anybody that they would have

16   benefits for the rest of their life.

17   **Q.**   Okay.  And during those orientations at Buchanan, did

18   you ever tell employees that CONSOL retiree medical benefits

19   were vested?

20   **A.**   No.  I don't ever recall saying that.

21   **Q.**   And you mentioned the disclaimer.  So did you ever tell

22   any employees at the orientation that CONSOL retiree medical

23   benefits would never change?

24   **A.**   No.  In fact, we told them the opposite; that, you

25   know, all of the plans, including retiree medical, were

1    subject to change.  It was actually on one of the slides,

2    the language regarding the company's ability to change,

3    manage, modify, or suspend any of the benefits.

4    **Q.**   So the language on the slides, where did you get that

5    language from?  Which document, if any?

6    **A.**   It would have been out of one of the plan documents or

7    the employee handbook or somewhere like that.  I know that

8    language was one of the very first paragraphs in the

9    employee handbook at the time.

10   **Q.**   So in these presentations, you never -- or did you ever

11   say that CONSOL retiree medical benefits would never be

12   terminated?

13   **A.**   No.

14   **Q.**   And when you were conducting orientations, did you ever

15   tell employees that that reservation of rights language in

16   the benefit plan would not apply to retiree medical

17   benefits?

18   **A.**   No.

19   **Q.**   What, if any, written materials would you have

20   distributed during these orientations?

21   **A.**   So we would give a copy of the employee handbook to the

22   employees.  And then we also had a three-ring binder that

23   contained all of the Summary Plan Descriptions for all the

24   benefit plans that they were eligible for.

25   **Q.**   Okay.  And then other than the employee orientation,

1    did you conduct any other presentation at Buchanan that

2    would have covered retiree benefits?

3    **A.**    The spousal sessions we talked about.  But that -- and

4    we may have had -- we may have had refreshers on those

5    throughout the years.  I can't be certain of that.  But I

6    seem to recall -- refresher training occasionally there once

7    every few years.

8    **Q.**    And were the refresher trainings when you talked about

9    retiree medical benefits, would that basically cover the

10   same things that you talked about in orientation?

11   **A.**    Yes, ma'am.

12   **Q.**    Are you familiar with an individual named Emmett Casey?

13   **A.**    I remember Emmett, yes, ma'am.

14   **Q.**    How do you know Mr. Casey?

15   **A.**    He was an employee at the Buchanan Mine during the

16   period of time I was there, and I recall him.

17   **Q.**    Did you ever conduct an orientation for when Mr. Casey

18   was present?

19   **A.**    Not that I recall.  Mr. Casey was employed there prior

20   to me coming there, so I would not have been involved in his

21   new employee orientation for sure.  He was already employed

22   there when I came to the mine.

23   **Q.**    Okay.  Did you ever give any other kinds of benefit

24   presentation where Mr. Casey was present that you remember?

25   **A.**    Maybe one of the refresher trainings or something of

 1    that nature.

 2    **Q.**   Okay.  Did you ever meet one-on-one with Mr. Casey to

 3    discuss his retiree medical benefits?

 4    **A.**   Not that I can recall.

 5    **Q.**   Did you ever promise Mr. Casey lifetime retiree medical

 6    benefits?

 7    **A.**   No, ma'am.

 8    **Q.**   Did you ever tell Mr. Casey that CONSOL's retiree

 9    medical benefits were vested?

10    **A.**   I do not recall ever telling him that.

11    **Q.**   Did you ever tell Mr. Casey that the plan reservation

12    of rights language found in the plan documents did not apply

13    to him?

14    **A.**   Absolutely not.

15    **Q.**   Did anyone from CONSOL ever tell you that you had the

16    authority to alter the terms of CONSOL's written plans?

17    **A.**   No.  Actually, to the contrary; we didn't have the

18    authority to make any changes to the plans.

19    **Q.**   So did you ever tell anyone that you had the authority

20    to change the written plan?

21    **A.**   No.

22    **Q.**   Did anyone from CONSOL ever tell you to make any

23    misrepresentations to employees regarding their retiree

24    medical benefits?

25    **A.**   No, ma'am.

 1    **Q.**   And did anyone from CONSOL tell you to lie to employees

 2    about their retiree medical benefits?

 3    **A.**   Absolutely not.

 4    **Q.**   Did anyone from CONSOL ever tell you to tell employees

 5    that their retiree medical benefits would be provided for

 6    life?

 7    **A.**   No.

 8    **Q.**   And did anyone from CONSOL ever tell you to tell

 9    employees that the reservation of rights language wouldn't

10    apply to their retiree medical benefits?

11    **A.**   No.

12    **Q.**   Thank you.  That's all the questions I have for now.

13    **A.**   Thank you.

14                        **CROSS-EXAMINATION**

15    **BY MR. POMPONIO:**

16    **Q.**   Good morning.

17    **A.**   Good morning.

18    **Q.**   You testified you participated in approximately 10

19    orientation meetings at the Buchanan Mine, correct?

20    **A.**   Correct.

21    **Q.**   And in those orientations in which you participated,

22    did you orally discuss retiree welfare benefits with the

23    miners?

24    **A.**   Yes.

25    **Q.**   Did you ever make comparisons to the UMWA plan in terms

WATERS - CROSS

1    of the retirement offered by CONSOL?

2    **A.**   We made comparisons to all the different benefits that

3    our employees had versus what the UMWA represented employees

4    had, yes, sir.

5    **Q.**   And you testified you used a slide presentation to

6    guide your presentation of retiree welfare benefits --

7    **A.**   Yes.

8    **Q.**   -- in those orientations?

9    **A.**   Yes, sir.

10   **Q.**   Did those slide presentations have comparisons,

11   comparing the CONSOL retiree benefits to the UMWA plan?

12   **A.**   I don't know that they did specifically compare the

13   retiree medical.  I don't remember that, to be honest with

14   you, sir.

15   **Q.**   Where did you receive your direction to make

16   comparisons to the -- between the CONSOL retiree welfare

17   benefit plan and the UMWA plan?

18   **A.**   It was part of the overall union-free strategy of the

19   company, so, you know, everyone in HR was involved in those,

20   in those discussions and presentations.

21   **Q.**   Is it fair to say that you received that direction in

22   part from the Vice President of Human Resources?

23   **A.**   Not directly, but, I mean, yes -- he was the man in

24   charge of those operations, yes, sir.

25   **Q.**   Do you have any recollection, in the 10 orientations

1   that you participated in, personally, orally making any

2   representations to the miners about the reservation of

3   rights clause, that CONSOL could have reserved the right to

4   terminate?

5   **A.**   Yes, I do.  There was a slide that actually had the

6   language out of the handbook or the Summary Plan Description

7   that we covered in those orientations.

8   **Q.**   And so did you -- in addition to the slide

9   presentation, did you -- do you recall saying out loud to

10   the miners that CONSOL reserves the right to terminate the

11   retirement welfare benefits?

12   **A.**   Yes.

13   **Q.**   What exact words did you use, if you can recall?

14   **A.**   It was the language that was in the plan.  I haven't

15   seen that language for a number of years.  Basically, you

16   know, CONSOL reserved the right to change, suspend, revoke,

17   terminate those plans at their sole discretion.

18               MR. POMPONIO:  May I have a copy of Plaintiff's

19   10-A?

20               Your Honor, may I approach?

21               THE COURT:  Yes.

22   BY MR. POMPONIO:

23   **Q.**   Mr. Waters, I'm handing you what's previously been

24   marked Plaintiff's 10-A.  And I'll represent to you that

25   this is a document that was previously admitted into

```
 1    evidence.  It's a part of a larger document.  These excerpts
 2    were the ones that were introduced into evidence.  And I
 3    want to direct your attention to the first page.
 4         It says, "Part of this is lawyer talk.  And that is
 5    important.  But let's look at a couple of key points.
 6    First, as it says -- company believes wholeheartedly in the
 7    things we have included in the handbook.  But the company
 8    does reserve the right to change them."
 9              MS. O'CONNOR:  Objection; foundation.
10         Mr. Pomponio hasn't established that the witness knows
11    what this is.
12              THE COURT:  The witness may answer the question,
13    whether he knows specifically what this is or not.
14         You may respond if you know the answer.
15              THE WITNESS:  Can you repeat the question?  I'm
16    sorry.
17    BY MR. POMPONIO:
18    Q.   Yes.  I hadn't finished getting through that.  I was
19    going to ask you -- that language there that appears in the
20    top of exhibit, Plaintiff's Exhibit 10-A, are you familiar
21    with this language in terms of your discussions with miners
22    at the 10 orientations in which you had participated in?
23    A.   It seems familiar, yes.
24              MR. POMPONIO:  Plaintiff's 15.
25         May I approach, Your Honor?
```

1           THE COURT:  You may.

2    BY MR. POMPONIO:

3    **Q.**   I'm handing you what's been marked as Plaintiff's

4    Exhibit 15.  I'll ask, could you please look at that

5    document.  And I'll represent to you that this is a -- it's

6    a supervisor instruction relevant to the Bailey Mine, which

7    I understand that you -- you didn't work at the Bailey Mine,

8    but I wanted to know if you had received similar supervisory

9    instructions to this for your orientations at the Buchanan

10   Mine?

11   **A.**   This document does not look familiar to me.

12   **Q.**   Okay.  Did you work with another HR manager at the

13   Buchanan Mine by the name of Jeff Fox?

14   **A.**   I never worked with Mr. Fox at Buchanan Mine.  He was

15   gone before I got there.

16   **Q.**   I want to go back to something you mentioned in your

17   direct testimony, and I don't have -- I didn't have it down

18   exactly as you said it, but you said something along the

19   lines that the rules in place provided that upon retirement

20   that -- that the miners would receive medical benefits, I

21   thought you said for life, subject to change.

22          Was that your testimony?

23   **A.**   Yes, sir.  At the time that I was there, should someone

24   have retired during that time, then they would have had the

25   retiree benefits for the balance of their life.  That was

1    the -- that was the plan, as it was designed, at that time.

2    It was later amended.  And I think that's the big reason

3    we're here today.

4    **Q.**   Okay.

5              MR. POMPONIO:  Your Honor, may I have a moment to

6    confer?

7              THE COURT:  Yes.

8        (An off-the-record discussion was held between

9    plaintiffs' counsel.)

10              MR. POMPONIO:  No further questions, Your Honor.

11              THE COURT:  Thank you.

12              MS. O'CONNOR:  Your Honor, may I have a moment to

13    confer with counsel?

14              THE COURT:  You may.

15        (An off-the-record discussion was held between defense

16    counsel.)

17              MS. O'CONNOR:  No further questions, Your Honor.

18              THE COURT:  May the witness be excused?

19              MS. O'CONNOR:  He may.

20              MR. POMPONIO:  Yes, Your Honor.

21              THE COURT:  Thank you, sir, Mr. Waters.

22              THE WITNESS:  Thank you, Judge.

23              THE COURT:  You're excused.  Let me ask you -- and

24    you can just leave the exhibit there at the bench, at the

25    desk -- you're excused, but until the trial is over, don't

1    discuss your testimony with any other witnesses in the case,

2    unless the Court gives you permission to do so.

3               THE WITNESS:  Yes, sir.

4               THE COURT:  Thank you.

5               THE WITNESS:  Thank you.

6               MS. FUNDERBURG:  Your Honor, the defendants call

7    Gene Bailey.

8          **GENE FRANKLIN BAILEY, DEFENDANT'S WITNESS, SWORN**

9               THE CLERK:  Mr. Bailey.  Please state your name

10   and spell it for the record.

11        Gene Franklin Bailey, G-E-N-E, F-R-A-N-K-L-I-N, Bailey,

12   B-A-I-L-E-Y.

13              THE CLERK:  Thank you, Mr. Bailey.  If you would

14   please take the stand.

15                     **DIRECT EXAMINATION**

16   **BY MS. FUNDERBURG:**

17   **Q.**  Morning, Mr. Bailey.

18   **A.**  Good morning.

19   **Q.**  Thank you for being here to testify today.  Just to

20   start off, can you tell us where you currently live?

21   **A.**  I live in Bluefield, Virginia.

22   **Q.**  And, Mr. Bailey, are you a party to this lawsuit?

23   **A.**  Since I'm here, I assume that I am.

24   **Q.**  Are you a defendant in this case?

25   **A.**  I worked for Consolidation Coal, but, as far as, you

BAILEY - DIRECT

1    know, being a defendant, I don't know the answer to that.

2    **Q.**    Okay.  Well, let --

3    **A.**    I have not seen the lawsuit.

4    **Q.**    Okay.  Can you tell me why you came here to testify

5    today?

6    **A.**    I received a subpoena from the law firm which indicated

7    I had knowledge concerning this lawsuit.  And I had received

8    phone calls in the past indicating that.

9    **Q.**    Mr. Bailey, can you tell me, did you ever receive

10   retiree medical benefits from CONSOL?

11   **A.**    Yes, I did.

12   **Q.**    And how long did you receive those benefits?

13   **A.**    I retired in 1997, and I received them until CONSOL

14   changed the plan -- revoked the plan.  I don't know the

15   specific date.

16   **Q.**    Okay.  Let's talk a little bit about your history at

17   CONSOL.  So you previously worked at CONSOL, you said?

18   **A.**    Yes, I did.

19   **Q.**    When did you go start working at CONSOL?

20   **A.**    I started March of 1976.

21   **Q.**    And when is it that you retired?

22   **A.**    The date I retired?

23   **Q.**    Yes, sir.

24   **A.**    Officially would have been July 1, 1998 -- '97.  I

25   stand corrected.

1  **Q.**   Can you just give us an overview of your career at

2  CONSOL?

3  **A.**   Yes, ma'am.  I started, as I said, in March of 1976 as

4  a personnel assistant in Virginia, which was the

5  headquarters for the Southern Appalachian region of CONSOL.

6  Three months later, I was promoted to manager of manpower

7  services.  I continued to work in Pocahontas until we moved

8  the regional office of Bluefield, Virginia, in 1983.

9      1985, I -- my title changed from manager of manpower

10  services to manager of comp and benefits and salary

11  administration.

12      In 1992, I was transferred to the Mid-Continent Region,

13  west of St. Louis.  And there I worked -- also was a manager

14  of manpower service and communications for that region.

15      I then was transferred to Morgantown, West Virginia, in

16  January 1996, and also was in a human resource position

17  there similar to the others.

18      And then I retired July 1 of 1997.

19  **Q.**   And just to clarify, can you tell us the locations

20  where you worked?  I think you listed a couple of them

21  there?

22  **A.**   Pocahontas, Virginia, and in an office there.  At the

23  regional headquarters from '96 to -- I believe it was around

24  1983, when we built the facility in Bluefield, Virginia,

25  which again was the regional headquarters.  And then when I

```
 1    went to St. Louis --
 2              THE COURT:  Let's go over that again.
 3              THE WITNESS:  I'm sorry.
 4              THE COURT:  You were at regional headquarters
 5    there from when to when?
 6              THE WITNESS:  The regional headquarters was moved
 7    from Pocahontas, Virginia, in 1983, to Bluefield, Virginia.
 8    We built a new office building.
 9              THE COURT:  Well, before that, where were you?
10              THE WITNESS:  I was in Pocahontas, Virginia.
11              THE COURT:  For how long?
12              THE WITNESS:  From '76 to 1983.
13              THE COURT:  Working for whom?  CONSOL?
14              THE WITNESS:  I'm sorry, sir?
15              THE COURT:  Working for whom?
16              THE WITNESS:  Working for Consolidation Coal.
17              THE COURT:  Thank you.
18              THE WITNESS:  I worked for Consolidation Coal all
19    those years.  When I went to the Mid-Continent Region, our
20    headquarters was in a place -- and I probably can't even
21    spell it for you -- but it was in Creve Coeur, which is a
22    small city west of St. Louis.
23         And then I was transferred to Morgantown, West
24    Virginia, and worked out of an office -- I think -- in a
25    place called Osage, West Virginia, which was a former mine
```

1    site.  The former headquarters had been in Morgantown, West

2    Virginia.

3    BY MS. FUNDERBURG:

4    Q.   Thank you, Mr. Bailey.  And did you ever work at the

5    Buchanan Mine?

6    A.   No, I did not.

7    Q.   Did you have any involvement at the Buchanan Mine?

8    A.   I had some involvement from the regional headquarters

9    in Bluefield, Virginia.

10   Q.   What time period was that?

11   A.   That probably would have been a few months prior to the

12   opening of the Buchanan Mine, somewhere around 1983, '84.

13   Q.   And what duties did you perform in relation to the

14   Buchanan?

15   A.   My primary duties were dealing with employee personnel

16   within the region.  When plans were made to commence with

17   the hiring, I was involved in the preliminary hiring

18   process, along with a vice president by the name of Ron

19   Smith.  We interviewed some of our former employees who had

20   been laid off, both salaried and those represented by the

21   UMWA.  And that was my primary duty in regard to Buchanan at

22   that time.

23   Q.   Let's turn to while you worked at CONSOL.  Can you tell

24   me what, if any, involvement you had in putting together

25   materials for employee -- new hire orientation programs?

BAILEY - DIRECT

1   **A.**   I really had no input in regard to the preparation of

2   any orientations material.

3   **Q.**   And what, if any, involvement did you have in

4   conducting the new hire orientation programs?

5   **A.**   I never -- I never conducted or participated in any new

6   employee orientation programs.

7   **Q.**   Did you ever present at an orientation at the Buchanan

8   Mine?

9   **A.**   No, ma'am.

10  **Q.**   Did you personally ever cover employee benefits in any

11  orientation session?

12  **A.**   I never covered any in any orientation session.

13  **Q.**   And aside from any orientation, while you worked at

14  CONSOL, were you involved in making any other presentations

15  to employees?

16  **A.**   The only presentation that I made dealt with a program

17  I refer to as sexual harassment or sexual discrimination.  I

18  was always involved if there were any kind of discrimination

19  complaints or whether they be sex, race, and so forth.  I

20  did put a program together for sexual harassment and sexual

21  discrimination, those presentations.  And I don't ever

22  recall putting on one at the Buchanan facility.

23  **Q.**   During what years did you conduct those presentations,

24  if you recall?

25  **A.**   I would think it was in the late '80s, but I don't

1    totally recall it.  And I may have put on a couple when I

2    was in St. Louis, around '92, '93.

3    Q.   And just to clarify, did any of those presentations

4    cover employee benefits at all?

5    A.   Not at all.

6    Q.   Aside from those presentations that you testified to,

7    did you make presentations at any other meetings while you

8    worked at CONSOL?

9    A.   None that I recall.

10   Q.   Did you ever cover employee benefits with current

11   employees at any other meetings?

12   A.   No, ma'am.

13   Q.   Mr. Bailey, I want to ask you about an individual named

14   Emmett Casey.  Do you know him?

15   A.   I know him as an acquaintance.  I do not know him well.

16   Q.   Do you recall conducting any presentation where Mr.

17   Casey was present while you worked at CONSOL?

18   A.   I do not recall Mr. Casey ever being in any of my

19   presentations.

20   Q.   Whether or not you recall if Mr. Casey was present, did

21   you ever make a presentation at Buchanan that addressed

22   employee benefits?

23   A.   No, ma'am.

24   Q.   Did you ever tell Mr. Casey that he would have lifetime

25   retiree medical benefits?

BAILEY - DIRECT

1    **A.**   No, ma'am.

2    **Q.**   Did you ever tell Mr. Casey that his retiree medical

3    benefits would vest?

4    **A.**   No, ma'am.

5    **Q.**   Did you ever tell Mr. Casey that his benefits could

6    never be terminated?

7    **A.**   No, ma'am.

8    **Q.**   Did you ever tell Mr. Casey to ignore language in his

9    plan documents that stated CONSOL had the right to terminate

10   or modify the benefits?

11   **A.**   No, ma'am.

12   **Q.**   Did you ever tell Mr. Casey that you had authority to

13   promise him something different than what was written in

14   CONSOL documents?

15   **A.**   No, ma'am.

16   **Q.**   More broadly, did you ever describe CONSOL's benefits,

17   retiree benefits to any employee as vested?

18   **A.**   Restate that question, please.

19   **Q.**   Did you ever describe CONSOL's retiree medical benefits

20   to any employee as being vested?

21   **A.**   Not that I recall.

22   **Q.**   Did you ever describe CONSOL's retiree medical benefits

23   to any employee as being lifetime or lifelong?

24   **A.**   Never.

25   **Q.**   Did you ever tell any employee that CONSOL retiree

1    medical benefits would never change?

2    **A.**   No, ma'am.

3    **Q.**   Did you ever tell any employee that CONSOL retiree

4    medical benefits would never be terminated?

5    **A.**   No, ma'am.

6    **Q.**   Did you ever lie to any employee about their benefits

7    or the duration of those benefits?

8    **A.**   No, ma'am.

9    **Q.**   Did you ever tell any employee something about benefits

10   that was different than what was written in CONSOL's plan

11   documents and Summary Plan Descriptions?

12   **A.**   No, ma'am.

13   **Q.**   Did you ever tell any employee to ignore or disregard

14   reservation of rights language in plan documents and Summary

15   Plan Descriptions?

16   **A.**   No, ma'am.

17   **Q.**   Did you ever tell any employee that you had the

18   authority to promise them something different than what was

19   written in the plan documents?

20   **A.**   No, ma'am.

21   **Q.**   Okay.  Just a couple final questions, Mr. Bailey.

22        Did anyone at CONSOL ever tell you that you had the

23   authority to alter the terms of the written benefit plans?

24   **A.**   No, ma'am.

25   **Q.**   Did anyone at CONSOL ever tell you to lie to employees

BAILEY - CROSS

1    regarding retiree benefits?

2    **A.**  No, ma'am.

3    **Q.**  Did anyone at CONSOL ever tell you to mislead employees

4    about retiree medical benefits?

5    **A.**  No, ma'am.

6    **Q.**  Did anyone at CONSOL ever tell you to promise employees

7    that retiree medical benefits would vest or last for their

8    lifetime?

9    **A.**  No, ma'am.

10    **Q.**  Did anyone from CONSOL tell you to tell employees that

11    their benefits could never be terminated?

12    **A.**  No, ma'am.

13    **Q.**  And finally, did anyone ever tell -- at CONSOL ever

14    tell you to tell employees to ignore or disregard

15    reservation of rights language in plan documents?

16    **A.**  No, ma'am.

17    **Q.**  Thank you, Mr. Bailey.  I have nothing further.

18          MR. PETSONK:  Good morning, Your Honor.

19          THE COURT:  Good morning.

20                    **CROSS-EXAMINATION**

21    **BY MR. PETSONK:**

22    **Q.**  Mr. Bailey, where are you employed right now?

23    **A.**  I've been retired for almost 24 years.

24    **Q.**  Have you performed any consulting or lobbying services

25    during the time that you've been retired?

BAILEY - CROSS

1   **A.**   I've done no lobbying.  I've done a little bit of

2   consulting with a company called King Tire.  I've done a

3   little consulting and help set up the company here in

4   Charleston by the name of BrickStreet, which now is Encova.

5   **Q.**   Any other --

6   **A.**   No, sir.

7   **Q.**   And is BrickStreet and Encova, is that a -- like a

8   mutual insurance company?

9   **A.**   Yes, sir, it is.

10   **Q.**   Does it provide Workers' Compensation coverage to coal

11   mining companies?

12   **A.**   Yes, sir.

13   **Q.**   Have you ever worked for or consulted for CONSOL Energy

14   in connection with your work for BrickStreet?

15   **A.**   No, sir.

16   **Q.**   Do you know if BrickStreet served as a third-party

17   administrator for CONSOL's Workers' Compensation at any

18   time?

19   **A.**   No, sir, I don't.  I do not know.

20   **Q.**   Okay.  But you are not performing any of that type of

21   consulting work right now; is that right?

22   **A.**   I do a little bit of PR for them in the Bluefield area.

23   **Q.**   For whom?

24   **A.**   For Encova.

25   **Q.**   And do you know whether CONSOL has any ownership

BAILEY - CROSS

1    interest in Encova currently?

2    **A.**    No, I have no knowledge of any.

3    **Q.**    Okay.  You mentioned that you received phone calls in

4    the past about this case.  Who called you?

5    **A.**    The first phone call was probably two or three years

6    ago.  I have no idea the name of the individual that called

7    me at that time.

8    **Q.**    Was it someone that worked for CONSOL; that is, was it

9    someone presently at that time who was then working for

10   CONSOL?

11   **A.**    I think it was someone identified themselves as maybe

12   an attorney that probably was working for CONSOL.

13   **Q.**    Did you speak to that attorney several years ago?

14   **A.**    I spoke with that individual, yes, sir.

15   **Q.**    Okay.  Anybody else who you called -- or who you

16   remember receiving phone calls from about this case?

17   **A.**    I received a call -- I received a subpoena initially

18   and a call from Mr. Torres, I believe, regarding this case.

19   **Q.**    Okay.  Any other phone calls you remember receiving?

20   **A.**    None that I recall, sir.

21   **Q.**    When you became manager of manpower services in the

22   early '80s -- if I understood your testimony right?

23   **A.**    In the late '70s, yes, sir.

24   **Q.**    Late '70s, and then on through '85, right?

25   **A.**    Yes, sir.

BAILEY - CROSS

1    **Q.**   Who did you report to?

2    **A.**   I reported initially to John Fox, the first two or

3    three months before I was promoted in '76.  And then to BB

4    Hyler, H-Y-L-E-R.

5    **Q.**   And what was BB Hyler's position at that time?

6    **A.**   As far as I remember, he was Regional Manager of Human

7    Resources.

8    **Q.**   Okay.  And did you continue to report to the Regional

9    Manager of Human Resources throughout the remainder of the

10   time you worked out of the Bluefield area for CONSOL?

11   **A.**   Yes, sir.

12   **Q.**   And who succeeded BB Hyler as Regional Manager of Human

13   Resources in that area?

14   **A.**   Michael Hymes.

15   **Q.**   And so you worked for Mr. Hymes after Mr. Hyler,

16   correct?

17   **A.**   Yes, sir.

18   **Q.**   You mentioned that CONSOL hired both salaried and

19   previously union represented miners when they opened

20   Buchanan Mine; is that right?

21   **A.**   Yes, sir.

22   **Q.**   And you were working, as I understand it, at that

23   time -- meaning, around 1983 -- when the Buchanan Mine first

24   opened -- or you were working for Mr. Hyler at that time; is

25   that right?

BAILEY - CROSS

1    A.    No.  I think I was working for Mr. Hymes at that time.

2    Q.    Okay.  But it was either Mr. Hyler or Mr. Hymes during

3    that time?

4    A.    Yes, sir.

5    Q.    During the time that Buchanan opened?

6    A.    Yes, sir.

7    Q.    Did you work out of the same office location as those

8    individuals during that period?

9    A.    When I was in Pocahontas, part of the time I was in a

10   separate facility across the street.  And then when we moved

11   to Bluefield, Virginia, we were all in the same facility.

12   Q.    You are aware that CONSOL presented a new miner

13   orientation program to individuals that they hired at the

14   Buchanan Mine, right?

15   A.    Yes, sir, I am aware.

16   Q.    Do you know who developed that program?

17   A.    I can't tell you specifically who put the program

18   together.  I assume it was the corporate facility, for the

19   most part.  Probably the legal people, the people from Human

20   Resources, maybe in conjunction with management in the

21   Bluefield operations.

22   Q.    Did you participate in the development of that

23   orientation program yourself?

24   A.    Not that I recall, sir.

25   Q.    Are you aware of a program known as the Buchanan

BAILEY - CROSS

1   Advantage?

2   **A.**   I probably have heard that term.  I'm not sure exactly

3   what it means.

4   **Q.**   What do you understand insofar as you do understand it?

5            MS. FUNDERBURG:  Objection.  Calls for

6   speculation.

7            THE COURT:  Sustained.

8   BY MR. PETSONK:

9   **Q.**   Do you have any understanding of what it does mean?

10           MS. FUNDERBURG:  Objection; asked and answered.

11           THE COURT:  The witness may answer.

12           The question is:  Do you have any understanding of

13   what the term "Buchanan Advantage" means?

14           THE WITNESS:  I think I do.  And to me, it would

15   be that we were offering better wages and better benefits

16   to -- a 401(k) plan and things of that nature than

17   individuals had when they were represented by the UMWA.

18   BY MR. PETSONK:

19   **Q.**   Did you ever attend presentations made to coal miners

20   at the Bluefield office?

21   **A.**   I don't ever remember any presentations done at the

22   Bluefield office.  No, sir, I don't think I did.

23   **Q.**   But you don't even remember that CONSOL made

24   presentations to coal miners at the Bluefield office, right?

25   **A.**   I do not recall that.

BAILEY - CROSS

```
 1    Q.    Okay.

 2              MR. PETSONK:  I don't have any further questions.

 3              THE COURT:  Any further questions?

 4              MS. FUNDERBURG:  Nothing further, Your Honor.

 5              THE COURT:  Do you need to confer?

 6         And may the witness be excused?

 7              MS. FUNDERBURG:  Yes, Your Honor.

 8              MR. PETSONK:  Yes.

 9              THE COURT:  Mr. Bailey, you're excused from the

10    trial.  Do not discuss your testimony with any other witness

11    in the case until the trial is over.

12              THE WITNESS:  Yes, sir.

13              THE COURT:  If you need any relief from that, let

14    me know.

15              THE WITNESS:  Thank you, sir.

16              THE COURT:  Thank you.  And you're excused.

17              THE WITNESS:  Mm-hmm.

18              MS. BATES:  Your Honor, the defendants call Gerald

19    Nicholson.

20              THE CLERK:  Please take the lectern.

21         **GERALD NICHOLSON, DEFENDANT'S WITNESS, SWORN**

22              THE CLERK:  State your name and spell it for the

23    record.

24              THE WITNESS:  Gerald Nicholson, G-E-R-A-L-D,

25    N-I-C-H-O-L-S-O-N, Nicholson.
```

| | |
|---|---|
| 1 | THE CLERK:  Thank you.  And if you'd please take |
| 2 | the stand. |
| 3 | **DIRECT EXAMINATION** |
| 4 | **BY MS. BATES:** |
| 5 | **Q.**   Good morning, Mr. Nicholson. |
| 6 | **A.**   How are you doing? |
| 7 | **Q.**   Thank you so much for being here today.  Where do you |
| 8 | live, Mr. Nicholson? |
| 9 | **A.**   I live in Princeton, West Virginia. |
| 10 | **Q.**   Are you a party to this lawsuit? |
| 11 | **A.**   No. |
| 12 | **Q.**   So how did you learn about this trial? |
| 13 | **A.**   I saw a crowd together in Princeton of guys that was |
| 14 | actually getting together and having a class action lawsuit. |
| 15 | And so I knew that was going on.  And then, of course, I got |
| 16 | a call from Chicago and talked to me about the trial at that |
| 17 | time. |
| 18 | **Q.**   Did you also receive a subpoena to testify? |
| 19 | **A.**   Yes.  Yes, I did. |
| 20 | **Q.**   Why did you agree to come all the way to Charleston to |
| 21 | testify today? |
| 22 | **A.**   I had no idea what you wanted out of me.  But, you |
| 23 | know, just come and tell what I knowed and tell the truth. |
| 24 | And no reason not to come. |
| 25 | **Q.**   Well, we appreciate it.  Mr. Nicholson, did you ever |

1    receive CONSOL retiree medical benefits?

2    **A.**   I did.

3    **Q.**   And did those end?

4    **A.**   They did.  I had 40 years with CONSOL, and received my

5    card, and I had it almost a year, and got the letter that

6    they were ending.

7    **Q.**   And actually, could you walk through your career at

8    CONSOL, starting 40 years before, in the beginning, and just

9    tell us each time frame where you worked?

10   **A.**   Okay.  Close as I can.  I started in 1970 as an

11   industrial engineer.  I started at the mines that my dad was

12   working at.  I was the first salaried employee in the

13   family, so they were all UMWA.  And at the mines, my dad

14   worked there.  I had three brothers that worked there.  My

15   grandfather worked at that mines.  My great grandfather

16   worked at mines, you know, before I got there.

17        I got four generations that worked at mines.  All my

18   uncles worked there and all my cousins worked there and all

19   my neighbors worked there.  So it was like a family mine.

20             THE COURT:  Where was that?

21             THE WITNESS:  Turkey Gap.

22             THE COURT:  And did the mine have a name?

23             THE WITNESS:  The name of it was Turkey Gap.

24             THE COURT:  Thank you.

25        Go ahead.

1    BY MS. BATES:

2    **Q.**   How long were you at Turkey Gap?

3    **A.**   Two years.

4    **Q.**   And then where did you go?

5    **A.**   We had -- we had a gentleman that was injured

6    underground and he was about to lose his leg, and they

7    brought him out of the mine.  He was bleeding severely.  And

8    since I'd just gotten out of the Army, I knew how to take

9    care of that.  So I took care of the wound.

10       We had no training in the company anywhere, any of the

11   companies, so we really didn't -- we received on-the-job

12   training.  There was no training.

13       But the UMWA asked for a class on first aid to help

14   take care of a person that way.  And we asked a gentleman,

15   Jim Jones -- they were just starting the Training Department

16   in the mines for CONSOL.  Had one man, Jim Jones.  Asked him

17   to come over and put a class on.  He didn't show.

18       So they told me to get a book and go in there and talk

19   to them about first aid.  And I did.  And some guy come in

20   and sat in the back of the room and got up and left.  And I

21   went and asked the superintendent where the guy was that was

22   going to teach the class.

23       He said, well, he came; listened to you, got up and

24   left.  Said he couldn't do any better than I did.  And that

25   gentleman hired me then -- the first person they hired in

1    the Training Department.  We started the Training Department

2    in CONSOL at Southern Appalachian Region.

3    **Q.**   And was the Training Department part of the Human

4    Resources Department?

5    **A.**   No.  It was in the Safety Department at the time.

6    Later on, it was put in the HR Department.

7    **Q.**   So where did you work for the Training Department?

8    Where were you located?

9    **A.**   I worked out of Pocahontas.

10   **Q.**   For how long?

11   **A.**   In the Southern App, I probably worked there about 20

12   years.

13   **Q.**   And then where did you go?

14   **A.**   After the 20 years, they started moving everybody

15   around.  I went to Bluefield, still in the Training

16   Department.  And went to Oakwood, Virginia, still in the

17   Training Department.  And I then left there and went to

18   Jones Fork, Kentucky.  And then my last years was in

19   Pittsburgh, manager employee development for CONSOL.

20   **Q.**   And when did you leave CONSOL?

21   **A.**   2010.

22   **Q.**   Was that when you retired?

23   **A.**   Yes.

24   **Q.**   Were you ever at the Buchanan location?

25   **A.**   Yes.  I helped get Buchanan started.

NICHOLSON - DIRECT

1    **Q.**   Did you work at the location or did you just visit it?

2    **A.**   I visited.

3    **Q.**   Why did you visit the Buchanan location?

4    **A.**   We would put training classes together for them.

5    People had to have training, according to the law, before

6    they go underground.  And give them the training.  My job

7    was mainly to give underground training and make sure that

8    they understood what was going on to keep them from being

9    injured.

10   **Q.**   What years did you give training at Buchanan?

11   **A.**   I'm not sure exactly, but from Day One that it started.

12   Until -- for about 10 years.  But, you know, it was on and

13   off, because we finally hired a training guy full-time for

14   Buchanan.  And we actually hired HR guys and safety guys,

15   and I, more or less, trained them to do their job.

16   **Q.**   Were you ever at CONSOL of Kentucky?

17   **A.**   Yes, I was.

18   **Q.**   Was that in a similar capacity?

19   **A.**   I went to CONSOL of Kentucky in HR, but I didn't do --

20   I actually did a lot of the medical work on bill paying and

21   stuff like that.

22   **Q.**   When were you at CONSOL of Kentucky?

23   **A.**   I'm not sure the years I was there.  I was there for

24   seven years.  It was in the '90s.

25   **Q.**   And I want to get back to the training sessions that

1    you did.

2    **A.**    Mm-hmm.

3    **Q.**    Did you ever conduct orientation sessions for new

4    employees at CONSOL?

5    **A.**    Yes, I did.

6    **Q.**    What type of topics did you cover for those orientation

7    sessions?

8    **A.**    I would cover just the underground or the surface

9    parts, you know, like roof and rib, and mine ventilation,

10   and just the safety items.

11   **Q.**    Did you ever cover benefits at any presentation at

12   CONSOL?

13   **A.**    No, I didn't.

14   **Q.**    So you never discussed retiree medical benefits for

15   CONSOL at any presentation?

16   **A.**    No, I didn't.  We actually had -- at each location I

17   went to, Jones Fork and Buchanan, actually had HR people,

18   and that was their responsibility to cover that.

19   **Q.**    Did you ever watch those people give presentations

20   about CONSOL benefits?

21   **A.**    Yes, I did.  I actually helped put the books together

22   and put the slides together and would have -- actually work

23   with them, getting them ready to teach the classes.

24   **Q.**    And when you say you put the book together and the

25   slides, do you mean for the orientation sessions?

1    **A.**    For -- we had books for different parts of it.  I might

2    have a book on electricity, and have a book on HR, have a

3    book on benefits -- different things, yes.

4    **Q.**    Did you ever prepare materials about CONSOL's benefits?

5    **A.**    Yes.

6    **Q.**    What were those materials?

7    **A.**    That was the handbook they'd give them.  They actually

8    -- they actually give them a handbook where they could

9    follow you through the classes.  They had to sign for that

10   book.  There is a page in it that we put that you actually

11   signed that you received it.  And at the end of it, there

12   was a page that you tear out that the material was covered.

13   And every class I went to, they gave the books out, so, you

14   know, I monitored a lot of classes.  But -- they would

15   actually tear that out and put it in their personnel file.

16   **Q.**    So did you ever present at training classes?

17   **A.**    Yes, I taught.  What they would do is they would bring

18   around 32 -- 32 people in a class -- foreman training --

19   they would bring to my class.  And I taught the whole --

20   they would bring them out of the workforce, and they would

21   sign them up on salary, send them over to me.  And I have

22   them there for eight weeks, teaching federal law, state law,

23   you know, just getting them ready to take the state test.

24   **Q.**    And were benefits covered at any of the foreman

25   training classes?

1    **A.**   No.  What happened is we would bring them from Bishop

2    Coal Company, Itmann Coal Company, Consolidation Coal

3    Company and we'd bring them from contract mines and get them

4    certified.  They were signed up at the mines.  And if I

5    covered -- I never was a part of that, but if any of that

6    was covered, it was covered at the mine site.  It was

7    different.

8    **Q.**   So there was no need to do it as a foreman; is that

9    what you're saying?

10   **A.**   They didn't have time for it.

11   **Q.**   Did you ever make any other kind of presentations at

12   CONSOL?

13   **A.**   Yes.  I was in charge of EMT classes.  As a matter of

14   fact, the Governor of West Virginia put me on the committee

15   to -- to help put together the EMT mining for the state of

16   West Virginia.  I taught at the Vo-tech center at night.

17   And I taught the surface mining, underground mining at

18   Princeton, and the EMT certification.  And there is probably

19   20 some classes altogether that I put on for CONSOL.

20   **Q.**   And in any of the classes or presentations or meetings

21   that you ever presented for CONSOL, did you ever talk about

22   CONSOL's benefits?

23   **A.**   No.  When it come to something like that, I always

24   bring in a HR guy to talk about it.  If, you know, like if

25   there was a engineering problem, I would bring an engineer

1    to talk about it.  Electric problem, I bring an electric guy

2    to talk about it.  Most of the classes after -- I developed

3    them; I would train somebody else to teach it.

4    **Q.**   I'd like to ask you, do you know personally Emmett

5    Casey?

6    **A.**   I do know Emmett.  I consider him a good friend of

7    mine.

8    **Q.**   How do you know him?

9    **A.**   He come through my foreman certification class.  I

10   helped him get certified.

11   **Q.**   Do you know when that was?

12   **A.**   It had to be in the '70s -- I'm not sure.  I put so

13   many of the classes on.  But had to be in the '70s.  And I

14   have had Emmett in all kinds of classes since then.  Some of

15   them I taught; some I didn't teach.  But I've had him in EEO

16   classes, managing mines classes, all kinds of management

17   courses.

18   **Q.**   In any of those classes with Mr. Casey, did you ever

19   tell him anything about CONSOL's retiree medical benefits?

20   **A.**   I never did cover benefits.

21   **Q.**   And understanding that you didn't -- did you ever tell

22   him that he would have lifetime retiree medical benefits?

23   **A.**   No.

24   **Q.**   Did you ever tell him that his retiree medical benefits

25   from CONSOL would never be terminated?

1    **A.**    No.

2    **Q.**    Did you ever tell him that the language reserving

3    CONSOL's right to change or terminate the plan didn't apply

4    to him?

5    **A.**    No.

6    **Q.**    Or that he could ignore that language?

7    **A.**    No, I didn't.

8    **Q.**    Do you know personally or remember someone whose name

9    is Terry Prater?

10   **A.**    No.  That doesn't mean I didn't have him in class,

11   but -- I had thousands of people in classes, but I don't

12   remember him.

13   **Q.**    You don't remember if you've ever talked to Terry

14   Prater about benefits at all?

15   **A.**    No.

16   **Q.**    In any conversation with any employee from CONSOL, did

17   you ever tell anyone that CONSOL's retiree medical benefits

18   would last for life?

19   **A.**    No.

20   **Q.**    Did you ever tell anyone at CONSOL that the retiree

21   medical benefits would be vested?

22   **A.**    No.

23   **Q.**    Did you ever hear anyone else at CONSOL describe

24   benefits that way?

25   **A.**    No, I haven't.  And I sat in on a lot -- you know, to

1    get started in these orientation classes, I've sat in and

2    worked with the people at -- HR people.  Like -- I don't

3    know if you want any names or not, but John Fox, when he

4    first got started, worked with him close, and Ed Davidson,

5    and Craig Campbell.  And I didn't hear any of them say it

6    was for life or any of that.  They read what was on the, you

7    know, on the slide and in the book.

8    **Q.**   Did you ever tell any CONSOL employee ever that their

9    retiree medical benefits would never be terminated?

10   **A.**   No.

11   **Q.**   Did you ever lie to any CONSOL employee about their

12   benefits?

13   **A.**   No.

14   **Q.**   Did you ever tell them anything different from what was

15   in the written materials, the plan documents, the Summary

16   Plan Descriptions?

17   **A.**   That's something we learned at an early age, you went

18   by the book.  And, you know, if you got away from the book

19   whatsoever, just ended up in trouble.  And that includes any

20   safety item.  That's what I covered.  You had to be very,

21   very careful.  You stayed with what the script was and what

22   was in the book.

23   **Q.**   Did you ever tell any CONSOL employee that they could

24   ignore or disregard that language reserving CONSOL's right

25   to change or terminate the benefit plan?

1    **A.**   No.

2    **Q.**   Did you ever tell any CONSOL employee that you had

3    authority to change CONSOL's benefit plan?

4    **A.**   No.

5    **Q.**   Or to promise something outside of what the written

6    terms said?

7    **A.**   No.

8    **Q.**   Did anyone at CONSOL ever tell you that you had that

9    kind of authority to change the benefit plan?

10   **A.**   No.

11   **Q.**   Did anyone at CONSOL tell you to misrepresent CONSOL's

12   retiree medical benefits to employees?

13   **A.**   No, never, no.

14   **Q.**   Or to lie to employees about their benefits?

15   **A.**   No.

16   **Q.**   Did anyone at CONSOL ever tell you to promise employees

17   lifetime retiree medical benefits?

18   **A.**   No.

19   **Q.**   Or to tell them that those benefits would never be

20   terminated?

21   **A.**   No.

22   **Q.**   Did anyone at CONSOL tell you to tell employees that

23   the reservation of rights clause, that the company could

24   terminate benefits, didn't apply to them?

25   **A.**   No.

```
 1    Q.   Or that they could ignore it?

 2    A.   No, ma'am.

 3         MS. BATES:  I don't have any more questions for

 4    you.  Thank you, Mr. Nicholson.

 5         THE WITNESS:  Yes, ma'am.

 6                    CROSS-EXAMINATION

 7    BY MR. PETSONK:

 8    Q.   Good morning, Mr. Nicholson.

 9    A.   Good morning.

10    Q.   You testified here that you participated in the process

11    of developing new miner orientation materials?

12    A.   Right.

13    Q.   And that included for the Buchanan Mine, right?

14    A.   That's correct.

15    Q.   And also for the CONSOL of Kentucky, Jones Fork

16    operations, right?

17    A.   Yes, mm-hmm.

18    Q.   Did you work with Craig Campbell during that process?

19    A.   Some, yes.

20    Q.   Did he work in the HR Department at that time?

21    A.   Yes.

22    Q.   Did you work with Mike Hymes during the development of

23    those materials?

24    A.   I worked for Mike Hymes, but I never -- Mike never

25    worked with me on any of that, no.
```

1    Q.    Okay.   To clarify the time frame there, you stated that

2    when you began working in the Training Department in 1972,

3    the Training Department was underneath the Safety Department

4    for CONSOL, right?

5    A.    That's correct.

6    Q.    And then thereafter, it moved -- was transferred to the

7    Human Resources Department, right?

8    A.    That's correct.

9    Q.    Do you remember when you were transferred from safety

10   to Human Resources?

11   A.    It would be the late '70s, early '80s.

12   Q.    So before the opening of the Buchanan Mine, right?

13   A.    That's correct.

14   Q.    Who managed you or managed the -- the work that you did

15   in developing those new miner orientation programs?

16   A.    It was just a large group of people worked the CONSOL

17   plaza would help with some of the information.   Anything we

18   taught had to be approved by Pittsburgh.   They would tell

19   us, start putting a book together.   And we'd have to send it

20   to, for example, to Mike Hymes to look at and to approve.

21   And then he had to send it to Pittsburgh, and they'd have to

22   approve it.   And we'd look at the changes they made, and

23   we'd make more changes and we'd go back and forth.   Not any

24   one person did that.   It was a group exercise.

25   Q.    Sure.   And was that process the same throughout the

1    time that you worked for CONSOL, when it came to developing

2    materials for presentation to miners?

3    **A.**    For safety or anything else, we had a group.  You had

4    to get everything approved before you'd teach it.

5    **Q.**    Did that same process unfold for the benefits and Human

6    Resources part of the presentation?

7    **A.**    Yes.

8    **Q.**    And when Mike Hymes sent the -- and Mike Hymes was --

9    at the time you're describing, and once you were in the HR

10   office, and beginning in the early '80s, -- your testimony

11   is that Mike Hymes reviewed new miner orientation materials,

12   and then, thereafter, he had to send them up to his manager

13   somewhere in the Pittsburgh corporate office; is that right?

14   **A.**    That's correct.

15   **Q.**    And do you remember who was the -- the senior manager

16   of Human Resources at that time?

17   **A.**    I think it was Buck Hyler.  But, again -- you know, I'm

18   not sure Buck Hyler actually looked at it or had somebody in

19   his office look it over.  And same way with Mike Hymes.

20   Mike was responsible for that, but I'm not sure if he sat

21   down and read it word-for-word or had somebody else at the

22   department look at it.

23   **Q.**    Very good.  I understand your testimony.

24        Are you aware of a program called the union-free

25   advantage?

NICHOLSON - CROSS

```
 1    A.    No.

 2    Q.    You've never -- never heard the term before?

 3    A.    No.

 4    Q.    The Buchanan advantage?

 5    A.    I've never heard of the --

 6    Q.    Have you heard of that --

 7    A.    What was it?

 8              COURT REPORTER:  I'm sorry.  Please repeat the

 9    question.

10    BY MR. PETSONK:

11    Q.    Union-free advantage?

12    A.    Union-free -- I'm not sure I heard it in those terms or

13    not.  But, you know, it sounds familiar, but that's all I

14    can say.

15    Q.    You stated that in your foremen's classes that you

16    delivered for CONSOL, you didn't cover benefits yourself,

17    because those topics had already been covered at the mine

18    site; is that right?

19    A.    Right.  And you'd have people from different companies

20    in there, and you couldn't cover it anyway.  There would be

21    too many differences.

22    Q.    Okay.  And you testified that the presentations that

23    the Human Resources Department provided to miners included a

24    script that went along with them; is that right?

25    A.    Yes.
```

```
 1    Q.   And was that script produced through the same process
 2    you described with Mr. Hymes and Mr. -- whoever the superior
 3    was at the time?
 4    A.   That's correct.
 5    Q.   Where was the Turkey Gap mine located?
 6    A.   Next to Matoaka [phonetic], in Princeton, West
 7    Virginia.
 8    Q.   In Mercer County?
 9    A.   Right.
10    Q.   You mentioned that many of your family members were
11    UMWA miners; is that right?
12    A.   They all were, yes.
13    Q.   And did they retire as UMWA miners?
14    A.   My great grandfather -- they didn't have any benefits
15    when he worked.  He was a hand loader.  My dad was the first
16    one that retired with benefits.  And all my brothers, they
17    left, got other jobs, because of mining being shut down.
18    But I had several uncles and a father-in-law that worked and
19    got retirement, yes.
20    Q.   Got UMWA retirement and welfare benefits?
21    A.   Mm-hmm.
22              MR. PETSONK:  I don't have any further questions,
23    Your Honor.
24              MS. BATES:  May I have a moment, Your Honor?
25              THE COURT:  Yes.
```

```
 1            (An off-the-record discussion was held between defense
 2    counsel.)
 3            MS. BATES:  Thank you, Mr. Nicholson.  I don't
 4    have any more questions.
 5            THE COURT:  May Mr. Nicholson be excused from the
 6    trial?
 7            MS. BATES:  Yes.  Thank you.
 8            MR. PETSONK:  Yes.
 9            THE COURT:  Mr. Nicholson, you're excused from the
10    trial.  Let me caution you, however, not to discuss your
11    testimony with any other witness in this case until the
12    trial is over.
13            THE WITNESS:  Okay.  And that's -- you don't know
14    when it's going to be over, right?
15            THE COURT:  Right now, we don't, but the plan is
16    it will be over this week.
17            THE WITNESS:  Okay.
18            THE COURT:  And so if you need any relief from
19    that direction, let me know.
20         Thank you, sir, for being with us.
21            THE WITNESS:  Thank you.
22            THE COURT:  And you're excused.
23            THE WITNESS:  Yes, sir.  Thank you.
24            THE COURT:  Let me ask whether this would be a
25    good point to recess?
```

 1              MR. TORRES:  Yes, Your Honor.

 2              THE COURT:  What further witnesses do you have?

 3              MR. TORRES:  We have one more live witness to

 4    present today, Your Honor, and then we have three video

 5    depositions to present today.

 6              THE COURT:  And does that conclude your case?

 7              MR. TORRES:  No.  We have Mr. Kowzan, who is

 8    driving up from Florida, Your Honor, if you remember; he's

 9    going to be here for tomorrow.  And then we have -- we have

10    one video deposition that is in process, Your Honor.  That

11    will be concluded tonight and we would present that

12    tomorrow, along with Mr. Elswick's video testimony.

13              THE COURT:  Well, can something be done to advance

14    that?  It sounds to me that you don't have enough to finish

15    today.

16              MR. TORRES:  We can certainly present Mr. Elswick

17    today.  Mr. Mason's deposition was this morning, and we have

18    the transcript from it, but opposing counsel was not

19    finished with their examination.  And so we could certainly

20    present that tomorrow, along with Mr. Kowzan.

21         Those would be the last two things we would have to do

22    tomorrow.

23              THE COURT:  When do you plan to finish the

24    deposition in which you are in the midst?

25              MR. TORRES:  This evening, Your Honor.

```
 1              THE COURT:  How long is it going to take to get
 2      it?
 3              MR. TORRES:  We'll have it done for tomorrow, Your
 4      Honor.  It will be transcribed overnight and we can present
 5      it tomorrow.
 6              THE COURT:  And so tomorrow, it would be that and
 7      Mr. Kowzan.  Anything else?
 8              MR. TORRES:  That's it, Your Honor.
 9              THE COURT:  How long will Mr. Kowzan take?
10              MR. TORRES:  I'm guessing in total, Mr. Kowzan
11      should take about the same length of these witnesses we've
12      been seeing today, so 30 to 45 minutes, Your Honor.
13              THE COURT:  Very good.  It looks to me as though
14      you could get started in that deposition a lot sooner,
15      because you don't have much left to do today.
16              MR. TORRES:  Yes, Your Honor.
17              THE COURT:  We'll be back in 15 minutes.
18              THE CLERK:  All rise.
19         (A recess was taken at 11:10 a.m. until 11:30 a.m.)
20              THE CLERK:  All rise.
21              THE COURT:  Please be seated.
22              MR. TORRES:  Thank you, Your Honor.
23         Your Honor, defendants call John Fox.
24              THE CLERK:  Mr. Fox, if you'd please raise your
25      right hand.
```

1           **JOHN FOX, DEFENDANT'S WITNESS, SWORN**

2           THE CLERK:  If you would please state your name

3   and spell it for the record.

4           THE WITNESS:  John W. Fox.  Mailing address is 144

5   Kimberly Lane, Princeton, West Virginia, 24739.

6           THE CLERK:  And if you would please spell your

7   name for the record.

8           THE WITNESS:  Pardon?

9           THE CLERK:  Spell your name.

10          THE WITNESS:  John W. Fox.

11          THE CLERK:  If you would please spell it.

12          THE WITNESS:  J-O-H-N, middle name Wayne,

13  W-A-Y-N-E, last name, F-O-X.

14          THE CLERK:  Thank you.

15          MR. TORRES:  Your Honor, may I remove my mask?

16          THE COURT:  You may.

17                    **DIRECT EXAMINATION**

18  **BY MR. TORRES:**

19  **Q.**   Good morning, Mr. Fox.

20  **A.**   Good morning.

21  **Q.**   Can you hear me okay?

22  **A.**   Yes.

23  **Q.**   Okay.  Great.  Mr. Fox, are you a party to this

24  lawsuit?

25  **A.**   I am.

FOX - DIRECT

```
1    Q.   Did you receive a subpoena to come testify today?

2    A.   I'm getting an echo.

3    Q.   I'm sorry.  Did you receive a subpoena to come testify

4    today?

5    A.   Yes, I did.

6    Q.   Are you a defendant in this lawsuit?

7    A.   No.

8    Q.   Okay.  You previously worked at CONSOL Energy, Mr. Fox?

9    A.   I did.

10   Q.   For what period of time; what was your start date and

11   your end date?

12   A.   I started in 1975 and ended in 2000.

13   Q.   Okay.  And what happened in 2000?

14   A.   Took a retirement.

15   Q.   After you retired from CONSOL, did you ever receive

16   retiree medical benefits from CONSOL?

17   A.   I did.

18   Q.   Do you recall how long you received them?

19   A.   I don't know the specific date.

20   Q.   Okay.  Why do you no longer receive those benefits?

21   A.   They were terminated by the company.

22   Q.   Now, when you started in 1975 at CONSOL, Mr. Fox, what

23   was your position?

24   A.   I was a personnel assistant.

25   Q.   Okay.  When you retired from CONSOL in 2000, what was
```

1    your position?

2    **A.**    Manager of management development.

3    **Q.**    What department was that in?

4    **A.**    Pardon?

5    **Q.**    What department was that in?

6    **A.**    That was in Human Resources.

7    **Q.**    Okay.  From the time you started from '72 until you

8    retired in 2000, how many of your jobs at CONSOL were in

9    Human Resources?

10    **A.**    All of them.

11    **Q.**    Okay.  And very briefly, can you just give us an

12    overview of what the various locations you were at and the

13    time periods from '72, Mr. Fox?

14    **A.**    From '75, I was at Itmann Coal Company.  And I also was

15    at Rowland Coal Company.

16    **Q.**    Let me stop you there.  Are those two companies -- were

17    they owned by CONSOL?

18    **A.**    They were owned by CONSOL, managed by CONSOL, in

19    Raleigh County, West Virginia.

20    **Q.**    Okay.  Please continue.

21    **A.**    And in 19 -- late '75, '76, I was transferred to

22    Pocahontas, Virginia, at the regional headquarters.

23    **Q.**    For CONSOL?

24    **A.**    For CONSOL.  I was in charge of employment for the four

25    states area in Southern West Virginia, Virginia, Tennessee,

1    and Kentucky.

2    **Q.**   And how long did you hold that position?

3    **A.**   Approximately, one year.

4    **Q.**   What happened next?

5    **A.**   And then I was moved and promoted to manager of

6    compensation and benefits for the Southern Appalachian

7    Region.

8    **Q.**   For CONSOL?

9    **A.**   For CONSOL.

10   **Q.**   And how long did you hold that position?

11   **A.**   Until 1983.

12   **Q.**   And what happened then?

13   **A.**   1983, I was transferred to the Buchanan Mine in

14   Buchanan county, Virginia, and by CONSOL.

15   **Q.**   I'm sorry, if I missed that.  What was your title when

16   you were transferred to Buchanan?

17   **A.**   At Buchanan, I was supervisor of industrial employee

18   relations.

19   **Q.**   And how long were you at Buchanan?

20   **A.**   1991, '92.

21   **Q.**   And what happened after -- at that point in time?

22   **A.**   I was transferred -- promoted to the corporate office

23   in Pittsburgh.

24   **Q.**   And did you have any other positions other than --

25   after you were transferred to Pittsburgh, other than the

FOX - DIRECT

1    manager of management development?

2    **A.**    No.  I stayed in that position until I retired.

3    **Q.**    Thank you.  While you were employed at the Buchanan

4    Mine, Mr. Fox, we are talking 1982 or '83 to 1991 to 1992?

5    **A.**    Correct.

6    **Q.**    During that period when you were at Buchanan Mine,

7    what, if any, involvement did you have in conducting

8    employee orientations?

9    **A.**    I conducted employee orientations for all new hourly

10   employees referred to as production and maintenance

11   employees.

12   **Q.**    Would that be from when you arrived at Buchanan until

13   you left in '91, '92?

14   **A.**    We started those orientations January 1984, and I did

15   my last one somewhere in May '91 or '92, somewhere like

16   that.

17   **Q.**    After leaving Buchanan and moving to the corporate

18   offices, did you ever conduct any other employee

19   orientations?

20   **A.**    No.

21   **Q.**    Again, focusing on Buchanan, Mr. Fox, when you

22   conducted employee orientations at Buchanan, what portions

23   of the orientation program did you cover?

24   **A.**    I covered the employee handbook, and I covered the

25   union awareness, operating union-free.

1    **Q.**    Okay.  And what, if any, materials did you distribute

2    during the orientations that you conducted?

3    **A.**    I distributed the employee handbook; also distributed

4    the Summary Plan Descriptions.  There may have been a case

5    or two where the Summary Plan Descriptions may have been

6    mailed to the employee's home or we gave them out at the

7    mine, but, for the most part, they were given out during the

8    orientation.

9    **Q.**    So they got an employee handbook and Summary Plan

10   Description?

11   **A.**    Right.

12   **Q.**    And --

13             THE COURT:  Let me ask you -- let me interrupt.

14   What's the difference between the employee handbook and the

15   Summary Plan Descriptions?  What's the difference between

16   the two?

17             THE WITNESS:  The Summary Plan Descriptions go

18   into extreme detail on each benefit.  The Summary Plan

19   Description is just a general outline of the benefits and

20   work policies.

21             THE COURT:  To what extent is the Summary Plan

22   Description or parts of it, if any, incorporated into the

23   employee handbook?

24             THE WITNESS:  Just a general mention of that

25   particular benefit.

1        THE COURT:  You say a general mention?

2        THE WITNESS:  Yes.

3        THE COURT:  Can you expand on that?

4        THE WITNESS:  There was no details.  Specific

5    details of each particular plan was in the Summary Plan

6    Description.  The handbook was just a general overview.

7        THE COURT:  What is the handbook saying with

8    respect to employee retiree medical benefits in the

9    handbook?

10        THE WITNESS:  I don't recall the specifics.  It's

11    been too long.

12        THE COURT:  Thank you.

13   BY MR. TORRES:

14   Q.   Just to follow-up on the Judge's question, Mr. Fox --

15   and we might be able to clarify the record.

16        MR. TORRES:  Could I have Defendant's 18, Josh?

17        THE COURT:  What's the number?

18        MR. TORRES:  Defendant's 18, Your Honor.

19        May I approach, Your Honor?

20        THE COURT:  You may.

21   BY MR. TORRES:

22   Q.   Mr. Fox, I'm going to show you what's been admitted

23   into evidence as Defendant's Exhibit 18.  And taking a look

24   at the front page of that document, are you familiar with

25   that document?

1   **A.**   That looks like what we gave out at orientation.

2   **Q.**   And what -- you said you gave out two booklets at the

3   orientation; which one would this be?

4   **A.**   This would be the Summary Plan Description of the

5   benefit plans.

6   **Q.**   Okay.  And how did the -- this was -- I know this is a

7   photocopy, Mr. Fox, but in the actual physical version of

8   this document, can you explain to the Judge sort of what it

9   looked like?

10   **A.**   It was in a binder.  I don't know if it's a two-ring or

11   three-ring binder.  The holes were prepunched, and employees

12   just inserted it into the binder.

13   **Q.**   Okay.  And --

14          THE COURT:  Let me ask you this:  The employees

15   inserted it into a three-ring binder.  Did the three-ring

16   binder consist of something else?

17          THE WITNESS:  No, the three-ring binder was just

18   an empty binder, and they opened it up and put these

19   prepunched Summary Plan Descriptions into that binder.

20          THE COURT:  Thank you.

21          MR. TORRES:  May I approach, Your Honor?

22          THE COURT:  You may.

23   BY MR. TORRES:

24   **Q.**   Mr. Fox, I'm showing you what's been marked for

25   identification as Defendant's Exhibit 32.  I would like you

1    to take a look at that and tell me if you're familiar with

2    it?

3    **A.**    Yes, I am familiar with it.

4    **Q.**    What is this?

5    **A.**    It's the employee handbook for Buchanan Mine.

6    **Q.**    And again, realizing that this is a photocopy, can you

7    explain to the Judge the size of this document that is

8    reflected in Defendant's Exhibit 32?

9    **A.**    The actual document wasn't much bigger, maybe the same

10   size as your photocopy.  It was simply stapled in the corner

11   for each -- on the side for binding purposes.  Just a --

12   it's a small, small handbook for an employee to carry in

13   their pocket if they wanted to.

14   **Q.**    Okay.  And just give me one second, please.

15        If you look at the document, there are page numbers on

16   the bottom of each page of the photocopy pages?

17   **A.**    Mm-hmm.

18   **Q.**    And if you turn to Page 24.

19   **A.**    Okay.

20   **Q.**    And there is a section there that says, "Employee

21   Benefits"; is that correct?

22   **A.**    Yes.

23   **Q.**    And then just moving forward in the document, can you

24   -- can you tell us how many of the pages actually discuss

25   employee benefits in the employee handbook?

1   **A.**   It appears that the -- moving forward, there is on page

2   25 and 26, they are touched upon.

3   **Q.**   Okay.

4   **A.**   25, 26, 27, and actually Workers' Comp was on Page 28.

5   **Q.**   Okay.  So that would be a section that covered employee

6   benefits, at least in the handbook?

7   **A.**   Pardon?

8   **Q.**   That would be the section that covered employee

9   benefits?

10   **A.**   Correct.  Correct.

11          MR. TORRES:  Your Honor, defendants offer Exhibit

12   32.

13          MR. PETSONK:  No objection.

14          THE COURT:  Admitted.

15   **Defendant's Exhibit 32 admitted.**

16   BY MR. TORRES:

17   **Q.**   So getting back to my questions about the orientation

18   that you conducted, Mr. Fox, while you were at Buchanan.

19   **A.**   Okay.

20   **Q.**   With respect to the employee handbook, what portions of

21   this do you recall covering during the orientations that you

22   conducted?

23   **A.**   Well, we went over the handbook from beginning to end

24   and read it word-for-word to all employees; gave them the

25   opportunity to ask any questions about the handbook, about

1    benefits or work practices, whatever.  But it was covered in

2    its entirety.  In fact, if I'm not mistaken, on the last

3    page, there was a page there for a signature, and they tore

4    that page out and handed it back, and it was just to make

5    sure I remember covering it with them.

6    **Q.**   Okay.  And do you recall what, if anything, the

7    employee handbook said about the company's right to

8    terminate or change benefits?

9    **A.**   Yeah.  The company reserved that right, and it's in the

10   employee handbook, and may have been in the Summary Plan

11   Description, as well, that the employee -- the company had

12   the right to change those benefits.

13   **Q.**   Okay.  So again, directing your attention to the

14   numbered page 1 in the employee handbook, Mr. Fox?

15   **A.**   Okay.

16   **Q.**   Can -- and then there is a section that says,

17   "Handbook," correct?

18   **A.**   Yes.

19   **Q.**   And there is a -- can you point out in that section

20   where the reservation of rights language is contained in the

21   employee handbook?

22   **A.**   Mm-hmm.  Give me that question again.

23   **Q.**   Sure.  Can you point out under that heading, "About

24   Your Handbook," can you point out where the reservation of

25   rights language is contained?

FOX - DIRECT

```
 1              MR. PETSONK:  Objection.  Lack of foundation, Your
 2     Honor.  I'm not sure he's --
 3              THE COURT:  I can't hear you.
 4              MR. PETSONK:  I don't think he's established that
 5     there is a reservation of rights in this section, Your
 6     Honor.
 7              THE COURT:  Well, let's let counsel develop it and
 8     you can cross.
 9     BY MR. TORRES:
10     Q.   Do you remember the question, sir?
11     A.   Yes.  The last portion of that paragraph about your
12     handbook reserves the right to modify, revoke, change or
13     alter plans, policies or procedures at any time.
14              THE COURT:  Now, where is that?  Which page?
15              MR. TORRES:  Bates Number page 1, Your Honor, in
16     the heading "About Your Handbook."
17     BY MR. TORRES:
18     Q.   Just so we are clear for the record, Mr. Fox, the
19     language that you read is in a sentence that begins, "While
20     Consolidation Coal believes whole-heartedly," -- correct?
21     A.   Correct.
22     Q.   And it goes on to say, "Consolidation Coal Company
23     reserves the right to modify, revoke, or change any or all
24     such plans, policies, or procedures at any time," correct?
25     A.   That's correct.
```

FOX - DIRECT

1    **Q.**    And that's the language you were referring to?

2    **A.**    Correct.

3    **Q.**    And that's what -- part of what you would have read to

4    the employees during that orientation?

5    **A.**    Yes.

6    **Q.**    Okay.  And then you mentioned a moment ago that one of

7    the other things that would be distributed during the

8    orientation was the Summary Plan Description; is that

9    correct?

10   **A.**    Correct.

11   **Q.**    And you testified that your recollection is that also

12   contained reservation of rights language, correct?

13   **A.**    Yes.

14   **Q.**    Okay.

15           MR. TORRES:  Your Honor?  Your Honor?

16           THE COURT:  Yes.

17           MR. TORRES:  I'm having a bit of a nasal drip.

18   Could I have a minute just to grab a tissue?

19           THE COURT:  You may.

20           MR. TORRES:  Thank you, Your Honor.  I apologize.

21   BY MR. TORRES:

22   **Q.**    Mr. Fox, when you were conducting the orientation in

23   addition to distributing the handbook and the Summary Plan

24   Description you've already testified to, did you use any

25   slides during your employee orientation?

1    **A.**   Yes, we did.

2    **Q.**   Okay.  What -- focusing on employee benefits, do you

3    recall what was on the slides that you used during the

4    orientation?

5    **A.**   I do not remember any specifics on slides.  They were

6    just general.

7    **Q.**   And with respect to the reservation of rights language

8    that we were discussing a moment ago, do you recall if there

9    was anything in those slides referring to the reservation of

10   rights language?

11   **A.**   No, I do not.

12   **Q.**   Okay.  And other than slides, Mr. Fox, do you recall if

13   you used any scripts when you were conducting orientations

14   at Buchanan?

15   **A.**   There was a script, but I did not use a script.

16   **Q.**   You did not use a script?

17   **A.**   I did not use a script.

18   **Q.**   Okay.  Mr. Fox --

19              MR. TORRES:  Could I have 10-A and 14, please?

20              Your Honor, may I approach?

21              THE COURT:  You may.

22   BY MR. TORRES:

23   **Q.**   Mr. Fox, I'm going to show you two documents that have

24   already been introduced into evidence.  The first one is

25   Plaintiff's Exhibit 10-A.  Do you have it in front of you?

1   Do you have 10-A in front of you?

2   **A.**   Yes.

3   **Q.**   And I want to direct your attention to -- I'm sorry.

4        First off, does that document look familiar to you, Mr.

5   Fox?

6   **A.**   No.

7   **Q.**   And directing your attention to the top of Plaintiff's

8   10-A, there is a paragraph that begins, "Part of this is

9   lawyer talk."  Do you see that?

10   **A.**   I do.

11   **Q.**   Can you read that first paragraph, and let me know when

12   you're done, Mr. Fox.  Read it just to yourself, not out

13   loud.

14   **A.**   (Witness complies.)  Okay.

15   **Q.**   Mr. Fox, in the orientations that you conducted at

16   Buchanan, do you ever recall using any of the language

17   that's included in that first paragraph I just had you read?

18   **A.**   No.

19   **Q.**   Do you ever recall using the term "Lawyer talk" during

20   any of the orientations you conducted at Buchanan?

21   **A.**   No.

22   **Q.**   And if you turn now to Plaintiff's Exhibit 14, Mr. Fox?

23   First off, again, are you familiar with this document?

24   **A.**   No.

25   **Q.**   Have you ever seen it before?

1    **A.**    No.

2    **Q.**    And again, I'd ask you if you could read to yourself

3    the paragraph at the very top of Plaintiff's Exhibit 14.

4    Let us know when you are done.  Up to the word, "The right

5    to change them."

6    **A.**    Okay.

7    **Q.**    Mr. Fox, in any of the orientations that you conducted

8    at Buchanan, do you recall ever reading any of the language

9    that's contained in the paragraph I just had you read?

10   **A.**    No.

11   **Q.**    And again, you never recall using the word "Lawyer

12   talk" in any of the orientations that you conducted?

13   **A.**    No.

14   **Q.**    Thank you.  Let me take those back from you so I can

15   return them from where they came.  Just the top two.  Thank

16   you.

17                   MR. TORRES:  Thank you, Josh.

18                   THE CLERK:  Thank you.

19   BY MR. TORRES:

20   **Q.**    Now, you already testified that one of the things you

21   did in your orientations was read the reservation of rights

22   language from the employee handbook, correct?

23   **A.**    Yes.

24   **Q.**    And in the orientations that you conducted, do you

25   recall saying anything else to employees about the

1    reservation of rights language, other than reading the

2    language that was contained in the handbook?

3    **A.**   That was it.

4    **Q.**   And during the course of your orientation, you said you

5    also covered -- I think you called it union-free.  Did I

6    recall that correctly?

7    **A.**   Yes.

8    **Q.**   And I'll ask you specifically about the topics you

9    covered regarding that in one second.  But as part of the

10   orientation where you were talking about union-free, do you

11   recall making any comparison between CONSOL's benefits and

12   UMWA benefits?

13   **A.**   I did not make any comparison.

14   **Q.**   You did not?

15   **A.**   I did not.

16   **Q.**   And can you tell us just generally -- for purposes of

17   the union-free portion of your orientation, can you tell us

18   what you recall covering during that section?

19   **A.**   Well, we covered the benefits of being union-free

20   versus represented from the standpoint of our wages were

21   higher, our -- you had no -- you didn't have to pay union

22   dues and assessments enforced by the union.  All of that was

23   -- did not apply to Buchanan Mine.

24   **Q.**   So just so we are clear, you said you talked about the

25   benefits.  You mean the advantages?

1    **A.**    Pardon?

2    **Q.**    You said you talked about the benefits of being --

3    **A.**    Union-free, correct.

4    **Q.**    But you mean that as the pros -- not benefits in the

5    sense that you talked about employee benefits; is that

6    correct?

7    **A.**    Correct.

8              MR. PETSONK:  I'm going to object to the form of

9    the question, Your Honor.  He's directing the witness.

10             MR. TORRES:  I'll restate the question, Your

11   Honor.

12             THE COURT:  Go ahead.

13   BY MR. TORRES:

14   **Q.**    It doesn't matter.  Your testimony is fine, Mr. Fox.

15   We can move on.

16        Mr. Fox, do you know Emmett Casey?  Are you familiar

17   with him?

18   **A.**    I'm acquainted with him.

19   **Q.**    And do you recall if you ever conducted an orientation

20   at Buchanan when Mr. Casey was present?

21   **A.**    Right before I left the mine, going to Pittsburgh he

22   was in one of the last classes I presented.

23   **Q.**    Other than the orientation that you recall where Mr.

24   Casey was present at, do you recall any other meetings where

25   you conducted a presentation when Mr. Casey was present?

1   **A.**   I wouldn't have done any more presentations after that.

2   **Q.**   Okay.  And did you ever tell Mr. Casey that he would

3   have lifetime retiree medical benefits?

4   **A.**   I did not.

5   **Q.**   Did you ever tell Mr. Casey that his retiree medical

6   benefits would vest?

7   **A.**   No.

8   **Q.**   Did you ever tell Mr. Casey that his benefits would

9   never be terminated?

10  **A.**   No.

11  **Q.**   Did you ever tell Mr. Casey to ignore or disregard the

12  language in CONSOL's SPD that said CONSOL had the right to

13  modify or terminate benefits?

14  **A.**   No.

15  **Q.**   Did you ever tell Mr. Casey that you had authority to

16  promise him something different from what was written in

17  CONSOL's plan documents or Summary Plan Descriptions?

18  **A.**   No.

19  **Q.**   Did you ever describe CONSOL's benefits to any

20  employees while you were conducting your orientations at

21  Buchanan as vested?

22  **A.**   No.

23  **Q.**   Did you ever describe CONSOL's retiree benefits to

24  employees at any orientation you conducted at the Buchanan

25  as lifetime or lifelong?

1  **A.**  No.

2  **Q.**  Did you ever tell any employee at any of the

3  orientations that you conducted at Buchanan that CONSOL's

4  retiree medical benefits would never change?

5  **A.**  No.

6  **Q.**  Did you ever tell any employee at any of the

7  orientations you conducted at Buchanan that CONSOL's retiree

8  medical benefits would never be terminated?

9  **A.**  No.

10  **Q.**  Mr. Fox, did you ever lie to employees about their

11  benefits or the duration of those benefits?

12  **A.**  No.

13  **Q.**  Did you ever tell any employee something different than

14  what was in CONSOL's plan documents and employee handbooks

15  regarding their benefits?

16  **A.**  No.

17  **Q.**  Did you ever tell any employee to ignore or disregard

18  the reservation of rights language in the employee handbook?

19  **A.**  No.

20  **Q.**  Or in the Summary Plan Description?

21  **A.**  No.

22  **Q.**  Did you ever tell any employee at any of the

23  orientations you conducted at Buchanan that you have the

24  authority to promise them something different than what was

25  written in their plan documents and Summary Plan

1    Descriptions?

2    **A.**    No.

3    **Q.**    Did the -- during the presentations you conducted at

4    Buchanan, did you ever tell employees that retiree medical

5    benefits would be provided for life?

6    **A.**    No.

7    **Q.**    During the presentations you conducted at Buchanan, did

8    you ever tell employees that reservation of rights in

9    CONSOL's benefit plans did not apply to retiree medical

10   benefits?

11   **A.**    No.

12   **Q.**    Did anyone from CONSOL ever tell you you had the

13   authority to alter the terms of CONSOL's written benefit

14   plan?

15   **A.**    No.

16   **Q.**    Did anyone from CONSOL tell you to lie to employees

17   regarding CONSOL's retiree medical benefits?

18   **A.**    No.

19   **Q.**    Did anyone at CONSOL tell you to mislead employees

20   regarding CONSOL's retiree medical benefits?

21   **A.**    No.

22   **Q.**    Did anyone at CONSOL tell you to promise employees that

23   retiree medical benefits would vest or last throughout their

24   lifetimes?

25   **A.**    No.

1    **Q.**   Did anyone from CONSOL tell you to tell employees that

2    retiree medical benefits would never be terminated?

3    **A.**   No.

4    **Q.**   Did anyone from CONSOL tell you to tell employees to

5    ignore or disregard the reservation of rights language in

6    the plan documents --

7    **A.**   No.

8    **Q.**   -- or any employee handbook?

9    **A.**   No.

10   **Q.**   And did anyone from CONSOL ever tell you to tell

11   employees that the reservation of rights clause in CONSOL's

12   written benefit plans did not apply to retiree medical

13   benefits?

14   **A.**   No.

15          MR. TORRES:   Thank you, Mr. Fox.  I don't have any

16   further questions.

17                      **CROSS-EXAMINATION**

18   **BY MR. PETSONK:**

19   **Q.**   Mr. Fox, do you still have in front of you those

20   documents that Mr. Torres was asking you about a moment ago?

21   **A.**   I didn't hear the first part of your question.

22   **Q.**   Do you have those documents in front of you that Mr.

23   Torres asked about?

24   **A.**   I have the Buchanan employee handbook and the Summary

25   Plan Descriptions, yes.

1   **Q.**   The handbook is marked Defendant's Exhibit 32.

2   Do you see that?

3   **A.**   I do.

4   **Q.**   Can you open that document -- access that document?

5   **A.**   Okay.

6   **Q.**   If you flip to page 4 -- or pages 3 and 4, which are

7   included on the same page in this exhibit?

8   **A.**   Okay.

9   **Q.**   These are from the employee handbook, which was a

10   small, sort of a pocket-sized handbook for employees, right?

11   **A.**   They appear to be the same, yes.

12   **Q.**   And do you see that there is a section beginning at the

13   bottom of page 3 called:  "Management Philosophy - Working

14   Together"?

15   **A.**   Mm-hmm.

16   **Q.**   And it says, "Mutual respect and trust are an important

17   part of the good relationship we seek to maintain among all

18   employees at the Buchanan Mine"; is that right?

19   **A.**   Yes.

20   **Q.**   And on the next page, at page 4, it says -- about

21   CONSOL's philosophy.  Is that right?

22   **A.**   "Our philosophy," yes.

23   **Q.**   And I'm going to read you three of the sentences

24   comprising the first full paragraph on that page.

25   "Employees at Buchanan Mine have and receive

FOX - CROSS

1   competitive wages, benefits, and working conditions as

2   compared with other employees in the area.  Buchanan Mine

3   management surveys other companies in the areas around us to

4   assure that the pay, benefits, and work practices at our

5   mine are competitive or better.  If changes need to be made

6   in order to remain competitive or better, we will do it."

7        Do you see that?

8   **A.**   I do.

9   **Q.**   Did you present that part of the employee handbook to

10  people in the orientation sessions you've described, as

11  well?

12  **A.**   We would have read that in the orientation.

13  **Q.**   From 1982 to 1992, while you were the supervisor of

14  industrial employee relations at the Buchanan Mine, who was

15  your supervisor in the Human Resources Department?

16  **A.**   I was there from '83 to '90 -- or '91, '92.  Not '82.

17  **Q.**   Okay.  During that period, who was your supervisor in

18  the Human Resources Department?

19  **A.**   I had a functional responsibility to Mike Hymes.  And I

20  reported directly to the superintendent.

21  **Q.**   For day-to-day operations at the mine, you reported to

22  the superintendent?

23  **A.**   Right.

24  **Q.**   But for human resources management, you reported to

25  Mike Hymes?

1    **A.**    Mike Hymes.

2    **Q.**    And he was the Regional Manager for Human Resources for

3    CONSOL in the area at that time?

4    **A.**    That's correct.

5    **Q.**    Did Mr. Hymes --

6            MR. PETSONK:  Well, let me approach, if I may,

7    Your Honor?

8        Your Honor, may I approach?

9            THE COURT:  You may.

10            THE CLERK:  Plaintiff's 29.

11            MR. POMPONIO:  What number are we on?

12            MR. PETSONK:  29.  Is that correct?

13            I thought that the Plan Amendment was 29.  I

14    thought we were on 30.

15            THE CLERK:  That's actually correct.  If I could

16    do that again.  Plaintiff's Exhibit 30.

17            MR. PETSONK:  May I approach, Your Honor?

18            THE COURT:  Now, what's the number of this

19    exhibit?

20            MR. PETSONK:  Plaintiff's 30.

21            THE COURT:  Pardon?

22            MR. PETSONK:  Plaintiff's 30.

23            THE COURT:  30.

24            THE CLERK:  Is this different than what was just

25    handed to the Court?

```
 1              MR. PETSONK:  I'm sorry, you've already got a copy

 2      of it.

 3              THE COURT:  Josh, is that 30?

 4              THE CLERK:  Plaintiff's 30.

 5              THE COURT:  Thank you.

 6      BY MR. PETSONK:

 7      Q.   You can use this to fasten the exhibit back together.

 8      A.   Thank you.

 9              MR. TORRES:  Could I see the exhibit, please?  I'd

10      like a copy.

11              MR. PETSONK:  Okay.  This is -- this is what's

12      identified.

13              MR. TORRES:  You don't have a copy?

14              MR. PETSONK:  I probably do have a copy.

15              MR. TORRES:  I'd like a copy of the document if

16      you are going to question on it.

17              MR. PETSONK:  Okay.

18      BY MR. PETSONK:

19      Q.   Mr. Fox, Mike Hymes testified in this case that he gave

20      you this exhibit.  Do you recall receiving this from Mr.

21      Hymes?

22      A.   This particular Exhibit has "Bailey Mine" on it, but I

23      don't remember -- I didn't receive anything from Bailey.

24      Q.   On the first page, there is a handwritten note that

25      indicates that it should be used at the -- it should be used
```

1    for some purpose.  Do you see that note?

2    **A.**   I see that at the top.

3    **Q.**   Mr. Hymes testified he gave this to you to use in

4    developing the new miner orientation at the Buchanan Mine?

5    **A.**   I don't recall that.

6    **Q.**   Can you flip through the document, and there is a slide

7    labeled Slide 42.  Can you read the text that accompanies

8    that slide?

9    **A.**   It's going to take me a while to get to it.

10           THE COURT:  Where is Slide 42?

11           THE WITNESS:  What page is it on?

12           MR. PETSONK:  Bear with me one second.

13           I'll show you --

14           THE COURT:  Where is it?

15           MR. PETSONK:  It's on the page stamped 622, Your

16   Honor.

17   BY MR. PETSONK:

18   **Q.**   Can you read the text?

19           THE COURT:  Hold just a moment.  Go ahead.

20           MR. TORRES:  Your Honor, I'm going to object to

21   the question.  Because before he has him start reading

22   portions of this document, he should establish a foundation

23   as to whether the witness is familiar with the document.

24   He's already said he doesn't recall receiving it.

25           THE COURT:  Sustained.

1          MR. PETSONK:  I was going to ask him, Your Honor,

2     if --

3          THE COURT:  Ask him whether he's familiar with the

4     document and lay a foundation for what you want to go on to.

5     BY MR. PETSONK:

6     Q.   I've directed you to page 622.  Have you also had the

7     chance to review that page?

8     A.   I don't remember seeing this.

9     Q.   Okay.  Does this -- does this look similar to any

10    materials that you do remember receiving from Mr. Hymes?

11    A.   I can't answer that.  I don't know.

12    Q.   Do you remember receiving from Mr. Hymes any materials

13    that compared the Buchanan benefits, the Buchanan nonunion

14    or P&M benefits to the benefits offered under the United

15    Mine Workers benefit claim?

16    A.   I do not remember that.

17    Q.   So you don't recognize this document and you don't --

18    do you recall Mr. Hymes giving you instruction about the

19    contents of the new miner orientation program at Buchanan?

20    A.   No.

21    Q.   Who did instruct you about the contents that you were

22    to include in the materials you presented at the new miner

23    orientation during those years you testified you presented

24    that orientation?

25    A.   I don't remember specifically, but we all reviewed it

1    as a group in Human Resources prior to the presentation

2    and decided consequently that we would give out the Summary

3    Plan Descriptions in the orientation and we would cover the

4    handbook word-for-word.  And that's what we did.

5    **Q.**   How many days was the orientation program that you

6    delivered during that period that you provided new miner

7    orientation at the Buchanan Mine?

8    **A.**   Would you ask that question again?

9    **Q.**   How many days long was the new miner orientation

10   program that you delivered at the Buchanan Mine?

11   **A.**   It comprised of six days; five-day classroom, one day

12   mine.

13   **Q.**   When you -- when you -- okay, bear with me one second.

14            MR. PETSONK:  Your Honor, I would move for

15   admission of this document, because, you know -- the witness

16   has testified that he was managed by Mr. Hymes and that he

17   consulted with his management group in developing the new

18   miner orientation materials for use at Buchanan Mine.  And

19   that, you know, that this -- Mr. Hymes testified that he

20   gave this document to Mr. Fox for use in that process.  And

21   I think it's probative of the direction that Mr. Fox

22   received about the contents of those programs.

23        And so he -- I'd like to question him about whether his

24   manager --

25            THE COURT:  You moved for its admission.  Anything

1   else?

2            MR. PETSONK:  No, sir.

3            THE COURT:  Mr. Torres.

4            MR. TORRES:  Your Honor, this -- in addition to

5   that being a gross mischaracterization of Mr. Fox's

6   testimony, he hasn't laid a foundation.  The gentleman said

7   he's never seen the document before; doesn't recall it.  So

8   there is no foundation for him to then further question him

9   about a document he's already testified he's never seen

10  before.

11           THE COURT:  Anything further on the point?

12           MR. PETSONK:  No, Your Honor.

13           THE COURT:  The objection is sustained.

14           MR. PETSONK:  May I approach, Your Honor?

15           THE COURT:  You may.

16           THE CLERK:  Plaintiff's 31.

17           MR. TORRES:  May I have a copy of the document,

18  please?

19           MR. PETSONK:  Yes.

20  BY MR. PETSONK:

21  Q.   Mr. Fox, I've handed you what's been marked Plaintiff's

22  Exhibit 31.  And it is stamped with sequential numbers

23  beginning on the bottom right-hand side of the first page,

24  labeled CONSOL 025675, and it runs through CONSOL 025766.

25  Do you see this?

1    **A.**    Yes, I see the numbers, yes.

2    **Q.**    Does this document look familiar to you?

3    **A.**    It may be copies of slides, but I can't verify that

4    they were slides used at Buchanan.

5    **Q.**    Well, take a look through the -- through the document,

6    if you need to.  I know it's a lengthy document here.

7         MR. TORRES:  Your Honor.

8         THE COURT:  Yes.

9         MR. TORRES:  I don't see that this document was

10   included in the materials that the plaintiffs included on

11   the pretrial submission.  I also think this is somewhat

12   beyond the scope of the direct examination.

13        MR. PETSONK:  Well, Your Honor, I'm sure that we

14   did not designate this document I'm cross-examining about

15   it.  This document was produced by the defendants, and --

16        THE COURT:  The question was whether or not you

17   had noted this document in the pretrial order?

18        MR. PETSONK:  No, Your Honor, we had not.  This

19   was a document -- you know, I simply seek to use this

20   document to cross-examine the witness.  It was produced by

21   the defendants.  And I should also note, it was

22   characterized in the defendant's 30(b)(6) deposition as a

23   document that was utilized at the Buchanan Mine.

24        And Mr. Fox's knowledge about the use of slides at the

25   Buchanan Mine is also represented in the 30(b)(6) deposition

 1    based on the corporation's interview of Mr. Fox about what

 2    he did at the Buchanan Mine.

 3          MR. TORRES:  Your Honor, the document Mr. Petsonk

 4    is referring to is a document from the 2000s.  That's what

 5    the testimony was at the 30(b)(6) deposition, which was

 6    after the period of time that Mr. Fox testified he was

 7    conducting orientations.  So it's beyond the scope, Your

 8    Honor, and I can establish that by voir diring the witness.

 9    He's already said he doesn't know whether it was used at

10    Buchanan.  And I don't think that this is appropriate

11    testimony from a document from a period after Mr. Fox

12    testified he no longer conducted orientations at the

13    Buchanan Mine.

14          THE COURT:  You may take your witness on voir

15    dire.

16          MR. TORRES:  Thank you, Your Honor.

17          MR. PETSONK:  Hold on.  Your Honor, I'm going to

18    remove myself and all my materials from this stand so Mr.

19    Torres can have access to it.

20          MR. TORRES:  And, I'm sorry, this is 31?  That's

21    what you marked this?

22          MR. PETSONK:  Right.

23                     **VOIR DIRE EXAMINATION**

24    BY MR. TORRES:

25    **Q.**   Mr. Fox, you testified earlier that you left Buchanan

FOX - CROSS

```
 1    in 1991 or 1992; is that correct?

 2    A.    That's correct.

 3    Q.    And I believe you also testified that after you left

 4    Buchanan, you didn't conduct any further employee

 5    orientations; is that correct?

 6    A.    That's correct.

 7    Q.    And after you left Buchanan, did you have any

 8    involvement in the development of any employee orientations

 9    that may have been used at Buchanan?

10    A.    No.

11    Q.    Did you have any involvement in any orientations that

12    were used at any other location for first line employee

13    orientations?

14    A.    No, not to my knowledge.

15    Q.    This document that is in front of you, had you ever

16    seen this before today?

17    A.    Honestly, I've never -- I don't think I've ever seen

18    this document.

19    Q.    Okay.  And do you know where it came from?

20    A.    No.

21    Q.    Do you know who prepared it?

22    A.    I do not.

23    Q.    Do you know where it may have been used?

24    A.    No.

25    Q.    Do you know when it may have been used?
```

1    **A.**    No.

2           MR. TORRES:  Your Honor, I'll renew my objection.

3    This is not a document this gentleman used in any

4    orientations that he testified to.  He hasn't seen it before

5    or doesn't know where it was from or who created it, or

6    anything else about this document, or whether it was even

7    used at the Buchanan location.

8        There is no foundation for it to be introduced during

9    the witness' testimony.  And it's certainly beyond the scope

10   of the direct examination, given his statement that he's

11   never seen it before and didn't use it.  And I further,

12   again, note it wasn't disclosed by the plaintiffs in their

13   pretrial submissions.

14          THE COURT:  Thank you.

15       Anything further on the point?

16          MR. PETSONK:  Well, Your Honor, this witness --

17   first of all, we are simply using this document for

18   cross-examination and to seek to impeach the testimony on

19   direct.  And this was -- this document was produced by the

20   defendants as a document having been presented at Buchanan.

21   And the witness -- and neither the witness nor the defendant

22   seems to possess the actual slideshows that they did use

23   during the period that Mr. Fox was at Buchanan.

24       And Mr. Fox -- Mr. Fox indicated the materials did not

25   materially change over time.  And I can, you know, question

```
 1    him further about that, Your Honor.  And if I may --
 2              MR. TORRES:  Your Honor, he never said any such
 3    thing.  It's a gross misstatement of this gentleman's
 4    testimony.  He never said any such thing.
 5         Mr. Petsonk keeps throwing things in that are just
 6    simply not true, Your Honor.  And I'm not sure if there is
 7    any exception to foundation, that is, I don't have a
 8    document from 1980, so can I ask him about some other
 9    document from some other period of time?
10         That's not an appropriate response to the lack of
11    foundation that's been established.
12         He keeps referring to this 30(b)(6) deposition
13    testimony, Your Honor, but the fact remains, that this
14    gentleman testified today, under oath, that the last time he
15    was at the Buchanan Mine was 1991, 1992.  And he's testified
16    under oath, he doesn't know where this document came from;
17    he wasn't involved in its preparation; he doesn't know how
18    it was used; he didn't use it at Buchanan.
19         So I renew my objection, Your Honor.  I don't think
20    anything Mr. Petsonk said even adequately responds to any of
21    that .
22              MR. PETSONK:  Your Honor, may I inquire?
23              THE COURT:  No.  You can argue the point.  I'm
24    going to rule on this now.
25              MR. PETSONK:  Your Honor, from 1991 until the year
```

1    2000, Mr. Fox testified that he was the manager of

2    management development and a more senior position within

3    CONSOL Human Resources Department.

4         And Mr. Fox told the 30(b)(6) representative -- and the

5    corporation testified, in its 30(b)(6) deposition that Mr.

6    Fox said it's his understanding the material would -- did

7    remain generally the same throughout the period he worked

8    there, at least, that is, the new employee training

9    materials.

10        So this is the very best evidence that Mr. Fox

11   characterized as reflecting, Your Honor, the contents of the

12   new miner orientation program during the time that Mr. Fox

13   worked at the Buchanan Mine site and then thereafter, during

14   the time that Mr. Fox worked in a more senior Human

15   Resources position as manager of management development.

16        So I simply, because he had knowledge directly about

17   the mine site, he's also --

18             THE COURT:  Who had knowledge directly?

19             MR. PETSONK:  Mr. Fox had knowledge about what he

20   conveyed at the mine site, and he also has knowledge about

21   Human Resources practices in his capacity as a Senior Human

22   Resources Manager, Your Honor.

23             THE COURT:  He told you that he doesn't recall

24   anything about this document.

25             MR. PETSONK:  Well, Your Honor, he's not had the

1    chance to be questioned about the -- the contents of the

2    document.  It's a lengthy document.

3              THE COURT:  The objection is sustained.

4              MR. PETSONK:  May I approach, Your Honor?

5              THE COURT:  You may.

6              MR. PETSONK:  What is this document?

7              THE CLERK:  32.  Plaintiff's Exhibit 32.

8    BY MR. PETSONK:

9    **Q.**  Mr. Fox, I've presented you a document that CONSOL has

10   produced in this case reflecting a discussion comparing the

11   CONSOL nonunion benefits to union benefits.  Does this

12   document look familiar to you?

13   **A.**  It does not.

14   **Q.**  You testified earlier that you made comparisons between

15   the CONSOL nonunion benefits and union benefits, right?

16             MR. TORRES:  Objection.  Misstates the prior

17   testimony.

18             THE WITNESS:  I don't recall saying that.

19   BY MR. PETSONK:

20   **Q.**  Okay.  Do you recall being interviewed by a person

21   named Erica Fisher from CONSOL in connection with this case,

22   Mr. Fox?

23   **A.**  I don't remember the name.

24   **Q.**  Okay.  Do you recall making presentations to miners at

25   Buchanan about the advantage of working union-free?

1   **A.**   Yes, we made some presentations, yes, to the advantage

2   of working union-free.

3   **Q.**   And in those presentations, did you compare the

4   benefits under CONSOL's nonunion plan to the benefits

5   available to miners under the United Mine Workers?

6   **A.**   I do not recall making any comparison between the two

7   in the terms of benefits.

8   **Q.**   Do you recall making any comparisons between those two

9   plans in the benefits at all?

10   **A.**   No.

11   **Q.**   And so when you look at this document that describes

12   the union-free advantage by comparing CONSOL benefits to

13   UMWA benefits, this document looks completely unfamiliar to

14   anything that you ever presented to anybody at Buchanan

15   during the time you worked there, right?

16   **A.**   I don't -- I don't recall using anything like that.  I

17   don't.

18        MR. PETSONK:  Well, Your Honor, I move for its

19   admission.

20        MR. TORRES:  Your Honor, he hasn't laid a

21   foundation.  I can voir dire the witness further, if Your

22   Honor would like to establish that.

23        THE COURT:  You may do so.

24        MR. TORRES:  Thank you, Your Honor.

25

1
## VOIR DIRE EXAMINATION

2      **BY MR. TORRES:**

3      **Q.**   Mr. Fox, you have an exhibit in front of you, Number

4      32?

5      **A.**   Yes, I do.

6      **Q.**   Have you seen this document before?

7      **A.**   No.

8      **Q.**   Did you ever use this in any presentations that you

9      conducted at Buchanan?

10     **A.**   I don't recall ever seeing it or using it.

11     **Q.**   Do you know who prepared this?

12     **A.**   I do not.

13     **Q.**   Do you know where it might have been presented?

14     **A.**   No.

15     **Q.**   Do you know when it might have been presented?

16     **A.**   No.

17     **Q.**   Do you know to whom it might have been presented?

18     **A.**   No.

19     **Q.**   Do you know where these figures came from that are

20     contained in the presentation?

21     **A.**   No.

22     **Q.**   Do you know if they are accurate?

23     **A.**   No.  No.

24              MR. TORRES:  Your Honor, there has been no

25     foundation laid for the admission of this document.

1            THE COURT:  Anything further on that?

2            MR. PETSONK:  No.

3            THE COURT:  I take it there is an objection to the

4      admissibility of the document?

5            MR. TORRES:  Yes, Your Honor.

6            THE COURT:  The objection is sustained.

7      BY MR. PETSONK:

8      **Q.**   Mr. Fox, Mr. Hymes testified in this case that in 25 to

9      50 different orientations that he observed you to conduct

10     for miners at the Buchanan operation, that you never brought

11     up that CONSOL had the right to terminate retiree welfare

12     benefits.  Do you disagree with Mr. Hymes' testimony?

13     **A.**   I disagree with it.

14     **Q.**   Mr. Waters, who testified in this case, testified that

15     he used a script, and, in fact, he testified he used a

16     script that you were questioned about earlier, Plaintiff's

17     Exhibit 10-A, and Mr. Hymes similarly testified that he --

18            MR. TORRES:  I'm going to object to the form of

19     the question, Your Honor, because it misstates Mr. Waters'

20     testimony.  So I at least need to preserve my record.

21     That's not what he testified to.  He said the document

22     looked familiar.  He never testified he used it.

23            MR. PETSONK:  Okay, Your Honor.  I can restate my

24     question, Your Honor.

25            THE COURT:  Go ahead.

1    BY MR. PETSONK:

2    **Q.**   Mr. Waters testified that he used language contained in

3    the Plaintiff's Exhibit 10-A.

4            MR. TORRES:  Objection, Your Honor.

5            MR. PETSONK:  When he did -- he said that he used

6    that lawyer talk language in his testimony here today.

7            MR. TORRES:  Your Honor, that is an absolute gross

8    mischaracterization of Mr. Waters' testimony.

9        Mr. Pomponio showed him Exhibit 10-A, and he testified

10   that the language looked familiar.  That was the sum total

11   of Mr. Waters' testimony.

12       And Mr. Petsonk keeps trying to mischaracterize it in

13   asking this witness a question.  And I don't think that's an

14   appropriate way to conduct an examination.

15           THE COURT:  Restate your question.

16   BY MR. PETSONK:

17   **Q.**   Mr. Waters testified that he informed miners at the

18   Buchanan Mine that they would have lifetime retiree medical

19   benefits subject to a reservation of --

20           THE COURT:  Just one moment.  Is that what Mr.

21   Waters testified to?

22           MR. POMPONIO:  Yes, Your Honor.

23           THE COURT:  So, Mr. Torres, is that your

24   recollection?

25           MR. TORRES:  It is not my recollection, Your

1  Honor.

2          THE COURT:  What do you recall him saying?

3          MR. TORRES:  I recall him discussing the lifetime

4  benefits.  I could have Ms. O'Connor refer to it.  She was

5  the one questioning Mr. Waters, if you want to --

6          MS. O'CONNOR:  Mr. Waters said that at the time he

7  was working there, he said he told employees that subject to

8  the reservation of rights clause at the time that he was

9  working there, they would have retiree medical benefits for

10  the duration of their life, unless it changed.

11          MR. POMPONIO:  His testimony, Judge, was that they

12  would have -- if -- the rules provided that they would have

13  retirement medical for life subject to change.  I had him

14  repeat it under cross.

15          THE COURT:  Then you may present the question

16  within that framework.

17  BY MR. PETSONK:

18  **Q.**  Mr. Waters testified here, as we've discussed just now,

19  that when he provided new miner orientation and training to

20  the employees at the Buchanan Mine, that he explained to

21  them they would have retiree welfare benefits throughout the

22  duration of their lives, but that that benefit was subject

23  to a reservation of rights of CONSOL's right to change the

24  benefit.

25          MR. TORRES:  Objection, Your Honor.  He's -- Mr.

1   Pomponio just said something, and he's throwing words in

2   there to try to change the meaning of what his co-counsel

3   just described Mr. Waters testified to.  He said, benefits

4   for life, subject to change.

5           THE COURT:  And that's the sum total?

6           MR. TORRES:  That's right.

7           THE COURT:  So present your question then in that

8   fashion.  You have not done that.  Proceed in that fashion

9   or surrender the witness.

10  BY MR. PETSONK:

11  **Q.**   Mr. Fox, Mr. Waters testified here that he told miners

12  at the Buchanan Mine that they would receive benefits for

13  lifetime subject to CONSOL's reservation of rights to alter

14  those benefits.  That's my understanding of his testimony in

15  this case.

16      My question to you, sir, is, whether you dispute that

17  testimony that Mr. Waters, in fact, said --

18          MR. TORRES:  Well, object to the form of the

19  question.  How can you dispute some testimony he wasn't

20  present to witness, Your Honor?

21          THE COURT:  Sustained.  You can try it again.

22  BY MR. PETSONK:

23  **Q.**   Do you disagree, Mr. Fox, that Mr. Waters told miners

24  at the Buchanan Mine in his miner -- new miner orientation

25  sessions, that they would have benefits for the rest of

```
 1    their lives subject to CONSOL's reservation of rights to
 2    change those benefits?
 3              MR. TORRES:  Objection.  Lack of foundation.  He
 4    hasn't established he was present when Mr. Waters conducted
 5    any orientations.
 6              THE COURT:  What foundation is there for the
 7    question?
 8    BY MR. PETSONK:
 9    Q.   Mr. Fox, were you present during new miner orientation
10    sessions provided for Buchanan Mine by Mr. Waters?
11    A.   No.
12    Q.   Did Mr. Waters work for you during the time that he
13    worked at the Buchanan Mine?
14    A.   No.
15    Q.   And do you know Mr. Waters?
16    A.   I know him.
17    Q.   How do you know him?
18    A.   He worked at Buchanan after I left.
19    Q.   Okay.  Was there any -- well, okay.
20         I would just -- I don't think I have any further
21    questions for the witness at this time, Your Honor.
22              MR. TORRES:  I don't have any further questions,
23    Your Honor.
24         Thank you, Mr. Fox.
25              THE COURT:  May Mr. Fox be excused from the trial?
```

```
 1                 MR. TORRES:  Yes, Your Honor.

 2                 MR. PETSONK:  Yes, Your Honor.

 3                 THE COURT:  Mr. Fox, you're excused from the

 4      trial, and I caution you, however, not to discuss your

 5      testimony with any other witness in this case until the

 6      trial is over.

 7                 THE WITNESS:  Okay.

 8                 THE COURT:  And thank you, sir.

 9           And when you exit, if you'll go through the courtroom

10      door down that corridor.  You may have come in that way.

11                 THE WITNESS:  Thank you.

12                 THE COURT:  Very good.  And just leave any

13      exhibits there at the desk.  Thank you.

14                 THE WITNESS:  Thank you.

15                 MR. TORRES:  Your Honor, could we have a moment?

16      I believe right now we have some videos to prepare, so if we

17      could have a few minutes to get that set up so we can

18      present those?

19                 THE COURT:  At this point now, what do you have

20      left besides Mr. Kowzan tomorrow and perhaps a video

21      deposition that you're still in the process of taking?

22                 MR. TORRES:  Yes.  Today, we have three video

23      depositions to present today, Your Honor:  Craig Campbell,

24      Chase Elswick and Tom Hudson.

25           And then we are trying to make arrangements to do Mr.
```

1   Mason's deposition this afternoon.  But we'll have that

2   ready -- whenever that happens today, we'll have it ready

3   for tomorrow.

4       And then we have Mr. Kowzan, and that's it.

5           THE COURT:  On the three that you have left, would

6   you tell me again how long they are?  That is, the three to

7   do today?

8           MR. TORRES:  Yes, Your Honor.  I believe each of

9   them are about 25 to 30 minutes long.

10          THE COURT:  Well, it seems to me, it's 25 to 1:00,

11  it might be better for us to come back at quarter till 2:00

12  and start with those videos at that point.

13          MR. TORRES:  Yes, Your Honor.

14          THE COURT:  And in light of that, it looks to me

15  you might be able to arrange a time that you can get back to

16  the videotaped deposition later today and get that out of

17  the way so everything is on time in the morning.

18          MR. TORRES:  Yes, Your Honor.

19          THE COURT:  I've got an afternoon docket tomorrow

20  that I'd like to make if we can get this done.

21          MR. TORRES:  Yes, Your Honor.

22          THE COURT:  And we'll see how it works.  Thank

23  you.

24          THE CLERK:  All rise.

25      (A recess was taken at 12:35 p.m. until 2:00 p.m.)

```
 1              (Afternoon Session, February 17, 2021 at 2:00 p.m.)

 2              THE CLERK:  All rise.

 3              THE COURT:  Good afternoon.  Please be seated.

 4     You may proceed.

 5              MS. FUNDERBURG:  Your Honor, we are prepared to

 6     proceed with the first of our evidentiary depositions.

 7              THE COURT:  And those are videotaped depositions?

 8              MS. FUNDERBURG:  Yes, that's right.

 9              THE COURT:  Please go ahead and set them up.

10              MS. FUNDERBURG:  Tom Hudson.

11         (The videotaped deposition of Tom Hudson was played.)

12         (The videotaped deposition of Tom Hudson concluded.)

13              MS. FUNDERBURG:  Your Honor, at this time, we

14     would move for admission of the transcript of Mr. Hudson's

15     deposition, and we also have that on a disc for the Court.

16              THE COURT:  Any objection?

17              MR. POMPONIO:  No, Your Honor.

18              THE COURT:  It is received and admitted.

19         Are you going to have a written transcript?

20              MS. FUNDERBURG:  Yes, Your Honor.  We have that

21     here.

22              THE COURT:  The next time when we go through the

23     next witness, let me have the transcript before you get

24     started.

25              MS. FUNDERBURG:  Of course.  I think the next
```

```
1    witness is going to be Mr. Elswick.

2            Can you mark this 33-A and this 33-B?

3            THE CLERK:  Sure.

4            THE COURT:  The Hudson transcript is being marked

5    as an exhibit?

6            MS. FUNDERBURG:  Yes, Your Honor.  The written

7    transcript is being marked Defendant's Exhibit 33-A, and the

8    disc will be 33-B.

9            THE COURT:  There is no 33?

10           MS. FUNDERBURG:  That's correct.

11           THE COURT:  Thank you.

12           MS. FUNDERBURG:  Your Honor, before I proceed with

13   Mr. Elswick, I can go ahead and offer the Court the written

14   transcript and the CD premarked.

15           THE COURT:  Please do so.

16           MS. FUNDERBURG:  And the transcript will be

17   Defendant's Exhibit 34-A, and the disc will be 34-B.

18           THE CLERK:  This is defendant's 34-A?

19           MS. FUNDERBURG:  Yes.

20       We're ready.  And this will be the video of Mr.

21   Elswick's deposition.

22       (The videotaped deposition of Chase Elswick was

23   played.)

24       (The videotaped deposition of Chase Elswick concluded.)

25           MS. FUNDERBURG:  At this time, Your Honor, the
```

```
 1    defendants move for admission of Defendant's Exhibit 34-A
 2    and 34-B.
 3              THE COURT:  Any objection?
 4              MR. POMPONIO:  No, Your Honor.
 5              THE COURT:  It is admitted.  And they are
 6    admitted.
 7         Defendant's Exhibits 34-A and 34-B admitted.
 8              MS. FUNDERBURG:  Thank you.
 9              THE COURT:  And just to be utterly clear, with
10    respect to 33-A and 33-B, is there any objection to either
11    of them?
12              MR. POMPONIO:  No, Your Honor.
13              THE COURT:  And they are admitted as indicated
14    earlier.
15         Defendant's Exhibits 33-A and 33-B admitted.
16              THE COURT:  Yes, ma'am.
17              MS. FUNDERBURG:  Finally, Your Honor, we have one
18    more deposition that we'll be offering today, and that's Mr.
19    Craig Campbell.  So --
20              THE COURT:  This last one didn't meet the promise
21    of 25 minutes.  And how long is this one going to be?
22              MS. FUNDERBURG:  Let me check.
23         I believe it's about a half hour, Your Honor.
24              THE COURT:  Let's recess for about 10 minutes.
25              MS. FUNDERBURG:  Thank you.
```

```
 1                    THE CLERK:  All rise.

 2            (A recess was taken at 3:24 p.m. until 3:36 p.m.)

 3                    THE CLERK:  All rise.

 4             THE COURT:  Please be seated.  I hope you are

 5     going to do better with this one than you did the last one.

 6             MS. FUNDERBURG:  Your Honor, I believe it's 36

 7     minutes long.

 8             THE COURT:  Well, I was thinking more in terms of

 9     that may be the dullest deposition I've ever heard.  He's

10     seen too many movies.

11          And you may proceed.

12             MS. FUNDERBURG:  All right, Your Honor.  We have

13     one more deposition, Mr. Campbell.  So I have this marked as

14     Defendant's Exhibit 35-A for the transcript, and 35-B for

15     the disc.

16             THE CLERK:  35-A.

17             THE COURT:  You may proceed.

18          (The videotaped deposition of Craig Campbell was

19     played.)

20          (The videotaped deposition of Craig Campbell

21     concluded.)

22             MS. FUNDERBURG:  Your Honor, at this time, the

23     defendants move for admission of Exhibits 35-A and 35-B.

24             MR. POMPONIO:  No objection.

25             THE COURT:  They are admitted.
```

FITZWATER v CONSOL

1       **Defendant's Exhibits 35-A and 35-B admitted.**

2               THE COURT:  And that covers the day's activities.

3               MR. TORRES:  Yes, Your Honor.

4               THE COURT:  Anything yet this evening?

5               MR. POMPONIO:  Nothing from us.  I just have a

6       housekeeping question about the Defendant's Exhibits.

7           I have -- I don't have marked that Defendant's Exhibit

8       2, 4, or 32 have been admitted.  Have those -- have I

9       just --

10              THE COURT:  Do I understand, you just need copies?

11              MR. POMPONIO:  I just need to know if they'll been

12      admitted for the record?

13              THE COURT:  What are the numbers again?

14              MR. POMPONIO:  2, 4, and 32.

15              THE CLERK:  I have 32 is admitted.  And 2 and 4 is

16      not.

17              THE COURT:  I understand from the clerk that 32

18      has been admitted, but 2 and 4 have not.

19              MR. POMPONIO:  Okay.  Thank you.

20              THE COURT:  And let me ask whether or not there is

21      a motion?

22              MR. TORRES:  2 and 4, Your Honor?

23              THE COURT:  Yes.

24              MR. TORRES:  I believe so, but could we take it up

25      in the morning just so we could review it.  I don't believe

FITZWATER v CONSOL

```
 1    we'll be offering it, but I just want to take a look at
 2    those.
 3              THE COURT:  Very good.  So let us know about that
 4    first thing in the morning.
 5              MR. TORRES:  Yes, Your Honor.
 6              THE COURT:  Anything else?
 7              MR. TORRES:  Nothing from the defendant, Your
 8    Honor.  Thank you.
 9              MR. POMPONIO:  Nothing from plaintiff.
10              THE COURT:  If not, do I understand Mr. Kowzan is
11    available at the outset?
12              MR. TORRES:  Yes, Your Honor.  I've confirmed he's
13    arrived this afternoon.
14              THE COURT:  He's in town?
15              MR. TORRES:  Yes.
16              THE COURT:  And the videotaped -- or -- is it
17    another videotaped deposition that you are in the midst of
18    now?
19              MR. TORRES:  Yes, Your Honor.
20              THE COURT:  And you'll be able to get the
21    transcript for it before coming in in the morning?
22              MR. TORRES:  Yes, Your Honor.
23              THE COURT:  Thank you.  See you at 9:30.
24              THE CLERK:  All rise.
25          (Proceedings concluded at 4:18 p.m.)
```

1      CERTIFICATE OF OFFICIAL REPORTER

2         I, Catherine Schutte-Stant, Federal Official Realtime

3    Court Reporter, in and for the United States District Court

4    for the Southern District of West Virginia, do hereby

5    certify that, pursuant to Section 753, Title 28, United

6    States Code, the foregoing is a true and correct transcript

7    of the stenographically reported proceedings held in the

8    above-entitled matter and that the transcript page format is

9    in conformance with the regulations of the Judicial

10    Conference of the United States.

11

12         s/Catherine Schutte-Stant, RDR, CRR

13    _____    March 8, 2021

14         Catherine Schutte-Stant, RDR, CRR
          Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25