```
 1                 IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                         AT CHARLESTON

 3      _____x
                                       :
 4      BENNY FITZWATER,               :  CIVIL ACTION
        CLARENCE BRIGHT, TERRY PRATER, :  NO. 2:16-cv-09849
 5      EMMET CASEY, JR.,              :
        CONNIE Z. GILBERT,             :  Consolidated with:
 6      ALLAN H. JACK, SR., and,       :  CIVIL ACTION
        ROBERT H. LONG.,               :  NO. 1:17-cv-03861
 7                   Plaintiffs,       :
                                       :
 8                      -vs-           :
                                       :
 9      CONSOL ENERGY, INC.,           :
        CONSOLIDATION COAL CO.,        :
10      FOLA COAL CO., LLC,            :
        CONSOL OF KENTUCKY, INC.,      :
11      CONSOL PENNSYLVANIA COAL CO.,  :
        LLC, and KURT SALVATORI,       :
12                                     :  BENCH TRIAL
                     Defendants.       :  VOLUME VII
13      _____x
```

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.,**
**SENIOR UNITED STATES DISTRICT JUDGE**
**FEBRUARY 18, 2021**

**APPEARANCES:**
**FOR THE PLAINTIFFS:**        **SAMUEL B. PETSONK, ESQUIRE**
                              PETSONK PLLC
                              P. O. Box 1045
                              Beckley, WV  25802

          Proceedings recorded by mechanical stenography,
transcript produced by computer.

                   _____
                   CATHERINE SCHUTTE-STANT, RDR, CRR
                        Federal Official Court Reporter
                   300 Virginia Street East, Room 6009
                        Charleston, WV 25301

```
 1    APPEARANCES CONTINUED:

 2    FOR THE PLAINTIFFS:        BREN J. POMPONIO, ESQUIRE
                                 LAURA DAVIDSON, ESQUIRE
 3                               Mountain State Justice, Inc.
                                 1217 Quarrier Street
 4                               Charleston, WV  25301

 5

 6

 7    FOR THE DEFENDANTS:        JOSEPH J. TORRES, ESQUIRE
                                 ALEXIS E. BATES, ESQUIRE
 8                               EMMA J. O'CONNOR, ESQUIRE
                                 KATHERINE M. FUNDERBURG, ESQUIRE
 9                               Jenner & Block LLP
                                 353 N. Clark Street
10                               Chicago, IL  60654

11

12

13    FOR THE DEFENDANTS:        MICHAEL D. MULLINS, ESQUIRE
                                 Steptoe & Johnson PLLC
14                               707 Virginia Street East
                                 17th Floor
15                               Charleston, WV 25301

16

17

18

19

20

21

22

23

24

25
```

```
1                              INDEX

2
    DEFENDANT'S
3   WITNESSES        DIRECT  CROSS  REDIRECT RECROSS  EXAMINATION

4
    GERALD KOWZAN   1192    1206  1219, 1224   1226     1220
5
    VOIR DIRE       1217
6

7

8


9   VIDEOTAPED DEPOSITIONS:

10
    TERRY MASON     1183
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      INDEX TO EXHIBITS

 2
       PLAINTIFF'S
 3     EXHIBITS                           ADMITTED

 4
        34                                1220
 5

 6

 7     DEFENDANT'S
       EXHIBITS                           ADMITTED
 8
        36-A                              1187
 9      36-B                              1187

10

11

12     Defendant's
       Exhibits 2 and 4 withdrawn         1180
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (The following Bench Trial was held before the
 2     Honorable John T. Copenhaver, Jr., Senior United States
 3     District Judge, in the case of Fitzwater, et. al. versus
 4     CONSOL, et. al, on Thursday, February 18, 2021, at
 5     Charleston, West Virginia.)
 6                  P-R-O-C-E-E-D-I-N-G-S              9:32 a.m.
 7              THE CLERK:  All rise.
 8              THE COURT:  Good morning.  Please be seated.
 9              MR. TORRES:  Your Honor, I think we had just a
10     couple of preliminary matters we wanted to address before we
11     get started with Mr. Mason's deposition.
12         I think Ms. Bates had a couple issues on exhibits.
13              MS. BATES:  We were wondering, Your Honor, for the
14     exhibits that have not been admitted, if you would prefer
15     that we withdraw those or if we can leave them as marked but
16     not moved into evidence?
17              THE COURT:  If the exhibits have been marked and
18     have been denied, then they'll be part of the record.
19              MS. BATES:  If they've never been moved into
20     evidence --
21              THE COURT:  I can hardly hear you.
22              MS. BATES:  I apologize.  If they've never --
23              THE COURT:  You might remove your mask.
24              MS. BATES:  If they've never been moved into
25     evidence but were marked, would you prefer that we withdraw?
```

```
 1              THE COURT:  If they've never been moved into

 2    evidence, but were used in order to examine a witness, they

 3    would need to be in the record.  If they were never used for

 4    any purpose, they can simply be withdrawn and you can note

 5    now what those are.

 6              MS. BATES:  They are Exhibits 2 and 4 for

 7    defendants.

 8              THE COURT:  And I take it there is no objection to

 9    that?

10              MR. POMPONIO:  No, Your Honor.

11              THE COURT:  Defendant's Exhibits 2 and 4 are being

12    withdrawn.

13         Defendant's Exhibits 2 and 4 withdrawn.

14              MR. TORRES:  Thank you, Your Honor.

15         Your Honor, regarding Mr. Mason's deposition that we

16    are going to show, we'd like to mark the transcript as

17    Defendant's Exhibit 36-A, and the disc of this deposition as

18    Defendant's Exhibit 36-B.  We have the transcripts which we

19    can bring up in a second.  The discs are being burned and

20    they'll be delivered here at 10 clock, at which point, when

21    we finish showing the deposition, we can offer 36-B into

22    evidence, as well, if Your Honor is okay with proceeding in

23    that fashion.

24              THE COURT:  Any objection?

25              MR. PETSONK:  No objection to that, Your Honor.
```

```
 1              THE COURT:  You may proceed, accordingly.

 2              MR. TORRES:  Thank you, Your Honor.

 3              MR. PETSONK:  Your Honor, if I may raise a

 4   question at this juncture about this deposition?

 5              THE COURT:  Do you want to wait until Mr. Torres

 6   is back at counsel table?

 7              MR. PETSONK:  Yes.

 8              THE CLERK:  36-A.

 9              THE COURT:  Go ahead, Mr. Petsonk.

10              MR. PETSONK:  Your Honor, I introduced an exhibit

11   to the deposition, which is not included in the transcript

12   here, and so I wanted to offer that exhibit here now, as

13   well, Your Honor, for the Court's consideration in

14   connection with the deposition.

15              THE COURT:  What is this now?

16              MR. PETSONK:  It's an exhibit to the deposition.

17              THE COURT:  Is this something that you handed to

18   the witness during the course of the deposition?

19              MR. PETSONK:  I did via the Zoom deposition, Yes,

20   Your Honor.

21              MR. TORRES:  Your Honor, we have an objection to

22   the admissibility of the exhibit, which we can deal with

23   after the deposition has been played.

24              THE COURT:  So it is not of consequence through

25   the reading of the deposition?
```

1              MR. PETSONK:  Your Honor, it's -- I simply was

2    seeking to offer the exhibit to the deposition as a trial

3    exhibit here, Your Honor, so that it may be examined by the

4    Court, because it will be subject to, I believe, an

5    objection that the Court will have to consider.

6              THE COURT:  But do I understand that it is not

7    necessary to consider the matter until after the deposition

8    has been read?

9              MR. TORRES:  We think that's right, Your Honor.

10             THE COURT:  Mr. Petsonk, do you agree?

11             MR. PETSONK:  I think that's your -- it's Your

12   Honor's preference, yes.  I'm fine to it.

13             THE COURT:  I need for you folks to tell me the

14   way to proceed.  You know what happened.

15             MR. TORRES:  Your Honor, we think that Mr. Mason's

16   deposition should be played for Your Honor's consideration,

17   and then at that point we can take up the admissibility of

18   the exhibit.

19             THE COURT:  Again, is there any objection to that?

20             MR. PETSONK:  There is no objection.  That's fine

21   to proceed that way.  Thank you.

22             THE COURT:  Is it the case that the Court's not

23   going to need the deposition to understand the questioning

24   and answer?

25             MR. TORRES:  I don't believe so, Your Honor.  We

```
 1   believe -- it's not necessary.
 2            THE COURT:  If that is the case, then we'll
 3   proceed, Mr. Torres, the way you suggested.
 4            MR. TORRES:  Thank you, Your Honor.  As you
 5   suggested.
 6            Can we proceed with the deposition, Your Honor?
 7            THE COURT:  You may.
 8            MR. TORRES:  Thank you.
 9       (Videotaped deposition of Terry Mason played.)
10       (Videotaped deposition of Terry Mason completed.)
11            THE COURT:  Do I understand that the last witness
12   is, defendants' last witness is Mr. Kowzan?
13            MR. TORRES:  Yes, Your Honor.  We have Mr. Kowzan
14   left.
15            THE COURT:  And he's ready?
16            MR. TORRES:  Yes, Your Honor.
17            THE COURT:  Let's recess for 15 minutes.  How long
18   will he be?
19            MR. TORRES:  Our testimony is, I think, relatively
20   short.  I think 15, 20 minutes, at most.
21            THE COURT:  Well, let me ask you, also, on the
22   exhibit that's referred to near the end of the deposition,
23   do the parties wish to address that now?
24            MR. PETSONK:  Your Honor, I think I -- I don't
25   need to argue it.  I tender it for admission.  I think I
```

1    attempted to do that.  And, Your Honor, I can present it if

2    you want to mark it.  I don't mean to belabor it, Your

3    Honor.

4             THE COURT:  Mr. Torres.

5             MR. TORRES:  Your Honor, Mr. Mason testified that

6    some of the information -- I don't think a proper foundation

7    has been laid for its introduction through this witness.

8    Mr. Mason said the information was familiar.  He said that,

9    without a date on it, he wouldn't know when it was used.  He

10   said that slides that he used had initials on them and

11   dates; that the slides he guessed could have very well been

12   produced after he left.

13       So I don't believe that there's been a proper

14   foundation laid for the -- admission of the exhibit as Mr.

15   Mason testified to.

16            THE COURT:  What does it indicate, that these are

17   slides that he used?

18            MR. PETSONK:  He stated that they look like slides

19   that he used.  He stated he initialed slides that he made

20   changes to.  And these slides don't have Mr. Mason's

21   initials on them.  So he stated, they look like the slides

22   he used, and he stated if he had made changes to them, his

23   initials would have appeared on them.

24       So his testimony was, these look like the slides that

25   he used, and they don't look like slides as to which he made

1    any changes.

2        He was able to testify about the contents, the origin,

3    and the purpose for which he used these.  So -- that's the

4    nature of his personal knowledge about these slides.

5            MR. TORRES:  Your Honor, he said -- for example, I

6    can't tell you if those are the exact numbers.  He said,

7    again, the information looked familiar.  He didn't know if

8    he used the slides.  He didn't know the dates of the slides.

9        I don't think that that -- they are trying to offer

10   these up as his slides, and I think it's pretty clear that

11   they are not.  And that, at best, he said that the

12   information in the slides looked familiar.  So I don't think

13   a foundation has been laid, Your Honor.

14           THE COURT:  At one point, he stated that he dated

15   his slides, and that these weren't dated.

16           MR. TORRES:  Correct, Your Honor.

17           THE COURT:  At the tail end of his testimony, he

18   indicated that maybe they could have been.  And I thought

19   that was somewhat inconsistent.  I couldn't quite grasp what

20   was being said.  I think I will want to look at the

21   transcript again and at that point make a ruling on the

22   matter.

23           MR. PETSONK:  Shall I present it to the clerk,

24   Your Honor?

25           THE COURT:  You may.  What number is it?

```
 1              MR. PETSONK:  33.

 2              MR. TORRES:  Your Honor, before we break, just one

 3    last housekeeping matter.  We have the discs from Mr.

 4    Mason's deposition, we'd like to have that marked and move

 5    for the introduction of Mr. Mason's transcript and disc.

 6              THE COURT:  Let's do that now.

 7              MR. TORRES:  Yes.  Your Honor, we move for

 8    admission of Defendant's Exhibits 36-A and 36-B.

 9              THE COURT:  Any objection?

10              MR. PETSONK:  Well, Your Honor, just to clarify,

11    does this include both Volume 1 and Volume 2 of Mr. Mason's

12    transcript, because on the paper you handed me today, it

13    just included Volume 1?

14              MR. TORRES:  The Exhibit we tendered was the

15    entire transcript of Mr. Mason's deposition.

16              THE COURT:  Well, the transcript seems to cover

17    the whole thing.  That's what we heard.  But what about the

18    disc?

19              MR. TORRES:  The disc does, too, Your Honor.

20              THE COURT:  If it does, that answers your

21    question, doesn't it?

22              MR. PETSONK:  Yes, Your Honor, it does.

23              THE COURT:  Is there any objection to 36-A and

24    36-B?

25              MR. PETSONK:  No.
```

```
 1            THE COURT:  Admitted.

 2       Defendant's Exhibits 36-A and 36-B admitted.

 3            THE COURT:  Let me ask you, there were a number of

 4  objections, most of which were pro forma, in various of

 5  these depositions.  Except for Plaintiff's 33, are the rest

 6  of them withdrawn?

 7            MR. TORRES:  Yes, for defendants, Your Honor.

 8            MR. PETSONK:  Yes, and, likewise, for the

 9  plaintiff.

10            THE COURT:  And I'm speaking now about all of the

11  depositions?

12            MR. PETSONK:  Correct.

13            MR. TORRES:  Correct.

14            THE COURT:  That are in evidence.

15            MR. PETSONK:  That's correct, Your Honor.

16            MR. TORRES:  Yes.

17            THE COURT:  Thank you.

18         We'll be in recess for 15 minutes.

19            THE CLERK:  All rise.

20       (A recess was taken at 10:52 a.m. until 11:10 a.m.)

21            THE CLERK:  All rise.

22            THE COURT:  Please be seated.

23            MR. TORRES:  Your Honor, before we begin with Mr.

24  Kowzan, I did have one matter.  The plaintiffs had asked us

25  about another stipulation concerning some employee numbers.
```

1    The most efficient way for us to try and determine whether

2    the information is accurate would be to speak to Mr.

3    Salvatori.  And so, in order to do that, I'd need Your

4    Honor's permission to ask him about the information that the

5    plaintiffs have asked us to stipulate to.

6              THE COURT:  And when do you propose to do that?

7              MR. TORRES:  Well, they just gave it to us on the

8    break.  Your Honor, I could certainly call him right now.  I

9    could call him when we finish with Mr. Kowzan.  It was just

10   brought to our attention.  I'm just trying to figure out the

11   most efficient way to make it happen.

12             THE COURT:  As I understand you, when we finish

13   with the last witness, if it is the last witness, you'd be

14   able to get him by telephone, and then in what form would

15   the stipulation come?

16             MR. TORRES:  I believe the stipulation would be

17   just the parties could orally enter a stipulation, if we're

18   able to agree to the numbers.  But in order to -- if we are

19   able to agree with the figures, verify them, the person who

20   could probably do it the most quickly would be Mr.

21   Salvatori.

22             THE COURT:  Do you intend to make the request by

23   telephone from the courthouse?

24             MR. TORRES:  Yes, Your Honor.

25             THE COURT:  How long would it take you to make the

1    request?

2          MR. TORRES:  I could call him right now, Your

3    Honor, if you prefer, before we start.

4          THE COURT:  If it's going to be the case where

5    some examination needs to be made, then we wouldn't be

6    getting an immediate answer.  That's what I'm really after,

7    whether or not you are getting an immediate answer?

8          MR. TORRES:  I would not be able to get an

9    immediate answer.  They are asking us about information from

10   five years ago, Your Honor.

11         THE COURT:  And so how long will it take for a

12   search to be made once you pose the question?

13         MR. TORRES:  I don't know the answer, Your Honor.

14   Only because, as I said, it's old information.  All I can

15   ask Mr. Salvatori, as quickly as possible, could we

16   determine whether these numbers are accurate or not.

17         THE COURT:  Well, do you think this is something

18   that if you made the request before him now, you would have

19   the answer when we finish with this witness?

20         MR. TORRES:  I hope so, Your Honor.  I certainly,

21   the sooner I ask him, obviously, the sooner I can get a

22   response.

23         THE COURT:  Well, let's try to get that in before

24   this case record is closed on this hearing.

25         MR. TORRES:  Yes, Your Honor.

1       THE COURT:  And can you tell me what the

2   stipulation is about?

3       MR. TORRES:  It's the plaintiff's stipulation,

4   Your Honor.

5       MR. PETSONK:  It's just the number of individuals

6   affected by the termination of the plan at issue here.  We

7   think we can stipulate to that.  We think that Mr. Salvatori

8   should be able to confirm that number.  We provided all the

9   evidence to support the proposed stipulation, and Mr.

10  Salvatori should be able to reference that.

11      THE COURT:  Can you state for the Court now what

12  exactly it is that you propose so there will be no question

13  about the response?

14      MR. PETSONK:  Yes.  Mr. Pomponio has that number.

15      THE COURT:  Mr. Torres, I may want you to recess

16  long enough to make the telephone call now.

17      MR. TORRES:  Yes, Your Honor.

18      THE COURT:  Before we begin with this witness.

19      MR. POMPONIO:  Your Honor, the plaintiffs propose

20  that the parties stipulate that 3,052 active and retired

21  plan participants were affected by the 2015 termination of

22  the plan.

23      THE COURT:  That covers it?

24      MR. PETSONK:  It would be the 2014 curtailment and

25  the 2015 elimination.

1          THE COURT:  What is it that you are asking now?

2     Let's do it once.  Why can't you just get together and

3     confer with each other and provide a simple statement?

4          MR. POMPONIO:  3,052 active and retired plan

5     participants were affected by the 2014 curtailment of the

6     plan benefits and the 2015 termination.

7          MR. TORRES:  Your Honor, may I be excused just to

8     call Mr. Salvatori and pose that question to him?

9          THE COURT:  You may.  We'll be in recess for 10

10    minutes.

11          THE CLERK:  All rise.

12       (A recess was taken at 11:18 a.m. until 11:31 a.m.)

13          THE CLERK:  All rise.

14          THE COURT:  Please be seated.

15     Mr. Torres, did you make contact?

16          MR. TORRES:  Yes, Your Honor.

17     Your Honor, I spoke with Mr. Salvatori.  He's trying to

18     look into the matter and understands Your Honor's desire to

19     hear back sooner rather than later as to whether we can

20     agree to the numbers that were provided to us a couple of

21     minutes ago from counsel.

22          THE COURT:  Thank you.

23          MR. TORRES:  You're welcome.

24     Your Honor, defendants call Gerald Kowzan.

25          THE CLERK:  Mr. Kowzan, if you'd please raise your

 1    right hand.

 2              **GERALD KOWZAN, DEFENDANT'S WITNESS, SWORN**

 3              THE CLERK:  Please state your name and spell it

 4    for the record.

 5              THE WITNESS:  Gerald Kowzan, G-E-R-A-L-D,

 6    K-O-W-Z-A-N.

 7              THE CLERK:  Thank you.

 8                        **DIRECT EXAMINATION**

 9    BY MR. TORRES:

10    **Q.**   Mr. Kowzan, good morning.

11    **A.**   Good morning.

12    **Q.**   Where do you currently live, Mr. Kowzan?

13    **A.**   Englewood, Florida.

14    **Q.**   Are you a party to this lawsuit?

15    **A.**   No.

16    **Q.**   Why did you agree to come testify today?

17    **A.**   I was a long-term employee of CONSOL, and they were

18    good to me, and I was subpoenaed.

19    **Q.**   You were subpoenaed?

20    **A.**   Yes.

21    **Q.**   Thank you.  When did you begin your employment at

22    CONSOL?

23    **A.**   December 1984.

24    **Q.**   When did you retire from CONSOL?

25    **A.**   May 1st 2015.

1    **Q.**   And when you were hired in at CONSOL in 1984, what was

2    your first position?

3    **A.**   I was in accounting.  I was in accounting.

4    **Q.**   Thank you.  How long were you in accounting?

5    **A.**   About two years.

6    **Q.**   So until about 1986?

7    **A.**   Yes.

8    **Q.**   What happened in 1986?

9    **A.**   I switched over to Human Resources.

10   **Q.**   Okay.  And where were you located?

11   **A.**   I was a -- I started out as a personnel assistant at

12   the Wheeler Creek, W-H-E-E-L-E-R, Creek Mine in Illinois.

13   **Q.**   Illinois.  How long were you in Illinois?

14   **A.**   I was in Illinois until May -- or -- April of 2003.

15   **Q.**   What happened in 2003?

16   **A.**   I was transferred to Virginia.

17   **Q.**   Okay.  And did you have the same job?

18   **A.**   I had the same title, Supervisor of Human Resources for

19   some locations in Virginia.

20   **Q.**   Okay.  And were those represented or nonrepresented

21   locations?

22   **A.**   Those were represented.

23   **Q.**   Okay.  And how long were you at the Virginia location

24   after you went there in 2003?

25   **A.**   I stayed in Virginia until 2015, until I retired.

1    **Q.**   Okay.  Did your title change -- after you became HR

2    Supervisor in 2003, did you ever have any other positions at

3    CONSOL?

4    **A.**   I was promoted to manager of Central App operations, in

5    2006.

6    **Q.**   And how long did you hold that position?

7    **A.**   Until I retired in 2015.

8    **Q.**   Okay.  When you were a HR supervisor then from 2003 to

9    2006, what locations were you responsible for?

10   **A.**   Buchanan, CONSOL of Kentucky, and then when we

11   purchased AMVEST, Fola operations.

12   **Q.**   I think I asked a bad question.

13       When you were the HR supervisor in 2003, where were you

14   located?

15   **A.**   At Virginia.

16   **Q.**   Okay.  And what locations were you responsible for

17   beginning in 2003?

18   **A.**   Miller Creek and Amonate.

19   **Q.**   And you said those are represented locations?

20   **A.**   Yes.

21   **Q.**   And when you were manager of HR in 2006, what mines

22   were you responsible for?

23   **A.**   Well, I wasn't directly responsible, but I was over the

24   HR functions for Buchanan, CONSOL of Kentucky, and also

25   Amonate, and Meadow Branch was still open at that time.  And

1    when we purchased Fola -- or AMVEST, then Fola, and there

2    was another surface mine and an underground operation, as

3    well, I can't remember their names.

4    **Q.**   Okay.  So in terms of this mine, there was 90 union

5    employees when you become HR that would have been Buchanan,

6    CONSOL of Kentucky, and later on, the AMVEST-Fola operation?

7    **A.**   That is correct.

8    **Q.**   All right, thank you.  I apologize for the confusion.

9         While you were the HR -- Manager of HR, beginning in

10   2006, what, if any, responsibility did you have for CONSOL

11   Pennsylvania mine sites?

12   **A.**   None.

13   **Q.**   Mr. Kowzan, while you were the manager of HR, beginning

14   in 2006, were you familiar with CONSOL's retiree medical

15   benefit plans?

16   **A.**   Yes.

17   **Q.**   And what did those medical plans, if anything, state

18   regarding CONSOL's right to cancel or terminate them?

19   **A.**   Well, it was in the Summary Plan Descriptions.

20   **Q.**   Okay.  What about that?

21   **A.**   There was a statement that said that CONSOL had a right

22   to change or to terminate.

23   **Q.**   Thank you.  Focusing again on the time period from 2006

24   until your retirement, Mr. Kowzan, did you have any

25   involvement in employee orientation programs?

1    **A.**    Yes.

2    **Q.**    At what locations?

3    **A.**    Well, the ones I mentioned.

4    **Q.**    Okay.

5    **A.**    Buchanan, CONSOL Kentucky, Fola operations.

6    **Q.**    Okay.  And in those orientations that you participated

7    in, Mr. Kowzan, what portion of your orientation would you

8    cover?

9    **A.**    The section that showed the advantages to the

10    union-free operation.

11    **Q.**    Okay.  In the course of presenting the union-free

12    portion of the orientation, Mr. Kowzan, what, if any,

13    information did you present regarding retiree medical

14    benefits?

15    **A.**    None.

16    **Q.**    And in conducting the union-free orientations you just

17    referred to, Mr. Kowzan, what, if any, comparisons did you

18    make between UMWA and CONSOL retiree medical benefits?

19    **A.**    None.

20    **Q.**    Aside from the orientations that you just referred to,

21    Mr. Kowzan -- and, again, focusing on the time period 2006

22    to 2015 -- did you participate in any other presentations

23    for CONSOL employees at which you discussed CONSOL's retiree

24    medical benefits?

25    **A.**    Repeat that again .

1    Q.   Sure.  Putting aside the orientations you just
2    testified about, during the period 2006 to 2015, did you
3    participate in any other presentations to CONSOL employees
4    at which you discussed CONSOL's retiree medical benefits?
5    A.   The only thing was, when we bought Fola, they did not
6    -- they had their own plans, and we converted them to our
7    plans.  And we did a presentation at an Armory in
8    Summersville for the whole family -- well, for the spouse --
9    I shouldn't say for the whole family -- for the spouse, if
10   they wanted to come, as well as the employee.  And there was
11   a slide there that -- if I recall, I think it was just one
12   slide there, that talked about what eligibility there was
13   for retiree medical.
14   Q.   Do you remember approximately when that presentation
15   was, Mr. Kowzan?
16   A.   It was a couple years after we bought Fola.
17   Q.   Do you remember when they purchased Fola?
18   A.   No.
19   Q.   Okay.  Fair enough.  And so, again, just to be clear,
20   other than that presentation at the Armory you just
21   testified to, were there any other presentations that you
22   participated in during the period 2006 to 2015, in which you
23   made any presentations regarding CONSOL's retiree medical
24   benefits?
25   A.   Well, that's the only one I remember.

1   **Q.**   Okay.  Thank you.

2        Mr. Kowzan, do you know Emmett Casey?

3   **A.**   I remember the name.

4   **Q.**   Okay.  Do you recall ever making a presentation at Mr.

5   Casey's initial employee orientation at Buchanan?

6   **A.**   No.

7   **Q.**   Okay.  Do you recall making presentations at any other

8   meetings where Mr. Casey was present?

9   **A.**   Not particularly, no.

10   **Q.**   Do you recall ever having a conversation with Mr. Casey

11   in any other time regarding the topic of retiree medical

12   benefits?

13   **A.**   No.

14   **Q.**   Did you ever tell Mr. Casey, Mr. Kowzan, that he would

15   have lifetime retiree medical benefits?

16   **A.**   No.

17   **Q.**   Did you ever tell Mr. Casey that his retiree medical

18   benefits would vest?

19   **A.**   No.

20   **Q.**   Did you ever tell Mr. Casey that his benefits would

21   never be terminated?

22   **A.**   No.

23   **Q.**   Did you ever tell Mr. Casey to ignore or disregard in

24   CONSOL's plan the language that said they had the right to

25   modify or terminate retiree medical benefits?

1    **A.**   No.

2    **Q.**   Did you ever tell Mr. Casey that you had authority to

3    promise him something different from what was written in

4    CONSOL's plan documents or Summary Plan Descriptions?

5    **A.**   No.

6    **Q.**   Do you know Mr. Benny Fitzwater, Mr. Kowzan?

7    **A.**   I remember the name.

8    **Q.**   Do you recall discussing -- I'm sorry.

9         Do you recall having any conversations with Mr.

10   Fitzwater -- strike that.

11        Do you recall making any presentations when Mr. --

12   where Mr. Fitzwater was present?

13   **A.**   Not particularly, him, no, or anyone really.

14   **Q.**   Okay.  Do you recall having any discussions with Mr.

15   Fitzwater regarding his retiree medical benefits?

16   **A.**   No.

17   **Q.**   Do you recall having any meetings with Mr. Fitzwater

18   regarding his retirement from CONSOL?

19   **A.**   No.

20   **Q.**   Do you recall ever telling Mr. Fitzwater that he would

21   have lifetime retiree medical benefits, Mr. Kowzan?

22   **A.**   No.

23   **Q.**   Did you ever tell Mr. Fitzwater that retiree medical

24   benefits would vest?

25   **A.**   No.

1    **Q.**   And did you ever tell Mr. Fitzwater that his benefits

2    would never be terminated?

3    **A.**   No.

4    **Q.**   Did you ever tell Mr. Fitzwater to ignore, disregard

5    language in CONSOL's plan documents that stated CONSOL had

6    the right to modify or terminate benefits?

7    **A.**   No.

8    **Q.**   And did you ever tell Mr. Fitzwater that you had

9    authority to promise him something different than what was

10   written in CONSOL's plan documents or Summary Plan

11   Descriptions?

12   **A.**   No.

13   **Q.**   Just to go to another topic briefly.

14        You said that CONSOL's SPD had reservation of rights

15   language.  Do you recall that testimony?

16   **A.**   Yes.

17   **Q.**   While you were in this time period we're talking about,

18   2006 to 2015, do you remember how the Summary Plan

19   Descriptions were distributed to employees?

20   **A.**   They received a copy during orientation, the new

21   employee orientation.  And then they would get copies in the

22   mail of whenever -- like, a change to a plan or something

23   would occur.

24   **Q.**   Okay.  So these orientations that you referred to in

25   your testimony, in the course of that employer orientation,

1  one of the things that would happen is they would get a copy

2  of the SPD, correct?

3  **A.**   That's correct.

4  **Q.**   Okay.  Mr. Kowzan, are you familiar with an individual

5  by the name of Clarence Bright?

6  **A.**   I remember the name.

7  **Q.**   Okay.  Do you recall conducting any presentations when

8  Mr. Bright was present?

9  **A.**   No.

10  **Q.**   Do you recall having any conversations with Mr. Bright

11  regarding retiree medical benefits?

12  **A.**   No.

13  **Q.**   Do you recall any conversations you ever had with Mr.

14  Bright?

15  **A.**   No.

16  **Q.**   Did you ever tell Mr. Bright that he would have

17  lifetime retiree medical benefits, Mr. Kowzan?

18  **A.**   No.

19  **Q.**   Did you ever tell Mr. Bright that his retiree medical

20  benefits would vest?

21  **A.**   No.

22  **Q.**   Did you ever tell Mr. Bright that his benefits would

23  never be terminated?

24  **A.**   No.

25  **Q.**   Did you ever tell Mr. Bright to ignore, disregard

1    language in CONSOL's plan documents that stated that CONSOL

2    had the right to modify or terminate those benefits?

3    **A.**   No.

4    **Q.**   And did you ever tell Mr. Bright that you had the

5    authority to promise him something different from what was

6    written in CONSOL's plan document or Summary Plan

7    Descriptions?

8    **A.**   No.

9    **Q.**   Mr. Kowzan, are you familiar with an individual by the

10   name of Terry Prater?

11   **A.**   I remember the name.

12   **Q.**   Okay.  Do you remember making any presentations when

13   Mr. Prater was present?

14   **A.**   No.

15   **Q.**   Do you remember discussing Mr. Prater's retirement from

16   CONSOL with Mr. Prater?

17   **A.**   No.

18   **Q.**   Do you remember discussing retiree medical benefits

19   with Mr. Prater at any time?

20   **A.**   No.

21   **Q.**   Mr. Kowzan, did you ever tell Mr. Prater that he would

22   have lifetime retiree medical benefits?

23   **A.**   No.

24   **Q.**   Did you ever tell Mr. Prater that his retiree medical

25   benefits would vest?

1      **A.**   No.

2      **Q.**   Did you ever tell Mr. Prater that his benefits would

3      never be terminated?

4      **A.**   No.

5      **Q.**   Did you ever tell Mr. Prater to ignore or disregard

6      language in CONSOL's plan documents that stated CONSOL had

7      the right to modify or terminate retiree medical benefits?

8      **A.**   No.

9      **Q.**   Did you ever tell Mr. Prater that you had authority to

10     promise him something different from what was written in

11     CONSOL's plan documents or Summary Plan Descriptions?

12     **A.**   No.

13     **Q.**   Mr. Kowzan, regardless of what conversations you may or

14     may not recall with the individuals we just discussed, at

15     any time during the period 2006 to 2015, did you ever

16     describe CONSOL's retiree medical benefits to any employees

17     as vested?

18     **A.**   No.

19     **Q.**   Did you ever describe CONSOL's retiree medical benefits

20     during that time to any employee as being lifetime or

21     lifelong?

22     **A.**   No.

23     **Q.**   Did you ever tell any employee, during that time period

24     from 2006 to 2015, that CONSOL's retiree medical benefits

25     would never change?

1    **A.**   No.

2    **Q.**   Did you ever tell any employees during that period,

3    2006 to 2015, that CONSOL's retiree medical benefits would

4    never be terminated?

5    **A.**   No.

6    **Q.**   Mr. Kowzan, did you ever lie at any time to any

7    employee about their benefits or the duration of those

8    benefits while you were at CONSOL?

9    **A.**   No.

10   **Q.**   Did you ever tell any employee something different than

11   what was stated in CONSOL's plan documents and Summary Plan

12   Descriptions about the benefits CONSOL offered?

13   **A.**   No.

14   **Q.**   Did you ever tell any employee, while you were at

15   CONSOL, to ignore or disregard the reservation of rights

16   language in CONSOL's plan documents and Summary Plan

17   Descriptions?

18   **A.**   No.

19   **Q.**   Did you ever tell any employee that you had the

20   authority to promise him something different from what was

21   written in CONSOL's plan documents and Summary Plan

22   Descriptions?

23   **A.**   No.

24   **Q.**   Mr. Kowzan, did anyone from CONSOL, while you were

25   there, ever tell you that you had the authority to alter the

1    terms of CONSOL's written benefit plans?

2    **A.**    No.

3    **Q.**    Did anyone from CONSOL ever tell you to lie to

4    employees regarding CONSOL's retiree medical benefits?

5    **A.**    No.

6    **Q.**    Did anyone from CONSOL ever tell you to mislead

7    employees regarding CONSOL's retiree medical benefits?

8    **A.**    No.

9    **Q.**    Did anyone from CONSOL ever tell you to promise

10   employees that their retiree medical benefits would vest or

11   last throughout their lifetimes?

12   **A.**    No.

13   **Q.**    Did anyone from CONSOL ever tell you to tell employees

14   that their retiree medical benefits would never be

15   terminated?

16   **A.**    No.

17   **Q.**    Did anyone from CONSOL ever tell you to tell employees

18   to ignore or disregard the reservation of rights language in

19   the plan documents and SPDs that were distributed during

20   their initial orientations?

21   **A.**    No.

22   **Q.**    Did anyone from CONSOL ever tell you to make any

23   misrepresentations to employees regarding their retiree

24   medical benefits?

25   **A.**    No.

1    **Q.**   And did anyone from CONSOL ever tell you to tell

2    employees that the reservation of rights clause in CONSOL's

3    benefit plans did not apply to retiree medical benefits?

4    **A.**   No.

5         MR. TORRES:   Thank you, Mr. Kowzan.

6         Nothing further, Your Honor.

7                   **CROSS-EXAMINATION**

8    **BY MR. PETSONK:**

9    **Q.**   Hi there, Mr. Kowzan.

10   **A.**   Morning.

11   **Q.**   You testified that you never -- that during the time

12   you were the manager of HR for operations, Central App

13   operations for CONSOL, you never made comparisons between

14   the CONSOL welfare benefits plan and the UMWA welfare

15   benefits plan; is that right?

16   **A.**   That's broad.   I made some comparisons to the pension

17   plan and wages in presentations.

18         MR. PETSONK:   Your Honor, may I approach the

19   witness?

20         THE COURT:   You may.

21         MR. TORRES:   What document are you showing him?

22         MR. PETSONK:   Plaintiff's 11.

23   BY MR. PETSONK:

24   **Q.**   Mr. Kowzan, I've presented you a document that's

25   stamped Plaintiff's Exhibit 11.   And at the top, it's

 1   captioned, "Know the Facts About Wage and Benefit

 2   Improvements."

 3        Does this document look familiar to you?  I can

 4   explain -- testimony in this case indicates that this

 5   document was distributed to CONSOL employees within that

 6   Central App Region, within the time frame from '06 to '15,

 7   that you were the Manager of HR for Central App?

 8             MR. TORRES:  Well, I'm going to object, Your

 9   Honor.  I don't think the testimony in this case was any

10   such thing.

11        He should ask the gentleman whether he's familiar with

12   the document or not, rather than referring to testimony he

13   continues to mischaracterize.

14             MR. PETSONK:  He's taking the time --

15             THE COURT:  Step back and start anew.

16   BY MR. PETSONK:

17   **Q.**   Have you had time to look at the document, Mr. Kowzan?

18   **A.**   Not yet.

19   **Q.**   Okay.  Go ahead and read it.

20        Do you recollect knowing that CONSOL distributed a

21   document resembling this one?

22             THE COURT:  Please let the witness finish --

23             MR. PETSONK:  I'm sorry, Your Honor.

24             THE COURT:  -- and then you can ask him a

25   question.

```
 1              MR. PETSONK:  Sure.

 2              THE WITNESS:  Okay.  I've read it.

 3   BY MR. PETSONK:

 4   Q.   Does this document look familiar to you?

 5   A.   Yes.

 6   Q.   What do you understand that it is?

 7   A.   It is a document that was passed out during an

 8   organizing campaign at the Fola operations.

 9   Q.   Would that have been around 2010?

10   A.   I don't recall the date.

11   Q.   But it was while you were Manager of HR for the Central

12   App operations of CONSOL until 2015, right?

13   A.   Yes.

14   Q.   So this document, it does state:  "Fact:  You are

15   eligible for Retiree Healthcare (or a Healthcare

16   Reimbursement Account if you were hired after 1-1-2007) once

17   you have 10 years of service and reach age 55."

18        Is that right?

19   A.   That's what the document says, yes.

20   Q.   And down at the bottom, it says, "This is a better deal

21   than UMWA negotiated in the national contract.  And

22   remember, it didn't cost you a penny in dues or

23   assessments."

24        Right?

25   A.   That's what it says.
```

1    **Q.**   So did you draft this document?

2    **A.**   No.

3    **Q.**   Do you know who did?

4    **A.**   I'm not sure.

5    **Q.**   Did you provide this document to your subordinates

6    within the HR Department?

7    **A.**   No.

8    **Q.**   How did you come into possession of this document?

9    **A.**   It was given to me by someone else.

10   **Q.**   Who gave it to you?

11   **A.**   I'm not sure.

12   **Q.**   Was it a superior of yours within the Human Resources

13   Department?

14   **A.**   He held a higher level, yes.

15   **Q.**   And --

16   **A.**   If it was him who gave it to me.

17   **Q.**   And who are you thinking of?

18   **A.**   Tony Mayer.

19   **Q.**   And what position did Tony Mayer hold in the Human

20   Resources Department of CONSOL during this period?

21   **A.**   I'm not sure.

22   **Q.**   But he was your superior?

23   **A.**   He held a higher position.

24   **Q.**   Okay.  Do you recall Mr. Mayer giving you any other

25   documents that made this characterization about eligibility

1    for retiree healthcare, and that such benefit was superior

2    to the -- or was a better deal than the UMWA national

3    contract?

4              MR. TORRES:  Object to the form of the question.

5    He's misstating the document, Your Honor.

6              THE COURT:  Please restate the question.

7    BY MR. PETSONK:

8    **Q.**   Do you remember receiving any other document like this

9    for operations other than Fola?

10   **A.**   No.

11   **Q.**   Did you develop slideshows for presentations to

12   employees regarding their welfare benefits while you were

13   Manager of HR for Central App?

14   **A.**   No.

15   **Q.**   But you made such slideshow presentations, right?

16   **A.**   I made presentations about the decision they would have

17   to make, whether to remain a union-free operation.

18   **Q.**   And you presented those at Buchanan, right?

19   **A.**   Yes.

20   **Q.**   And at Fola or the AMVEST properties; is that right?

21   **A.**   Yes.

22   **Q.**   And at CONSOL of Kentucky; is that right?

23   **A.**   Yes.

24   **Q.**   And there is one underground mine you referenced at the

25   AMVEST properties, which I believe is referred to as the

1    Terry Eagle Mine; is that right?

2    **A.**    I don't remember it being called that.

3    **Q.**    When you made the presentations at the Fola Mine that

4    you've just referenced, what building at that facility did

5    you make them at?  If you remember?

6    **A.**    The training center.

7    **Q.**    At Drennen, West Virginia?

8    **A.**    That might have been the location.

9    **Q.**    That was CONSOL's training center, at that --

10   **A.**    Wherever the training center was located.  I don't

11   remember where it was located.

12   **Q.**    When you made those presentations, you testified -- if

13   I understand you -- that you didn't create them, but,

14   instead, you received them from someone else in HR at

15   CONSOL, right?

16   **A.**    Yes.

17   **Q.**    And was that Mr. Mayer in each instance -- or do you

18   recognize other individuals in the Human Resources office at

19   CONSOL giving you the PowerPoint presentations -- or the

20   slideshows you've just referenced?

21   **A.**    No.  They were there when I got there -- some of them.

22   And we -- they were revised at a later date.  But Mayer was

23   gone by then.

24   **Q.**    When you say they were there when you got there, are

25   you meaning that they were in your office when you arrived

1    in the position of Manager of HR for Central App?

2    **A.**    Yes.

3    **Q.**    And where was that office?  Was that at the Bluefield

4    office for CONSOL?

5    **A.**    No.  It was in Oakwood, Virginia.

6    **Q.**    Was that the regional office at that time when you

7    became the manager of it?

8    **A.**    Yes.

9    **Q.**    And was that office previously located at Bluefield?

10   **A.**    I don't know.

11   **Q.**    Okay.

12              MR. PETSONK:  Your Honor, may I approach the

13   witness?  Plaintiff's 9.  Thank you.

14              THE COURT:  You may.

15   BY MR. PETSONK:

16   **Q.**    Please take a look at the document I've handed you,

17   which is labeled Plaintiff's Exhibit 9 --

18              MR. PETSONK:  And, Your Honor, if I may inquire of

19   another exhibit simultaneously?

20              MR. TORRES:  Well, Your Honor, I don't have

21   Plaintiff's 9 as being admitted.

22              MR. PETSONK:  May I inquire of the witness about

23   Plaintiff's 12?

24              THE COURT:  Let's go back to 9.  Are you going to

25   proceed with it or not?

1          MR. PETSONK:  I can withdraw it, Your Honor.  I

2    had a similar document that was admitted.

3          THE COURT:  And so I understand, you're not

4    proceeding on Plaintiff's 9, and go on to the next item.

5          MR. PETSONK:  Thank you, Your Honor.

6          THE COURT:  This is, what?

7          MR. PETSONK:  Plaintiff's 12.

8    BY MR. PETSONK:

9    **Q.**   Mr. Kowzan, does that document look familiar to you?

10   Mr. Kowzan?

11   **A.**   May I take the time to read it?

12   **Q.**   Please do.  Yes, absolutely.

13         Plaintiff's 12 is a Benefits Information Sheet and --

14         THE COURT:  Just a moment.  The witness is

15   obviously reviewing the exhibit.

16   BY MR. PETSONK:

17   **Q.**   Mr. Kowzan, I don't mean to rush you, sir, I'm just

18   curious as to whether you are able to determine if it looks

19   familiar to you yet at this point?

20   **A.**   I don't remember this particular document.  But I've

21   seen -- I've seen -- you know, I've seen this.

22   **Q.**   Is this a form document stating information pertinent

23   to the benefits of employees within the company of CONSOL?

24   **A.**   This was -- this was created at a layoff, a

25   reduction-in-force.

1    **Q.**   So you remember that, around February of 2014, CONSOL

2    conducted a reduction-in-force at the Fola operations; is

3    that what you're referencing?

4    **A.**   I don't -- I didn't remember the date.  But it is here,

5    it says, "Effective 2-14-2013."  There was a layoff.  And

6    this would have been a sheet given to employees.

7    **Q.**   Did you develop the form for this sheet?

8    **A.**   No.

9    **Q.**   Who developed that form?

10   **A.**   Someone in corporate office.

11   **Q.**   Was it -- do you remember who?

12   **A.**   No.

13   **Q.**   When you say the corporate office, you mean the Human

14   Resources Department?

15   **A.**   Yes.

16   **Q.**   And then what you remember is that you received this

17   document from the Human Resources office in Pittsburgh; is

18   that right?

19   **A.**   Yes.

20   **Q.**   And did you meet with employees to assist them in the

21   reduction-in-force that occurred at Fola around this time

22   frame?

23   **A.**   Repeat that again.

24   **Q.**   Did you meet with employees at Fola as part of carrying

25   out the reduction-in-force that occurred in this time frame

1   at that site?

2   **A.**   I don't recall.

3   **Q.**   The document references Chase Elswick; was he a Human

4   Resources person for CONSOL at the Fola site?

5   **A.**   Yes.

6   **Q.**   Do you know if Mr. Elswick met with coal miners at the

7   site in carrying out the layoff that occurred around

8   February of 2013?

9   **A.**   I don't know.

10   **Q.**   Did you customarily travel to the Fola site in your

11   capacity as Manager of Human Resources to assist with Human

12   Resource functions at that operation?

13   **A.**   Yes.

14          MR. PETSONK:  Your Honor, may I approach?  I have

15   one other document.

16          THE COURT:  You may.

17   BY MR. PETSONK:

18   **Q.**   Here you are, Mr. Kowzan.  Mr. Torres asked you about a

19   meeting that CONSOL conducted at the Armory in Summersville,

20   West Virginia.

21          Do you recall that?

22   **A.**   Yes.

23   **Q.**   And you testified that you presented a slide to -- in

24   the course of that meeting, that addressed retiree welfare

25   benefits.  Do you remember testifying that way to Mr. Torres

1    on his examination of you here?

2    **A.**    Yes.

3    **Q.**    Now, I've presented you this document that's been

4    labeled Plaintiff's Exhibit 34.  If you look on the very

5    last page of this document, it is stamped page 91, and then

6    there is another identifying number beneath that that says,

7    CONSOL 000718.

8         Does this page appear to you to be the page that you

9    presented at that meeting at the Armory that you referenced?

10   **A.**    Appears so.

11   **Q.**    And do you see it says, "Retiree Health and Welfare" as

12   a caption to the page, and it says, "CONSOL Energy" at the

13   top of the page.  And it says, "Eligibility - Age 55 and 10

14   years of service (including AMVEST time)," right?

15   **A.**    Yes.

16   **Q.**    Now, I just handed you this document.  And you may not

17   be able to have examined every page at this point, but does

18   this page, page 91, appear to contain any language reserving

19   CONSOL's right to terminate those retirement welfare

20   benefits?

21   **A.**    This page just says what it says.  I mean -- no, there

22   is nothing about terminating.

23   **Q.**    And you're pretty sure that, as you testified earlier,

24   you distributed CONSOL's Summary Plan Descriptions at this

25   event at the Armory; is that right?

1    **A.**   I think -- I think the Summary Plan Descriptions at

2    this particular time were mailed later.

3    **Q.**   Oh, okay.  Okay.

4          MR. PETSONK:  I don't have any further questions

5    at this time, Your Honor, other than to move for admission

6    of Plaintiff's Exhibit 34.

7          THE COURT:  Any objection?

8          MR. TORRES:  Could I have just one second to look

9    at the other 90 pages of this, Your Honor?

10          THE COURT:  You may.

11          MR. TORRES:  Could I voir dire, Your Honor?

12          THE COURT:  You may.

13          MR. TORRES:  Thank you, Your Honor.

14                    **VOIR DIRE EXAMINATION**

15   **BY MR. TORRES:**

16   **Q.**   Mr. Kowzan, do you have this document in front of you

17   still?

18   **A.**   Yes.  This, yes.

19   **Q.**   Okay.  Can you hear me okay?

20   **A.**   Yes.

21   **Q.**   Okay.  So counsel was asking you a question about the

22   last page of this, which is page 91.  Is that right?

23   **A.**   Correct.

24   **Q.**   And if you look to the prior page, page 90 -- are you

25   there, sir?

1    **A.**   Yes.

2    **Q.**   Does that also cover retiree health and welfare?

3    **A.**   Yes.

4    **Q.**   And if you can tell -- so when you made your

5    presentation at Summersville, which of these two pages would

6    you have covered regarding retiree medical benefits?

7    **A.**   Both.

8    **Q.**   Both of them, okay.  And the first -- the page 90, if I

9    understand this correctly -- and tell me if I'm wrong --

10   this addresses employees who would have been hired before

11   1-1-07; is that correct?

12   **A.**   Yes.

13   **Q.**   And it's the next page, 91, Mr. Petsonk was asking you

14   about, addresses benefits for employees hired after 1-1-07;

15   is that right?

16   **A.**   Yes.

17   **Q.**   Okay.

18           MR. TORRES:  With that clarification, Your Honor.

19   We have no objection to the admission of the exhibit.

20   You're done, right?

21           MR. PETSONK:  Yes.

22           MR. TORRES:  Could I just have a minute to check

23   my notes, Your Honor, to see if there is anything I need to

24   cover?

25           THE COURT:  Yes.

1                    **REDIRECT EXAMINATION**

2     **BY MR. TORRES:**

3     **Q.**   Mr. Kowzan, do you have Plaintiff's Exhibit 11 in front

4     of you?  That's the document that says, "Know the Facts."

5     **A.**   Yes.

6     **Q.**   And I realize you didn't have a specific recollection

7     of the timing of when this document was handed out; is that

8     correct?

9     **A.**   Besides that it was during an organizing campaign.

10    **Q.**   At which location?

11    **A.**   Fola.

12    **Q.**   Okay.  And are you aware of this being used at any

13    other location or at any other time?

14    **A.**   No.

15    **Q.**   Okay.  Thank you for clarifying that.

16          And then again, just to be clear, you mentioned -- Mr.

17    Petsonk was asking you some questions about presentations

18    that you made regarding employee benefits.  And you referred

19    to the presentation you made at Summersville.

20          Do you recall that testimony?

21    **A.**   Yes.

22    **Q.**   We were just looking at the two pages you covered at

23    that presentation, correct?

24    **A.**   Correct.

25    **Q.**   Other than that presentation, do you recall making any

1    other presentations, you, personally, on employee benefits?

2    **A.**    Just -- just -- when we'd make, you know, like, a

3    difference or something like that.  And it was -- one of the

4    things we did was a comparison of wages with the UMWA

5    contract and a comparison of pensions.

6    **Q.**    Okay.  Other than those wage and pension comparisons,

7    do you recall making any other presentations regarding

8    employee benefits?

9    **A.**    No.

10    **Q.**    Okay.  Thank you for clarifying that.

11            MR. TORRES:  May I have one minute, Your Honor?

12            THE COURT:  You may.

13            MR. TORRES:  Thank you, Your Honor.

14        Thank you, Mr. Kowzan.  I have no further questions.

15            THE COURT:  Is there an objection to Plaintiff's

16    Exhibit 34?

17            MR. TORRES:  No objection to Plaintiff's Exhibit

18    34, Your Honor.

19            THE COURT:  It is admitted.

20            **Plaintiff's Exhibit 34 admitted.**

21            THE COURT:  Anything further?

22            MR. PETSONK:  No, Your Honor.

23                            **EXAMINATION**

24    **BY THE COURT:**

25    **Q.**    Mr. Kowzan, what was the purpose of the meeting at the

1    Armory in Summersville?

2    **A.**    When we -- when we bought AMVEST, we kept them -- they

3    stayed on their own benefits for a year or so.

4    **Q.**    Are you talking about Fola?

5    **A.**    Yes, mm-hmm.  And we were converting them to CONSOL's

6    benefits at the first of the year.  And so we rented a

7    location big enough where the employees could come and bring

8    their spouses, and we had two presentations going on at the

9    same time, and to accommodate them over a weekend and see

10   everybody.  And so that was the purpose of those meetings,

11   to explain the benefits that they would be going to.

12   **Q.**    And the two presentations, those were of groups of

13   employees, some hired before 2007, and some hired after

14   2007?

15   **A.**    Yes.

16   **Q.**    And you indicated that the Summary Plan Descriptions

17   were distributed after that meeting?

18   **A.**    Yes.

19   **Q.**    Those were revised Summary Plan Descriptions or were

20   they those that were already in existence?

21   **A.**    They weren't in existence, because we were -- they were

22   being printed at that particular time.

23   **Q.**    Those who were there were existing employees or wives

24   of existing employees?

25   **A.**    Correct.

KOWZAN - EXAMINATION BY THE COURT

1    **Q.**   And they were receiving the Summary Plan Descriptions

2    that would have been dealt with at that occasion at a later

3    time?

4    **A.**   Correct.

5    **Q.**   When would that have been?  If you know?

6    **A.**   Prior to them having to enroll in the benefits,

7    starting January 1.  I can't tell you the exact time.  Best

8    recall is, we had the presentations in the late summer, and

9    the Summary Plan Descriptions were then sent to their homes

10   sometime in the fall, with enough time for them to be able

11   to look at them and make a decision on what benefits they

12   wanted to enroll in for the next year when it went into

13   effect.

14   **Q.**   Thank you.  Are these employees who would have received

15   Summary Plan Descriptions on earlier occasions?

16   **A.**   These particular employees?

17   **Q.**   Yes.

18   **A.**   No.

19   **Q.**   Were those new employees?

20   **A.**   This presentation here was to current employees and

21   spouses.

22   **Q.**   Had they never received a Summary Plan Description

23   before this time?

24   **A.**   The Summary Plan Descriptions they had were the --

25   what's called the AMVEST plan -- or AMVEST Company plan.

KOWZAN - EXAMINATION BY THE COURT

1    AMVEST owned Fola, that's who we bought it from.

2    **Q.**   And so CONSOL had just taken them over?

3    **A.**   Right.

4    **Q.**   And they were providing CONSOL's plan?

5    **A.**   Starting at the first of the year.

6    **Q.**   And they were given an opportunity to figure out

7    whether they wanted to involve themselves in it, that is,

8    the various benefits, and they had until what, January, 1,

9    to make that decision?

10   **A.**   Yes.

11   **Q.**   Thank you.  Let me ask you one other question.

12       On this exhibit that you have a copy of, I think it's

13   probably the first one that was presented to you -- do you

14   see that?

15   **A.**   Yes.

16   **Q.**   It's Plaintiff's Exhibit 11.  I didn't understand

17   exactly what you were saying about whether you recall

18   receiving this "Know the Facts" exhibit from Mr. Mayer, or

19   anybody else, for that matter.

20       Do you recall having received that?

21   **A.**   I've seen it.  Whether Mr. Mayer provided this, like, a

22   copy -- here's one for you to have -- I can't say that I

23   have.  But I did see this and -- when that organizing

24   campaign was going on up there at Fola.

25   **Q.**   Thank you.

*Catherine Schutte-Stant, RDR, CRR (304) 347-3151*

1          MR. TORRES:  Could I have a few more questions of

2    Mr. Kowzan?

3          THE COURT:  You may.

4          MR. TORRES:  Thank you, Your Honor.

5                    **REDIRECT EXAMINATION**

6    **BY MR. TORRES:**

7    **Q.**   Do you remember what year the AMVEST acquisition

8    occurred?

9    **A.**   No, I do not.

10   **Q.**   Okay, fair enough.  Whenever it occurred, at the time

11   it occurred, what benefits were the Fola/AMVEST employees

12   receiving?

13   **A.**   The benefits they were on under the AMVEST ownership.

14   **Q.**   So they were still getting the benefits from the prior

15   company that --

16   **A.**   The prior company.

17   **Q.**   And I think you testified in response to the Judge's

18   questions that, at some point after the acquisition, CONSOL

19   decided to move them on to CONSOL benefits, correct?

20   **A.**   Correct.

21   **Q.**   And that was the reason you had the presentation at the

22   Armory, to explain to them what their new benefits would

23   look like?

24   **A.**   Correct.

25   **Q.**   And at that time, was there any option to stay on the

1    Fola benefits, or were they being told, we are going to give

2    you these benefits in lieu of the Fola benefits?

3    **A.**    In lieu of.

4    **Q.**    So it wasn't an either/or option?

5    **A.**    No.

6    **Q.**    And then your recollection is, after that presentation,

7    at some point in time, they were provided Summary Plan

8    Descriptions?

9    **A.**    Yes.

10    **Q.**    Okay.  Thank you for clarifying the sequence there.

11    And then going back to this document; you said that you

12    recall seeing it at some point in time related to organizing

13    activity at Fola, correct?

14            THE COURT:  You're referring to Plaintiff's 11?

15            MR. TORRES:  I apologize, Your Honor.  Yes, it's

16    Plaintiff's Exhibit 11.

17            THE WITNESS:  Correct.

18    BY MR. TORRES:

19    **Q.**    And if you look at the first paragraph under the

20    heading "Wage and Benefit Improvements" -- do you see that?

21    **A.**    Yes.

22    **Q.**    Okay.  And it makes reference to, "It's been about

23    2 1/2 half years since CONSOL bought AMVEST," correct?

24    **A.**    Correct.

25    **Q.**    And again, do you have any reason to doubt that -- have

1   any reason to doubt -- well, you don't remember when you

2   received it, correct?  You don't remember when you received

3   the document?

4   **A.**   No, I do not.

5   **Q.**   That's fair enough.

6           MR. TORRES:  Nothing further, Your Honor.

7   Thank you.

8                  **RECROSS EXAMINATION**

9   **BY MR. PETSONK:**

10  **Q.**   Mr. Kowzan, as to this transition from the Fola

11  benefits to CONSOL's benefits, once CONSOL took acquisition

12  of the Fola properties, did the CONSOL HR Department have

13  responsibility for administering benefits to those miners at

14  Fola?

15  **A.**   At the purchase -- right after the purchase?  I wasn't

16  involved with it right after the purchase.  I don't know.

17  **Q.**   You say you weren't involved.  Do you know whether

18  CONSOL was involved, that is, did they take responsibility

19  for handling benefits starting right at the time of the

20  acquisition?

21  **A.**   I do not know.  I wasn't involved.  I don't know what

22  happened at that time.

23  **Q.**   Well, the documents you've reviewed, at least, seem to

24  indicate that the AMVEST properties were acquired by CONSOL

25  in around '07, and that was during the time you were the

```
 1    Manager of HR for the Central App Region, right?
 2             MR. TORRES:  Object to the form of the question.
 3             THE COURT:  What is the objection?
 4             MR. TORRES:  Your Honor, I think he's testified he
 5    didn't recall when the Fola acquisition occurred.
 6        And Mr. Petsonk is trying to get him to agree -- I
 7    don't disagree it's 2007, but the witness said he didn't
 8    recall.
 9             THE COURT:  Start over.
10    BY MR. PETSONK:
11    Q.  You were the manager of the HR function for the Central
12    App Region of CONSOL at the time CONSOL acquired Fola?
13    A.  Yes.
14    Q.  And yet, you don't know whether CONSOL, CONSOL HR
15    Department was processing or administering benefits for
16    CONSOL's miners beginning at that -- at that time of the
17    acquisition?
18    A.  When AMVEST was purchased, at that time, the
19    determination was that it would be a stand-alone facility
20    and it didn't come under the jurisdiction of Central App
21    until at a later date.  I don't remember what date that was.
22    And that's when I got involved.
23    Q.  Okay.  I think that clarifies the witness' knowledge.
24    Thank you.
25             MR. TORRES:  Nothing further, Your Honor.
```

 1          THE COURT:  And may Mr. Kowzan be excused?

 2          MR. PETSONK:  Yes, from our standpoint.

 3          MR. TORRES:  Yes, Your Honor.  Thank you.

 4          THE COURT:  Mr. Kowzan, you're excused.  And thank

 5   you for being with us.  Let me caution you that you are not

 6   to discuss your testimony with any other witness until this

 7   trial is over, which is just about right now, I hope.

 8          THE WITNESS:  Okay.

 9          THE COURT:  And I expect you'll be glad to get

10   back to Florida.

11          THE WITNESS:  Yes, I will.

12          THE COURT:  Thank you.

13          THE WITNESS:  Okay.  Thank you.

14          THE COURT:  You can probably leave that jacket at

15   the airport.

16          THE WITNESS:  I actually drove here.  I'm not

17   ready to fly yet.  I'm not used to driving on these roads

18   anymore either.

19          THE COURT:  Does the defendant have anything

20   further?

21          MR. TORRES:  Nothing further, Your Honor.

22       Thank you.

23          THE COURT:  And does the plaintiff?

24          MR. POMPONIO:  Just the matter of the stipulation.

25          THE COURT:  And do you want to check to see if you

 1    have a response?

 2              MR. TORRES:  If I could step outside and call Mr.

 3    Salvatori, I can see where they are at, Your Honor?

 4              THE COURT:  Somebody go with Mr. Torres and come

 5    back and tell us whether he's continuing to get an answer or

 6    he can come right back here.

 7              MR. TORRES:  Thank you, Your Honor.

 8         (Mr. Torres and Ms. Bates left the courtroom.)

 9         (Pause.)

10         (Ms. Bates re-entered the courtroom.)

11              THE COURT:  What did you learn?

12              MS. BATES:  I'm sorry to keep you waiting, but Mr.

13    Salvatori is checking with someone on his staff to see if

14    they can confirm it.  And they've been working --

15              THE COURT:  I can't quite hear you.

16         Would you mind to remove your mask?

17              MS. BATES:  He's still on the phone.

18              THE COURT:  He's talking to Mr. Salvatori?

19              MS. BATES:  Yes.  And Mr. Salvatori is checking

20    with his staff.

21              THE COURT:  Very good.  Thank you.

22              MS. BATES:  I'll check back in.

23              THE COURT:  And so, I think he believes he's going

24    to get it resolved while he's talking on the phone?

25              MS. BATES:  He's trying.

```
 1              THE COURT:  Thank you.
 2         (Mr. Torres re-entered the courtroom.)
 3              MR. TORRES:  Your Honor, I haven't heard --
 4    they're fervently looking for this information, Your Honor.
 5    It relates to something that happened -- that happened six
 6    years ago.  So they've got their benefits department trying
 7    to confirm whether the information is correct.
 8         They just don't want to keep Your Honor waiting.
 9         I've asked them -- oh, there they are, Your Honor.
10    Sorry.
11              THE COURT:  Go ahead.
12         (Mr. Torres left the courtroom.)
13         (Pause.)
14         (Mr. Torres re-entered the courtroom.)
15              MR. TORRES:  Your Honor?
16              THE COURT:  Yes.
17              MR. TORRES:  Thank you for your patience, Your
18    Honor.  So my client is going to e-mail me something
19    momentarily that I can offer as a stipulation based upon
20    their review.  The numbers that the plaintiffs asked us
21    about are not correct.  I will -- but I can read what our --
22    what we understand the number to be, and then plaintiffs
23    will either agree to that or not.
24              THE COURT:  And when do you expect to get that
25    number?
```

1          MR. TORRES:  He was typing it as I hung up with

2     him, Your Honor.  So I told him to e-mail it to me

3     immediately.

4          THE COURT:  So that should be coming in

5     momentarily?

6          MR. TORRES:  Yes, Your Honor.

7          THE COURT:  And let me ask about other matters.

8       I understand, of course, the evidence has concluded,

9     but with respect to the exhibits, has the Court ruled on all

10    of them that have been presented, except for what would be

11    Plaintiff's 19, 20, and 33?

12         MR. PETSONK:  Yes, Your Honor.  Well, 20 and 33

13    stood out in my memory, and I'll check as to 19.

14         MR. TORRES:  We are checking, Your Honor.

15         MR. PETSONK:  Yes, that's correct.  Your Honor.

16         MR. TORRES:  I would agree with those, Your Honor.

17    And the only other open issue I saw, the Plaintiff's Exhibit

18    was Number 10, which they then -- if you recall, they

19    offered 10-A, and I just don't remember if 10 was withdrawn

20    or if there is anything more that needs to be done with

21    that.  I believe, Your Honor -- so, any way, that's the only

22    one we saw.

23         THE COURT:  10-A was admitted.

24       What is to be done with 10?

25         MR. PETSONK:  I don't know if it's -- that -- my

 1    instinct, Your Honor, is to allow it to remain a part of the

 2    record, but I understand it will not be considered.

 3         THE COURT:  I believe the Court simply needs to

 4    rule with certainty on it.

 5         MR. PETSONK:  Yes, Your Honor.

 6         THE COURT:  And, as I recall, that was the Enlow

 7    Fork exhibit?

 8         MR. PETSONK:  Correct.

 9         THE COURT:  It may be that it's already clear upon

10    the record, but I'll review that and decide finally on it

11    and include it for consideration, along with 19, 20, and 33

12    of the plaintiffs'.

13       And any others?

14         MR. TORRES:  We didn't have anything else, Your

15    Honor, other than that one.

16         THE COURT:  And do the plaintiffs have anything

17    else?

18         MR. PETSONK:  No, Your Honor.

19         THE COURT:  That seems to cover the record.

20       The next question that I have has to do with the

21    conclusion of the case.

22       And I would ask the parties, first, what further

23    submissions do you suggest?

24         MR. TORRES:  Your Honor, at least from the

25    defendants' perspective, given the size of the record, we

1   thought some type of post-hearing submission in lieu of any

2   sort of oral summations might be of more use to the Court,

3   after we've had a chance to review the transcript, to make

4   sure we are providing something that we think would be

5   useful to the Court in resolving any issues.

6           THE COURT:  Well, once you have the transcript,

7   what would you expect to provide?

8           MR. TORRES:  A post-hearing brief, Your Honor,

9   that just addressed the two remaining claims in relation to

10  the evidence that was admitted at trial.  And, obviously,

11  we'll meet whatever time limits or page limits Your Honor

12  thinks would be appropriate.

13          THE COURT:  Thank you.

14      What's the plaintiffs' view?

15          MR. PETSONK:  Your Honor, we are prepared to

16  provide a summation here today and to tender a very limited

17  argument or presentation as to remedies, but we can also do

18  that by brief.  We could do both.

19          THE COURT:  It seems to me that it would be

20  helpful if the parties provided in writing that which you

21  wish to present, and do so after the preparation of the

22  transcript.  I want to get this case decided soon.  And it's

23  my understanding that the reporter can prepare a transcript

24  within 14 days.  And I would ask whether or not one or more

25  of the parties would expect to order the transcript at the

1    14-day rate?

2         MR. TORRES:  We certainly intend to order at

3    whatever rate will allow us to do it as quickly as Your

4    Honor finds helpful.

5         THE COURT:  I've spoken to the court reporter, and

6    she tells me that 14 days is about as good as she can do

7    with this in view of other constraints on her time.  And so

8    we'll plan on that.

9      Once you receive that, how quickly can the briefs be

10   filed?

11     And do the parties have a proposal as to whether or not

12   the order should be other than the plaintiffs proceeding

13   initially, and then with the defendant following?

14     What do you suggest in that respect?

15        MR. TORRES:  That's fine with us, Your Honor.  And

16   subject to however much time plaintiffs think they need to

17   file their initial brief, we can file -- you know, we could

18   ask for some period of time after that, once we figure out

19   when they are going to make their submission.

20        MR. PETSONK:  I need to confer with my team here

21   so I don't obligate us collectively to submit something

22   sooner than everyone is happy with here.

23     (An off-the-record discussion was held between

24   plaintiffs' counsel.)

25        MR. PETSONK:  Your Honor, we would propose that

FITZWATER v CONSOL

1  our brief be tendered on March 22nd.

2  THE COURT:  I'm going to ask you to make it March

3  10th.

4  MR. PETSONK:  That's fine, Your Honor.

5  THE COURT:  And the defendants' response can be by

6  March 20th.  And the Court should have enough from you by

7  that time.

8  MR. TORRES:  That's fine.  March 20th is a

9  Saturday, Your Honor.

10  THE COURT:  Then make it the 19th.

11  MR. TORRES:  We'll make it whatever you need it to

12  be, Your Honor.

13  THE COURT:  If it's reasonable for you to do it.

14  The 10th is in the middle of the week.  The 19th would be

15  Friday, as I understand it.

16  MR. TORRES:  Yes, Your Honor.

17  THE COURT:  And then should the plaintiffs wish to

18  respond with something, I'm going to ask you to do it within

19  four days.

20  MR. PETSONK:  Thank you, Your Honor.

21  THE COURT:  That is, there may be something you

22  feel needs to be corrected or confronted, and you can do

23  that quickly, if you would.

24  MR. PETSONK:  And so I'm clear, that would be the

25  23rd or the 25th for our four-day period for the response?

1            THE COURT:  Well, we said the 19th, and four days

2    later would be the 23rd.

3            MR. PETSONK:  Thank you, Your Honor.

4            THE COURT:  And with that, I would ask if the

5    parties have anything further?

6            MR. TORRES:  We have nothing further, other than

7    just again texting my client to explain Your Honor is

8    awaiting this e-mail they are supposed to be sending.

9            THE COURT:  Yes.

10           MR. TORRES:  Other than that, we have nothing

11   further.

12           THE COURT:  Well, it doesn't look like you're

13   going to get an answer before we recess here momentarily.

14       I'm going to suggest that the parties confer and

15   provide something in writing to the Court.

16           MR. TORRES:  Very well, Your Honor.

17           THE COURT:  And I hope you are going to be able to

18   reach agreement on it, but we'll just see what you come up

19   with.

20           MR. TORRES:  Thank you, Your Honor.

21           THE COURT:  I would ask you, if you can respond

22   freely, Mr. Petsonk, on what did you base the three-thousand

23   figure?

24           MR. PETSONK:  We based it on two trial exhibits

25   that we had designated, one of which was entered as -- was

1  moved for entry as Plaintiff's Exhibit 23, Your Honor, but

2  it was -- it was not admitted.  And the other -- and I have

3  that document here, and it's -- on pages Bate-stamped 16195

4  and 16196 of that document are two tables setting forth the

5  number of retiree plan participants at the date that is

6  indicated here, which is April of 2015.

7        THE COURT:  The date being, again, what?

8        MR. PETSONK:  April of 2015.

9        THE COURT:  Thank you.  Well, that may be helpful

10 to --

11       MR. PETSONK:  Your Honor, there is one other

12 document which we did not move.  It was designated as a

13 trial exhibit.  It's another table that presents the

14 enrollment numbers as of the -- as of 2014 for active

15 workers who were retiree eligible, and that document is

16 designated in our pretrial submission, Your Honor, as a

17 trial exhibit.  We did not move for its entry.  It's

18 Bate-stamped 15433, CONSOL 15433.

19       THE COURT:  Mr. Torres is nodding in agreement

20 that he is aware of it?

21       MR. TORRES:  We are aware of the document, Your

22 Honor.  That's what I provided to my client to verify this

23 agreement.

24       THE COURT:  Finally, I want to ask you one other

25 question, and I don't want to get into it in-depth, but what

1    is the position of the parties at this juncture with regard

2    to the count having to do with the timeliness, or lack of

3    it, of the presentation of Summary Plan Descriptions?  Is

4    that in issue?

5                MR. PETSONK:  Yes, Your Honor.  Simply for this

6    reason:  The new retiree plan that Mr. Salvatori addressed

7    was adopted in 2011.  Up until 2011, CONSOL's welfare

8    benefits were all tendered in one unified, one unitary plan.

9        And then for the first time, as of January 1, 2011,

10   CONSOL created a new plan, which was a retiree welfare

11   benefits plan.

12       And it is as to that new plan that we think the

13   testimony throughout the course of the trial was consistent,

14   that the plaintiffs did not receive a copy of the Summary

15   Plan Description for that new plan that they were newly

16   participating in, beginning as of 2011, Your Honor.

17               THE COURT:  Let me ask you, is the entire issue on

18   that count then riding on the point you've just made?

19               MR. PETSONK:  Yes, Your Honor.

20               THE COURT:  And so it all has to do with 2011?

21               MR. PETSONK:  Did they receive a copy of that plan

22   within 90 days after becoming participants in that new plan,

23   which became effective in 2011, yes, Your Honor.

24               THE COURT:  Thank you.

25               MR. TORRES:  As to the timing, Your Honor, we

1    believe that this claim fails, because in -- after the plan

2    was split in 2011, as Mr. Salvatori testified, the company

3    issued Summaries of Material Modifications to both the

4    active populations and the retired populations, addressing

5    the fact that the plan had been split.

6         And we believe under the Department of Labor

7    regulations that govern this, and ERISA, that, coupled with

8    the 2009 and 2010 SPDs that were in existence, satisfied any

9    notice obligations that the defendant had to communicate the

10   fact that the plan had been split and any changes associated

11   with that.

12        The other thing -- the point I would make, Your Honor,

13   is that in 2011, the date they point to as the trigger,

14   several of the plaintiffs were not even retired yet.

15        So even if you accept the premise that the splitting of

16   the plan triggered a notice obligation, for those

17   individuals who didn't retire until 2013 or 2014, they

18   couldn't argue they were a participant in the retiree plan,

19   because they hadn't yet retired.

20        So for those two reasons, Your Honor, we don't think

21   there is any merit to that point.

22             THE COURT:  Thank you.

23        Anything further on that, Mr. Petsonk?

24             MR. PETSONK:  No, Your Honor.

25             THE COURT:  I am going to expand that to ask you

1    one other question, and that is, the statute of limitations.

2        What is the position of the parties, if you understand

3    it, on that matter, and maybe it could be simplified to the

4    extent I think the SPD delivery has been simplified?

5        MR. TORRES:  Your Honor, to the extent that

6    plaintiffs in their submissions identify the splitting of

7    the plan as the trigger date, the statute of limitations

8    that we believe controls is one year from whenever they

9    claim the alleged violation was.

10       Alternatively, Your Honor, if you tie it to some later

11   point in time, you know, the announcement in 2014 that the

12   plan was going to be terminated, we believe that the -- that

13   the claim is still untimely, because we don't believe they

14   filed their suit within one year of that time, but we don't

15   believe that that's the right time period.

16       THE COURT:  You're applying the West Virginia

17   statute?

18       MR. TORRES:  Pardon?

19       THE COURT:  You're applying the West Virginia

20   statute?

21       MR. TORRES:  Yes, Your Honor, because ERISA does

22   not apply a statute of limitation for these types of claims.

23   And so it's well-established that you then borrow the most

24   analogous state statute of limitations; and as we pointed

25   out in our pretrial submission, courts have applied that

1   West Virginia statute to alleged disclosure violations of

2   this type.

3           THE COURT:  Thank you.

4       Mr. Petsonk.

5           MR. PETSONK:  My understanding is the only statute

6   of limitations argument that is currently maintained is this

7   one as to the applicable limitations period regarding the

8   claim for failure to timely disclose the Summary Plan

9   Description.  And so I will just address that issue, because

10  I understand it's the only statute of limitations issue that

11  is considered now by the Court.

12          THE COURT:  I'm not quite sure about that.

13          MR. TORRES:  I disagree, Your Honor, completely.

14  I answered the question Your Honor posed, which was as to

15  the SPD claim.  We also have a statute of limitations as to

16  the breach of the fiduciary duty claim.

17          THE COURT:  Thank you.

18          MR. PETSONK:  Your Honor, so I wanted to clarify

19  that before -- I'll address the SPD limitation period.

20  First of all, there is not a limitations period -- unlike

21  the fiduciary duty claim, where ERISA does provide a

22  limitations period -- there is not.  And so you have to make

23  the borrowing.  The most analogous limitations to the most

24  analogous claim under West Virginia law, we believe, first

25  of all, to be a contract claim, which carries a five-year

1   statute of limitations.  This is in the nature of a

2   contract.  It's -- the appropriate limitations period, if we

3   are looking to borrow from West Virginia law, should be the

4   five-year period, Your Honor, first of all.

5        Second of all, if -- even according to Mr. Torres, who

6   looks to Section 5 -- or Chapter 55, Article 2, Section 12

7   of the West Virginia Code, that section of the code offers

8   three potential defaults -- or derivative limitations

9   period, and the most applicable of which is the two-year

10  period under that statute, Your Honor, which applies to

11  claims for damage to property.

12       And this claim that we have in front of Your Honor is a

13  claim in the nature of a -- of the law of trust.  It's a

14  claim arising regarding trust property.  And that's how Your

15  Honor has, in your Summary Judgment Order, has couched the

16  breach of fiduciary duty claim.  That's how it's understood

17  by the Fourth Circuit and most of the sister circuits.

18       And so if 55-2-12 of the West Virginia Code is the more

19  appropriate statute to reference for the purposes of

20  ascertaining the limitations period, then the period set

21  forth in that statute that the Court -- I would invite you

22  to consider -- is the one that applies to damage to

23  property.

24       We've asserted the remedy that we are seeking here is

25  damage to the trust property.  And we'll set that forth.

1    And the last point, the third point as to this SPD

2    limitations issue is, even if it's a two-year or a five-year

3    or a one-year period, the purpose of the claim is that the

4    plaintiffs didn't have notice of the document.  So how could

5    they have known that it changed?

6        We think this is exactly the kind of situation where

7    discovery rules should apply to toll the limitations period

8    until the -- until the time in June of 2015, when the

9    plaintiffs were notified that their plan was terminated.

10   And so, regardless of the contract period, the property

11   damage period or even the one-year period, which really

12   should only apply to cases that, you know, that survive

13   death, the period should be tolled, Your Honor, until June

14   16th of 2015, the date when the plaintiffs discovered the

15   nature of the harm that they suffered from not receiving the

16   SPDs.

17           THE COURT:  Thank you.

18       Mr. Torres, anything else?

19           MR. TORRES:  Just briefly, Your Honor.

20       Again, if the nature of the -- if the triggering event,

21   as I said, they -- they identified 2011 in their submissions

22   as the triggering event.

23       But anyway, in September of 2014, CONSOL announced it

24   was going to terminate these benefits after a period of five

25   years.  So if there was any discovery that needed to go on,

 1     the plaintiffs were well aware that, at the latest, as of

 2     that date, CONSOL did not consider itself obligated to

 3     continue to provide these benefits for life.  So that's the

 4     latest time that the limitation period could begin.

 5          And the case law is very clear, that it's not when the

 6     harm is felt, Your Honor, but when the plaintiffs were on

 7     notice that the other party intended to take action.

 8          So there is no dispute that as of the date in September

 9     of 2014, when CONSOL announced this, it clearly was advising

10     the participants -- all of whom admitted getting that

11     letter -- that CONSOL didn't consider itself obligated to

12     provide lifetime benefits.

13          And so if there's a one-year limitation, then they are

14     too late, Your Honor.

15               THE COURT:  Thank you.

16               MR. PETSONK:  Your Honor?  Just because I wanted

17     to clarify in response very briefly, if I may, to something

18     that Mr. Torres said there.

19          He argues that the -- if this is a discovery rule, if

20     Your Honor allows the claims to -- the limitation period to

21     begin running from the date in or around October of 2014,

22     when the plaintiffs were put on notice about a change to

23     their retiree welfare benefits, we think that there is not a

24     dispute that -- that they understood their welfare benefits

25     could change.

1    The issue here is did CONSOL -- did the plaintiffs

2  understand that CONSOL reserved the right to terminate the

3  benefits.  And the plaintiffs did not learn that their

4  benefits were terminated until June of 2015, Your Honor.

5    So the -- the limitation period should not run until

6  the plaintiffs discovered the matter that they are

7  complaining about here in this case, which has been accepted

8  for trial, which is -- which is not that there is a

9  lifetime -- we are not trying the case to argue there is a

10  lifetime plan; we are simply arguing here that there were

11  misrepresentations, as you know, Your Honor, by the apparent

12  agents, and the plaintiffs discovered those

13  misrepresentations -- that is, the plaintiffs learned for

14  the first time on June of 2015, that they wouldn't have

15  healthcare coverage until they were 65.  That's when they

16  learned that.  It's June of 2015 when they learned that.

17  That's when they discovered the matter of -- the conduct

18  about which they complain in this case.

19    So if it's tolled, it should be tolled from that date,

20  Your Honor.

21    THE COURT:  Thank you.

22    The parties will doubtless be addressing those fully in

23  your briefs.

24    And I would ask, finally, anything further?

25    MR. TORRES:  Nothing from the defendant, Your

1       Honor.  Thank you for your patience throughout this.

2                    MR. PETSONK:  No further questions.

3                    THE COURT:  I want to ask you, as I mentioned a

4       moment ago, see if you can get together immediately on the

5       response that you may learn what it is before you leave the

6       building, and then you can simply file a joint statement, it

7       is hoped, that will contain the stipulation.

8                    MR. TORRES:  Yes, Your Honor.  I just did hear

9       from my client and they asked me to call.  They had one

10      thing they wanted to clarify.

11          So as soon as I do that, I will e-mail the other side,

12      and we'll get this resolved one way or the other today, Your

13      Honor.

14                   THE COURT:  Very good.  And thank you.

15          And thank you folks for your appearance and your

16      efforts in this case.  We'll await your further submission.

17      Thank you.

18                   THE CLERK:  All rise.

19          (Proceedings concluded at 1:09 p.m.)

20

21

22

23

24

25

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2         I, Catherine Schutte-Stant, Federal Official Realtime

 3    Court Reporter, in and for the United States District Court

 4    for the Southern District of West Virginia, do hereby

 5    certify that, pursuant to Section 753, Title 28, United

 6    States Code, the foregoing is a true and correct transcript

 7    of the stenographically reported proceedings held in the

 8    above-entitled matter and that the transcript page format is

 9    in conformance with the regulations of the Judicial

10    Conference of the United States.

11

12         s/Catherine Schutte-Stant, RDR, CRR

13         _____  March 9, 2021

14         Catherine Schutte-Stant, RDR, CRR
           Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```